**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 CR 869 |
| | ) | Judge Robert W. Gettleman |
| THOMAS OSADZINSKI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR A DETENTION HEARING AND
REQUEST FOR PRE-TRIAL RELEASE FROM CUSTODY ON CONDITIONS**

Defendant, **THOMAS OSADZINSKI**, by and through his attorneys, **STEVEN A. GREENBERG** and **JOSHUA G. HERMAN,** pursuant to the Bail Reform Act of 1984, 18 U.S.C. § 3142, *et seq.*, *United States v. Salerno*, 481 U.S. 739 (1987), as well as the Due Process and Excessive Bail clauses of the Fifth and Eight Amendments to the Constitution of the United States, respectfully moves for the following relief: (1) that a hearing be held pursuant to 18 U.S.C. §3142(f) so that he may present argument and evidence in support of his pre-trial release; and, (2) grant his pre-trial release from custody on strict conditions.

**I.      INTRODUCTION**

Thomas Osadzinski was a junior at DePaul University when the FBI arrested him on November 18, 2019 in a headline-grabbing terrorism case for allegedly attempting to provide material support to ISIS.[1] But the charges that followed did not accuse Thomas of attempting to

---

[1] *See*, *e.g.*, Jon Seidel, *Chicago man accused of helping preserve Islamic State propaganda on social media*, Chicago Sun Times, Nov. 19, 2019 (available at: https://bit.ly/3nKN8NE) (last visited Nov. 18, 2020); Grace Hauck, *Undercover FBI agents say Chicago college student tried to write code for ISIS*, USA Today, Nov. 20, 2019 (available at: https://bit.ly/335BMeW) (last visited Nov. 18, 2020); Michael Kan, *Student Arrested for Building ISIS Computer Propaganda Computer Program*, PC Mag, Nov. 19, 2019 (available at: https://bit.ly/2ULj5sH) (last visited Nov. 18, 2020).

1

support ISIS in any way remotely similar to the typical terrorism case one sees filed in the federal courts. Thomas did not make plans to commit acts of violence; he did not buy or attempt to buy weapons; he did not send money or material to ISIS; nor did he try to travel to overseas to join ISIS on the battlefield. Rather, as the FBI put it in its press release, the 20-year-old "designed a process that uses a computer script to make ISIS propaganda more conveniently accessed and disseminated by users on a social media platform."[2] *See also* Complaint, Dkt. #1, ¶7.

This "process" is presumably the "services" that Thomas attempted to provide to ISIS in violation of 18 U.S.C. §2339B(a)(1), as alleged in the indictment. (Dkt. #16). As will be shown as this case proceeds to trial, these unique charges not only get the evidence wrong regarding the "process," but they are also misguided because, in its zeal to achieve the impossible goal of scrubbing the Internet of all ISIS-related material, the government has stretched the material support statute beyond its bounds and, quite dangerously, in a manner that raises serious First Amendment concerns. It is not alleged that the videos, which may have intrinsic First Amendment value, are in and of themselves illegal. The charges thus pose novel questions regarding whether the alleged "services" are protected First Amendment activity, and, as such, would also be expressly *excluded* from the material support statute. *See* 18 U.S.C. §2339B(i) ("Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States."). Further, charging Thomas with making a "process" that could be used for, among other things, organizing and saving ISIS-related videos also raises important questions, and thus strong defenses, about whether Thomas was acting or attempting to act under the direction or control of ISIS or in coordination with ISIS, which the

---

[2] DOJ Press Release, *Chicago Man Charged with Attempting to Provide Material Support to ISIS*, Nov. 19, 2019 (available at: https://bit.ly/390SFeR) (last visited Nov. 18, 2020).

government must prove; or whether this is, at best, "independent advocacy," which is not illegal. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31-32 (2010) ("HLP").

