UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 869 |
| | ) | |
| vs. | ) | Honorable Robert W. Gettleman |
| | ) | |
| THOMAS OSADZINSKI | ) | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
REQUEST FOR PRE-TRIAL RELEASE**

The UNITED STATES OF AMERICA, through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully responds to Defendant's Motion for a Detention Hearing and Request for Pre-Trial Release from Custody on Conditions. Dkt. No. 54. Because no set of conditions can reasonably assure the safety of the community or the defendant's appearance at future proceedings, the government respectfully requests that the Court order the defendant detained pending trial.

## I. INTRODUCTION

The encrypted social media application Telegram was a darling of ISIS supporters until Telegram started shutting down ISIS channels and deleting content.[1] In response to this changed landscape, the defendant, an ISIS supporter, set out to help ISIS solve this problem. Specifically, he designed a computer script

---

[1] *E.g.,* https://www.vox.com/world/2017/6/30/15886506/terrorism-isis-telegram-social-media-russia-pavel-durov-twitter (describing Telegram as ISIS's "app of choice"); https://www.wired.com/story/opinion-isis-is-now-harder-to-track-onlinebut-thats-good-news/ (describing Telegram's "account removal campaign" against ISIS).

that directed Telegram[2] bots to copy and save ISIS official media content and other pro-ISIS information in order to help ISIS spread its message and make its materials more available to its supporters. This automated process sorted and categorized large volumes of official ISIS media content according to specified criteria, and copied it to other Telegram accounts created by the defendant, where they were preserved and could be more conveniently accessed and disseminated by other users. Without this script, the file would have to be manually transferred, a process that could take a significant amount of time.

The defendant sent the script to two FBI online covert employees ("OCEs"), whom he believed were members or supporters of ISIS and who he believed were with pro-ISIS media organizations, and to a FBI Confidential Human Source ("CHS"), whom he believed was a like-minded ISIS supporter, in order to encourage other ISIS members to employ the script.

As described in more detail below, the defendant was fully committed to ISIS. Indeed, his creation of a computer script to preserve and disseminate official ISIS media information was not the first time he worked on behalf of ISIS. In addition, he translated information for ISIS and did voiceover work in pro-ISIS videos.

The evidence also shows that the defendant was willing to engage in violence on behalf of ISIS, a risk that remains if he were to be released. Finally, the defendant is married to a woman living in Indonesia. For all of these reasons, the defendant is

---

[2] Telegram was identified as Social Media Application 1 in the complaint.

both a danger to the community and a flight risk. He should be ordered detained pending trial.

## II.    PROCEDURAL BACKGROUND

On November 15, 2019, the Honorable Sunil R. Harjani signed a complaint charging Thomas Osadzinski with attempting to provide material support and resources to a foreign terrorist organization, specifically ISIS, in violation of 18 U.S.C. § 2339B. Dkt. No. 1. Osadzinski was arrested the following day.

The defendant waived a detention hearing. Dkt. No. 7. On December 12, 2019, a grand jury sitting in the Northern District of Illinois returned an indictment charging the defendant with one count of attempting to provide material support and resources to a foreign terrorist organization, specifically ISIS, in violation of 18 U.S.C. § 2339B Dkt. No. 16.

On November 23, 2020, the defendant filed the current motion for release. Dkt. No. 54. A hearing on this motion is scheduled for December 28, 2020. Dkt. No. 57.

## III.    FACTUAL BACKGROUND

### A. The FBI Received Tips About the Defendant's Support of ISIS and Met With Defendant's Family

The defendant's fascination with ISIS and violence began long before his first interaction with law enforcement. In approximately February 2018, an ex-girlfriend of the defendant reported to the FBI that the defendant was consumed by ISIS propaganda, death, and military combat. A second ex-girlfriend confirmed the same. On March 1, 2018, the FBI interviewed defendant's parents at their home. During the interview the FBI informed his parents that they were from the Counterterrorism

3

Division of the FBI and that they were concerned with the defendant's online activities. As described below, the charged conduct in this case occurred after the FBI's meeting with defendant's parents, his proposed third party custodians. The agents also unsuccessfully tried to arrange an interview with defendant. Later, on March 27, 2018, an agent assigned to this case left a voice message for the defendant which included her name and phone number.

### B. The Defendant Provided Services to ISIS

As described in the Complaint, on or about February 7, 2019, the defendant independently contacted OCE2, who he believed was a member of a pro-ISIS media group. Compl. ¶ 29. The defendant subsequently began an online relationship with OCE2, who on March 1, 2019, sent the defendant a media report that Telegram had been banning and deleting Telegram channels used by ISIS. The defendant responded to the report, "they delete 1 we make 2 more…brother showed me how to copy channels." GX 2 at 0047. The defendant also stated that Twitter banned him in "2 minutes" after he uploaded an Amaq [official ISIS news organization] statement. *Id.* at 0054-55. During the same discussion, the defendant described using PGP (pretty good privacy) encryption methods, stating that this method is "very powerful". *Id.* at 56. He added that al Qaeda used that method and that he thought he "could make one of our own". *Id.* He also described using another program that was "completely impenetrable" and that law enforcement could "spend 1 billion dollars and they cannot break the code." *Id.* at 0057.

The next month, on or about March 27, 2019, the defendant explained to OCE2 his plan to provide support to ISIS, writing, "I will began a new and very valuable project I will be developing a custom gentoo linux[3] version designed for ansar [ISIS supporters] it can run on any computer and will be very lightweight, fast, and secure." The defendant sent OCE2 a link to a group chat, stating "I will post updates here for trusted brothers only." The defendant clarified he was working on the project "by myself. It will be very secure, in sha allah it will only browse" Telegram. "When there are less things installed the operating system is harder to hack." Compl. ¶¶ 43-44.

