**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 CR 869 |
| | ) | Judge Robert W. Gettleman |
| THOMAS OSADZINSKI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS INDICTMENT FOR**
**VAGUENESS AND UNCONSTITUTIONALITY AS APPLIED TO**
**DEFENDANT UNDER THE FIRST AND FIFTH AMENDMENTS**

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 1260
Chicago, Illinois 60604
(312) 879-9500

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 457
Chicago, IL 60614
(312) 909-0434
jherman@joshhermanlaw.com

## **TABLE OF CONTENTS**

I.   INTRODUCTION.................................................................................................... 1

II.  BACKGROUND.................................................................................................... 4

III. ARGUMENT ......................................................................................................... 6

    A.   Legal Standards........................................................................................... 6

      1.   The First Amendment ........................................................................ 7

      2.   *HLP*, the First Amendment, and the Material Support Statute .............................. 9

    B. The Material Support Statute, 18 U.S.C. §2339B(a)(1),
    is Unconstitutionally Vague as Applied to Defendant and the
    Alleged Expression and Conduct at Issue in This Case. ............................................. 14

    C. Defendant's Speech and Expression is Protected by
    First Amendment and the Charge is Unconstitutional as Applied. ............................. 19

IV.  CONCLUSION ..................................................................................................... 23

i

## **TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. ACLU*, 535 U.S. 564 (2002) ............................................................. 7

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ........................................................ 23

*Bd. of Trs. v. State Univ. of N.J. v. Fox*, 492 U.S. 469 (1989) ......................... 8

*Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012) .................................................. 7

*Board of Education v. Pico*, 457 U.S. 853 (1982) ...................................... 2, 22

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) .............................................. *passim*

*Cline v. Frink Dairy Co.,* 274 U.S. 445 (1927) ................................................ 18

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) ......................................... 18

*Elrod v. Burns*, 427 U.S. 347 (1976) .............................................................. 20

*Erznoznik v. Jacksonville*, 422 U.S. 205 (1975) ......................................... 2, 23

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ......................................... 16

*Hess v. Indiana*, 414 U.S. 105 (1973) ............................................................. 22

*Hill v. Colorado*, 530 U.S. 703 (2000) ............................................................ 20

*Holder v. Humanitarian Law Project (“HLP”)*, 561 U.S. 1 (2010) ............ *passim*

*Kolender v. Lawson*, 461 U.S. 352 (1983) .................................................. 7, 15

*Lanzetta v. New Jersey*, 306 U.S. 451 (1939) ................................................. 18

*Marbury* v. *Madison*, 5 U.S. 137 (1803) .......................................................... 9

*Matal v. Tam*, 137 S. Ct. 1744 (2017) .............................................................. 8

*Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ..... 19

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) .................................. 7

*Russell v. United States*, 369 U.S. 749 (1962) ............................................. 1, 7

*Schultz v. City of Cumberland,* 228 F.3d 831 (7th Cir. 2000) ......................... 8

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991) ......... 8

*Skilling v. United States*, 561 U.S. 358 (2010) ................................................ 7

*Smith v. Goguen*, 415 U.S. 566 (1974) ........................................................... 16

*Snyder v. Phelps*, 131 S. Ct. 1207 (2011) ............................................. 8, 20, 21

*Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011) ................................................. 19

*Terminiello v. Chicago*, 337 U.S. 1 (1949) ...................................................... 8

*Texas v. Johnson*, 491 U.S. 397 (1989) .................................................................... 8, 20

*Todd v. United States*, 158 U.S. 278 (1895) ............................................................. 14, 15

*United States v. Antzoulatos*, 962 F.2d 720 (7th Cir. 1992) ......................................... 15

*United States v. Bly,* 510 F.3d 453 (4th Cir. 2007) ......................................................... 6

*United States v. Chiochiu*, No. 2:17-cr-00306-JCM-PAL,
   2019 U.S. Dist. LEXIS 133587 (D. Nev. Apr. 8, 2019) ...................................... 19

*United States v. Hendricks*, 950 F.3d 348 (6th Cir. 2020) ............................................ 12

*United States v. Jones*, 383 F. Supp. 3d 810 (N.D. Ill. 2019) ....................................... 17

*United States v. Jones*, 689 F.3d 696 (7th Cir. 2012) ............................................. 15, 18

*United States v. Landham*, 251 F.3d 1072 (6th Cir. 2001) .............................................. 6

*United States v. Lanier*, 520 U.S. 259 (1997) ................................................................. 7

*United States v. Nagi*, 254 F. Supp. 3d 548 (W.D.N.Y. 2017) .................................. 17, 18

*United States v. Playboy Entm't Grp.*, 529 U.S. 803 (2000) ........................................... 8

*United States v. Sineneng-Smith*, 910 F.3d 461 (9th Cir. 2018) ...................................... 7

*United States v. Stevens*, 559 U.S. 460 (2010) ................................................................. 9

*United States v. Stock*, 728 F.3d 287 (9th Cir. 2013) ...................................................... 6

*United States v. White*, 610 F.3d 956 (7th Cir. 2010) .................................................. 7, 21

*United States v. Williams*, 553 U.S. 285 (2008) ............................................................ 7, 9

*United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999) .................................................... 2

*Universal City Studios v. Reimerdes*, 111 F. Supp. 2d 294 (S.D.N.Y. 2000) .................... 2

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001) ..................... 2, 19, 20

*Watts v. United States*, 394 U.S. 705 (1969) ................................................................. 6, 9

*Whitney v. California*, 274 U.S. 357 (1927) .................................................................... 2

*Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804 (7th Cir. 2014) ......................... 14

## Statutes

18 U.S.C. §2339A(b)(2) ............................................................................................ 10, 15

