**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 CR 869 |
| | ) | Judge Robert W. Gettleman |
| THOMAS OSADZINSKI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**
**OBTAINED AS A DIRECT AND DERIVATIVE RESULT OF**
**ALL ORDERS ISSUED PURSUANT TO 18 U.S.C. §2703(D)**

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 1260
Chicago, Illinois 60604
(312) 879-9500

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 457
Chicago, IL 60614
(312) 909-0434
jherman@joshhermanlaw.com

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................ 3

    A.   The July 5, 2018, §2703(d) Application ................................................ 3

    B.   The Affidavit Submitted in Support of the July 5, 2018, §2703(d) Application .... 6

    C.   The July 5, 2018, §2703(d) Orders ........................................................ 9

    D.   The August 17 and 22, 2018, §2703(d) Applications and Orders ...................... 10

    E.   Material Produced Pursuant to the §2703(d) Applications and Orders ............... 11

III. ARGUMENT .................................................................................................... 12

    A.   Legal Standards ..................................................................................... 12

    C.   *Carpenter v. United States* ................................................................... 14

    D.   The §2703(d) Orders Were Not Based on "Specific and Articulable" Facts that Were "Relevant and Material" to the Ongoing Criminal Investigation for Material Support for Terrorism. ................................ 16

    E.   The Government's Failure to Obtain a Warrant Violated Defendant's Fourth Amendment Rights ................................ 18

IV.  CONCLUSION ................................................................................................ 24

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Camara* v. *Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967) ... 12

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) ............................................................ *passim*

*D.Z. v. Buell*, 796 F.3d 749, 754 (7th Cir. 2015) ......................................................................... 16

*In re United States for an Order Pursuant to 18 U.S.C. § 2703(d)*,
   206 F. Supp. 3d 454 (D.D.C. 2016) ......................................................................................... 16

*In re United States for an Order Pursuant to 18 U.S.C. § 2703(d)*, 206 F. Supp. 3d 454, 458
   (D.D.C. 2016) ............................................................................................................................ 17

*Naperville Smart Meter Awareness v. City of Naperville*, 900 F.3d 521 (7th Cir. 2018)....... 22, 23

*Riley* v. *California*, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014) ...................................... 12, 14, 22

*Terry v. Ohio*, 392 U.S. 1 (1968) ................................................................................................. 16

*United States v. Ali*, 870 F. Supp. 2d 10 (D.D.C. 2012) .............................................................. 17

*United States v. Beverly*, 943 F.3d 225 (5th Cir. 2019) ............................................................... 16

*United States v. Castro-Aguirre*, 983 F.3d 927 (7th Cir. 2020)................................................... 14

*United States v. Moalin*, 973 F.3d 977 (9th Cir. 2020)...................................................... 1, 22, 23

*United States v. Moreno-Vasquez*, No. CR 18-549-TUC-CKJ (LAB),
   2020 U.S. Dist. LEXIS 42047 (D. Ariz. Mar. 10, 2020) ......................................................... 17

*United States v. Perrine*, 518 F.3d 1196 (10th Cir. 2008)........................................................... 16

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) ............................................................. 16

**Statutes**

18 U.S.C. § 2510................................................................................................................. 12

18 U.S.C. §2702......................................................................................................... 12, 13

18 U.S.C. §2703......................................................................................................... *passim*

18 U.S.C. §2711................................................................................................................. 12

**Rules**

Fed. R. Crim. P. 12(b)(3) ................................................................................................... 1

ii

**Other Sources**

Daniel De Zayas, *Carpenter v. United States and the Emerging*
    *Expectation of Privacy in Data Comprehensiveness Applied to*
    *Browsing History*, 68 Am. U.L. Rev. 2209, 2249 (2019)........................................ 21

David Cole, *'We Kill People Based on Metadata,'* The New York Review, May 10, 2014.......... 1

Discord, *What is Discord?* .................................................................................................. 10

Electronic Frontier Foundation,
    *Surveillance Self-Defense, Why Metadata Matters*, March 12, 2019 ...................... 19

Matt Blaze, Wired, *Phew, NSA is Just Collecting Metadata.*
    *(You Should Still Worry)*, June 19, 2013.................................................................. 19

Paul Szoldra, *Leaked NSA document says metadata collection*
    *is one of agency's 'most useful tools'*, Business Insider, Dec. 7, 2016 ................... 19

Defendant, **THOMAS OSADZINSKI**, by and through his attorneys, **STEVEN A. GREENBERG** and **JOSHUA G. HERMAN,** pursuant to the Fourth Amendment to the Constitution of the United States and Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, moves to suppress all evidence obtained as a direct and derivative result from all orders issued pursuant to 18 U.S.C. §2703(d) of the Stored Communications Act ("SCA"), including all fruits derived therefrom.

## I.   INTRODUCTION

Under the auspices of §2703(d), the government compelled companies, including Google and Apple, to collect, search for, and produce detailed information related to Defendant's personal email, phone, and social media accounts.  That information encompassed details regarding people that he associated and communicated with, "friend lists," downloads of applications, general location data, and other revealing information.  The information was also retrospective in nature, as the government demanded all material from the "creation of each respective account."  Even if described as "non-content," it is "profoundly misleading" to suggest that there are minimal privacy interests in this type of information—as government officials in the NSA and CIA have readily admitted when they stated that "metadata absolutely tells you everything about somebody's life. If you have enough metadata, you don't really need content" and "We kill people based on metadata."[1]  Defendant thus had a reasonable expectation of privacy in the sensitive information that was collected, particularly when taken in the aggregate, as it chronicled his online and even physical existence.  *See United States v. Moalin*, 973 F.3d 977, 996 (9th Cir. 2020) (finding "considerable force" in privacy interests in telephony metadata collected by NSA, and concluding

---

[1] David Cole, *'We Kill People Based on Metadata,'* The New York Review, May 10, 2014 (available at: https://bit.ly/3a0ult9) (April 10, 2021).

that "the telephony metadata collection program exceeded the scope of Congress's authorization in section 1861 and therefore violated that section of FISA.").

