**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 CR 869 |
| | ) | Judge Robert W. Gettleman |
| THOMAS OSADZINSKI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR NOTICE AND PRODUCTION**
**OF DISCOVERY RELATING TO SURVEILLANCE**

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 1260
Chicago, Illinois 60604
(312) 879-9500

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 457
Chicago, IL 60614
(312) 909-0434
jherman@joshhermanlaw.com

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   THE GOVERNMENT'S INVESTIGATION OF DEFENDANT ......................................... 4

III.  ARGUMENT ................................................................................................... 8

    A. The Government and the Intelligence Agencies
    Have a Documented  History of Not Disclosing Controversial
    Surveillance Techniques ............................................................................... 9

        1. "Parallel Construction." ........................................................................ 15

    B. The Government's Known Surveillance Tools. ................................................... 16

        1.    FISA ............................................................................................. 18

        2.    Executive Order 12333 ..................................................................... 27

        3.    Surveillance Under Section 702 of FISA ................................................. 36

        4.    Surveillance Under Sections 703, 704, and 705 of FISA ........................... 40

        5.    Surveillance Under §215 of the PATRIOT Act ........................................ 43

        6.    National Security Letters. .................................................................. 44

    C. The Prosecutors Must Provide Notice of the Surveillance
    Methods and Authorities That Were Used. ...................................................... 16

        1.    The Fourth and Fifth Amendment Require Notice and Discovery of
        Surveillance Techniques, Methods, and Legal Authorities ......................... 46

        2.    Defendant is Entitled to Notice under 18 U.S.C. § 3504 ........................... 49

        3.    FISA Requires Notice and Disclosure ................................................... 51

        4.    Fed. R. Crim. P. 12 and 16 Require Notice and Disclosure ........................ 52

IV.   CONCLUSION ................................................................................................ 52

## TABLE OF AUTHORITIES

**Cases**

*[Docket No. Redacted]*, 2011 WL 10945618, at *9, (FISA Ct. Oct. 3, 2011) ............................ 37

*ACLU v. Clapper*, 785 F.3d 787 (2d Cir. 2015) ............................................. 11, 43

*ACLU v. NSA*, 438 F. Supp. 2d 754 (E.D. Mich. 2006) ............................................... 36

*ACLU v. NSA, et al.*, 13 CV 9198 (S.D.N.Y.) ................................................. 29

*Agurs v. United States*, 427 U.S. 97 (1976) ..................................................... 1

*Brady v. Maryland*, 373 U.S. 83 (1963) ......................................... 1, 26, 47

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ............................................... 25

*Dalia v. United States*, 441 U.S. 238 (1979) ............................................. 47, 48

FISC Dkt. No. Misc. 19-02, March 5, 2020, Order, p. 1 ..................................... 12

FISC, Dkt. Nos. 16-1182, 17-52, 17-376, 17-679, Jan. 7, 2020 Order, p. 1 ................ 12

*Giglio v. United States*, 405 U.S. 150 (1972) .............................................. 1

*Hess v. Indiana*, 414 U.S. 105 (1973) .................................................. 25

*In Re Accuracy Concerns Regarding FBI Matters*
  *Submitted to the FISC* (FISC Dkt. No. Misc. 19-02, Dec. 17, 2019) .................... 12

*In re De Monte*, 667 F.2d 590 (7th Cir. 1981) ........................................... 50

*In re Grand Jury Matter*, 683 F.2d 66 (3d Cir. 1982) .................................... 50

*In re Grand Jury Proceedings of Aug., 1984*, 757 F.2d 108 (7th Cir. 1984) ............. 3, 50

*In re Kevork*, 788 F.2d 566, 569 (9th Cir. 1986) ........................................ 20

*John Doe, Inc. v. Mukasey*, 549 F.3d 861 (2d Cir. 2008) ................................ 45

*Kyllo v. United States*, 533 U.S. 27 (2001) ............................................. 48

*Maryland v. Pringle*, 540 U.S. 366 (2003) .............................................. 23

*Murray v. United States*, 487 U.S. 533 (1988) ........................................ 34, 47

*Smith v. Black*, 904 F.2d 950 (5th Cir. 1990),
  *vacated on other grounds*, 503 U.S. 930 (1992) ...................................... 47

*Snyder v. Phelps*, 131 S. Ct. 1207 (2011) .............................................. 25

*United States v. Alter*, 482 F.2d 1016 (9th Cir. 1973) ................................ 35, 51

*United States v. Apple*, 915 F.2d 899 (4th Cir. 1990) .................................. 35

*United States v. Apple*, 915 F.2d 899 (4th Cir. 1990) .................................. 50

*United States v. Armstrong*, 517 U.S. 456 (1996) ....................................... 52

*United States v. Bagley*, 437 U.S. 667 (1986) ........................................... 1

*United States v. Belfield*, 692 F.2d 141 (D.C. Cir. 1982) ...................................... 19, 26

*United States v. Cavanagh*, 807 F.2d 787 (9th Cir. 1987)........................................ 21

*United States v. Donovan*, 429 U.S. 413 (1977) ...................................................... 48

*United States v. Duggan*, 743 F.2d 59 (2d Cir. 1984) .............................................. 26

*United States v. Fernandez*, 913 F.2d 148 (4th Cir. 1990) ...................................... 49

*United States v. Freitas*, 800 F.2d 1451 (9th Cir. 1986)........................................... 47

*United States v. Gamez-Orduno*, 235 F.3d 453 (9th Cir. 2000) ................................ 47

*United States v. Hamide*, 914 F.2d 1147 (9th Cir. 1990)........................................... 51

*United States v. Hasbajrami*, 11 Cr. 623 (JG) (E.D.N.Y.) ...................................... 39

*United States v. Jones*, 565 U.S. 400 (2012) ............................................................ 48

*United States v. Moalin*, 973 F.3d 977 (9th Cir. 2020)........................................ *passim*

*United States v. Mohammad*, 339 F. Supp. 3d 724 (N.D. Ohio 2018) ...................... 18

*United States v. Mohamud*, 10 Cr. 475 (KI) (D. Oregon).......................................... 39

*United States v. Nixon*, 418 U.S. 683 (1974) ............................................................ 49

*United States v. Ott*, 827 F.2d 473 (9th Cir. 1987) .................................................. 26

*United States v. Pacella*, 622 F.2d 640 (2d Cir. 1980) ............................................ 50

*United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976)............................................. 34

*United States v. Tucker*, 526 F.2d 279 (5th Cir. 1976) ............................................ 50

*Wong Sun v. United States*, 371 U.S. 471 (1963) ............................................. 34, 46, 47

**Statutes**

12 U.S.C. §3414 ........................................................................................................ 45

15 U.S.C. §1681 ........................................................................................................ 45

18 U.S.C. §2518 .................................................................................................. 40, 48

18 U.S.C. §3504 ................................................................................................. *passim*

18 U.S.C. §3511 ........................................................................................................ 45

18 U.S.C. §2339B(a)(1) .............................................................................................. 1

18 U.S.C. §2709 .................................................................................................. 17, 45

50 U.S.C. §1801, *et seq.*...................................................................................... *passim*

50 U.S.C. §1804, *et seq.*........................................................................................ 20, 21

50 U.S.C. §1805, *et seq.*...................................................................................... *passim*

50 U.S.C. §1806, *et seq.*...................................................................................... *passim*

50 U.S.C. §1825, *et seq.*......................................................................................*passim*

50 U.S.C. §1842(c) ............................................................................................... 48

50 U.S.C. §1861.......................................................................................... 17, 43, 44

50 U.S.C. §1881, *et seq.*......................................................................................*passim*

50 U.S.C. §3162 .................................................................................................... 45

Section 702...........................................................................................................*passim*

**Other Sources**

Executive Order 12333 ........................................................................................*passim*

Protect America Act, Pub. L. No. 110-55, 121 Stat. 552 (2007)................................. 36

**Other Authorities**

Alex Abdo, *New Documents Shed Light on One of the NSA's Most Powerful Tools*,
Aug. 29, 2014, AMERICAN CIVIL LIBERTIES UNION.................................................... 29

Amos Toh, Faiza Patel, & Elizabeth Goitein, *Overseas Surveillance in an
Interconnected World*, Brennan Center (Mar. 16, 2016) ........................................ 27

Barton Gellman & Ashkan Soltani, *NSA Collects Millions of E-mail
Address Books Globally*, Wash. Post (Oct. 14, 2013), ........................................... 28

Barton Gellman & Ashkan Soltani, *NSA Tracking Cellphone Locations
Worldwide, Snowden Documents Show*, Wash. Post (Dec. 4, 2013),....................... 28

Brad Heath, *FBI Warned Agents Not to Share Tech Secrets with Prosecutors*,
USA Today (Apr. 20, 2016) ................................................................................. 16

Brendan Sasso, *NSA Tracks Phone Locations Under Executive Order*, Hill (Dec. 6, 2013)....... 28

Charles Doyle, *National Security Letters in Foreign Intelligence Investigations: Legal
Background*, Cong. Research Serv. RL33320 at 1 (July 30, 2015) .......................... 45

Charlie Savage, *Door May Open for Challenge to Secret Wiretaps*,
N.Y. TIMES, Oct. 16, 2013 ................................................................................... 15

Charlie Savage, *Reagan-Era Order on Surveillance Violates Rights,
Says Departing Aide*, Aug. 13, 2014, N.Y. Times............................................ 10, 28, 29

Charlie Savage, *U.S. Used Patriot Act to Gather Logs of Website Visitors*,
N.Y. Times, Dec. 3, 2020 ..................................................................................... 44

Commission on CIA Activities Within the United States, Report to the President (1975).......... 19

Cora Courier and Ryan Deveraux, *The Ghost of Ronald Reagan Authorizes Most NSA Spying*,
The Intercept, Sept. 29, 2014 ............................................................................... 30

DAVID S. KRIS & J. DOUGLAS WILSON, NAT'L SEC.
INVESTIGATIONS & PROSECUTIONS (2012)..................................................... 35, 42, 44

DOJ Office of the Inspector General, *A Review of the Department of Justice's Involvement with the President's Surveillance Program* ........... 10, 16

Executive Order 12333 – FOIA Lawsuit, AMERICAN CIVIL LIBERTIES UNION ........................... 30

FINAL REPORT OF THE SELECT COMMITTEE TO STUDY GOVERNMENTAL OPERATIONS WITH RESPECT T O INTELLIGENCE ACTIVITIES, S. Rep. No. 94-755, 94th Cong., 2d Sess. (1976) ..................................................... 19

Jenna McLaughlin, *FBI Told Cops to Recreate Evidence from Secret Cell-Phone Trackers*, THE INTERCEPT (May 5, 2016) ......................................................... 16

John Napier Tye, *Meet Executive Order 12333: The Reagan rule that lets the NSA spy on Americans* ................................................................... 27, 28

John Shiffman & Kristina Cooke, *U.S. Directs Agents to Cover Up Program Used to Investigate Americans*, REUTERS (Aug. 5, 2013) ................................................... 16

*NSA Overview of Signals Intelligence Authorities*, p. 4 (Jan. 8, 2007), ..................................... 27

*President Trump has signed the FISA reauthorization bill*, Jan. 20, 2018, The Verge ............... 40

Privacy and Civil Liberties Oversight Board, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act*, July 2, 2014 .............. 37

Ryan Devereaux et al., *Data Pirates of the Caribbean: The NSA Is Recording Every Cell Phone Call in the Bahamas*, The Intercept (May 19, 2014) .............................................. 28

Ryan Gallagher, *The Surveillance Engine: How the NSA Built Its Own Secret Google*, The Intercept (Aug. 25, 2014), ................................................................. 29

Sarah St. Vincent, *Dispatches: US Surveillance Court Opinion Shows Harm to Rights*, HUMAN RIGHTS WATCH (Apr. 22, 2016) ......................................................... 15

*The Attorney General's Guidelines for Domestic FBI Operations*, at 7 (Sept. 29, 2008) ........... 16

Tim Cushing, *DEA Gets Unchecked Access to Call Records*, TECHDIRT (July 10, 2014) ........ 16

