UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 869 |
| | ) | |
| vs. | ) | Honorable Robert W. Gettleman |
| | ) | |
| THOMAS OSADZINSKI | ) | |

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO DISMISS INDICTMENT**

The United States of America, by and through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby respectfully submits its Response to Defendant's Motion to Dismiss Indictment For Vagueness and Unconstitutionality as Applied to Defendant Under the First and Fifth Amendments (R. 65).

The defendant suggests that he created or altered a computer script for the sole purpose of "organizing and downloading pro-ISIS videos and media for personal review and for potential sharing with others." R. 65 at 14. The defendant further states that neither the indictment nor complaint allege that the defendant engaged or coordinated with a designated Foreign Terrorist Organization. From that foundation, the defendant argues that the material support statute, as applied to him, is void for vagueness and a violation of his Fifth Amendment rights. Separately, the defendant argues that his conduct is protected First Amendment speech.

The defendant's motion to dismiss, on both grounds, must be denied as the defendant's conduct belies his assertion that his intention was simply to download and share videos for personal viewing and that he had no intention of collaborating

with ISIS. More specifically, the defendant's motion to dismiss based on the word "service" as vague should be denied because the defendant was aware that ISIS was a designated Foreign Terrorist Organization (FTO), he was fully aware his conduct could draw the attention of law enforcement, he did not intend to operate independently of ISIS and he attempted to coordinate with the FTO. In short, the defendant did not act as an independent advocate for the group but instead desired to commit "media jihad" on behalf of ISIS. As such, the statute as applied to the defendant is not void for vagueness and the defendant's Fifth Amendment rights have not been violated.

Moreover, because the defendant's drafting and distribution of the computer script was designed to provide support to ISIS, coupled with his attempt to coordinate with the group, his conduct was not protected free speech and the defendant's First Amendment rights have not been violated.

## ARGUMENT

### A.    Applicable Law

A criminal law that is unconstitutionally vague violates a person's Fifth Amendment right to due process of law. *Johnson v. United States*, 576 U.S. 591 (2015). A criminal statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (internal quotation marks omitted). "A statute that does not provide 'fair notice' of what 'conduct is forbidden' or 'is so indefinite that it encourages arbitrary and erratic arrests and convictions' is deemed

void for vagueness." *United States v. Sylla*, 790 F.3d 772 (7th Cir. 2015) (quoting *Colautti v. Franklin*, 439 U.S. 379 (1979)). "[A] court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir.1999) (quoting *United States v. Strauss*, 999 F.2d 692, 697 (2d Cir.1993)); *United States v. Sattar*, 272 F.Supp.2d 348, 357 (S.D.NY 2003).

Courts analyze vagueness challenges as applied to the particular facts of the case before it. "We consider whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Humanitarian Law Project*, 561 U.S. at 18–19 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)). "A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law." *Hoffman Estates*, 455 U.S. at 495.

## B.    The Material Support Statute is Not Void for Vagueness As Applied to the Defendant

The defendant has been charged with attempting to provide material support, in the form of services, to ISIS in violation of Title 18, United States Code, § 2339B. More specifically, as alleged in the indictment and complaint,

> OSADZINSKI designed a process that used a computer script that directed Social Media Platform 1 bots to copy and save ISIS official media content in order to help ISIS spread its message and make its materials more available to its supporters. This process sorted and categorized large volumes of official ISIS media content according to specified criteria, and copied it to other Social Media Application 1

3

environments created by OSADZINSKI, where they were preserved and could be more conveniently accessed and disseminated by other users.

Compl. ¶ 7. Defendant's computer script automated the transfer of ISIS materials from one channel to another. Without defendant's script, this would have been done manually, by copying each file individually, which could take extensive amounts of time. *Id.* ¶ 7. Such a script would enhance ISIS's internet and media operations because various social media platforms and websites routinely removes ISIS content. Id. ¶ 8.

