```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
        UNITED STATES OF AMERICA,           )
 4                                          )
                        Plaintiff,          )
 5                                          )
                   vs.                      )  No. 19 CR 869
 6                                          )
        THOMAS OSADZINSKI,                  )  Chicago, Illinois
 7                                          )  October 15, 2021
                        Defendant.          )  9:34 a.m.
 8

 9           TRANSCRIPT OF PROCEEDINGS - Volume No. 7 AM

10          BEFORE THE HONORABLE ROBERT W. GETTLEMAN

11                        and a Jury

12
        APPEARANCES:
13
        For the Plaintiff:      HON. JOHN R. LAUSCH, JR.
14                              United States Attorney
                                BY:  MR. BARRY JONAS
15                                   MS. MELODY WELLS
                                Assistant United States Attorneys
16                              219 South Dearborn Street, Fifth Floor
                                Chicago, Illinois  60604
17                              (312) 353-5300

18
                                MS. ALEXANDRA HUGHES
19                              Trial Attorney, Department of Justice
                                National Security Division
20                              950 Pennsylvania Avenue, NW
                                Washington, D.C.  20530
21

22

23      Official Court Reporter:  NANCY L. BISTANY, CSR, RPR, FCRR
                                219 South Dearborn Street, Room 1706
24                              Chicago, Illinois 60604
                                (312) 435-7626
25                              nancy_bistany@ilnd.uscourts.gov
```

```
1    APPEARANCES:   (Continued)

2
     For the Defendant:            GREENBERG TRIAL LAWYERS
3                                  BY:   MR. STEVEN GREENBERG
                                   53 West Jackson Boulevard, Suite 1260
4                                  Chicago, Illinois  60604
                                   (312) 879-9500
5

6                                  LAW OFFICE OF JOSHUA G. HERMAN
                                   BY:   MR. JOSHUA G. HERMAN
7                                  53 West Jackson Boulevard, Suite 404
                                   Chicago, Illinois  60604
8                                  (312) 909-0434

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

PAGE

CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT          1322
     BY MS. WELLS

CLOSING ARGUMENT ON BEHALF OF DEFENDANT               1367
     BY MR. HERMAN

GOVERNMENT REBUTTAL CLOSING ARGUMENT                  1414
     BY MR. JONAS

1    (Proceedings heard in open court:)

2    THE COURT SECURITY OFFICER:  All rise.

3    (Jury in.)

4    THE COURT:  Good morning, ladies and gentlemen.

5    Please be seated.

6    As I said yesterday, the evidence has been presented,

7    and now it's time for closing argument.  This is the

8    opportunity the lawyers have to summarize the evidence from

9    their point of view and to try to persuade you to reach a

10   verdict in favor of their respective clients.

11   Please remember what I've said several times already.

12   Arguments, statements by lawyers are important, but they are

13   not evidence.  So if the evidence is different than what the

14   lawyers say, it's the evidence that counts, and it's the

15   evidence from which the jury will find the facts of this case.

16   When the lawyers -- the way this works is sort of

17   like a debate.  And if you were on a debate team, the

18   government has the burden of proof, so they go first.  Then the

19   defense gets a chance to respond and to present their argument.

20   And then the government has a brief rebuttal afterwards to the

21   statements, so they go last because they have the burden of

22   proof.

23   And then I'm going to instruct you on the law, and

24   you'll begin your deliberations.  And the alternates will be

25   identified and discharged.

1        So that's what's going to happen now.  So please pay

2   attention.  And Ms. Wells is going to do the closing for the

3   government.

4        Ms. Wells.

5        MS. WELLS:  May I proceed?

6        THE COURT:  Please.

7        MS. WELLS:  And may I have the screens for the

8   courtroom, please.  Thank you.

9        CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

10       MS. WELLS:  "I do jihad in media.  I renew my pledge

11  to Abu Ibrahim al-Qurashi."  Those are the defendant's words,

12  and those -- that is the defendant's pledge of allegiance to

13  ISIS.

14       And as the defendant said over and over again in the

15  evidence that you saw during this trial, the defendant was

16  committed to supporting ISIS, and he was committed to media

17  jihad.  And he acted on that commitment.  The defendant's media

18  jihad included the creation and the modification of a suite of

19  computer programs, including the process described in

20  "Operation:  Heralds of the Internet."

21       Defendant knew that ISIS had a problem.  Defendant

22  knew that ISIS could not keep its media information on the

23  internet.  It was being taken down left and right by social

24  media platforms and other websites.

25       And defendant's set of Python computer scripts

1     offered a technical solution to that problem.  Defendant's

2     media jihad included not just writing and creating the process

3     in Heralds of the Internet, but he also modified other Python

4     computer programs, tailoring them to users who he believed were

5     also trying to help ISIS.

6              Beyond that, he taught those computer programs to

7     those people, those like-minded ISIS supporters.  And his media

8     jihad included the distribution of several versions of these

9     programs to those people.

10             He helped them configure their computers.  He taught

11    them how to run them.  He gave them all the information about

12    the various programs and ancillary files they needed in order

13    to make it work.

14             And, ladies and gentlemen, what ended with the

15    defendant's development and distribution and teaching of this

16    set of technical tools, it began back in June of 2018 when the

17    defendant joined a channel on Telegram called "Weapons."  And

18    when the defendant was in that channel, he posted something

19    there.  He posted a guide to making an explosive called TATP,

20    and that guide was branded with the ISIS logo, and that guide

21    described itself.  It described itself as a gift to the

22    mujahideen who operate in the Kuffar lands.  And the defendant

23    asked:  Does anybody have the video that goes along with this?

24             Unbeknownst to the defendant, someone from the FBI

25    saw that post, OCE 1.  That was the first witness who testified

1    in the trial.

2            And OCE 1 began talking to the defendant online.  And

3    in those conversations, the defendant told OCE 1 that he was

4    studying for jihad, and he previewed to OCE 1 the direction

5    that his study of jihad would take over the coming months.  He

6    said he was in a top school for computers, and he told OCE 1,

7    "If any brothers need help with security, tell them to come to

8    me."

9            And the defendant told OCE 1 something else.  He said

10   that the Mukhabarat -- that's the word that the defendant used

11   to describe the police, to describe the FBI -- he says,

12   "They're following me.  They're watching me.  And because of

13   that," the defendant said, "I have to stay passive for now.

14   Because of that," the defendant said, "I can't get in contact

15   with brothers for now."

16           And when you go to deliberate, ladies and gentlemen,

17   read these communications.  This is Government Exhibit 100-1.

18   Because context matters, and you know that in the context of

19   that conversation, the defendant, when he said, "I can't get

20   into contact with the brothers for now," he wasn't talking

21   about his fellow Muslims in his neighborhood.

22           If the FBI was watching him, the brothers who he

23   could not -- he could not get in contact with were his ISIS

24   brothers.  And so the defendant believed he just needed to be

25   patient.

1           And he was.  He laid low.  He waited until the heat

2    died down.  And in February of 2019, he reemerged.  In February

3    of 2019, the defendant sought out Organization 1.  Organization

4    1 we learned is a pro-ISIS, pro-extremist organization that

5    distributes explosive materials and toxins online.

6           And the defendant contacted that group.  But, again,

7    unknown to him, the person who responded was OCE 2, Jack

8    Rodgers.  And over the next several months, the defendant's

9    statements to OCE 2 made clear who he supported and what he was

10   doing in.  And the answer was ISIS.

11          He sent OCE 2 an audio recording of the defendant

12   pledging bayat -- that's that oath of allegiance -- pledging

13   his oath of allegiance to ISIS.  He did it twice.

14          And then he asked OCE 2:  "Hey, can you send me the

15   words," because he wanted to make sure he could do it the right

16   way.

17          The defendant told OCE about how he -- OCE 2 about

18   how he'd made his own ISIS flag and sent pictures of that to

19   OCE 2.  He talked to OCE 2 about methods for evading law

20   enforcement and ways that other ISIS supporters could do the

21   same.

22          One of the defendant's ideas was to make "our own"

23   encryption program, again, to evade law enforcement.  One of

24   the defendant's ideas was to -- to develop his own custom

25   operating system for Ansar.  And who are Ansar?  You heard this

1    in the trial.  Those are ISIS supporters as well.

2            And he wanted that operating system to be very

3    secure, and he thought that doing that would be valuable.  And

4    ask yourselves, valuable to who?  Who was a very secure

5    operating system designed for ISIS supporters supposed to help?

6    It is supposed to help ISIS.

7            And by August of 2019 something had changed,

8    something important had changed for the defendant, and he told

9    OCE 2 about that as well.  He said, again, the FBI -- and he

10   called them "the Mukhabarat" -- he said they'd given up on

11   following him.  "And now," the defendant said, "Now I am making

12   as much jihad as possible."  And in August of 2019, the

13   defendant made his jihad.

14           At that time he sent OCE 2 the document that he

15   created called "Operation:  Heralds of the Internet."  And that

16   is that teaching technical manifesto that explains how to use

17   the defendant's modified Python computer program in order to

18   sort, organize, and preserve ISIS official media, media the

19   defendant knew that ISIS was having trouble keeping online,

20   media the defendant knew that supporters like him were having

21   trouble accessing.

22           And in Heralds of the Internet, the defendant made

23   clear exactly who he was trying to help, who this service was

24   for, who this tool was for.  And it was for ISIS.  He

25   prioritized working on ISIS official media organizations like

1    al-Hayat and al-Furqan.  And he said in that document what he

2    hoped would happen.  He said, "I hope that the brothers in

3    al-Hayat" -- and, again, that's an official ISIS media

4    organization.  And so who has access to the al-Hayat channels?

5    ISIS.

6            He said, "I hope that the brothers who have access to

7    the al-Hayat channels will give me access so that I can come in

8    and use this access to organize their material or," he said, "I

9    hope that they will use it themselves to organize their own

10   things."

11           And from August forward the defendant continued

12   making as much jihad as possible.  In August around the same

13   time, he was in touch with Ahakim Abbas.  That was the CHS.

14   That was one of the ones -- the witness who he had the

15   in-person meetings with who you heard the recordings from.

16           And in August he was talking to the CHS.  And as you

17   learned from the CHS, the defendant had different accounts.  He

18   had a regular Telegram account for normal conversations.  He

19   had a regular WhatsApp account for normal conversations.  And

20   then he had another Telegram account.  What was that one for?

21   That was for his ISIS conversations.

22           And so when the two of them would talk about ISIS,

23   that's the account they would use.  And the defendant mentioned

24   to the CHS that he had had accounts closed by Telegram that had

25   contained ISIS material.  And, again, this was that problem

1   that several of the witnesses in this case described for you.

2   ISIS couldn't keep its material out there on the internet.

3          And by September he had shared two versions of a

4   computer program with the CHS.  And he was teaching the CHS in

5   detail how to use them, how they worked, what they did, walking

6   through those steps.

7          And by October the defendant did something else.  He

8   sought out Organization 2.  And you'll remember who

9   Organization 2 is.  This is the group that takes ISIS official

10  media and translates it into English.  So the defendant went

11  out and found that group.  And, again, unknown to the

12  defendant, the person who responded was someone from the FBI.

13  That was OCE 4, Bill Smith.

14         And immediately, immediately in his conversation with

15  that -- with OCE 4, what did the defendant say about himself?

16  He said, "I'm a munasir.  I copy channels and share."  You

17  learned what that word means.  A munasir is a supporter, again,

18  a supporter of ISIS.

19         And he volunteered immediately "Here's a copy of this

20  script.  Here's the tool that I use to automate this process."

21  And you saw and heard from OCE 4 and in those communications

22  that the defendant then spent hours teaching OCE 4 how to use

23  it, troubleshooting with him on his phone and later on his

24  computer, showing him which files and programs he needed to

25  download in order to run the script.

1    And when they finally had everything configured the

2    right way -- because this is not something that you can just

3    pick up and do.  There's a certain amount of training or

4    information that you need in order to use this.

5    Once they were ready to do it, he walked OCE 4 step

6    by step by step through the process.  And when OCE 4 said,

7    "Hey, you know what, I actually don't speak Arabic, and these

8    communications with the bot are in Arabic.  Do you have a

9    version in English," the defendant said, "Sure, let me

10   translate it for you."  And he sent him another version.

11   And around the same time in October he continued to

12   discuss with the CHS his computer programs, giving him more

13   information about they -- about what they were and how they

14   worked.  And he sent yet another version to the CHS on October

15   10th.

16   And so you'll remember that one of the things that

17   the defendant has said is that media jihad will never end.

18   And, in fact, the only thing that put an end to the defendant's

19   media jihad was his arrest in November of 2019 when he resisted

20   and fought back against the arresting officers and in one final

21   gesture of support to ISIS, raised his finger in salute.

22   For his actions the defendant is charged with

23   attempting to provide material support to ISIS, and

24   specifically, he is charged with attempting to provide material

25   support in the form of services.

1        And, ladies and gentlemen, at the very end of this

2   case, the Court is going to instruct you on the law, and it is

3   what the Court says about the law, not what the lawyers say,

4   not what the witnesses say.  It is what the Court says that

5   matters, and you must follow his instructions.

6        What I expect that he will instruct you is that in

7   order to prove the charge against the defendant, the government

8   must prove beyond a reasonable doubt.  That is our burden, and

9   a burden we embrace.  We must show that the defendant, one,

10  knowingly attempted to provide services to ISIS; and two, that

11  the defendant knew that ISIS either -- and we must prove one

12  but not all three of these -- either was a designated foreign

13  terrorist organization, that ISIS engaged in terrorist

14  activity, or that ISIS engaged in terrorism.

15       And I want to begin with the second element, because

16  the evidence on this, ladies and gentlemen, is not genuinely in

17  dispute.  And, in fact, the evidence shows that the defendant

18  knew all three of those things about ISIS.

19       He knew all sorts of things about ISIS, but one of

20  the things that he specifically knew was that ISIS was, in

21  fact, a designated foreign terrorist organization.  And he knew

22  this because he had a criminal complaint, and that's a legal

23  document that charges someone with a crime.  He had a criminal

24  complaint alleging that these two people, Schimenti and Jones,

25  had provided material support to ISIS.  And he had that in his

1    room, but he didn't just have the thing.  He sent pictures of

2    it to OCE 3.  And in talking to OCE 2, he asked OCE 2 to make

3    dua, to say a prayer for the brothers, Schimenti and Jones.

4            And this document contains an important piece of

5    information, because it very specifically states the fact that

6    ISIS is a designated foreign terrorist organization.  That's

7    right there at the bottom:  To date, ISIS remains a designated

8    FTO.

9            And the document says something else that's

10   important, because we're going to come back to this.  It lists

11   al-Furqan Establishment for Media Production as an alias for

12   ISIS.  Al-Furqan is ISIS.  They are one and the same.  So

13   that's something that the defendant knew.

14           Here's something else that the defendant knew.  The

15   defendant knew that ISIS engaged in terrorist activity or

16   terrorism, and he knew this for a lot of different reasons.

17   One of those reasons is the literal thousands upon thousands of

18   ISIS videos, images, and other files that he had stored in his

19   Telegram accounts on his phone.

20           And you heard from the witnesses.  You heard from

21   Special Agent Fee, who reviewed some of the content on that

22   phone, that some of those videos showed people being killed,

23   showed people being beheaded.  You heard from the CHS that he

24   watched videos with the defendant that showed similar things,

25   people being shot, people being beheaded.  There was a video

1    that involved two suicide bombers.

2              So the contents of that material, ladies and

3    gentlemen, showed that the defendant knew about this.  But the

4    defendant also knew about ISIS's terrorism and its terrorist

5    activity because he told OCE 2 and later OCE 3 that he helped

6    to make this video, the one we're about to watch a clip from.

7    This is called "The Fighting Has Just Begun."

8              And he sent this video to both of those witnesses,

9    and he said that he had done the video -- the voiceover work in

10   the video.  And we're going to watch a short clip and listen to

11   the American voice at the beginning.  That's the -- the voice

12   of the defendant said, "Hey, this is me."  And that voice is

13   introducing a crystal-clear message about what ISIS is all

14   about, terror.

15             (Said video recording played in open court.)

16             MS. WELLS:  Not only did the defendant know about

17   ISIS's terrorist activity and terrorism; he embraced it.  One

18   of the things he said to OCE 2 was:  I do jihad in media, but

19   the sword is the other part.

20             And let's look at a couple of the statements that he

21   made showing that he embraced that concept.  One of these

22   things that he talked about with OCE 2 is what would happen if

23   he was ever arrested.  And make no mistake, ladies and

24   gentlemen, the reason the defendant was planning for what he

25   would do when he was arrested is because he knew he was doing

1    something wrong.

2              He said, "If they ever come to arrest me, by Allah, I

3    will make Dawlah with the sword.  I will never go to their

4    false man-made court."  And you can see the emoji that he sent

5    right below that, a knife and two crossed swords.  And you can

6    use your common sense, ladies and gentlemen.  You know exactly

7    what message he was trying to convey when he sent that.

8              He said similar things to OCE 2.  He said, "I'll be a

9    shaheed" -- that means a martyr -- "before the Mukhabarat," the

10   police, "ever catch me."

11             He told OCE 1:  "Once I get my gun and explosives

12   belt, the Mukhabarat will never get me."

13             And in a different context, he told OCE 2 this.  This

14   was about what would happen if he was drafted into the miliary.

15   He said, "If they pick me," eyeballs, truck, dynamite.  You get

16   it.

17             And then he said there was a mujahid who did this.

18   He joined the American Army and killed 12 people.

19             So that's the second element, ladies and gentlemen.

20   The evidence shows beyond a reasonable doubt -- and there is no

21   genuine dispute about this -- that the defendant knew either

22   that ISIS was a designated terrorist organization, that it

23   engaged in terrorist activity, or that ISIS engaged in

24   terrorism.

25             So let's talk about the first -- the first element

1    the government must prove.  The defendant is charged with

2    attempting to provide a certain type of material support to

3    ISIS, namely, services.

4              And, again, I anticipate that the Judge will instruct

5    you that "services" includes advocacy or activities, activities

6    performed in coordination with or at the direction of ISIS.

7              He will also tell you that independent advocacy or

8    activity is not prohibited by the law.

9              And the evidence in this case, ladies and gentlemen,

10   the defendant's own actions, his own words, his own computer

11   programs, has all shown beyond a reasonable doubt that he was

12   working to benefit ISIS and that he was responding to specific

13   directions and calls to action that ISIS issued to supporters

14   like him.  Engage in media jihad, support the Islamic State on

15   the digital front.

16             And knowing about ISIS's problem keeping its media

17   online, the defendant took action.  He created a technical

18   program that was meant to solve that problem, and he worked, he

19   worked to preserve that ISIS media, to save it, to sort it, to

20   organize it, to share it with others.

21             And, ladies and gentlemen, the evidence has shown

22   that the defendant, who had sworn his allegiance to ISIS, was

23   doing all of that for a reason.  He was not acting

24   independently.

25             And so what does it mean to attempt something?

1    Again, I anticipate that the Court will instruct you that in

2    order to show attempt, the government must prove beyond a

3    reasonable doubt two things:  The defendant knowingly took a

4    substantial step toward providing services to ISIS; and

5    secondly, that he did so with the intent to provide services to

6    ISIS.

7              And so as to this first element, the substantial

8    step, the evidence will show that the defendant took at least

9    one of those; and, in fact, he took several.  And that included

10   writing, distributing, and using the computer process described

11   in "Operation:  Heralds of the Internet."  It included

12   modifying those other Python computer programs that you've

13   seen, distributing those to others, teaching those to others,

14   and using them himself.

15             And we're going to turn to the evidence of those

16   substantial steps in a moment, but I want to begin with the

17   second one here, which is intent, because intent matters.

18   Intent matters.  It's an element that the government must

19   prove.  And we embrace that burden to show beyond a reasonable

20   doubt that what he intended to do was provide his services to

21   ISIS.

22             And as you consider the evidence in this case,

23   consider all of the things that have come in into the record.