Following Thomas's arrest and initial appearance, a detention hearing was waived without prejudice. Counsel now request a bond hearing and pre-trial release on strict conditions. This request is consistent with the position of Pretrial Services in its report from November 21, 2019. Notwithstanding the sensationalistic "terrorism" charges, Pretrial Services concluded that there was a combination of conditions that would reasonably assure that Thomas appears in court and the safety of the community. Pretrial Services therefore recommended that Thomas be released on bond secured by property.[3] (*See* Dkt. #10, Pretrial Bail Report).

Thomas can offer property—his parents' Highland Park home—to secure his bond.[4] His parents also offer their continuing support, as they have stood by him despite the "terrorism" label, and have maintained constant contact with him over the past year while he has been detained in the MCC, when instead he should have been finishing his college degree. His parents will offer him a stable place to live, custodial oversight, and the assurance that any other conditions imposed by the Court will be fulfilled. Thus, for the reasons set forth herein, Thomas can rebut the presumption of detention and the factors set forth in 18 U.S.C. § 3142(g) support release.

II. **ARGUMENT**

A. **Legal Standards Regarding Detention in Presumption Cases.**

Any detention analysis must begin by recognizing how the Supreme Court has emphasized that "[i]n our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *Salerno*, 481 U.S. at 755. Indeed, this presumption of release is embodied in the Bail

---

[3] Counsel will alert Pretrial Services as to this motion if a supplemental report must be prepared.

[4] Thomas was living elsewhere during the time-frame of the charges.

3

Reform Act, 18 U.S.C. § 3142. The statute states that the Court "shall order" pretrial release, § 3142(b), except in certain narrow circumstances. And even if the Court determines under § 3142(c) that an unsecured bond is not sufficient, the Court "shall order" release subject to "the least restrictive further conditions" that will "*reasonably assure*" the defendant's appearance in court and the safety of the community. 18 U.S.C. § 3142(c)(1) (emphasis added). Thus, under this statutory scheme, "it is only a 'limited group of offenders' who should be detained pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3189); *see also United States v. Byrd*, 969 F.2d 106, 110 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention."). Further, the facts that the Court uses to support a finding of detention, based on danger to the community "shall be supported by clear and convincing evidence." 18 U.S.C. § 3142(f)(2)(B). *United States v. Salerno*, 481 U.S. 739, 750 (1987). A finding that no conditions will reasonably assure a defendant's presence in court must be made by a preponderance of the evidence.

Counsel acknowledge that the material support charge brought under 18 U.S.C. § 2339B creates a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(3). That rebuttable presumption is, however, only categorical and based on the charge, not on the individual. Thus, the statute clearly permits release even for an individual charged under the terrorism statutes.

Presumption aside, the overriding question remains whether there are conditions or combinations of conditions that will reasonably assure the appearance of Defendant as required and the safety of any other person and the community. 18 U.S.C. § 3142(c). Here, it is submitted that release is warranted because factors under 18 U.S.C. § 3142(g) rebut the presumption of

detention and further demonstrate that there are conditions of release that will reasonably assure both Thomas's appearance in court and the safety of the community.

A defendant rebuts the statutory presumption by meeting a "burden of production," which involves coming forward "with *some evidence* that he will not flee or endanger the community if released." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (emphasis added). In *Dominguez*, the Seventh Circuit emphasized how the "burden of production is not a heavy one to meet." *Id*. Indeed, the presumption of detention is rebutted by "*[a]ny evidence* favorable to a defendant that comes within a category listed in § 3142(g) . . . including evidence of their marital, family and employment status, ties to and role in the community . . . and other types of evidence encompassed in § 3142(g)(2)." *Id*. (emphasis added). For instance, any "evidence of economic and social stability" can rebut the presumption. *Id.* As long as a defendant "come[s] forward with some evidence" pursuant to § 3142(g), the presumption of flight risk and dangerousness is definitively rebutted. *Id.* ("Once this burden of production is met, the presumption is 'rebutted.'") (quoting *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985)). Additionally, the burden of persuasion ultimately remains with the government, terrorism charges notwithstanding. *Dominguez*, 782 F.2d at 707; *Jessup*, 757 F.2d at 384.