On or about April 11, 2019, the defendant informed OCE3, whom the defendant was referred to by OCE 2, that he used a Linux-based version of Microsoft Word. The defendant told OCE3, "I love learning about computers akhi [brother]. theyre very useful for jihad." Compl. ¶ 46. On or about May 1, 2019, the defendant sent OCE3 a video of the defendant's computer screen entitled "building the first version," which, appears to depict a Linux-based Operating System under development. The defendant stated the operating system would be "available for the ansar [ISIS supporters] to use soon," and described certain technical specifications along with features which would distinguish it from other Linux-based systems and prevent exploitation by "crusader intelligence agencies." The defendant added, "It is hard work and a lot of studying but bithnillah swt [Allah willing] I can make something useful." In the same exchange, the defendant further advised OCE3 that

---

[3] Gentoo Linux is a free computer operating system that is a highly customizable version of Linux, and "Linux" is a free computer operating system, that provides a wide range of functionalities.

in the meantime, OCE3 should use a specific operating system known for its security features along with other anonymization and encryption measures for any activity by OCE3 on [Telegram]. The defendant further spoke about creating a guide for "trusted brothers." *Id.* ¶ 47.

On August 7, 2019, on Telegram, the defendant told OCE2 "[I] did make something… I forgot to show you," and sent a screenshot depicting computer file folders labeled in Arabic with the names of various ISIS Wilayat, or provinces.[4] The defendant said these are, "all *publications* from all wilayah." Compl. ¶ 49. The defendant said "I made my own python[5] scripts to organize everything," and sent a sample of computer code stating, "i coded this… it organizes the channels." The defendant then sent two Telegram channel invitations to OCE2. The defendant said the first channel was "original," which OCE2 understood to mean the channel had been created by someone else. The defendant characterized the second channel as [the] "channel I made with the script." OCE2 joined both channels and saw that the "original" channel ("ISIS Channel 1") contained a large volume of official ISIS media releases, including Al-Furqan media content of various file sizes. *Id.* ¶¶ 49-50.

OCE2 also observed that the High Definition (HD) versions of the ISIS video from ISIS Channel 1 were being quickly and automatically added to the channel the defendant "made with the script" ("ISIS Channel 2"). Compl. ¶ 50. The defendant

---

[4] Wilayah is Arabic for province, which OCE2 understood to be a reference to provinces of ISIS. Islamic State territory was organized into Wilayat. Official ISIS media publications are often labeled according to the particular province where the footage and/or content originated.

[5] Python is a computer coding language.

explained that all of the publications that the script were copying to ISIS Channel 2 were "HD only," adding he [the defendant] had "downloaded the entire channel [ISIS Channel 1] and organized it." *Id.* The defendant further explained he had made an offline archive to house media content produced by official ISIS media outlets such as Al-Furqan and itsam. The defendant said he intended to "spread it everywhere." *Id.* Itsam is in reference to the ISIS-associated Al-I'tisam Media Foundation, and Furqan is in reference to the Al-Furqan Media Foundation, an official ISIS media organization.

On or about August 7, 2019, the defendant told OCE2 that he was going to spread the ISIS archive everywhere and make sure that nobody including law enforcement, can "take it down" from the internet. *Id.* ¶ 52. During the same conversation, when discussing operational security of the media content, the defendant stated, "i will also encrypt the files[.] so mukhabarat [intelligence agencies] cannot read them[.] the media jihad will never end…now I am making as much jihad as possible." *Id.* ¶ 53. During the same conversation, the defendant told OCE2 to use a computer program that was recommended by "ansar," that securely deleted computer files in order to prevent law enforcement from finding the files. *Id.* ¶ 54.

On or about August 16, 2019, the defendant told OCE2 he had finished copying materials produced by the Al Furqan Media Foundation[6] and was creating a document that would teach others how to use the computer script he created to copy

---

[6] Al Furqan Establishment for Media Production is an official ISIS media organization and is listed as an alias of ISIS in the State Department's Foreign Terrorist Organization designation of ISIS.

pro-ISIS material. Compl. ¶ 55. On the same day, the defendant sent OCE2 a document titled "*Operation: Heralds of the Internet.*" The document described in detail the defendant's plan to use his script written with the Python language that would sort, copy, organize, and redistribute large volumes of content from ISIS official media and other pro-ISIS channels on Telegram. The document included screenshots of the defendant's script along with detailed explanations of how the script operated. In keeping with the defendant's desire to spread the script to other ISIS supporters so that they too could preserve the ISIS recruitment material, the document further explained how the computer script could be modified by others to export information for additional ISIS channels. *Id.* ¶ 56.

On or about August 16, 2019, after the defendant sent *Operation: Heralds of the Internet* to OCE2, he told OCE2, "this document is very complicated. it is for organizing channels. but copying channels is easy. and i will do a document for that on android. so brothers who dont have a computer can do it. it will be much neater." Compl. ¶ 58. The defendant stated his intention of creating another tutorial document for copying and organizing channels on Telegram for pro-ISIS supporters who used Android cellular telephones. During the same conversation, the defendant stated,

> i am downloading the i'tisam channel and now i am almost done organizing the wilayah channel since i found a mistake i made, there was a old Furat Media channel and al-Hayat Media Center[7] channel. Almost all HD isdars. but i lost the brothers who made it."

---

[7] Like Al-Furat, Al-Hayat Media is an official ISIS media group and is included on the Department of States' designation of ISIS as a foreign terrorist organization.

Compl. ¶ 59. The defendant characterized the importance of "Furat" and "Al-Hayat" media, by stating, "they are so important akhi because they are in English so people understand." *Id.*

The defendant explained that his plan included distributing ISIS videos on Reddit, an online social media platform, with the expectation that this will divert the FBI's attention away from ISIS followers and cause law enforcement to waste time and resources by investigating others. Compl. ¶ 76. During the same conversation, OCE2 asked the defendant how he came up with the idea. In response, the defendant said, "before I was Muslim I wanted to find dawla [ISIS] videos but never could[.] its very good for dawah[8][.] the news lies about dawla videos and will never show it full[.] amin[.] I don't know them too close but I love their work[.]I try to help them[.]" Compl. ¶ 63.