18 U.S.C. §2339B(a)(1) ......................................................................................... *passim*

18 U.S.C. §2339B(h) ............................................................................................... 11, 17

18 U.S.C. §2339B(i) .................................................................................................... 1, 3

18 U.S.C. §875(c) ........................................................................................................... 6

**Other Authorities**

Conference Report on S. 2845, Intelligence Reform and Terrorism
    Prevention Act of 2004, 150 Cong Rec H 10994, 11017 ......................... 16

Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA) ........................ 16

**Rules**

Fed. R. Crim. P. 7(c)(1) ........................................................................... 6

Fed. R. Crim. P. 12(b) Rule 12(b) of the Federal Rules of Criminal Procedure ....................... 1, 6

**Other Sources**

Alan K. Chen, *Free Speech and the Confluence of National Security and Internet
    Exceptionalism*, 86 FORDHAM L. REV. 379, 385-86 (2017) ........................................ 4

Christina E. Wells, *Incitement at 100—and 50—and Today:
    Assumptions about "Terrorism" and the Brandenburg Incitement Test*,
    85 BROOKLYN L. REV. 111, 126-130, 140-142, 147 (2019) ................................. 3, 22

**Constitutional Provisions**

U.S. Const. Amend. I ........................................................................... *passim*

U.S. Const. Amend. V ........................................................................... 1, 6, 7

U.S. Const. Amend. VI ........................................................................... 6

Defendant, **THOMAS OSADZINSKI**, by and through his attorneys, **STEVEN A. GREENBERG** and **JOSHUA G. HERMAN,** pursuant to the Free Speech and Due Process clauses of the First and Fifth Amendments to the Constitution of the United States, Rule 12(b) of the Federal Rules of Criminal Procedure, as well as 18 U.S.C. §2339B(i), moves to dismiss the Indictment. The single count in the Indictment charges Defendant with attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. §2339B(a)(1). However, what is really at issue in this case are Defendant's rights to free speech and expression. The government's overly zealous charge infringes upon those rights in a manner that renders the material support statute void for vagueness and unconstitutional as applied to Defendant.

## I.     **INTRODUCTION**

As best that counsel can now discern, the government's theory appears to be that Defendant attempted to provide material support or resources in the form of "services" by using a computer "process" that he allegedly designed, which in turn employed a computer "script" that organized and downloaded videos for personal review, and that, at some unknown point in the future, the videos could possibly be made available to others online.[1] This theory implicates the First Amendment on two related levels.

First, the "process" that Defendant allegedly designed—*independently and without any coordination or direction from any member of ISIS*—is itself a form of speech and expression that

---

[1] Counsel have simultaneously filed a motion seeking a Bill of Particulars, which specifically requests that the government define, with particularity, the "material support or resources" and the "services" that are alleged without elaboration in the Indictment. Counsel reserve the right to amend this Motion to Dismiss should the government define those terms in a manner that is inconsistent with counsel's present understanding of the charge against him, even though it is settled law that a Bill of Particulars cannot save an invalid indictment. *See Russell v. United States*, 369 U.S. 749 (1962). Additionally, counsel have requested that any grand jury transcripts be produced so that they can review how the government portrayed the "services" to the grand jury. To date, the government has declined to produce the one grand jury transcript that it has indicated exists.

is entitled to First Amendment protection.[2]  *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445-49 (2d Cir. 2001) (recognizing computer code as speech); *Universal City Studios v. Reimerdes*, 111 F. Supp. 2d 294, 327 (S.D.N.Y. 2000) ("As computer code—whether source or object—is a means of expressing ideas, the First Amendment must be considered before its dissemination may be prohibited or regulated. In that sense, computer code is covered or, as sometimes is said, 'protected' by the First Amendment.").

Second, the material that Defendant organized, saved, and personally reviewed also has intrinsic First Amendment value, no matter how offensive and distasteful the government may find that material to be, and no matter how sincerely the government believes that it can censor online expression, including content that it deems contrary to its interests of national security.  *Board of Education v. Pico*, 457 U.S. 853, 866-67 (1982)  ("we have held that in a variety of contexts 'the Constitution protects the right to receive information and ideas.'"); *Erznoznik v. Jacksonville*, 422 U.S. 205, 209 (1975) ("when the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power").  That is true even if the government believes that the speech and expression at issue in this case advocates the use of force.  *See Whitney v. California*, 274 U.S. 357, 374 (1927) (the government is "denied the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence."); *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969) (government cannot "proscribe advocacy of the use of force ... except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").

---

[2] For the purposes of this Motion and the standard of review that views the allegations as true (*see*, *e.g.*, *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999)), counsel will presume the government's allegations as true, but, of course, reserve the right to challenge those allegations at trial.  Any factual assertions in this Motion should not be treated as statements of Defendant.

Those strong First Amendment concerns show that the government's use of the material support statute is unconstitutional as applied, particularly under the standard set forth in *Brandenburg*, 395 U.S. 444, which this Court should apply in its analysis of these important issues. Significantly, not only does the First Amendment protect these forms of expression and conduct, but the material support statute itself *expressly exempts* First Amendment conduct. The material support statute specifically provides as follows: "Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." 18 U.S.C. §2339B(i). The mandatory "shall" language clearly evinces Congress's intent to protect First Amendment conduct. The government's aggressive prosecutive theory contravenes this clear Congressional directive.

Relatedly, the prosecution renders the material support statute, 18 U.S.C. §2339B(a)(1), unconstitutionally vague as applied to Defendant in violation of the Fifth Amendment's guarantee of fair notice, as a reasonable person would not know that independently downloading, organizing, and even sharing ISIS-related videos with others is an act of terrorism. Put simply, it is not illegal to watch ISIS-related videos, and the government cannot create a crime when Defendant independently downloaded those videos and saved copies of them.