The government compelled the production of this detailed personal information not based on a showing of probable cause, but instead, pursuant to 18 U.S.C. §2703(d), on a lower showing of potential relevancy to an ongoing investigation. Further, in making that showing, the government relied primarily on stale evidence concerning protected First Amendment activity initially supplied through an anonymous online tip, which failed to meet even the lower statutory standard required by the SCA.

Even worse, the government sought and obtained orders compelling the production of this information *after* the Supreme Court resoundingly held that the government violated the Fourth Amendment when it obtained historical cell site location information ("CSLI") under the exact same statutory authority without a warrant in the landmark decision, *Carpenter v. United States*, 138 S. Ct. 2206 (2018). The sensitive and revealing historical online information that the government obtained here raises even greater privacy interests than CSLI. There is no excuse for the government's failure to heed to *Carpenter's* clear instructions, including its denunciation of obtaining private information based on "official curiosity." *Carpenter*, 138 S. Ct. at 2222. The logic and reasoning of *Carpenter* extends to the information that the government compelled services providers to produce in this case. The result of this challenge should therefore be the same as in *Carpenter*—a finding that the warrantless searches were unconstitutional.[2]

---

[2] Undersigned counsel has asked the government to confirm whether it intends to use at trial any information obtained from the §2703(d) orders that are the subject of this motion. The government has informed counsel that it had not yet made that determination. As such, this motion is filed assuming that the government will be using information obtained or derived from the §2703(d) orders. Undersigned counsel has also requested that the government produce any and all §2703(d) orders, including Applications and Affidavits associated with those orders. As of writing, the government has informed counsel that all orders, Applications, and Affidavits in its possession have been produced. However, should any additional orders, Applications, and Affidavits be produced in the course of ongoing discovery, counsel would reserve the right to file additional

## II.      BACKGROUND

On June 22, 2018, the Supreme Court held in *Carpenter*, in order to obtain historical CSLI, the government must first secure a warrant rather than an order pursuant to 18 U.S.C. §2703(d). On July 5, 2018, approximately two weeks after *Carpenter*, the government prepared a pleading entitled, Application for Orders Relating to Known and Unknown Electronic Communication Accounts. (Exhibit A). The caption of pleading, filed under seal in Case No. 18 GJ 385 was: "In the Matter of the Application of the United States of America for an Order Relating to Known and Unknown Apple, Google, Microsoft, Instagram, Twitter, Facebook, Tumblr, Ask.fm, Wickr, Yahoo, Snapchat, Skype, Tango, Amazon, Ebay, and Whatsapp Accounts." (Exhibit A). Along with the Application, the government submitted an Affidavit from FBI Special Agent Jack Farley, which is attached hereto as Exhibit B. Chief Judge Castillo signed two orders granting the government's Application the very same day it was submitted, July 5, 2018. Copies of the orders are attached hereto as Exhibit C.

### A.   The July 5, 2018, §2703(d) Application

The §2703(d) Application identified five separate "Subject Accounts," listed as an Apple ID associated with an email account; a Snapchat account; two Google Gmail email addresses; and a WhatsApp account. (Exhibit A, p. 1). The Application also identified six "Target Accounts," listed as two phone numbers; two Google Gmail email addresses; an email address at "mail.depaul.edu"; and an email address at "att.net." (Exhibit A, p. 2). The Application sought a Court order requiring that Google, Snapchat, WhatsApp, and Apple "to provide historical records and other non-content information for the Subject Accounts for the period of time from the creation of the account to the present." It also sought an order requiring the same information produced

---

suppression motions or adopt the arguments set forth herein directed at any additional §2703(d) orders that may be produced in the future.

"from the account creation date to the present for any accounts associated with the Target Accounts." (Exhibit A, p. 2). Finally, the Application sought a Court order requiring Apple and Google "to provide historical records and other non-content information related to Google Play transactional records related to Subject Accounts 1 (Apply), 3 (Google), and 4 (Google), including but not limited to app downloads, app purchases, any devices associated with iTunes, Apple's App Store, and Google Play downloads or purchases, as well as financial transaction records, including the dates and times of the downloads, purchases, or the use of the devices." (Exhibit A, pp. 2-3).

The government next discussed the request for records and non-content information pursuant to 18 U.S.C. §2703(d) in greater detail. (Exhibit A, pp. 3-8). It first identified "Apple, Google, Microsoft, Instagram, Twitter, Facebook, Tumblr, Ask.fm, Wickr, Yahoo, Snapchat, Skype, EBay, Amazon, and WhatsApp as "electronic communications services providers" because they "provider their customers access to electronic communication services, including function," or a "remote computer service" because "they provide computer facilities for the storage and processing of electronic communications. It then identified the subsections of 18 U.S.C. §2703 that supported its request. In particular, it noted that §2703(c)(2) allowed it to obtain through a subpoena "from a provider of an electronic communications service or a remote computing service" specific information about the customer, such as the customer's name, address, length and type of service, connection and session records, temporarily assigned network address, and means and source of payment information. Section 2703(d) enabled the government to compel this information pursuant to court order upon a showing specific and articulable facts that the records an information "are relevant to an ongoing criminal investigation." *See also* 18 U.S.C. §2703(c)(1)(B).