*Two Sets of Rules for Surveillance, Within U.S. and on Foreign Soil*, N.Y. Times (Aug. 13, 2014), .................................................................................. 27

Walter F. Mondale, Robert A. Stein, and Caitlinrose Fisher, *No Longer a Neutral Magistrate: The Foreign Intelligence Surveillance Court in the Wake of the War on Terror*, 100 MINN. L. REV. 2251, 2267 (June 2016) ..................................................... 39

**Rules**

Fed. R. Crim. P. 16 ........................................................................... 1, 2, 46, 52

Fed. R. Crim. P. 12 ............................................................................ 1, 46, 52

Fed. R. Crim. P. 41 .............................................................................. 16, 48

Defendant, **THOMAS OSADZINSKI**, by and through his attorneys, **STEVEN A. GREENBERG** and **JOSHUA G. HERMAN**, pursuant to Fed. R. Crim. P. 12 and 16, the Due Process and Effective Assistance of Counsel clauses of the Fifth and Sixth Amendments to the Constitution of the United States, as well as the principles established by *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), *Agurs v. United States*, 427 U.S. 97 (1976), and *United States v. Bagley*, 437 U.S. 667 (1986), respectfully moves this Court for its order compelling notice and production of all surveillance techniques that the government and any intelligence agencies used for Defendant's electronic activity and communications, including communications about Defendant or that referenced Defendant, and also all physical surveillance of Defendant. This request specifically includes, but is not limited to, an order requiring the production of any material concerning the intelligence agencies' use of surveillance pursuant to the Foreign Intelligence Surveillance Act ("FISA") and Executive Order (EO) 12333. Defendant also requests that the government submit a declaration pursuant to 18 U.S.C. §3504

## I.     INTRODUCTION

Counsel request that the Court issue an order compelling the prosecutors to provide notice and discovery productions of all surveillance, electronic, digital, physical or otherwise, that it or any other intelligence agencies, acting on its behalf, used to monitor Defendant or obtain information about Defendant. Typically, this type of information would not even need to be requested in a federal criminal case. However, in this case, which charges an offense of material support for terrorism under 18 U.S.C. §2339B(a)(1), this basic information is often impossible to obtain due to positions taken by the government that narrowly construe its disclosure obligations

1

in favor of non-disclosure. For instance, the government has taken the position that it has no obligation to disclose whether FISA was used in this case, presumably on the theory that it does not intend to use at trial any information obtained or derived from FISA surveillance.

As a result, counsel lack the most basic, necessary information about how and when the government's investigation into Defendant began; what surveillance methods were used and when; and, what evidence was collected from those surveillance methods. Such information is an essential predicate to any informed challenge to the government's evidence, particularly through suppression motions. It is also essential to the formulation of the theory of the defense and pretrial investigation direction, strategy and use of resources. Accordingly, this should also be considered as material necessary for the preparation of the defense under Rule 16(a)(1)(E)(i).

Perhaps more importantly, this notice requirement is of a constitutional dimension. Recently, the Ninth Circuit Court of Appeals recently emphasized, that, "[a]t a minimum, then, the Fourth Amendment requires notice to a criminal defendant when the prosecution intends to enter into evidence or otherwise use or disclose information obtained or derived from surveillance of that defendant conducted pursuant to the government's foreign intelligence authorities." *United States v. Moalin*, 973 F.3d 977, 1000 (9th Cir. 2020). The Ninth Circuit held that this notice requirement extended to foreign surveillance conducted under foreign surveillance statutes, such as the Foreign Intelligence Surveillance Act ("FISA") and the controversial Amendments to FISA ("FAA"), as well as to "other foreign intelligence authorities, including Executive Order 12333 and the FAA's predecessor programs." *Id*. at 1001. Notice under these "other foreign intelligence authorities" is essential because those programs lack any statutory protections that are present in

2

FISA. *Id.* Thus, notice of the government's reliance on surveillance techniques is essential to Defendant's Fourth and Fifth Amendment rights, including his right to due process, and is required under various statutes and rules described below. Put simply, the government's decision not to disclose its use of FISA, simply because it will not use information obtained or derived from it, cannot defeat Defendant's constitutional rights to fair notice.

Along these very same lines, notice should also be provided under 18 U.S.C. §3504. Section 3504(a)(1), which is entitled "Litigation concerning sources of evidence," provides in relevant part as follows:

> (a) In any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United States—
> (1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act;

18 U.S.C. 3504. *See In re Grand Jury Proceedings of Aug., 1984*, 757 F.2d 108, 114 (7th Cir. 1984). As discussed in detail below, most of the surveillance authorities that could be in play have not been tested in the courts, and may very well be unlawful. Even in *Moalin*, supra, the Ninth Circuit all but said that bulk collection under Section 215 violated the Fourth Amendment. *See Moalin*, 973 F.3d at 992-93 ("For all these reasons, defendants' Fourth Amendment argument has considerable force. But we do not come to rest as to whether the discontinued metadata program violated the Fourth Amendment because even if it did, suppression would not be warranted on the facts of this case.").

Counsel accordingly requests an order compelling notice and discovery of: (1) each

surveillance program or technique it used to obtain information about Defendant's communications or activities during its investigation; (2) the legal authority relied upon; and (3) any warrants, orders, directives, and court applications that supported the surveillance used.

## II.     THE GOVERNMENT'S INVESTIGATION OF DEFENDANT

Counsel anticipates that the government will contend that its investigation of Defendant was triggered by an anonymous tip that an individual left with the FBI in February of 2018. (FBI302_001-000012-14). According to discovery, this tip indicated that the individual observed Defendant with 100-300 ISIS-related videos on his computer and would watch some of them with the individual. The individual reported that the videos were downloaded from public websites and saved on Defendant's computer. The individual also represented that Defendant said he was in communication with pro-ISIS persons in an online social media application. Following this tip, the FBI conducted open-source social media searches, took screenshots of Defendant's Facebook page that showed he "liked" pages related to left-wing interests. (FBIEC_001-000005, FBIEC_001-000006). In early March 2018, the FBI interviewed Defendant's parents and his sister (FBI302_001-000001-02), and would then attempt to interview Defendant, who was represented by undersigned counsel Greenberg. (FBI302_001-000005-06). Then in late April, the FBI interviewed the initial tipster again, who repeated much of his/her anonymous tip (FBI302_001-000012-14). While the discovery does not appear to contain information related to Defendant's initial downloads of the ISIS-related videos, given the government's interest in investigating those who view and share those videos, it is most certainly plausible that the government was aware of Defendant's online activity prior to the February 2018 anonymous online tip.

4

The bulk of the government's evidence will likely stem from communications between Defendant and other individuals in different Telegram channels. For instance, in or around June 2018, Defendant communicated with others in a chatroom about weapons. (Crim. Compl., ¶¶26-27). Eventually, an undercover online FBI employee, or "OCE" communicated with Defendant and pressed him on whether he had any plans, including for the explosive TATP. Defendant put the OCE1 off and responded, "I think it will be some time before I try anything." (D_OCE1-COM_001-000056A-B). After 23 days passed, OCE1 reached out to Defendant again online. During this exchange, Defendant said, among other things, that he is staying "passive" because the FBI was watching him. (Complaint, ¶28).

Just two days after that online exchange, FBI agents physically entered Defendant's house in Northbrook, apparently under a pretense, as the home was listed for sale. (FBIFISUR_001-000001). FBI agents took photographs of the house of items including, "open book with contacts," "miscellaneous paperwork containing password '[XXXX]',"[1] "computer with external drive attached and removable thumb drive inserted," "military desert camouflage uniforms with helmet cover," "Star Wars Lego set," "clothes hanging in walk in closet," a "screen shot of WiFi networks" (which was apparently accessed once agents were inside the home), and other items from inside the home, including electronics and computers. (FBIFISUR_001-000001-000029).

One month later, on July 5, 2018, Defendant communicated online in another Telegram channel with another undercover FBI employee, described as "OCE5." (BINDER_006-OCE5_001-000085). Defendant told OCE5 that the FBI had been watching him and sent OCE5

---

[1] The password identified in the FBI report is not repeated here in this public pleading.

an audio file of a voicemail that an FBI agent left for him. (BINDER_006-OCE5_001-000072, BINDER_006-OCE5_001-000073). Defendant told OCE5 that the FBI wanted his computer, and in response OCE5 asked if they were just looking for "dawla" videos. Defendant replied, "I have no weapons . . . and the videos aren't illegal." (BINDER_006-OCE5_001-000065). That same day, and on at least several other occasions that month, the FBI conducted physical surveillance of Defendant at his parents' house in Northbrook. (FBIFISUR_001-000096; FBIFISUR_001-000096; FBIFISUR_001-000097).

On or about July 31, 2018, an FBI agent met with a confidential human source and showed him/her photographs of Defendant. The source recognized Defendant and told the agent that Defendant was at the Muslim Community Center in Chicago on July 27, 2018, and that they were in the same room for afternoon prayer. (FBIEC_001-000066). The FBI report further states, "CHS did not notice OSADZINSKI speak to anyone or notice anyone who appeared to be showing OSADZINSKI around." (*Id*.). The FBI continued to conduct physical surveillance of Defendant over the next several months, including during another pretense visit inside the family home in Northbrook (FBIFISUR_001-000030-000077); outside of Defendant's grandmother's house in Chicago (FBIFISUR_001-000078-91); of Defendant in Highland Park (FBIFISUR_001-000092-95); of Defendant on the job as a delivery truck driver (FBIFISUR_001-000101); of Defendant going to college classes at DePaul (FBIFISUR_001-000103); of Defendant going to his apartment off Lakeshore Drive (FBIFISUR_001-000104); and of Defendant attending religious services at the Islamic Center (FBIFISUR_001-000106; FBIFISUR_001-000109).

On or about February 7, 2019, Defendant contacted OCE2, another online covert FBI

employee, who purported to be from a pro-ISIS media online organization, not ISIS itself. (Complaint, ¶¶29, 31). During their online communications, Defendant told OCE2 that he knew Arabic well (which was not true) and that he could help translate material. (Complaint, ¶32). Less than a week later, on February 13, 2019, the FBI introduced a confidential human source ("CHS") to interact with Defendant in-person. The CHS met with Defendant in connection with his DePaul college computer science course, and told him about computer programming opportunities. (Complaint, ¶69). In reality, the FBI, either with or without DePaul's knowledge, set up a ruse job opportunity for the FBI CHS to use as an excuse to interact with Defendant. It began when another FBI agent came to one of Defendant's DePaul computer science classes pretending to be from the company and recruited students to do beta-testing for anti-virus software. Defendant accepted the job, and was paid approximately $1,000 for this employment. Notably, the CHS acted as Defendant's supervisor for this job, and Defendant reported to him. Also noteworthy is the fact that, as reflected in the Criminal Complaint, the CHS has been an FBI source since 2013, and was paid approximately $350,000.00 for his services. (Crim. Compl., ¶69, footnote 28).

Defendant and the CHS first met in-person on February 27, 2019, and would meet a total of five times over several months. (Crim. Compl., ¶70). While meeting with the CHS, Defendant continued to communicate with OCE2 online. In one chat, Defendant told OCE2 that "brother no name" showed him how to copy channels. (OCE2-CHS-COM_001-000047). OCE2 continued to try and have Defendant translate material, despite Defendant's poor Arabic. For instance, on March 19, 2019, OCE2 asked Defendant to translate a manual referencing car bombs from English to Arabic; however, Defendant put off OCE2 and replied that his Arabic was not good enough and

that he would have to ask someone else. (OCE2_CHS-COM_001-000230-OCE2_CHS-COM_001-000231). Around August 16, 2019, Defendant would send OCE2 a document entitled "Operation: Heralds of the Internet," which purported to show a script written in Python code that could organize videos, including pro-ISIS videos, and then download them. (Complaint, ¶56). Two more OCEs, dubbed OCE3 and OCE4, would also communicate with Defendant around this time period. Defendant allegedly showed OCE4 how the python script operated in order to organize and download videos. (Complaint, ¶66).