The defendant argues that the term "services" as applied to him is void for vagueness because the term "would not put a reasonable person on notice" that the charged conduct constituted provision of material support to ISIS. R. 65 at 14. The crux of the defendant's motion is that the service he performed is not, in and of itself, illegal and therefore, the term "service" as applied to his conduct is "ambiguous," "open-ended" and could lead to "arbitrary and discriminatory enforcement." R. 65 at 15.

The term "service" is not specifically defined in the statute nor, contrary to the defendant's position, does it not need to be. The ordinary meaning of the word suffices. Courts have historically struck down words that were ambiguous. *Humanitarian Law Project*, 561 U.S. at 20 – 21 ("We have in the past 'struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent' – wholly subjective terms without statutory definitions, narrowing context, or settled legal meanings"); *United States v. Hart*, 635 F.3d 850, 858 (6th Cir. 2011) (holding

term was not constitutionally vague when it has an ordinary meaning that is not subject to ambiguity).

"Service," however, as set forth in the statute, is not ambiguous and "does not require similarly untethered, subjective judgments." *Humanitarian Law Project*, 561 U.S. at 21. "[A] person of ordinary intelligence would understand the term 'service' to cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization." *Id*. at 24. In other words, to violate § 2339B by providing a "service," the government must prove that the defendant engaged in a "concerted activity, not independent activity," to a foreign terrorist organization, that was done in coordination with, or at the direction of, a FTO, or at least an attempt to do so." *Id*. at 23 – 24. As the defendant's conduct constituted such "concerted activity," the term "service" is not vague as applied to the defendant.

Moreover, the defendant's argument fails for several additional reasons. First, the defendant was fully aware that ISIS was a designated FTO and that providing support to ISIS was illegal. Second, the defendant did not intend to download videos for his or his friends' own personal viewing but instead intended to prevent ISIS propaganda videos from being removed from the internet, knowing that social media companies removed ISIS content and believing that law enforcement investigated individuals who downloaded the same. Third, the defendant did not intend to act as an independent advocate for ISIS but instead considered himself one with the organization and offered to provide assistance to the FTO, in order to commit, in his words, "media jihad."

### 1) Knowledge of Designation

Title 18, United States Code, § 2339B requires that, as an element of the offense, the government prove that the defendant "have knowledge that the organization is a designated terrorist organization . . . or that the organization has engaged or engages in terrorism." 18 U.S.C. § 2339B(a)(1). The "knowledge requirement of the statute further reduces any potential for vagueness." *Humanitarian Law Project*, 561 U.S. at 21.

The defendant was aware that ISIS was a designated FTO and that providing support to ISIS was illegal. During the execution of a search warrant at the defendant's apartment the FBI found, in the defendant's room, the criminal complaint from *United States v. Schimenti and Jones* (17 CR 236 N.D. IL). The complaint charged Edward Schimenti and Joseph Jones with conspiring to provide material support to ISIS. The complaint stated:

> On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.
>
> On May 15, 2014, the Secretary of State amended the designation of AQI as a FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS" – which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

In addition to stating that ISIS was a FTO, the complaint identified "attempting to provide material support and resources, namely, personnel and equipment, to a foreign terrorist organization, namely, the Islamic State of Iraq and al Sham, knowing that the organization was a designated terrorist organization, and that the organization had engaged in and was engaging in terrorist activity and terrorism," as a violation of Title 18, United States Code, § 2339B(a)(1), the same statute the defendant has been charged with violating.

Although Schimenti and Jones were not charged with providing "services" to ISIS (they were charged with providing personnel and equipment), the information contained in the complaint specifically informed the defendant that ISIS was a designated FTO, that it was engaged in acts of terrorism, and that providing material support to ISIS was illegal. The complaint also provided notice to the defendant that ISIS had a media wing (Al-Furquan Media) which was specifically identified in the designation of ISIS.