24   Consider what the defendant said, consider what the defendant

25   knew, and consider what the defendant did.

1    There's an expression.  When someone shows you who

2    they are, believe them the first time.  In this case, the

3    defendant has shown through his words and through his actions

4    over and over again exactly what he was doing, what he cared

5    about, and who he was trying to help.  And the answer is ISIS.

6          He pledged his allegiance first in the spring of

7    2019; and then again in October of 2019 after the ISIS leader

8    was killed, he renewed that oath of allegiance.  He did it

9    again.  He made his own ISIS flag.  He sent pictures of that to

10   the OCEs.

11         He introduced himself to OCE 4 as a munasir, an ISIS

12   supporter, and he talked about ways to help the Ansar, the ISIS

13   supporters, the brothers.  And he kept saying over and over and

14   over again exactly what he was doing.  He said, "Media jihad.

15   I do jihad in media."  He said, "The media jihad will never

16   end."

17         And in August of 2019, he told OCE 2 again exactly

18   what he was doing:  As much jihad as possible.

19         And during trial, ladies and gentlemen, there were

20   questions from defense counsel that suggested, well, jihad is a

21   complicated word.  It can mean different things.  Maybe that's

22   not what the defendant meant when he said it.

23         Well, ladies and gentlemen, the defendant has cleared

24   that up for you, because in conversations with OCE 2, OCE 2

25   asked him -- and this had to do with the voiceover for the

1    video we just watched -- are you doing this?  Are you doing

2    this to support the Islamic State or just for jihad?

3              And the defendant's answer was crystal clear:  Both.

4              And so all of the defendant's statements here and all

5    of his statements in the record -- and I encourage you to

6    review all of these communications when you deliberate -- they

7    give you a window, an insight into what the defendant was

8    thinking, what his intent was, what his mind-set was, what he

9    was acting towards.

10             But it's not just the things that he said.  The

11   actions that the defendant took, the activities that he was

12   involved in show what his intent was.  So what was one of those

13   activities?

14             Well, as he told OCE 2:  "I wrote an article.  It's

15   going to be in the next Youth of the Caliphate magazine."  And,

16   ladies and gentlemen, you know what Youth of the Caliphate is.

17   You heard OCE 2 describe it, but you can also see it for

18   yourself.

19             What is the caliphate in this magazine?  It's ISIS.

20   And make no mistake about that, there's the figure in the upper

21   right-hand corner waving the ISIS flag.  There's no question

22   what this is about.

23             And the defendant told OCE 2:  "I wrote a message.  I

24   used a pen name.  My pen name was Brush."

25             And there's the article by Brush.  And what did Brush

1    write?  What did the defendant write?  Well, he sent a message

2    of inspiration to the mujahideen, the supporters of ISIS.  And

3    what was that message?

4              Well, he wanted to inspire those supporters who were

5    fighting the American crusader soldiers and their puppets.  And

6    he had other ideas, too.  He wondered to OCE 2:  Hey, maybe I

7    can start my own magazine, a magazine like Rumiyah or Dabiq.

8    Dabiq, you will recall -- and this is in The Structure of the

9    Caliphate video that you saw -- is one of ISIS's official media

10   publications.  It's a magazine.

11             So he wasn't wondering, hey, maybe I can make my own

12   Entertainment Weekly.  Maybe I can make my own Time Magazine.

13   His inspiration were ISIS official publications.

14             What else did he do?  Well, we've talked about the

15   video voiceovers.  This set of images are from "The Fighting

16   Has Just Begun," which is the video we just watched the clip

17   of, the video the defendant said, "Hey, I did the voice work

18   for this."

19             And, ladies and gentlemen, when you consider what the

20   defendant was saying when he says, "I do media jihad," this is

21   media jihad.  That's what this video is about.  Don't spare

22   none.  Kill them all.

23             And he agreed with it.  In talking about this video

24   with OCE 2 and OCE 3, he said, "Hey, you know what the best

25   part is?  The end."

1          Do you know what happens at the end, ladies and

2    gentlemen, because the witnesses told you?  People are

3    beheaded.

4          What's something else that the defendant did that

5    showed what his intentions were?  Well, he did translation work

6    and subtitles for other videos.

7          He told OCE 2 -- or excuse me.  On two different

8    occasions, he translated passages from Arabic to English in his

9    conversations with OCE 2.

10         For example, what was one of those passages?  Well,

11   it was a passage that lists the steps that someone needs to

12   take before planning operations.  That's on pages 15 through 17

13   of Exhibit 200.  And you know what operations are in this

14   context, ladies and gentlemen.

15         He also said that he did -- he edited translations

16   for this video.  This video is called "Holding Firm to the

17   Pledge."  It's Government Exhibit 202-1 and 202-2.

18         And this video or -- this video does, in fact, have

19   English subtitles, and you can see addressing, oh, soldiers of

20   the Islamic State.

21         And you also learned who is speaking in this video,

22   because Dr. Zelin, the ISIS expert, said that this man -- and

23   you'll recall from the video there's Arabic speaking going on

24   in the background; that's what the subtitles are for -- this

25   man was ISIS's former official media spokesperson.

1          And here's another one.  The defendant said, "I

2     provided translation for Crusader State of Russia."  That's

3     this video.  And here is a screenshot of the translation that

4     the defendant said he was doing.  "Know that we will kill you

5     in your homes as well."

6          So when you ask who was the defendant intending to

7     help, what were his goals, what was his mind-set, these

8     actions, ladies and gentlemen, show you.

9          What else did he do?  Well, he had other plans.  He

10    had other ideas.

11         He said, "I'm working on an English nasheed."  This

12    is another conversation with OCE 2.  And you'll recall that a

13    nasheed is a song.  It's a song just -- it's acapella, no

14    instruments, just voices.  "I wrote it myself.  I'm trying to

15    make it perfect."

16         And this is important, ladies and gentlemen, because

17    he said something else that matters here.  Because what did he

18    want to do with this?  This wasn't a side project that he did

19    for fun at home.

20         He said, "Maybe Dawlah will use it.  Maybe ISIS" --

21    that's what Dawlah is -- "Maybe ISIS will use it."  He would

22    have liked this song to reach ISIS.  He would have liked them

23    to do something with it.  Those was his goals.  That was his

24    intention.

25         And then the defendant turns to other activities,

1    activities that particularly relied on his skill-set, in this

2    case, his computer skills.  He kept telling the witnesses:

3    "Oh, I study computer science.  I go to a top computer school."

4              This was something that he was focused on.  He knew

5    this is how he could help.  This is what made him different,

6    something extra that he could add.

7              And so here's one of his ideas, and he told this to

8    OCE 2 and later OCE 3.  This is the operating system he wanted

9    to design.  And, again, he described this as a very valuable

10   project.  And again ask yourselves, valuable for who?

11             Well, the answer is right there in the title of his

12   Telegram, "Al-Ansar OS Development," ISIS and its supporters.

13             Here's another one of his ideas.  In conversation

14   with OCE 3, he said, "I think I will make a guide for trusted

15   brothers, like Horizons."

16             Well, what is Horizons?  You heard from OCE 3 and

17   from Dr. Zelin.  They said it in almost exactly the same way.

18   It's basically IT tech support for ISIS.

19             And so, again, context matters.  When the defendant

20   is saying he wants to make a guide for trusted brothers and his

21   example is IT tech support for ISIS, who are the trusted

22   brothers that he's talking about?  It's not his fellow Muslims

23   at the neighborhood mosque, ladies and gentlemen.  He's talking

24   about ISIS.  He's talking about those supporters.  That's who

25   he wants to make the guide for; that's who he wants to help.

1            And so going back to those elements, the evidence --

2    and we're going to continue to talk about intent -- but the

3    evidence here overwhelming shows, shows beyond a reasonable

4    doubt, what the defendant intended to do and that his actions

5    were done with the intent to provide services to ISIS, that his

6    activities were to provide services to ISIS.

7            And so when you look at those elements, let's talk

8    about the other thing that the government must prove; and that

9    is, that the defendant knowingly took a substantial step toward

10   providing services to ISIS.

11           And the substantial step, as I believe you will be

12   instructed, is something that strongly corroborates that the

13   defendant intended to provide material support to ISIS.  So

14   we're going to continue to talk about that intent.

15           And I expect that one of the things that the defense

16   will tell you on summation is that, well, oh, the defendant's

17   not charged with writing articles or doing voiceovers or the

18   examples we just discussed.

19           And let's be clear.  Those are not the services he's

20   charged with providing, but they are evidence of his intent.

21   And you may consider all of the evidence in this case in

22   determining whether the government has met its burden of proof.

23           And so let's talk about substantial steps.  Again,

24   the services that the defendant is charged with providing is

25   that set of computer processes and programs that we've

1    discussed.

2              And so did the defendant take -- knowingly take a

3    substantial step toward providing those services to ISIS?  In

4    considering that, go back again to things that the defendant

5    knew.  What did he know?

6              Well, he knew that ISIS recruited media jihadis.

7    This is from The Structure of the Khilafah.  That's one of the

8    videos that you saw during the trial.  And the defendant had

9    this video.  It was saved on his phone.  It was also in the

10   Every Isdar Ever Telegram channel that he gave to OCE 4.

11             And this video describes exactly what it sounds like,

12   the structure of the Islamic State.  And you learned that this

13   video was made by a group that by now should sound familiar.

14   This is from Al-Furqan.  That's the official ISIS media

15   organization that is part of the designation.  Al-Furqan is

16   ISIS.

17             And as Al-Furqan instructs in this video, just like

18   the United States has a department of agriculture or a

19   department of commerce or a department of treasury, ISIS has a

20   department or a Diwan of Media.

21             And it is the Diwan of Media that is responsible for

22   all of the audio, visual, and written content for ISIS that

23   comes from the video, that comes from Al-Furqan.  And it lists

24   on this particular portion of the video a number of the

25   official ISIS media organizations.  Furqan is the one at the

1    top at, like, the 12 o'clock position with the little house on

2    the logo.  To the left is A'maq, another official organization

3    that's in the designation.  And to the right is Hayat.  That's

4    the one with the tear-dropped-shaped logo.

5            And there's something else that's important that's on

6    this slide, ladies and gentlemen, because the Media Diwan and

7    Al-Furqan in making this video specifically included someone

8    else in the structure of their media organization, someone else

9    who was part of the mission; and that is, supporters,

10   supporters like the defendant.

11           And I'll refer you, when you think about these

12   official media organizations, to Exhibits 1000-1 and 1000-2.

13   That's the designation language that lists Furqan, A'maq, and

14   Hayat as being part of ISIS, as being one and the same.

15           And this language about supporters is important,

16   because it's consistent with what Dr. Zelin talked about during

17   his testimony.  ISIS treated as equals its members and its

18   supporters.  It didn't matter if you were physically in the

19   caliphate when there was a physical caliphate or if you were a

20   supporter elsewhere around the world.

21           ISIS also treated as equals the people who fought on

22   the battlefield and the people who fought in media.  They were

23   equally important to ISIS's strategy and its mission.

24           And the defendant knew all about official media

25   because he kept talking about it with the witnesses.  When you

1      go and look at those folders and the Telegram channels of what

2      he saved, you'll see these names over and over again; Hayat,

3      Furqan, A'maq, et cetera, I'tisam.  There's more.  So he knew

4      all about this structure.  He had this video.  He knew about

5      official media.

6              But he knew something else, and I want to refer you

7      back to this video.  It's called "Inside 8," and there are

8      several clips from this video that are in evidence in the

9      Exhibit 409 series.  And I encourage you to go back and take a

10     look at these, look at them closely, because this video

11     contains specific instructions and directions to ISIS

12     supporters consistent with its media strategy.

13             And those instructions were very specific, and they

14     included support your khalifah, support ISIS on the digital

15     front.  And that is a direction that the defendant followed.

16         (Said video recording played in open court.)

17             MS. WELLS:  And he was listening.  He was paying

18     attention, because the defendant sent pictures, screenshots

19     from Inside 8 to OCE 2.  He said, "Hey, did you see Inside 8?"

20             And he'd studied it so closely.  He sent these images

21     of people in the video, these ISIS members or supporters typing

22     back and forth on some type of messaging platform.

23             He said, "The brothers" -- and, again, ladies and

24     gentlemen, do you know who the brothers are in this

25     conversation?  It is ISIS when he is talking about Inside 8.

1    "The brothers made their own Telegram."

2            And Inside 8 said something else.  It contained other

3    directions and instructions to supporters.  And here you can

4    see where they specifically equated and made it clear that

5    people who were working in media and on the battlefield were

6    the same:  Supporters of the khalifah everywhere, both in the

7    media as well on the battlefield.  That was the audience.

8    That's who they were talking to.

9            And those instructions told them to strive patiently

10   in the digital arena.  And those instructions said:  Do not

11   allow the disbelievers, the Kuffar, to enjoy a moment of sleep

12   or live a pleasant life.

13           And then it said something important, something

14   that's consistent with what the defendant knew and what the

15   defendant was acting upon.  They were talking about the fact

16   that websites and social media were closing ISIS-related

17   accounts.  And they said to their supporters:  "If they close

18   one, open another three.  If they close 3, open another 30."

19           (Said video recording played in open court.)

20           MS. WELLS:  And once again, the defendant was

21   listening.  He was paying close attention, because he repeated

22   this concept right back to OCE 2 endorsing it.

23           In a conversation with the defendant and OCE 2 in

24   March of 2019, they were talking about this post from something

25   called "ISIS Watch."  And that organization on Telegram was

1    explaining that 260 terrorist bots and channels were banned on
2    February 28th.

3            And how did the defendant respond to this
4    information?  He said exactly what Inside 8 said.  "They delete
5    1; we make 2 more."

6            And take a minute with that phrase, ladies and
7    gentlemen, because it matters.  When he says, "They delete 1,"
8    you know who he's talking about.  He's talking about Telegram
9    in this instance.

10           Who is the "we"?  Who is defendant a part of when
11   he's expressing this idea "We make 2 more"?  He is talking
12   about ISIS.  He considered himself a part of that.  He was
13   following their directions, listening to their strategy,
14   spreading that message to OCE 2 who, again, he believed to be
15   someone who worked for an organization that spread jihadi and
16   ISIS materials related to explosives and poisons.

17           And Inside 8 had other important directions.  They
18   addressed their comments to the "Lions of Information" and the
19   "Warriors of Media."  And they said, "Make sure that you are
20   only taking your news from official ISIS media sources."

21           (Said video recording played in open court.)

22           MS. WELLS:  And once again, ladies and gentlemen, the
23   defendant was paying attention, because he talked about this
24   again this time with OCE 4.  This is a message the defendant
25   sent OCE 4, and you can see at the top that it's got screen

1    captures from the clip that we just watched from Inside 8.  And

2    I know that the subtitles there on the bottom are a little hard

3    to read in the pictures, but helpfully enough, the defendant

4    put the same information in that first paragraph.

5              Remember those Lions of Information and those

6    Warriors of Media you just heard about?

7              Well, he's telling OCE 2 that same message.  Take

8    your news only from the central media of the Islamic State.

9    And the timing of this message from the defendant was

10   important, because he sent it on a particular date.  He sent it

11   on October 27th, 2019.

12             And what happened that day?  Dr. Zelin told you, and

13   so did OCE 4.  ISIS's leader had been killed on October 27th.

14   And so in response to that news, the defendant is sharing this

15   with OCE 4.  And he is reinforcing the idea just like Inside 8

16   told him to:  "Spread it.  Spread it, akhi.  Make sure other

17   people like us, other ISIS supporters know."

18             And so when thinking about Inside 8 as an example of

19   one of these ISIS official media publications, remember this

20   set of instructions from the video as well.  Because when you

21   consider what it means that the defendant was so committed to

22   media jihad, to doing media jihad for ISIS, well, ladies and

23   gentlemen, this is media jihad.

24        (Said video recording played in open court.)

25             MS. WELLS:  And so before we go back to the

1    defendant's substantial steps, to the actions that he took,

2    there's one more thing to keep in mind about what he knew, and

3    it's this problem that ISIS was having with its media.  And

4    we've touched on it a few times already this morning, and it

5    came up with a number of the different witnesses in the case.

6    Websites, social media, other online applications kept taking

7    this stuff down.

8              And so the defendant commented -- this is just one

9    example -- but here in a conversation with OCE 2, he's talking

10   about how Reddit, one of the websites he used, banned him for

11   posting Dawlah videos.  Dawlah, as you know, are ISIS videos.

12   He was aware of this issue.

13             And so in connection with the charge of attempting to

14   provide material support to ISIS, specifically services, he

15   came up with a technical solution.  So ISIS says, "Hey, if they

16   close 3 accounts, open another 30."

17             He came up with a technical solution that would deal

18   with that at scale.  He wasn't just going to open 30 new

19   Twitter accounts.  He came up with a set of computer programs

20   and processes that would copy quickly, efficiently, much faster

21   than anyone could ever do manually, preserve that information,

22   sort it, organize it, and make it available to other people,

23   because he knew how hard it was to find online.

24             All of those actions, completely consistent with and

25   absolutely following the specific message coming out from ISIS

1    and its media department.  This was the defendant's media

2    jihad, and he said it will never end.

3              And so what did he do?  What did he do?  How did he

4    direct his activities with this in mind?

5              He worked with what he had from where he was, and he

6    used his computer skills.  And in doing so, he took several

7    substantial steps toward attempting to provide those services

8    to ISIS.  And they included these; misdirecting law

9    enforcement; writing the Heralds of the Internet, the process

10   itself, the underlying script, and the teaching manual

11   document; distributing that teaching document; using it to

12   actually engage in the conduct that it's designed to do;

13   modifying other Python computer programs; distributing those

14   programs to people he believed were trying to help ISIS;

15   teaching those same people how to do it; and using those

16   programs himself.

17             So let's talk about those one at a time.  The first

18   one was misdirecting law enforcement.  And it's important to

19   remember that the defendant's plan to use his computer skills

20   to help ISIS had a couple of different components, and one of

21   those components is captured in this conversation with OCE 2.

22   And OCE 2 is asking the defendant what he would do with his

23   archive of ISIS media.  And the defendant said he had a plan,

24   and he described that plan in detail to OCE 2.

25             He said, "I know that the Kuffar, the disbelievers,

1    well, they like to watch combat videos, and they like to watch

2    Dawlah.  They like to watch ISIS videos, but" he said, "they're

3    hard to access."  Again, that's the problem for ISIS, right?

4    It's hard to get the stuff.

5            And so the defendant wanted to make those videos

6    available using something called "Torrent."  And you'll recall

7    that Mark Baggett, the computer expert, explained what that is.

8            Most of the time if you've got a video or a file or

9    something that's hosted on a website like Facebook or Twitter,

10   if that website gets taken down, the file goes down with it.

11   It's gone.  It's done.  That's the whole problem, right?  ISIS

12   media keeps getting taken down.

13           If you use Torrent files, it's different.  It's a

14   peer-to-peer network of information.  If it's saved on one

15   computer, it's saved on all of the computers in the network.

16   So if one of those computers gets taken down, the file is still

17   there.  It remains online on the network.

18           So he wanted to use Torrent files.  And the defendant

19   actually confirmed that that was the same understanding he had

20   of how it worked.  He said the thing that Torrent does is it

21   "makes it so nobody can take it down."

22           So what was he going to do with those Torrent files?

23   Well, again, he had a plan.  He was going to send private

24   messages to the Kuffar, to the disbelievers who were trying to

25   watch this stuff on the internet, on Reddit or other websites,

1    and he would include a link to his Torrent file, that

2    peer-to-peer network where the ISIS material was stored on

3    multiple computers.  And why was he going to do this?

4           Well, he explained it.  He was going to do it because

5    there was no downside.  He figured two things would happen.