After the presumption is rebutted, the Court must also consider the other evidence about the defendant's history and characteristics. *See Dominguez*, 783 F.2d at 707 ("[T]he rebutted presumption is not erased. Instead it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."). The Court should not give the presumption undue weight if evidence relating to other 18 U.S.C. § 3142(g) factors supports release.

Moreover, the Seventh Circuit has held that a judge may not detain a defendant in a presumption case based solely on evidence of past dangerousness. Even if the presumption is not rebutted, a judge is prohibited from detaining a defendant "based on evidence that he has been a danger in the past, except to the extent that his past conduct suggests the likelihood of future misconduct." *Dominguez*, 783 F.2d at 707. This means that, even when a defendant is charged with a serious crime or has a significant criminal history, there may be release conditions that will reasonably assure the safety of the community. *Id*.

Nor can the court order detention in a presumption case based solely on the seriousness of the crime charged. To rebut the presumption of dangerousness, a defendant need not "demonstrate that [the type of crime charged] is not dangerous to the community." *Dominguez*, 783 F.2d at 706. In *Dominguez*, the Seventh Circuit reversed a district court for expecting the defendants to "provide[] evidence that their participation in a narcotics distribution scheme was not a danger to the community." *Id.* As the court explained: "Under the district court's interpretation, few if any defendants in narcotics cases could ever rebut the presumption of dangerousness and thereby defeat pretrial detention." *Id*.

Lastly, the Court cannot rely solely on the weight of the evidence to detain a defendant in a presumption case. A defendant is not required to "'rebut' the government's showing of probable cause to believe that he is guilty of the crimes charged. That showing is not really at issue once the presumptions . . . have been properly triggered." *Dominguez*, 783 F.2d at 707.

In short, to rebut the presumption, a defendant simply needs to show is that there is "some evidence that he will not flee or endanger the community if released"; and, any evidence of the defendant's family ties, community ties, work history, or lack of criminal record can satisfy this requirement. *Dominguez*, 783 F.2d at 707.

## B. The Presumption of Detention is Rebutted Here.

As noted above, to rebut the presumption in this material support for terrorism case, Thomas only needs to produce "some evidence" that he will not flee or endanger the community if released. *Dominguez*, 782 F.2d at 707. Importantly, this is not a typical "terrorism" case by any stretch of the imagination, and the categorical presumption that arises due to the statutory charges is particularly ill-fitting. Indeed, Thomas can rebut the presumption by showing that "the specific nature of the crime charged, or that something about their individual circumstances, suggest that 'what is true in general is not true in the particular case.'" *Id*. at 707. Despite the fact that Thomas interacted with a number of FBI agents and employees who often dangled opportunities to see if he would take the bait, Thomas did not provide funds to ISIS, plan violent activity, acquire weapons, or take any tangible steps to causing real-world harm. Instead, the government alleges that Thomas designed a computer "process" that could be used to save and copy ISIS videos—which are alleged to be in and of themselves illegal. These charges not only exaggerate the sophistication of the "process," which will be shown to be rudimentary at best, but also raise serious First Amendment concerns.

Further, any favorable evidence listed in 18 U.S.C. § 3142(g), such as family and community ties and lack of criminal history, may be used to rebut the presumption. Thomas has strong family support and community ties. His parents have agreed to post as security their home, which has a significant amount of equity.[5] Doing so reflects trust in their son and his ability to abide by all bond conditions the court may impose. Additionally, Thomas's father works from home and can therefore supervise him along with his mother when she is not working. Thomas's

---

[5] Counsel understand that the family home is owned free-and-clear. Thomas's parents and Zillow estimate that the home has a market value of at least $350,000.00, with corresponding equity.

7

prior criminal history is minimal and consists of only a single case involving possession of a controlled substance during a Michigan camping trip from when he was eighteen years old. According to the Pretrial Services report, he received an expungeable form of probation that he successfully completed. *See* Ex. A, p. 5. He thus effectively has no criminal history, which puts him in the minority of defendants in federal criminal cases.[6] For these reasons, as well as those discussed below in context of the §3142(g) factors, Thomas has produced "some evidence" to rebut the presumption of detention.