**OCE4**

On October 2, 2019, the defendant, unsolicited, contacted a user account on Telegram operated by OCE4, who portrayed him/herself online as affiliated with an unofficial pro-ISIS online organization. Compl. ¶ 64. The defendant said, "ahki, do you have English translated isdarat [publications] from the wilayah? I'm a munasir [supporter] and copy channels and share." The defendant sent a screenshot showing a Telegram channel that appeared to have been created by the defendant, titled

---

[8]    Dawa    is    the    act    of    inviting    people    to    embrace    Islam. http://www.oxfordislamicstudies.com/article/opr/t125/e511

"Channel with every isdar ever." The channel appeared to contain 3,488 photos, 8,860 videos, 2,100 files, 3,457 audio files, 4 shared links, and 10 members. *Id.*

On or about October 3, 2019, OCE4 told the defendant a "brother" who knew computer code would contact the defendant on Telegram. Compl. ¶ 65. OCE4, posing as the "brother," contacted the defendant from a separate user account on Telegram and inquired about the code which copied Telegram channels. The defendant instructed OCE4 to download the application Termux, what the defendant described as "a linux emulator." Termux is an application that allows a user to run Linux tools on an Android device. A "linux emulator" was necessary because the defendant used a Linux operating system. *Id.* ¶ 65.

During the same conversation, the defendant provided OCE4 detailed instructions on how the defendant employed a Python script connected to nine bots the defendant controlled to automatically duplicate and save ISIS propaganda on Telegram. The defendant instructed OCE4 to use Termux to install Python and run the application. Once Python was installed, the defendant provided four Telegram bots for OCE4 to use for demonstration purposes. The defendant gave OCE4 directions on running Termux on an Android device. Compl. ¶ 66. The defendant demonstrated how to pull the content from a channel and post all the content into a blank channel. OCE4 watched the demonstration and observed the Python script automatically copying all the content from a channel containing 587 images, videos, text files, or audio files of Russian language ISIS propaganda and posting the content into a previously empty channel. According to OCE4, it took approximately four

minutes to copy the content of the ISIS channel and repost it into the previously empty channel. *Id.*

On or about October 3, 2019, in the same conversation, the defendant explained to OCE4 that the script is written in the Python programming language and was linked to approximately eight bots run by the defendant. The defendant explained "if you forward too many [messages] Telegram can ban or restrict your account[.] but with this bot program, Telegram never bans." Compl. ¶ 67. Telegram limits the number of messages a Bot may send to approximately 500 per minute. The defendant explained that because of this limitation, when the first bot reaches 500 messages, the Python script automatically rolls over to a second bot, and when the second bot reaches 500 messages, the Python script automatically rolls over to a third bot, and so forth. According to the defendant, the script rotates through a total of eight bots before starting again with bot one. By utilizing this Python script, the defendant was able to rapidly and automatically copy ISIS media channels on Telegram without being banned. *Id.*

On or about October 4, 2019, OCE4 informed the defendant that his directions had enabled OCE4 to successfully install and use the script. Later in the conversation, the defendant sent OCE4 a screen capture of his computer with a picture of files showing ISIS material, including magazines, speeches, and videos taken from different locations online. The defendant stated the files contain over 700GB of material, and that he had "download[ed] all and organize[d]." Compl. ¶ 68.

**CHS1**

In the winter of 2019, CHS1 met the defendant. Over the course of the relationship, CHS1 told the defendant that CHS1 was an ISIS supporter. Compl. ¶ 69. On or about August 21, 2019, during an in person meeting, the defendant invited CHS1 to a series of six channels on Telegram, ranging from "wilayah isdar," "itisam," "al-furqan," "speeches," "magazines," and stated, "these channels are all owned by me akhi, share with anyone you trust." *Id.* ¶ 73. The defendant then sent CHS1 a screenshot of the Python script he used to archive ISIS content into self-managed channels, and said "preview of copying a big channel with the script the brothers made." *Id.* The Python script the defendant sent to CHS1 appeared to be the same script he sent to OCE2 and OCE4. CHS1 asked the defendant if he acquired all these videos himself, to which the defendant replied, "some brothers made them all and I just copy them. But I did modify and sort them to 360p versions only so I can upload a full .rar[9] to archive." *Id.*

On or about October 8, 2019, CHS1 and the defendant met in person in Chicago, Illinois. During the meeting, CHS1 observed the Arch Linux operating system on the defendant's laptop. The defendant briefly showed CHS1 the password for the computer, which he kept on a piece of paper in his wallet. The defendant claimed he would swallow the piece of paper if caught by authorities. The defendant told CHS1 he runs the Python scripts for *Operation: Heralds of the Internet*. Compl. ¶ 75.

---

[9] A .rar file is a data container that stores one or more files in a compressed form.

On or about October 10, 2019 CHS1 and the defendant met in person. During the meeting, the defendant showed CHS1 how to download the necessary software. The defendant also showed CHS1 how to operate the Python script, which CHS1 was later successfully able to do on his own computer. Compl. ¶ 76. The defendant showed CHS1 how he would edit the video quality of ISIS videos he disseminated using his phone. The defendant indicated that the original Python script came from another ISIS supporter and that he edited the Python script for his ISIS preservation project. The defendant told CHS1 he had been sending screenshots with instructions for using the Python script to individuals in Chechnya to use. *Id.* The defendant discussed with CHS1 a new project he was working on using a Python script to copy and organize high quality ISIS videos. *Id.* During the same meeting, the defendant told CHS1 that he believed his project to preserve ISIS content was the "highest form of jihad." Compl. ¶ 77. The defendant informed CHS1 that "no more than ten brothers know how to do this kind of [media] jihad." *Id.*

### C. Translation Services

The defendant's devotion and support to ISIS went beyond creating and distributing the computer script discussed above. He also engaged with official ISIS media organizations to provide translation services, including a voice over on a disturbing ISIS propaganda video. On or about February 7, 2019, when the defendant first reached out to OCE2, he told OCE 2 that he had written an article, under the name Brush, called "A Message of Inspiration to the Mujahideen: Fighting the

American Crusader soldiers and their puppets" for a pros ISIS magazine called "Youth of the Caliphate." Compl. ¶ 30.