Through this case, the government has embarked on an incredibly dangerous path that transforms viewing and sharing videos associated with a foreign terrorist organization into acts of terrorism. The Supreme Court has warned that it is precisely in times of perceived urgency and conflict that rights safeguarded by the First Amendment, especially dissenting viewpoints of the disfavored, deserve the most protection.[3] The government's theory could easily be applied in other

---

[3] *See* Christina E. Wells, *Incitement at 100—and 50—and Today: Assumptions about "Terrorism" and the Brandenburg Incitement Test*, 85 BROOKLYN L. REV. 111, 126-130, 140-142, 147 (2019) (discussing history of prosecutions of disfavored political groups and the expansive use of the "terrorism" label "to

contexts where people who review and share speech of disfavored actors risk becoming targets of federal prosecution and imprisonment. The Court should not condone the government's expansion of the material support statute by allowing the impermissible chilling of protected First Amendment expression in the name of some perceived national security exceptionalism, which could easily lead to the prosecution and perhaps persecution of disfavored viewpoints and groups.[4]

## II.   <u>BACKGROUND</u>

On November 18, 2019, Defendant was arrested and charged in a Criminal Complaint with attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. §2339B. (Dkt. #1). On December 12, 2019, the grand jury returned a one-count indictment, which charged Defendant with attempting to provide material support to a foreign terrorist organization, ISIS, in violation of 18 U.S.C. §2339B(a)(1). (Dkt. #16).

The bare-bones Indictment alleges only that beginning "no later than in or about June 2018 and continuing until in or about November 2019" Defendant "knowingly attempted to provide material support and resources, namely, services, to a foreign terrorist organization, namely, the Islamic State of Iraq and al Sham, knowing that the organization was a designated foreign terrorist organization, and that the organization had engaged in and was engaging in terrorist activity and terrorism." (Dkt. #16, "Crim. Compl."). The Indictment does not provide facts or further

_____

quell the government's critics, much as officials attempted to delegitimize dissent in earlier eras" and calling for the use of the *Brandenburg* incitement standard in material support cases).

[4] Alan K. Chen, *Free Speech and the Confluence of National Security and Internet Exceptionalism*, 86 FORDHAM L. REV. 379, 385-86 (2017) (challenging arguments calling for the relaxation of "free speech protections surrounding unlawful advocacy" online, including involving terrorism based on claims of "national security exceptionalism," described as "a concept that has frequently been invoked by First Amendment scholars to suggest that courts may relax free speech protection in cases (or in specific eras) involving acute concerns about national security" and "internet exceptionalism," described as "the idea that courts may create new First Amendment rules to reflect the 'newness' of digital communication platforms because of concerns that the internet has fundamentally transformed human communication in ways that previous generations of doctrine do not adequately accommodate.").

clarification regarding the "material support or resources" and "services" that Defendant allegedly provided.

Further information regarding the government's theory can be gleaned from the Criminal Complaint, which is referenced herein solely to provide context in light of the absence of any facts in the Indictment. In the Criminal Complaint, the government claims that Defendant used a "process" that in turn used a "script" to organize and download ISIS-related videos and material online. (Crim. Compl., ¶7). This "process" and "script" organized videos by their resolution size, and saved the videos in an offline archive. (Crim. Compl., ¶9). The "process" is described in a written document that is called "Heralds of the Internet." (Crim. Compl., ¶¶55-56). A copy of this document is attached hereto as Under Seal Exhibit A.

As is further alleged in the Criminal Complaint, Defendant discussed with various undercover government agents that he saved videos in the offline archive so that he could later share or upload the videos into an online forum called Reddit, and specifically to non-ISIS supporters who had expressed an interest in seeing "combat" videos. (Crim. Compl., ¶51). But there is no reference in the Indictment or Criminal Complaint that he actually did so. Neither the Indictment nor the Criminal Complaint allege that the media and videos that Defendant organized and downloaded were themselves illegal. Similarly, there are no allegations that either the "process" or the "script" was inherently illegal, such as the case for alleged "malware" or another computer virus based on code.

Importantly, neither the Indictment nor the Criminal Complaint alleges that Defendant was ever in direct contact with any real ISIS member. And even more significant for the purposes of the material support charge, there is no allegation in the Indictment or Criminal Complaint that Defendant developed the "process" and used the "script" while coordinating with ISIS or working

under the direction or control of ISIS. The charging documents also conveniently and conspicuously omit the fact that Defendant told one of the government agents, "i have no weapons. and videos aren't illegal," plainly indicating that he did not believe that organizing and downloading the videos was illegal, much less an act of terrorism. (D-Binder_006-OCE5_001-000044; BINDER_006-OCE5_001-000065).

## III.   ARGUMENT

### A.   Legal Standards

In all criminal prosecutions, "the accused shall enjoy the right ... to be informed of the nature and cause of the accusation," and a defendant may be charged based only on matters actually presented to the grand jury. U.S. CONST. amends. V, VI. The Federal Rules of Criminal Procedure require that an indictment to set forth "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Under Rule 12(b)(3)(B), a defendant may move to dismiss an indictment if it fails "to state an offense." A court may review the sufficiency of an indictment to determine if it seeks to punish speech protected by the First Amendment. *United States v. Bly,* 510 F.3d 453, 457-58 (4th Cir. 2007) (holding that whether "a written communication contains either constitutionally protected 'political hyperbole' or an unprotected 'true threat' is a question of law"); *United States v. Stock*, 728 F.3d 287, 301 (9th Cir. 2013) (considering First Amendment challenge to indictment alleging threats under 18 U.S.C. §875(c)); *Watts v. United States*, 394 U.S. 705, 707 (1969) (charge "must be interpreted with the commands of the First Amendment clearly in mind").