4

The government then referenced the Affidavit of Special Agent Farley in support of the claim that specific and articulable facts provided reasonable grounds to believe that that the records were relevant and material to an ongoing criminal investigation. (Exhibit A, p. 5). That investigation was a grand jury investigation involving allegations that Defendant "supports the Islamic State of Iraq and al-Sham" and whether he "is providing or attempting to provide material support and resources" to ISIS. (Exhibit A, p. 5). Reference was then made to a witness who indicated that "[Defendant] uses electronic communication applications, and he watches ISIS propaganda through the internet." (Exhibit A, p. 5). The government asserted that reasonable grounds existed to believe that "the individual or individuals who use and communication" with the Subject accounts "may have information that is relevant" to its investigation into Defendant. (Exhibit A, p. 5).

The government then described why it believed the information sought was relevant to its investigation in the following two paragraphs:

> 7. As described in the affidavit, non-content header information for messages sent to and from the Subject Accounts will assist the FBI by revealing the existence of communications of the subject, and the identity of other individuals, including potential witnesses and co-conspirators, and communications devices and accounts possibly involved in violations of the Subject Offense.

> 8. In addition, a search of the service providers for accounts related to the Subject Accounts (through accounts associated by cookies, IP addresses, phone numbers, and email addresses) and the Target Accounts will assist the FBI by revealing other accounts associated with the user or users of the Subject Accounts or individuals who may have knowledge of the criminal activity and individuals involved in the criminal activity. Each of the Target Accounts are email accounts or phone numbers associated with the subscriber of the Subject Accounts and/or the apparent user(s) of the Subject Accounts.

(Exhibit A, p. 6).

In the next paragraph, the government specified that type of information sought pursuant to §2703(d). For instance, the government specified that, for the time period for the creation for

5

each account, companies would be compelled to produce customer or subscriber information of the Subject Accounts, including "any means and source of payment for services (including any credit card or bank account number), friend lists, push tokens, and associated email accounts or phone numbers."  (Exhibit A, p. 6).  Other requested information included "non-content header information for messages sent to and from the Subject Accounts, including "address information, usernames of the sender and recipients of messages, date and time of the communication, routing information, IP address connection records, and data transfer volume."  (Exhibit A, p. 7).  It also included "customer and subscriber information for any Google, Snapchat, WhatsApp, and Apple accounts linked by cookies, email address, IP address, or phone number to the Subject Accounts." (Exhibit A, p. 7).  The government sought the similar non-exclusive categories of information for the Target Accounts, including friend lists; IP addresses; associated email accounts or phone numbers; accounts linked by cookies; and also, Google Play transactional records that included historical app purchases and app downloads.  (Exhibit A, pp. 7-8).

**B.  The Affidavit Submitted in Support of the July 5, 2018, §2703(d) Application**

Along with the Application, the government provided the Affidavit of FBI Special Agent Jack Farley.  The Affidavit set forth the reasons why the government believed there were "specific and articulable facts" showing "reasonable grounds" to believe that the information sought was "relevant and material to an ongoing criminal investigation involving the provision and attempted provision of material support and resources to a designated foreign terrorist organization." (Exhibit B, p. 1).

The Affidavit starts with an extended section providing background information on service providers and describing how individuals used their online services and what type of information could be gathered from those service providers.  (Exhibit B, p. 2).  For instance, in describing

6

Facebook, the Affidavit noted that the company retained IP logs for users. (Exhibit B, p. 5). Those IP logs would reflect when users viewed a Facebook profile, and would also show "when and from what IP address the user did so." (Exhibit B, p. 5). The Affidavit also described how Email Service Providers, Google, and Apple retain emails on their systems "indefinitely." (Exhibit B, pp. 8, 9, 27). Email Service Providers and Google also keep record "that can reveal accounts accessed from the same electronic device, such as the same computer or mobile phone, including accounts that are linked by 'cookies,' which are small pieces of text sent to the user's Internet browser when visiting websites." (Exhibit B, pp. 8, 11). Other service providers described included Snapchat, which allows users to take photos or videos with their cameras in "real-time" and then save or send the photos/videos to friends in the application, or add the photos/videos to their "Story" to be viewed by the user's "friends." (Exhibit B, p. 20).

Following this extended description of the service providers and their services, the Affidavit briefly set forth the facts supporting its assertion that "reasonable grounds" existed to believe that information existed that was "relevant and material" to its ongoing criminal investigation into Defendant in a section entitled, "Thomas Osadzinski's Alleged Support of ISIS." (Exhibit B, pp. 32-33). These facts were based entirely on statements of Individual A. According to the Affidavit, on February 21, 2018, Individual A submitted an "anonymous online tip to the FBI because he/she was concerned that Osadzinski supported ISIS." (Exhibit B, p. 32). Individual A was also interviewed on April 27, 2018, by the FBI "in the presence of [his/her] parents." As set forth in the Affidavit, according to Individual A, Defendant downloaded "ISIS propaganda," including videos depicting violence from "publicly available websites and maintained about 100 to 300 ISIS related videos in a password encrypted folder on his personal desktop computer." (Exhibit B, p. 32). Individual A indicated that he/she last saw the videos in January 2018 at

7

Defendant's residence. (Exhibit B, pp. 32-33). Individual A also said that Defendant stated he communicated with ISIS supports from the United States in an online application. (Exhibit B, p. 33).