The use of additional surveillance under statutory and non-statutory authorities is all the more likely given Defendant's international travel to Indonesia in 2019 when he married an Indonesian national. *See*, *e.g.*, FISA Section 704 (requiring government to obtain a FISA order to target a U.S. person located abroad). The government should provide notice of any and all surveillance, as such notice is "a critical component of the Fourth Amendment in the context of [this] criminal prosecution." *Moalin*, 973 F.3d at 1000.

## III. <u>ARGUMENT</u>

At the outset, defense counsel note that this pleading does not suggest or accuse that the prosecutors on this case are deliberately withholding information; nor does it criticize the particular prosecutors in this case. Yet, at the same time, the prosecutors' routine response, being that they are aware of their notice and discovery obligations, should not be accepted as the conclusive end to all discussion in a national security case such as this one. This dynamic is evident in the discovery correspondence in this case. On January 23, 2021, defense counsel provided the government with an extensive discovery letter requesting details on the potential surveillance

8

authorities that were used in the investigation of Defendant. A copy of that letter is attached hereto as Exhibit A. On April 7, 2021, the government responded to that letter, a copy of which is attached hereto as Exhibit B. The government's response side-steps many of the requests that defense counsel made regarding the surveillance authorities. Regarding FISA in particular, the government states only: "it is the government's position that a FISA notice is not required in this matter." (Exhibit B, p. 2).[2] That response encapsulates counsel's concerns that compel this Motion. It deprives Defendant of basic notice of the surveillance used against him and the ability to challenge that surveillance. It obfuscates whether or not the fruits of that surveillance were then used to obtain other information against Defendant. The government's position reflects an overall design whose goal is to disclose as little as possible, if anything is disclosed at all, which thereby insulates the intelligence agencies that continue to operate without independent or meaningful oversight. Over and over, intelligence agencies have been caught withholding or misrepresenting information related to national security surveillance issues, particularly in *ex parte* proceedings. The fact that these same intelligence agencies presumably played a role in conducting any surveillance of Defendant underscores the need for notice.

A.    **The Government and the Intelligence Agencies Have a Documented History of Not Disclosing Controversial Surveillance Techniques.**

First, for many types of surreptitious surveillance, the government does not believe it has any obligation to provide notice to criminal defendants–despite the fact that such a position deprives defendants like Mr. Osadzinski of the opportunity to vindicate their constitutional rights

_____

[2] For the purposes of this motion, this discovery correspondence should satisfy any meet-and-confer requirements.

through suppression motions. That belief is manifested in the government's April 7, 2021, discovery response in this case. Rather than simply stating whether FISA was or was not used in this case, the government asserted: "it is the government's position that a FISA notice is not required in this matter." (Exhibit B). The government's letter also ignores the defense requests for notice of numerous other surveillance authorities, such as EO 12333.

Recent public disclosures indicate that the government holds an unjustifiably narrow view of its notice obligations, even when it relies on novel and legally untested surveillance methods in its investigations. For example, as is the case here, government officials have insisted that "defendants have no right to know" if investigators derived evidence from any of the government's sweeping surveillance activities under Executive Order 12333.[3] In fact, the government appears to maintain a policy against using "incidental 12333 intercepts of Americans as *direct* evidence in criminal prosecutions against them . . . so as not to have to divulge the origins of the evidence in court."[4]

The Justice Department also used so-called "scrubbing" procedures for years as part of a strategy to ensure that defendants never learned of warrantless wiretapping conducted under the "StellarWind" program and thus had no opportunity to challenge it.[5] (*See* DOJ Office of the Inspector General, *A Review of the Department of Justice's Involvement with the President's Surveillance Program* (July 2009), available at: http://nyti.ms/1Yvwvop (PDF pages 415–25,

---

[3] *See* Charlie Savage, *Reagan-Era Order on Surveillance Violates Rights, Says Departing Aide*, N.Y. Times, Aug. 13, 2014, http://nyti.ms/1wPw6l0, (hereinafter "Savage 12333 Article")

[4] *Id.*

10

672–77, 694–96) (hereinafter "StellarWind IG Report").) The government has also taken the position that defendants have no right to know when the NSA's bulk call-records program contributed to prosecutions—even though the Second Circuit declared that surveillance program to be illegal after its existence was finally revealed. *ACLU v. Clapper*, 785 F.3d 787 (2d Cir. 2015).

More recently, on December 9, 2019, the Department of Justice Office of Inspector General ("DOJ OIG") issued an extensive and scathing report entitled, "Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation,"[5] that concluded that the FBI repeatedly misrepresented evidence, omitted facts, and failed to disclose material that was contrary to its theories in the very high-profile, Carter Page FISA applications that were part of the "Crossfire Hurricane" investigation. In the summary of its findings, the DOJ OIG concluded, in part, that "the Crossfire Hurricane team failed to inform [DOJ] officials of significant information that was available to them at the time that the FISA applications were drafted and filed. Much of that information was inconsistent with, or undercut, the assertions contained in the FISA applications that were used to support probable cause and, in some instances, resulted in inaccurate information being included in the applications." (*Id.*, p. v). After arriving at those findings, the DOJ OIG conducted a broader investigation that concluded that these problems, particularly with what are known as "Woods Procedures" that help ensure the reliability of FISA applications, were widespread and not isolated to the Page FISA applications. According to the DOJ OIG, these problems were primarily caused by the FBI's "failure to share all relevant information" with the

---

[5] *See* https://bit.ly/3da86mw. (last visited April 12, 2021).

National Security Division's Office of Intelligence." (*Id*., p. viii). Due to the serious failures in the Carter Page FISA applications, the DOJ OIG concluded that "additional OIG oversight work is required to assess the FBI's compliance with [DOJ] and FBI FISA-related policies that seek to protect the civil liberties of U.S. persons," and therefore initiated an audit to "further examine the FBI's compliance with the Woods Procedures in FISA applications." (*Id*.).

The FISC also reviewed these findings concerning the FBI's malfeasance and expressed its dismay at its conduct, particularly that the *ex parte* FISA proceedings demanded higher standards of candor. On December 17, 2019, within days of the DOJ OIG's initial report on Crossfire Hurricane, Judge Rosemary Collyer, writing for the FISC, issued a stunning written rebuke of the FBI's practices before the court. *See In Re Accuracy Concerns Regarding FBI Matters Submitted to the FISC* (FISC Dkt. No. Misc. 19-02, Dec. 17, 2019).[6] On January 7, 2020, Judge James Boasberg of the FISC issued an order following the government's efforts to comply with the FISC's December 17, 2019 order.[7] The FISC noted how the government concluded that "in view of the material misstatements and omissions" that two of the FISC's authorizations for Page's FISA authorizations "were not valid." (FISC, Dkt. Nos. 16-1182, 17-52, 17-376, 17-679, Jan. 7, 2020 Order, p. 1). Then, on March 5, 2020, Judge Boasberg wrote another FISC order that stunningly observed that there was "little doubt that the government breached its duty of candor to the Court with respect to [the Page] applications."[8] (FISC Dkt. No. Misc. 19-02, March 5, 2020, Order, p. 1). The FISC further observed, again speaking directly to undersigned counsel's present

---

[6] This order is available at: https://bit.ly/33T93ur (last visited April 12, 2021).
[7] Available at: https://bit.ly/37HllXS (last visited April 12, 2021).
[8] Available at: https://bit.ly/3lWAIka (last visited April 12, 2021).

concerns, that the "frequency and seriousness" of the errors *"called into question the reliability of the information proffered in other FBI applications."* (*Id.*) (emphasis added).

On March 30, 2020, after conducting its audit and review of the FISA process and the FBI's compliance with the Woods Procedures in particular, the DOJ OIG issued a highly critical memorandum entitled, "Management Advisory Memorandum for the Director of the Federal Bureau of Investigation Regarding the Execution of Woods Procedures Filed with the Foreign Intelligence Surveillance Court Relating to U.S. Persons," consistent with the FISC's belief that there were widespread failures and deficiencies in other FBI FISA applications. (March 30, 2020 DOJ OIG Memorandum").[9]   In short, the DOJ OIG concluded that the serious compliance problems and oversight deficiencies found in the Crossfire Hurricane FISA applications were not isolated to that investigation, but instead "*routinely* identified deficiencies in documentation supporting FISA applications." (March 30, 2020 DOJ OIG Memorandum, p. 5) (emphasis added). The DOJ OIG's audit included a review of twenty-nine (29) FISA applications related to U.S. Persons that were prepared by various FBI field offices.  The DOJ OIG bluntly concluded that it lacked confidence that the FBI complied with its own Woods Procedures.  It explained the basis for this lack of confidence, which we submit should concern this Court as well, with the following very disconcerting language:

> Our lack of confidence that the Woods Procedures are working as intended stems primarily from the fact that:  (1) we could not review original Woods Files for 4 of the 29 selected FISA applications because the FBI has not been able to locate them and, in 3 of these instances, did not know if they ever existed; (2) our testing of FISA applications to the associated Woods Files identified apparent errors or inadequately supported facts in all of the 25 applications we reviewed, and

---

[9] Available at: https://bit.ly/3s9zaX9 (last visited April 12, 2021).

interviews to date with available agents or supervisors in field offices generally have confirmed the issues we identified; (3) existing FBI and NSD oversight mechanisms have also identified deficiencies in documentary support and application accuracy that are similar to those that we have observed to date; and (4) FBI and NSD officials we interviewed indicated to us that there were no efforts by the FBI to use existing FBI and NSD oversight mechanisms to perform comprehensive, strategic assessments of the efficacy of the Woods Procedures or FISA accuracy, to include identifying the need for enhancements to training and improvements in the process, or increased accountability measures.

March 30, 2020 DOJ OIG Memorandum, pp. 2-3. The "deficiency in the FBI's efforts to support the factual statements in FISA applications through its Woods Procedures *undermines the FBI's ability to achieve is 'scrupulously accurate' standard for FISA applications*." *Id*., p. 3. The DOJ OIG report also found that specific requirements related to FISA applications that utilized CHS reporting were not "consistently followed." (*Id.*, p. 7).

Thus, when the government inevitably points to the "safeguards" supposedly built into the FISA process, the Court should consider how the DOJ OIG and the FISC recently found that the government abused the *ex parte* process and lied, even with those procedures in place. This recent episode is, of course, not the first time that the FBI has been caught lying to the FISC—and is compelling support for disclosure and at least this Court's review of any FISA applications submitted in this case.

Second, even in those instances where notice is expressly required by statute, the government has failed to provide it. The Justice Department failed to provide *any* defendant with notice of FAA Section 702 (50 U.S.C. § 1881a) surveillance for more than five years, even though Congress made notice of that surveillance compulsory. *See* 50 U.S.C. §§ 1806(c), 1881e(a). The government apparently withheld notice based on a unilateral and unreviewable determination that

its evidence was not "derived from" the surveillance.[10]  The government altered course in 2013, but only after public outcry prompted the Solicitor General to conclude that the Justice Department's notice policy "could not be legally justified."[11]  The Ninth Circuit's decision in *Moalin* painstakingly details how the government failed to provide notice of "bulk collection" of telephonic metadata through Section 215 of the Patriot Act.  *Moalin*, 973 F.3d at 987-89.

Put simply, courts and defendants must have the ability to ensure that the government is not interpreting away its notice obligations through secret or self-serving legal and factual determinations. *See Alderman v. United States*, 394 U.S. 165, 168 (1969) (requiring adversarial proceeding to determine whether evidence was "derived from" unlawful surveillance).

### 1. "Parallel Construction."

Notice and discovery are all the more necessary in light of government efforts to conceal surveillance through the use of "parallel construction."  Parallel construction takes multiple forms, but it is broadly designed to make evidence obtained from one source appear as though it was obtained from another.[12]  This process often involves re-obtaining the same information using a second, less controversial method, in order to insulate the original method from judicial

---

[10] *See* Charlie Savage, *Door May Open for Challenge to Secret Wiretaps*, N.Y. Times, (Oct. 16, 2013), http://nyti.ms/1r7mbDy (describing how the Justice Department "long used a narrow understanding of what 'derived from' means" to improperly withhold notice from criminal defendants).