In addition to knowing about the designation, the defendant was also aware of the acts of terrorism that led to ISIS's designation. Specifically, and by way of example, on or about February 24, 2019, the defendant sent a video to OCE2 called "Holding firm to the Pledge 2." The defendant informed OCE2 that he "edited the translation for this one," implying that he assisted in the creating of the video and was aware of the content. The video contains footage of ISIS fighters in battle and includes an Arabic-language voiceover calling for ISIS fighters and supporters to

stand together against the West. In other words, the ISIS video contained footage of acts of terrorism that gave rise to the designation of ISIS.

The defendant's knowledge of ISIS's designation, his knowledge of the terrorist activity conducted by ISIS, and his knowledge of the statute prohibiting the provision, or attempted provision, of material support to ISIS, diminishes the defendant's argument that the statute is void for vagueness as applied to him.

### 2) *The Defendant Intended to Perform a Service for ISIS*

The defendant believed his computer skills, utilized through the script, would provide a service to ISIS by helping them preserve videos that he knew were used as tools to recruit members and to intimidate civilian populations. The defendant was aware that social media companies often removed ISIS content and believed that law enforcement investigated ISIS members who downloaded the content. The defendant specifically expressed a desire to preserve ISIS videos through his computer script, not for his own viewing pleasure, but for the "brothers" in ISIS. As part of the defendant's plan, he also hoped to divert law enforcement's attention away from ISIS members to others. The defendant's desire to commit what he called "media jihad," demonstrates that he was on notice that his conduct was prohibited. Therefore, the statute, specifically the term "service," is not void for vagueness as applied to the defendant.

More specifically, on or about March 1, 2019, OCE2 sent the defendant a media report that Telegram had been banning and deleting Telegram channels used by ISIS. The defendant responded, "they delete 1 we make 2 more…brother showed me

how to copy channels." The defendant's use of the pronoun "we" is illustrative of his intent – that he aligned himself with ISIS and considered himself to be part of the organization.

The defendant also stated that Twitter banned him in "2 minutes" after he uploaded an Amaq, an official ISIS news organization, statement. During the same discussion, the defendant described using "PGP" (pretty good privacy) encryption methods, stating that this method is "very powerful." He added that al Qaeda used that method and that he thought he "could make one of our own." He also described using another program that was "completely impenetrable" and that law enforcement could "spend 1 billion dollars and they cannot break the code."

On or about May 1, 2019, the defendant sent OCE3 a video of the defendant's computer screen entitled "building the first version," which appears to depict a Linux-based Operating System under development. The defendant stated the operating system would be "available for the ansar [ISIS supporters] to use soon," and described certain technical specifications along with features which would distinguish it from other Linux-based systems and prevent exploitation by "crusader intelligence agencies."

After this conversation with OCE2, the defendant proceeded to create a code that allowed ISIS videos to be preserved. On or about August 7, 2019, the defendant told OCE2 that he was going to spread the ISIS archive everywhere and make sure that nobody including law enforcement, can "take it down" from the internet. During the same conversation, when discussing operational security of the media content,

the defendant stated, "i will also encrypt the files[.] so mukhabarat [intelligence agencies] cannot read them[.] the media jihad will never end…now I am making as much jihad as possible." During the same conversation, the defendant told OCE2 to use a computer program that was recommended by "ansar," that securely deleted computer files in order to prevent law enforcement from finding the files.

On or about October 8, 2019, CHS1 and the defendant met in person in Chicago, Illinois. During the meeting, CHS1 observed the Arch Linux operating system on the defendant's laptop. The defendant briefly showed CHS1 the password for the computer, which he kept on a piece of paper in his wallet. The defendant claimed he would swallow the piece of paper if caught by authorities. The defendant told CHS1 he runs the Python scripts for *Operation: Heralds of the Internet*, attached to the defendant's motion as Exhibit A.