6    Either the Kuffar who watched the videos would watch them and

7    become converted to ISIS's point of view and become supporters

8    like him; or they would watch the videos, and law enforcement,

9    the Mukhabarat, would be paying attention.  They would start

10   gathering information about their computers, their IP

11   addresses.  And then they would waste their time watching a

12   kafir, a disbeliever, who doesn't support Dawlah.

13          So while law enforcement is distracted over here

14   looking at these stool pigeons that the defendant has created,

15   the real supporters like him can be busy on Telegram doing

16   their work.

17          So what else did he do?  What other substantial steps

18   did he take?  Well, he created this "Operation:  Heralds of the

19   Internet."

20          The other part, the other component of his plan, was

21   to collect and preserve all that ISIS material that was

22   constantly being taken down.  And this document is the

23   defendant's manifesto.  It is a step-by-step teaching document.

24   The defendant himself described it as very complicated.  And it

25   was a guide for supporters.

1          And we talk about intent, ladies and gentlemen.  This

2    document has an entire section dedicated to intent.  The

3    defendant's intention here was to teach everyone the

4    transgressions of the crusaders and how the Islamic State's

5    response to transgressions was self-defense.  There is no

6    mistaking who he is trying to help here or what he is about.

7          And this document mentions the same objective we just

8    talked about; diverting law enforcement through those Torrent

9    files.  Well, that's -- it's in the paragraph that's not

10   highlighted here, but he says he's going to use archive.org,

11   another website, and anonymously send out those dot-Torrent

12   files onto that website.

13         And he lists his priorities.  What is he focusing on?

14   What is this for?  What is he going to do with it?  What are

15   the people who read the document and learn from it going to do

16   with it?

17         Well, the priorities are clear.  Al-Furqan, ISIS;

18   Al-I'tisam, another official organization for ISIS; Media

19   Production Offices for Wilayat or the provinces, the physical

20   regions that ISIS controlled and that each of them, Dr. Zelin

21   told you, had its own media office; Al-Himma, another official

22   ISIS publication.

23         And the defendant explained where this came from.  He

24   said, "I'm going to use a modified version of a Python script."

25   And we're going to talk about all those other Python scripts

1    that he was out there circulating and using, but this is one

2    that he built off of.

3             And I want to refer you back to the testimony from

4    Mark Baggett, the computer expert, because he described

5    basically three buckets or three categories of computer

6    programs that he analyzed in the case, all of which came from

7    the defendant.

8             And Heralds of the Internet is the one that he

9    described as the most advanced.  He said it was an extension of

10   some of the other programs that he had looked at.  Because it

11   took the Python programs that used those Telegram bots to go

12   and avoid the Telegram spam limit, copy and paste things

13   incredibly quickly without getting restrictions on the

14   accounts; it took those, and it built upon them.

15            And it added a sort function, a search function that

16   allowed the defendant to take this material and categorize it.

17   In this case the defendant's document talks about separating

18   out videos by resolution.  He wanted HD, the highest quality

19   videos over here, and then he could put lower resolution videos

20   in different folders so people could go and find exactly what

21   they were looking for when they wanted it.

22            New functionality, something different, added value,

23   and the defendant was again clear what he wanted to happen with

24   this process.

25            He said, "By Allah's permission, the brothers" --

1    and, again, using the context of this document, targeting all

2    of those ISIS official media organizations, talking about

3    teaching about the transgressions of the crusaders and how

4    ISIS's response was self-defense, you know which brothers he is

5    talking about; it is ISIS -- "the brothers who have access to

6    al-Hayat Media Center channels" -- and, again, who has access

7    to official ISIS channels?  Well, ISIS does -- "hopefully they

8    will either be able to organize them or give me access to them

9    so that I would be able to organize them."

10            He wanted this process to reach ISIS.  He wanted it

11   to be used by al-Hayat.  He wanted it to be used so that he

12   could go in and help them get their house in order or he hoped

13   maybe they'll use it themselves.

14            He wanted to coordinate with al-Hayat.  He wanted to

15   coordinate with ISIS.  He was responding to those directions to

16   engage in media jihad to support ISIS on the digital front.

17   There is nothing independent about this.

18            And he didn't just create the document or keep it to

19   himself.  He gave it to other people, and he gave it OCE 2.

20   Again, this is the person he believed was doing explosives and

21   toxins work for ISIS and other extremist organizations.

22            And he talked about how he wanted to teach OCE 2.

23   Here in this conversation from August of 2019, that's when he

24   sends the file.  He explains:  "Well, I finished furqan" --

25   furqan is ISIS -- "and now I'm writing a document which teaches

1    it."  And he gives this over to OCE 2.

2              And this is where he says, "This is very complicated,

3    this thing that I've written," but he explains to OCE 2 what's

4    going on and what he wants to do next.

5              He said, "This is for organizing channels.  Copying

6    is easy, and so here's the thing I want to do.  I want to do

7    another document.  This time for Android operating systems so

8    that brothers who don't have a computer can do it.  It will be

9    much neater."

10             He had other goals.  He wanted to continue to expand.

11   Remember, the media jihad will never end, ladies and gentlemen.

12             And when he sent this information to OCE 2, he was

13   clear what he was doing.  He said, "I made my own Python

14   scripts to organize everything."  And he sent these folder

15   structures.  He sent something similar to OCE 4 showing all of

16   the stuff that he had been able to collect using his computer

17   programs.

18             And he said something else in Heralds of the

19   Internet.  He said, "By the grace of Allah, it works

20   flawlessly."  And the computer expert, Mark Baggett, agreed

21   with that.  He told you the process described in Heralds of the

22   Internet could be modified to search and sort by whatever

23   criteria the defendant wanted it to.  He told you there was no

24   ceiling on how many channels that could be used to copy and

25   sort.  There was no limit on the amount of data that it could

1    cover.

2              And recall also that it -- it was building upon those

3    Python scripts, the same ones that he sent to OCE 4.  And

4    remember what OCE 4 told you.  He said, "Once we got this to

5    work, I watched it -- I watched it happen.  And immediately,

6    automatically all of this stuff populates into these channels."

7              OCE 4 told you that when he had to make a copy of the

8    defendant's Every Isdar Ever Telegram channel, the only way he

9    could do it was using this process.  He said manually there was

10   no way.  It would have taken more than 100 man-hours.  This

11   process did it in four.  It worked flawlessly.

12             And so the defendant put his process to work.  He

13   used it.  He sent to OCE 2 an example:  "Here's an original

14   channel that I made, and here's what I copied using the

15   script."

16             And he's explaining in this case, you know, in

17   Heralds of the Internet, he's trying to find only the 360p, the

18   lower resolution videos.  In this example, he said, "I used it

19   to find the HD videos.  I pulled those out instead.  I

20   downloaded it all.  I organized it."

21             Here's another example of him using it.  The top two

22   pictures, those come from Heralds of the Internet, Exhibit 201.

23   And you'll see the titles, HD only, Furqan, Furqan 360.

24             The bottom two Exhibits 604-15 and 31, those come

25   from his phone.  Those are Telegram channels that his phone had

1    images of, same exact channels.

2            And there are more.  If you go through these exhibits

3    in the 604 series from his phone, you'll see him using the

4    script.  You'll see the bots working.  You'll see the Telegram

5    channels he accessed.

6            Here are some examples:  "AlHayat HD ONLY,

7    alhayathdonly2," the sequel; "itisambanners, undone Furqan,"

8    something that he was -- it was a work-in-process.

9            And the list keeps going, more al-Hayat, more Wilayah

10   archives, all Isdarat 2, English translations with 360p

11   designated underneath.  He was putting this process to work.

12           So what else did he do?  What other substantial steps

13   did he take?  Well, he modified different Python scripts.  And

14   I want to go back to Mark Baggett for a moment, the computer

15   expert, and talk about those different buckets, those different

16   categories.

17           This exhibit is called "TelegramApp.py."  It's

18   Exhibit 508.  He sent this one to the CHS.  Mark Baggett

19   analyzed this, and he said, "Well, this is kind of like the

20   origin point of these scripts, and this one is a little

21   different, because it doesn't use Telegram bots to do any of

22   the copying or sorting.  Instead it has the particular

23   information that it's going to copy and paste to hard coded

24   into the script itself.  It's written into the code."

25           And so, ladies and gentlemen, when you look at

1    this -- and you don't have to be a computer programmer to read

2    this part of the code and understand what it is -- it tells you

3    what channels the script was designed for.  The names are

4    familiar, al-Hayat, al-Furqan, A'maq.  So that's one version.

5        Here's another version of the Python scripts.  This

6    is one of the ones that uses the Telegram bots.  And I want to

7    go back to something OCE 4 told you, because this is a version

8    that he sent to OCE 4.  This is 402 called NAS.PY.  This was

9    the one that was written in Arabic.  And the picture that

10   you're looking at is what Mark Baggett made when he did the

11   test, so this shows the interaction with the bot.  The script

12   is giving you all of the Arabic text.  The user is putting in

13   the information on the right.

14       And OCE 4 explained -- and his conversations with the

15   defendant show the same thing if you go back and review those

16   conversations -- that what these scripts, the NAS.PY group of

17   scripts, did that was particularly important was that it solved

18   a technical problem within Telegram.  In Telegram, if you go in

19   and you paste too many things too quickly, Telegram thinks that

20   you're a spammer.  They're, like, this is not what you're

21   supposed to be doing.  You shouldn't be pasting, you know,

22   dozens or however many files this quickly so fast.  You're not

23   a normal user.  Something is wrong, and so they restrict your

24   account.

25       And if your goal is to copy and paste as much

1    information as you possibly can and preserve it and move it and

2    organize it, that is an issue for you.  And so, once again, the

3    defendant, using his computer skills, is using these modified

4    Python scripts to get around that.  And as he explained to OCE

5    4 and as they discussed, what the bots do is they go in and

6    cycle through.

7           So a bot starts working in Telegram.  If it runs up

8    against the spam limit and gets restricted, it goes back, and

9    the next bot takes over until it gets restricted, and another

10   bot takes over and so on and so forth.  And so it avoids this

11   technical problem within Telegram.

12          And he had different versions of it.  This is one

13   that he sent to the CHS, and you'll see that there's different

14   pass codes or different initiation words.  One had that

15   "longee" initiation word.  This one just had the "Start," and

16   this one was featured in Heralds of the Internet.

17          So he's tweaking it to have different ways to

18   initialize the program.  He's also tweaking it for users.  So

19   OCE 4 -- this is Exhibit 403; this is the English version --

20   OCE 4 says, "Hey, I don't speak Arabic.  Do you have another

21   one?  Can you send it to me in English?"

22          And the defendant says, "Yes, here you go."  So he

23   has this other version that he gave to an English language

24   user, because what the defendant cared about is that the people

25   he was sharing this with could actually make them work.  The

1    person he thought was involved in translating ISIS official

2    material into English, he wanted to make sure that this guy

3    could use it, and so he changed it.  He made it so that he

4    could.

5         Here's yet another version that he sent to the CHS.

6    This one is also in English, but it has some different commands

7    that come from the bot.  This one, "Send master link.  Send

8    slave link.  Duplication apparatus initialized."  All of these

9    things are changes to the user interface that make it different

10   for the person who is using the program.

11        And he made other tweaks for the CHS.  Remember, the

12   CHS was saying, "Hey, I can't get this thing to work because

13   there's an Arabic character I'm supposed to enter, and it

14   doesn't work on my computer."

15        So the defendant changed it.  He got rid of the

16   Arabic character, and he put that in English so that the CHS

17   could actually make it work.  He cared about making sure that

18   the people he was teaching, the people he was distributing to,

19   that they could actually do this work, too.

20        And so here's a list.  This doesn't include Heralds

21   of the Internet.  He sent that back in August.  These are the

22   other computer files that he sent either to the CHS or to OCE 4

23   on each of these different dates.

24        And ladies and gentlemen, each of these

25   distributions of this computer program constitute a substantial

1    step in the defendant's attempt to provide services to ISIS.

2            And remember, it wasn't just the scripts themselves.

3    It wasn't the programs.  He also sent all of the ancillary

4    computer files that the CHS needed, the bot.ini and other

5    things like that.  He told them what programs they needed to

6    install, the Telethons, the Termux, the Python code itself.

7    All of that additional information he was providing to these

8    people who he thought were going to use this like he would, to

9    help ISIS.

10           And so that turns to the next part of his project.

11   He was teaching this stuff.  He wasn't just throwing it out

12   there.  He was making sure that it landed.

13           And with each of these people, each of the witnesses

14   you heard from, he made those efforts.  So he sends Heralds of

15   the Internet to OCE 2.  This is a conversation with OCE 2.

16   Heralds itself is a teaching document.

17           And he says to OCE 2:  "Hey, tomorrow I'm going to

18   begin making the 360p archives, and I'm going to teach you

19   programming."

20           In another part of that conversation, he offers to

21   teach OCE 2 Python, the programming language.  And, again,

22   remember who he thinks he's talking to.  Who is he trying to

23   help here?  Someone who does explosives and toxins work for

24   ISIS and extremist organizations.  How did he think that person

25   was going to use this?  Who did he think that person using this

1    was going to benefit?  ISIS.

2           Same thing with OCE 4.  This is an excerpt, and you

3    can go back to those communications.  And there are pages and

4    pages and pages of the defendant's instructions helping OCE 4

5    troubleshoot this to get his computer and his phone set up.

6           And, again, who did the defendant believe that OCE 4

7    was?  Someone involved with ISIS official media translations.

8           The same thing is true with the CHS.  This is from

9    one of the meetings recorded on October 10th, Exhibit 506-6.

10   And, again, it's just an example.  There are many instances

11   where the defendant was explaining to CHS exactly how to make

12   this work.  He was putting in the time.  He was putting in the

13   effort.

14          And something else that matters in all of this is in

15   asking, what activity was the defendant engaging in?  What

16   service was he trying to provide?  Well, it's this set of

17   computer programs, these processes, these technical solutions

18   to ISIS's problem with the media.  But he was doing something

19   that mattered.

20          These are the defendant's words in conversation with

21   the CHS.  He said, "I'm the only person in the world doing this

22   right now."

23          OCE 4 told you, he didn't have another method that

24   could do what the defendant's computer program did.  He would

25   have had to copy it manually and spend dozens or hundreds of

1    hours working on it.  This was adding value, and the defendant

2    knew it.

3              Just like he said when he was thinking about that

4    operating system plan, "I want to do something valuable."

5    Well, he came up with something valuable.  He knew it was

6    valuable, and so he shared it with other people and taught them

7    how to do it.  And he used it himself.

8              So another substantial step that the defendant took

9    was using this set of programs.  And these are a couple of

10   examples.

11             So on the left, that's a computer script.  And on the

12   right is a screenshot from the defendant's phone showing him

13   using that same bot.  And you can match -- again, you don't

14   have to be a programmer.  You can match where it says, "Send

15   master link, send slave link" with the computer program on the

16   left and the bot program on the right.

17             Here's a different version.  This is one of the

18   Arabic versions of the script that the defendant had and sent

19   around and distributed.  And then the screenshot on the right

20   is from his phone.  They match up again.

21             And there are more like this.  You can take a look at

22   all of these exhibits when you deliberate.

23             And so it wasn't just the writing of the code, the

24   distributing of the code, the teaching of the code.  You know,

25   remember, OCE 2 asked the defendant:  "What are you going to do

1    with this?"

2            And the defendant answered very clearly again what

3    his goal was:  Spread it everywhere.

4            And go back to that Inside 8 video.  If they close 3

5    accounts, open 30.  Spread it everywhere.  The defendant was

6    doing that at scale, at an exponentially higher rate than what

7    other people could do.  And he was following through with his

8    media jihad.

9            He had heard the instructions.  He had heard the

10   directions to support the caliphate on the digital front.

11           And so, ladies and gentlemen, when you go back to the

12   elements, the evidence has shown beyond a reasonable doubt that

13   the defendant took a substantial step toward providing his

14   services to ISIS.  And as we discussed earlier, all of that was

15   with the intent to provide services to ISIS.

16           And so it brings us back to the beginning.  We talked

17   about the fact that the defendant knew ISIS was an FTO.  He

18   knew it engaged in terrorist activity.  He knew it engaged in

19   terrorism.  But the defendant also knew, and the evidence has

20   shown beyond a reasonable doubt, that he knowingly attempted to

21   provide his services to ISIS.

22           And so having considered all of that evidence, go

23   back to the defendant's own words.  Because, like I said, he's

24   been telling you -- through his conversations with these

25   witnesses, he's been telling us over and over exactly what he

1    was doing.  "Now I am making as much jihad as possible."  And

2    he followed through on that promise.  He followed through right

3    up until the very end when Special Agent Schaefer put handcuffs

4    on him and he kicked an FBI agent across the room and in one

5    final act of defiance threw up his finger in salute to ISIS,

6    his last act of jihad.

7            When you go to deliberate, ladies and gentlemen,

8    consider the evidence.  Consider the defendant's

9    communications, the documents, the computer programs

10   themselves, the testimony, everything.

11           And when you consider that evidence, we ask that you

12   return the only verdict that is consistent with the evidence,

13   that the defendant is guilty of attempting to provide material

14   support to ISIS.  Convict him.

15           THE COURT:  Thank you, counsel.  Are you done?  Thank

16   you.

17           Why don't we take our morning break now, and then

18   we'll hear from the defense and rebuttal.  And we should be

19   able to have the jury begin deliberating right around the lunch

20   hour.  That's great.  Thank you.

21           THE CLERK:  All rise.

22       (Recess from 10:44 a.m. until 11:04 a.m.)

23           THE COURT:  Please be seated, folks.

24           Mr. Herman, I recognize you for closing argument.

25           MR. HERMAN:  Thank you, Your Honor.

1              CLOSING ARGUMENT ON BEHALF OF DEFENDANT

2              MR. HERMAN:  Big words, no action, bold pledges,

3    empty promises.  One-and-a-half years of investigating this

4    young man, this teenage college student, all we have when you

5    look at the evidence are exaggerations and boasts of a lonely

6    19-year-old lost in the abyss of the internet.

7              Government agents tracked this young man since June

8    of 2018, one-and-a-half years until his arrest until November

9    of 2019.  They were in pro-ISIS forums, online in spaces, as

10   the government likes to say, in the virtual world.  And they

11   talked to him, and he talked back.  And as you heard one of the

12   first witnesses, anybody could be anybody online.  And we'll

13   get into some of those conversations.  Bold words, fake words.

14             They infiltrated through a ruse a college classroom.

15   They set up a fake job for him where he as a desperate college

16   student could pretend to be this great coder and possibly get a

17   job in the future.  And guess what?  He made a best friend.

18   And guess what?  His best friend just happened to be a Muslim

19   who he just converted to -- a religion he just converted to.

20             They showered him with praise.  They told him he was

21   the best coder ever.  When Tom said, "I went to jail for a drug

22   case," what was their response?  "You're pure, brother.  You're

23   pure."

24             But amongst themselves in their secret chat rooms,

25   the FBI was calling him a stupid fanboy.  They gave him

1    opportunity after opportunity and chance after chance to do

2    something for ISIS, to provide something to ISIS.  And as we

3    will see, which the government did not just tell you about,

4    which the government skipped, he refused; he refused; he

5    refused.

6         When he did things alone, when he did things on his

7    own, when he acted independently, he came up with stuff.  But

8    when they added the slight little twist, "What are you going to

9    do for ISIS," either he came up with something and it just

10   petered out, or he just -- as some of the younger people in

11   this courtroom may know, he ghosted them.

12        All they got were lame excuses after lame excuse

13   after another lame excuse.  Empty promises, no action.  They

14   have a lot of talk.  They have a lot of opinions.  They have a

15   lot of personal views, personal beliefs that he's expressing.