### C. The § 3142(g) Factors Support Release on Conditions.

Section 3142(g) describes the factors for the Court to consider when determining whether there are conditions of release to reasonably assure a defendant's appearance in court and the safety of any other person in the community. In determining what conditions will assure a defendant's appearance, the Bail Reform Act directs courts to consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to the community posed by the defendant's release. 18 U.S.C. §3142(g)

*First*, the Court is to consider the nature and circumstances of the offense. 18 U.S.C. §3142(g)(1). Thomas was ultimately indicted for attempting to provide services to ISIS based on his alleged development of a "process" that can be used to save and forward ISIS-related videos that are found online. At most, this does not involve the creation of media, but rather the organization of it. In the Criminal Complaint, the government characterizes the "process" as a

---

[6] In a 2016 study the U.S. Sentencing Commission found that 72.8% of federal offenders sentenced in 2016 had been convicted of a prior offense. *See The Criminal History of Federal Offenders* May 2018), available at: https://bit.ly/2ZxBRHO (last visited Aug. 26, 2019).

8

sophisticated computer code that organized ISIS propaganda in a way that allowed end-users to download videos by their resolution size (and thus, as the government suggests in the Criminal Complaint, individuals with slower internet speeds could chose to access files that could be downloaded easier). As the evidence will show, this is not correct at all. At best, the "process" simply identified and organized already available videos by their resolution to create an offline archive—not some online repository that end-users could readily access. And, significantly, the media that was allegedly organized is not alleged to be inherently illegal.

In any event, these charges followed an extensive government investigation that began no later than February 2018 and involved a number of government employees, known as Online Covert Employees or "OCEs" who communicated online with Thomas, in addition to at least one confidential informant who met with Thomas in person. In these exchanges, Thomas frequently exaggerated about his identity and personal history to become someone he was not. He falsely boasted to make himself sound important in the eyes of others. He also developed different personae, even telling others online that he was from Chechnya, when in reality he was from Park Ridge, living in Lincoln Park, and going to college.[7] He engaged people in many online messaging

---

[7] In online messages with "OCE5" on June 30, 2018, Thomas wrote:

> My community is very Bosnian
>
> And I'm chechen Russian
>
> We all get along

The FBI's OCE5 responded:

> Mashallah! I am impressed akhi
>
> Abu Omar Al Shishani is one of my heroes and a glorious shaheed….

BINDER_006-OCE_001-000018. Thomas is not "chechen Russian" but making up this identity triggered the OCE5's reference to Abu Omar Al Shishani, who was a "Georgian Chechen jihadist" who served as an ISIS commander in Syrian. *See* https://bit.ly/3kUeTRR. As part of this constructed online identity, Thomas even made up a story that his parents left Russia after the "Beslan school hostage crisis" in 2004. BINDER_006-OCE5_001-000007.

and video game forums, and might very well be considered an "Internet troll."

The government will likely point to how Thomas made politically-related comments sympathizing with ISIS, and how on November 2, 2019, he even pledged "bayat" or allegiance to ISIS that, like a true millennial, he photographed to commemorate and shared on social media to OCE4. (Dkt. #1, ¶81). And even these exaggerated comments reflect a confused identity that Thomas was exploring on the fringes of the Internet. Indeed, as a recent convert to Islam who, at best, knew rudimentary Arabic,[8] he often confessed ignorance about basic phrases or concepts that came up in online chats and largely responded to comments made by the OCEs and confidential informant. Even the "bayat" note made on November 2, 2019, was plainly made in response to a question posed by one of the government operatives. Not reflected in the Criminal Complaint is the fact how on November 1, 2019 the confidential informant who befriended and employed Thomas asked, "Did you do your bayiea yet?" Thomas replied: "not yet akhi. I don't know the words." (CHS-COM_001-000430).[9]