On or about February 10, 2019, the defendant told OCE2 in Arabic, *"I know English well. If you need help tell me…"* Compl. ¶ 32. On or about February 13, 2019, the defendant told OCE2 that he was working with another ISIS supporter, who had asked the defendant to translate pro-ISIS videos from Arabic to English for a pro-ISIS media group and who the defendant described as "100% not mukhabarat," meaning not law enforcement. Compl. ¶ 33. During a later conversation, on or about March 18, 2019, the defendant explained how he became involved with the pro-ISIS organization the defendant stated "I met [Individual 2] and they needed one english speaking brother. after we trusted each other then he gave me work to do and alhamdulillah I am part of it 1.5 years ago i met him." *Id.*

On or about February, 13, 2019, the defendant sent OCE2 links to a YouTube video titled, "ISIS operate freely in Iraq, and Security Forces unable to follow!!" and "TO THE CRUSADER STATE OF RUSSIA." Compl. ¶ 34. The video celebrated a deadly attack in Russia. The defendant told OCE2 that he had "presented translations to them." *Id.*

On or about February 24, 2019, OCE2 asked the defendant if he still translated for the pro-ISIS media group. The defendant responded "Yes, *thanks be to God.*" Compl. ¶ 35. The defendant then sent OCE2 files containing translations of portions of a video called "Holding firm to the Pledge 2," and stated, "I edited the translation for this one." *Id.* The video contains footage of ISIS fighters, battle footage and

includes an Arabic-language voiceover calling for ISIS fighters and supporters to stand together against the West. During the same conversation, the defendant said, "if you need any help I will help too"… "sometimes I am busy with school, but jihad is always more important than relaxing and games." *Id.*

On or about March 4, 2019, the defendant forwarded OCE2 a video produced by a pro-ISIS group. He asked OCE2, just prior to sending the video, "did you know I did the voice for [the video]. Compl. ¶ 38. The defendant then followed by sending a video, titled "The Fighting Has Just Begun," which urges Muslims to "return the flames of war into the countries of aggressors" and includes a song urging the viewer to "go and answer the call, don't spare none, kill them all, it is now time to rise, slit their throats watch them die." Compl. ¶ 38. The video ends with images of severed heads rolling on the ground. In the video, a narrator is heard delivering commentary in English, which concludes with the following:

> …To break the pride of the crusaders is an obligation until they follow the orders of the mujahideen[10] and halt their aggression. We invite you, our muwahhid[11] brother, to return the flames of war into the countries of the aggressors. Just as the planes of the crusaders burnt the homes of Muslim residents in Iraq and Sham,[12] the Muslim in their lands will retaliate with an equivalent strike.

Compl. ¶ 38.

Immediately after sending the video to OCE2, the defendant stated, "I did the voice," referring to the English-language narrator. Compl. ¶ 40. In response to OCE2's question as to the purpose of his actions – were they for jihad or the Islamic

---

[10] Mujahideen are Jihadist fighters.
[11] A muwahhid is a person who witnesses to the oneness of God.
[12] Sham is a historical term referring to the greater Syria region.

15

State, the defendant replied "both." *Id.* A few days prior, the defendant also sent OCE3 three different file versions of the same video, confirming that he had contributed vocal narration to the video. Compl. ¶ 48.

### D. The Defendant Shared Instructions for Manufacturing an Explosive and Threatened Violence Against Law Enforcement

The defendant, both online and during his interactions with covert government actors, professed a willingness and desire to commit violence against law enforcement agents, including by making an explosive belt to target law enforcement as well if faced with a potential arrest, engaging in violence or becoming martyr. The defendant was particularly fixated on a specific FBI agent assigned to this case.

On May 28, 2018, an agent assigned to this matter received a voicemail from an unknown caller who stated that he had found her name, number, and job title posted on the internet and thought it was "weird" and wanted to see if it was real. He also stated he thought she should know her information was posted online.

The caller, a college student, was identified and interviewed by the FBI. He stated that he was in Discord, a gaming chat forum, when another person who went by "Friend_of_Tawheed#6248," entered the chat and stated that he was under investigation by the FBI, that he was being followed by the FBI, and that the FBI had come to his home. The college student challenged the truthfulness of Friend of Tawheed and, in response, Friend of Tawheed shared the case agent's phone number in the chat room.

On or about June 6, 2018, the defendant, without any prompting by any government actor, posted a picture of instructions for manufacturing TATP, a highly

unstable explosive used by terrorist organizations to commit attacks, in a pro-ISIS Telegram channel called "Weapons". Compl. ¶ 26. The defendant asked if anyone in the chatroom had the video that went with the TATP instructions. The defendant and others in the chatroom discussed security measures to take while acquiring TATP ingredients and tips for handling explosives ingredients. Later in the conversation, the defendant described a video that was officially released by ISIS with English subtitles on how to make a chemical explosive in a kitchen. *Id.*

When the defendant posted to the Weapons channel, OCE1 was present on the channel. At the time, OCE1 was not aware who the defendant was, and OCE1 responded to the defendant's post about TATP. After exchanging greetings, OCE1 sent the defendant a screen capture of the TATP instructions the defendant had previously posted in the chatroom. OCE1 warned the defendant to be careful with the TATP instructions, due to the instability of the ingredients. In response, the defendant stated that "i will be doing studying. yes. i think it will be some time before i try anything." OCE1 asked the defendant if he was studying for school and the defendant replied "*for jihad*." (emphasis added). The defendant stated he would commit jihad in "America… the worst one." GX 1 at 0019.[13] OCE1 warned the defendant to pick his target carefully and not harm innocent Muslims. The defendant replied that it would be "best to Target the government…citizens can be risky unless they are in blatant kufr[14] (alcohol bars, LFBT parade/club)." *Id.* at 20.

---

[13] For reference, pertinent statements by the defendant are highlighted in yellow in the attached exhibits.

[14] Kufr is a reference to kuffar, or non-believers.

In late June 2018, the defendant forwarded OCE1, whom he believed was an ISIS supporter that he met in a "Weapons" chat room on Telegram, the March 27, 2018, voice message the FBI left for the defendant, which included the FBI agent's name and phone number.

On June 29, 2018, the defendant informed OCE1 that he had "to stay passive for now because of mukhabarat" were watching him and that he "can't get in contact with the brothers. For now." GX 1 at 0024. The defendant explained that he "was told by a knowledgeable brother to wait for now because awallahi[15] the FBI is watching me." *Id.* at 0025. The defendant also said that [there is a] "slanderous rafid[16] whore with American mukhabarat intelligence... they have 5+ agents surveilling me." *Id.* at 0026. The defendant's statement regarding a "slanderous rafid whore," is a clear reference to the female FBI agent who attempted to interview him.