For an indictment to be legally sufficient, the indictment "must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime." *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001)

(citations omitted); *Russell v. United States*, 369 U.S. 749 (1962). An indictment based on an unconstitutional law, either under a facial or as applied theory, must be dismissed. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737-38 (2017); *United States v. Sineneng-Smith*, 910 F.3d 461, 479-85 (9th Cir. 2018).

In order to satisfy Due Process, a criminal statute must "'define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Skilling v. United States*, 561 U.S. 358, 402-03 (2010) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)); *Bell v. Keating*, 697 F.3d 445, 455 (7th Cir. 2012) ("A vagueness claim alleges that, as written, the law either fails to provide definite notice to individuals regarding what behavior is criminalized or invites arbitrary and discriminatory enforcement—or both."). Thus, a statute that fails to provide a "person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement" is unconstitutionally vague. *United States v. Williams*, 553 U.S. 285, 304 (2008). To determine if a statue provides such notice to the public and possess such guidelines to law enforcement, courts consider "the statute, either standing alone or as construed" in order to confirm whether it was "reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

## 1. The First Amendment

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I. It "removes from the government any power 'to restrict expression because of its message, its ideas, its subject matter, or its content.'" *United States v. White*, 610 F.3d 956, 959-60 (7th Cir. 2010) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)). Because Defendant challenges the indictment on First Amendment grounds, the

7

burden is on the government to show the constitutionality of the prosecution. *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816-17 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *Bd. of Trs. v. State Univ. of N.J. v. Fox*, 492 U.S. 469, 480 (1989) ("the State bears the burden of justifying its restrictions").

The Supreme Court has determined that the material support statute, 18 U.S.C. §2339B, is a content-based restriction when the prosecution is based on a defendant's speech, and distinguishes favored from disfavored speech according to the ideas that are expressed. *Holder v. Humanitarian Law Project ("HLP")*, 561 U.S. 1, 27 (2010) ("§2339B regulates speech on the basis of its content."). A content-based restriction is presumptively invalid and must meet a "strict scrutiny" standard because content-based regulation is presumptively "beyond the power of the government." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991); *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) ("[T]he Government's disapproval of a subset of messages it finds offensive . . . is the essence of viewpoint discrimination."); *Schultz v. City of Cumberland,* 228 F.3d 831, 840 (7th Cir. 2000).

The Supreme Court has repeatedly emphasized the broad scope of First Amendment protections, including for offensive, disfavored, and politically unpopular speech. *See Texas v. Johnson*, 491 U.S. 397, 419-20 (1989) (holding that the First Amendment protects the expressive act of flag burning); *Snyder v. Phelps*, 131 S. Ct. 1207, 1219 (2011) (picketing at funerals of U.S. soldiers is protected speech). It has emphasized the function of free speech serves to invite debate and dispute, which is why it "protected against censorship or punishment" even if it "strike[s] at prejudices and preconceptions and [has] profound unsettling effects, unless it poses a "clear and present danger." *Terminiello v. Chicago*, 337 U.S. 1, 4-5 (1949). The Supreme Court has also

rejected the government's efforts to impose "balancing tests" that compare the value of speech against societal costs. In response to similar arguments, the Supreme Court has declared:

> As a free-floating test for First Amendment coverage, that sentence is startling and dangerous. The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it. The Constitution is not a document "prescribing limits, and declaring that those limits may be passed at pleasure." *Marbury* v. *Madison*, 5 U.S. 137, 1 Cranch 137, 178, 2 L. Ed. 60 (1803).

*United States v. Stevens*, 559 U.S. 460, 470 (2010). Thus, except in narrow circumstances, the First Amendment acts as a shield for such speech and expression. Such exceptions, which are not present in this case, include "true threats" (*Watts,* 394 U.S. at 708); the incitement of imminent lawless action that is likely to produce such action (*Brandenburg,* 395 U.S. at 447); and, offers to engage in illegal transactions (*Williams,* 553 U.S. 285).

## 2. *HLP*, the First Amendment, and the Material Support Statute

In *HLP*, the Supreme Court upheld the material support statutes in the context of the First Amendment overbreadth challenge. However, in doing so, the Court did not preclude future as-applied challenges to the statute. Because *HLP* provides, in large part, the framework for this motion, the facts and holdings of the case are discussed in detail.

The plaintiffs in *HLP* were two United States citizens and six domestic organizations that challenged the constitutionality of the material support statute, 18 U.S.C. §2339B.[5] *HLP*, 561 U.S. at 10. The plaintiffs desired to provide support to two designated terrorist organizations, the Partiya Karkeran Kurdistan ("PKK") and the Liberation Tigers of Tamil Eelam ("LTTE"). *Id.* at 9. Specifically, they wished "to provide support for the humanitarian and political activities of the

---

[5] This lawsuit was initially filed in 1998, and was not resolved by the United States Supreme Court until 2010.

PKK and the LTTE in the form of monetary contributions, other tangible aid, legal training, and political advocacy," but they claimed the fear of prosecution prevented them from doing so. *Id*. More specifically, the plaintiffs explained that they wanted to do the following:

- "training members of the PKK on how to use humanitarian and international law to peacefully resolve disputes";
- "engaging in political advocacy on behalf of Kurds who live in Turkey"; and
- "teaching PKK members how to petition various representative bodies such as the United Nations for relief."
- "training members of the LTTE to present claims for tsunami-related aid to mediators and international bodies";
- "offering their legal expertise in negotiating peace agreements between the LTTE and the Sri Lankan government";
- "engaging in political advocacy on behalf of Tamils who live in Sri Lanka."