The Application then identified several online accounts associated with the Defendant, which indicates that the FBI had already investigated Defendant's online activities and likely service of some type of process on the service providers. For instance, the FBI listed a specific Apple ID that was associated with two phone numbers, one of which was associated with Defendant's parents and the family's Northbrook residence. (Exhibit B, p. 33). The Application also identified a Snapchat account, "DePaul Related Email Addresses," and a "WhatsApp" account, and linked them to specific email addresses and phone numbers that were ostensibly associated with the Defendant. (Exhibit B, pp. 34-35). While it appears that the FBI had already identified several accounts associated with Defendant, these inquiries apparently resulted in no independent information supporting the FBI's suspicion of Defendant's alleged support of ISIS. In other words, the "specific and articulable" facts all stemmed from Individual A, who last saw the videos on January 2018—seven months before the §2703(d) Application was submitted and approved.

Next, the Application described the FBI's "Planned Investigation," which described how the FBI would use the requested information to: (a) assist in identifying the individuals who created the Subject Accounts, "and those who communicated with the users of the accounts"; (b) assist in identifying other "electronic communication, social media, and storage accounts" used by the user or users of the Subject Accounts; and, (c) determine whether the user or users of the Subject Accounts "was communicating with other known or suspected supporters, recruiters, or fighters for ISIS." (Exhibit B, p. 35).

The Affidavit concluded with a section entitled, "Relevancy & Materiality of Subscriber Information to the Investigation." (Exhibit B, pp. 35-36). The Affiant described how information identifying a user's social media and email accounts and other "non-content header information for social media and electronic messages sent to and from the Subject Accounts" and "additional social media, email, and instant messaging accounts associated with the Target Accounts will assist the FBI in identifying other accounts likely to be used by the subject of this investigation or witnesses of the criminal activity." (Exhibit B, pp. 35-36). Specifically, the Affiant described how the information requested would include the following:

- Subscriber and log-in information that "may provide geographic location of the user or users and how the user accesses the internet";

- Whether and how the user or users "anonymizes their online activity and their uses of aliases, monikers, or *noms de guerre*;

- Identify the users of the Subject Accounts and the identities of individuals who either provided or attempted to provide material support, were witnesses to that offense, or were in communication with anyone who provided or attempted to provide material support;

- Any other accounts used by individuals who were engaged in or who were in communication with anyone who provided or attempted to provide material support; and,

- "the timing of communications among individuals" who provided or attempted to provide material support, and witnesses to the same.

(Exhibit B, pp. 36-37).

### C. The July 5, 2018, §2703(d) Orders

On July 5, 2018, Chief Judge Castillo signed Orders granting the government's §2703(d) Application. Copies of the Orders are attached hereto as Exhibit C. The Orders authorized the government to compel the production of information related to the listed Subject Accounts and Target Accounts. Mirroring the Application, the Orders compelled production of information

including "friend lists, push tokens, and associated email accounts or phone numbers" from the accounts "for the period of time from the creation of each respective account to the present." (Exhibit C, pp. 4-5). It also compelled production of IP address connection records; identifying information of the senders and recipients of messages; other accounts "linked by cookies, email address, IP address, or phone number"; app downloads and app purchases; and identifying information of devices associated with downloads and financial transactions using the accounts.

### D.  The August 17 and 22, 2018, §2703(d) Applications and Orders

On August 17 and 22, 2018, the government sought and obtained additional orders under §2703(d) compelling the production of information related to two additional subject accounts from the service provider Discord, which is a private online communications platform.[3]  Copies of the Applications and associated Orders are attached hereto as Exhibit D.  The Applications requested Discord to produce information related to the Target Accounts, which included the same accounts identified in the July 5, 2018, §2703(d) Application, but also added an email address ending in "glenbrook225.org"—which was presumably associated with Defendant's high school email address.

These August §2703(d) Applications relied on the same information provided by Individual A, namely the anonymous tip regarding Defendant downloading ISIS videos from publicly available websites.  They also added reference to an interview on July 19, 2018, with another individual who communicated over Discord with someone that the government believed

---

[3] *See* Discord, *What is Discord?* (available at: https://bit.ly/2QaIME2) (last visited April 10, 2021) ("Discord is a free voice, video, and text chat app that's used by tens of millions of people ages 13+ to talk and hang out with their communities and friends. …The vast majority of servers are private, invite-only spaces for groups of friends and communities to stay in touch and spend time together. There are also larger, more open communities, generally centered around specific topics such as popular games like Minecraft and Fortnite. All conversations are opt-in, so people have total control over who they interact with and what their experience on Discord is.").

to be Defendant. According to this individual, Defendant indicated in a Discord chat that he was being watched by the FBI and that he had a "handler," whose phone number he provided to the individual. (Exhibit D, p. 5). This Application includes no information from this individual about Defendant's alleged support of ISIS. The remainder of the Application, specifically its description of the information sought from Discord, is largely identical to the language in the July 5, 2018, Application.

### E. Material Produced Pursuant to the §2703(d) Applications and Orders

Discovery produced by the government shows that the Internet and social media companies that received the §2703(d) orders produced voluminous records related to Defendant's online accounts. Illustrative examples of this discovery material are included in Under Seal Group Exhibit E. The material provided by Google includes detailed IP address login information that could be used to determine Defendant's location information, and hundreds of pages reflecting individual emails between Defendant and others, including his family members and medical practitioners. The records readily revealed, for instance, that Defendant was obtaining drug tests and National Drug Screening. *See* Exhibit E, FBI2703D_001-000340, 360. The records also include numerous Google Docs, which are identified by title, such as "Introduction to Computing Using Python by Ljubomir Perokovic.pdf," which was created on April 16, 2018 at 6:37 PM (FBI2703D_001-000134); and numerous ostensibly college-related documents, including "Stats HW Osadzinski," created on January 8, 2018 at 2:01AM (FBI2703D_001-000136); "IT223 Midterm_Assorted Data.docx," which was created on May 8, 2018 at 11:46 PM (FBI2703D_001-000137); and, "REL 266 Critical Response 2," which was created on April 19, 2018 at 3:21 AM (FBI2703D_001-000196).