[11] *Id.*

[12] *See, e.g.*, Sarah St. Vincent, *Dispatches: US Surveillance Court Opinion Shows Harm to Rights*, HUMAN RIGHTS WATCH (Apr. 22, 2016), https://bit.ly/3oHuLtc (last visited Dec. 10, 2020) (describing parallel construction as a process through which the government creates "an alternative explanation for how the authorities discovered a certain fact," thereby masking the true source of the information).

scrutiny.[13] Thus, emails initially obtained using a controversial foreign intelligence program might be re-obtained using an ordinary Rule 41 warrant or a grand jury subpoena, leaving both the defendant and the Court oblivious as to the original source. From what has been disclosed of this controversial tactic, parallel construction is routinely accompanied by instructions that agents shall not mention the original surveillance in any court filings, testimony, or legal proceedings.[14] In other instances, agents have even withheld this information from prosecutors in order to avoid disclosure in court.[15]

> B.    The Government's Known Surveillance Tools.

Public disclosures over the last several years, including those highlighted above, make it clear that the intelligence agencies use an array of surveillance programs and techniques in national security investigations and prosecutions, and that information ostensibly seized as "intelligence" is readily available to the agents investigating the crime.[16] However, due to the very nature of this motion for notice and discovery, the defense is not in a position to identify every type of surveillance the intelligence agencies may have used in its investigation and into or

---

[13] *See* John Shiffman & Kristina Cooke, *U.S. Directs Agents to Cover Up Program Used to Investigate Americans*, REUTERS (Aug. 5, 2013), https://reut.rs/3n6vjsv (last visited Dec. 10, 2020) (describing parallel construction as a form of evidence laundering).

[14] *See* StellarWind IG Report at 401 (describing instructions forbidding agents from citing warrantless StellarWind surveillance "in affidavits, court proceedings, subpoenas, or for other legal or judicial purposes"). Jenna McLaughlin, *FBI Told Cops to Recreate Evidence from Secret Cell-Phone Trackers*, The Intercept (May 5, 2016), http://bit.ly/24uFSd5 (last visited Dec. 10, 2020) (same for Stingray surveillance); Tim Cushing, *DEA Gets Unchecked Access to Call Records*, Techdirt (July 10, 2014), http://bit.ly/1ErIUAn (last visited Dec. 10, 2020) (same for Hemisphere surveillance).

[15] *See* Shiffman & Cooke, *supra*; Brad Heath, *FBI Warned Agents Not to Share Tech Secrets  with Prosecutors*, USA Today (Apr. 20, 2016), http://usat.ly/1W2zIvl. (last visited Dec. 10, 2020).

[16] *See The Attorney General's Guidelines for Domestic FBI Operations*, at 7 (Sept. 29, 2008), https://bit.ly/2W5njvY (last visited Dec. 10, 2020).

about Defendant. Nevertheless, it is possible to identify the types of foreign intelligence surveillance that were most likely relied upon by the agencies given the allegations in this case.

- Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. §§ 1801-1812 and 1821-1829;

- Executive Order 12333;

- Section 702 of FISA (50 U.S.C. §1881a) (Surveillance targeting non-U.S. persons without a warrant)

- Sections 703–05 of FISA (50 U.S.C. §1881b–d) (Surveillance targeting U.S. persons who are located overseas);

- Section 215 of the Patriot Act (50 U.S.C. §1861) (Collection of business records, including bulk collection prior to November 29, 2015); and,

- National Security Letters (18 U.S.C. §2709 &(c)) (Collection of call records, internet records, financial records, and other materials).

Importantly, Defendant seeks notice and discovery of surveillance that involved the monitoring of his communications and activities, regardless of whether or not he was the original "target" of that surveillance. Indeed, even if Defendant was not originally targeted, he is "aggrieved" by the monitoring of his communications and activities and is therefore entitled to notice of the FISA surveillance. *See, e.g.*, 50 U.S.C. §1806(c) (notice requirement), §1801(k), (defining "aggrieved person" as "a person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance"); §1821(k) (defining "aggrieved person" as "a person whose premises, property, information, or material is the target of physical search or any other person whose premises, property, information, or material was

17

subject to physical search"). Below is a brief overview of the surveillance tools for which counsel requests notice and discovery.

### 1. FISA

As noted above, the government has taken the position that "a FISA notice is not required in this matter." Tellingly, the government's response to counsel's discovery letter does *not* simply state that FISA was not used. The refusal to provide that direct and simple response strongly implies that it was used, and the government has taken the position because it does not view Defendant to be an aggrieved person who is entitled to notice under the statute and therefore cannot move to suppress the fruits of any FISA surveillance. FISA requires the government to "notify the aggrieved person and the court or other authority in which the information is to be disclosed or used that the Government intends to so disclose or so use such information" when it "intends to enter into evidence or otherwise use or disclose in any trial … against an aggrieved person, any information obtained or derived from an electronic surveillance of that aggrieved person pursuant to" FISA. 50 U.S.C. §1806(c); §1825(d) (standard for physical FISA searches). FISA further provides that the person "against whom evidence obtained or derived from an electronic surveillance to which he is an aggrieved person … may move to suppress the evidence obtained or derived from such electronic surveillance." 50 U.S.C. §1806(e); §1825(f) (standard for physical FISA searches). *See also United States v. Mohammad*, 339 F. Supp. 3d 724, 735 (N.D. Ohio 2018) ("An aggrieved person can move for suppression on the grounds that (1) the information was unlawfully acquired or (2) the surveillance or physical search was not made in conformity with the FISC's order."). Respectfully, the Court should not

18

automatically accept the government's positions that Defendant is either not an aggrieved person and/or that the government will not use any FISA-derived evidence at trial. This request comes in light of the history of FISA, its purpose, and how the likely use of said surveillance evidence in this case ostensibly appears to be improper and could very well have generated evidence that was used in the investigation of Defendant, even if the government conveniently declares that it will not be "trial evidence."

As background, FISA, 50 U.S.C. §1801, et seq., was enacted in 1978 in the wake of domestic surveillance abuses by federal law enforcement agencies as catalogued in Congressional Committee and Presidential Commission Reports.[17] The statute was designed to provide a codified framework for foreign intelligence gathering within the confines of the United States in response to civil liberties concerns and the gap in the law noted by the Supreme Court in *United States v. United States District Court (Keith, J.)*, 407 U.S. 297, 308-09 (1972).

Through FISA, Congress attempted to limit the propensity of the Executive Branch to engage in abusive or politically-motivated surveillance. FISA constituted Congress' attempt to balance the "competing demands of the President's constitutional powers to gather intelligence deemed necessary to the security of the Nation, and the requirements of the Fourth Amendment." H.R. Rep. No. 95-1283, at 15. As a result, FISA's provisions represented a compromise between

---

[17] *See*, *e.g.*, FINAL REPORT OF THE SELECT COMMITTEE TO STUDY GOVERNMENTAL OPERATIONS WITH RESPECT TO INTELLIGENCE ACTIVITIES, S. Rep. No. 94-755, 94th Cong., 2d Sess. (1976); Commission on CIA Activities Within the United States, Report to the President (1975) (commonly referred to as the "Rockefeller Commission Report"). *See also United States v. Belfield*, 692 F.2d 141, 145 (D.C. Cir. 1982) ("[r]esponding to post-Watergate concerns about the Executive's use of warrantless electronic surveillance, Congress, with the support of the Justice Department, acted in 1978 to establish a regularized procedure for use in the foreign intelligence and counterintelligence field").

19

civil libertarians seeking preservation of Fourth Amendment and privacy rights, and law enforcement agencies citing the need for monitoring agents of a foreign power operating in the United States. *See In re Kevork*, 788 F.2d 566, 569 (9th Cir. 1986) (quotation omitted) (FISA "was enacted in 1978 to establish procedures for the use of electronic surveillance in gathering foreign intelligence information. . . . The Act was intended to strike a sound balance between the need for such surveillance and the protection of civil liberties"). Since its inception, FISA's constitutionality has been upheld without exception.

Important differences exist between the standards for a FISA warrant and that issued under the Fourth Amendment and/or Title III of the U.S. Criminal Code. The "probable cause" required under FISA is merely that the target qualifies as an "agent of a foreign power." (*See* 50 U.S.C. §§1801(b)). The standard does not require that a crime has been, or is being, committed, but rather that the "agent of a foreign power" will use the electronic device subject to electronic surveillance, or owns, possesses, uses, or is in the premises to be searched. (*See* 50 U.S.C. §§1805(a)(3) & 1824(a)(3)).

In that context, FISA establishes procedures for surveillance of foreign intelligence targets, pursuant to which a federal officer acting through the Attorney General may obtain judicial approval for conducting electronic surveillance for foreign intelligence purposes. The FISA statute created a special FISA Court—the FISC—to which the Attorney General must apply for orders approving electronic surveillance of a foreign power, or an agent of a foreign power, for the purpose of obtaining foreign intelligence information. *See* 50 U.S.C. §§1802(b), 1803 & 1804.

20

The FISC is a unique court, as the Ninth Circuit explained in *United States v. Cavanagh*, 807 F.2d 787 (9th Cir. 1987): "[w]ith important exceptions not pertinent here, FISA requires judicial approval before the government engages in any electronic surveillance for foreign intelligence purposes." *Id.* at 788. FISA also requires that any application to the FISC be made under oath by a federal officer and contain certain information and certifications found in §1804, which include identifying or describing the target (§1804(a)(2)); containing "a statement of the facts and circumstances relied upon by the applicant to justify his belief that…the target of the electronic surveillance is a foreign power or an agent of a foreign power; and .. each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power" (§1804(a)(3)); a statement of proposed minimization procedures" §1804(a)(4); "a description of the nature of the information sought and the type of communications or activities to be subjected to the surveillance" (§1804(a)(5)); various certifications by government officials (§1804(a)(6)(A)-(E); a statement stating "whether physical entry is required to effect the surveillance" (§1804(a)(7)); a statement regarding any previous applications (§1804(a)(8)); and, "a statement of the period of time for which the electronic surveillance is required to be maintained." (§1804(a)(9)).

Also, in accordance with §1805(a)(4), if a target is a "United States person," the FISC must determine whether the "certifications" under §1804(a)(6)(E)—namely that the information sought is "the type of foreign intelligence information designated," and the information "cannot reasonably be obtained by normal investigative techniques"—are "not clearly erroneous." In addition, §1805(a)(2)(A) provides "that no United States person may be considered a foreign

power . . . solely upon the basis of activities protected by the first amendment." As a U.S. citizen, Defendant qualifies as a "United States person" under §1801(i).

Critical to the operation of FISA and its application in this case are the definitions related to "foreign power" set forth in 50 U.S.C. §1801. A "foreign power" is defined in §1801(a) to include foreign governments, groups they control, and groups engaged in terrorism. An "Agent of a foreign power" is defined as any person who:

(A) knowingly engages in clandestine intelligence gathering activities for or on behalf of a foreign power, which activities involve or may involve a violation of the criminal statutes of the United States;

(B) pursuant to the direction of an intelligence service or network of a foreign power, knowingly engages in any other clandestine intelligence activities for or on behalf of such foreign power, which activities involve or are about to involve a violation of the criminal statutes of the United States;

(C) knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power;

(D) knowingly enters the United States under a false or fraudulent identity for or on behalf of a foreign power or, while in the United States, knowingly assumes a false or fraudulent identity for or on behalf of a foreign power; or,

(E) knowingly aids or abets any person in the conduct of activities described in subparagraph (A), (B), or (C) or knowingly conspires with any person to engage in activities described in subparagraph (A), (B), or (C).

50 U.S.C. §1801(b)(2) (Section 1801(b)(1) defines an "Agent of a foreign power" by a series of acts done by someone who is any person "other than a United States person" that are much broader than those set forth in subsection (b)(2) and quoted above, which are applicable to "United States persons.")

Orders authorizing FISA wiretaps are issued for certain specified periods of time, but can be extended pursuant to additional applications. §§1805(d)(1) & (2). FISA authorizes any "aggrieved person" to move to suppress evidence obtained or derived from an electronic surveillance on the grounds that "the information was unlawfully acquired" or "the surveillance was not made in conformity with an order of authorization or approval." §§1806(e)(1) & (2); 1825(f). FISA defines "aggrieved person" as "a person who is the target of electronic surveillance or any other person whose communications or activities were subject to electronic surveillance." §1801(k). FISA permits evidence generated in intelligence investigations to be used in criminal prosecutions. §§1806(b) & 1825(c).