On or about October 10, 2019, the defendant told CHS1 that he believed his project to preserve ISIS content was the "highest form of jihad." The defendant emphasized the importance of his services to ISIS when he informed CHS1 that "no more than ten brothers know how to do this kind of [media] jihad."

The defendant's repeated statements regarding his plot to prevent law enforcement from removing ISIS material from the Internet through the script, to include his statement about swallowing his password for the computer that contained the script if confronted by law enforcement, show that the defendant recognized that the charged conduct was "proscribed." *Humanitarian Law Project*, 561 U.S. at 18–19. Moreover, the defendant's use of the pronouns "we" and "our" (e.g. "make one of *our*

10

own"), with respect to ISIS further demonstrates that he did not intend to act as an independent advocate but instead to act as part of the organization. In other words, the term "services" cannot be vague as applied to the defendant's conduct, when the defendant acknowledged that his conduct would draw law enforcement scrutiny.

### 3) *Direction and Control from, or Coordination, with ISIS*

The defendant is charged with attempting to provide material support to ISIS, *see* Indictment, R. 16. Consistent with the government's charges, defendant repeatedly expressed his desire to assist, coordinate with, and/or act at the direction of ISIS. Nevertheless, the defendant argues that the government has not alleged that he has performed his service at the direction of, or in coordination with, ISIS. *See* R. 65 at 17. The defendant is wrong.

First, the defendant has been charged with "*attempting* to provide material support and resources to a foreign terrorist organization." By charging attempt, the government is not required to allege or establish actual coordination or direction with ISIS, as long as the government presents evidence that the defendant attempted to do so. The evidence of his desire to engage with ISIS, and attempt to do so, is plentiful.

The clearest example is contained within the document the defendant sent to the OCE2, entitled *Operation Heralds of the Internet*. The document explains how to use the defendant's computer script to copy and preserve ISIS videos. In the document, he tellingly writes "By Allah's permission, the brothers who have access to the disorganized al-Furat Media and al-Hayat Media Center channels will be able to

11

organize them or give me access to them *so that I would be able to organize them*."[1] (emphasis added) (Ex. A, OCE2-COM_001-000063 – 64). The defendant's statement offering his assistance – "give me access to them so that I would be able to organize them" – to designated, official ISIS media organizations, is an affirmative statement of his attempt and desire to coordinate with ISIS and refutes the defendant's argument that he was acting for his own personal benefit.

Second, when the defendant sent *Operation: Heralds of the Internet* to OCE2, he told OCE2, "this document is very complicated. it is for organizing channels. but copying channels is easy. and i will do a document for that on android. so brothers who dont have a computer can do it. it will be much neater." The use of the word "brothers" in context of the conversations clearly references ISIS supporters. The defendant's plan to create a second document to assist "brothers" without a computer is further evidence of his attempt to coordinate with ISIS members by teaching them how to use his methods of preserving ISIS content.

Significantly, during the same conversation, OCE2 asked the defendant how he came up with the idea. In response, the defendant said, "before I was Muslim I wanted to find dawla [ISIS] videos but never could[.] its very good for dawah[2][.] the news lies about dawla videos and will never show it full[.] amin[.] I don't know them too close but I love their work[.]I try to help them[.]" In a revealing moment, in

---

[1] Al-Furat Media and Al-Hayat Media are official ISIS media groups and are included on the Department of States' FTO designation of ISIS https://ge.usembassy.gov/amendments-to-the-terrorist-designations-of-the-islamic-state-of-iraq-and-syria-march-21/

[2] Dawa is the act of inviting people to embrace Islam. http://www.oxfordislamicstudies.com/article/opr/t125/e511

discussing the challenges of locating ISIS videos on the internet, and the defendant's project, the defendant stated "I try to help them." "Them" is clearly ISIS. Simply put, the defendant was offering his services to ISIS because he believed his project to engage in "media jihad" by preserving ISIS content was the "highest form of jihad." The defendant informed CHS1 that "no more than ten brothers know how to do this kind of [media] jihad."