16        And as I will talk about, just because those beliefs

17   may be the same as that of a terrorist organization does not

18   mean it's illegal.  And this is -- I felt like -- we'll get to

19   this in a second -- like I was watching a movie and knowing

20   there was a plot twist coming.  And I'll show you the plot

21   twist in a minute.  It's the surprise, but it's also the law.

22        In a case that is as serious as this one, in a case

23   that is charging an offense of terrorism, you need more than a

24   copy-and-paste program that the FBI knew about in January of

25   2019.  You need more than words and empty promises and a lonely

1    kid trying to make friends, talking to whoever he's going to

2    talk to.  You need more than that for a terrorism case, ladies

3    and gentlemen.

4           Big words, no action.  And of all the words in this

5    case, there are two that matter, and those are words that Tom

6    said.  Those are words that you did not hear until the last day

7    of trial testimony, and he said them multiple times.  What were

8    those words?  He said that to the CHS, his best friend.  He

9    said, "It's not illegal."  He said it twice.  And you remember

10   that in one transcript where the CHS actually who reviewed all

11   of the transcripts wrote "not legal."  And we listened to it;

12   everybody in the courtroom listened to it again.  Actually,

13   it's not illegal.

14          That's what he said.  That's what he believed.  It

15   was not illegal.  And you know why it's not illegal?  Because

16   of two other words, two other words that I believe the Judge

17   will instruct you on, two other words that the government can't

18   even get out of its mouth.  Those words are the First

19   Amendment.  That's why Tom believed what he was doing was not

20   illegal.  That's why he said it, and that's why it's not

21   illegal.

22          I'd like to talk about three things briefly, and it's

23   about you.  Three words; sacrifice, service, and duty.

24          First the sacrifice.  You've sat with us now for two

25   weeks.  We know that you have families, jobs, kids, and loved

1    ones.  And coming in here every day was a sacrifice, which we

2    appreciate.  Sometimes up here at the podium we can get a

3    little heated; we can get a little long-winded.  And I'm trying

4    not to be long-winded today.  But it's a sacrifice to listen

5    carefully every day to every piece of evidence that comes in.

6              And I know you did.  You were listening carefully.

7    I'm used to having everybody sitting in the jury box there

8    where I can at least see them out of the corner of my eye, but

9    I can tell that you're all -- nobody is -- everybody is paying

10   attention.  It's a sacrifice to do that.  It's a sacrifice to

11   come in every day, to sit there in masks, to come in every day

12   from all of the other places you come from.  And maybe in the

13   beginning of the trial it sounded like a break, a good idea to

14   have a break from your family.  But two weeks in, after hearing

15   everything, maybe it's a different story.  And we thank you,

16   all of us here thank you for your sacrifice.

17             The second word is "service."  What you are doing --

18   and I'm not going to sugarcoat this -- is sitting in judgment

19   of another person.  You are peers from the community, drawn at

20   random, selected through a process to perform a service of

21   judgment of another person, to listen to the evidence, to be

22   instructed on the law, and to render a fair decision, to render

23   the right decision.

24             Without that service, without your sacrifice, the

25   system would crumble.  And it is an honor, it's been an honor

1    to participate in this process with you.  So I personally want

2    to thank you as well.

3              In that service you are sitting in judgment of a

4    young man, and you have heard testimony through this case about

5    that young man.  One of the things that I'd like to point out

6    right off the bat is it wasn't until the last day of testimony

7    that you really heard his voice in little clips that we

8    selected.  And you'll have the entire audio from those meetings

9    with the CHS to listen to him.

10             But one of the things that I want to plant right now,

11   which I hope you picked up on, was that the person he was

12   talking to another person, a human being in the flesh, was a

13   completely different person than he was online.  The person he

14   was when he was meeting with this man, who he saw as his

15   mentor, this man who -- he calls it "I'm your big brother" --

16   was completely different than all the chats that the government

17   put up.  The dynamite sticks, "I've got a very sharp knife,"

18   all of that was bull.

19             When he's in person, do you hear him talking like

20   that?  It's the anonymity of the abyss of the internet that

21   allows him to spout off provacative things without any type of

22   accountability.

23             And as I'll discuss, he's not on trial for what he

24   said.  He had a right to say those things.  You heard that he

25   was a college student at DePaul and 19 years old -- 19 years

1    old at the time that this was happening, a college student.

2             You also heard and can infer from the chats, he

3    didn't have any friends.  Who else would jump on the

4    opportunity for the first guy that is friendly with him to all

5    of a sudden they're going out to Middle Eastern food?  He goes

6    back to a hotel room with him to eat food on a bed together and

7    on a couch together.  And he's sending pictures of himself.

8    "I'm doing my first Ramadan."

9             Think about that.  Think about the type of person

10   that as soon as you meet this stranger -- and this is a person

11   from the chats, you can tell, was a little paranoid of things

12   going on in the world.  He wrote a college essay about Muslims

13   being persecuted.  And the first guy that says, "Hey, you want

14   to go out to dinner with me?  Sure, I'll sit in a car with you.

15   I'll spend three hours with you in a hotel room."

16            He's a completely different person in the flesh than

17   he is online, and I just ask you to keep that in mind if you

18   start looking through these chats again.

19            You heard he was born in -- from one of the witnesses

20   that he believed he was born in Park Ridge, Illinois.  He's an

21   American citizen, teenage American citizen.  You heard in his

22   chats with his conversations with the informant that at some

23   point in time he picked up a drug case and then became a

24   Muslim.  And all of a sudden he goes from zero to 10, dressing

25   differently, growing a beard, trying to figure out what it

1    means to be a Muslim, looking for guidance.

2              And it seems like he took a wrong turn, but that

3    wrong turn is not an illegal one, to learning online about what

4    it means to be a Muslim.

5              You also have -- the last word is "duty."  The duty

6    is a solemn one.  The duty is one that you will and have been

7    sworn to.  The duty when you hear the evidence and the

8    argument -- and this is just argument.  What Miss Wells said is

9    argument.  What Mr. Jonas is going to say after me is just

10   argument.  You are the finders-of-fact.  We are arguing.

11             When you go back into the jury room, you

12   deliberate -- you deliberate as a unit, but your convictions,

13   your beliefs are yours as individuals.  And you may go back and

14   forth with each other debating the facts, debating the issues.

15   Do not yield on your individual beliefs.  Stand firm in what

16   you believe.  You were chosen for a reason.  You were chosen

17   for that service.  We asked you to make that sacrifice.

18             I want to turn back to something -- and this is the

19   last point I'll have in this introduction -- something that

20   Mr. Greenberg said in his opening statement that may have been

21   lost.  It was said quickly.  He said, "This is important."

22             Every trial in this courtroom is important.  But this

23   one, I submit to you, is more important.  Why is it important?

24   Because it's not just about Tom.  It's about principles.  The

25   most important principle is freedom.  It's a freedom of speech.

 1    And you will, I anticipate, be instructed and I'll show you

 2    soon an instruction on the First Amendment.

 3              This is an important case.  The First Amendment is

 4    first for a reason.  The framers of the Constitution put it in

 5    the beginning for a reason, because without it nothing else

 6    follows.  And they put it there because they were concerned

 7    about the tyranny of a king who could stop what they're saying,

 8    who could censor them, who could determine what people can and

 9    can't say.  That's why it's first.  That's why it's the most

10    important.

11              The First Amendment includes a right to say things

12    that are disfavored, that are reprehensible, that I vile, that

13    when we see them and we watch them we feel sick inside.  But

14    those are just as protected as "I love you."  And there's a

15    reason for that.  Because if you don't protect the worst, the

16    best is at risk.  If you don't protect the worst, we lose the

17    freedom, and it is us for citizens to protect the worst.

18              There's a saying that you often see in cases or just

19    out there, which is:  "I may not agree with what you say, but I

20    will defend to the death your right to say it."  And sometimes

21    that comes up in situations where you've got groups marching

22    through neighbors or other entities that are spouting vile and

23    reprehensible views, but they've got a right to do it.

24              In that "I may not agree with what you say, but I

25    will defend the right for you to say it," there's a legal

1    component, and there's a philosophical component.  The

2    philosophical component is:  What kind of country do we want to

3    live in?  What kind of community do we want to live in?  Is it

4    one where we can tolerate the views that are the worst?  Is it

5    one where we can accept somebody's right to say the most

6    despicable and then our right to disagree with it?  Or is it

7    one where we're going to give the keys to the government in

8    terms of what we can and cannot say?

9              We are not asking you to agree with any of Tommy's

10   views.  We are not asking you to accept them, and we would

11   never do that, because there was probably at the time only one

12   person in this room that did have those opinions and beliefs.

13             We are asking you to accept and recognize his right

14   to say those things.  We are asking you to acknowledge exactly

15   what he said to the CHS, "It's not illegal."

16             I spoke a little earlier about this being a movie

17   with a plot twist.  Well --

18             THE COURT:  One of the jurors just raised their hand.

19             A JUROR:  I'm sorry to interrupt.  My pen is out of

20   ink.

21             MR. HERMAN:  I think that's a good sign.

22         (Discussion off the record.)

23             MR. HERMAN:  Are you ready?

24             A JUROR:  Yes.

25             MR. HERMAN:  Thank you.  Here's the surprise, ladies

1    and gentlemen.  You've heard two weeks of evidence about him

2    saying, "I like ISIS.  I'm going to do this for ISIS.  Here's

3    my pledge of ISIS -- for ISIS."

4              And you may be thinking through these two weeks, what

5    the heck are these guys doing over here?  If this case is just

6    about this guy liking ISIS, doing something for ISIS, this

7    could be a one-day trial?  What are we doing here?

8              Well, guess what, there's more, as they say in the

9    infomercials.  He is just not on trial for liking ISIS.

10   Because guess what?  Liking ISIS is not illegal.  He's on trial

11   for providing services.

12             And now I'm going to put up what I believe are, in a

13   little bit chopped-up form but accurately quoted, the

14   instructions that I think you're going to get at the end of

15   trial.  Okay?  And usually in these cases from the defense

16   side, we put these instructions all the way at the end where we

17   can talk about them after we've gone through all of the

18   evidence.

19             But after hearing the government's presentation and

20   sitting through the same trial you did, I thought it was

21   important to do the reveal about what this case is actually

22   about.

23             Material support and resources includes any services.

24   Well, "services" is a pretty broad term, right, at least that's

25   what we think.  Not so.  The term "services" refers to

1    concerted activity, not independent activity.

2             I want you to think back to the government's opening

3    statement.  How many times did the government say, "independent

4    activity"?  I counted maybe two or three just in the terms of

5    not independent.

6             That's the definition of services that he's on trial

7    for.  He's not on trial for liking ISIS.  He's on trial for

8    providing services.  And services, ladies and gentlemen, has a

9    very specific definition.  Concerted activity, not

10   independent -- it's concerted, not independent activity.

11            There's more.  Services provided -- so everybody

12   knows, I believe that the Judge will give you these

13   instructions in writing.  So anybody who is about to run out of

14   ink again may -- can put your pens down, but I just ask you to

15   listen.  Okay?

16            Services provided as material support to a foreign

17   terrorist organization includes advocacy or activity performed

18   in coordination with or at the direction of a foreign terrorist

19   organization.  It must be in coordination with or at the

20   direction of the foreign terrorist organization.  Why is that?

21   Because independent advocacy is not prohibited.  Independent

22   advocacy is not prohibited.  It must be in coordination with or

23   at the direction of the foreign terrorist organization.

24            Now, I realize this case is charged as an attempt,

25   and I'll explain why that doesn't matter.  Okay?

1     Now, I believe you're going to get an instruction

2  also on the First Amendment, and that's why I'm talking about

3  it.  That's why during examination of witnesses we popped up

4  with a couple of questions about the First Amendment, because

5  it matters, because it's relevant, because the law says that's

6  what it is.  And you will be instructed on the First Amendment,

7  and you could read the First Amendment here and in the jury

8  instructions as well, but there's more.

9     The statute that Tom is charged with, the material

10 support statute, these funny numbers, 2339B(1), Congress wrote

11 into the statute these words:  Nothing in this section shall be

12 construed or applied as to abridge the exercise of rights

13 guaranteed under the First Amendment to the Constitution of the

14 United States.

15    Now, think to yourselves, why would Congress in a

16 terrorism statute make a First Amendment instruction?  Well, I

17 submit to you, once in a while Congress can do something right.

18 And here it did something right.  Here it echoed the framers.

19 Here it said in the most reprehensible, in the most vile, in

20 the worst of the worst, when you're talking about violence,

21 there's still -- the First Amendment lives.  It breathes.  And

22 we are not going to let whatever war on terror, whatever

23 chapter we're on in the war on terror right now swallow up the

24 First Amendment, because it comes first.

25    Now, you will also be instructed, I believe, a

1    further gloss:  Advocacy that is done independently of the

2    foreign terrorist organization and not at its direction or in

3    coordination with it does not violate the statute.

4              Again, there must be coordination with or at the

5    direction of ISIS.  Then and only then with direction and

6    coordination does the mighty First Amendment give way.

7    Otherwise, it is a shield.  It protects us all.  It protects

8    the best.  It protects the worst.

9              Merely supporting ISIS is not material support.  And

10   I think with the two slides, the plot twist reveal of what this

11   case is actually about, I think you can see why it's more

12   complex than that.

13             The government's closing argument, much like the

14   trial, went over and over again these videos, these vile

15   videos.  Nobody is disagreeing with that.  We would have agreed

16   to let them -- to say that's what they say.  It's awful.

17   Nobody on our side asked the question:  "But, you know, isn't

18   there another spin on this video?"  No, of course there's not.

19   They're the worst.  But that's not what he's charged with.  He

20   had a right to watch those videos.  He had a right to share

21   those videos.

22             He acted independently.  Did you hear the

23   government's arguments about direction, coordination?  I'm

24   going to get to them.

25             Knowing ISIS had a problem about videos or something

1    like that and then doing something about it is not coordination

2    with ISIS.  That's still independently acting, ladies and

3    gentlemen.  That's still acting on your own.

4           If somebody says, "Can you retweet this," and you

5    retweet it, you're not coordinating or acting at their

6    direction.  Give me a break.  You're acting independently.

7           So as the government, with its evidence, it's

8    essentially throwing all of these videos against the wall,

9    throwing everything up there.  It's an intimidating

10   distraction, and it is your duty to see through it, to see that

11   this case is more than that, to see that the law actually

12   requires more.

13          As I said, being an ISIS supporter is not material

14   support.  As much as we all may personally disagree with it,

15   liking ISIS is not illegal.  Supporting ISIS, independently

16   supporting ISIS is not illegal.  Sympathizing with ISIS is not

17   illegal.  Even independently advocating for the goals of ISIS

18   is not illegal.

19          Parallel advocacy is not illegal.  There must be an

20   attempt of direction or control from the terrorist

21   organization, not just acting on your own.

22          So the government, ladies and gentlemen -- and I

23   think I caught this right -- when they said the support is

24   illegal, that's not the law.  You will be instructed on the

25   law.

1        Tom in this case, ladies and gentlemen, was an

2    independent advocate.  He was a freelancer.  I think that was a

3    word -- I took that word from Zelin -- Dr. Zelin.  I really

4    liked it.  He was a freelancer working on his own.  He was an

5    independent supporter.

6        We're not going to sit up in here and say that now he

7    didn't like ISIS.  Of course he did, but that's not illegal.

8    He was a fanboy.  This is not us saying this.  This is the FBI

9    calling him a fanboy.  What's a fanboy, right?  Writing letters

10   to Justin Bieber -- I don't know why that popped in my head --

11   but writing -- writing to, you know, your favorite stars, okay,

12   and it doesn't matter if it's a terrorist organization.  You're

13   still -- it's going from one direction to the other.  That's

14   what he's doing right now.  It's simply independent activity.

15       And it doesn't matter if he's looking around on the

16   internet from -- for official videos or unofficial videos, and

17   he's asking people for -- from al-Hayat, al-Furqan, or

18   whatever, for these videos.  That's exactly what Dr. Zelin

19   does, right?

20       I think to quote another great philosopher, Steve

21   Greenberg, I think on cross-examination he asked somebody,

22   "Everything has to come from somewhere, right?"

23       It's not illegal to get the videos from somewhere.

24   It's not illegal to get the videos from a Telegram channel.

25   It's not illegal to download those videos and watch them.  It's

1    not illegal to share them.

2              So this is a case for one-and-a-half years, ladies

3    and gentlemen, one-and-a-half years there's investigations

4    going on.  It goes for a little bit.  It stops.  It picks up

5    again.  And what do we have?  What are the services?

6              I mean, I think that some of you may have been

7    surprised when you realized that services is a technical term.

8    What are they, right?  It's still not clear to me, you know, if

9    I were in your shoes what -- from the government's presentation

10   what the services are.  Okay?

11             The best we can tell, based on the evidence, is

12   NAS.PY, copy-and-paste program; Heralds, copy and paste, plus

13   search term.  Okay?  Those aren't my words.  That's Mark

14   Baggett describing what it does, copy, paste, copy, paste, plus

15   search term.

16             The services, ladies and gentlemen, as I put up on

17   the slide here, are the tail that wags the dog.  What is this

18   case really about?  This case isn't about these services.  This

19   case isn't about a copy-and-paste program.

20             This case is about scrubbing the internet of ISIS

21   material, no matter where it came from, no matter how

22   independently it got up there.  OCE 4 said something along

23   those lines.  The FBI wants all this crap off the internet.

24   And somebody -- some people in this room, maybe most of us,

25   will say, "Yeah, I agree with that."  But that doesn't mean

1    it's illegal.  That's a different question.

2              Whether or not we agree with it, whether or not we

3    like it doesn't change the fact that it's not illegal to put it

4    on the internet.

5              And as Ms. Wells correctly said -- and I'll go into

6    it a little later -- we are going to argue that the videos

7    aren't illegal.  We are going to argue that he's not charged

8    with them.  And ask yourselves why.

9              This case is not about the services.  It's about

10   stopping the videos.  It's about suppressing personal beliefs.

11   From the government's perspective, nobody should like ISIS.

12   That is -- these are -- every single one of these FBI witnesses

13   that got up there, you know, every time they hear, you know, a

14   tree falling in the forest, they think it's -- you know, it's

15   ISIS.  Every time this guy says "brother," it's ISIS.  You

16   know, every time he, you know, whispers something, it's ISIS.

17             You know, this is even after the fact -- and I'll get

18   to the clip a little later -- where this guy said to the CHS,

19   "I never met anybody in ISIS."

20             It's still all ISIS, right?  You got to see through

21   those distractions and to see what this case is really about.

22             Now, I think that Ms. Wells may have seen my

23   PowerPoint because, yes, two weeks of evidence, no crime.  The

24   videos are not illegal, ladies and gentlemen.  He's not charged

25   with them.  The posters are not illegal.  Do you remember those

1    posters?  Maybe Mr. Jonas will bring them in for his rebuttal.
2    Sometimes they do that, bring all the stuff that they didn't do
3    in their opening.

4            The posters aren't illegal.  These are these giant
5    posters.  Do you remember how big they are?  He's printing them
6    in his college library.  He sends a message to his friend:  "I
7    hope somebody doesn't catch me printing out this big jihad
8    poster."  Can you image how much that would have cost, how much
9    toner it cost, right, to print that thing out?  It's not
10   illegal.  He put it up in his bedroom, right?  He sent a
11   picture of it.  You know, he might as well have taken a selfie
12   with it.  It's not illegal.  It's expression, ladies and
13   gentlemen.

14           And the government, what they say, "Oh, but it's
15   relevant to his intent."  Well, guess what?  We think it's
16   relevant to his intent, too.  Because guess what?  He did all
17   of this on his own.  He did it all independently.  And it's not
18   illegal simply because he downloads it from some library, like
19   Zelin does, printing it out.  You can go on Zelin's website
20   right now and find The Structure of the Caliphate, find
21   Inside 8.  You'd probably find that poster.  Go print it out.
22   That's not illegal.

23           Writing articles is not illegal.  And the government
24   put one up, this "Youth of the Caliphate" article.