While Thomas often falsely boasted about his background and experience as he searched for companionship and acceptance online, he was earnest when he said that he did not believe he was violating the law. On or about July 5, 2018, Thomas had an online chat with an OCE about being watched by the FBI. The OCE asked, "they just lookin for dawla videos?" Thomas then responded, "i have no weapons. and videos aren't illegal. there's really nothing they can do lol." D-Binder_006-OCE5_001-000044; BINDER_006-OCE5_001-000065. Thomas's belief that he

---

[8] Osadzinski's college transcript, which can be provided to the Court under seal upon request, shows that he enrolled in "Basic Arabic" as a sophomore at DePaul.

[9] It is, of course, telling how Thomas said he "renewed" a pledge that he just admitted he did not know the words to. It is also noteworthy how this "bayat" occurred well after the "process" was developed and just days before the arrest.

was not violating the law is a significant factor when considering the nature and circumstances of the offense, particularly as the government will have to prove that he *knowingly* provided material support to ISIS.

*Second*, 18 U.S.C. §3142(g)(2) instructs the Court to consider the weight of the evidence. This is the least important factor to consider. Suffice it to say for now, there will be significant disputes as to the government's characterization of the evidence, namely the purported sophistication and use of the "process" Osadzinski supposedly developed. This was akin to a school project, not a complicated computer code. While counsel anticipates that expert testimony will still be necessary, it will mainly be used to explain how basic the "process" was. But most importantly, the government will have the burden of showing that Osadzinski attempted to act under the direction and control of ISIS or in coordination with ISIS. *HLP,* 561 U.S. at 31-32. The evidence will not show that Osadzinski tried to coordinate with ISIS members or work under their direction and control (and most certainly it will not show that he actually did so). Moreover, when one "OCE" offered to introduce Thomas to members of the "Diwan," which presumably meant ISIS, Thomas made excuses and put him off. Specifically, on June 6, 2018, OCE1 wrote, "when you are ready and if you are really serious about meeting like minded brothers in your country, I can start to talk to the diwan here and see if they want to help you." Thomas responded, "alhamadullah insha'Allah. I have much learning to do. InshaAllah in the near future." D_OCE1-COM_001-000062A. Surely, someone who desired to provide material support to ISIS would have responded differently.

Counsel are confident that a serious challenge to the material support charge may be made under *HLP*. Among other things, independent advocacy, including political support for a terrorist organization is not material support in violation of the law. The material support statute itself is

clear in that regard when it clarifies that the term "personnel" does not include: "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." *HLP*, 561 U.S. at 23 (quoting 18 U.S.C. §2339B(h)). Likewise, for "services" to amount to material support, they must reflect some type of "concerted activity, not independent advocacy." *Id. See id.*, at 24 ("We interpret 'service' along the same lines. Thus, any independent advocacy in which plaintiffs wish to engage is not prohibited by § 2339B. On the other hand, a person of ordinary intelligence would understand the term "service" to cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization."). Thus, the law does not and cannot be interpreted to "suppress ideas or opinions in the form of 'pure political speech.'" *Id.*, at 26. Instead, only a narrow category of speech is covered by the material support statute— that which is made "under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Id*.

Thus, counsel intends to challenge, through pretrial motions and/or trial, the very premise of the government's prosecution. Even accepting the allegations in the Criminal Complaint to be true, the government's case fundamentally rests on the prosecution of Thomas independently creating or using a computer script to organize media files depicting ISIS's exploits and propaganda. These files were already available on the internet and could be accessed in different websites and online applications. Independently organizing these files for personal viewing or even for uploading on other websites is easily seen as protected First Amendment activity and is not material support.