OCE1 asked if the defendant could fight them, to which the defendant replied, "if I must I will attain shahadah[17] .... inshaAllah. i know a brother in contact with IS [ISIS] media department... if i do it there will be an isdar."[18] GX 1 at 0026. OCE1 asked the defendant if he had weapons. The defendant replied that he had a knife and that he knows "some brothers with guns but I prefer the Kalashnikov.[19]" *Id.* at

---

[15] Awallah is a term used to mean swearing to God.

[16] Rafid is an Arabic term which translates to 'rejecter,' and is often used by Sunni extremists as a pejorative epithet for Shi'ite Muslims.

[17] Shahada is an Arabic term for the Muslim profession of faith. Based on the content and context of this conversation it appears that OSADZINSKI meant Shaheed, which is an Islamic term for martyrdom.

[18] Isdar is an Arabic term for a news announcement.

[19] A Kalashnikov is an automatic rifle, more commonly known as an AK-47.

0027. Defendant also said, "any American employee will not be innocent. Americans who work for American law enforcement…the agents who follow me..." *Id.* at 0028.

The defendant went on to state that he knows a person that could get him a "glock17…9mm hollow tip FMJ armor piercing rounds."[20] Compl. ¶ 28. Later in the same conversation, the defendant told OCE1, "I am doing a lot of reading… like explosive making… once I get my gun and explosive belt, the mukhabarat will never get me." *Id.*

On or about March 2, 2019, the defendant talked to OCE2 about military recruiters and Selective Service Registration. The defendant advised OCE2 he would never be picked up for military service because he is on the "terrorist watch list… if they pick me… [eyeball emoji] [car emoji] [dynamite emoji]." GX 2 at 0073. It appears that the defendant was stating that if he was ever drafted by the U.S. military, he would commit a car bombing attack.

During the same conversation, the defendant discussed Nidal Hassan, the Fort Hood shooter, with OCE2. The defendant stated "there was one Mujahid who did this… he joined the American army and killed 12 of them on their base." GX 2 at 0073. The defendant subsequently sent a link to a Wikipedia article on the shooting. The defendant stated, "I keep thinking about it leaving the dunya[21] is hard" and "I do jihad in media but the sword is the other part." *Id.* at 0079. The defendant

---

[20] FMJ, or Full Metal Jacket, is a small arms projectile round.
[21] Dunya refers to the temporal world, or life on earth, as opposed to the eternal spiritual realm.

concluded, "if they ever come to arrest me by Allah, I will make dawah[22] with the sword. I will never go to their false man made court." GX 2 at 0088. OCE2 asked for clarification from the defendant, and the defendant posted emojis of a knife and two crossed swords. The defendant stated, "In sha Allah it won't happen but if Allah wills it, I will make the jihad." GX 2 at 0089.

Between March 24 and 30, 2019, the defendant sent OCE2 pictures and videos of himself using wires and tools to solder his airsoft pistol.[23] OCE2 asked if the defendant was building a bomb. *E.g.*, GX 2 at 0264-74. The defendant replied, "I want to learn how. I was fixing my gun." *Id.* at 0275.

On or about March 31, 2019, the defendant asked OCE2, "akhi. do you think you have a guide to make a detonator?" GX 2 at 0301. The defendant explained he wanted the guide because "I want to study it and practice making them so I know." *Id.* The defendant expressed his concern over the use of acetone peroxide based explosives, stating "the acetone and peroxide ones. they are not safe, right? they can explode from heat and they become less powerful after a long time." *Id.* at 0302. The defendant further stated with regard to his own readiness to use such explosives, "I am thinking about it but I don't want to do martyrdom operation and I don't want to be caught in sha Allah. I want to study and read and understand." But he then stated that he has a "good opportunity here because the city [Chicago] is big and there are

---

[22] Dawah means to invite, call or summon another. The term is often used to describe when Muslims share their faith with others, and acts include charity and proselytization.
[23] An airsoft gun is a realistic replica gun system that shoots plastic bullets using air power.

many people. I saw Baghuz[24] and it made me hate this country. I can't sit in the chair while muslims are dying." GX 2 at 0307.

During the same conversation, OCE 2 asked the defendant if he pledged "bayah," allegiance to ISIS. The defendant responded that he tried but that "he can't do it perfect." GX 2 at 0310. He then sent OCE2 a recording, presumably of the defendant pledging "bayah" to ISIS. *Id.* The defendant asked OCE2 if he had the full text in Arabic. The defendant then sent another voice message. OCE2 responded with "may allah accept from you my brother." *Id.* at 0314.

The March 31, 2019 conversation with OCE2 turned back to martyrdom. The defendant stated that he didn't think he could become a martyr but that "if there were brothers and weapons here i would do it." During the same conversation, the defendant commented on the "mukhabarat" [security and intelligence services], the defendant stated, "and if I am ever caught they won't arrest me. I will be a shahid[25] before they ever capture me." GX 2 at 0308.

On or about May 9, 2019, the defendant discussed with CHS1 his research of the case agent who had previously attempted to interview him in March 2018. The defendant stated, "So the FBI Counterterrorism Division started harassing me and my family…they said for internet activities." The defendant told CHS1,

> It's not counterterrorism, listen these people they don't have any bond for the Islamic community. They don't have any work being a police officer. They got the job, they got the job because

---

[24] Based on open source information, Baghouz was an ISIS stronghold in Syria and was taken over by US, Kurdish and European Union forces in 2019.
[25] A shahid is a martyr.

[the agent's] dad was a politician.[26] This Agent and then that was in 2016 right after Trump got elected, March 2016. So [the agent] doesn't even have the job for [the agent's] qualifications, just because it's a politician. They're not good at counterterrorism."

CHS1 then asked the defendant to clarify what he meant, to which the agent stated, "[T]he agent's dad….The agent that follows me and like tries to…Yeah, FBI!"