*HLP*, 561 U.S. at 14-15 (brackets removed).

The Supreme Court first rejected the plaintiffs' argument that the material support statute required that they intend to further the organizations' illegal activities. *HLP*, 561 U.S. at 16-17. The Supreme Court highlighted that the mental state in the statute was "knowledge" and only required that an individual knowingly provide support to the organization and know it is a terrorist organization. The individual's intent was not relevant to a violation of 18 U.S.C. §2339B. *Id*.

The Supreme Court then disagreed with the plaintiffs' challenges that the material support statute was unconstitutionally vague because it failed to provide them with adequate notice whether their desired conduct was prohibited. *HLP*, 561 U.S. at 20-21. In this portion of its opinion, the Supreme Court looked at the types of conduct that the plaintiffs sought to engage in, and found that it easily qualified as "training" or "expert advice." In particular, the Court concluded that "A person of ordinary intelligence would understand that instruction on resolving disputes through international law falls within the statute's definition of 'training' because it imparts a 'specific skill,' not 'general knowledge.'" 18 U.S.C. §2339A(b)(2). *HLP*, 561 U.S. at

22.  Additionally, this type of assistance also qualified as "expert advice or assistance" because, as the Supreme Court reasoned, "A reasonable person would recognize that teaching the PKK how to petition for humanitarian relief before the United Nations involves advice derived from, as the statute puts it, 'specialized knowledge.'"  *HLP*, 561 U.S. at 22.  The Supreme Court used the plaintiffs' own description of their own conduct as being "training" and "expert advice" to show that the conduct naturally fell under the statute.  *Id*. ("In fact, plaintiffs themselves have repeatedly used the terms "training" and "expert advice" throughout this litigation to describe their own proposed activities, demonstrating that these common terms readily and naturally cover plaintiffs' conduct.").

The plaintiffs also argued that the term "personnel" was unconstitutionally vague because engaging in "political advocacy" could run afoul of the statute.  *HLP*, 561 U.S. at 23 ("Plaintiffs also contend that they want to engage in "political advocacy" on behalf of Kurds living in Turkey and Tamils living in Sri Lanka. … They are concerned that such advocacy might be regarded as "material support" in the form of providing "personnel" or "service[s]," and assert that the statute is unconstitutionally vague because they cannot tell.").  The Supreme Court rejected this argument, and found that, by statute, the term "personnel" only covered those working under the direction or control of the terrorist organization.

Thus, while the terms "material support," "training," and "expert advice or assistance," should be broadly construed, there are also limitations to the statutory terms.  For instance, the material support statute itself clarifies that the term "personnel" does not include:  "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control."  *HLP*, 561 U.S. at 23 (quoting 18 U.S.C. §2339B(h)).  Likewise, for "services" to

amount to material support, they must reflect some type of "concerted activity, not independent advocacy." *Id*. *See id*., at 24 ("We interpret 'service' along the same lines. Thus, any independent advocacy in which plaintiffs wish to engage is not prohibited by § 2339B. On the other hand, a person of ordinary intelligence would understand the term "service" to cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization."). *See also United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020) (quoting *HLP*, 561 U.S. at 23-24 (a "service" refers to "concerted activity" including "any 'act done for the benefit or at the command of' a foreign terrorist organization."). While the Supreme Court clarified that a service must be in coordination with or at the direction of the terrorist organization, it did not separately define the term "service."

Finally, the Supreme Court rejected the plaintiffs' arguments that the material support statute violated the freedom of speech guaranteed by the First Amendment. *HLP*, 561 U.S. at 25-26. The Supreme Court concluded that the statute did not ban "pure political speech" or advocacy that was independent of the terrorist organization. Rather, the statute bars material support, which is often not in the form of speech or expression. *Id*. at 26. The Supreme Court's reasoning on this First Amendment challenge has a tautological quality. In short, it repeated that the statute does not prohibit independent speech, but rather prohibits material support, which could take on the form of speech or expression, such as imparting as specialized skill. In that instance, the speech is not protected speech, but is instead material support. The Court itself recognized this murkiness when it observed: "Whether foreign terrorist organizations meaningfully segregate support of their legitimate activities from support of terrorism is an empirical question." *HLP*, 561 U.S. at 29. It then answered its own question by highlighting that any support to a terrorist organization is prohibited, even if intended for a lawful purpose, because the fungibility of the support provided

could free-up other support that would further the unlawful goals of the organization. *Id.* at 30 ("Material support meant to "promot[e] peaceable, lawful conduct," …. can further terrorism by foreign groups in multiple ways. "Material support" is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups--legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds--all of which facilitate more terrorist attacks.").

Notwithstanding the fuzzy lines drawn by the Supreme Court, it is clear that the material support law does not and cannot be interpreted to "suppress ideas or opinions in the form of 'pure political speech.'" *HLP*, 561 U.S. at 26. Instead, only a narrow category of speech is covered by the material support statute—that which is made "under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Id*. *See also id*. at 31-32 ("The statute reaches only material support coordinated with or under the direction of a designated foreign terrorist organization. Independent advocacy that might be viewed as promoting the group's legitimacy is not covered."). Accordingly, the Supreme Court left unprotected only the "narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Id*. at 26. The Court, like Congress, avoided placing "any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups." *Id*. at 36.

Finally, while the Supreme Court rejected the constitutional challenges brought by the plaintiffs who sought to provide support directly to the PKK and LTTE, the Court also noted that it was not addressing "the resolution of more difficult cases that may arise under the statute in the future." *Id.* at 8; *id*. at 21 ("Of course, the scope of the material-support statute may not be clear in

13

every application. But the dispositive point here is that the statutory terms are clear in their application to plaintiffs' proposed conduct."). The instant case, and the prosecution of Defendant's alleged organizing and downloading pro-ISIS videos and media for personal review and for potential sharing with others in the future presents such a case—not only because the statute provides too much enforcement activity to the government but also because it does not provide sufficient notice to Defendant.