11

### III.  ARGUMENT

#### A.  Legal Standards

The Fourth Amendment of the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV.  The basic purpose of the Fourth Amendment "'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Carpenter*, 138 S. Ct. at 2213 (*Camara* v. *Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967)).  The Fourth Amendment was created "as a 'response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity.'" *Carpenter*, 138 S. Ct. at 2213 (quoting *Riley* v. *California*, 134 S. Ct. 2473, 189 L. Ed. 2d 430, 452 (2014)).

#### B.  Legal Background Regarding §2703(D) Orders

The SCA, which is found at 18 U.S.C. §§2701-2711, begins by prohibiting "electronic communication services" and "remote computer services" from knowingly disclosing contents of communications either stored by or carried on the services.  18 U.S.C. §2702(a)(1)-(3).[4]  The SCA requires the government to obtain a warrant in order to compel disclosure from an electronic communication service of the contents of wire or electronic communications that "is in electronic storage in an electronic communications system for one hundred and eighty days or less."  18

---

[4] The SCA defines an electronic communication service provider as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). The statute defines an RCS provider as "the provision to the public of computer storage or processing services by means of an electronic communication system." 18 U.S.C. §2711(2).  Thus, depending upon the particular services offered and the specific data at issue an electronic communication service provider may also be considered a remote computing service provider.

U.S.C. §2703(a). Communications stored for more than 180 days on an electronic communications system, or with a remote computing service, may be obtained with a warrant or an order pursuant to 18 U.S.C. 2703(d). *See* 18 U.S.C. §2703(a), (b)(1)(A)-(B).[5] Indeed, disclosure can be compelled only in limited circumstances without a warrant, including pursuant to 18 U.S.C. §2703. *See* 18 U.S.C. §2702(b)(2). The SCA authorizes the government to compel production from the electronic communications system or the remote computing service of the following limited pieces of information:

> (A)  name;
> (B)  address;
> (C)  local and long distance telephone connection records, or records of session times and durations;
> (D)  length of service (including start date) and types of service utilized;
> (E)  telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and
> (F)  means and source of payment for such service (including any credit card or bank account number), of a subscriber to or customer of such service when the governmental entity uses an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena or any means available under paragraph (1).

18 U.S.C. §2703(c)(2).

This information can be compelled pursuant to 18 U.S.C. § 2703(d), upon issuance of a court order. That order may issue "only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that ... the records or other information sought, are relevant and material to an ongoing criminal investigation." *Id.* at §2703(d). This

---

[5] Accordingly, if government seeks data that is held by is an electronic communications system provider in electronic storage for 180 days or less, then, the government must obtain search warrant. But if the electronic communications system provider has held the data in electronic storage for at least 181 days, then an order under § 2703(d) is sufficient. And if on the data is being held by a remote computing service provider "solely for the purpose of providing storage or computer processing services," then a § 2703(d) order may authorize the production of the data without regard to the length of time that it has been held.

standard is "significantly lower than the probable-cause requirement for a warrant." *United States v. Castro-Aguirre*, 983 F.3d 927, 934 (7th Cir. 2020).

### C. *Carpenter v. United States*

On June 22, 2018, the Supreme Court held that the "reasonable grounds" standard under §2703(d) was inadequate under the Fourth Amendment in order to compel the production of historical CSLI. *Carpenter*, 138 S. Ct. 2206 (2018). In *Carpenter*, law enforcement investigating a string of interstate robberies obtained historical CSLI, which was data created when cell phones connected to nearby cell sites for optimal reception and then held by wireless cell phone service carriers. In particular, the government obtained an §2703(d) order requesting "seven days of CSLI from Sprint," which showed the defendant's phone to be roaming in northeastern Ohio and altogether the government obtained "12,898 location points cataloguing Carpenter's movements—an average of 101 data points per day." *Carpenter*, 138 S. Ct. at 2212. The defendant argued that the seizure of the cell-site data violated his Fourth Amendment rights because it was obtained without a warrant support by probable cause. *Id*.

The Supreme Court began by recognizing how the historical underpinnings of the Fourth Amendment were rooted in the need to "secure the privacies of life against arbitrary power" and "to place obstacles in the way of a too permeating police surveillance." *Carpenter*, 138 S. Ct. at 2213-14. The Court also emphasized how these original understandings of the Fourth Amendment inform the Court's decisions when it is confronted with technological advancements, particularly with surveillance tools that encroach upon individual privacy interests. *Id*. *See also Riley v. California*, 134 S. Ct. 2473 (2014) (holding that a warrant is required to search a cell phone incident to arrest). The Court then focused on two primary privacy concerns that manifest in one's location as well as in information held by third parties.

14

First, with respect to location, the Court recognized that the defendant had a recognized privacy interest in his location and movements, which were catalogued in cell-site location records each time his cell phone when it made and received calls.  *Carpenter*, 138 S. Ct. at 2214-15.  Second, the Court determined that the defendant had a reasonable expectation of privacy in those records even though they were held by the wireless cell phone providers, largely because of the "unique nature of cell phone location records." *Carpenter*, 138 S. Ct. at 2217.  The Court noted that unlike prior precedents, which dealt with telephone and bank records, cell-site location records "convey[ed] to the wireless carrier not just dialed digits, but a detailed and comprehensive record of the person's movements." *Carpenter*, 138 S. Ct. at 2217.