When notice of FISA surveillance is provided, an "aggrieved" defendant may move to suppress FISA-generated evidence, §1806(f) provides that if the Attorney General files an affidavit that "disclosure or an adversary hearing would harm the national security of the United States," the court deciding the motion must consider the application and order for electronic surveillance in camera to determine whether the surveillance was conducted lawfully.

Before authorizing FISA surveillance, the FISA Court must find, inter alia, probable cause to believe that "the target of the electronic surveillance is a foreign power or an agent of a foreign power." §1805(a)(2)(A). The Supreme Court has reiterated the long-standing rule that criminal probable cause requires "a reasonable ground for belief of guilt," and that "the belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Under FISA, though, unlike a traditional warrant, the probable cause

standard is directed not at the target's alleged commission of a crime, but at the target's alleged status as "a foreign power or an agent of a foreign power."

Here, absent any notice of the use of FISA, much less the opportunity to review the applications for any of the surveillance orders at issue, defense counsel cannot specify whether the allegations asserting that, for example, Defendant was an "agent of a foreign power" were sufficient to satisfy FISA. Because Defendant is an American citizen, any warrant should have been issued under §1801(b)(2). Most of the authority for warrant against a United States person is obviously inapplicable to this case. There is no suggestion that Defendant engaged in clandestine intelligence gathering (§1801(b)(2)(A)), acted under the direction of an intelligence network of a foreign power (§1801(b)(2)(B)), that he knowingly engaged in sabotage or international terrorism on behalf of a foreign power (§1801(b)(2)(C)), that he entered the United States under a false or fraudulent identity (§1801(b)(2)(D)), or that he aided or abetted or conspired in any such activity (§1801(b)(2)(E). Indeed, in reviewing FISA's definitions of "agent of a foreign power" under §1801(b)(2), it is difficult to comprehend which was most likely utilized for Defendant.

FISA includes an additional restriction for electronic surveillance of a "United States person," as it prohibits finding probable cause for such a target based solely upon First Amendment activities. In making that probable cause determination, the statute directs "[t]hat no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment." §1805(a)(2)(A). Accordingly, if the target participated in First Amendment activities such as downloading videos online, sharing videos, or

24

posting comments in chat rooms, such activities *cannot* serve as a basis for probable cause for a FISA warrant. Based on the discovery received and reviewed thus far, Defendant's online activity appears to be limited to such expressive behavior. Such expression clearly implicates First Amendment protected conduct, no matter how distasteful the government or even the general public may find it. *See Snyder v. Phelps*, 131 S. Ct. 1207 (2011) (First Amendment protects picketers at military funeral). Activities such as expressing support, urging others to express support, gathering information, and distributing information are protected and cannot serve as a basis for probable cause. Moreover, the First Amendment includes the freedom to advocate the use of force or the violation of the law or even to advocate for unlawful action at some indefinite time in the future. *See Brandenburg v. Ohio*, 395 U.S. 444, 447-49 (1969); *Hess v. Indiana*, 414 U.S. 105, 108-09 (1973).

This, of course, raises the serious question whether there was any basis, other than protected First Amendment activity, for commencing FISA surveillance on Defendant, if it in fact occurred. Should the answer be in the negative, the FISA surveillance would be invalid under 50 U.S.C. §1805(a)(2)(A). In any event, it is essential that the adversary process be allowed to function in its full capacity in this case to ensure the proper enforcement of FISA's First Amendment protections, and that defense counsel be allowed to view all FISA applications and warrants and fully participate in challenging their validity.

So that counsel may fully develop the arguments articulated above in order to allow the Court to make a fully informed decision regarding suppression as well as other critical issues, such

as the production of *Brady* material, the Court should order that the government provide notice of the use of FISA in this case.

According to FISA's legislative history, disclosure to defense counsel may be "necessary" under 50 U.S.C. §1806(f): where the court's initial review of the application, order, and fruits of the surveillance indicates that the question of legality may be complicated by factors such as "indications of possible misrepresentation of fact, vague identification of the persons to be surveilled, or surveillance records which include a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order." *Belfield*, 692 F.2d at 147 [quoting S. Rep. No. 701, 95th Cong., 2d Sess. 64 (1979)]; *see, e.g.*, *United States v. Ott*, 827 F.2d 473, 476 (9th Cir. 1987) (same); *United States v. Duggan*, 743 F.2d 59, 78 (2d Cir. 1984) (same).

Here, as discussed above, there are ample justifications for disclosure of the FISA applications, which would permit defense counsel an opportunity to demonstrate that the requisite probable cause with respect to the issue of knowledge was lacking, that with respect to Defendant, a "United States person," the alleged "activities" fell within the protection of the First Amendment and, thus, could not be used as a basis for probable cause in any event, and/or that the information in the applications was either unreliable or obtained via illegal means. But none of these important questions can be answered unless Defendant first receives "notice" of the FISA surveillance, as should be provided here if, in fact, FISA was used in any capacity either to target Defendant or if any of his communications, or communications about him were incidentally collected through FISA. As such, counsel requests—at a minimum—that notice of FISA surveillance be provided.

### 2. Executive Order 12333

Public disclosures, primarily resulting from Freedom of Information Act litigation spearheaded by the American Civil Liberties Union, as well as through public comments by a former State Department official turned whistleblower, have called critical attention to the routine use of EO 12333, a controversial executive directive first issued by President Reagan in 1981 and subsequently revised. EO 12333 serves as the "primary source" of the NSA's foreign intelligence-gathering authority and governs most surveillance conducted abroad.[18] Over the past several years, it has grown increasingly clear that the scale of the intelligence agencies' surveillance under EO 12333 is vast—and that those agencies use this information when investigating individuals here in the United States.[19]

By its terms, EO 12333 authorizes the "Intelligence Community" to, among other things, "collect information concerning, and conduct activities to protect against, international terrorism, proliferation of weapons of mass destruction, intelligence activities directed against the United States, international criminal drug activities, and other hostile activities directed against the United States by foreign powers, organizations, persons, and their agents." (E.O. 12333 1.4(b)). Public disclosures show that the scope of EO 12333 surveillance is significantly broader than its already expansive terms. *See* John Napier Tye, *Meet Executive Order 12333: The Reagan rule that lets*

---

[18] *See NSA Overview of Signals Intelligence Authorities*, p. 4 (Jan. 8, 2007), http://bit.ly/1ruKbBk.

[19] *See generally* Amos Toh, Faiza Patel, & Elizabeth Goitein, *Overseas Surveillance in an Interconnected World*, Brennan Center (Mar. 16, 2016), http://bit.ly/1UfSdMW; *Two Sets of Rules for Surveillance, Within U.S. and on Foreign Soil*, N.Y. Times (Aug. 13, 2014), http://nyti.ms/1u2juDt (chart describing uses of EO 12333 surveillance).

*the NSA spy on Americans*.[20]  (explaining how EO 12333 authorized bulk collection and storage of the content of U.S. person communications that are incidentally collected through mass surveillance methods, and that the EO 12333 "does not require that the affected U.S. persons be suspected of wrongdoing and places no limits on the volume of communications by U.S. persons that may be collected and retained.").

Other reports show just how expansive the intelligence agencies' surveillance under EO 12333 has become. These reports indicate that the NSA surveillance has included, among other things:

- Collecting communications in bulk from overseas communications hubs and from satellite transmissions.[21]

- Collecting nearly five billion records per day on the location of cell phones, including those of Americans.[22]

- Collecting hundreds of millions of contact lists and address books from personal email and instant-messaging accounts.[23]

- Recording and storing every single phone call into, out of, and within at least two countries, including the Bahamas.[24]

The number of United States residents swept up in EO 12333 incidental collection is

---

[20] The article is also available at:  https://wapo.st/37VOs9Q (last visited Dec. 10, 2020).

[21] *See* Charlie Savage, *supra* note 3.

[22] Brendan Sasso, *NSA Tracks Phone Locations Under Executive Order*, Hill (Dec. 6, 2013), http://bit.ly/1BOqWCZ; *see* Barton Gellman & Ashkan Soltani, *NSA Tracking Cellphone Locations Worldwide, Snowden Documents Show*, Wash. Post (Dec. 4, 2013), http://wapo.st/1mSXZAP.

[23] Barton Gellman & Ashkan Soltani, *NSA Collects Millions of E-mail Address Books Globally*, Wash. Post (Oct. 14, 2013), http://wapo.st/MaTqn0.

[24] Ryan Devereaux et al., *Data Pirates of the Caribbean: The NSA Is Recording Every Cell Phone Call in the Bahamas*, The Intercept (May 19, 2014), http://bit.ly/1qFFVNC.

uncertain, but has been described as "sizable."[25]  Moreover, the NSA is reportedly permitted to search the massive trove of collected U.S. person communications "using keywords likely to bring up Americans' messages" so long as the searches have a "foreign intelligence" purpose.[26]  Both the NSA and FBI regularly use these incidentally collected U.S. person communications for their investigations.[27]  Additionally, under this authority, the NSA collects both content—such as phone calls, emails, and text messages—and so-called "metadata," such as phone records, records of internet activity, and location information.

On September 29, 2014, the American Civil Liberties Union ("ACLU") released a number of documents disclosed by the government in response to a Freedom of Information Act ("FOIA") lawsuit filed by the ACLU on December 30, 2013.[28]  *See ACLU v. NSA, et al.*, 13 CV 9198 (S.D.N.Y.).  These documents include an internal NSA surveillance manual from 2007 stating that EO 12333 "is the *primary source* of NSA's foreign intelligence-gathering authority." (emphasis

---

[25] *See also* Charlie Savage, *supra* note 3 ("Still, the number of Americans swept up under 12333 could be sizable. As the N.S.A. intercepts content in bulk from satellite transmissions and from overseas fiber-optic hubs, Americans' messages in the mix can be vacuumed up. By contrast, when operating on domestic networks under FISA, the agency may engage only in targeted, not dragnet, collection and storage of content.")

[26] *Id.*

[27] *See* Ryan Gallagher, *The Surveillance Engine; How the NSA Built its Own Secret Google*, Intercept, Aug. 25, 2014, https://bit.ly/32aFLWO (last visited April 12, 2021) (noting how the FBI uses its ICREACH search engine program and "taps into" some of the data collected under EO 12333).

[28] *See* Alex Abdo, *New Documents Shed Light on One of the NSA's Most Powerful Tools*, Aug. 29, 2014, AMERICAN CIVIL LIBERTIES UNION, (*available at* https://www.aclu.org/blog/national-security/new-documents-shed-light-one-nsas-most-powerful-tools).  This article provides links to copies of the original documents obtained by the ACLU through its FOIA lawsuit and describes their general contents.  The article concludes that, based on the contents of the newly released documents, EO 12333 "although not the focus of the public debate, actually governs most of the NSA's spying."  *Id.*

29

added).[29]  Similarly, a June 2013 legal factsheet from the NSA provides that FISA "only regulates a subset of NSA's signals intelligence activities" and that the NSA "conducts the majority of its SIGINT activities solely pursuant to the authority provided by Executive Order (EO) 12333."[30]

Most recently, on April 5, 2021, the Privacy and Civil Liberties Oversight Board (PCLOB) released a report based on six years of research of the government's use of EO 12333.[31]  ("PCLOB Report").  The PCLOB Report describes EO 12333 as a "foundational document for the United States' foreign intelligence efforts, including efforts to protect the nation from terrorism" and "is among the largest and most complex of U.S. surveillance authorities. (PCLOB Report, p. 4).  The authors noted that their report "did not cover the full extent of the framework provider for, and activities conducted under, the Order."  (*Id.*, p. 5).

The topics reviewed by PCLOB consisted of "counterterrorism-related activities involving one or more of the following: (1) bulk collection that carries a significant chance of acquiring some U.S. person information; (2) use of incidentally collected U.S. person information; (3) targeting of U.S. persons; and (4) collection that occurs within the United States or from U.S. companies." (*Id.*, p. 6).  This review included "two deep dive reviews of CIA activities, and one review of an NSA activity," which resulted in classified reports submitted to Congress, the NSA, and the CIA. (*Id.*).