*Pledge to ISIS*

The defendant's position that he was only providing independent advocacy is further undercut by his formal pledge of loyalty to the leader of ISIS, known as pledging "bayah." On March 31, 2019, OCE2 asked the defendant if he pledged "bayah" to ISIS. The defendant responded that he tried but that "he can't do it perfect." He then sent OCE2 a recording, which appears to be of defendant pledging "bayah" to ISIS. The defendant asked OCE2 if he had the full text in Arabic. The defendant then sent another voice message. OCE2 responded with "may allah accept from you my brother."

On November 2, 2019, following the death of former ISIS-leader Abu Bakr al-Baghdadi approximately one-week prior, the defendant sent, unsolicited, his pledge to the new leader of ISIS, Abu Ibrahim Al-Hashimi Al-Qurashi, to OCE4. On the same day, the defendant also sent OCE4 an image of an ISIS flag with a handwritten note that stated, "I RENEW MY PLEDGE TO ABU IBRAHIM AL-HASHIMI AL-QURASHI, IN THE LAND OF AMERICA."

The defendant's repeated recognition that law enforcement may scrutinize his conduct, as well as the purpose of his conduct – to preserve ISIS videos that were being removed from the internet – conclusively show that the defendant was aware that the services he was providing were illegal. As a result, the statute – as applied to defendant – is not void for vagueness. The defendant knew he was providing services (or attempting to) ISIS, that he attempted to coordinate his conduct with them, and that his conduct was proscribed. *See Humanitarian Law Project*, 561 U.S. at 21 ("[T]he statutory terms are clear in their application to plaintiff's proposed conduct, which means the vagueness challenge must fail. Even assuming the heightened standard applies because the material support statute potentially implicates speech, the statutory terms are not vague as applied to plaintiffs.")

Indeed, at least one court has affirmed a material support conviction where the underlying conduct involved disbursement of propaganda and training materials over the internet. In *United States v. Mustafa*, 406 F. App'x 526, 530 (2d Cir. 2011), the defendant operated a network of terrorist websites, which distributed jihadi propaganda and instructions on how to build bombs and manufacture poisons. The defendant was charged with, *inter alia*, conspiracy to provide and providing material support and resources to a foreign terrorist organization. In rejecting the defendant's void-for-vagueness challenge, the court held that a person of ordinary intelligence would know that "creating and maintaining websites that host training manuals and propaganda for jihadist organizations and provide instructions for making explosive devices and other weapons" is prohibited. *Mustafa*, 406 F. App'x at 530. Similarly, a

14

person of ordinary intelligence would know that creating a computer script specifically designed to preserve ISIS videos on the internet, is prohibited.

### C. The Defendant's Conduct is Not Protected by the First Amendment

The defendant argues that computer code is First Amendment protected free speech. In support, he presents three arguments. First, he argues that writing computer script is speech. Second, he argues that his conduct was political speech. Third, he argues that downloading and viewing videos, even videos of a violent nature, is protected speech. The defendant's position has no merit.

*Computer Code is Not Protected Speech*

Speech in the form of services coordinated with (or attempted to) an FTO, is not protected First Amendment activity. The Supreme Court has distinguished between independent advocacy (protected speech) and "advocacy performed in coordination with, or at the direction of, a foreign terrorist organization." (not protected speech) *Humanitarian Law Project*, 561 U.S. at 26 (citations omitted). As such, proscribed conduct/services that may be considered speech, are not an exempted class of conduct under the material support statutory framework. Indeed, the Supreme Court has clarified that when material support takes the form of speech, "the statute is carefully drawn to cover only a narrow category of speech, to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Id.*

The defendant cites to the civil case of *Universal City Studios v. Corley*, 273 F. 3d 429 (2nd Cir. 2001) in support of his position that computer script or code is speech.