25           Look at the last page of that index.  If you look at

1    that last page of that article, excuse me, it says something

2    about "These are all unofficial."  Right?  These are all

3    fanboys.  And you're not being asked to agree with what he said

4    in that stupid article.  He had a right to write it, though,

5    and he's not on trial for it.  He did it on his own.

6            And you'll also see -- I think that we may have

7    gotten into this a little bit or there's chats to OCE 2.  Guess

8    what else he sent?  He sent a college essay that he did at

9    DePaul on why America lost 9/11.  And he predicted:  We're

10   going to get bogged down in Afghanistan because our war on

11   terror is out of control, and the terrorists have won because

12   we've overextended ourselves.  That's in the binder, too.

13           He shares his college essay.  Guess who else he gave

14   the college essay to?  His college.  These are his opinions.

15   These are his views.

16           There's also another occasion with OCE 2 where OCE

17   2 -- and you see this over and over again -- what are you going

18   to do about this?  Right?  This is after a mass shooting of

19   Muslims who were praying, men and children and women who were

20   praying in a mosque in New Zealand.  Forty-plus people were

21   gunned down by a white supremacist.  And this OCE 2 says, "What

22   are you going to do about it?  What are you going to do about

23   it?"

24           Somebody who is really riled up and violent said,

25   "Well, I'm going to get a gun, and I'm going to go out there,

1    and I'm going to get revenge."

2            What does he say?  "I'm going to write an article,

3    and I'm going to post where he did."

4            The articles are not illegal.  The articles are the

5    pinnacle of expression.  He's doing them on his own.  So the

6    government says he's doing all of this to indicate his support

7    for ISIS.

8            We submit to you it shows -- it's a stronger sign of

9    his independent advocacy, of acting alone on his own to express

10   his views.

11           The voiceovers are not illegal.  Okay?  Who cares?

12   Social media terms of service are not the law.  You've heard

13   some witnesses come up here and say, "Well, Telegram takes all

14   this stuff down."  Well, thankfully, Facebook is not writing

15   the laws.  Telegram is not writing the laws.

16           Now we have to rely on these witnesses to talk about

17   these terms of service.  Terms of service is not the law.

18   Finding work-arounds is not illegal.  He's not charged with

19   computer hacking.

20           The ISIS flag is not illegal.  You want to talk about

21   independent advocacy or independent activity.  This guy had to

22   use a stencil that he cut and a black piece of fabric to make

23   his own flag.  He's not asking other -- coordinating with other

24   people:  "Yo, bro, where can I get an ISIS flag?"  He cuts it

25   out on his own.  It's completely independent.

1      And pledging allegiance is not illegal, and it does

2   not make all of his activities automatically material support.

3          Now, I want to talk briefly about those two pledges

4   of bayat, because the government -- and I wasn't planning to,

5   but the government's first splash page was of that pledge.

6   Okay?  Let's talk about them.

7          OCE 2 asks Tommy:  "Have you pledged bayat?"  Tommy

8   tries to send him a garbled message, and it's -- it gets, like,

9   10 seconds.  He doesn't know the words.  He asks for the words.

10          OCE 2 gives him a script that Tom then reads.  And

11  what you heard was Tom reading a script provided by the

12  government.  And like everything else Tom said online about

13  sharp knives and explosive belts, take it with a grain of salt.

14          The second time, this is when the CHS in October -- I

15  believe it's October 10th -- asks about bayat.  And you heard

16  that thing about:  "Yo, dude, you got to say it to three

17  people."  You know, first Tom says, "You know, oh, I didn't do

18  it before.  Oh, wait, no, maybe one person I did it before, but

19  I don't know the words," even though he was given a script.

20  Okay?  And this is his best friend saying this.  That's October

21  10th.

22          Towards the end of October -- in fact, I believe it's

23  November 1st -- the CHS asks him again:  "Have you done your

24  bayat?"

25          So Tom, he doesn't even go back to the script that

1    the OCE 2 gave him, and he writes this little note card.  I

2    guess that's official enough, right?  And he sends it to OCE 4.

3          What did the CHS say about why he asked Tom if he did

4    bayat?  Because his FBI handler told him to.

5          Is it not a coincidence that the only evidence that

6    we have of Tom sending it to anybody is to another FBI agent?

7    Is there any evidence anywhere that Tom has sent this pledge to

8    anybody other than the FBI who is out there asking him if he's

9    done it?

10          Pledging allegiance, in any event, is not illegal,

11    and it doesn't make what Tom did material support.

12          Two weeks of evidence, no crime.  Everything I just

13    went through on the list, not illegal.  Everything I went

14    through on that list, independent activity, independent

15    advocacy.  No coordination, no direction, no concerted

16    activity.

17          The only things that the government can come up with

18    for the services, the services, ladies and gentlemen -- you

19    have to cut through this cloud of intimidating distractions and

20    look at what he's actually charged with -- NAS.py and Heralds.

21    And guess what?  It waited months to arrest him for NAS.py and

22    Heralds.  Ask yourself why.

23          He gives the first version of NAS.py to the CHS in

24    September -- you heard that testimony -- mid-September,

25    September 16th, I think.  A month before, August 16th, he gives

1    this Heralds of the Internet document.  If this was material

2    support, if the Heralds of the Internet document was terrorism,

3    ladies and gentlemen, arrest him then.  If NAS.py was

4    terrorism, arrest him then.

5              You just sat through, again, a summation of what this

6    stuff can do.  It spreads like a virus.  ISIS videos will go on

7    forever.  It's a wild fire that can't be stopped.  All he

8    needed to do was share it with one person, and then that person

9    shares it with somebody else, on and on and on.  But they wait

10   months to arrest him.  He could have sent it to millions of

11   people through various chains, posted it somewhere for free

12   download, which I submit to you there is absolutely no evidence

13   that he did any of that.  But regardless, they wait.  They wait

14   a month.

15             It's not illegal.  It's not a crime.  If it was

16   terror -- terrorism, ladies and gentlemen, put a stop to it

17   then.  They know where this kid's at.  He's under surveillance.

18   His best friend is an FBI agent.  He's talking up these other

19   OCEs online.  Cut the plug.  Get the warrant.  Put a drone in

20   his computer.  Lock him up.  None of that happens.

21             They wait until November 18th, over a month after he

22   shows OCE 4 how to do this.  Three months, three months after

23   he gives Heralds of the Internet that we have to -- we heard

24   about again.

25             It's all legal.  And why else do we know it's all

1    legal?  Because when Tom was being recorded by his best friend,

2    this is what he says, October 10th.  "It's not even illegal for

3    him, brother.  It's not technically here in the U.S.

4    Technically, this is."

5              And you could see the dynamic in these exchanges when

6    you listen to them again.  Tom believes it's not illegal for an

7    American non-Muslim to have this, but it is for a Muslim.

8              And you remember Fee -- Agent Fee, the guy who had no

9    role in the case except to get up there and talk about evidence

10   he didn't know about, read from Tom's blue book.  And what's a

11   blue book for maybe -- maybe not everybody knows, but a blue

12   book is an exam book that you write in in college before

13   everything was digital, and I guess maybe even after it's

14   digital because this just happened recently.  He writes in this

15   blue book.  There's a double standard.  There's a double

16   standard in this country.  You heard what Fee said.  Muslims

17   are getting arrested.  White people are not.  That was his

18   view.  And he is saying here, it's not illegal.  These videos

19   are not illegal.

20             And here's -- this is the good one.  This is the one

21   that the CHS changed, and I changed it back.  We changed it

22   back.  This is Tom speaking, "TO:  They will gather every way

23   possible to send you to prison just because you have these,

24   because it's not illegal to have these, but it's legal for them

25   to mess with you and try to get you to do something."  That's

1    Tom, October 10th, just a month before he's arrested after he's

2    given the script to OCE 4, after he's done Heralds.  And CHS

3    doesn't disagree with him.

4           Why else do we know it's not illegal to watch and

5    download and share these videos?  The government's expert told

6    you.  Jihadology, the jihadi media super store, tens of

7    thousands of videos over time, and up until sometime in 2019,

8    anybody could download them.  And you heard what Zelin said.

9    He goes onto official sites, jihadi sites, under a different

10   name.  He downloads the videos.  He puts them up on his

11   website.  And only after he got in trouble in England did he

12   say, "Well, I'm going to put a little gate on this.  And if you

13   want permission to see them, just email me."  And it didn't

14   sound like he was telling anybody no.

15          What else did Zelin say, the government's expert, the

16   one that the government called?  "Thankful for my First

17   Amendment."  That's what he said.  That's what he wrote when he

18   was talking about his experience with England, not America,

19   with England.  "I'm thankful to be an American.  I'm thankful

20   to have a First Amendment."

21          We know that Tom went to Jihadology.  These are a

22   couple of government exhibits, part of the screen scroll.

23   Notice the date, October 8th.  He's talking to OCE 4 at the

24   same time.  And this is somebody here, and it's hard to read so

25   I quote it.  "Tom, do you think we can make a crawler for

1    Jihadology using Scrapy and Python?  You said you're an expert

2    in it.  I just looked at it for a bit.  99 percent sure no name

3    used this."

4          Tom is still talking about going to Jihadology.  If

5    this guy can do it, if this doctor can do it who works in

6    Washington think-tanks and is called by the government in trial

7    after trial, I can do it.

8          The guy writes back:  "I never used Scrapy before,

9    but I can check even though this site got extremely

10   restricted."

11         Tom:  "Yeah, it's just nice for flexing purposes.

12   And I also need all PDFs of speeches translated which aren't

13   restricted.  Only videos are restricted."

14         The guy says, "I'll see what I can do over the

15   weekend."

16         Do you remember what was happening at the same time

17   with OCE 4?  Why Tom went to that website?  He's looking for

18   English translations.  This is a time period when he's looking

19   for things.  And in his mind, Jihadology is the same thing as

20   this other place he's going to.  It's all perfectly legal in

21   his mind to download these videos, to save them.

22         Here's this picture that I put up when I was asking

23   Aaron Zelin:  "Jihadology crawl before censorship."

24   Censorship, ladies and gentlemen, his words, that's how Tom

25   viewed it, and I submit to you, based on his article and

1    testimony, that's how Dr. Zelin would view it, censorship.

2          Tom also talked about Jihadology to the CHS.  You

3    remember that?  And this is the time when he also says, "In May

4    of 2019 I never even talked to ISIS.  Why are these people

5    bothering me?  All I'm doing is downloading videos."

6          Let me see if this can play.

7       (Audio recording played in open court.)

8          MR. HERMAN:  Jihadology, he's getting them from

9    Jihadology.

10          And the CHS, the FBI guy, doesn't say, "No, you can't

11   do that.  It's illegal.  You got to watch out, bro."  He says

12   the opposite.

13      (Audio recording played in open court.)

14          MR. HERMAN:  I couldn't have said it better.  "That's

15   your freedom."  And that's what the government is telling Tom.

16   "That's your freedom."

17          The right to watch videos includes the right to share

18   them, and the government says it's a false flag operation.

19   He's going to put these videos up on Reddit and get the FBI to

20   get all distracted and chase its tail around.

21          But this is in the binder.  This is with OCE 2.

22   These are guys on Reddit saying, "Do you have ISIS videos in

23   one place?  I have an archive I was hoping to cross reference."

24          Look at this guy Shegmos at the bottom.  "Hello,

25   would you like to make a Torrent with your ISIS videos?  I

1    think it is the best way of preserving combat footages.  I am

2    going to upload my combat footage archive in the summer."

3              And you remember there was a thing -- a clip that the

4    CHS played where Tom is talking about Reddit.  Tom is talking

5    about putting his own stuff on Reddit, right, putting his own

6    self on Reddit, posting videos himself on Reddit.

7              That's a pretty stupid false flag operation.  This

8    whole false flag thing is just some more BS that Tom was

9    talking big about, just more big talk to the OCE 2.

10             Tom himself is putting stuff on Reddit, getting told

11   on, getting into battles.  These guys are asking him for stuff.

12             Now, how do we know -- how do we know what Tom's

13   intent was?  Whether or not it was to support ISIS or whether

14   it was to act independently, actions speak louder than words,

15   as the government often says.

16             Multiple times -- and I'm going to go through

17   these -- I'm going to try to go through these pretty quickly.

18   Multiple times OCE, CHS try to get Tom to do something.  And

19   this is a very important nuance, and I know you were paying

20   attention.  There's a twist between just doing something and

21   then doing something for ISIS.  Just doing something is not

22   illegal.  Doing something for ISIS crosses the line.  And when

23   that line is drawn, you see Tom tip toe up to it and not look

24   over, not step over the line.

25             OCE 1, "You want to meet the brothers in the Diwan?"

1    That's the first one, right?  June of 2018, this guy who

2    supposedly wants to do anything and everything for ISIS is

3    given an invitation through a guy in the Weapons chat room?

4            OCE 3:  "Do you want to translate bomb instructions

5    for ISIS?"

6            CHS, and this is the critical one because this is

7    after NAS.py.  "Take screenshots of what you're doing so I can

8    give them to the brothers in ISIS."

9            The first time in those chats when the CHS adds the

10   qualification "to ISIS."

11           Tom never did any of these things.  And if this is

12   hard to read, I'll try to read it for you.  This is OCE 1.

13   "Are you really" -- "Are you really serious about meeting

14   like-minded brothers in your country?  I can start to talk to

15   the Diwan."  The Diwan is ISIS, media Diwan and part of the

16   bureaucracy.

17           Tom:  "I have much learning to do.  Maybe in the

18   future."

19           Now, those of us who chat with people online know

20   when somebody is saying go away, maybe later, right?

21           This is a 19-year-old at the time.  We all know what

22   they talk like, sometimes for better or worse.

23           Same chat, June 6, 2018, after they move to Wickr.

24   "It will also make the bros feel more comfortable if you are

25   really serious about doing what you said you want to do in your

1    country.  I will let you know when.  The FBI is surveilling

2    me."  A classic Tommy excuse.  "I can't do anything.  The FBI

3    is watching me.  Can't do anything.  I'm sorry.  The FBI is

4    watching me."  Right?

5              Meanwhile, while the FBI is watching him, according

6    to the government, he's committing all of these crimes with

7    NAS.py and Heralds.  If he really thought that those crimes

8    would get him on the FBI's radar, he wouldn't be doing it.  If

9    he's sitting there thinking "I'm under constant surveillance,"

10   he wouldn't be doing those things thinking that they're

11   illegal.

12             Again, June 28th, the second chat.  And this was a

13   funny one.  June 29th, he chimes in like "How are you doing?"

14   And the first thing he says, "I've been busy.  I have to stay

15   passive.  I can't do anything."

16             The guy didn't even ask him if he wants to do

17   anything.  He said, "I'm too busy."

18             Now, let's go back, because the government talked

19   about this one.  OCE 1, the first guy who testified, this is a

20   Weapons chat room, TATP, highly volatile explosives, bombs,

21   attacking law enforcement, knives.  Remember how he qualified

22   that?  "I've got a knife, but it's very sharp.  You know,

23   pistols, explosive belts.  AK-47s, I don't have one, but I can

24   build one."

25             No follow-up from the OCE after June 29th?  This kid

1    is talking crazy.

2          Now, one of two things are true in this scenario.

3    Either he's really bad at his job, and that's probably not

4    right because the government called him as a witness, or the

5    FBI knows this guy is full of it, that he's not a threat,

6    because we're not making any kind of qualms about what the FBI

7    was doing in that chat room.  I think all of us can agree, if

8    somebody is talking about bombs, we want the FBI talking to

9    that guy to figure out if he's real.  There's nothing wrong

10   with that.  But when they stopped, I think that's an indication

11   for this highly and trained online covert employee.

12         Tom refused to translate for ISIS.  Do you remember

13   this one?  OCE 3, that guy, the first thing he says in the

14   chat, "The B thing for the brothers in the furqah all have

15   bi'ah for the Khilafah."  That means ISIS.  This guy was

16   fighting me over whether or not that meant ISIS.  That means

17   ISIS.  You want to translate something for ISIS.  He was also

18   fighting me over Google Translate, not so much after the Arabic

19   dictionary that he could have used.

20         Tom never translates that document, never translates

21   that document.  Somebody who wanted to provide material support

22   for ISIS, somebody who wanted to do something for ISIS, for the

23   benefit of ISIS, to ISIS, would have translated a two-page

24   document.

25         This guy is talking about, oh, he was working on it.

1   He talked about his brother.  Come on.  How many excuses did

2   this guy make to not do something.  Right?

3           This guy is saying, "Oh, I was just listening.  I was

4   just seeing what he would do."  Look at this chat.  "We need to

5   move faster, akhi."  April 30, "So when, akhi?"  That's about

6   the bomb-making instructions.  That's the FBI asking this kid

7   to translate bomb-making instructions for ISIS, which he never

8   did.

9           Here's a little timeline of excuses and refusals,

10  April 12th OCE 3 sends the bomb instructions.  Around April 16

11  Tom says his buddy has been offline.  "Do it tomorrow."  Later

12  April 20th, "My partner is gone, and I'm busy with school.  It

13  will be done today.  I'm done.  I'm done with it."  April 30th,

14  he never does it.  And they stop chatting after May 4th.

15          The OCE, that guy said, "Oh, Telegram must have shut

16  down his channel because he's talking craziness."  Not so, not

17  so.

18          This is from the April -- excuse me.  This is the OCE

19  2 binder.  This is a chat -- Tom is SKRRRR.  This is in your

20  OCE 2 binder.  "It is the convert Qital.  I had to delete my

21  account.  I had to delete my account."  Not Telegram deleted my

22  account.

23          Fifteen days later, OCE 2 at the top, "By the way,

24  akhi, have you talked to the brother Khaleel?  He asked me

25  about you."  That's the guy that's asking Tommy to make

1    bomb-making instructions.

2         Tommy says, "Not recently.  Don't give him my

3    username."

4         This is the guy that the government says wants to

5    help ISIS?  That somebody communicated to him, make these

6    bomb-making instructions, right?  And then you remember how OCE

7    3 changes his subject to computer skills for ISIS, and the

8    government put this up, this Ansar OS Operating System.

9         You recognize these are screenshots that Tom sent to

10   OCE 3.  Do you recognize them?  The same ones that he sent to

11   OCE 2.  Look at the date, March 28th, 2019.  He sent this same

12   screen -- these were sent in May of 2019, sent the same

13   screenshots.  He's just recycling stuff that he sent to

14   somebody else.

15        And what happened to that project, August 2019, his

16   big project?  "It's too difficult," sad face emoji.

17        This is nothing more than a screenshot.  All this

18   talk about what he wants to do for ISIS is like he's the Elon

19   Musk of the caliphate.  All of these ideas, all of these

20   inventions is nothing more than talk.

21        The Inside 8 Telegram, those chats, "I'm a college

22   sophomore, and I'm going to invent a new chat system for ISIS

23   to use."  How far did that get other than taking a screenshot?

24        Horizons, the government put that up.  Do you

25   remember that?  It's almost a comical exchange of "Who's on

1    first?"  He didn't know who Afaaq was.  Afaaq means Horizons in

2    Arabic.  He sends this whole thing to OCE 3 about "I'm going to

3    do this."  He doesn't even know what it says, ladies and

4    gentlemen.  They are all empty boasts.

5         Let's go to Heralds.  What does "Heralds" mean?  The

6    news.  What is news?  Expression, his intention.

7         The government -- the government called it a

8    manifesto.  What is a manifesto?  It's a statement of intent.

9    It's a statement of personal belief.  This is his view.  Right

10   or wrong, it's his view.  And how did he do it?  "I made it on

11   my own."  That's independent, ladies and gentlemen.