***Third***, the Court considers the history and characteristics of the defendant. 18 U.S.C. §3142(g)(3). Thomas was born in Park Ridge, Illinois, and has lived his entire life in the

Chicagoland area, mostly in the northern suburbs. He attended and graduated from Glenbrook North High School in 2017. While in high school he worked at a Target store. After graduating, Thomas enrolled at DePaul. As reflected in his college transcript, Thomas's grades spanned the spectrum, including his grades in computer classes. He received an "F" in "Python for Programmers" in the 2017-2018 Spring term. This is significant because the so-called "process" that Thomas designed used a Python computer code. His transcript also showed an interest in classes related to Middle East studies. While in college, he also worked at UPS, at the DePaul University library's help desk, and in a computer-related "beta-tester" job, which turned out to be a ruse set up by the FBI and its confidential informant.

As noted above, Thomas has virtually no criminal history. While he experimented with controlled substances in high school, he subsequently stopped using completely, attended a drug treatment program as part of his expungeable probation, and provided a clean sample following his arrest on November 19, 2019. As also reflected in the Pretrial Services Report, Thomas previously saw a mental health doctor for anxiety and was prescribed medication. This too does not weigh in favor of detention. If anything, any mental health treatment needs would be much better served outside of custody, instead of in the MCC where Thomas has received virtually no mental health treatment.

*Fourth*, the Court considers the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). Despite the "terrorism" charge, the risk of danger posed by Thomas's release is minimal. The government may very well suggest that Thomas poses some risk because he once had toy airsoft guns or played paintball with friends. These would be gross exaggerations of the risk posed by release and most certainly do not mandate detention. Likewise, the charged offense—developing a "process" that

13

could organize and save videos that are not themselves illegal—is not such an offense that suggests the community would be imperiled if Thomas was released, particularly if his access to technology was severely restricted, if not banned. Moreover, it is not alleged that Thomas had any contact with actual ISIS members (and as noted above, he even denied a chance for an introduction), much less that he worked in coordination with or under the direction or control of such individuals. As the evidence will show, rather than being an ISIS computer expert, he was a recent convert to Islam with basic college-level computer skills who was looking for an identity and seeking acceptance. He is not a risk to the community, especially with careful conditions of release that can be crafted.

### D. Conditions of Release Can Be Crafted to Reasonably Assure Thomas's Appearance and the Safety of the Community.

The standard under §3142(g) only requires conditions that can "reasonably assure" a defendant's appearance and the safety of the community. Again, Pretrial Services, with its expertise and institutional experience, believed that conditions could be crafted to reasonably assure Thomas's appearance in court and the safety of the community. Counsel must concur with that opinion. In addition to the standard conditions, Thomas's parents are prepared to post as security their house that they have paid off. Counsel also propose that some level of home detention would be appropriate, which would further assure Thomas's appearance for court and the safety of the community. Any suggestion that Thomas poses a flight risk because he has a wife in Indonesia is also misplaced, and can effectively be addressed through surrender of a passport and location monitoring. Counsel are also confident that the Pretrial Services office can craft conditions of release that would restrict Thomas's ability to access and use technology, should that also be a necessary condition. For example, Thomas's parents would agree to restrict Thomas's access to communication devices, monitor any other communications that he has, and consent to

additional monitoring by Pretrial Services through the use of monitoring software programs on any devices that Thomas is permitted to access.

### III. CONCLUSION

For the foregoing reasons and those to be presented at a future hearing, Defendant Thomas Osadzinski respectfully requests (1) that a hearing be held pursuant to 18 U.S.C. §3142(f) so that he may present argument and evidence in support of his release; and, (2) that the Court grant his pre-trial release from custody on strict conditions.

Respectfully submitted,

/s/ Steven A. Greenberg
**STEVEN A. GREENBERG,**

/s/Joshua G. Herman
**JOSHUA G. HERMAN**
Attorneys for Defendant

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 1260
Chicago, Illinois 60604
(312) 879-9500

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 457
Chicago, IL 60604
(312) 909-0434
jherman@joshhermanlaw.com

## CERTIFICATE OF SERVICE

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing was served on November 23, 2020 in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 457
Chicago, IL 60604
(312) 909-0434
jherman@joshhermanlaw.com