**E. The Defendant's Arrest and Search of His Home**

On November 16, 2019, the defendant was arrested and a search warrant was executed at the defendant's apartment. The arrest took place in a hotel room during a meeting between the defendant and CHS1. Knowing that the defendant had pledged to attack law enforcement if ever arrested, agents attempted to surprise the defendant and secure him before he had a chance to react. Despite their efforts, the defendant, consistent with his previous statements, resisted the agents.

In his room the agents found evidence of the defendant's research on the case agent. Specifically, they found a copy of the criminal complaint from the case of *United States v. Edward Schimenti and Joseph Jones*, 17 CR 236, which charged Schimenti and Jones with conspiracy to provide material support to ISIS, in violation of 18 USC 2339B. The case agent was the affiant of that complaint. They also found an ISIS flag.

Significantly, and underscoring the concern over the defendant's willingness to commit violence in the name of jihad, the agents found a crude two panel

---

[26] The case agent's father was an elected official in another state.

handwritten drawing of two individuals facing each other. The drawing was in the defendant's desk drawer. As depicted below, in the first panel, one individual is holding FBI credentials while stating, "Stop there terrorist." The second individual is pointing a gun at the agent. In the second panel, the agent appears to be dead while lying in a pool of blood, while the second person is screaming "Allah Akbar," in Arabic.



## IV.    LEGAL STANDARD

### A.    The Bail Reform Act

Bail decisions are controlled by the Bail Reform Act of 1984, codified at 18 U.S.C. §§ 3141-3156. The Act provides that, in general, a court "shall order" a defendant's pretrial release unless the court determines that there is no "condition or combination of conditions . . . [that] will reasonably assure the appearance of such

person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).

Detention is appropriate where the government proves by clear and convincing evidence that the defendant is a danger to others or to the community, or when the government proves by a preponderance of the evidence that the defendant is a risk of flight, and that in either case, there are no conditions or combination of conditions that will assure the safety of the community or the defendant's appearance at future court proceedings. *See* 18 U.S.C. §3142(f).

Whether detention is sought on the basis of flight or dangerousness, the Act lists four factors to be considered in the detention analysis:

> (1) "the nature and circumstances of the offense charged";
> (2) "the weight of the evidence against the person";
> (3) "the history and characteristics of the person"; and
> (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g).

## B.    Presumption Cases

Because the defendant has been charged with a terrorism offense under 18 U.S.C. § 2339B, there is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community. 18 U.S.C. § 3142(e)(3)(C) (18 U.S.C. § 2339B is a crime listed in 18 U.S.C. § 2332b(g)(5)).

Though rebuttable, this presumption places a burden on the defendant to produce some evidence to show that he will not constitute a danger to the public or a

serious risk of flight. Arguments are not evidence and are not sufficient to rebut the presumption. *United States v. Salkicevic*, 2015 WL 525556 *2 (N.D. IL February 10, 2015). The burden of persuasion demonstrating the need for detention nevertheless remains with the government. *See United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985). Even if the defendant presents evidence to challenge the presumption, it remains a factor to be considered by the court. *Portes*, 786 F.2d at 764; *United States v. Dominguez*, 783 F.3d 702, 707 (7th Cir. 1986) ("Use of ['rebuttable'] in this context is somewhat misleading because the rebutted presumption is not erased. Instead, it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g).").

## V.   ARGUMENT

### A.   The Defendant Has Failed to Rebut the Presumption

The defendant has failed to overcome the presumption of detention. His arguments in support of release can be boiled down to two points – his defenses, which are not appropriate for this motion, and parental oversight, which is addressed below. In any event, neither of these constitute evidence to rebut the presumption in favor of detention. *See United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) (defendant must "come forward with evidence that he does not pose a danger to the community or a risk of flight."); *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991)("[A] defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption.").

25

In sum, the defendant attempts to divert the courts attention by presenting a series of legal arguments related to the merits of his case, including the scope of the First Amendment and independent advocacy versus conduct at the direction and control of ISIS. This is not evidence. Although such arguments could be advanced in a motion to dismiss or other motion *in limine*, they not factors to be considered by the court in reviewing a motion for pre-trial release. *See* 18 U.S.C. § 3142(g); *United States v. Bilbrough*, 432 F. Supp. 261, 268 (D. Md. 2020) (finding that for purposes of detention, while defendant's "adoption of certain ideological beliefs is protected activity, his significant role in an organization that has professed support for the use of violence. . . [is] relevant to support the inference that he has an interest in engaging in violent acts.") Nonetheless, the government disagrees with the defendant's arguments related to the merits of his case and will address them if and when the defendant presents the appropriate motion.[27]

## B. The Defendant is a Danger to the Community and a Flight Risk

### 1. Nature and Circumstances of the Offense Charged

The nature of the charged offense is serious and weighs heavily against the defendant. "The nature and circumstances of the offenses [terrorism] with which the defendant has been charged could scarcely be more serious." *Salkicevic*, 2015 WL

---

[27] These arguments are also contradicted by the evidence. At trial, the government will offer evidence that the defendant did not engage in independent advocacy, including the defendant's efforts on behalf of two pro-ISIS media organizations. On behalf of ISIS, these groups created violent videos, instruction manuals on building weapons of mass destruction, improvised explosive devices, and chemical toxins for use against westerners.

525556 at *2; "It is not a common violent crime, but rather terror that rips civilization's fabric." *United States v. Sheikh*, 994 F. Supp. 2d 736, 740 (E.D.NC 2014).

The defendant's conduct was motivated not by money or greed but by a deeply held belief in ISIS and its ideology and methods, including violence. In conjunction with his adherence to ISIS's ideology, the defendant has explicitly rejected the authority of the American court system. As the defendant stated, he views this Court as a "false man made court."

Indeed, the defendant provided support to ISIS while believing the FBI was watching him. Yet, that belief did not deter him and there is no reason to expect that any conditions imposed by this Court will prevent him from continuing to provide support to ISIS, attempt to retaliate against law enforcement, or flee the country. Indeed, a defendant motivated by radical Islamic ideology is less amenable to deterrence than an individual who is not. (*See* Bruce Hoffman, *Inside Terrorism* 127-28 (2005). "[T]errorists[,] [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011), citing *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir.2003).