### B. The Material Support Statute, 18 U.S.C. §2339B(a)(1), is Unconstitutionally Vague as Applied to Defendant and the <u>Alleged Expression and Conduct at Issue in This Case.</u>

As applied in this case, the material support case violates Defendant's rights to Due Process because it fails to provide him with adequate notice about what "services" are criminal and violate the law in the context of First Amendment expression and also provides law enforcement with too much enforcement discretion. *Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804, 835 (7th Cir. 2014) ("All laws must be clear and precise enough to give a person of ordinary intelligence fair notice about what is required of him and also to guard against the arbitrary and discriminatory exercise of enforcement discretion.").

The term "services" as applied in this case is so vague that it would not put a reasonable person on notice that downloading pro-ISIS media for personal viewing and for potentially sharing with others online is providing material support to a terrorist organization. One can find numerous videos depicting combat violence and material that can be portrayed as pro-ISIS in all corners online. *See, e.g.*, https://jihadology.net/. The government does not and has never argued that the media in and of itself is illegal, and that simple possession of the material is a criminal act. Nor could it. Thus, a reasonable person would not know that downloading videos for personal use and possible for sharing with others is an act of terrorism. *See Todd v. United States*, 158 U.S. 278,

282 (1895) (internal quotation omitted) ("before a man can be punished, his case must be plainly and unmistakably within the statute.").

In response, the government may argue that Defendant used a "process" that was able to automatically organize videos by resolution size and then download them for his personal use and for potentially sharing with others. But that "process" does not somehow transform protected conduct into illegal conduct. Moreover, it must be emphasized that neither the Indictment nor the Criminal Complaint allege that Defendant worked under the direction and control of ISIS. The best the government can muster is that Defendant communicated online with individuals who purported to be from pro-ISIS groups. But whatever "pro-ISIS" might mean, it is not the same as a designated foreign terrorist organization, which is a necessary element of a material support charge. Even *HLP* cannot be read so broadly as to create a terrorism offense when one communicates with, or even provides services or resources to, a group that is not a foreign terrorist organization itself.

Additionally—and particularly in light of the total absence of Defendant working in coordination with ISIS or under its direction and control—the ambiguous and open-ended scope of "services" as applied in this case invites, and in fact resulted in, arbitrary and discriminatory enforcement. *Kolender*, 461 U.S. at 357; *United States v. Jones*, 689 F.3d 696, 701 (7th Cir. 2012) ("Vagueness doctrine rests on concerns about fair notice and arbitrary enforcement."); *United States v. Antzoulatos*, 962 F.2d 720, 726 (7th Cir. 1992) ("The most important aspect of the doctrine is the requirement that the legislature establish minimal guidelines to govern the discretion of law enforcement officials."). Importantly, Congress did not separately define the term "service," unlike the terms "training" and "expert advice or assistance." *See* 18 U.S.C. §2339A(b)(2) and (3) (defining "training" and "expert advice or assistance."). *See HLP*, 561 U.S.

15

at 12 (noting how Congress added the term "service" in the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA) to the definition of "material support or resources" and definitions for "training" and "expert advice or assistance").[6] Accordingly, the term "service" does not have a statutory definition that limits its scope. The lack of such a definition "impermissibly delegate[] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972). In *Smith v. Goguen*, the Supreme Court found that a state law that a statute imposing liability for one who publicly "treats contemptuously" the United States flag was unconstitutionally vague, particularly because the phrase lacked a limited definition that provided guidelines for law enforcement. *Smith v. Goguen*, 415 U.S. 566, 572-73 (1974). *See id*. at 575 ("Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections. Legislatures may not so abdicate their responsibilities for setting the standards of the criminal law."). Similarly, the undefined and sweeping term "services" is also prone to selective enforcement, particularly when law enforcement focuses on individuals who express or receive disfavored speech, such as independently watching pro-ISIS videos. Such conduct remains legal, as even independently supporting a foreign terrorist organization and promoting its legitimacy does not violate the law. *See United States v. Nagi*, 254 F. Supp. 3d 548, 557-58

---

[6] Legislative history also indicates a focus on "training," "personnel," and "expert advice," but *not* "service." For instance, Congressman Mike Green (WI) made these comments regarding the passing of the 2004 amendments to the material support statutes:

> I am also glad to see the "material support for terrorism" prohibition enhancement provisions included in this bill. Some previous versions of these provisions were challenged as being too vague, and this legislation cures that problem. This legislation clearly provides that "training," "personnel" and "expert advice" are defined broadly without abridging the exercise of rights guaranteed under the first amendment.

Conference Report on S. 2845, Intelligence Reform and Terrorism Prevention Act of 2004, 150 Cong Rec H 10994, 11017 (also available at: https://bit.ly/3uMfEBI) (last visited April 11, 2021).

(W.D.N.Y. 2017) (*quoting*, *HLP*, 561 U.S. at 32 ) ("In short, *Humanitarian Law Project* held that, while § 2339B does not proscribe pure speech—even radical speech that 'might be viewed as promoting the group's legitimacy.'").