Thus, because "an individual maintains a legitimate expectation of privacy in the record of his physical movements," the Supreme Court held in *Carpenter* that accessing seven days' or more worth of historical cell-site location information was enough to require the securing of a warrant supported by probable cause. *See Carpenter*, 138 S.Ct. at 2217-21.  As such, the Court held that "[t]he Government must generally obtain a warrant supported by probable cause before acquiring such records." *Id.* at 2221.  The §2703(d) orders fell "well short of the probable cause required for a warrant" and represented a "gigantic departure" from the probable cause standard. *Id.*  The Court then held as follows:  "Consequently, an order issued under Section 2703(d) of the Act is not a permissible mechanism for accessing historical cell-site records. Before compelling a wireless carrier to turn over a subscriber's CSLI, the Government's obligation is a familiar one—get a warrant." *Id.  See also Castro-Aguirre*, 983 F.3d at 934.  Finally, the Court characterized its opinion as "narrow," in that it was limited to the issue of historical CSLI. *Carpenter*, 138 S. Ct. at 2220.

**D. The §2703(d) Orders Were Not Based on "Specific and Articulable"
Facts that Were "Relevant and Material" to the Ongoing
Criminal Investigation for Material Support for Terrorism.**

As an initial matter, Defendant challenges the issuance of the §2703(d) orders on the
grounds that they do not present "specific and articulable" facts showing that the information
sought is relevant to an ongoing criminal investigation. This standard has been described as an
"intermediate" burden, which is higher than that required for a subpoena, but lower than probable
cause. *In re United States for an Order Pursuant to 18 U.S.C. § 2703(d)*, 206 F. Supp. 3d 454,
455 (D.D.C. 2016). Conclusory statements do not satisfy the requirements of §2703(d), and
"fishing expeditions" are not permitted. Id. (citing legislative history). The "relevant and
material" requirement in §2703(d) is derived from *Terry v. Ohio*, 392 U.S. 1 (1968). *See United
States v. Beverly*, 943 F.3d 225, 233 (5th Cir. 2019); *United States v. Warshak*, 631 F.3d 266, 291
(6th Cir. 2010) (quoting *United States v. Perrine*, 518 F.3d 1196, 1202 (10th Cir. 2008). To satisfy
that standard, law enforcement must have "more than a hunch" that a crime has occurred; "he must
be able to point to specific facts that suggest that a stopped individual has committed, was
committing, or is about to commit an offense. *See D.Z. v. Buell*, 796 F.3d 749, 754 (7th Cir. 2015)
(citing *Terry*, 392 U.S. at 21–22).

The information provided included an anonymous online tip from Individual A from
February 2018, followed up by an interview with the FBI in April 2018.[6] As presented in the
Affidavit, Individual A said that Defendant had saved 100 to 300 of ISIS videos stored on his
computer and showed some of them to Individual A. These videos were downloaded from
"publicly available websites," according to Individual A. He/she also said that Defendant also

---

[6] Counsel will not disclose the identity of Individual A in this pleading, but understand it is a person who
knew Defendant in high school and would have had a bias that was not disclosed in the Affidavit. Counsel
can supply more information to the Court in an under-seal setting or pleading.

said that he communicated with ISIS supporters on a social media application.[7]  These facts are neither specific nor articulable.  Nor should they permit the government to obtain a wide-ranging §2703(d) order that gives it extraordinary authority to compel Google, Apple, Facebook, and other social media and email companies to provide detailed information about communications with no temporal limitations.

Moreover, Individual A described only protected First Amendment conduct—watching videos, downloading them, and potentially communicating with others online.  There is nothing criminal in this conduct—nor did the government state as much in its Application or the agent's Affidavit.  *See United States v. Moreno-Vasquez*, No. CR 18-549-TUC-CKJ (LAB), 2020 U.S. Dist. LEXIS 42047, at *7-8 (D. Ariz. Mar. 10, 2020) (affirming magistrate's granting of motion to suppress of historical location data because obtained through §2703(d) application because the government presented no facts that the defendant violated the law as a drug dealer).

Further, the implication that the material will be relevant because "criminals use email" is insufficient, as "such an allegation could be made in any case involving criminal conduct by a person (or persons) with an email address - which includes almost everyone at this point."  *In re United States for an Order Pursuant to 18 U.S.C. § 2703(d)*, 206 F. Supp. 3d 454, 458 (D.D.C. 2016) (citing *United States v. Ali*, 870 F. Supp. 2d 10, 37 (D.D.C. 2012).  Under this logic, the government could always obtain non-content email information from every suspected criminal.  *Id*.

The second set of §2703(d) orders from August 2018 that were directed at Discord are also insufficient.  Those Applications, which were not accompanied by a new Affidavit, referenced the February 2018 anonymous tip regarding Defendant and his "possible communications with ISIS,"

---

[7] Interestingly, counsel is aware of that social media application and can represent that the §2703(d) orders did *not* seek information from that social media application.

and reference to videos, which now ballooned to 100 to 600 in number, without any explanation for the increase. (Exhibit D, p. 4). The Application added only reference to a July 19, 2018, FBI interview with Individual D, who shared that someone believed to be Defendant said he had an FBI "handler" and shared the phone number for that individual. There is nothing in those statements that plausible shows that the requested information is relevant or material for a criminal investigation regarding material support for terrorism.