---

[29] *See* Executive Order 12,333 – FOIA Lawsuit, AMERICAN CIVIL LIBERTIES UNION, (*available at* https://bit.ly/39Xmv4k) (Dec. 10, 2020).

[30] *See* https://bit.ly/33ZPaBU (last visited Dec. 10, 2020).  *See also* Cora Courier and Ryan Deveraux, *The Ghost of Ronald Reagan Authorizes Most NSA Spying*, The Intercept, Sept. 29, 2014 (available at https://bit.ly/3gBODex) (last visited April 12, 2021).

[31] A copy of the PCLOB report can be accessed here:  https://bit.ly/3wGE1m9 (last visited April 9, 2021).

The PCLOB Report noted that much of its work "has been classified or otherwise protected," but offered what it described as "general observations." (PCLOB Report, pp. 11-12). Those observations emphasized the importance of Attorney-General approved guidelines that "provide a high-level framework for the collection, retention, and dissemination of U.S. person information." (*Id.*, p. 12). The Report indicated that intelligence agencies did not timely update their internal policies to conform to the Attorney-General guidelines, particularly to implement new privacy and civil liberties safeguards and in light of evolving technology and developing legal standards. (*Id.*, p. 12). On these points, the Report observed as follows:

> Agencies should review their analyses regularly and revise them as necessary. Activity-specific analysis should update as appropriate to reflect changes in the law and technology. For instance, as technology evolves, so may the IC element's ability to assess scope and nature of U.S. person information likely to be acquired incidentally while conducting a given activity. Similarly, an IC element's analytic capabilities (e.g., its ability to query or search for U.S. person information) may broaden, and short- or long-term retention capabilities may evolve. Such potential new facts could impact an existing legal analysis. Additionally, as capabilities and intelligence needs evolve, elements benefit from regularly assessing the value of a specific intelligence activity in achieving its stated purpose.

(*Id.*).

After providing an overview of the history of EO 12333, the PCLOB Report addressed specific issues, although still at a generally high-level. For instance, the PCLOB Report confirmed that EO 12333 authorizes intelligence agencies to "conduct searches and surveillance inside the United States targeting U.S. persons" in "limited circumstances," which include searches or surveillance conducted by the FBI. (PCLOB Report, p. 20). The techniques used for those searches must be the "least intrusive" but still may be "considered particularly intrusive, such as using a monitoring device" if done in conformity with the agency's Attorney-General approved

guidelines. (*Id.*, pp. 20-21). Other observations raise more questions, such as the point that intelligence community employees cannot "investigate whatever they want" because they must "be responsive to specific needs for information conveyed by the President and top executive branch policymakers." (*Id.*, p. 21). However, that information is set forth in a rather Orwellian sounding "National Intelligence Priorities Framework," which is a "classified document containing topics that have been identified as intelligence priorities through a formal system led by the [Director of National Intelligence]." (*Id.*, p. 21). The PCLOB also observes that EO 12333 permits intelligence sharing with federal law enforcement. (*Id.*, p. 24, EO 12333 "permits the IC to engage in specific activities, such as cooperating in law enforcement activities to investigate or prevent clandestine intelligence activities by foreign powers, or international terrorist or narcotics activities."). EO 12333 also permits the intelligence community to "collect, retain, or disseminate incidentally obtained information about a United States person if the information "may indicate involvement in activities that may violate Federal, state, local, or foreign laws." (*Id.*).

Thus, under EO 12333 authority, the NSA collects both content—such as phone calls, emails, and text messages—and so-called "metadata," like phone records, records of internet activity, and location information. Although the full extent of the intelligence agencies' activities under EO 12333 is unknown, even after PCLOB's six-year study and Report, it is clear that those agencies intercept an enormous amount of data with these tools. It is also clear that both the NSA and FBI use this information in investigations like the one that preceded this prosecution.

Critically, as the PCLOB Report makes clear, even though surveillance conducted under EO 12333 typically takes place outside the United States, the communications of persons within

the United States may still be swept up in large quantity. Because U.S. communications increasingly travel across U.S. borders, and because many popular email systems rely on networks of "mirror" servers located around the world, even purely "domestic" communications are actually susceptible to incidental interception overseas under EO 12333.[32]

However, despite the fact that intelligence agencies conduct bulk surveillance under EO 12333, and that the communications of U.S. persons are swept up by this surveillance, EO 12333 operates without any Judicial branch oversight, as surveillance under EO 12333 requires no warrant or judicial approval. Indeed, surveillance programs under EO 12333 have never been challenged in any court. Thus, the potential use of EO 12333 in this case raises serious constitutional concerns, which compel counsel to seek discovery regarding EO 12333, which has not been previously requested. Recent disclosures about the scope of EO 12333 lead to the unavoidable conclusion that EO 12333 forms the legal basis for much of the NSA's electronic intelligence-gathering activities, and results in the collection and storage of massive amounts of U.S. person communications through, among other factors, the legal loophole of incidental collection.[33]

Counsel accordingly request discovery regarding the use of EO 12333 for several reasons.

---

[32] Axel Arnbak & Sharon Goldberg, *Loopholes for Circumventing the Constitution: Unrestrained Bulk Surveillance on Americans by Collecting Network Traffic Abroad at 19-27*, Telecomm. Policy Research Conf. (Aug. 27, 2014), http://bit.ly/1lWB4I4 (explaining how even purely *domestic* communications or data may be routed or stored abroad without a person ever realizing it, leaving that data vulnerable to collection under E.O. 12,333) (last visited April 12, 2021).

[33] *See* Legal Fact Sheet: Executive Order 12333, June 19, 2013, (*available at* https://bit.ly/376O9tW) (last visited April 12, 2021) (stating that "NSA conducts the majority of its [Signals Intelligence] activities pursuant to the authority provided by Executive Order (EO) 12333")

First, the due process rights grounded in the Fourth and Fifth Amendments entitle defendants to challenge the legality of this surveillance and a meaningful opportunity to seek the suppression of the derivative evidence. *See, e.g.*, *Wong Sun v. United States*, 371 U.S. 471, 486-88 (1963) (describing "fruit of the poisonous tree" doctrine); *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (describing right to seek suppression of evidence "derived" from an unlawful search); *United States v. Phillips*, 540 F.2d 319, 325-26 (8th Cir. 1976) (party seeking to suppress fruit of unlawful surveillance must be given a "full and fair opportunity" to meet prima facie burden of showing that the surveillance was unlawful).

Disclosure of the use of EO 12333 is necessary for Defendant to be able to challenge the constitutionality of the collection and storage of his communications pursuant to that untested executive directive. Courts and defendants must have the ability to ensure that the prosecutors, at the behest of the intelligence agencies, are not interpreting away their notice obligations through secret or self-serving legal and factual determinations, such as a unilateral assessment of whether evidence is "derived from" EO 12333 surveillance. *See Alderman*, 394 U.S. at 168 (requiring an adversarial proceeding to determine whether evidence was "derived from" unlawful surveillance).

Finally, at a minimum, 18 U.S.C. §3504 entitles Defendant to notice of any surveillance conducted pursuant to EO 12333. An "unlawful act" is defined to "mean[] any act the use of any electronic, mechanical, or other device … in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto." 18 U.S.C. §3504(b). Section 3504 requires the "affirmance or denial of the *fact* of electronic surveillance, even if the

34

government believes it was lawful."[34]  A "cognizable claim" for notice under the statute "need be no more than a 'mere assertion,' provided that it is a positive statement that illegal surveillance has taken place."  *United States v. Apple*, 915 F.2d 899 (4th Cir. 1990). The party must make a *prima facie* showing that he was "aggrieved by the surveillance," *i.e.*, "that he was a party to an intercepted communication, that the government's efforts were directed at him, or that the intercepted communications took place on his premises."  *Id.* at 905.  Of course, because a defendant will have only limited information about the intelligence agencies' undisclosed surveillance, this initial showing need not be complete; it must only have a "colorable basis." *Id.*

Here, Defendant has made the requisite showing for notice under §3504.  Based on the disclosures concerning the vast scope of EO 12333 surveillance, and in light of the discovery showing that Defendant engaged in online chats through Telegram and social media platforms, and that Defendant himself was overseas during the course of the investigation, there is most certainly a "colorable basis" to believe that the prosecutors' evidence in this case is obtained or derived from EO 12333 surveillance.

Accordingly, the prosecutors should be ordered pursuant to § 3504 to affirm or deny the use of EO 12333 in this case.  *See United States v. Alter*, 482 F.2d 1016, 1027 (9th Cir. 1973) (finding the government's response to a claim under § 3504 insufficient because it was conclusory, failed to clearly identify all governmental agencies involved in the surveillance, failed to identify the date ranges of the surveillance, and relied on vague hearsay recitations).

---

[34]  David S. Kris & J. Douglas Wilson, Nat'l Sec. Investigations & Prosecution 237 n.2 (2012) (hereinafter "Kris and Wilson").

### 3. Surveillance Under Section 702 of FISA

On October 4, 2001, President George W. Bush secretly authorized the Terrorist Surveillance Program (TSP), which allowed the NSA to engage in warrantless electronic surveillance inside the United States. After *The New York Times* exposed the program and a federal district court ruled that the program was unconstitutional, *ACLU v. NSA*, 438 F. Supp. 2d 754 (E.D. Mich. 2006), the government stated that the program would not be reauthorized in its then-existing form. The government ultimately sought legislative amendments to FISA that granted authorities beyond what FISA had allowed for three decades.

The legislative amendments sought by the Bush administration were embodied in Section 702, which was signed into law on July 10, 2008.[35] Section 702 substantially revised the FISA regime and authorized the acquisition, without individualized suspicion, of a wide swath of communications, including U.S. persons' international communications, from Internet and telecommunications providers inside the United States. The authority granted by Section 702, however, is far more sweeping than the authority that the intelligence agencies have traditionally exercised under FISA. Section 702 surveillance is far-reaching, despite the explicit limitation contained in the statute that surveillance acquisition "shall be conducted in a manner consistent with the fourth amendment to the Constitution of the United States." 50 U.S.C. § 1881a(b)(5).

Section 702 allows the intelligence agencies to conduct dragnet surveillance of international communications entering or leaving the United States, including communications

---

[35] On August 5, 2007, Congress passed a predecessor statute, the Protect America Act, Pub. L. No. 110-55, 121 Stat. 552 (2007), which expired in February 2008.

sent or received by U.S. persons. As disclosed by the FISC in 2011, the NSA acquires "more than [250] million Internet communications each year pursuant to [Section 702], *[Docket No. Redacted]*, 2011 WL 10945618, at *9, (FISA Ct. Oct. 3, 2011) [hereinafter Bates October 2011 Opinion], and that number is, most certainly, "significantly higher" today. Privacy and Civil Liberties Oversight Board, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act*, July 2, 2014 [hereinafter "PCLOB Report"] at 116. This extraordinary reach is the result of the statute's granting of permission to intercept communications when at least one party to a phone call or email is a foreigner located abroad. In particular, Section 702 permits the Attorney General and DNI to "authorize jointly, for a period of up to 1 year . . . the targeting of persons reasonably believed to be located outside the United States to acquire foreign intelligence information." 50 U.S.C. §1881a(a).

Significantly, no neutral judicial officer or court ever approves the target of this surveillance. Rather, the FISC approves only the general procedures the government proposes to use in carrying out its surveillance and, on the basis of those procedures alone, the FISC issues a so-called "mass-acquisition order." *See* 50 U.S.C. §1881a. Before obtaining such an order, the Attorney General and DNI must provide to the FISC a written certification attesting that the FISC has approved, or that the government has submitted to the FISC for approval, both "targeting procedures" and "minimization procedures." *Id.* §1881a(d)–(g). The targeting procedures, according to the statute, must be "reasonably designed" to ensure the acquisition is "limited to targeting persons reasonably believed to be located outside the United States" and to "prevent the intentional acquisition of any communication as to which the sender and all intended recipients

are known at the time of the acquisition to be located in the United States." *Id.* §1881a(g)(2)(A)(I). The minimization procedures must also meet the requirements of section 1801(h), 1821(4). *Id.* §1881a(g)(2)(A)(ii).