*Corley* is inapposite. In *Corley*, movie studios sought to enjoin Corley from publicly posting a computer program that would allow individuals to circumvent encryption technology placed on DVDs to prevent the unauthorized viewing and copying of motion pictures, in violation of the Digital Millennium Copyright Act.

Although *Corley* found that computer code is speech, the analysis presented by the Corley court – determining if the statute was content-neutral and if there was a substantial government interest – is inapplicable here. As stated above, if the service provided was not done as independent advocacy but as coordination with the FTO, then the interest of the government in prohibiting the conduct outweigh any speech protections the conduct may be afforded in other circumstances. "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Humanitarian Law Project*, 561 U.S. at 35.

The government has a compelling interest in regulating such speech; specifically, the protection of our national security by starving a terrorist organization of resources, in prohibiting the provision of support through 2339B. "Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order." *Id*. at 28. "The 'foreign terrorist organization' designation means that the Executive Branch has determined—and the D.C. Circuit, in choosing not to set aside the designation, has concluded that the determination was properly made— that materially supporting the organization is materially supporting actual violence." *United States v. Afshari*, 426 F.3d 1150, 1160 (9th Cir. 2005); *United States v.*

*Warsame*, 537 F. Supp. 2d 1005, 1016 (D. Minn. 2008) ("While the prohibitions of §
2339B may include some limited expression protected under the First Amendment,
the Court cannot conclude that § 2339 punishes a substantial amount of free speech
in relation to its plainly legitimate sweep.").

*Defendant's Computer Script is Not Protected Political Speech*

The defendant argues that his provision of material support to ISIS was a form
of political speech, and as such is entitled to First Amendment protection R. 65 at 20
("Downloading, reviewing, and potentially sharing pro-ISIS videos can also be seen
as a form of political speech.").

First, ISIS is not a political organization but a terrorist organization. *See
Warsame*, 537 F. Supp. 2d at 1015 (funds sent to a FTO are not
protected political speech when made to an organization "whose overwhelming
function" is not political advocacy.). As described above, the defendant's actions and
descriptions of his own conduct show that he knew ISIS was a terrorist organization.

Second, there is nothing contained within the facts proffered by the
government, nor are there any facts proffered by the defendant, that indicate the
defendant was attempting to engage in political speech. His actions on behalf of ISIS
fall squarely within Congress's prohibition on providing material support, which
includes only a "narrow category of speech made, under the direction of, or in
coordination with foreign groups that the speaker knows to be terrorist
organizations." *Humanitarian Law Project*, 561 U.S. at 25.

*The Content of the ISIS Videos Is Irrelevant*

The defendant argues that he cannot be prosecuted due to the violent nature of the videos he sought to preserve. The defendant suggests the court apply the test set forth in *Brandenburg v. Ohio*, 395 U.S. 444 (1969) to determine if the defendant's conduct is protected free speech. The *Brandenburg* test states that speech that addresses violence is protected by the First Amendment, absent advocacy directed to incite or produce imminent lawless action. *Brandenburg*, 395 U.S. at 447-48.

The *Brandenburg* test is inapplicable here. The content of the videos for which he sought to preserve is not, in and of itself, what the defendant has been charged with. He has been charged with providing a service to a terrorist organization by creating and modifying computer script that was designed to preserve the ISIS videos in an environment where ISIS had difficulty keeping its materials available online. That action, with the requisite intent and attempted coordination with ISIS, is not protected speech regardless of the content of the videos.

## Conclusion

For the reasons set forth above, the government requests that the Court deny the defendant's Motion to Dismiss.

Respectfully submitted,

JOHN R. LAUSCH, Jr.
United States Attorney

By:    */s/ Barry Jonas*
BARRY JONAS
MELODY WELLS
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604

ALEXANDRA HUGHES
Trial Attorney
Department of Justice
National Security Division
950 Pennsylvania Ave.
Washington, D.C.

Dated: June 28, 2021