12        Heralds only adds a search term to the NAS.py, and it

13   was only sent to OCE 2.  Did you hear any other evidence about

14   Heralds going out to the world?  More importantly, did you hear

15   any evidence about him actually doing what he said he was going

16   to do in Heralds, uploading a Torrent to Reddit?

17        This isn't a substantial step for terrorism to write

18   a personal statement in a PDF.  It never went anywhere.  It was

19   like the operating system.  It was like the new Telegram.  It

20   was like Horizons.  It's nothing.

21        When Mr. Greenberg -- when Steve asked OCE 2, "Well,

22   you tried this Heralds thing?"  Do you remember the answer?

23   "No."  Because it wasn't a crime.  It's an afterthought that

24   they came when they were trying to figure out a way to get this

25   guy.

1           And the chats -- before I forget, the chats from

2     March of 2019 when these FBI guys are talking to each other,

3     one of these guys said, "He's talking a lot of shit.  I think

4     it's time for him to go to jail."  What did OCE 4 say?

5     "Hahaha.  American in sha Allah."  And they're looking for a

6     reason to lock him up.  And this is the best they can come up

7     with, this PDF of a personal statement that doesn't even get

8     off the ground that's sent to one person?

9           October, almost two months after this thing is sent

10    to OCE 2, OCE 2 checks in.  "How is Heralds going?

11          "Ah, I'm too busy with school.  I hope I can finish."

12          Very important, ladies and gentlemen.  Actions speak

13    louder than words.  When -- what happened at the end of the

14    chats with OCE 2?  We did not get into those in great detail,

15    but here's a timeline to help you.  They're at the end of one

16    of these giant binders of not illegal conduct.

17          Tom sends Heralds August 16th to OCE 2.  OCE 2

18    reaches out August 27th, right?  Asks him how his amaliat is

19    doing.  Tom didn't -- remember "amaliat" is operation.  Tom

20    responds back:  "What's amaliat," right?

21          Just like when Tom was asking OCE 3 all these jihadi

22    words.  "Like, what does that mean?"  There was one word that

23    Tom had to ask him twice "What does this mean?"  And this guy

24    is, "Oh, these are jihadi words."  This is the guy -- the

25    government is teaching him these jihadi words.  He doesn't know

1    them.

2           OCE 2 reaches out, and Tom doesn't respond.  OCE 2

3    reaches out again.  Tom says he's busy with school.  That's the

4    one we saw.  Again, Tom says, "What operation?"  He doesn't

5    even know what he's talking about.

6           That's Heralds, October 5th through 7th.  He says

7    he's looking for -- this is somebody else.  There's nothing at

8    the end.  You've got this giant binder -- and I'm not going to

9    grab it out because I'm trying to get through this -- giant

10   binder of OCE 2 communications starting in February.  You've

11   got this much from August to October.

12          If this guy wanted to help ISIS with this Heralds

13   document, he would have jumped all over this.  He would have

14   said, "Help me improve this, man.  Send this to ISIS, man.

15   Help me do this."  And he never says that.  He never says "Give

16   this to ISIS.  Give this to your bosses in your whatever, your

17   organization, ███."

18          CHS, the big brother, best friend, the

19   half-million-dollar man, pretty good -- pretty good living.

20   The mind-reader, this is the guy that got up here, he could

21   tell what he's thinking just by feeling the vibes.  The $10,000

22   bonus.  He didn't say no.  He danced around it.

23          The ruse job through DePaul, can you image that?  You

24   can connect the dots.  There's a survey given in his DePaul

25   class.  The survey gets to the CHS, and all of a sudden Tom has

1    got a job, and he's the best coder in the world.  He's paid for

2    that work.  Can you imagine that?  FBI wanting to develop a

3    relationship with this guy, and they pay him, right?

4              Flattery, calling Tom pure, meeting in hotel rooms,

5    teaching him about Islam, teaching him how to dress.

6              There's one occasion where the CHS buys Tom's wife a

7    traditional Muslim outfit, teaches Tom how to fold it.  Tom

8    sends him his grades, his school work.  "Look how good I'm

9    doing?"

10             Tom would do anything for his big brother except make

11   screenshots for ISIS when the CHS said, "I need you to do this.

12   Walk me through this, step by step.  Take a screenshot, and

13   then I will translate it for the brother in the State."  "The

14   State," he adds that qualification.

15             "A lot of brothers in the State, Allah willing, the

16   brothers, they don't speak English."

17             Does Tom give him the screenshot?  He says, "Yeah,

18   I'll do it."  You know, at the end of this meeting in the hotel

19   room, "I'll do it."  He could have done it right there.  Do you

20   know how easy it is to take a screenshot?  It's three buttons,

21   press them at once.

22             He doesn't do it.  As soon as the CHS says, "I'm

23   doing this.  You do something.  I'll give it to ISIS," Tom

24   backs away from the line.

25             That happened on October 10th.  Tom is not arrested

1    until November 18th.  That's more than a month to take a

2    screenshot.  Never does it.

3            OCE 4, Tom provides NAS.py script to OCE 4.  OCE 4

4    worked for an organization or pretended to work for an

5    organization.  This happened in October of 2019.  And the

6    government said, "Well, that's an official organization."

7            Do you remember what Dr. Zelin said, the government's

8    expert?  He says it's unofficial.  I'm going to take the

9    expert's word over that.  I'm going to take the expert who

10   talks about the First Amendment, an unofficial organization.

11           And guess what?  Tom, within seconds, gives this guy

12   the NAS.py script.  And when Tom gives him the NAS.py script,

13   he doesn't say, "I'm doing this for ISIS."  The other guy

14   doesn't say, "It's ISIS."  Right?  He's doing it on his own.

15   He's doing it independently, ladies and gentlemen.

16           This is a word that the government used for OCE 4.

17   He's volunteering.  What is the definition of volunteering?  Is

18   doing something independently.  That's the government's

19   description of what he did with OCE 4.  He volunteered this

20   thing independently, without being asked to do it for ISIS.

21           NAS.py, ladies and gentlemen, is not a service.  We

22   talked about Heralds, another one of these fantastic ideas that

23   went nowhere.  NAS.py is not a service.  The FBI knew about

24   this thing in January 2019.  The FBI knew of a version of it

25   that was out there, a version of it that was out there.  Some

1    type of copying and forward thing for Telegram, they knew about
2    it.

3              It's window dressing.  Any changes that were made --
4    remember Baggett?  Any changes that were made were window
5    dressing.  You going to convict somebody for terrorism for
6    window dressing?  Guess what?  Baggett had to change the script
7    to get it to work.  This foolproof copying and forward thing, a
8    simple change on the back end at Telegram, it doesn't work
9    anymore.

10             What does it do?  It copies and pastes videos that
11   aren't illegal.  Now, the government said, but ISIS wanted
12   these channels everywhere.  That doesn't stop it from being
13   independent voluntary conduct in terms of what he was doing.
14   Really all it does is save time from a manual copying.  And
15   we're going to convict somebody for terrorism for saving time?
16   Give me a break.  That's what this case boils down to.  Give me
17   a break.

18             It is used for independent advocacy.  It's used for
19   seeing these videos, for watching them, which he has a right to
20   do.  We know he has a right because Zelin, the government's
21   expert, we agree with him.  The First Amendment, freelancing,
22   you can download from official media.

23             ISIS is not on trial, ladies and gentlemen.  All of
24   these videos that come in, ISIS is not on trial.  Tom is on
25   trial.

1          The government's -- holes in the government's case.

2    How many electronic devices were seized in this case?  How many

3    did you hear about?  Phone scroll, things going through chats?

4    He brought his laptop when he got arrested, had passwords in

5    his pocket, the same passwords he said he was going to swallow.

6          Now, if Jonas gets up here and talks about, oh, but

7    he had this encryption, well, then where's the -- where is the

8    government witness to talk about the encryption, how they tried

9    to get him but couldn't?

10         Any contact with ISIS?  In fact, the opposite.  "I

11   don't know anybody in Dawlah."  That's what he told on a

12   recording.  No contact with any other brother.

13         Who is this Tunisian brother that Tom says he saved

14   with a video game?  He saved him from Tunisian intelligence

15   with the video game.

16         He only gives NAS.py and Heralds to the FBI.  Where

17   is the explanation of where else it went, this acts of

18   terrorism that only go to the FBI?

19         He only gives bayat to the FBI.  What's up with that?

20   No case agents testifying, explaining about this -- all of this

21   investigation.  They're fine -- he's a fine young man, and his

22   partner, I've got no qualms against them, but they put up a guy

23   from the search warrant who wasn't even there.  What's going

24   on?

25         Where is the forensic evidence in this case other

1    than Baggett?  Instead they rely on emojis to prove his intent,

2    the sword, the explosives.  Where is the video of his arrest,

3    of this skinny kid throwing an FBI agent across the room, of

4    lifting the finger of Tawheed?  Maybe it was the other finger,

5    for all we know.  This guy, the CHS doesn't say anything about

6    a guy flying across the room.  Come on.

7              I'm winding up, ladies and gentlemen, I promise.

8    Thank you.

9              I'm going to go back to where we started, what this

10   case is about.  It's not about what the government told you

11   it's about.  It's not about just liking ISIS.  These are

12   instructions that I believe the Judge is going to give you.  He

13   has to knowingly attempt to provide material support or

14   resources; namely, services to a designated foreign terrorist

15   organization.

16             You will also, I believe, be instructed on the First

17   Amendment.  Advocacy that is done independently of the

18   terrorist organization and not at its direction or in

19   coordination does not violate the statute.  There must be

20   coordination.  There must be direction.

21             Attempt, knowingly takes a substantial step but, more

22   importantly, with the intent to provide material support.  And

23   when you think about the question of intent, I submit to you,

24   you look at what he did not do.  When given the opportunity to

25   do something for ISIS three, four times, over and over again --

1    OCE 3, "We need it faster.  So when?" -- the same guy that is

2    pulling up ISIS images off his own FBI computer and sending it

3    to him, "We need it faster."

4              What he doesn't do, he doesn't provide it to ISIS.

5    What he does is independent.  What he does is personal.  What

6    he does is his own.

7              OCE 2 asking him afterwards in late October, "Come

8    on, we need to do this.  What's going on with your operation?"

9    Crickets.  "I'm busy with school."

10             OCE 4, not identified as an ISIS member.  Tommy

11   doesn't say, "I'm doing this for ISIS."  Very important.  When

12   you say the script, he sent the script; he showed him the

13   script.  So what?  It's not about the script, ladies and

14   gentlemen.

15             Merely attempt does not negate independent advocacy.

16   Independent advocacy, ladies and gentlemen, it is what is

17   crucial here.  Simply because ISIS says, "Well, we want our --

18   we want our videos to be seen," that doesn't mean what he does

19   is in coordination.  That doesn't negate the independence of

20   his activity.

21             Remember that quote that Ms. Wells pulled up, "the

22   only person in the world that does this"?  "The only person in

23   the world that does this," what could be more independent?

24   Volunteering, their words, that's independence.

25             Ladies and gentlemen, your duty in this case --

1    there's one part I left out -- your duty in this case is to be

2    courageous, is to be courageous in these facts, these facts

3    that are intimidating, the videos, the messages that make your

4    skin crawl, that make you want to hate him and his views that

5    he shared in 2018, 2019.  But your duty is to set aside your

6    prejudices.  Your duty is to be courageous in the face of those

7    intimidating distractions.  Your duty is to follow the law that

8    you will be instructed on.

9          Your duty is to listen to his words when he says,

10   "This is not illegal."  And your duty, and you will find after

11   following the duty, will be to find him not guilty.  Thank you.

12         THE COURT:  Thank you, Mr. Herman.

13         Can I just talk to the counsel here off the record?

14   (Proceedings heard at sidebar off the record.)

15         THE COURT:  Ladies and gentlemen, these arguments

16   sometimes go a little bit longer than we hope, but they're very

17   important, as I told you.  And it is almost 25 after 12:00.

18         Let us -- let's take a short lunch break today so we

19   can get you -- get Mr. Jonas's rebuttal and the instructions to

20   you fairly early in the afternoon, and then you will have some

21   time to deliberate today.

22         So why don't we come back at 1:00.

23         THE CLERK:  All rise.

24         THE COURT:  Please, one more thing.  Do not start --

25   I know you have a lot to think about, and you've been given a

1  lot to think about by some very excellent lawyers.  Don't start

2  deliberating or talking about the case until it's all over and

3  I instruct you.

4          So just enjoy a brief lunch, and we'll be back at

5  1:00.

6          (Jury out.)

7          THE COURT:  There was something I was going to

8  mention to you before they came in this morning; and that is,

9  on page 13 of the transcript -- if they ask for a transcript --

10  remember, the instruction is you got to ask for it -- if they

11  ask for the transcript from October 10th, which is 506-10, on

12  page 13, the CHS did agree on cross-examination that the word

13  should be "illegal" instead of "legal."

14          So if they do -- if they do ask for it, you have to

15  make that change.

16          MR. JONAS:  Yes, sir.

17          THE COURT:  Okay.  Mr. Greenberg, was there something

18  else?

19          MR. GREENBERG:  There was, Judge.  I just want to --

20  is my mic on or should I just --

21          THE COURT:  Speak loudly.

22          MR. GREENBERG:  Okay.  I just want to raise

23  something, because I heard it in the opening government

24  argument.  I didn't want to object and go to sidebar, and I

25  think they may raise it again, given our argument.  That it's

1    sort of a circular argument that because ISIS is asking for
2    people to support them -- they've got that one arrow with
3    supporters on the side -- that if you're supporting them,
4    you're doing it at the direction of ISIS.
5         And if that argument were made, it extinguishes any
6    concept of independent advocacy.  And I don't think they should
7    be able to make an argument that because ISIS asked for
8    supporters to support them that someone then is committing a
9    crime by supporting them.
10        THE COURT:  They will be instructed on the law, and I
11   think that they'll follow the instruction.  And that doesn't
12   include what you just said.
13        MR. GREENBERG:  Right.
14        THE COURT:  Is that what you're going to say,
15   Mr. Jonas?
16        MR. JONAS:  Yes, Judge.
17        MR. GREENBERG:  So making that argument, that would
18   be inconsistent with what you're going to instruct them.
19        THE COURT:  If they make an argument that's
20   inconsistent with the instructions, then I think you should
21   object.
22        MR. GREENBERG:  Okay.  I just want to flag it.
23        THE COURT:  I don't like objections.  I think that
24   both sides here were nicely restrained, and I appreciate that.
25        All right.  Let's have a quick lunch and be back at

1    1:00.

2         (Recess at 12:25 p.m. until 1:00 p.m. )

```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
       UNITED STATES OF AMERICA,        )
 4                                      )
                     Plaintiff,         )
 5                                      )
                 vs.                    ) No. 19 CR 869
 6                                      )
       THOMAS OSADZINSKI,               ) Chicago, Illinois
 7                                      ) October 15, 2021
                     Defendant.         ) 1:06 p.m.
 8

 9          TRANSCRIPT OF PROCEEDINGS - Volume No. 7 PM

10          BEFORE THE HONORABLE ROBERT W. GETTLEMAN

11                        and a Jury

12
       APPEARANCES:
13
       For the Plaintiff:       HON. JOHN R. LAUSCH, JR.
14                              United States Attorney
                                BY:  MR. BARRY JONAS
15                                   MS. MELODY WELLS
                                Assistant United States Attorneys
16                              219 South Dearborn Street, Fifth Floor
                                Chicago, Illinois  60604
17                              (312) 353-5300

18                              MS. ALEXANDRA HUGHES
                                Trial Attorney, Department of Justice
19                              National Security Division
                                950 Pennsylvania Avenue, NW
20                              Washington, D.C.  20530

21

22

23     Official Court Reporter:  NANCY L. BISTANY, CSR, RPR, FCRR
                                 219 South Dearborn Street, Room 1706
24                               Chicago, Illinois 60604
                                 (312) 435-7626
25                               nancy_bistany@ilnd.uscourts.gov
```

1    APPEARANCES:   (Continued)

2

3    For the Defendant:          GREENBERG TRIAL LAWYERS
                                 BY:   MR. STEVEN GREENBERG
                                 53 West Jackson Boulevard, Suite 1260
4                                Chicago, Illinois  60604
                                 (312) 879-9500

5

6                                LAW OFFICE OF JOSHUA G. HERMAN
                                 BY:   MR. JOSHUA G. HERMAN
7                                53 West Jackson Boulevard, Suite 404
                                 Chicago, Illinois  60604
8                                (312) 909-0434

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          ( Jury in.  Proceedings heard in open court.)

2                THE COURT:  Good afternoon, folks.  Please be seated.

3          I recognize Mr. Jonas for rebuttal.

4                MR. JONAS:  Thank you, Judge.

5                GOVERNMENT REBUTTAL CLOSING ARGUMENT

6                MR. JONAS:  Good afternoon.  Mr. Herman spoke to you

7    before lunch a lot about the First Amendment.  And I think one

8    thing we can agree on, the First Amendment is a powerful right

9    that we have as Americans that is a right that many people in

10   other countries don't have, and it's something that I think we

11   hold true to our hearts but often don't think about.

12               But the First Amendment in this case is alive and

13   well, and nobody is violating the defendant's First Amendment

14   rights, because the defendant hasn't been charged for something

15   he said.  He's been charged for something he did.

16               MR. GREENBERG:  Objection, Judge.

17               THE COURT:  Overruled.

18               MR. JONAS:  He's been charged with the computer

19   script, with modifying it, with making it better -- now, Mr.

20   Herman sort of called it window dressing; it actually was a lot

21   more than that, and I'll talk about that in a minute -- and

22   with distributing it to people he believed were all pro-ISIS

23   brothers.

24               Now, the key here in that act, as we all agree, is

25   determining the defendant's intent.  What was he trying to do?

1    Who was he trying to benefit?  What service was he trying to

2    provide when he did all this?

3            And in determining that intent, you can look at what

4    he said and what he did.  Again, he hasn't been charged with

5    that, but that doesn't mean all of that is off the table.

6            It's like the *Miranda* warnings we hear over -- all

7    the time in police shows and police movies.  You have the right

8    to remain silent.  The defendant didn't have to say anything,

9    but he did.  Anything you say can and will be used against you.

10           So you as the jury have the absolute right to go

11   through these binders, look at what the defendant said about

12   his support for ISIS, and determine -- and consider that in

13   determining his intent when he distributed -- modified and

14   distributed that script -- the computer script.

15           Now, Mr. Herman also said that the defendant

16   exaggerated, that he puffed.  I mean, that may -- those may not

17   be the exact words he used, but I think you get the point, that

18   he wasn't -- he was a talker, not a doer.

19           He said the defendant was a lonely 19-year-old.

20   Well, first of all, there's been no evidence that the defendant

21   was lonely or had no friends, so that shouldn't even be

22   something you consider.

23           But really was he just someone who talked, someone

24   who -- excuse my language -- just BS'd the people online, or

25   was he someone who did act?

1          The defendant wrote an article for Youth of the

2    Caliphate magazine under the name Brush.  No one forced him to

3    do that.  He did that.

4          The defendant did subtitles for ISIS videos before he

5    ever met or engaged with anyone from the FBI.  That was him.

6    That was an act.

7          The defendant did a voiceover for an ISIS video that

8    glorified violence, that told people to go out and terrorize

9    and burn and kill and then showed beheadings, which the

10   defendant seemed to really like.  That's not talk.  That's act.

11         OCE 2 asked the defendant early on in their

12   relationship to translate stuff, and he asked him that because

13   the defendant said right away, "I translate.  I translated the

14   videos."

15         So the FBI was testing.  Is he someone who is just

16   all talk or is he someone who acts?  And the defendant

17   translated.  Mr. Herman told you he never responded to the FBI.

18   I encourage you, go through the 200 series binder.  Those are

19   the communications between the defendant and OCE 2, and you

20   will see early on that the defendant willingly, voluntarily

21   translated ISIS material for OCE 2, who is working for an

22   organization that the defendant -- that was advertised as one

23   that published material on explosives and on toxins on behalf

24   of ISIS.