The defendant's fundamental rejection of this Court's authority paired with his disrespect for law enforcement suggests that he would not abide by restrictions imposed by the Court if he were released.

In addition, the defendant's conduct before his arrest involved a growing and significant interest in violence, including explosive belts, chemicals, and firearms. And as his interest in violence grew, the defendant developed and implemented a plan to assist ISIS in a way that he believed corrected a weakness in ISIS's "media jihad," namely, the ability to keep official ISIS media content and other pro-ISIS information online and available to its supporters. Specifically, he crafted a computer program that automated the copying and preservation of ISIS information online, offense conduct that demonstrates significant technical ability.

Here, the defendant searched for and sought out others whom he believed were members of pro-ISIS media groups. He solicited invitations to such groups and volunteered his services. His contacts with OCE 1, OCE2 and OCE4 were not initiated by government actors – in fact, the OCEs did not know who the defendant was when he first engaged with them.

While the defendant claims that he did not have contact with any actual ISIS members (Def. motion at 14). This is incorrect. The defendant engaged with members of ISIS media organizations. Although not specifically part of the services that are charged, by his own admission, he provided translations of ISIS propaganda videos that were graphic and glorified violence. Moreover, a witness told the FBI that the defendant acknowledged that he was communicating with ISIS supporters on password-encrypted ISIS channels on Telegram.

The defendant's argument that he was simply organizing legal videos belies the defendant's own stated understanding that his conduct constituted "media jihad."

The services he provided were designed to prevent Telegram from deleting ISIS recruitment videos and to preserve those videos in order to spread ISIS's message. The defendant also attempted to divert the FBI's focus and resources to others by uploading the videos to more conventional social media applications that are visited by individuals who are not ISIS member or supporters.

Indeed, the defendant's conduct must be considered in light of ISIS's and its supporting organizations' view that the media as crucial to advancing the goals of the Islamic State. For example, in approximately August 2015, Maktaba al-Himmah, an official media organization for the Islamic State, produced a lengthy document titled, "You are a Mujahid, O Media Man," about the importance of the mujahideen media. "Inciting jihad," said the publication, was equal to "waging jihad." The author declared that "the power of words is sharper (stronger) than atomic bombs." Additionally, the document stated, "So my dear unknown media soldier, know how valuable your role is in attaining victory…You are a mujahid for the cause of Allah." If released, including release to home confinement, there is no evidence that the defendant will stop using his technical skills to support ISIS online. Indeed, as he told OCE2 "[it] will never end…now I am making as much jihad as possible."

Moreover, the defendant employed operational security to prevent his technological efforts on behalf of ISIS from being detected and dismantled. As he told OCE2, he was going to ensure that law enforcement cannot "take it down" from the internet and that he was encrypting his files so "mukhabarat cannot read them." He

also told OCE2 that he was "very good at computer security" and that he "doesn't use windows for jihad work," but instead uses "linux." GX 2 at 0059.

The defendant's statements about his operational security were confirmed by the evidence collected in the case. In November 2019, the FBI seized multiple electronic devices from the defendant, to include the laptop computer he showed to CHS1 and his desktop computer, which contained a total of four hard drives. Those computers contained software intended to limit access to them, consistent with defendant's conversations with OCE2. In addition to the use of encryption, the defendant also accessed the internet through Virtual Private Networks (VPN), which disguise the IP address of the user (for example, giving a U.S.-based user an IP address for Sweden). *E.g.*, Compl. ¶ 52. He also utilized file deletion software. During the execution of the search warrant at his apartment, agents found thumb drives that contained software designed to wipe hard drives and other media devices. He also used two phones – one for his ISIS support and one for everyday usage.

All of the evidence indicates that the defendant will continue to provide support to ISIS if released, online or elsewhere. His earlier use of operational security measures would make it impossible for pretrial services, which cannot monitor computer usage, to detect violations of his conditions of release or new criminal conduct.

The defendant states that his parents will provide "custodial oversight" and ensure that the defendant complies with any conditions imposed by the court. Those purported good intentions are contradicted by the defendant's commission of the

30

charged crimes after his parents met with the FBI and were warned about the defendant's online activity. This should have alarmed his parents, spurred them to investigate the defendant's activities, and take measures to address the situation. Yet, as far as the government is aware, the defendant's parents did nothing or, if they responded, their efforts failed. There is no indication that his parents would be any more successful in detecting or curtailing his online activities now, in light of his motivation and his operational security skills, if he was allowed to live with them. *Sheikh*, 994 F. Supp. 2d at 739 ("Further, his family members admitted they were unaware of the conversations and conduct performed by defendant online which constitutes a large portion of the activity making up the crime alleged against him.")

The defendant also offers to allow "additional monitoring by Pretrial Services through the use of monitoring software programs on any device that [defendant] is permitted to access." Def. Motion at 14-15. This statement is wrong for two reasons. First, if released, the defendant should not have access to *any* electronic devices. Second, Pretrial Services has informed the parties that it does not have the ability to monitor any of the defendant's internet activity, making it impossible to ensure the defendant's illegal conduct would not persist. In sum, there is a real and legitimate concern that the defendant will continue to provide support to ISIS if released, which presents a danger to the worldwide community. *See United States v. Hir*, 517 F.3d 1081 (9th Cir. 2008).

In addition to the likelihood that the defendant would continue his "media jihad," the defendant has also demonstrated a strong proclivity to violence.

Specifically, while "studying for jihad," defendant researched how to construct bombs and explosive devices. He visited a Telegram chat room titled "Weapons," and he stated that he would commit an attack if approached by law enforcement or if necessary. His research reveals a potential for violence that, in light of his uncontested support for ISIS, is troubling and presents a separate danger to the community.

The defendant attempts to portray himself in a passive light – that is, he claims he was nothing more than a voyeur "exploring the fringes of the internet" (Def. motion at 10) and that he responded to "opportunities dangled" by the OCEs (Def. motion at 7). That portrayal is simply not accurate. As noted above, the defendant actively sought out people he believed to be working on behalf of ISIS and independently contacted OCEs.