Importantly, the Supreme Court's rationale for rejecting the vagueness challenges in *HLP* does not extend to Defendant's as-applied vagueness challenge to the term "services." In *HLP* the Supreme Court rejected the plaintiffs' challenges to "personnel" and "training" in large part by noting that 18 U.S.C. §2339B(h) did not prevent independent advocacy, and instead required that one act under the "direction or control" of the foreign terrorist organization. *HLP*, 561 U.S. at 39 ("In particular, we in no way suggest that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations."). However, unlike Defendant, the *HLP* plaintiffs sought to communicate *directly to the FTOs*. While the *HLP* plaintiffs' communications necessarily involved expression, it also involved direct training and assistance to the FTOs regarding matters such as how to advocate and engage in political advocacy. Such speech and conduct clearly involved direct coordination with the FTOs, and likely working under the direction and control of the FTOs, which brought their speech and conduct directly under 18 U.S.C. §2339B(h). Defendant's alleged conduct stands in stark contrast. For starters, he had no communications with ISIS. Nor was his expression and conduct directed toward ISIS, but rather to himself in the form of reviewing and watching videos for personal use, and, potentially, to others, in the form of sharing information.[7]

---

[7] The allegations in this case are also clearly distinguishable from those presented in *United States v. Jones*, 383 F. Supp. 3d 810 (N.D. Ill. 2019). In that case, Judge Andrea R. Wood denied the defendants' motion to dismiss the material support charge brought under 18 U.S.C. §2339B(a)(1) on vagueness and overbreadth grounds. However, as Judge Wood described, the defendants' argument contended that the material support statute was "unconstitutionally vague because it is unclear whether supporting an individual who purportedly desires to join but is not currently a member of an FTO, such as the CHS, constitutes the provision of material support." *Id*., at 815. Moreover, the superseding indictment in *Jones* also accused the defendants of arranging overseas for an undercover for

Finally, perhaps the best evidence of the fatal lack of notice is that Defendant himself did not believe that watching and downloading videos was illegal. The fact that Defendant would have to "guess" that his conduct could be criminal fails Due Process. *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971); *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids."). The statute subjects Defendant's protected First Amendment conduct in viewing and saving media that is not illegal, and even his stated intent to share it with others, to an unascertainable standard.

Thus, the statute, as applied to this case vis-à-vis the government's broad interpretation of the term "services," fails to provide a reasonable person of fair notice that the conduct ostensibly at issue in this case was forbidden. *Cline v. Frink Dairy Co.,* 274 U.S. 445, 448 (1927). The statute, as applied, and the indictment should be deemed void for vagueness. Accordingly, because individuals like Defendant are not on notice as to the difference between protected speech and association and unprotected speech and association, the Court should dismiss the charge under 18 U.S.C. §2339B as unconstitutionally vague.

---

the purposes of joining ISIS, and also "providing cell phones to ISIS" "to use in creating improvised explosive devices." *Id*., at 816. Indeed, as charged in the superseding indictment, the defendants were charged with providing "personnel and equipment"—which provide far more detail than "services." (Case No. 17 CR 236, Dkt. #71). Likewise, the defendants' overbreadth challenge was rejected because, as Judge Wood noted, the superseding indictment "charges Defendants with conduct beyond just voicing support for ISIS: they attempted to provide supplies that ISIS could use to create explosives and personnel that ISIS could direct to accomplish its goals." *Jones*, 383 F. Supp. 3d at 817. In contrast, Defendant's Indictment only alleges that he attempted to provide "services," which appear to be solely related to protected First Amendment conduct, *not* trying to help someone go overseas to join ISIS and providing cellular phones to use in explosives.

18

**C. Defendant's Speech and Expression is Protected by**
**<u>First Amendment and the Charge is Unconstitutional as Applied.</u>**

Even if the material support statute is, as applied, not void for vagueness, the charge against Defendant should still be dismissed because the statute, as applied, prosecutes protected First Amendment conduct in a manner that renders it unconstitutional. An as-applied challenge "charges an act is unconstitutional as applied to a plaintiff's specific activities even though it may be capable of valid application to others." *See Surita v. Hyde*, 665 F.3d 860, 875 (7th Cir. 2011) (citing *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 (1984)).

As a preliminary matter, Defendant's speech and expression at issue here is protected by the First Amendment. First, the "process" that counsel believe to be at the heart of the "services" that Defendant allegedly attempted to provide is, in effect, a form of speech. This "process" is likely the "Heralds of the Internet" document and the "script" it describes, which can be used to organize and download videos of a specific resolution. (Under Seal Exhibit A). The "process" and "script" used simply cannot be described as "malware" or some type of virus that is designed to cause damage to computer systems.[8] Regardless of whether the government claims the "services" to be the "process," "script," or "Heralds of the Internet" document and its contents, the First Amendment applies.

Computer code, and computer programs constructed from code, is entitled to First Amendment protection. *Corley*, 273 F.3d at 449. In *Corley*, the Second Circuit explained how

---

[8] Importantly, the "process" and "script" at issue in this case are not alleged to be illegal unto themselves, such as malware. This is very much unlike the code in *United States v. Chiochiu*, No. 2:17-cr-00306-JCM-PAL, 2019 U.S. Dist. LEXIS 133587 (D. Nev. Apr. 8, 2019), which was for programs related to email-scrapers and credit card-skimmers that was found to be unprotected by the First Amendment because it facilitated and was integral to criminal activity.

computer code can qualify as expression protected by the First Amendment because it conveys information and can be a vehicle for the exchange of ideas:

> Instructions such as computer code, which are intended to be executable by a computer, will often convey information capable of comprehension and assessment by a human being. A programmer reading a program learns information about instructing a computer, and might use this information to improve personal programming skills and perhaps the craft of programming. Moreover, programmers communicating ideas to one another almost inevitably communicate in code, much as musicians use notes. Limiting First Amendment protection of programmers to descriptions of computer code (but not the code itself) would impede discourse among computer scholars, just as limiting protection for musicians to descriptions of musical scores (but not sequences of notes) would impede their exchange of ideas and expression. Instructions that communicate information comprehensible to a human qualify as speech whether the instructions are designed for execution by a computer or a human (or both).