Thus, as a threshold matter, the Applications fail to set forth "specific and articulable" facts "showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation," and thus failed to meet the requisite standard under §2703(d).

### E. The Government's Failure to Obtain a Warrant Violated Defendant's Fourth Amendment Rights

Even if the Court determines that the paltry factual assertions in the Applications satisfied the §2703(d) relevancy standard, it should still suppress all information obtained or derived from those orders because they failed to meet the probable cause and warrant standard required by the Fourth Amendment following *Carpenter*.

Defendant had a reasonable expectation of privacy in the information that was obtained through the §2703(d) orders. While the Applications and Orders repeat the terms "non-content" to describe the information sought, the information that can be gleaned from the records is incredibly revealing on its own. But perhaps more importantly, the information in the aggregate creates a complete online profile of Defendant, including with whom he associated and when he communicated with those individuals. And that is precisely what the government sought in this case. The aggressive and far-reaching applications demanded production of information not only about the Subject and Target accounts, but also of accounts *linked and associated* with those

18

accounts, including by cookies.[8]  The government explicitly sought to identify individuals with whom Defendant communicated, and specifically sought his "friend lists."

Moreover, the IP address information that the government requested and obtained permitted the government to identify Defendant's location, which is precisely why it sought that information.  (Exhibit E, FBI2703D_001-000106).  Defendant has an expectation in privacy regarding individuals with whom he communicates, information regarding internet browsing history, his physical locations, and other interests that were exposed and collected pursuant to the §2703(d) orders.  (*See* Exhibit EFBI2703D_001-000017, 21).  The metadata produced in this case is far more revealing that "non-content" subscriber information envisioned by Congress when it enacted the SCA.  To the contrary, "[e]ven a tiny sample of metadata can provide an intimate lens into a person's life."[9]  For instance, metadata can reveal that one "rang a phone sex line at 2:24 am and spoke for 18 minutes"; "called the suicide prevention hotline from the Golden Gate Bridge"; "got an email from an HIV testing service, then called your doctor, then visited an HIV support group website in the same hour."  *Id*.  The fact that the government does not see the "content" of those communications does not diminish the privacy concerns at stake.  While content "may be what we *say*, but metadata is about what we actually *do*."[10]  Metadata can also be more revealing than "content" because it is more easily processed in "automated analysis by computer."  *Id*.  ("So

---

[8]"A cookie is information saved by your web browser. When you visit a website, the site may place a cookie on your web browser so it can recognize your device in the future. If you return to that site later on, it can read that cookie to remember you from your last visit and keep track of you over time."  *See* Federal Trade Commission, Internet Cookies (available at: https://bit.ly/3mqG8pw) (last visited Apr. 7, 2021).

[9] *See* Electronic Frontier Foundation, *Surveillance Self-Defense, Why Metadata Matters*, March 12, 2019 (available at: https://bit.ly/3uzHBg0) (last visited April 10, 2021).

[10] *See* Matt Blaze, Wired, *Phew, NSA is Just Collecting Metadata.  (You Should Still Worry)*, June 19, 2013 (available at: https://bit.ly/3d5aMBO) (last visited April 10, 2021); Paul Szoldra, *Leaked NSA document says metadata collection is one of agency's 'most useful tools'*, Business Insider, Dec. 7, 2016 (available at: https://bit.ly/3d33MW5) (April 10, 2021).

while the NSA quickly drowns in data with more voice content, it just builds up a clearer and more complete picture of us with more metadata."). It can also be more revealing than content because it reveals context, "insights into who we are and the implicit, hidden relationships between us," and patterns of behavior. *Id*. Here, the metadata of Defendant's email communications reveals that on June 27, 2017, 5:21:23 pm, Defendant emailed a lawyer in Michigan (who happened to represent him on a criminal defense matter); on June 25, 2017, 9:36:03 am, Defendant's mother emailed him, copying someone at "nationaldrugscreening.com;" three minutes later at 9:39:39 am, the person at "nationaldrugscreening.com" responded to Defendant's mother and copying Defendant; and then at 9:59:25 am; Defendant's mother emailed the person at "nationaldrugscreening.com" and copied Defendant; and then 3:31:33 pm Defendant's mother emailed him. (Exhibit E, FBI2703D_001-001265-67). The next day on July 26, 2017, at 5:09:17 pm, Defendant, who was an incoming freshman at DePaul, received an email from finaid1@depaul.edu. (Exhibit E, FBI2703D_001-001267). There are hundreds of vignettes of Defendant's life that can be pieced together through this metadata.

Also significant is the historical nature of the content sought and obtained, and the fact that it could be collected and presumably analyzed with very little difficult. Similar concerns troubled the Supreme Court in *Carpenter*. There, the Court faulted the warrantless search in *Carpenter* in no small part because the "retrospective quality of the data here gives police access to a category of information otherwise unknowable." *Carpenter*, 138 S. Ct. at 2218. The exact same problem exists here, as the §2703(d) orders requested all information from the date the online accounts were created, well before Defendant was even known to the government.

While the cell-site location information in *Carpenter* was arguably more granular in terms of pinpointing the defendant's location over time, the "non-content" information obtained through

the §2703(d) orders in this case is far more encompassing and revealing, particularly in the aggregate.  Even more than physical movements, online activity can create an "all-encompassing record" of an individual's profile, habits, and associations.  *Carpenter*, 138 S. Ct. at 2217.  In *Carpenter*, the Court wrote that a "cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales."  Likewise, the information sought and obtained by the non-content orders reveals with whom a user communicated, what websites they visited, when those communications happened, and where the user was located when the communication transpired. *See*, *e.g.*, Exhibit E, FBI2703D_001-000338.