Finally, the certification and supporting affidavit must attest that the Attorney General has adopted "guidelines" to prevent the targeting of U.S. persons in certain contexts, *id.* §1881a(b); that the targeting procedures, minimization procedures, and guidelines are consistent with the Fourth Amendment; and that "a significant purpose" of the acquisition is "to obtain foreign intelligence information." *Id.* §1881a(g)(2)(A)(iii)–(vii). The phrase "foreign intelligence information" is defined broadly to include, among other things, information concerning terrorism, national defense, and foreign affairs. *Id.* §1801(e). Since all the FISC are reviewing are the "certifications" or procedures to be followed for the surveillance, a crucial difference between the Section 702 and traditional FISA emerges: *Section 702 authorizes surveillance not predicated on probable cause or individualized suspicion*.

When an intelligence agency makes a Section 702 application to the FISC, it is simply asking the court to approve the overall targeting and minimization procedures—incredibly vague parameters which will guide the agency's entire surveillance for the following year. The FISC does not consider individualized and particularized surveillance applications or make individualized probable cause determinations. Further, unlike in a FISA application, the intelligence agency need not demonstrate to the FISC that its surveillance targets are agents of foreign powers, engaged in criminal activity, or connected even remotely with terrorism. Thus, the role that the FISC plays under Section 702 bears no resemblance to the role that it traditionally

38

played under FISA—let alone the role a typical Article III court plays when approving a search warrant.

Once a Section 702 certification has been approved, non-U.S. persons reasonably believed to be located outside the U.S. may become targets of surveillance. *See* Walter F. Mondale, Robert A. Stein, and Caitlinrose Fisher, *No Longer a Neutral Magistrate: The Foreign Intelligence Surveillance Court in the Wake of the War on Terror*, 100 MINN. L. REV. 2251, 2267 (June 2016) ("Unlike the original design of FISA, where FISC adjudicated individual warrant determinations before any targeting occurred, the FAA transformed FISC into a meta-arbiter, approving generally applicable targeting and minimization procedures that applied after a search occurred.").

The following chart[36] demonstrates how Section 702 differs from other electronic surveillance statutes—traditional FISA and Title III wiretaps—in terms of what information must be presented to a neutral and detached judicial officer in order to obtain authorization to execute specific search and seizures:

|  | Title III | Traditional FISA | Section 702 |
|---|---|---|---|
| Required level of suspicion | Probable cause the individual is committing, has committed, or is about to commit a criminal offense. *See* 18 U.S.C. § 2518(3)(a). | Probable cause the individual is a foreign power (including terrorist organizations) or an agent of a foreign power. *See* 50 U.S.C. § 1805(a)(2)(A). | None |
| Required level of suspicion | Probable cause communications concerning an offense | Probable cause each targeted facility is being used, or is about to be used, by a foreign | None |

---

[36] Lawyers for the Office of the Federal Public Defender for the District of Oregon created this chart for their post-trial motions in *United States v. Mohamud*, 10 Cr. 475 (KI) (D. Oregon), and it also appeared in pre-trial motions in *United States v. Hasbajrami*, 11 Cr. 623 (JG) (E.D.N.Y.).

| regarding facility to be monitored | will be obtained through interception. *See* 18 U.S.C. § 2518(3)(b). | power or an agent of a foreign power. *See* 50 U.S.C. § 1805(a)(2)(B). | |
|---|---|---|---|
| Particularity regarding individual to be monitored | Specify the identity, if known, of the person committing the offense or whose communications are to be intercepted. *See* 18 U.S.C. § 2518(1)(b). | Specify the identity, if known, or a description of the specific target of the surveillance. *See* 50 U.S.C. § 1805(c)(1)(A). | None |
| Particularity regarding location to be monitored | Specify the nature and location of the communications facilities as to which, or the places where, interception will occur. *See* 18 U.S.C. § 2518(1)(b). | Specify the nature and location of each facilities or places at which the surveillance will be directed. *See* 50 U.S.C. § 1805(c). | None |
| Particularity regarding types of communications to be intercepted | Particular description of the type of communication sought to be intercepted. *See* 18 U.S.C. § 2518(1)(b). | Designate the type of foreign intelligence information being sought and the type of communications or activities to be subjected to surveillance. *See* 50 U.S.C. § 1805(c)(1)(C). | None |

Despite its controversial provisions and unknown scope of its application, particularly with regard to U.S. persons, on January 20, 2018, President Trump signed the FISA reauthorization bill, which extended the provisions of Section 702 through 2023.[37]

### 4. Surveillance Under Sections 703, 704, and 705 of FISA

Surveillance under Sections 703 (50 U.S.C. §1881b), 704 (50 U.S.C. §1881c), and 705 (50 U.S.C. §1881d) of FISA are targeted at U.S. persons who are located overseas. Each provision addresses different forms of this surveillance and/or different means by which it may be

---

[37] *President Trump has signed the FISA reauthorization bill*, Jan. 20, 2018, The Verge, available at: https://bit.ly/2IAALEM (last visited April 12, 2021).

authorized. Sections 703, 704, and 705 were enacted as part of the FISA Amendments Act of 2008. To date, as far as counsel can discern, no defendant has received notice of surveillance under these provisions. As a result, no defendant has ever been able to raise a challenge to these provisions, which, accordingly, have never been subjected to meaningful judicial review.

Section 703 authorizes the government to engage in real-time electronic surveillance and to seize and search stored electronic data when it targets U.S. persons who are reasonably believed to be located outside the United States. 50 U.S.C § 1881b. Section 703 surveillance is typically conducted on U.S. soil and effectuated after the intelligence agencies compel telecommunications providers to assist. To obtain an order under Section 703, the agency must submit an application to the FISC establishing probable cause to believe that the targeted U.S. person is a foreign power or the agent of a foreign power. 50 U.S.C. § 1881b. But unlike surveillance that is conducted under the original provisions of FISA, the agencies are not required to make any showing as to the specific facilities, places, premises, or property at which the surveillance will be directed. *See id.* §1881b(b)(1)(H). While the government is expressly required to give notice of this surveillance in criminal proceedings, counsel is unaware of a single instance when a defendant ever received notice. *See* 50 U.S.C. §§ 1806(c), 1881e(b).[38]

Similarly, Section 704 authorizes the agencies to target U.S. persons reasonably believed to be located outside the United States, but it has even fewer constraints on the government.

---

[38] It is certainly not outside the realm of possibility that the prosecutors are withholding notice based on an unjustifiably narrow interpretation of what evidence is "derived from" Section 703 surveillance, as it has done with other forms of surveillance, including Section 702 (50 U.S.C. § 1881a).

41

Moreover, the FISC's review is far more limited. 50 U.S.C §1881c. Surveillance under Section 704 is, in most instances, conducted overseas. The agencies need not inform the FISC about how it intends to conduct the surveillance. The agencies need only establish probable cause to believe that the targeted U.S. person is a foreign power or agent of a foreign power. Aside from that showing, Section 704 "contains no limits on the type of information or method of acquisition, and expressly forbids the FISC from inquiring into those matters."[39] Again, as far defense counsel can tell, no defendant has received notice of surveillance under Section 704.

Section 705(b) allows the intelligence agencies to conduct surveillance of U.S. persons located abroad while bypassing the procedures in Sections 703 and 704 in certain circumstances. 50 U.S.C. § 1881d(b). Section 705(b) permits the agencies to target a U.S. person overseas based solely on the Attorney General's authorization, provided the FISC has previously authorized surveillance or physical searches of the target on U.S. soil. *See id.* Thus, Section 705(b) significantly expands the scope of the intelligence agencies' surveillance of a target with no additional judicial oversight, simply based on the fact that the targeted U.S. person was located outside the United States. That is because the original FISC-authorized surveillance is narrowly circumscribed by statute. *See id.* § 1805 (conditioning a FISC order upon probable cause to believe that the target is using, or about to use, "each of the facilities or places at which the electronic surveillance is directed"). Surveillance under Section 705(b) is not subject to similar constraints. As with each of the provisions above, no defendant in a criminal case has ever

---

[39] Kris and Wilson, *supra* note 34, 656–57 (2012) (citing 50 U.S.C. § 1881c(c)(3)(A), (c)(5).

received notice of Section 705(b) surveillance.

### 5. Surveillance Under §215 of the PATRIOT Act.

It is also possible that the intelligence agencies' investigation of Defendant relied on surveillance conducted under Section 215 of the PATRIOT Act. 50 U.S.C. § 1861. For nearly a decade, until November 29, 2015, the NSA relied on Section 215 to collect call records in bulk from major domestic telecommunications companies. After the Second Circuit held the NSA's bulk call-records program unlawful in *ACLU v. Clapper*, 785 F.3d 787 (2d Cir. 2015), Congress modified Section 215 to expressly prohibit the bulk collection of records. However, the government could have still used Section 215 to obtain Defendant's internet browsing records, and travel records. On May 20, 2020, Senator Wyden of Oregon wrote to then Director of National Intelligence Richard Grenell and asked him to confirm whether the government used Section 215 to collect U.S. citizens' "web browsing and internet searches" despite the fact that on May 13, 2020, "59 U.S. Senators voted to prohibit this form of warrantless surveillance, reflecting the broad, bipartisan view that it represents a dangerous invasion of Americans' privacy."[40] Six months later, on November 25, 2020, and after initially denying that Section 215 was utilized, DNI John Ratcliffe wrote to Senator Wyden and admitted that the government used Section 215 in one of the FISC's 61 orders issued in 2019 that "resulted in the production of information that could be characterized as information regarding browsing."[41] The New York Times reported how

---

[40] A copy of Senator Wyden's letter is available at: https://bit.ly/340CR8D (last visited April 12, 2021).

[41] A copy of DNI Ratcliffe's November 6, 2020, response and November 25, 2020, correction letter to Senator Wyden are available at: https://bit.ly/37WtiIG (last visited April 12, 2021).

Senator Wyden faulted the DNI for providing "no guarantee that the government's wouldn't use the Patriot Act to intentionally collect Americans' web browsing information in the future."[42]

Defendant should have the opportunity to test whether any such use of Section 215 complied with both the statute and the Constitution, particularly since the intelligence agencies used Section 215 to illegally collect call records in bulk for years. Moreover, because the agencies cannot use Section 215 to investigate a U.S. person "solely upon the basis of activities protected by the" First Amendment, Defendant must have the opportunity to test whether the prosecutors, through the intelligence agencies, complied with this express prohibition. *See* 50 U.S.C. § 1861(a)(2)(B) ("An investigation conducted under [Section 215] shall not be conducted of a United States person solely upon the basis of activities protected by the first amendment to the Constitution of the United States").

### 6. **National Security Letters**.

The government also uses National Security Letters (NSLs) to gather evidence in national security investigations without any judicial review or approval by requiring recipients, like electronic service providers, to disclose certain types of customer records. The recipients are typically prohibited from notifying their customers that they received such a demand, and thus individuals like Defendant almost never learn that they have been targeted.[43] There are several different federal statutory frameworks for the issuance of NSLs: 18 U.S.C. §§2709,

---

[42] Charlie Savage, *U.S. Used Patriot Act to Gather Logs of Website Visitors*, N.Y. Times, Dec. 3, 2020, available at:  https://nyti.ms/39Y6b39 (last visited April 12, 2021).

[43] Kris & Wilson, *supra* note 34 at 728; *see also John Doe, Inc. v. Mukasey*, 549 F.3d 861, 883 (2d Cir. 2008) (finding gag provisions unconstitutional "to the extent that they impose a nondisclosure requirement without placing on the Government the burden of initiating judicial review of that requirement").

3511; 12 U.S.C. §3414; 15 U.S.C. §§1681(u) & 1681(v); and 50 U.S.C. § 3162). "Congress has struggled with efforts to ensure the effectiveness of the NSL authority, while guarding against its abuse."[44]  Section 2709 specifically authorizes the FBI to compel a "wire or electronic communication service provider" to disclose "subscriber information" and "electronic communication transaction records" upon a senior official's independent and uncorroborated certification that the desired information is "relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities…." 18 U.S.C. §§ 2709(b)(1) and (2).