25         When OCE 3 asked him to translate material, yeah, he

1    didn't do it.  But read the 300 series binder as to why it

2    never happened, because the brother he went to for help because

3    the defendant wasn't completely comfortable, the brother he

4    went to for help was under investigation.  So the defendant's

5    Telegram account was deleted, and the defendant backed away.

6    He didn't want to get busted.

7            Speaking of which, in June of 2018 it was the

8    defendant who went into a weapons chat room looking for TATP

9    material.  And luckily, the FBI was there, and they started to

10   engage with him because they were concerned.  The FBI did what

11   we all hope they would do.  They did their job.  They didn't

12   run out and arrest him right away.  They held back, because

13   they wanted to see who is this person and what are they up to.

14           And then the defendant disappeared from the room, so

15   the FBI backed away, but an investigation continued.

16   Mr. Herman was critical of the FBI's investigation.  But you

17   shouldn't be, because the FBI didn't run out right away.  They

18   held back, and they watched.

19           And the defendant told OCE 1:  "The FBI is watching

20   me.  I've got to lay low.  I got to lay low until the heat is

21   off."  And he did until February 2019 when he felt the heat was

22   no longer on him, so he reached out to Organization 1.

23           OCE 2 responded, and then they were off.  And that's

24   when the defendant said, "I'm Brush from Youth of the

25   Caliphate.  Here are the videos that I was involved and helped

1    creating, making ISIS videos."

2              You have to wonder and ask yourself, how does

3    someone, a 19-year-old from the suburbs of Chicago, get his

4    voice on an ISIS video that glorifies violence?  He was acting.

5    He was trying to help.

6              The defendant reached out to Organization 1.  The

7    defendant reached out to Organization 2 on his own.  He engaged

8    with another pro-ISIS organization that billed itself as one

9    that translated ISIS material into English.  No one forced him

10   to do that.

11             OCE 2 suggested to him that he reach out to OCE 3,

12   and he did.  No one forced him to reach out to OCE 3.  The FBI

13   was seeing and testing him.  Is he willing to do things?  And

14   he was.

15             And, yes, it took awhile before the FBI arrested him

16   because they were giving him the opportunity to stop, and he

17   didn't.  The FBI introduced the CHS.  You saw him testify over

18   the past few days.  And the CHS, of course, yes, he was

19   praising the defendant.  He was saying -- he was blowing smoke

20   up his butt because the CHS had to get close to him to learn

21   what the defendant's plans were.

22             And he wasn't arrested right away.  The CHS first

23   engaged him in February, because the FBI, again, was seeing is

24   this person serious.

25             Then in August 2019 everything changed.  That's where

1   the script came out, and Heralds of the Internet came out.  And

2   the defendant took this Python code that was sent to him by

3   another brother, the brother in Tunisia, that only did copying

4   and nothing more, and the defendant modified it.  He made it

5   better.  He made it copy thousands of videos at a very fast

6   pace.

7          That was not in the original script.  That's not

8   window dressing.  That is doing a service to ISIS so that those

9   videos are preserved; they're not taken down; and they're

10  preserved in a way that other people can get.

11         He organized it.  He added into a script the ability

12  to organize the videos by resolution, so the brothers in the

13  field who don't have high definition -- or high-speed internet

14  can access the lower-resolution videos.  And this was important

15  to the defendant, and this was important to ISIS, because as

16  you heard from Aaron Zelin and as you saw from the material we

17  presented to you, ISIS has a media Diwan, a department of

18  media.  You don't see that here in the United States.  It's

19  because media was so important to ISIS.  It helped further

20  their mission.  It recruited people.  It incentivized their

21  members and supporters, and it terrorized the people who were

22  enemies of ISIS.

23         And the defendant knew all that.  He knew how

24  important these videos were to the organization.

25         Now, Mr. Herman showed you some screenshots and

1    recordings where the defendant said, "This isn't illegal."

2    Okay.  That was earlier on, like, May, I believe it was, 2019.

3            There is an expression:  Ignorance of the law is no

4    excuse.  That's not always true, but it is here.  There are

5    some crimes that require the government to prove what's known

6    as willfulness.  And what that means is the government has to

7    prove that the defendant who violated those crimes or committed

8    those crimes acted knowing that he was either breaking the law

9    or doing something wrong that he wasn't supposed to do.

10           When the Judge reads you the instructions in a few

11   minutes, you are not going to see the word "willfulness"

12   anywhere.  It is not a requirement for the statute that he's

13   been charged with.

14           All the government has to prove with regard to what's

15   in his head is that he knowingly provided support to ISIS, not

16   that he knew it was against the law.  So whether the defendant

17   was saying it's against the law or not is irrelevant.

18           But consider all the steps he took to hide his

19   conduct from the FBI knowing that they were watching him.  I'm

20   not going to go through them all.  You'll see them as you go

21   through the binders.

22           He kept talking about encryption.  He kept talking

23   about using certain programs, VPNs, Tor, The Onion Router.  He

24   kept talking about being careful.  He had Telegram accounts,

25   one for ISIS, one for not ISIS.  He was doing what we would

1    call operational security, op sec.  That's the term the FBI

2    likes to use.  He was employing op sec.  And why would he be

3    doing that if he believed what he was doing was perfectly

4    legal?

5              Mr. Herman went through a list of steps and said,

6    "This is not illegal.  This is not illegal.  This is not

7    illegal."  Right?  Copying videos, downloading videos, watching

8    videos is not illegal.  Again, those are things that you can

9    consider when you consider the act that the defendant did and

10   what his intent was.

11             But let me give you another analogy, if I can.

12   Someone walks into a store, Columbia, REI, Eddie Bauer, and

13   they buy a ski mask.  It's Chicago.  It gets cold in the

14   winter.  That's not illegal.

15             Someone -- that person goes home, and they write a

16   note on the kitchen table.  Not illegal.  We do it all the

17   time.  That same person applies for a FOID card so he can carry

18   a gun.  Second Amendment right, not illegal.  Walks into a

19   bank, people still walk into banks.  There are tellers that are

20   still employed there.  Goes up to the teller, not illegal.

21             That same person who is wearing the ski mask hands a

22   note to the teller.  It says, "Give me all your money.  I have

23   a gun.  I will kill you."  That's illegal.

24             You put those -- you can take any crime and break it

25   down and say, "This isn't illegal.  This isn't illegal."  You

1    put them together.  You have a crime.

2           And that's what happened here.  You put everything

3    together, you have a crime.  Material support to ISIS.

4           Now let's talk about independent advocacy.

5    Mr. Herman talked a lot about that.  And really what this boils

6    down to, let's talk -- let's get to brass tacks.  Was the

7    defendant acting independently on his own, completely isolated

8    from ISIS; or was he acting at their direction or attempting to

9    coordinate with them?

10          And he talked about Mr. Zelin and what Mr. Zelin has

11   done with Jihadology.  That's a great comparison.  Think about

12   it.  Aaron Zelin creates Jihadology because he's an academic.

13   He works at a think tank.  He preserves videos for study.  He

14   doesn't preserve them to help ISIS.  That's independent.

15          What the defendant did was all about helping ISIS.

16   That's not independent.

17                MR. GREENBERG:  Objection, Judge.

18                THE COURT:  Overruled.

19                MR. JONAS:  So let's talk about -- let's break this

20   down a little further and talk about direction, direction from

21   ISIS.

22          Now, let's -- direction is not sitting across the

23   table from Abu Bakr al-Baghdadi when he was alive -- he's the

24   former leader of ISIS that's now dead -- or anybody from ISIS

25   and having them tell you:  "This is what you need to do."

1        That could be direction, but direction is not defined

2   that narrowly.  Direction is a blast-out from the organization

3   to its members and its supporters to do things.

4        Let me give you another example, another analogy.  I

5   think Mr. Greenberg says he likes analogies.  So do I.

6        Go to a Bulls game or any sporting event, and on the

7   screen there's a noise meter that encourages the people in the

8   audience, the fans, the supporters of the Bulls, the fanboys,

9   to make more noise, to clap, to scream.  And the people in the

10  stands do.  That's taking direction from the Bulls.  And that's

11  what we have here.

12       Ms. Wells showed you Inside 8.

13       MR. GREENBERG:  Judge, I hate to keep objecting, but

14  this is what we discussed before.

15       THE COURT:  And I'll keep overruling.

16       MR. JONAS:  Thank you, Judge.

17       Ms. Wells showed you Inside 8.  You're going to have

18  it when you go back and deliberate.  I encourage you to watch

19  it.  That is one of the examples, one of the examples where

20  ISIS was telling the supporters what to do.  And in that one,

21  it was about the media, do the media.

22       That wasn't the only one.

23       Claire, can I have this?

24     (Discussion off the record.)

25       MR. JONAS:  That's all right.

1          So when you go back there, you're going to see the

2    Government's Exhibit -- it's the series 603.  603 are items

3    taken from the defendant's phone.  And what you're going to see

4    and what I would have showed you, if it was working, is a

5    screenshot of something from al-Hayat Media Center.

6          Now, you've heard all about al-Hayat.  It's official

7    ISIS.  It's part of the designation.  And in that screenshot on

8    the defendant's phone, it says, "Answer the call."  That is

9    direction to its supporters, to its followers.

10         Now, just because they send it out, that in and of

11   itself doesn't make it a crime to be a supporter.  But when

12   that supporter responds the way the defendant did, that's a

13   crime.

14         So he, in creating the script, in filling the need of

15   ISIS when their videos are taken down in social media, comes up

16   with this idea to preserve them, to make it better, make it

17   better organized so that the brothers can have access to them,

18   that's responding to the direction of ISIS.  And that's a

19   service, and that's material support, and that's not

20   independent.

21         In responding to the call, the defendant is trying to

22   build a bridge back to ISIS.  Now, the language of the statute,

23   what the Judge is going to read to you, it's coordination or

24   direction.  So just responding to the direction without more,

25   by doing the script and distributing it, that's enough for you

1    to find him guilty.  But the defendant also tried to

2    coordinate.  Remember, he reaches out to Organization 1 and

3    after develops a script and after develops "Operations:

4    Heralds of the Internet," and he sends it to Organization 1.

5    Why?

6              This is an organization that promotes ISIS explosive

7    material and toxic material.  Why would he be sending them the

8    script, Heralds of the Internet, how to do what he is trying to

9    do, unless he's trying to get it out to the ISIS community?

10             Now, whether that organization is official ISIS or

11   unofficial ISIS doesn't matter.  As Dr. Zelin told you,

12   unofficial takes direction from official.  As the defendant

13   said -- and you'll see this when you review the binders -- I

14   don't know what's official.  I don't know what's unofficial.

15   But he doesn't care.  He still reaches out.  He doesn't take

16   steps to be -- act independently.  He's all in.  He wants to

17   help the organization.

18             So he reaches out to Organization 1.  He sends them

19   the script.  Reaches out to Organization 2, knowing that they

20   translate ISIS material to English, sends them the script.

21   Why?  Because he wants to get it out there.  He wants to spread

22   it.  I talk to two friends, and they talk to two friends, and

23   so on.  And the more people who do the script, the more people

24   who preserve videos, the more that those videos are not going

25   to go away.  And that's going to help ISIS.

1        If you look at Government's Exhibit 604 series, those

2   are screenshots of the defendant's phone taken by the FBI.

3   You'll see in 604-9 and 10, he told someone:  "I'll get you --

4   I'll help you copy your channels.  I'm working on a way to

5   preserve it for Android."

6        That's not someone in the FBI.  So when Mr. Herman

7   says there's no evidence he gave this to anyone but the FBI,

8   well, that is evidence he was talking to someone not from the

9   FBI and talking to them about getting them something similar to

10  Heralds of the Internet, if not exactly Heralds of the

11  Internet.

12        I know you're all anxious to get back there and start

13  deliberating, so I'm going to wrap up.

14        If you believe that the defendant was intending to

15  act as an independent advocate when OCE 2 asked the defendant

16  about why he was doing this, why he was helping with the

17  videos, and the defendant said "For ISIS" -- and the OCE 2

18  said, "For ISIS or jihad," and the defendant said "For both";

19  if you believe he was acting as an independent advocate when he

20  told OCE 2 that al-Qaeda has an encryption program and he can

21  make our own, our own, meaning ISIS; if you find -- if you

22  believe that he was acting as an independent advocate when he

23  talked about developing a Linux system for Ansar, the brothers,

24  and when OCE 2 asked how would this help ISIS, the defendant

25  said, "It would be more secure"; if you believe he was acting

1    as an independent advocate when Operation:  Heralds of the

2    Internet he said -- and I'm paraphrasing -- "al-Furat and

3    al-Hayat can use this to organize their channels or I can do it

4    for them"; if you believe he was acting as a independent

5    advocate when he says to OCE 2, "I'm going to create this wild

6    goose chase for the FBI to go off and investigate the Kuffar

7    who don't believe in Dawlah so that the equan, the brothers who

8    were planning attacks, have less time being spied on" -- that

9    is page -- that's page 35 of the 200 series binder, the second

10   page 35 -- if you believe he was acting as an independent

11   advocate when he said, "There's only 10 brothers in the world

12   who do this" and in the context of creating the script for

13   ISIS; if you believe he was acting as an independent advocate

14   when, in discussing the challenges of locating ISIS videos, in

15   response to OCE 2, he says, "I try to help them" -- not "I'm

16   acting on my own" -- "I try to help them"; and if you believe

17   he's an independent advocate when he said, "I do jihad in

18   media"; and if you believe that he was an independent advocate

19   when he pledged bayat on his own -- no one made him do it; it

20   is on his own, and he did that a second time after Baghdadi was

21   killed, and he had to do it for the new ISIS leader -- if you

22   believe he was an independent advocate for all of that, plus

23   more that you'll see in these exhibits, then find him not

24   guilty.

25                But there's a more logical, common-sense answer for

1  all that conduct; and that is, he was heeding the call of ISIS.

2  He was providing material support in the form of services at

3  their direction.  Find him guilty.  Thank you.

4          THE COURT:  Thank you, Mr. Jonas.

5      (Discussion off the record.)

6          MR. HERMAN:  I apologize.  I think for the record

7  that I think we need to make, that if we could do so briefly on

8  sidebar, based on something Mr. Jonas just said regarding an

9  objection that we make sure we want to be preserved.

10          THE COURT:  Well, I think your objection is

11  preserved, obviously.

12          MR. HERMAN:  This is a different objection to a

13  burden-shifting argument.

14          And if that's, based on what Mr. Jonas said at the

15  end about having to find things to render --

16          THE COURT:  Well, let's not talk about it now.  All

17  right.  We'll do a quick sidebar.

18      (Proceedings heard at sidebar on the record:)

19          MR. HERMAN:  Judge, at the end of Mr. Jonas's

20  rebuttal, he listed off the things that the jury must find in

21  order to find Mr. Osadzinski not guilty.  We see that as a

22  burden-shifting argument instead of the things that the jury

23  must find in order to find him guilty.

24          If it's the government's burden, what the argument

25  did was essentially tell the jury to go back and to look at the

1    things in order to find him not guilty.

2          THE COURT:  He's basically responding to your

3    argument.

4          MR. JONAS:  Yeah.

5          THE COURT:  And I don't think that's shifting the

6    burden at all.  The jury is going to be instructed again that

7    the burden is squarely on the government, and, of course,

8    Ms. Wells said that several times.

9          And I didn't -- I didn't understand it that way.  I

10   don't think it was meant that way, and he was just responding

11   to your argument.

12         MR. GREENBERG:  Judge, if I may.

13         THE COURT:  Which you did very well, by the way.

14         MR. GREENBERG:  When you tell a jury that they have

15   to find things to find someone not guilty, that's burden

16   shifting.  When you say you have to find this to find him not

17   guilty and this to find him not guilty, that's burden shifting,

18   because they don't have to find those things to find him not

19   guilty.  They have to find affirmative things to find him

20   guilty.

21         But as soon as you tell the jury, in order to find

22   someone not guilty, you must find this is true, that's burden

23   shifting.

24         And I understand the Court -- but that's classic

25   burden shifting, because you're telling the jury that you're

1   not saying you have to find that he did this to find him

2   guilty.  You're saying unless you find he didn't do it, you

3   know, you have to find him guilty.  You can't -- it's classic

4   burden shifting.

5           And there's one other -- if I may, while I'm

6   speaking, he said -- and I know you overruled my objection; I

7   just want -- it was in your own decision in this case about how

8   someone can be -- and I'm quoting -- that someone can

9   vigorously advocate goals and philosophies, embrace Hamas.

10  That's what you said in this case.  You were quoting a Seventh

11  Circuit case in your decision.  He said that only speech was

12  protected.

13          If you're writing things, if you're doing voiceovers,

14  if you're doing those things, while they may be acts, they are

15  still First Amendment protected acts.

16          And Mr. Jonas said that those things were not

17  protected.  I objected, and you overruled my objection.  But

18  actions are also First Amendment protected, and actions that

19  are a form of speech are First Amendment protected.

20          We looked at the jury instruction, and the jury

21  instruction does not set that out.  So now the jury is given

22  the impression under the argument with this sustained objection

23  that an act is not protected by the First Amendment.

24          So if he did a voiceover, it's not protected by the

25  First Amendment.  If he sends something out on the internet,

1       it's not protected by the First Amendment.  If he spread this,

2       it's not protected by the First Amendment.

3               THE COURT:  If he does it at the direction of or in

4       coordination with ISIS, that's the burden that they have

5       assumed, and the jury will be instructed.

6               I don't think -- I don't think what Mr. Jonas said

7       was inconsistent with that.

8               MR. GREENBERG:  Well, he didn't say that, Judge.  He

9       said the First Amendment protects speech; it doesn't protect

10      acts.  That's what he said.

11              THE COURT:  But in the context of what he was saying,

12      it was the acts that he described and the government has been

13      arguing about.  I don't think -- I'm just not there.

14              I don't know.  Mr. Jonas, do you want to add

15      anything?

16              MR. JONAS:  No, Judge.  I agree with your ruling.

17              THE COURT:  But you've made your record on it.  It's

18      an interesting question.

19              MR. GREENBERG:  Thank you.

20          (End of sidebar proceedings.)

21              THE COURT:  All right.  Ladies and gentlemen, you've

22      heard the evidence.  Now you've heard the argument of the

23      lawyers.  And my courtroom deputy is going to pass out

24      written -- the written instructions.  I'm going to read them.

25      Each of you will have a copy.  You may follow along with them

1    or you may just sit back and listen.  That's up to you.  It's

2    probably easier to follow along.

3           All right.  Members of the jury, I will now instruct

4    you on the law that you must follow in deciding this case.  I

5    have given you -- each of you the instructions to use in the

6    jury room.  And you must follow all of my instructions about

7    the law even if you disagree with them.  This includes the

8    instructions I gave you before trial and the instructions I

9    gave you during the trial and the instructions I'm giving you

10   now.

11          As jurors, you have two duties.  Your first duty is

12   to decide the facts from the evidence that you saw and heard

13   here in court.  This is your job, not my job or anyone else's

14   job.

15          Your second duty is to take the law as I give it to

16   you, apply it to the facts, and decide if the government has

17   proved the defendant guilty beyond a reasonable doubt.

18          You must perform these duties fairly and impartially.

19   Don't let any sympathy, prejudice, fear, or public opinion

20   influence you.  And in addition, don't let any person's race,

21   color, religion, national ancestry, or gender influence you.

22          You must not take anything that I have said during

23   the trial or anything that I did during the trial as indicating

24   that I have an opinion about the evidence or about what I think

25   your verdict should be.

1    The charge against the defendant is in a document

2    called an indictment.  You will have a copy of the indictment

3    during your deliberations.

4    The indictment in this case charges that the

5    defendant -- charges the defendant with attempting to provide

6    material support to a designated foreign terrorist

7    organization.  The defendant has pled not guilty to the charge.