Similarly, the defendant argues that his November 2019 "bayah" pledge only occurred after he was asked if he had pledged by CHS1 and that the defendant said he did not know the words. This account omits that months earlier, the defendant told OCE2 that he had pledged bayah but just did not do so perfectly. It also ignores the defendant's November 2, 2019 unsolicited pledge to the new leader of ISIS that he sent to OCE4, after ISIS announced Abu Ibrahim Al-Hashimi Al-Qurashi as the new leader of ISIS, following of death of the prior leader, Abu Bakr al-Baghdadi. On or about November 2, 2019, the defendant sent OCE4 an image of an ISIS flag with a handwritten note that stated, "I RENEW MY PLEDGE TO ABU IBRAHIM AL-HASHIMI AL-QURASHI, IN THE LAND OF AMERICA."



The defendant also identifies himself as an "internet troll." An internet troll has been defined as someone who creates "discord on the Internet by starting quarrels or upsetting people by posting inflammatory or off-topic messages in an online community."[28] While the government recognizes that the defendant may have been an internet troll on gaming forums, *i.e.* Discord, when it came to ISIS Telegram channels, as described above, he was very serious and at no time is the government aware of him every intentionally starting fights with other ISIS supporters.

In short, the charged offense is indisputably serious and the defendant faces a significant terms of imprisonment if convicted. Based on the government's evidence above, this weighs heavily in favor of detention.

### 2. The Weight of the Evidence is Strong

The weight of the evidence is strong and consists, *inter alia*, of extensive preserved conversations (either through screenshots of online communications or

---

[28] https://unlcms.unl.edu/engineering/james-hanson/trolls-and-their-impact-social-media

audio and video recordings of in person meetings) by the defendant with multiple FBI OCEs, and a CHS, only some of which are described in this motion. *See Sheikh*, 994 F. Supp. 2d at 740-41 (the Court found the weight of the evidence was strong in a terrorism offense where the defendant made statements to FBI CHS and OCEs. "The conversations took place over the internet and therefore exist in typed form."). The evidence clearly demonstrates the defendant's support for ISIS and his strong desire to assist ISIS through the use of his advanced computer skills.

The defendant argues that this factor carries the least weight yet notably does not contest the facts set forth in the complaint. He instead attempts to divert the Court's attention from the strength of the evidence by attempting to minimize the defendant's conduct. While Pretrial Services does not consider the charges or the facts in making its recommendation, the Court should strongly consider this information, which weighs in favor of detention, in deciding this motion.

### 3. The Defendant's History and Characteristics

The defendant is an avowed ISIS supporter, with a troubling interest in violence and a fixation on the FBI, including a specific agent assigned to this case. His history and characteristics confirm that he is a danger to the community and a risk of flight. The uncontested fact that the defendant contacted people he believed to be ISIS media officials and offered his support. Coupled with the defendant's explicit and repeated discussion of the use of violence against law enforcement personnel and his research of explosives in order to "study jihad," it is clear that he is a danger to the community. Moreover, the fact that he committed his criminal conduct and made

these statements knowing the FBI was investigating him, demonstrates a profound disrespect for the law and shows that prosecution or court intervention would not deter him.

Simply put, the defendant is not motivated by his desire for financial gain nor were his actions a one-time mistake. His unwavering commitment to ISIS and demonstrated efforts to thwart law enforcement show that if released his bahvior is likely to continue. He believes that supporting ISIS trumps the rules of any "man-made court." The defendant's views are wholly incompatible with following any conditions of release set by this Court and weigh heavily in favor of detention.

### F. Risk of Flight

If released, the defendant has incentive to flee and the means to do so. He is facing 20 year sentence for a significant terrorism offense. He has a wife abroad. *See.* GX 3. The defendant states in his motion that he will not be able to travel if he surrenders his passport and is on location monitoring but that ignores reality. Having a supportive spouse in another country is a strong motivator to flee and avoid a lengthy jail sentence.

The defendant's relationship with his wife in Indonesia was a topic he discussed with friends before his arrest. Specially, he told multiple friends and a CHS that he was traveling to Indonesia to get married. He stated that he met his wife on a dating app. According to a friend of the defendant, the defendant sent one of his friends pictures of the defendant's wedding in approximately June 2019 that appear to have been taken in Indonesia. GX 3. The defendant had plans to travel back to

Indonesia in November 2019 but was arrested shortly before the trip. The defendant told one friend that his wife did not disapprove of his support for ISIS.

The defendant's marriage provides a significant motivation to flee because he has family and a place to live should he leave the United States. Moreover, the United States does not have an extradition treaty with Indonesia. If the defendant were to flee there, it would be difficult, if not impossible, for the United States to have him returned to stand trial. Having a wife in Indonesia, who can provide comfort and support, compared with a trial followed by a possible lengthy period of incarceration in the United States, is a compelling factor that would motivate a defendant to flee. Finally, the defendant's ability to hide his online conduct, including from pretrial services, would allow him to plan for travel abroad without detection.

## VI.   CONCLUSION

The government's evidence shows that the defendant attempted to provide support to a violent foreign terrorist organization. Moreover, the defendant has asserted that he would commit acts of violence against law enforcement, fixating on an agent assigned to this case. He has studied and shared bomb making recipes. He has drawn a crude, but clear, depiction of him killing an FBI agent. In addition, the defendant continued to support ISIS while aware that the FBI was monitoring him. He used his technical skills to try to stop the FBI from discovering his conduct. All the while, his parents were unable or unwilling to stop his behavior. All of these facts clearly demonstrate that the defendant is a danger to the community.

Finally, the defendant, who is facing 20 years in jail, has a wife in Indonesia who is essentially a magnet drawing him to a part of the world that will provide him with a safe harbor, is a risk of flight. For all of these reasons, there is no combination of conditions that can reasonably be fashioned to protect the public or assure the defendant's appearance.

WHEREFORE, the United States respectfully requests that this Court order that the defendant be detained pending the resolution of this case.

Respectfully Submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    *s/ Barry Jonas*
BARRY JONAS
MELODY WELLS
TIFFANY ARDAM
Assistant United States Attorneys
219 S. Dearborn
Chicago, IL 60604
(312) 353-5000

Dated: December 23, 2020