*Id.*, 273 F.3d at 448.

Downloading, reviewing, and potentially sharing pro-ISIS videos can also be seen as a form of political speech. In the "Heralds of the Internet" document, Defendant allegedly wrote that the videos the "process" downloaded could be shared in order to show that ISIS was acting in "self-defense." (Under Seal Exhibit A). This is, at heart, a political perspective, despite the fact that it may be widely refuted and found to be without merit. It is also the type of political viewpoint that it is entitled to First Amendment protection, rather than prosecution. *See Hill v. Colorado*, 530 U.S. 703, 787 (2000) (Kennedy, J., dissenting) ("Laws punishing speech which protests the lawfulness or morality of the government's own policy are the essence of the tyrannical power the First Amendment guards against"); *Elrod v. Burns*, 427 U.S. 347, 356 (1976) ("political belief and association constitute the core of those activities protected by the First Amendment"); *Johnson*, 491 U.S. at 411 ("expression of dissatisfaction with the policies of this country, [is] expression situated at the core of our First Amendment values"). Certainly, if the Supreme Court upholds the speech of religious protestors in *Snyder v. Phelps*—who protested the funeral of a U.S. soldier

while carrying signs that said, among other things, "God Hates the USA/Thank God for 9/11," "Thank God for IEDs," and "Thank God for Dead Soldiers"—because that speech involves matters of public concern that is entitled to "special protection" under the First Amendment, then Defendant's downloading, reviewing, and potentially sharing with others of pro-ISIS videos that others created is also entitled to such protection. *Snyder*, 131 S.Ct. at 1215, 1219. That is especially so when Defendant's *independently* expressed his opinions and the *Heralds* document, and not in coordination with or under the direction and control of ISIS, which the material support statute requires in order to sustain a conviction.

Moreover, the videos downloaded through the "process" are not in and of themselves illegal. Thus, the First Amendment conduct at issue here must be distinguished from speech and expression that has held to not be constitutionally protected, such as true threats or speech, or such as "solicitation" that is in and of itself a crime. *See United States v. White*, 610 F.3d 956, 960 (7th Cir. 2010). On this point, counsel submits that it is essential that the Court apply the *Brandenburg* test to determine whether or not Defendant's speech and expression fall within the First Amendment.

In *Brandenburg*, the Supreme Court struck down a state statute that made it a crime for people to "advocate or teach the duty, necessity, or propriety" of violence, and held that some statements that advocated violence had social value and therefore received First Amendment protection. *Brandenburg*, 395 U.S. at 448. The speech at issue in *Brandenburg* were statements by Ku Klux Klan members such as "we're not a revengent organization, but if our President . . . continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken." *Id*. at 446. The Supreme Court concluded that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of

21

force . . . except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id*. at 447. Following *Brandenburg*, in *Hess v. Indiana*, 414 U.S. 105 (1973), the Supreme Court found that a conviction based on statements including, *"*We'll take the fucking street later" or "We'll take the fucking street again," in the presence of a police officer was invalid because the statements were not intended to incite imminent violence and, "at worst," "amounted to nothing more than advocacy of illegal action at some indefinite future time." *Id.,* at 414 U.S. at 108.

It is essential to apply the *Brandenburg* standard and require a showing of imminent harm because, as one scholar has noted, applying "a version of *Brandenburg* unencumbered by a requirement of imminent harm, officials can use the terrorism label to selectively punish the political advocacy of unpopular groups just as they did in earlier eras." *Incitement at 100-and 50—and Today*, *supra* footnote 3, at 135. Here, taking the allegations in the Indictment to be true, the "services" are not "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447-448.

To the contrary, by criminalizing Defendant's organizing, downloading, and potentially sharing not unlawful pro-ISIS videos with others, the government's use of the material support statute unconstitutionally infringes on Defendant's speech and association rights under the First Amendment. Simply saving and, potentially, sharing videos created by others is not illegal. By acting in that manner to preserve the videos for others to review, Defendant's role was analogous to an online publisher of others' speech. That type of role is also entitled to First Amendment protection.

The First Amendment "protects the right to receive information and ideas." *Pico*, 457 U.S. at 866-67 (quoting *Stanley* v. *Georgia*, 394 U.S. 557, 564 (1969)). In *Pico*, a case that challenged

a municipality's decision to ban certain books from a library, the Supreme Court emphasized that the right to receive information flows from the "*sender's* First Amendment right to send" that information and also because "the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Id*. (emphasis in original); *see also Erznoznik*, 422 U.S. at 209 (finding statute that banned drive-in movie theaters from showing films depicting nudity as violating First Amendment and noting "when the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power"); *Bartnicki v. Vopper*, 532 U.S. 514, 533-34 (2001) (First Amendment protects disclosures of illegal obtained cell phone conversation that was publicized in newspaper and radio). These First Amendment principals expose the error in this prosecution. They also reveal the true danger that the government's charge poses, as it transforms an individual's constitutionally protected right to receive and share ideas that may be offensive, intolerant, and disfavored, but are not inherently illegal unto themselves, into acts of terrorism.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Indictment against Defendant.

Respectfully submitted,

/s/ Steven A. Greenberg
**STEVEN A. GREENBERG,**

/s/Joshua G. Herman
**JOSHUA G. HERMAN**
Attorneys for Defendant

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 1260
Chicago, Illinois 60604
(312) 879-9500

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 404
Chicago, IL 60604
(312) 909-0434
jherman@joshhermanlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing was served on April 12, 2021, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Joshua G. Herman
53 W. Jackson Blvd., Suite 404
Chicago, IL 60614
(312) 909-0434
jherman@joshhermanlaw.com