Data aggregation and its analysis is also a significant factor that impacted the decision in *Carpenter*.  The concern was not simply law enforcement viewing a person's location at a particular time, but the locations over time, which allowed the government to create a "detailed chronicle of a person's physical presence compiled every day, every moment, over several years," that concerned the Court.  *Carpenter*, 138 S. Ct. at 2220. These same concerns are even more pronounced in this case.  Not only does the material obtained from the §2703(d) orders reveal where Defendant was located through IP addresses, and thus his movements, but also with whom he was communicating in a manner that reveals his associations.  In fact, the *very purpose* of the §2703(d) orders according to the government's Applications was to discover those associations and Defendant's network of friends and relations.

The portion of the order to compelling the production of accounts linked by cookies is particularly problematic.  Tracking cookies collect online browsing history, which creates a "a comprehensive and pervasive record of an internet user's online behavior."[11]   This online

---

[11] Daniel De Zayas, *Carpenter v. United States and the Emerging Expectation of Privacy in Data Comprehensiveness Applied to Browsing History*, 68 Am. U.L. Rev. 2209, 2249 (2019).

"comprehensive record" raises the same concerns, if not more, as the record of physical movement created by CSLI. For instance, browsing history could reveal associations with individuals in other states or countries that one could not physically visit. Browsing history could also include visits to therapists and doctors, and websites of a political, religious, or sexual nature, and other intimate associations and beliefs that would not necessarily be available simply through physical movements. The very purpose of cookies is to create profiles of internet users based on their browsing histories. Moreover, browsing history is also historical, which creates the same type of retrospective tracking that the Supreme Court criticized in *Carpenter* and historical CSLI and also in *Riley* with respect to viewing the contents of an arrestee's cellular phone. Accordingly, Defendant clearly had a reasonable expectation of privacy in the information sought by and obtained through the §2703(d) orders. *Moalin*, 973 F.3d at 992 ("Society may not have recognized as reasonable Smith's expectation of privacy in a few days' worth of dialed numbers but is much more likely to perceive as private several years' worth of telephony metadata collected on an ongoing, daily basis—as demonstrated by the public outcry following the revelation of the metadata collection program.").

Based on the similarities with *Carpenter*, there should be no realistic counter-argument that the Defendant did not have a reasonable expectation of privacy based on the "third-party doctrine." Rather, just as with the location information in *Carpenter*, it matters not that some of this information, particularly the location and IP address information, is shared with others. Similar to the cell-site location information in *Carpenter*, Defendant does not have the realistic option *not* to share his IP address or other "non-content" information, such as data stored in cookies that link his online accounts, when he logs onto his email, visits a website, or chats with friends. *See Carpenter*, 138 S. Ct. at 2217. *See Naperville Smart Meter Awareness v. City of Naperville*,

22

900 F.3d 521, 527 (7th Cir. 2018) (finding that plaintiffs had a reasonable expectation of privacy in the energy levels used in their houses, and that the municipality conducted a search by using a program that collected energy usage levels at fifteen-minute intervals). As in *Moalin*, where the Ninth Circuit found the third-party doctrine to be inapplicable to telephony metadata collected by the NSA, there is a "gulf between" the detailed metadata-related information collected by the government here and simple pen-register information that simply shows calls to and/or from a phone. *Moalin*, 973 F.3d at 990.

Accordingly, Defendant had a reasonable expectation in the non-content information and other information sought in and obtained through the §2703(d) orders. Under *Carpenter*, any request for this information required a warrant supported by probable cause. Instead, the government obtained the orders based on a purported showing of "relevancy," which falls "well short" of probable cause.

Finally, any effort by the government to seek refuge in the "good faith" doctrine should be rejected. The government submitted the §2703(d) applications in this case *after Carpenter* was decided. While *Carpenter* dealt specifically with historical CSLI, it should have been obvious that the holding dramatically changed the showing for required for all applications under §2703(d). As such, the Court should reject any attempt by the government to excuse its failure to obtain a warrant based on the "good faith" doctrine.

In *Carpenter*, the Supreme Court reminded us all that the Fourth Amendment was originally developed to "secure the privacies of life against arbitrary power" and "to place obstacles in the way of a too permeating police surveillance." *Carpenter*, 138 S. Ct. at 2213-14. The Court also lambasted the notion that the government could seek private records based on "official curiosity." *Carpenter*, 138 S. Ct. at 2222. That "official curiosity" is precisely what is

embodied in the §2703(d) orders, as the government sought to learn Defendant's "friend list," with whom he communicated, and what he read. Consistent with *Carpenter*, the Court should ensure that the Fourth Amendment remains a bulwark protecting that private information against the government's arbitrary power and invasive surveillance.

IV.     **CONCLUSION**

For the foregoing reasons, the Court should suppress any all information obtained or derived from the orders issued pursuant to 18 U.S.C. §2703(d).

Respectfully submitted,

/s/ Steven A. Greenberg
**STEVEN A. GREENBERG,**

/s/Joshua G. Herman
**JOSHUA G. HERMAN**
Attorneys for Defendant

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 1260
Chicago, Illinois 60604
(312) 879-9500

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 404
Chicago, IL 60604
(312) 909-0434
jherman@joshhermanlaw.com

## <u>CERTIFICATE OF SERVICE</u>

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing was served on April 12, 2021, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Joshua G. Herman
53 W. Jackson Blvd., Suite 404
Chicago, IL 60614
(312) 909-0434
jherman@joshhermanlaw.com