The intelligence agencies have used NSLs to demand email records, including email addresses and screen names associated with a targeted account and those in contact with that account.  Indeed, even after the Justice Department's Office of Legal Counsel concluded in 2008 that it was unlawful for the FBI to seek certain types of internet records using NSLs, the FBI continued to use NSLs to demand that information for years.  In this case, the intelligence agencies may have used NSLs to, among other things, (1) ascertain Defendant's unique IP addresses; (2) obtain Defendant's account information across various communications services, including metadata associated with his online communications and activities; and (3) obtain his internet browsing records.

---

[44] Charles Doyle, *National Security Letters in Foreign Intelligence Investigations: Legal Background*, Cong. Research Serv. RL33320 at 1 (July 30, 2015), https://www.fas.org/sgp/crs/intel/RL33320.pdf.

### C. The Prosecutors Must Provide Notice of the Surveillance Methods and Authorities That Were Used.

Defendant is entitled to know how the intelligence agencies monitored his communications and activities. Such notice is a necessary prerequisite before Defendant can test, through discovery and adversarial proceedings, whether the agencies lawfully obtained or derived the evidence that it plans on using at trial from that surveillance. *See generally Keith*, 407 U.S. at 321; *Alderman*, 394 U.S. at 168; *Moalin*, 973 F.3d at 1000. The sources of authority requiring notice of the agencies' surveillance methods in criminal cases include, but are not limited to, the Fourth and Fifth Amendments to the Constitution, 18 U.S.C. § 3504, FISA itself (50 U.S.C. §§1806, 1825(d)) and Federal Rules of Criminal Procedure 12 and 16.

### 1. The Fourth and Fifth Amendment Require Notice and Discovery of Surveillance Techniques, Methods, and Legal Authorities.

The only way to vindicate a criminal defendant's right to suppress illegally acquired evidence is through notice. *See Moalin*, 973 F.3d at 1000. This suppression right becomes especially important when the government adopts new and intrusive surveillance techniques. The discussion set forth above illustrates how the intelligence agencies routinely employ legally untested surveillance methods in aid of investigations and that it often conceals those methods in order to avoid court review. However, Due Process rights grounded in the Fourth and Fifth Amendments entitle defendants to challenge the legality of these surveillance techniques and to seek suppression of the derivative evidence. *See Wong Sun v. United States*, 371 U.S. 471 486-88 (1963) (describing "fruit of the poisonous tree" doctrine); *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (describing right to seek suppression of evidence "derived" from an

46

unlawful search).

Additionally, Defendant's right to notice and discovery is also found within the prosecutors' obligations under *Brady* to disclose evidence in its possession that is favorable to the accused, including any information material to a defendant's motion to suppress evidence. *See United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000); *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992) (due process mandates the disclosure of information in the government's possession if nondisclosure would "affect[] the outcome of [a] suppression hearing").

Clearly, in order to seek suppression, a defendant must first know about the surveillance that led to the source(s) of the prosecutors' evidence. Courts have long found that notice was a constitutionally required element of surreptitious searches, like wiretaps and sneak-and-peak entries. *See, e.g.*, *Berger*, 388 U.S. at 60 (finding wiretapping statute unconstitutional because, among other things, it had "no requirement for notice as do conventional warrants"); *United States v. Freitas*, 800 F.2d 1451, 1456 (9th Cir. 1986) (finding sneak-and-peak warrant constitutionally defective for its failure to provide explicitly for notice within a reasonable time); *Dalia v. United States*, 441 U.S. 238, 247-48 (1979) (observing that Title III provided a "constitutionally adequate substitute for advance notice by requiring that once the surveillance operation is completed the authorizing judge must cause notice to be served on those subjected to surveillance").

In response to these rulings, Congress has incorporated express notice provisions into many surveillance statutes, (s*ee, e.g.*, 18 U.S.C. § 2518(8)(d) (Title III)), because it recognized

that "all authorized interceptions must eventually become known at least to the subject" in order to "insure the community that the techniques are reasonably employed." *United States v. Donovan*, 429 U.S. 413, 438 (1977) (quoting S. Rep. No. 1097, 90th Cong., 2d Sess., p. 2194 (1968)); *see also* 50 U.S.C. § 1806(c) (FISA electronic surveillance); *id.* § 1825(d) (FISA physical search); *id.* § 1842(c) (FISA pen register); *cf.* Fed. R. Crim. P. 41(f) (requiring notice).

Absent notice to defendants, courts can never review the intelligence agencies' utilization of new technologies to conduct searches in criminal investigations. For example, in *Keith*, the government responded to the defendant's motion to compel the disclosure of electronic surveillance information in a national-security prosecution by publicly acknowledging that investigators had overheard the defendant's conversations using wiretaps. *Keith*, 407 U.S. at 299-300. Additionally, in *Kyllo v. United States*, 533 U.S. 27, 29-30 (2001), the defendant received notice that the government's search warrant application relied on evidence gathered using thermal-imaging technology. And in *United States v. Jones*, 565 U.S. 400, 402-03 (2012), the defendant had notice of the government's use of GPS tracking in order to record his movements. None of these seminal Fourth Amendment decisions would have been possible if the defendants had not received notice of the government's secret and novel searches.

Here, the Court should ensure that Defendant has sufficient notice of any surveillance of his communications or activities to allow him to make informed suppression claims and arguments. *Moalin*, 973 F.3d at 1000; *see also Alderman*, 394 U.S. at 168 (recounting, in wiretapping challenge, Supreme Court's refusal to "accept the *ex parte* determination of relevance by the Department of Justice in lieu of adversary proceedings in the District Court").

48

Indeed, it would make little sense—and contravene the adversarial nature of criminal proceedings—if the intelligence agencies could pre-determine, as part of its notice analysis, difficult or unique legal questions that a defendant would advance put before the Court. The prosecutors should not be able to have it both ways by prosecuting defendant, and simultaneously maintaining its secrecy in doing so. *See also United States v. Nixon*, 418 U.S. 683, 708-709 (1974); *United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990).

Counsel therefore submit that the Fourth Amendment and Fifth Amendment Due Process clause require not only notice to a defendant, but also disclosure of underlying surveillance applications or intercepts. This is precisely why the Supreme Court has previously compelled the prosecutors to turn over records of wiretapped conversations in a national security case, even as the government threatened to abandon the prosecution if required to disclose them. *See Keith*, 407 U.S. at 318-24. The prosecution should be bound by that same choice here, whenever it has relied in whole or in part on undisclosed surveillance programs in the course of its intelligence agencies' investigation.

### 2. Defendant is Entitled to Notice under 18 U.S.C. § 3504.

Congress has also provided a right to notice of electronic surveillance by statute. Under 18 U.S.C. § 3504, if a party in a proceeding before any court claims that "evidence is inadmissible" because "it is the primary product of an unlawful act or because it was obtained by the exploitation of any unlawful act" then the government must "affirm or deny the occurrence of the alleged unlawful act." The statute defines "unlawful act" as "the use of any electronic, mechanical, or other device (as defined in section 2510(5) of this title) in violation of the Constitution or laws of

the United States or any regulation or standard promulgated pursuant thereto." *Id.* § 3504(b).

Section 3504 requires that the government affirm or deny the fact of electronic surveillance, even if the government contends that the surveillance was lawful. A "cognizable claim" for notice under the statute "need be no more than a 'mere assertion,' provided that it is a positive statement that illegal surveillance has taken place." *United States v. Apple*, 915 F.2d 899, 905 (4th Cir. 1990) (citing *United States v. Tucker*, 526 F.2d 279, 282 & n.4 (5th Cir. 1976)). The party must make a *prima facie* showing that he was aggrieved by the surveillance, that he "was a party to an intercepted communication, that the government's efforts were directed at [him], or that the intercepted communications took place on [his] premises." *Apple*, 915 F.2d at 905.

The Seventh Circuit has held that the government must respond to a defendant's request made pursuant to §3504 even if the defendant does not provide a verified affidavit. *In re Grand Jury Proceedings of Aug., 1984*, 757 F.2d at 114; *In re De Monte*, 667 F.2d 590, 595 (7th Cir. 1981). Because a defendant will have only limited information about the intelligence agencies' undisclosed surveillance, this initial showing need not be complete; it must only have a "colorable basis." *Id.* (citing *United States v. Pacella*, 622 F.2d 640, 643 (2d Cir. 1980)); *see also In re Grand Jury Matter*, 683 F.2d 66, 67 (3d Cir. 1982) (requiring notice under §3504 upon the affidavits of the defendant and another individual that "there had been 'unusual sounds' on the defendant's phone, . . . and that two policemen had told the other individual that the appellant's phone had been wiretapped").

Defendant has made the requisite showing for notice under 18 U.S.C. §3504. First, the intelligence agencies have collected information about Defendant and his online activities and

obtained his private electronic communications while not providing specifics regarding those collections. Moreover, even if the prosecution has not provided formal notice that FISA was used, it has also refused to say that it was not used. The prosecutors should therefore provide notice of the surveillance methods used in this case and its purported legal authorities. *See United States v. Alter*, 482 F.2d 1016, 1027 (9th Cir. 1973) (finding the government's response to a claim under § 3504 insufficient because it was conclusory, failed to clearly identify all governmental agencies involved in the surveillance, failed to identify the date ranges of the surveillance, and relied on vague hearsay recitations).[45]

### 3. FISA Requires Notice and Disclosure.

FISA expressly requires the government to provide a defendant with notice of some types of the surveillance at issue. *See* 50 U.S.C. §1881e (requiring notice of surveillance conducted under Section 703). However, as discussed above, the government has a record of interpreting this requirement far too narrowly, in order to avoid notifying criminal defendants of the surveillance used in their cases. If the intelligence agencies used data obtained from Section 703 in its investigation, it must give notice, so that Defendant may seek to suppress any resulting evidence. Moreover, the government's determinations about whether its evidence is "derived from" this surveillance must be subjected to adversarial litigation and review. *See Alderman*, 394 U.S. at 183-84.

---

[45] Although the prosecutors may argue that §3504 is not applicable to FISA, it has been used before to secure notice of FISA surveillance. *See United States v. Hamide*, 914 F.2d 1147, 1149 (9th Cir. 1990).

### 4. Fed. R. Crim. P. 12 and 16 Require Notice and Disclosure.

Federal Rules of Criminal Procedure 12(b)(3)(C) and 16(a)(1)(E)(i) also support Defendant's request for notice and discovery of the government's surveillance techniques because such information is necessary to prepare a motion to suppress. Indeed, Defendant's request falls squarely within Rule 16(a)(1)(E)(i)'s materiality requirement because a suppression motion directly implicates the government's ability to prove that he committed the crime charged. *See United States v. Armstrong*, 517 U.S. 456, 462 (1996) (holding that Rule 16(a)(1)(c), the predecessor to Rule 16(a)(1)(E)(i), applies to "shield" claims that "refute the Government's arguments that the defendant committed the crime charged"). Because Defendant cannot fully respond to the evidence comprising the prosecutors' case in chief without knowing the extent of its surreptitious searches and seizures, he is entitled to notice and discovery. *Id.* at 462 (defining the term "defense" in Rule 16 as the "defendant's response to the Government's case in chief").

### IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant, by and through counsel, respectfully moves this Court for an Order compelling notice and discovery of the surveillance techniques that the government used to monitor Defendant's communications and activities in the course of its investigation.

Respectfully submitted,

/s/ Steven A. Greenberg
**STEVEN A. GREENBERG,**

/s/Joshua G. Herman
**JOSHUA G. HERMAN**
Attorneys for Defendant

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 1260
Chicago, Illinois 60604
(312) 879-9500

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 404
Chicago, IL 60604
(312) 909-0434
jherman@joshhermanlaw.com

53

## <u>CERTIFICATE OF SERVICE</u>

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing was served on April 12, 2021, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Joshua G. Herman
53 W. Jackson, Blvd., Suite 404
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com