8    The indictment is simply the formal way of telling

9    the defendant what crime he's accused of committing.  It's not

10   evidence that the defendant is guilty.  It doesn't even raise a

11   suspicion of guilty.

12   The defendant is presumed innocent of the charge.

13   This presumption continues throughout the case, including

14   during your deliberations.  It's not overcome unless, from all

15   the evidence in the case, you are convinced beyond a reasonable

16   doubt that the defendant is guilty as charged.

17   The government has the burden of proving the

18   defendant's guilt beyond a reasonable doubt.  This burden of

19   proof stays with the government throughout the case.

20   The defendant is never required to prove his

21   innocence.  He is not required to produce any evidence at all.

22   You must make your decision based only on the

23   evidence that you saw and heard here in court.  Don't consider

24   anything that you've seen or heard outside of court, including

25   anything from the newspaper, television, radio, internet, or

1    any other source.

2          The evidence includes only what the witnesses said

3    when they were testifying under oath, the exhibits that I

4    allowed into evidence, and the stipulations that the lawyers

5    agreed to.  And there were a number of them here.  A

6    stipulation is an agreement that certain facts are true or that

7    a witness would have given certain testimony.

8          Nothing else is evidence.  The lawyers' statements

9    and arguments are not evidence.  If what a lawyer said is

10   different from the evidence as you remember it, the evidence is

11   what counts.  The lawyers' questions and objections likewise

12   are not evidence.

13         A lawyer has a duty to object if he thinks a question

14   is improper.  If I sustain an objection to a question that the

15   lawyer asked, just don't speculate on what the answer might

16   have been, as I mentioned earlier.

17         If during the trial I struck testimony or exhibits

18   from the record or told you to disregard something, you must

19   not consider it.

20         Give the evidence whatever weight you decide it

21   deserves.  Use your common sense in weighing the evidence and

22   consider the evidence in light of your own everyday experience.

23         People sometimes look at one fact and conclude from

24   it that another fact exists.  This is called an inference.

25   You're allowed to make reasonable inferences so long as they

1    are based on the evidence.

2          Now, you've heard the term "direct" and
3    "circumstantial evidence," and I've mentioned those earlier as
4    well.  Direct evidence, again, is evidence that directly proves
5    a fact, and circumstantial evidence is evidence that indirectly
6    proves a fact.

7          You are to consider both direct and circumstantial
8    evidence.  The law does not say that one is better than the
9    other.  It's up to you to decide how much weight to give to any
10   evidence, whether direct or circumstantial.

11         And don't make any decisions simply by counting the
12   number of witnesses who testified about a certain point.

13         What is important is how truthful and accurate the
14   witnesses were and how much weight you think their testimony
15   deserves.

16         Now, a defendant has an absolute right not to testify
17   or present evidence, as happened here.  You may not consider in
18   any way the fact that the defendant did not testify or present
19   evidence.  You should not even discuss it during your
20   deliberations.

21         Now, part of your job as jurors is to decide how
22   believable each witness was and how much weight to give each
23   witness's testimony.  You may accept all of what a witness says
24   or part of it or none of it.

25         Some of the factors you may consider include:  The

1  age of the witness; the intelligence of the witness; the

2  witness's ability or opportunity to see, hear, or know the

3  things the witness testified about; the witness's memory; the

4  witness's demeanor; whether the witness had any bias,

5  prejudice, or other reason to lie or slant the testimony; the

6  truthfulness and accuracy of the witness's testimony in light

7  of the other evidence presented; and inconsistent or consistent

8  statements or conduct by the witness.

9  I have a blank page there.  All of you do, too.  Just

10  skip it.

11  It is proper for an attorney to interview any witness

12  in preparation for trial.

13  Now, you have heard testimony of an identification of

14  a person.  Identification testimony is an expression of the

15  witness's belief or impression.  In evaluating this testimony,

16  you should consider the opportunity the witness had to observe

17  the person at the time and to make a reliable identification

18  later.  You should also consider the circumstances under which

19  the witness made the identification later.

20  The government must prove beyond a reasonable doubt

21  that the defendant is the person who committed the crime that

22  is charged.

23  Now, you have heard witnesses, namely, Aaron Zelin,

24  who gave opinions and testimony regarding the terrorist

25  organization ISIS and Mark Baggett who gave the opinion

1    testimony regarding computer terminology and the Python

2    computer programming language.  You do not have to accept these

3    witnesses' testimony -- these witnesses' opinions.  You should

4    judge the witnesses' opinions and testimony the same way you

5    judge the testimony of any other witness.  In deciding how much

6    weight to give to these opinions and testimony, you should

7    consider the witnesses' qualifications, how each reached his

8    conclusions, and the factors that I have described for

9    determining the believability of any testimony.

10           Now, you've heard recorded conversation and seen

11   video recordings.  This is proper evidence that you should

12   consider together with and in the same way you consider the

13   other evidence.

14           You were also given transcripts of the conversations

15   to help you follow the recordings as you listened to them.  The

16   recordings are the evidence of what was said and who said it.

17   The transcripts are not evidence.  If you noticed any

18   differences between what you heard in a conversation and what

19   you read in the transcripts, your understanding of the

20   recording is what matters.  In other words, you must rely on

21   what you heard, not what you read.  And if you could not hear

22   or understand certain parts of the recording, you must ignore

23   the transcript as far as those parts are concerned.

24           I am providing you with the recordings and a device

25   with instructions on how to use it.  It is up to you to decide

1    whether to listen to the recordings during your deliberations.
2    And you may, if you wish, rely on your recollections of what
3    you heard during the trial.
4            If, during your deliberations, you wish to have
5    another opportunity to view any of the transcripts as you
6    listen to a recording, please send a written message to the
7    court security officer, and I will provide you with the
8    transcripts of that recording.
9            Now, certain charts -- it's actually just one
10   chart -- were shown to you to help explain other evidence that
11   was admitted, specifically Government's Exhibit 721.  Charts
12   are not themselves evidence or proof of any facts, so you will
13   not have these particular charts during your deliberations, or
14   this particular chart, I should say.
15           Now, if you've taken any notes during the trial, you
16   may use them during your deliberations to help you remember
17   what happened during the trial.  You should use your notes only
18   as aids to your memory.  The notes are not evidence.  All of
19   you should rely on your independent recollection of the
20   evidence, and you should not be unduly influenced by the notes
21   of other jurors.  Notes are not entitled to any more weight
22   than the memory or impressions of each juror.
23           You have heard evidence obtained from the
24   government's use of online covert employees and a confidential
25   human source, the CHS.  The government is permitted to use

1  these techniques.  You should consider evidence obtained this

2  way together with and in the same way that you consider the

3  other evidence.

4          Now, the indictment charges that the crime happened

5  "on or about" particular dates.  The government must prove that

6  the crime happened reasonably close to those dates.  The

7  government is not required to prove that the crime happened on

8  the exact date.

9          In deciding your verdict, you should not consider the

10  possible punishment for the defendant.  If you decide that the

11  government has proved that the defendant is guilty beyond a

12  reasonable doubt, then it will be my job to decide on the

13  appropriate punishment.

14          Now, the indictment charges the defendant with

15  knowingly attempting to provide material support and resources,

16  namely, services, to a foreign terrorist organization, namely,

17  the Islamic State of Iraq and al Sham, which is also known as

18  ISIS, knowing that the organization was a designated foreign

19  terrorist organization or that the organization had engaged in

20  and was engaging in terrorist activity and terrorism.

21          In order for you to find the defendant guilty of this

22  charge, the government must prove both of the following

23  elements beyond a reasonable doubt:

24          First, that the defendant knowingly attempted to

25  provide material support or resources, namely services, to a

1    designated foreign terrorist organization, namely ISIS.

2         Second, that the defendant knew that ISIS was a

3    designated foreign terrorist organization, that ISIS engaged or

4    engages in terrorist activity, or that ISIS has engaged or

5    engages in terrorism.

6         If you find from your consideration of all the

7    evidence that the government has proved each of these elements

8    beyond a reasonable doubt, then you should find the defendant

9    guilty.

10        If, on the other hand, you find from your

11   consideration of all the evidence that the government has

12   failed to prove any one of those two elements, either of those

13   two elements, beyond a reasonable doubt, then you should find

14   the defendant not guilty.

15        Now, a person attempts to commit the crime of

16   providing material support to a foreign terrorist organization

17   if he, first, knowingly takes a substantial step toward

18   providing material support to a foreign terrorist organization;

19   and second, with the intent to provide material support to a

20   foreign terrorist organization.  The substantial step must be

21   an act that strongly corroborates that the defendant intends to

22   carry out the crime of attempting to provide material support

23   to a foreign terrorist organization.

24        I have another blank page.  I'm on page 21 for those

25   of you who may have had a blank page in there.

1    Now, as explained above, you must find beyond a

2    reasonable doubt that the defendant knew that the Islamic State

3    of Iraq and al Sham, also known as ISIS, and the Islamic State,

4    was a designated foreign terrorist organization or had engaged

5    or was engaging in terrorist activity or terrorism.

6    The term "foreign terrorist organization" has a

7    particular meaning under this statute.  In order for an

8    organization to qualify as a foreign terrorist organization,

9    the organization must have been designated as such by the

10   Secretary of State through a process established by law.  I am

11   instructing you that as a matter of law ISIS has been

12   designated a foreign terrorist organization by the United

13   States Secretary of State.

14   The term "terrorist activity" means any activity

15   that, if it had been committed in the United States, would have

16   been unlawful under the laws of the United States or any state

17   and that involves a threat, attempt, or conspiracy to use any

18   explosive, firearm, or other weapon or dangerous device (other

19   than for mere personal monetary gain), with the intent to

20   endanger, directly or indirectly, the safety of one or more

21   individuals or to cause substantial damage to property.

22   The term "terrorism" means premeditated, politically

23   motivated violence perpetrated against noncombatant targets by

24   subnational groups or clandestine agents.

25   The term "material support and resources" includes

1    any services.  The term "services" refers to concerted

2    activity, not independent activity.  Services provided as

3    material support to a foreign terrorist organization includes

4    advocacy or activity performed in coordination with or at the

5    direction of a foreign terrorist organization.  Independent

6    activity or advocacy, however, is not prohibited.

7            A person acts knowingly if he realizes what he is

8    doing and is aware of the nature of his conduct and does not

9    act through ignorance, mistake, or accident.  In deciding

10   whether the defendant acted knowingly, you may consider all the

11   evidence, including what the defendant did or said.

12           Now, you have heard a lot about the First Amendment.

13   So the First Amendment to our Constitution provides -- and I'm

14   quoting -- "Congress shall make no law respecting an

15   establishment of religion, or prohibiting the free exercise

16   thereof; or abridging the freedom of speech, or of the press;

17   or the right of the people peaceably to assemble, and to

18   petition the Government for redress of grievances."

19           Title 18, United States Code, Section 2339(B)(i), the

20   statute under which the defendant is charged in the indictment,

21   provides:

22           Nothing in this section shall be construed or applied

23   as to abridge the exercise of rights guaranteed under the First

24   Amendment to the Constitution of the United States.

25           Advocacy that is done independently of the terrorist

1   organization and not at its direction or in coordination with

2   it does not violate the statute.  Advocacy performed in

3   coordination with, or at the direction of, ISIS is not shielded

4   by the First Amendment.

5           Now, ladies and gentlemen, once you are all in the

6   jury room, the first thing you should do is to choose a

7   foreperson.  The foreperson should see to it that your

8   discussions are carried on in an organized way and that

9   everyone has a fair chance to be heard.  You may discuss the

10  case only when all jurors are present.

11          Once you start deliberating, do not communicate about

12  the case or your deliberations with anyone except other members

13  of the jury.  You may not communicate with others about the

14  case or your deliberations by any means.  And this includes

15  oral or written communications, as well as any electronic

16  method of communication -- we try to include everything here --

17  such as cell phone, smartphone, iPhone, Blackberry, if anybody

18  still uses a Blackberry, computer, text messages, instant

19  messaging, the internet, chat rooms, blogs, websites, or

20  services like Facebook, LinkedIn, YouTube, Instagram, Snapchat,

21  Twitter -- maybe we should include Telegram in that -- or any

22  other method of communication.  We try to include everything.

23          If you need to communicate with me while you're

24  deliberating, send a note through the court security officer,

25  who will be sitting right outside the courtroom.  The note

1 should be signed by the foreperson or by one or more members of

2 the jury.  And to have a complete record of the trial, it's

3 important that you do not communicate with me except by a

4 written note.  Please include the date and time on any such

5 note that you might send.  I may have to talk to the lawyers

6 about your message, so it may take some time to get back to

7 you.  You may continue your deliberations while you wait for

8 the answer.  Sometimes it takes a little while, so you can

9 continue deliberating.  Please be advised that transcripts of

10 the trial testimony are not available to you.  You must rely on

11 your collective memory of the testimony.

12         If you send me a message, do not include the

13 breakdown of any votes you may have conducted.  In other words,

14 don't tell me that you're split 6-6, 8-4, whatever it happens

15 to be.

16         I have another blank page here.

17         I'm on page 26 now.  Now, the verdict form has been

18 prepared to you, and you will take the form to your jury room.

19 In fact, each of you has a copy of the verdict form.  The only

20 one that has to be filled out is the one that the foreperson

21 will fill out.  It's the last page in the instructions that you

22 have here.  It's very simple.  This is a single-count

23 indictment, and it just says you have to find the defendant

24 guilty or not guilty.

25         When you make that decision, you'll check off whether

1   it's not guilty or guilty.  And then the foreperson and all the

2   rest of the jurors will sign it and -- when you've reached your

3   unanimous verdict.  And then you will all sign it.  You will

4   tell the court security officer you've reached a verdict.  And

5   you will come back to the courtroom, and I will read the

6   verdict aloud.

7           Now, ladies and gentlemen, the verdict must represent

8   the considered judgment of each juror.  Your verdict, whether

9   it is guilty or not guilty, must be unanimous.

10          You should make every reasonable effort to reach a

11  verdict.  And in doing so, you should consult with each other,

12  express your own views, and listen to your fellow jurors'

13  opinions.  Discuss your differences with an open mind.  Do not

14  hesitate to reexamine your own view and change your opinion if

15  you come to believe it is wrong.  But you should not surrender

16  your honest beliefs about the weight or effect of evidence just

17  because of the opinions of your fellow jurors or just so that

18  there can be a unanimous verdict.

19          The twelve people who will be on this jury should

20  give fair and equal consideration to all the evidence, and you

21  should deliberate with the goal of reaching an agreement that's

22  consistent with the individual judgment of each juror.

23          You are the impartial judges of the facts.  Your sole

24  interest is to determine whether the government has proved its

25  case beyond a reasonable doubt.

1    Now, ladies and gentlemen, you may take these back

2  into the jury room with you and have them when you deliberate.

3    This is always sort of a sad moment in any trial when

4  we have to identify the alternates who have been sitting

5  through this case and paying good -- paying attention, but we

6  have alternates just in case we lose somebody for whatever

7  reason it happens to be, as I explained earlier.  So it's

8  important that we do have alternates.

9    So our two alternates are Ms. Reyes and Mr. Morford.

10  So -- no, you can stay there just for now.

11    (Laughter.)

12    THE COURT:  Somebody is very anxious to get out.

13    I was going to ask each of you, if you would, after

14  you pick up your belongings in the jury room, to just stop by

15  my chambers because I'd like to thank each of you personally,

16  as I will thank all of the jury personally at the end of the

17  trial.

18    One other thing I want to say is, it's now 2:00.

19  It's Friday afternoon.  If you are still deliberating by 4:30,

20  you should knock off for the day.

21    We are way ahead of schedule.  We had told you

22  originally when you got your first communication from the

23  court, this could be a three- or four-week trial.  Thanks to

24  excellent lawyering on both sides of the case and a lot of

25  preparation by the Court and by the counsel, the trial was much

1    shorter than that.  So don't feel that you have to push forward

2    to reach a verdict today.  If you do, fine.  But it will have

3    to be by 4:30, because I have to leave here by 5:00 today.  And

4    then once you reach a verdict, then we have some business to

5    take care of.  So don't feel that you're -- that time is a

6    factor.  It's much more important to deliberate properly and to

7    give everybody a fair and impartial verdict here.

8          So just when you reach that 4:30 -- if you reach that

9    4:30 mark today, you can go home.  If you have a verdict by

10   then, we'll take the verdict.

11         At this time, I'm going to swear our courtroom deputy

12   in.  Mr. Marshal, do you solemnly swear or affirm that as

13   marshal in this case you will be in charge of this jury and

14   that you will provide a suitable place for their deliberations

15   and will suffer no one to speak to them until the verdict has

16   been reached?

17         COURT SECURITY OFFICER:  I do.

18         (Court security officer sworn.)

19         THE COURT:  Ladies and gentlemen, you are now a

20   deliberating jury.  If you do deliberate over the week -- if

21   you haven't reached a verdict -- we have a weekend coming up --

22   please remember what I always say.  Don't talk about the case.

23   Pretend that it just doesn't exist for the folks around you.

24   And when you come back, you can begin your deliberations on

25   Monday.  Any time you want to start is fine with us on Monday.

1    And any exhibits, we will -- Claire is always

2  reminding me of things.  We will be bringing the exhibits that

3  were introduced into evidence.  As I said, if you want to see

4  any of the transcripts as you're thinking about or listening to

5  any of the recorded information, just let us know, and we'll

6  bring those in as well.  All right.

7    THE CLERK:  All rise.

8    (Jury out.)

9    MR. JONAS:  Your Honor, can you let the alternates

10  know that they're still on call in case --

11    THE COURT:  I'm going to tell them that.

12    MR. JONAS:  Thank you, Judge.

13    THE COURT:  I will definitely tell them that.  You

14  don't mind if I tell them that off record, do you?

15    MR. JONAS:  No, that's totally fine.

16    THE COURT:  That's what I usually do when I talk to

17  them in chambers.

18    (Discussion off the record.)

19    MR. JONAS:  Your Honor, I'm sorry.  There's one other

20  quick thing.

21    Mr. Herman said a word during his closing that he

22  shouldn't say.  We're going to ask -- we'll make a motion to

23  have that word redacted from the transcript.

24    MR. HERMAN:  Yeah, and it was inadvertent.  I

25  apologize for any work for anybody else.  And obviously no

1    objection.

2              MR. JONAS:  We don't blame Mr. Herman at all.  We

3    fully expected Mr. Greenberg to have done it ten times by now.

4    Thank you, Judge.

5              THE COURT:  Good job.  Really great closing arguments

6    all around.

7              MR. JONAS:  Thank you, Judge.

8              THE COURT:  Make sure that we have your numbers,

9    because if we get a question, we usually get them quickly, and

10   we want to be able to get you back here as quickly as possible.

11             Are you going to stay in the building?

12             MR. GREENBERG:  We'll either stay in the building or

13   we're across the street, Judge.

14             THE COURT:  Yes.

15             MR. GREENBERG:  But we'll probably stay in the

16   building -- I think we're going to stay in the building for a

17   while.

18             THE COURT:  Okay.

19             MR. GREENBERG:  Yeah.

20             THE COURT:  And make sure we have your cell numbers.

21   Thanks again.

22             MR. GREENBERG:  Yes.

23             THE COURT:  Okay.

24             MR. GREENBERG:  Thank you.

25             (Adjournment at 2:00 p.m. until 9:30 a.m. on 10/18/2021.)

C E R T I F I C A T E

I, Nancy L. Bistany, certify that the foregoing is a complete, true, and accurate transcript from the record of proceedings on October 15, 2021, VOLUME NO. 7, before the HON. ROBERT W. GETTLEMAN in the above-entitled matter.

_/s/ Nancy L. Bistany, CSR, RPR, FCRR_                December 9, 2021

        Official Court Reporter                 Date
        United States District Court
        Northern District of Illinois
        Eastern Division