**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 CR 869 |
| | ) | Judge Robert W. Gettleman |
| THOMAS OSADZINSKI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S CONSOLIDATED POST-TRIAL MOTIONS
FOR JUDGMENT OF ACQUITTAL UNDER RULE 29
<u>OR, ALTERNATIVELY, FOR A NEW TRIAL UNDER RULE 33</u>**

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 1260
Chicago, Illinois 60604
(312) 879-9500
Steve@Greenbergcd.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 404
Chicago, IL 60614
(312) 909-0434
jherman@joshhermanlaw.com

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................... 6

    A.    The Indictment and the Attempted Material Support Charge, as
          Defined by the Government's Response to the Bill of Particulars Motion ............ 6

    B.    Defendant's First Amendment Motion to Dismiss ................................................. 7

    C.    Defendant's Motions *in Limine* ............................................................................ 11

    D.    The Trial ............................................................................................................... 11

        1)   Opening Statements ......................................................................................... 12

        2)   OCE1 ................................................................................................................ 13

        3)   OCE2 ................................................................................................................ 16

        4)   Mark Baggett .................................................................................................... 22

        5)   FBI Special Agent Mike Fee ............................................................................ 23

        6)   OCE3 ................................................................................................................ 24

        7)   Dr. Aaron Zelin ............................................................................................... 26

        8)   OCE4 ................................................................................................................ 34

        9)   CHS ................................................................................................................... 37

        10) FBI Special Agent Jacob Schaeffer ................................................................ 43

        11) Defense Oral Motion for Judgment of Acquittal ............................................. 44

        12) Jury Instructions Conference ........................................................................... 45

        13) Government Closing .......................................................................................... 45

        14) Defense Closing ................................................................................................ 50

        15) Government Rebuttal ........................................................................................ 52

        16) Jury Instructions ............................................................................................... 55

        17) Jury Deliberations and Verdict ........................................................................ 56

III. ARGUMENT ...................................................................................................... 57

    A.    The Court Should Order a Judgment of Acquittal Under Rule 29 ...................... 58

        1)   Legal Standards for Rule 29 Motion ................................................................ 58

        2)   The Government Failed to Prove Defendant Guilty  Beyond a
             Reasonable Doubt of Each of the Elements  Required for an
             Attempted Material Support Offense ................................................................ 60

i

a) Elements of the Attempted Material Support
Offense and Relevant Law...................................................................... 60

b) The Evidence Was Insufficient to Show that Defendant Acted or
Attempted to Act under the Direction of or in Coordination with
ISIS, Rather Than Engaging in Independent Advocacy and Activity. ................. 64

i. Defendant's Independent Advocacy and Activity.......................................... 64

ii. The Government Failed to Prove That Defendant
Attempted to Work Under the Direction of ISIS. ......................................... 67

iii. The Government Failed to Prove That Defendant
Attempted to Coordinate With ISIS. ............................................................ 71

iv. The Government's "Attempted" Material Support
Theory Nullifies Independent Advocacy and Abolishes
the Requirement of a Substantial Step. ........................................................ 74

c) The Evidence Was Insufficient to Convict Because Services Must
Be Provided (or Attempted) to the FTO, not a non-FTO. .................................... 76

d) A Judgment of Acquittal Should be Ordered Because Defendant
Was Convicted for Protected First Amendment Activity. .................................... 79

e) Defendant's Conviction Violates the Due Process Clause  Because
the Material Statute, As Applied, Was Vague and Failed to
Provide Requisite and Fair Notice. ....................................................................... 81

B. Alternatively, the Court Should Grant Defendant a New Trial Under Rule 33 ........... 83

1) Legal Standards for Rule 33 Motion................................................................... 83

2) Defendant is Entitled to a New Trial Because the Government's
Improper Closing Arguments Shifted the Burden of Proof. ................................ 83

a) The Prosecutor's Rebuttal Argument Impermissibly
Shifted the Burden of Proof to the Defense. ........................................................ 84

b) Other Courts Have Found Like Comments to
Constitute Impermissible Burden-Shifting. ......................................................... 90

c) The Prosecutor's Remarks Incurably
Affected the Fairness of the Trial. ....................................................................... 91

3) Defendant is Entitled to a New Trial Due to the Repeated Admission
and Display of Unduly Prejudicial and Irrelevant Videos and Images................. 94

4) Defendant Preserves His Pretrial Motions Denied by the Court. ........................ 99

5) Defendant is Entitled to a New Trial Based on Cumulative Error. ...................... 99

IV. CONCLUSION ........................................................................................................... 100

## TABLE OF AUTHORITIES

**CASES**

*Bernstein v. United States Dep't of State*, 922 F. Supp. 1426 (N.D. Cal. 1996) .......................... 87

*Brandenburg v. Ohio*, 395 U.S. 444 (1969).................................................................................. 81

*Boim v. Quranic Literacy Institute and Holy Land Foundation for Relief and Development*, 291 F.3d 1000 (7th Cir. 2002). .............................................. 10, 62, 64

*Chapman v. United States*, 500 U.S. 453 (1991).......................................................................... 92

*Coffin v. United States*, 156 U.S. 432 (1895)............................................................................... 89

*Coleman v. Johnson*, 132 S. Ct. 2060 (2012) .............................................................................. 59

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................................... 80

*Engle v. Isaac*, 456 U.S. 107 (1982)............................................................................................ 85

*Hill v. Colorado*, 530 U.S. 703 (2000) ........................................................................................ 80

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982)................................... 82

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .................................................... passim

*In re Winship*, 397 U.S. 358 (1970).................................................................................. 59, 89, 92

*Jackson v. Virginia*, 443 U.S. 307 (1979).................................................................................... 58

*Jones v. United States,* 526 U.S. 227 (1999) ............................................................................... 59

Michelson v. United States, 335 U.S. 469 (1948) ........................................................................ 96

*Neder v. United States,* 527 U.S. 1 (1999)................................................................................... 59

*People v. Walker*, 2017 WL 4015721; 2017 Mich. App. LEXIS 1424 (Mich. App. Sept. 12, 2017) ............................................................................................ 90

*Rand v. United States,* 2020 WL 1126182; 2020 LEXIS 39148 (W.D.N.C., Mar. 6, 2020) ............................................................................................... 85

*Reves v. Ernst & Young*, 507 U.S. 170 (1993).............................................................................. 61

*Sullivan v. Louisiana*, 508 U.S. 275 (1993)........................................................................... 89, 92

*Swinford v. Warden, Dayton Corr. Inst.*, 2012 WL 868979, 2012 U.S. Dist. LEXIS 33550 (S.D. Oh. Mar. 13, 2012). ...................................................... 90

*United States v. Adams*, 628 F.3d 407 (7th Cir. 2011) ................................................................ 91

*United States v. Allen*, 269 F.3d 842 (7th Cir. 2001).................................................................. 100

*United States v. Antzoulatos*, 962 F.2d 720 (7th Cir. 1992) ....................................................... 81

*United States v. Artus*, 591 F.2d 526 (9th Cir. 1979)................................................................... 84

*United States v. Berry*, 92 F.3d 597 (7th Cir.1996)..................................................................... 83

iii

*United States v. Bohle*, 445 F.2d 54 (7th Cir. 1971) ................................................................ 93

*United States v. Carter*, 236 F.3d 777 (6th Cir. 2001) ............................................................ 84

*United States v. Cassese*, 428 F.3d 92 (2nd Cir. 2005) .......................................................... 59

*United States v. Conley*, 942 F.2d 1125 (7th Cir. 1991) ........................................................ 60

*United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017) .......................................................... 82

*United States v. Delay*, 440 F.2d 556 (7th Cir. 1991) ............................................................ 60

*United States v. Diaz-Diaz*, 433 F.3d 128 (1st Cir. 2005) .................................................... 90

*United States v. Garcia*, 919 F.3d 489 (7th Cir. 2019) .......................................................... 59

*United States v. General Elec. Co.*, 869 F. Supp. 1285 (S.D. Ohio 1994) ............................ 59

*United States v. Gillaum*, 372 F.3d 848 (7th Cir. 2004) ........................................................ 83

*United States v. Gladish*, 536 F.3d 646 (7th Cir. 2008) ........................................................ 75

*United States v. Glover*, 558 F.3d 71 (1st Cir. 2009) ............................................................ 90

*United States v. Gorman*, 613 F.3d 711 (7th Cir. 2010) ........................................................ 95

*United States v. Howard*, 179 F.3d 539 (7th Cir.1999) .......................................................... 58

*United States v. Inglese*, 282 F.3d 528 (7th Cir. 2002) .......................................................... 83

*United States v. Johnson*, 875 F.3d 360 (7th Cir. 2017) ........................................................ 82

*United States v. Jones*, 689 F.3d 696 (7th Cir. 2012) ............................................................ 81

*United States v. Jones*, 713 F.3d 336 (7th Cir. 2013) ...................................................... 59, 65

*United States v. Katz*, 582 F.3d 749 (7th Cir. 2009) .............................................................. 65

*United States v. Lawson*, 653 F.2d 299 (7th Cir. 1981) ........................................................ 93

*United States v. Lindh*, 212 F. Supp. 2d 541 (E.D. Va. 2002) .............................................. 62

*United States v. Maras*, 940 F.2d 91 (2nd Cir. 1990) ............................................................ 84

*United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013) ........................................................ 94

*United States v. Miller*, 761 F. Supp. 1368 (S.D. Ind. 1991) ................................................ 60

United States v. Moccia, 681 F.2d 61 (1st Cir.1982) .............................................................. 96

*United States v. Mohanad Hammadi*, 737 F.3d 1043 (6th Cir. 2013) .................................... 76

*United States v. Moore*, 115 F.3d 1348 (7th Cir. 1997) ........................................................ 59

*United States v. Muller*, 819 Fed. Appx. 701 (11th Cir. 2020) .............................................. 84

*United States v. Muscarella*, 585 F.2d 242 (7th Cir. 1978) .................................................. 92

*United States v. Nagi*, 254 F. Supp. 3d 548 (W.D.N.Y. 2017) .............................................. 80

*United States v. Phillips*, 527 F.2d 1021 (7th Cir. 1975) ...................................................... 83

*United States v. Powell*, 652 F.3d 702 (7th Cir. 2011) ............................................................ 100

*United States v. Reed*, 875 F.2d 107 (7th Cir. 1989) ................................................................ 83

*United States v. Roberts*, 119 F.3d 1006 (1st Cir. 1997) ........................................................... 90

*United States v. Rodrigues*, 159 F.3d 439 (9th Cir. 1998) ......................................................... 84

*United States v. Saint Louis*, 889 F.3d 145 (4th Cir. 2018) ....................................................... 84

*United States v. Sanchez*, 615 F.3d 836 (7th Cir. 2010) ........................................................... 59

*United States v. Seals*, 419 F.3d 600 (7th Cir.2005) ................................................................ 96

*United States v. Simpson*, 479 F.3d 492 (7th Cir. 2007) ........................................................... 96

*United States v. Skandier*, 758 F.2d 43 (1st Cir. 1985) ............................................................ 90

*United States v. Van Allen*, 524 F.3d 814 (7th Cir. 2008) ......................................................... 99

*United States v. Vargas*, 583 F.2d 380 (7th Cir. 1978) ............................................................. 83

*United States v. Washington*, 184 F.3d 653 (7th Cir. 1999) ...................................................... 83

*United States v. Wihbey,* 75 F.3d 761 (1st Cir. 1996) ........................................................... 90, 91

*United States v. Williams*, 553 U.S. 285 (2008) ..................................................................... 82

*United States v. Wolfe*, 701 F.3d 1206 (7th Cir. 2012) ............................................................. 91

*United States v. Wright*, 937 F.3d 8 (1st Cir. 2019) ........................................................... passim

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001) ......................................... 80

*Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000) ............................................................ 84

**STATUTES**

18 U.S.C. §2339B(a)(1) .......................................................................................... passim

18 U.S.C. §2339B(i) ............................................................................................... 8, 70

**RULES**

Federal Rule of Criminal Procedure 29 ............................................................... 1, 5, 58

Federal Rule of Criminal Procedure 33 .................................................................... 1, 5

**OTHER SOURCES**

Government Merits Brief, *Holder v. Humanitarian Law Project*, Case No. 08-1498 ....... 2, 61, 76

v

Kasey A. Feltner, *Swipe Right for ISIS:  Social Media and Material Support to Foreign Terrorist Organizations*, 26 B.U. Pub. Int. L.J. 95 (2017) .................................. 72, 75

*Kathy Gannon*, The AP Interview:  Taliban pledge all girls in schools soon, Associated Press, Jan. 15, 2022 ................................................................................ 5

Norman Abrams, *A Constitutional Minimum Threshold for the Actus Reus of Crime? MPC Attempts and Material Support Offenses*, 37 Quinnipiac L. Rev. 199 (2019) ............... 75

*Taliban spokesperson defends Afghanistan government's actions*, DW News, Jan. 4, 2022......... 5

Defendant, **THOMAS OSADZINSKI**, by and through his attorneys, **STEVEN A. GREENBERG** and **JOSHUA G. HERMAN**, and pursuant to Federal Rule of Criminal Procedure 29, respectfully moves the Court for the entry of an order granting a judgment of acquittal. In the alternative, Defendant moves for a new trial pursuant to Federal Rule of Criminal Procedure 33.

I.  **INTRODUCTION**

In this country you can support a terrorist organization, advocate on behalf of a terrorist organization, and even be a member of a terrorist organization. What you cannot do is provide material support to the organization, but only if you are acting under the direction of or in coordination with the organization. Put another way, the category of prohibited activities is limited to engaging in certain conduct only when that conduct is done at the specific direction of the terrorist organization or in concert with the organization. The evidence at Defendant Thomas Osadzinski's trial showed that he expressed support for ISIS, a designated foreign terrorist organization; he sympathized with its viewpoints; he wanted to share his understanding of its philosophies as well as its media; and he, on his own and without anyone from the organization telling him to do so, modified a computer script that could be used to copy, forward, and organize pro-ISIS videos on the Internet. There was, at worst, evidence he supported a terrorist organization's viewpoints, defended the terrorist organization, and advocated for the terrorist organization. None of that was illegal.

Because Defendant did not attempt to act at the direction of ISIS or in coordination with it, it is not surprising that the government failed to present evidence of anyone telling him what to do, anybody giving him any instructions on what to do, or any communications with ISIS whatsoever. Instead, and at best, the government's proof of "direction" boiled down to clips from publicly available ISIS videos that it argued Defendant viewed, and its evidence of "coordination"

1

involved Defendant's communications with "unofficial" non-terrorist organizations, not ISIS itself. This evidence fell woefully short of proof beyond a reasonable doubt as to the critical elements of direction and coordination, and instead rested on impermissible speculations. More importantly, the government's evidence failed to show that Defendant modified the computer script—the specific "services" at issue—in concert with ISIS or under its direction. Nor could it. The evidence indisputably shows he did so independently.

The fact that his actions are legal is supported by both the decision of *Holder v. Humanitarian Law Project* and the government's position when the case was argued. There, Justice Elena Kagan, in her role as Solicitor General, wrote in the government's Supreme Court merits brief, that "Congress did not prohibit individuals from joining terrorist groups, expressing solidarity with them, or even inciting others to engage in terrorist conduct," and that "[t]he material support statute is not reasonably read to cover—and in the face of any constitutional doubt should not be read to cover—independent advocacy." *See* Case No. 08-1498, Govt. *HLP* Merits Brief, pp. 14-15; p. 54.[1] The Supreme Court agreed when it held that for "services" to amount to material support, they must involve "concerted activity, not independent advocacy." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 23 (2010) ("HLP"). *See id*., at 24 ("We interpret 'service' along the same lines. Thus, any independent advocacy in which plaintiffs wish to engage is not prohibited by §2339B. On the other hand, a person of ordinary intelligence would understand the term "service" to cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization.").

Completely contrary to *HLP*, Defendant was convicted of attempting to provide material support under 18 U.S.C. §2339B(a)(1) for his independent advocacy and activity. He was not

---

[1] The government's Supreme Court merits brief in *Holder v. Humanitarian Law Project* is available at: https://bit.ly/3GAzMxi (last visited Jan. 17, 2022) ("Govt. *HLP* Merits Brief").

convicted for attempting to provide material support to ISIS in the form of "services" as *HLP* defined the term. Rather, he was doing exactly what the government and the Supreme Court in *HLP* agreed was permitted. At trial, the evidence showed, that the "services" were shared with groups not designated as foreign terrorist organizations. Further, the evidence showed that Defendant never tried to provide any "services" *to* ISIS at the invitation and request of the government operatives, who gave him multiple opportunities to do so. Thus, Defendant was convicted because he may have provided lawful services to non-terrorist organizations. The government's arguments at Defendant's trial effectively abdicated the position it took before the Supreme Court, where it repeatedly asserted that the material support statute was not unconstitutionally ambiguous *because* the statute required the services to be provided to the foreign terrorist organization. As a consequence, Defendant was convicted of supporting ISIS, not for providing material support to ISIS. The difference is glaring. The government's extraordinarily broad position asserted at Defendant's trial tacitly renounces its prior assertion to the Supreme Court that the statute requires a "direct relationship" with the FTO, and will inevitably sweep up innocent conduct, as it did here.

Defendant's conviction also rested on evidence of his attempted coordination with the strategies and goals of ISIS, not with the organization itself. Such evidence is insufficient to sustain a conviction. *See United States v. Wright*, 937 F.3d 8, 29 (1st Cir. 2019), *cert. denied*, 140 S. Ct. 1283, 206 L. Ed. 2d 264 (2020) (finding non-harmless constitutional error because the jury instruction on coordination could not "be read to say that 'coordination' must be with the terrorist organization itself rather than with the organization's strategy and tactics, if merely publicly available."). Supporting the goals of ISIS and sympathizing with its goals and philosophies squarely falls within the lawful realm of independent advocacy and activity.

3

The fact that the terrorist organization may find it convenient or encourage people to advocate independently for it and support its goals does *not* mean that people do so at its direction or in coordination with it. To think otherwise would completely gut *HLP* by verdict. If the government's theory is allowed to stand, then no one could lawfully express solidarity with an organization, as the government could argue that the mere fact the organization said that it wanted people to express their support was enough to demonstrate direction or coordination. This vague theory would extinguish independent advocacy.

Moreover, the government's theory effectively used the "attempt" charge to nullify the constitutionally vital safe harbor of "independent advocacy" and avoid proving a "substantial step" that can be meaningfully distinguished from protected activity. The government used Defendant's protected speech and independent advocacy as evidence of his "substantial step" to provide material support. Treating "independent advocacy" as an "attempt to support" criminalizes constitutionally protected First Amendment activity. A conviction based on that evidence and theory cannot stand, and is in direct contravention of the explicit statutory safe harbor, which provides that nothing in the material support "shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." 18 U.S.C. §2339B(i). In *HLP*, the Supreme Court anticipated that future applications of the material support statute could violate the First Amendment when it stated:

> All this is not to say that any future applications of the material-support statute to speech or advocacy will survive First Amendment scrutiny. It is also not to say that any other statute relating to speech and terrorism would satisfy the First Amendment. In particular, we in no way suggest that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations. … We simply hold that, in prohibiting the particular forms of support that plaintiffs seek to provide to foreign terrorist groups, § 2339B does not violate the freedom of speech.

*HLP*, 561 U.S. at 39. The Supreme Court limited its holding in *HLP* to the "particular forms of support that plaintiffs seek to provide to foreign terrorist groups," which involved direct face-to-face instruction with members of the terrorist organizations. *Id*. The prosecution, and now conviction, of Defendant's expressive conduct is precisely the "future application" of the material support statute that does not survive First Amendment scrutiny, especially because the use of the "attempt" charge is used to abolish "independent advocacy."

Consequently, because the evidence at trial was insufficient to prove Defendant guilty of attempting to provide material support to ISIS, the Court should grant his motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. If allowed to stand, the government's expansive, content-based theory exposes a wide-range of protected conduct to prosecution as terrorism offenses such as interviewing a Taliban spokesperson on current affairs in Afghanistan (and perhaps even forwarding a video of the interview);[2] creating, selling, or wearing an IRA t-shirt readily available for purchase online;[3] or hosting a repository of jihadi material online, not to mention the largest material repository, Jihadology.[4] Each of these actions no doubt publicize the foreign terrorist organizations and amplify their messages, which the organizations no doubt want and appreciate. But they are also done independently and are clearly lawful.

---

[2] *See Taliban spokesperson defends Afghanistan government's actions*, DW News, Jan. 4, 2022 (available at: https://bit.ly/33SJBrG) (last visited Jan. 20, 2022); *Kathy Gannon*, The AP Interview: Taliban pledge all girls in schools soon, Associated Press, Jan. 15, 2022 (available at: https://bit.ly/33C71lx) (last visited Jan. 20, 2022).

[3] *See* https://amzn.to/33Slvh1.

[4] *See* Jihadology.net (available at: https://jihadology.net/) (last visited Jan. 20, 2022); *see also* Jihadology.net, "New video message from The Islamic State: 'The Structure of the Caliphate'", July 6, 2016 (available at: https://bit.ly/3nJki2u) (last visited Jan. 20, 2022); Jihadology.net, "New video message from The Islamic State: 'Inside the Caliphate #8'", Oct. 30, 2018 (available at: https://bit.ly/3qJwh1L) (last visited Jan. 20, 2022).

In the alternative, errors at trial justify relief pursuant to Federal Rule of Criminal Procedure 33. Namely, the government's rebuttal closing argument created significant and prejudicial burden-shifting problems when it listed ten (10) facts that the jury needed to find in order to acquit Defendant. Not only was this argument improper on its face, but the facts the government highlighted bore no relation to the elements of the offense. Moreover, the government's repeated introduction of inflammatory and prejudicial videos over the defense's objections were unduly prejudicial, particularly given the actual elements of the offense.

## II.    BACKGROUND

### A.  The Indictment and the Attempted Material Support Charge, as Defined by the Government's Response to the Bill of Particulars Motion

On November 18, 2019, Defendant was arrested and charged in a Criminal Complaint with attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. §2339B. (Dkt. 1). On December 12, 2019, the grand jury returned a one-count indictment, which charged Defendant with attempting to provide material support to a foreign terrorist organization, ISIS, in violation of 18 U.S.C. §2339B(a)(1). (Dkt. 16).

The Indictment alleges only that beginning "no later than in or about June 2018 and continuing until in or about November 2019" Defendant "knowingly attempted to provide material support and resources, namely, services, to a foreign terrorist organization, namely, the Islamic State of Iraq and al Sham, knowing that the organization was a designated foreign terrorist organization, and that the organization had engaged in and was engaging in terrorist activity and terrorism." (Dkt. 16). The Indictment does not provide facts or further clarification regarding the "material support or resources" and "services" that Defendant allegedly provided.

On April 12, 2021, Defendant moved for a Bill of Particulars. (Dkt. 71). Defendant specifically sought the following particulars:

1. Identify with specificity all the alleged "material support resources" that Defendant attempted to provide to ISIS (Indictment, Count One); and,

2. Identify with specificity the alleged "services" that Defendant attempted to provide to ISIS. (Indictment, Count One)

(Dkt. 71, p. 10). On June 28, 2021, the government opposed providing a Bill of Particulars but effectively described the "material support" and "services" as follows:

> The services the defendant attempted to provide to ISIS are the creation or modification of computer code or script, which he used in conjunction with channels established on the Social Media Application Telegram. The code was designed to copy ISIS propaganda material from Telegram channels containing the material to the Telegram channels he created. The services included, as part of the same course of conduct, the defendant's distribution and demonstration of the code to others whom he believed were members of unofficial ISIS media organizations, as well as other ISIS supporters.
>
> The defendant's services included the creation or modification of the code, the establishment of Telegram channels in which to utilize the code, the distribution of the code to others in order to spread the ability to preserve ISIS videos, and efforts to divert law enforcement's attention in order to protect the code and the Telegram channels from law enforcement interference. The defendant's purpose was to preserve ISIS material that was being deleted from the internet by Telegram, thereby thwarting ISIS's attempt to both recruit and terrorize online. The defendant was attempting to assist ISIS in perpetuating their message by circumventing Telegram's efforts. The defendant's distribution of the code or script was not done with a benign purpose of sharing the material but was done with the intent to propagate his efforts by others. The more people who followed his lead and used his code, the harder it would be for Telegram to remove the material from the internet.

(Dkt. 85, pp. 17-18). Notably, the filing was silent as to any "direction or control."

**B. Defendant's First Amendment Motion to Dismiss**

Among other pretrial motions, Defendant filed a pleading entitled, "Motion to Dismiss Indictment for Vagueness and Unconstitutionality as Applied to Defendant Under the First and Fifth Amendments." (Dkt. 65). The Motion argued that the computer script that underpinned the

government's "services" theory was itself "a form of speech and expression that is entitled to First Amendment protection." (*Id*, pp. 1-2). The Motion further asserted that the material that Defendant organized, saved, and viewed "also has intrinsic First Amendment value, no matter how offensive and distasteful the government may find that material to be, and no matter how sincerely the government believes that it can censor online expression, including content that it deems contrary to its interests of national security." (*Id*., p. 2). Given the strong First Amendment interests at stake, Defendant argued that the government's prosecution was also in contravention with the statutory safe harbor set forth in 18 U.S.C. §2339B(i). (*Id*., p. 3). Additionally, the charge was unconstitutionally vague as applied to Defendant in violation of his Fifth Amendment rights, because "a reasonable person would not know that independently downloading, organizing, and even sharing ISIS-related videos with others is an act of terrorism." (*Id.*, p. 3). The Motion also warned that the government's theory could result in the "chilling of protected First Amendment expression" that "could easily lead to the prosecution and perhaps persecution of disfavored viewpoints and groups." (*Id*., p. 4).

In its Response, the government argued that Defendant did not intend to operate as an independent advocate for ISIS but instead attempted to coordinate with it and to "commit 'media jihad'" on its behalf. (Dkt. 83, p. 2). It argued that the term "service" was not ambiguous because it "must prove that the defendant engaged in a 'concerted activity, not independent activity,' to a foreign terrorist organization, that was done in coordination with, or at the direction of, a FTO, or at least attempted to do so.'" (Dkt. 83, p. 5 (quoting *HLP*, 561 U.S. at 23-24)). The government also argued that Defendant "intended to prevent ISIS propaganda videos from being removed from the internet" and, was not acting as an independent advocate, "but instead considered himself one

with the organization and offered to provide assistance to the FTO" to commit "media jihad." (Dkt. 83, p. 5).

On July 27, 2021, Defendant submitted his Reply in support of his Motion to Dismiss. In that pleading, Defendant emphasized how the government's arguments conflated "FTOs and non-FTOs," which "highlight[ed] the incurable vagueness problems with the term 'services.'" (Dkt. 90, pp. 1-2). The Reply reiterated the broad implications of the government's prosecution theory and the risk posed to those who legally espoused or even merely sought to learn more about disfavored and unpopular viewpoints. (*Id*., p. 3). Defendant's Reply also noted that the quasi-Bill of Particulars provided by the government did not cure the vagueness of the term "services." Instead, the government's arguments broadened the term "services" to include conduct provided to non-FTOs, when the statute required the services be provided to the FTO. (*Id*., pp. 5-6). The government's theory and its focus on non-FTOs exacerbated the vagueness problems. (*Id.*, p. 7) ("In other words, violation of the material support statute requires the provision of services to the FTO, and not to some non-FTO entities and individuals such as the "unofficial ISIS media organizations" and the "ISIS supporters." Thus, the Bill of Particulars creates even more uncertainty and fair notice problems by raising the possibility that services provided to a non-FTO could violate the material support statute."). Defendant explained that specific examples cited by the government as indicative of his desire to help ISIS was in in reference to other, non-FTO entities, which highlighted the vagueness problems with the prosecution. (*Id*., pp. 13-16); *id*. p. 17 ("Thus, this is another instance highlighting the vagueness of the term "services" as applied in this case as a reasonable person would not know that wanting to communicate with a non-FTO could violate the material support statute."). Thus, even sharing the script to ISIS supporters (as opposed to members) would not be an "attempt to coordinate with or work under the direction of

ISIS." (*Id.*, p. 20). Defendant also repeated his arguments regarding the inherent First Amendment protections extended to the videos and materials that the script copied as well as in the script itself. (*Id.*, pp. 21-23).

The Court denied Defendant's Motion to Dismiss on July 29, 2021. (Dkt. 93). In rejecting the Defendant's vagueness arguments, the Court reasoned that the Criminal Complaint and Indictment alleged that "defendant's conduct of creating a computer script to prevent ISIS videos from being deleted, and translating ISIS videos into English for pro-ISIS media organizations," which "clearly constituted 'concerted activity.'" (Dkt. 93, p. 3). The Court concluded that the Indictment alleged that Defendant intended to "perform a valuable service for ISIS" because he "believed his computer skills would provide a service to ISIS by helping them preserve videos that defendant knew were used to recruit members and to intimidate civilians." (*Id.*, p. 4). It further observed that Defendant desired to preserve videos "for 'brothers' who support ISIS." (*Id.*). According to the Court, these and other facts "demonstrate that defendant intended to act as a part of the organization and for the organization's benefit, not merely as an independent advocate." (*Id.*). Regarding the Defendant's arguments targeted at the distinction between non-FTOs and ISIS, the FTO, the Court only noted that the material support statute has been applied in situations where defendants did not interact with actual FTO members. (*Id.*, p. 5, footnote 3).

With regard to the First Amendment arguments, the Court correctly noted that when material support is in the form of speech, the statute covers only the narrow category of speech done at the direction of or in coordination with the FTO. (Dkt. 93, p. 5). It observed how one can become a member of an FTO; praise the FTO for its use of terrorism; and "vigorously advocate the goals and philosophies" of the FTO without violating the statute. (*Id.*, pp. 5-6) (quoting *Boim v. Quranic Literacy Institute and Holy Land Foundation for Relief and Development*, 291 F.3d 1000, 1026 (7th Cir. 2002)). Yet, the Court reasoned that Defendant's conduct did not constitute speech

because the computer script "prevented ISIS videos from being deleted" and thus "benefitted the FTO by quickly and efficiently re-uploading videos, operating at a speed and scale much greater than could any one individual. The scale and sophistication of this script transforms his conduct from an individual expressing an opinion, to providing a service to an FTO." (Dkt. 93, p. 6).

### C. **Defendant's Motions *in Limine***

Relevant to the arguments set forth below, Defendant filed various motions *in limine* before and in trial. *See* Dkt. 107 ("Defendant's Motion *in Limine* Concerning the Government's Preliminary Exhibit List"); Dkt. 135 ("Defendant's Second Motion to Prohibit Cumulative Prejudicial Evidence"). Those motions were largely designed to prevent the introduction of unduly prejudicial and irrelevant videos and images. The motions emphasized that evidence was not needed to prove the disputed elements of the offense—namely the question of direction and coordination as opposed to independent advocacy—and would instead serve to inflame the jury. The Court largely denied the motions,[5] but instructed the government not to display particularly gruesome images to the jury. Relatedly, Defendant also moved to preclude government witness "OCE1" from testifying based on relevancy and prejudice grounds. Dkt. 126. The defense argued that OCE1 would not offer any testimony about the charged conduct, specifically the computer script, but would instead be used to introduce unduly prejudicial and irrelevant evidence concerning a "Weapons" chatroom and a discussion of weapons, even though Defendant did not conduct any acts of violence. The Court denied the motion.

### D. **The Trial**

The case proceeded to jury trial on October 4, 2021. During the trial, the government called four individuals with whom Defendant interacted online, not knowing they were FBI operatives.

---

[5] The Court agreed with the defense that one specific exhibit related to 9-11 should be precluded based on the trial's proximity to the 20th anniversary of the attacks.

These witnesses were online covert employees, or "OCEs." For each OCE witness, the government introduced a binder containing screenshots of their electronic communications with Defendant. Those electronic communications primarily occurred on Telegram. The government called a confidential human source who met with Defendant for in-person meetings between February 2019 and November 2019. The government also introduced as evidence a binder containing the electronic communications between Defendant and the CHS, as well as recordings of their seven in-person meetings. Two other FBI agents testified: one provided information about items recovered during a search of Defendant's apartment and his phone and the other testified about Defendant's arrest on November 18, 2019. The government called two experts: Mark Baggett testified as an expert in the Python computer programming language and Aaron Zelin testified as an expert on ISIS. The defense did not put on any witnesses. The jury returned its verdict on October 18, 2021.

### 1) **Opening Statements**

In its opening statement, the government asserted that when Defendant referenced doing "jihad in media" he meant "I do battle for ISIS in media." (Vol. 1, p. 14:15-17). The government previewed that those words "are at the center, at the core of the government's case and the core of the conduct you'll be asked to consider over the course of this trial." (Vol. 1, p. 14:18-21). The government stated that Defendant "applied a computer process … to organize, copy, save, and ultimately, in his own words, spread everywhere ISIS propaganda." (Vol. 1, p. 14:23-25, p. 15:1). That computer process was the "service" that Defendant attempted to provide to ISIS. (Vol. 1, p. 15:2-5). In its opening statement, defense also previewed the First Amendment issues that would be raised during the course of trial. (Vol. 1, p. 21:18-22). The defense also noted that there would

be no evidence that Defendant said, "I do battle for ISIS in media" (Vol. 1, p. 22:20-22) and that the evidence would instead show that he acted as an independent advocate.  (Vol. 1, p. 26:20-21).

### 2) **OCE1**

The government's first witness was OCE1 who testified under the name Muhammad Hazeem.  (Vol. 1, p. 27).  In addition to working as an OCE, he was also worked as an FBI language analyst.  (Vol. 1, p. 28:4-5).  In that role, he "scour[s] social media and to find people who are planning or discussing acts of terrorism against the United States" (Vol. 1, p. 28:13-15) and specifically investigates "ISIS-inspired groups."  (Vol. 1, p. 29:11).  To do so, he purports to be a sympathizer and supporter of ISIS, but not as a member of ISIS.  (Vol. 1, p. 29:14-15; p. 77:23-25; p. 78:1-3). OCE1 explained that he encountered an online user named "K-Star," later determined to be Defendant, in a "Weapons" chatgroup in the online social media application Telegram. He explained that Defendant posted "a recipe" for TATP, an explosive material, and asked if anyone had a video guide for it.  (Vol. 1, p. 32:19-21; p. 34:2-3).

OCE1 explained that he interacted with Defendant on only two dates:  June 6, 2018 and June 29, 2018. (Vol. 1, p. 77:23-25; p. 78:1-8).  After seeing Defendant's TATP post in the online "Weapons" room, OCE1 had private and direct communications with Defendant.  (Vol. 1, p. 37:6-7).  He said that Defendant used an emoji representing the "Finger of Tawhid" and wrote "jihad," which he associated to mean "fighting for the Islamic State." (Vol. 1, p. 39:2-7; p. 40:19-21).  On cross-examination, he acknowledged that Defendant never said, "fighting for ISIS."  (Vol. 1, p. 80:18-22).

 OCE1 introduced the idea of a "target" during the chat when he said, "But akhi you really have to pick and choose your target carefully even in dar al harb so not to harm innocent Muslims especially now that Ramadan is coming to an end soon." (Vol. 1, p. 43:9-13).  On cross-

13

examination, OCE1 admitted that he was the first one to use the word "target." (Vol. 1, p. 85:20-23). OCE1 repeatedly asked questions such as what Defendant is "going to do about it," which were designed to elicit information about any plans for violence. (Vol. 1, p. 45:12-15).

OCE1 also asked Defendant if he knew "much about computers and internet security?" Defendant responded that he is "in the top school for computers trying my best. In a few years insha'Allah I will be very skilled." (Vol. 1, p. 47:18-22). Defendant said that he could "help many brothers" and knew about security issues, which OCE1 interpreted to mean that Defendant was offering his computer skills to "brothers." (Vol. 1, p. 48:1-17). OCE1 then introduced the term "diwan," which is the ISIS media bureau, when he wrote to Defendant, "When you are ready and if you are really serious about meeting like minded brothers in your country, I can start to talk to the diwan here and see if they want to help you." (Vol. 1, p. 48:19-24). In response, Defendant said "I have much learning to do. InshaAllah in the near future." (Vol. 1, p. 49:15-16).

After the online chat moved to another social media application at the request of OCE1 (Vol. 1, p. 50:18), Defendant said that he did not want his contact information shared because he was being watched by the FBI. (Vol. 1, p. 54:10-12). OCE1 wrote that he would be in touch again for more chatting, and Defendant replied, "It might be a long time." (Vol. 1, p. 54:19-21). OCE1 asked Defendant to share books he downloaded from the Weapons group, but Defendant never did. (Vol. 1, p. 55:8-11; p. 96:17-20).

OCE1 next contacted Defendant on Telegram on June 29, 2018, "to see what – how much he progressed with his plans," as he put it. (Vol. 1, p. 57:4-7). On cross-examination, OCE1 admitted that he did not know whether Defendant had actual plans, but that he would not have waited 23 days to contact him if Defendant actually had plans for violence. (Vol. 1, p. 99:2-11). Regardless, Defendant never reached out to OCE1 before OCE1 initiated this contact. Defendant

14

told OCE1 that he has "to stay passive for now" because the FBI was still watching him. (Vol. 1, p. 57:9-10). Defendant also said that he could not got into contact with the "brothers. (Vol. 1, p. 57:23-24). OCE1 still insisted, and wrote, "Let me help you akhi." (Vol. 1, p. 57:25). The government introduced pages of chats discussing obtaining weapons, such as knives and guns. (Vol. 1, pp. 61-65). Defendant told OCE1 that he was too young to buy a gun, and would have to wait two years.

On cross examination, OCE1 acknowledged that all of the discussion was anonymous, and that he could not identify Defendant in the courtroom, and could not determine if he was serious. (Vol. 1, p. 73:6-8, 23-25; p. 74:1). He also acknowledged that people had a First Amendment right to say provocative things, including things that made them sound dangerous. (Vol. 1, p. 74:24-25; p. 75:1-11). OCE1 agreed that Defendant often brought up reasons to delay, including not being skilled at computers. (Vol. 1, p. 82:2-8; p. 90:11-19). He also admitted that when Defendant said "trusted brothers" he did not say ISIS. (Vol. 1, p. 90:20-25; p. 91:1-6). Additionally, OCE1 agreed that he was the first person to say "diwan," and thus suggest providing help to ISIS, and that Defendant's response was only, "I have much learning to do" and "maybe" in the future, including when OCE1 asked Defendant if he was "really serious." (Vol. 1, p. 92:25; p. 93:2-17). When OCE1 again asked Defendant if he was "really serious," Defendant responded, "I will let you know when. It might be a long time." (Vol. 1, p. 95; 5-15). But Defendant never asked OCE1 to be connected to someone in the Diwan. (Vol. 1, p. 96:5-11). OCE1 further admitted that despite the discussion about weapons, including explosive belts, and targets, OCE1 never tried to contact Defendant after the June 29, 2018, chat. (Vol. 1, p. 128:3-13). OCE1 also acknowledged that Defendant never talked about copying videos with a computer code. (Vol. 1, p. 105:18-25; p. 106:1-10).

### 3) **OCE2**

OCE2 testified under the name "Jack Rodgers." (Vol. 1, p. 130:24). OCE2 said he was with the FBI for 13 years, and a special agent for 5 years. Before becoming a special agent, he was a linguist. (Vol. 1, p. 132:13-22). He specialized in counterterrorism as part of a squad that "specializes in terrorist use of the internet." (Vol. 1, p. 132:24; 133:5). OCE2 explained that his unit uses a paid source who "try to position him or herself in a place where they're likely to, as I said before, encounter activities suggestive of terrorism or support for terrorism." (Vol. 1, p. 134:3-5). OCE2 said that he was the handler for another CHS, who originally communicated with Defendant before OCE2 himself took over the communications around May 19, 2019. The communications all took place on Telegram. (Vol. 1, p. 136:1-11; p. 137:18-21; 138:1-5, 23-25; p. 139:1-4; Vol. 2, p. 253:1-3).

These communications began on February 7, 2019, when Defendant contacted Organization 1. (Vol. 1, p. 139:19-24). OCE2 described Organization 1 as "a pro-ISIS online publishing group which specializes in providing instructional material related to IEDs and toxins primarily to would-be attackers, plotters." (Vol. 1, p. 140:2-4). OCE2 said that Organization 1 advertised itself in Telegram rooms and elsewhere, and that is how Defendant contacted Organization 1. (Vol. 1, p. 142:4-17). After Defendant contacted Organization 1 through an advertisement, the CHS responded. (Vol., 1, p. 142:15-17; 144:16-25).

OCE2 then described an article written in the magazine, Youth of the Caliphate, by "Brush," which is how Defendant introduced himself to the CHS who was posing as a member of Organization 1. (Vol. 1, p. 149). The article was entitled, "A Message of Inspiration to the Mujahideen by Brush. A message of inspiration to the mujahideen fighting the American crusader soldiers and their puppets." (Vol, 1, p. 150:17-19; pp. 151-52; GX 205). This article in Youth of

the Caliphate was released on February 6, 2019, one day before Defendant contacted Organization 1. (Vol. 2, p. 213:1-14).

During their early discussions, Defendant told OCE2 that he helped with the translation of video clips. (Vol. 1, p. 154:12-16). OCE2 described how Defendant sent him a video entitled, "To the Crusader State of Russia," portions of which were then played in open court over defense objection. (Vol. 1, p. 155:18; pp. 156-157). The video appeared to be made by "AF Media," which OCE2 described as "Abd Al Faqer, a " pro-ISIS supporter media organization." (Vol. 1, p. 157:5-7; p. 161:13-17). Defendant told OCE2 that he provided AF Media with translations and worked for that organization. (Vol. 1, p. 158:20-24; 159:2-5). OCE2 provided Defendant with Arabic text to translate, which included reference to ISIS. However, the passage was not introduced into evidence. (Vol. 1, p. 160:7-20). OCE2 described another video that Defendant sent called "Holding Firm to the Pledge 2." The video was played over defense objection, which the Court interpreted as a standing objection. (Vol. 1, p. 161:18-22; p. 162:10-19).

As the discussion continued, OCE2 sent Defendant a link about banned accounts on Telegram. (Vol. 1, p. 167:13-20). OCE2 suggested finding another platform, to which Defendant responded, ""Brother no name showed me how to copy channels." (Vol. 1, p. 168:10-11). Defendant also brought up Inside 8, a video from Al Hayat, an official ISIS media organization depicting, among other things, scenes of fighters using computers and a messaging platform. (Vol. 1, p. 172:22-25; p. 173:4-12). The video was played, subject to Defendant's standing objection, and the OCE2 interpreted it for the jury, specifically portions detailing the uploading of videos online. (Vol. 1, p. 175:22-25).

Defendant also told OCE2 that he did the voiceover for AF Media for the "Fighting Has Just Begun" video. (Vol. 1, p. 188:21-25; 189:1-9). OCE2 then read from screenshots from the

video that referenced committing acts of violence, including by setting fire to buildings, forests, and commercial centers. (Vol. 1, pp. 190-192; GX 203-4 through 203-18 and 203-21 through 203-22). OCE2 asked Defendant if he was "doing this for supporting the Islamic State or just for jihad." (Vol. 1, p. 192:20-21). Defendant responded "both." (Vol. 1, p. 193:3). The government then played a nasheed, or a cappella song, that Defendant created and sent to OCE2. Defendant wondered to OCE2 whether Dawla, or ISIS, could use it. (Vol. 1, p. 194:8-20). OCE2 also testified about how Defendant said he wanted to obtain guns, but that he had to wait two years because he was too young to legally purchase a firearm. (Vol. 1, p. 196:7-20).

OCE2 also asked Defendant to translate instructions on how to make a car bomb from English to Arabic. OCE2 portrayed the instructions as being from "the brothers in the Islamic State" and that the instructions would "help the brothers and a lot of brothers want to take revenge and kill the kufar everywhere. This will help them." OCE2 explained that he did so to determine if Defendant was serious or just talk, and to see "whether or not he would really help a terrorist if given the opportunity." (Vol. 2, p. 215:14-25; p. 216:1-17). OCE2 sent the first few pages of the introduction for the car bomb translation. (Vol. 2, p. 217:24-25; p. 218:1). OCE2 said that this was specifically to help the Islamic State to build a car bomb. (Vol. 2, p. 218:2-7). Rather than translate the document, Defendant told OCE2 how he was busy at school and would have to contact someone else. (Vol. 2, p. 218:19-25). OCE2 said that Defendant put him in touch with another person but provided no other details about what happened with that person. (Vol. 2, p. 220:11-13).

Following this discussion about the translation for a car bomb for ISIS that Defendant did not do, the conversation shifted to a computer project, specifically a "Gentoo Linux version designed for Ansar." (Vol. 2, p. 220:24-25; p. 221:1-2). Later, Defendant would tell OCE2 that

18

the project was "too difficult." (Vol. 2, p. 256:15-19). Other chats highlighted by the government included OCE2 seeing photos Defendant sent and asking if he was building a bomb, only for Defendant to tell him he was fixing an airsoft gun. (Vol. 2, p. 224:14-15). Defendant also showed OCE2 an ISIS flag that he said he painted himself. (Vol. 2, p. 223:21-25; p. 224:1-9). OCE2 asked Defendant if he had done bayat, and Defendant said that he tried but "can't do it perfect." (Vol. 2, p. 238:11-18). OCE2 then sent the language for bayat to Defendant, who made a recording. (Vol. 2, p. 239:23-25).

OCE2 then turned the conversation back to making translations, and asked if Defendant was still interested in making translations for a group that was planning an operation in the west and needed to translate a document from Arabic to English. Defendant agreed but asked to work with "no name." (Vol. 2, p. 253:16-25; 254:1-3; 21-23). OCE2 then gave Defendant the Telegram screen name for OCE3. (Vol. 2, p. 256:6-19).

After Defendant told OCE2 that the Linux operating system project was "too difficult," Defendant showed OCE2 a collection of videos that he made from the different wilayat, or provinces of ISIS, and also a folder referencing "Jihadology." (Vol. 2, p. 257:2-10; GX 200-20-T). Defendant told OCE2, "I made my own Python scripts to organize everything." (Vol. 2, p. 258:4-6). Defendant explained that he made the script to organize different video channels: "I coded this. It organizes the channels." (Vol. 2, p. 259:22-25). The script created channels that organized videos by resolution size. (Vol. 2, p. 262:10-20). Defendant copied the videos to create an offline archive and to ultimately create a torrent file that could be shared with others, specifically on Reddit, where users like to watch Dawla videos but could not access them. (Vol. 2, p. 264:3-5; p. 265:9-10; p. 265:12-15; p. 274:21-24; p. 275:2-5). OCE2 asked Defendant if he

had any contacts with the Diwan, or ISIS media, and Defendant responded, "No." (Vol. 2, p. 283:4-10).

After further discussion of organizing video channels, Defendant sent OCE2 a pdf file called "Heralds of the Internet." (Vol. 2, p. 287:14; GX 201). According to Defendant, Heralds was for organizing Telegram channels. (Vol. 2, p. 295:17-20). OCE2 testified that he understood that the "Heralds" file "outlines the defendant's methodology for how he planned to organize and proliferate official ISIS media content." (Vol. 2, p. 288:13-15). OCE2 then read from the Heralds document. (Vol. 2, p. 287:18-20; p. 288-300). Priorities indicated in the document included spreading official ISIS media. When asked who Defendant was benefiting with Heralds, OCE2 said "those who wish to proliferate ISIS media content" and those who "consume it." (Vol. 2, p. 291:10-13). OCE2 also explained that Defendant said that the word "Heralds" was "like an old word for someone who tells news." (Vol. 2, p. 295:7-11).

After reviewing the Heralds of the Internet document, OCE2 confirmed that Defendant was still working with AF Media, the ISIS supporter media organization. (Vol. 2, p. 300:25; 301:1-5). OCE2 asked if AF Media worked with the Diwan. Defendant stated "I have no idea. I only speak to one brother from AF. We operate like cells." (Vol. 2, p. 301:15-19; p. 302:10-20). When OCE2 asked Defendant to explain how he came up with the idea for Heralds, Defendant said, "Before I was Muslim I wanted to find dawla videos but never could," and that it is "very good for dawah," or spreading the word of Islam, because "the news lies about dawla videos and will never show it full." (Vol. 2, p. 304:5-9). Probing further, OCE2 asked about another supporter media group, Sarh Al-Khalifa, and Defendant said that he did not know them "too close but I love their work. I try to help them." (Vol. 2, p. 305: 15-24).

20

On cross-examination OCE2 acknowledged that one could legally sympathize with ISIS, re-post ISIS videos, and even pledge bayat. (Vol. 2, p. 308:19-23; p. 309:7-12). He also had no information that Defendant engaged in any violent acts, such as building a bomb or even trying to build a bomb. (Vol. 2, p. 310:18-25, p. 311:1-2). OCE2 recognized that Defendant was not charged with any conduct prior to his sharing of the computer code and the Heralds document. (Vol. 2, p. 318:22-24). Regarding the Youth of the Caliphate Magazine, OCE2 noted that it was not an "official" magazine, it was not illegal to read it, and he did not understand it to be illegal to write articles. (Vol. 2, p. 334:11-21).

Turning to Heralds, OCE2 never personally ran the script depicted in the .pdf. (Vol. 2, p. 369:2-3). One of the objectives set forth in the document "was to show that the media misrepresented the Islamic State and that the Islamic State was acting in self-defense." (Vol. 2, p. 373:21-23). He understood the script to be designed to organize and copy ISIS media content. (Vol. 2, p. 374:1-11). OCE2 did not know if Heralds had been sent to anyone else. (Vol. 2, p. 374:12-18). Testifying about internal communications that he had with other FBI personnel, including OCE4 who would testify later at trial, OCE2 noted that a list that was made "from scraping Zelin's site," which was likely "Jihadology." (Vol. 2, p. 377:25; p. 378:1-8).

OCE2 also discussed how he and his colleagues questioned whether Defendant would send money overseas to support a terrorist organization without realizing that the money was actually provided by the FBI CHS who met with Defendant in-person in Chicago. (Vol. 2, p. 383:8-16). OCE2 explained that he did not know at that time that Defendant was interacting with the FBI CHS in Chicago. (Vol. 2, p. 384:2-7).

### 4) **Mark Baggett**

The government called Mark Baggett, who was an "information security professional" and worked for the Security Audit Network and Systems (SANS) Institute. (Vol. 2, p. 406:7, 14, 16-19). Baggett described his familiarity with Python, which is a "programming language that you can use to develop applications to run on computers. (Vol. 2, p. 408:6-8). Baggett was qualified "in information security and in the programming language, Python." (Vol. 2, p. 416:10-14).

Baggett explained that he was asked to review and analyze different Python scripts and a PDF document to determine what they did and whether they were functional. (Vol. 2, p. 416:18-23). He testified that there was sufficient code in the Heralds of the Internet PDF to determine that it was operational. (Vol. 2, p. 418:6-12). He also explained that another python script entitled "TelegramApp.py" copied "things from one channel to another on the Telegram network" and was also functional. (Vol. 2, p. 418:8-9; GX 508). He also reviewed python scripts entitled nas.py and nas_eng.py, and a third python script entitled nas.py. (Vol. 2, p. 419:19-23; p. 420:2-6; p. 421:8-10; GX 402, 403, 510). Baggett explained that the scripts "employ a number of bots to connect to the social media network. They connect to various channels on the network and then wait for commands for someone to allow them to ask the bots to copy messages from one channel to another." He testified that the scripts worked. (Vol. 2, p. 422:3-13). Baggett opined that the process described in Heralds was more sophisticated than the other scripts. (Vol. 2, p. 423:3-7). He explained that it was an "extension of the nas.py group" because it added a "search capability." (Vol. 3, p. 463:20-24). He also described the differences in the scripts that he reviewed as "window dressing." (Vol. 3, 468:9-15; p. 541:6-8). Baggett also noted that after March 9, 2021, the scripts would not have functioned due to a change on Telegram. (Vol. 3, p. 469:8-20).

Baggett then testified how he ran the scripts, with a slight modification to accommodate the change on Telegram, and recorded their operation, which was shown to the jury. (Vol. 3, pp. 474-476; p. 477:18-20). The bots he created can copy or forward videos in Telegram between source channels and destination channels. (Vol. 3, p. 483:20-25, p. 484:1). Turning back to Heralds, Baggett explained how the search term added was "360p," which filtered videos of that specific resolution type. (Vol. 3, p. 500:3-9; 16-19; p. 501:1-4). Any search term could be added for the copying function to filter for other terms. (Vol. 3, p. 511:19-25; p. 512:1-2).

On cross-examination, Baggett acknowledged that the scripts simply copy and paste videos at a high rate of speed, and Heralds just added a search term. (Vol. 3, p. 518:20-25; p. 519:1-3). He also recognized that the scripts could be used for any type of video. (Vol. 3, p. 522:11-13). Baggett could not determine what portions of the code Defendant wrote himself, if any. (Vol. 3, p. 524:7-10) ("I have no knowledge of who wrote any of the artifacts that I was asked to analyze or the relationship to your client."). In fact, Heralds indicated that there were other authors of the script and that someone else developed it. (Vol. 3, p. 524:18-20; 23-25, p. 525:1-8). Baggett also acknowledged that the code, as he examined it, would not work on Telegram, and that he had to remove a portion of the code for it to function. (Vol. 3, p. 534:3-9; p. 535:5-8). He also did not doubt that the desktop version of Telegram already had a function where one could select a number of videos and forward those videos to another channel. (Vol. 3, p. 538:16-21).

### 5) **FBI Special Agent Mike Fee**

The government's next witness was FBI SA Mike Fee, who testified about the search of Defendant's apartment following his arrest on November 18, 2019. (Vol. 3, p. 557). SA Fee was not personally involved in the search. (Vol. 3, p. 558:4-12). Through SA Fee, the government introduced posters and other items recovered from Defendant's apartment, including the large

posters, the homemade ISIS flag (Vol. 3, p. 559-560), the criminal complaint from *United States v. Jones and Schimenti* (which was admitted over the defense objection). Numerous ISIS-related images and videos recovered from Defendant's phone were also introduced over objection, including from a "scroll" of Defendant's phone. (Vol. 3, p. 576:21-25; p. 577:1-13). One video included the Structure of the Caliphate, which was played over objection. (Vol. 3, p. 579:10-25, GX 603-22). The government also introduced an image of Defendant's "renewed bayat" that was recovered from his phone. (Vol. 3, p. 590:24-25; p. 591:1).

On cross-examination, SA Fee acknowledged that he recovered no evidence that Defendant engaged in acts of violence. (Vol. 3, p. 598:13-15). The defense introduced excerpts from a college Blue Book examination as evidence of Defendant's state of mind. (Vol. 3, pp. 619-621). The handwritten essay was dated May 16, 2019, and reflected Defendant's views on how civil liberties in America deteriorated after 9/11, especially for Arab Americans. Various screenshots from Defendant's phone were also introduced, including one referencing making a "crawler for Jihadology." (Vol. 3, p. 623:3-5; DX 600-B).

### 6) OCE3

The government then called OCE3, who testified under the name "Khaleel." (Vol. 3, p. 631:23-25; p. 632:1-3). OCE3 worked as an FBI linguist and in an undercover capacity. (Vol. 3, p. 632:7-11). In this investigation, he was the individual introduced by OCE2 to provide bomb-making instructions to Defendant for translation. (Vol. 3, p. 633:15-22; p. 633:24-25; p. 634:1-3). On cross-examination, OCE3 acknowledged that OCE2 introduced him to Defendant as "independent," and did not describe him as being in ISIS. (Vol. 4, p. 722:15-19; p. 723:2-4). The conversations with Defendant were on Telegram. (Vol. 3, p. 634). OCE3 understood that the file

24

to be translated was a recipe for bomb-making material. (Vol. 3, p. 639:23-25; p. 640:1-3). He was tasked with providing these bomb-making instructions to Defendant. (Vol. 4, p. 683:13-22).

The first communication was on April 11, 2019. (Vol. 3, p. 636:21). OCE3, not Defendant, first brought up the bomb-making instructions, which OCE3 described as the "B Thing." (Vol. 3, p. 643:6-12). In his message to Defendant, OCE3 specified that the translation was for the firqah, which was a cell of supporters of ISIS who had pledged allegiance to ISIS. He further stated that those ISIS supporters would use the bomb to take revenge for what happened in Syria. (Vol. 3, p. 641:8-12; p. 642:4-21). He would later reiterate to Defendant that the bomb-making instructions would be used by ISIS, "the brothers of the khilafa" who would "make that bomb." (Vol. 3, p. 652:15-21).

OCE3 explained that Defendant himself did not translate the document, but instead said that he would have a "trusted brother" help him. This "trusted brother" was not online, according to Defendant, in a message on April 16, 2019. (Vol. 3, p. 654:3-11). On April 22, 2019, Defendant said that his brother had disappeared. (Vol. 3, p. 657:14-20). On May 1, 2019, OCE3 asked Defendant if he could use his computer skills to help ISIS. (Vol. 4, p. 685:3-9). In response, Defendant forwarded to OCE3 the same screenshots of the Gentoo Linux operating system that he had sent to OCE2, and described as "too difficult." (Vol. 4, p. 686:9-11; p. 748:20-25). OCE3 did not speak with Defendant after May 4, 2019, and also noted that Defendant's Telegram user account had been deleted. (Vol. 4, 716:6-16; p. 719:1-3).

On cross examination, OCE3 acknowledged that Defendant never said anything about Python, Heralds of the Internet, and never talked about copying ISIS videos from on Telegram channel to another or about organizing ISIS videos. (Vol. 4, p. 750:11-25; p. 751:1-4). He was also unaware of any single act of violence that Defendant committed. (Vol. 4, p. 723:17-24). He

25

admitted he asked Defendant to do the translation of the bomb-making instructions for ISIS. (Vol. 4, p. 726:3-18). He also acknowledged that Defendant never translated the bomb making instructions. (Vol. 4, p. 724:1-14). This was even so when online translation services or even a dictionary could have been used. (Vol. 4, p. 727:10-24, p. 727:25; p. 728:1-3). Still, 22 days passed from when OCE3 first provided the translation until the chat ended and Defendant did not do the translation. (Vol. 4, p. 728:19-25; 729:1-7). Defendant made numerous excuses about not doing the translation over those 22 days. (Vol. 4, p. 735:24-25; p. 736:1-3); (Vol. 4, p. 736:12-18 (April 16, 2019, did not finish the translation because the "brother" was not around); (Vol. 4, p. 739:15-19 (April 20, 2019)); (Vol. 4, p. 739:10-13 (April 21, 2019)); (Vol. 4, p. 741:9 (April 23, 2019)); (Vol. 4, p. 741:13 (April 25, 2019)); (Vol. 4, p. 741:22 (April 28, 2019)); (Vol. 4, p. 743:18-19 (April 30, 2019, OCE3 says "we need to move faster" on the translation)); (Vol. 4, p. 744:8-11 (OCE3 says, "So when akhi?")). OCE3 never tried to reach out to Defendant after May 4, 2019. OCE3 also acknowledged that Defendant never asked to be put in touch with anyone from ISIS. (Vol. 4, p. 760:14-21, p. 758:3-8).

### 7) Dr. Aaron Zelin

The government's next witness was Dr. Aaron Zelin. Prior to his testimony, the Court heard argument on Defendant's motions in limine regarding Zelin's proposed testimony. (Dkt. 104, 138). (Vol. 3, pp. 669-677). The Court generally agreed that some limitations should be placed on Zelin's testimony, including regarding the introduction of other terrorist incidents and elaboration of the videos. (Vol. 3, pp. 668-669). In response, the government emphasized that it needed Zelin to show that the service Defendant attempted to provide conferred a benefit to ISIS. (Vol. 3, p. 671:3-13). The Court generally agreed with that position. (Id.). The government continued to elaborate on its theory:

26

We just sort of need to under -- the jury -- what we hope his testimony will do is to contextualize for them why these videos were important, what they did. And part of it is they needed to have this supporter base that is more disbursed that was their homeland, and they're telling them in media that the defendant possessed. So this isn't just, you know, abstract kind of intent evidence that is divorced from the case itself.

They're saying in -- most specifically, in Inside 8, which was in the defendant's possession, they're saying join the media jihad, get online.

And there is this transition from a benefit being travel and fight with us to stay in your homeland, and you can be part of this mission. And so I just want to be very clear, because I hear Your Honor -- and we don't want to cross the line -- if it would be permissible to not sort in-depth but in this short way explain that there is sort of -- there was physical caliphate. It devolved, and there still is this global supporter network. And that's sort of helpful context for why -- why are they not urging you to come and pick up arms? Because part of what is a little -- what might not be clear to the average sort of, you know, citizen is that ISIS really wants its supporters to contribute, not just through waging warfare with guns but contributing in this media jihad.

(Vol. 3, p. 671:17-25; p. 672:1-15).   The Court found this argument to be "appropriate."   (Vol. 3, p. 672:16-18).

In response, the defense emphasized the problematic nature of the government's position and its use of Zelin, and how the government sought to establish the "element of attempted direction, coordination by showing it coming from the other way, by showing that ISIS tells unofficial media organizations to do X, Y, and Z. Defendant interacted with unofficial media organizations; therefore, he's attempting to coordinate with ISIS."   The defense further argued that the government's argument that focused on the potential benefit conferred to ISIS relieve themselves of the burden "to show what Tommy knew by showing instead what ISIS desired." The defense continued and noted that this method of proof removed the element of independent advocacy, "because if you advocate independently through what you think is an unofficial non-FTO that has, perhaps, some residual benefit to another group and to -- without you even knowing it, there's somebody in the unofficial group that may have communications with the FTO or just

27

the FTO saying it out there -- we want people to do this -- and all of a sudden your independent advocacy becomes material support is very dangerous."(Vol. 3, p. 673:1-25; p. 674:1-25; p. 675:2-13). The government responded that Zelin would explain that the "unofficial groups" "essentially take clips from official ISIS media, and they make them their own. And what the defendant was doing in reaching out to these groups is he was trying to assist ISIS's mission." (Vol. 3, p. 676:7-11). It reiterated its theory that it was relevant and necessary to explain the "media-related organizations" and why ISIS "in media that the defendant possessed, most notably in Inside 8, said that this is what I need you to do to support us." (Vol. 3, p. 676:15-18).

The Court's ruling sided with the government's position that providing a service to a non-foreign terrorist organization could evidence an intent to benefit ISIS itself:

> Well, I understand the point that the defense is making here, but there is enough evidence to support an inference, at least arguably at this time -- and, of course, it has to be beyond a reasonable doubt, and that's the jury's job -- that by providing this service, if you will, to the other organization, to the unofficial organization, he intended it to benefit ISIS itself.
> And so there's, I think, a needed explanation of the relationship between the two, and that's what I think Dr. Zelin is going to opine about.
> I don't think that's relieving the government of a burden. I think it's part of their burden to show that connection, if you will, or that there could be a connection between the two. And some of those videos and other material that we've seen seems to make that link, and I think that's something that is a little complicated and could use some explanation.

(Vol. 3, p. 676:21-25; p. 677:1-12).

With those rulings as a backdrop, Zelin testified as the government's second expert. Zelin explained how he was a senior fellow at the Washington Institute for Near East Policy, a Washington D.C., think-tank or research center. (Vol. 4, p. 789:25; 790:1-11). There, he focused primarily on doing research on jihadi groups like ISIS and al-Qaeda. His research methods including finding original primary source material. (Vol. 4, p. 781:21-25; p. 782:1-11). Zelin described "Jihadology.net" as a website he created in May 2010 that is a "primary source archive,

so it has content from the groups that I study as well as other groups because it's part of a project so that other researchers have access to this information so that they themselves can do research on it, of course." He explained that he started the website because he had a difficult time finding primary source jihadi videos and he wanted to have them available for others to use in research as well. (Vol. 4, p. 784:12-25; p. 785:1-6). Zelin's testimony was based only on his research and academic work, and not anything related to Defendant in particular. (Vol. 4, p. 786:5-10). He was qualified as an expert in terrorist groups, including ISIS. (Vol. 4, p. 786:11-15).

Zelin provided brief testimony about the origins of ISIS, and also explained that the organization wants "to take over territory anywhere possible so that they can implement Islamic law based off of their own interpretation of it; and therefore, everybody in the world essentially is under their writ." (Vol. 4, p. 787:15-20). After ISIS lost control over physical territory in Eastern Syria in March 2019, its messaging to supports included a "nostalgic narrative" for what it used to be "in relation to them controlling them controlling the territory." (Vol. 4, p. 789:2-16, 25; 790:1). He explained that "bayat" is a "religious oath of allegiance" given by members and supports of ISIS. (Vol. 4, p. 794:7-16).

Zelin also reviewed the "Structure of the Caliphate" video and described different official ISIS media outlets, such as Al-Furqan Foundation, Al-Hayat Media, Naba Newspaper, Amaq News Agency, Himma Library and other entities in the ISIS Central Media Office. (Vol. 4, p. 795:15-23; p. 796; GX 801; p. 801:12-23; 805:3-8). Zelin noted that ISIS media production was of a higher quality because it embedded videographers with fighters and other officials to capture scenes of ISIS activity. (Vol. 4, p. 811).

In addition to discussing official ISIS media organizations, Zelin was also asked about unofficial ISIS media groups and how they "operate to disseminate ISIS propaganda." (Vol. 4, p. 811:24-25). He answered as follows:

> They're essentially, more or less, supporters of the organization that want to further the message of the group because they're not actually in the areas that the group is operating in, but they still want to help them out in some ways. And so they then will, you know, create a bunch of different accounts or channels online and then potentially create an official media outlet that sort of spreads the message of ISIS.
>
> And a lot of times they'll try and remix official media content in their own way so that that's fashioned to a potentially broader audience, whether because it's edited differently or maybe it's not being taken down by a tech company because it's not official, or it's being put into another language so that those that might not know Arabic could understand it.

(Vol. 4, p. 812:1-20). The government also asked Zelin about the terms "centralized" and "decentralized media plan." (Vol. 4, p. 812:21-23). He explained the terms as follows:

> I mean, essentially you have a centralization of some strategic directive from the top, and then decentralization of sort of implementation of whatever that strategic directive is; so, you know, not necessarily in the media front, but as we were talking about before in relation to the governance and the structure of the Islamic State, the delegated committee essentially creates these strategic directives, so that's like the central top. But then the administrations or the provinces, based off of their knowledge of how to implement them, then decide to do it. So it's not like micromanagement, essentially.

(Vol. 4, p. 812:25; p. 813:1-10). The government asked additional questions regarding the relationship between official and unofficial groups, and specifically communications from official groups to unofficial groups. The exchange was as follows:

> Q. Are there instances where you have official ISIS media, Media Diwan entities, engaging with these unofficial groups?
>
> A. Yeah, they won't necessarily, like, call them out specifically, but they'll talk about the importance of work in the media on behalf of the group even if they aren't members.

30

Q. Are there specific examples where you have sort of official ISIS communicating with unofficial groups?

A. So, you know, sometimes leaders of the group will put out audio messages, and they'll praise those who work in the media field online that are supporting the group and trying to encourage them to do more because they see it as harming their enemies.
Then sometimes they'll put out graphics at certain times to boost the particular hashtag. This is, obviously, in the context of when Twitter was big and being, like, you should flood social media with that, essentially.
Other times they'll put out pamphlets that specifically directly talk to people in the media field and showing their importance to the movement even if they aren't actually members of the group, too.

(Vol. 4, p. 813:11-125; p. 814:1-5). Examples of unofficial groups included Horizons and Al-Faqir. (Vol. 4, p. 814:9-10, 19-21). Unofficial groups like Al-Faqir would remix official media products "in their own manner." (Vol. 4, p. 815:4-7; p. 816:1-6 ("[Unofficial groups] can take different pieces of official media and then try and put it in their own way or put their own spin on it and remix it in the same way, you know, you might see with people that are supporters of other endeavors."). After reviewing an exhibit that he described as referencing "unofficial media outlets or logos" of entities that "translate content … from Arabic to other languages," Zelin specifically described the group "Halummu" as one of those unofficial groups "primarily involved in translating the original Arabic content into English." (Vol. 4, p. 816:18-25; p. 817:1-4; GX 603-7). The groups Al Battar and Al Saqri were also unofficial groups. (Vol. 4, pp. 817-18). The government never asked Zelin about the group known as Sarh al-Khalifa.

Zelin spoke about how ISIS perceived unofficial media groups as important. (Vol. 4, p. 819:2-13) ("They see it as just as important to their endeavors as those fighting on the ground, because it's able to continue to expand their presence as well as garner new supporters; and therefore, while one might say, well, the people on the ground fighting are doing more because they're potentially taking over a territory, fighting their enemies, but ISIS views them on the same

level of importance.").  He offered similar testimony regarding how ISIS viewed, in its "own articulation," supporters as "being equally important in some regards" as members because ISIS sees them as "part of this broader movement that the Islamic State was trying to build."  (Vol. 4, p. 833:7-22).   ISIS viewed media operations as important to building a supporter basis and the internet an important part of that messaging.  (Vol. 4, p. 834:2-10).  The government again played the Inside 8 video and had Zelin discuss portions of it.  (Vol. 4, pp. 821-22). Zelin discussed how the video showed how ISIS portrayed itself as "still going against their enemies and thriving online, essentially or trying to at least" despite the efforts of social media companies and government intelligence agencies to take down or remove its content.  (Vol. 4, p. 824:2-14).  While ISIS viewed the supporter and unofficial organizations as important, he also explained that ISIS's warning against "following media from anyone aside from the Central Media of the Islamic State" to mean that "anything from outside of the Islamic State is polluted or there's a particular agenda; and therefore, you can only get the real truth from the Islamic State.  Otherwise, you're being fed some kind of distortion or lie and not the ground reality." (Vol. 4, p. 831:23-25; p. 832:1-8).

On cross-examination, Zelin provided additional information regarding his website, jihadology.  He explained that it has media content directly from the jihadi groups and that he created it in 2010 because it was not "necessarily easy to find" that primary source information when he was doing his Master's work.  (Vol. 4, p. 839:18-25, p. 840:1-8).  Zelin viewed his website as a "useful resource" and as necessary.  (Vol. 4, p. 840:9-15).  Zelin explained that he still obtains the jihadi material from the official jihadi channels themselves, including official ISIS sources. (Vol. 4, p. 846:14-17).  He followed unofficial channels, but only posted official content on his website.  (Vol. 4, p. 841:11-23).  Zelin also downloaded jihadi media material from archive.org. (Vol. 4, p. 848:1-3).  The official media videos that he reviewed during direct examination, such

as Inside 8 and Structure of the Caliphate, were available on his website; however, the unofficial videos were not. (Vol. 4, p. 859:24-25; p. 860:1-5).

For years, jihadology had open access, meaning that anyone could have accessed original jihadi material from the website. (Vol. 4, p. 842:4-12). But in April 2019, he implemented a free registration process that one had to complete before being able to view the jihadi videos and other material. (Vol. 4, p. 840:16-21; p. 841:6-10). Zelin estimated that he had 14,000 or 15,000 different jihadi media items posted on jihadology. (Vol. 4, p. 843:4-19). He acknowledged that he described the website as the "largest repository of jihadi content" in an article that he wrote entitled, "The Case of Jihadology and the Securitization of Academia." (Vol. 4, p. 844:7-8; DX 29). Zelin made his website and downloaded official jihadi material without any "government interference" or "special government permission." As he explained, "I just did it." (Vol. 4, p. 843:4-19). After downloading ISIS videos from official sources, he then made those videos available for "anyone who has a web address or an email address that you think passes the criteria that you've set." (Vol. 4, p. 846:20-23). Zelin agreed that there was no difference between someone obtaining media from an unofficial ISIS site and jihadology, including that each resulted in the spread of ISIS's message which it wanted. (Vol. 4, p. 859:3-9). Importantly, when an unofficial organization put together an edit of official media material, it was no longer "official" but was instead a "remix." (Vol. 4, p. 859:17-22). Zelin also agreed that the First Amendment allows him to watch the videos and maintain jihadology with the official jihadi content available for viewing. (Vol. p. 861:23-25; p. 862:1-9).

On redirect, the government continued to focus on how ISIS viewed its supporters as important to "furthering the group in some manner, whether in the media field if they're doing

something online, or even if somebody plans an attack themselves and kills people." (Vol. 4, p. 863:20-22; p. 864:6-17).

### 8) **OCE4**

Following Zelin, the government called OCE4, who testified under the name "Bill Smith." OCE4 worked for the FBI for 10 years, during which time he worked as an intelligence analyst and, since 2016, as an OCE in counterterrorism cases. (Vol. 4, p. 876:5-24; p. 877:5-6, 9). OCE4 explained that in October of 2019 Defendant contacted him on an online Telegram account that OCE4 controlled. (Vol. 4, p. 877:21-24; p. 881:6-10) The Telegram account was for Organization 2. (Vol. 4, p. 878:5-6). Organization 2's name was introduced as a sensitive exhibit, over objection set forth in pretrial pleading. (Vol. 4, pp. 879-880). OCE4 explained that Organization 2 "was a brand used by the Islamic State by ISIS's Media Diwan for English translations of ISIS media content. So ISIS content in English." (Vol. 4, p. 880:13-15).

OCE4 explained that Organization 2 was advertised and contact links and accounts were provided in pro-ISIS and ISIS groups on Telegram as a means by which to contact Organization 2. (Vol. 4, p. 881:16-22). In October 2019, Defendant contacted Organization 2 and asked for translations of ISIS material in English by asking, "'Akhi do you have English translated isdarat from the wilayah?' OCE4 explained that "isdarat" meant publications and "in the ISIS content, it usually means ISIS videos or PDFs but mostly videos." (Vol. 4, p. 885:16-24). OCE4 stated that this request related to Organization 2's involvement in English translations of ISIS media. (Vol. 4, p. 886:3-12).

Defendant introduced himself to OCE4 as a "munasir" who "cop[ies] channels and share," which to OCE4 meant he identified as an "online ISIS supporter" and "as part of his ISIS support activity what he did was he copied Telegram channels and then shared those channels." (Vol. 4,

p. 886:19-20; p. 887:4-7). Defendant then sent OCE4 a python file called nas.py, without any request from OCE4 for the file. (Vol. 4, p. 889:2, 19; p. 889:3-8; GX 402. OCE4 testified that the script "enables a series of Telegram bots to automatically take material that's in one location on Telegram and rapidly place it in another in an automated fashion." (Vol. 4, p. 891:6-10). OCE4 discussed how Defendant shared a channel with "every isdar ever" on it. (Vol. 2, p. 892:21-25). The two spent several hours unsuccessfully attempting to run the script on OCE4's phone. (Vol. 4, p. 905:5-7). Reviewing the binder of his communications with Defendant, OCE4 continued to describe how he interacted with the script and the bot. (Vol. 5, pp. 936-938). OCE4 continued to have problems with the script, and Defendant provided a translation in English in a separate python file called, nas_eng.py. (Vol. 5, p. 954:24-25; p. 955:10-11). After additional efforts trying to get the script to work (Vol. 5, pp. 955-960), the script functioned and copied a channel called RU Isdar into a new channel on Telegram. (Vol. 5, p. 958:1; p. 959:1-13; pp. 961-963).

The government again reference the Inside 8 and Structure of the Caliphate videos, which were included in the Every Isdar Ever channel. (Vol. 5, pp. 976-977). It displayed a screenshot from Structure of the Caliphate, which referenced "munasireen," which OCE4 explained meant "supporters." (Vol. 5, p. 981:1-8). OCE4 said that it took four hours to copy that Every Isdar Ever channel with the script. (Vol. 5, p. 991:23-25). Defendant told OCE4 that he can share the script with other "munasir," which OCE4 understood that to mean, "I could share this process with other online ISIS supporters." (Vol. 5, p. 994:22-25; p. 995:1-3). Defendant did not say, and there was no testimony to the effect, that he intended for the script to be shared with ISIS itself.

OCE4 also described how Defendant sent him various photos, including an image of a handwritten note that said, "I renew my pledge to Abu Ibrahim al-Hashimi al-Qurashi in the land

of America." (Vol. 5, p. 1008-1009:22-23). As would later be explained, this image was sent at the same time that the CHS told Defendant that he had to do bayat to three different people.

On cross examination, OCE4 acknowledged that he was involved in the investigation of Defendant as far back as June 2018, long before he was contacted by Defendant in October 2019. (Vol 5, p. 1014:7-13). His involvement in the background continued, and in March 3, 2019, he was part of a conversation when another member of his team wrote that Defendant "talked a lot of shit; I think it's time for him to go to jail." (*Id*.). OCE4 replied in this chat, "Hahaha, American in sha Allah." (*Id*.).

OCE4 also acknowledged one screenshot Defendant sent included reference to a file folder called "Jihadology crawl before censorship." (Vol. 5, p. 1019:9-15). That folder was amongst other folders named after official ISIS media sources. In communications with colleagues, OCE4 noted that Defendant made a list from "scraping Zelin's site." (*Id*.). He testified that in 2019, the public could at least watch jihadi videos from Jihadology. (Vol. 5, p. 1020:20-25). He also noted that, in his personal opinion, "it is First Amendment protected in terms of being able to view the material as it is there on Jihadology" and jihadi videos. (Vol. 5, p. 1021:12-14; p. 21-22). OCE4 also sent Defendant ISIS videos. (Vol. 5, p. 1023:21-25; p. 1024:1-2)

Defendant did not tell OCE4 that he was sharing the script as part of another group. The most Defendant said was that he was a "munasir," or supporter, who supported a "message." (Vol. 5, p. 1025:6-15; p. 1041:21-25). Defendant did not indicate to OCE4 that he sent the script at the direction of anyone else or any other group. OCE4 understood that Defendant "independently" clicked on a link and then interacted with OCE4. (Vol. 5, p. 1026:4-6). Defendant did not tell OCE4 that he was sharing the script "for ISIS." (Vol. 5, p. 1026:15-22). Moreover, OCE4 did not introduce himself as a member of ISIS or as a "munasir." (Vol. 5, p. 1028:5-15). Thus, neither

OCE4 nor Defendant stated that they were members of ISIS or using the script for ISIS. (*Id.*). Essentially, the script quickly copied material on Telegram from one channel to another. (Vol. 5, p. 1036:7-15). It could be used to copy or forward any type of media material. (Vol. 5, p. 1039:23-25). After confirming the script worked and could be shared online, the FBI waited more than one month to arrest Defendant. (Vol. 5, p. 1038:10-22).

Like OCE2, OCE4 claimed not to know about the in-person CHS who was investigating Defendant at the time it was occurring, but he knew there was an investigation going on in Chicago. (Vol. 5, 1031:24-25; p. 1032:1-10).

### 9) **CHS**

The government next called the CHS, who testified under the name "Ahakim Abbas." (Vol. 5, pp. 1057-58). The CHS worked with the FBI since 2013, and started to be a paid informant in 2014. Since then he has been paid over $560,000. (Vol. 5, p. 1059:7-10).

The CHS first met Defendant in February 2019 as part of a ruse that began with the FBI giving Defendant a survey to do beta-testing for software. (Vol. 5, p. 1061:21-25; p. 1062:2-7). The CHS acted as a representative from the company that was doing the beta testing and did not come up with the survey. (Vol. 5, p. 1062:8-12, 15-16). The survey went to students at DePaul University. (Vol. 5, p. 1063:15-18). The FBI paid Defendant for the work. (Vol. 5, p. 1063:24-25). The FBI paid Defendant $1,000.00 to do this fake job, and the CHS helped facilitate that payment by asking Defendant how he wanted to get paid, and then giving that information to the FBI. (Vol. 5, p. 1063:24-25; p. 1064:3-14). The CHS asked how Defendant wanted to be paid during their second in-person meeting, which occurred on April 12, 2019, in Chicago. (Vol. 5, p. 1066:4-10). Defendant was paid $1,000 to do the beta testing for this ruse job. (Vol. 5, p. 1064:17-21).

37

The CHS described how he developed a close relationship with Defendant, particularly on cross-examination. He explained how they played video games together and chatted on the website called Discord. (Vol. 5, p. 1066). The CHS said that they started to become friends after the April 12, 2019, meeting. (Vol. 5, p. 1068:7-8). Defendant would send the CHS his grades and photos of his homework. (Vol. 5, p. 1074:13-19; p. 1193:4-11). He sent pictures of his clothing and beard. (Vol. 6, p. 1192:16-20). He shared photos of his wedding in Indonesia. (Vol. 5, p. 1076:4-17). The CHS bought Defendant's wife traditional Islamic clothing and showed Defendant how to fold it. The CHS would go to a mosque with Defendant and they would pray together. (Vol. 6, p. 1167:20-25). The CHS said that at the time of the undercover operation, he was in his late 20s, which would have made him about 10 years older than Defendant, who was nineteen years old. (Vol. 6, p. 1168:16-18). He praised Defendant as one of the best students doing the beta testing, even though in fact he was aware of no other beta-testers. (Vol. 6, p. 1171:1-3). Defendant even asked the CHS if he could put him on his resume as a reference. (Vol. 6, p. 1181:11-22). The CHS also told Defendant that he loved him, and that it was "sudfa" or an unconditional "very good thing" that they met. (Vol. 6, p. 1211:2-20); (Vol. 6, p. 1230:7-17); (DX 32-3). The second time they met, CHS told Defendant that his "heart opened" which was a very significant thing to say to a Muslim brother. (Vol. 6, p. 1226:22-25; p. 1227:1-2). The CHS also told Defendant that he deserved to go to heaven because he is a good Muslim brother. (Vol. 6, p. 1244:9-25). Indeed, the CHS said his goal was to befriend Defendant (Vol. 6, p. 1169:2-4), which he accomplished because they were "best friends." (Vol. 6, p. 1181:11-22; p. 1193:14-15).

During the April 12, 2019, meeting, Defendant brought up how he is studying Python at school. (Vol. 5, p. 1068:1-2). The CHS met Defendant for the third time on May 9, 2019. (Vol. 5, p. 1068:12-14). After that meeting, the CHS testified how on May 15, 2019, Defendant sent

him a video "a Kurdish fighter woman getting shot by ISIS sniper." (Vol. 5, p. 1073:5-14). He described the video as such: "Q. What happens here? A. She's getting hit by an ISIS sniper and almost getting killed." (Vol. 5, p. 1074: 3-5). On cross-examination, the video was played to the jury and it clearly showed that the woman was not, in fact, shot. (Vol. 6, p. 1187-188; DX 40).

The CHS met with Defendant on August 21, 2019, which was their fourth in-person meeting. (Vol. 5, p. 1081). Like the other meetings, this one was recorded by the FBI. The government played audio clips of selected portions of the meeting. (Vol. 5, p. 1084:3-4). The CHS stated that during this meeting Defendant showed him Telegram channels that included pro-ISIS videos and content. (Vol. 5, p. 1085). According to the CHS, they continued to talk as friends after the beta testing project was completed. (Vol. 5, p. 1088:7-13). After this August 21, 2019, meeting, Defendant shared his Telegram channel that included pro-ISIS content with the CHS. (Vol. 5, p. 1089:8-11). The channel was organized by different media groups, such as al-I'tisam and Al-Furqan. (Vol. 5, p. 1089:23-25; p. 1090:1-16). Defendant told the CHS that he could "share with anyone you trust." The CHS interpreted that to mean that he could share the channel with "ISIS brothers," even though Defendant said neither "ISIS" nor "brothers." The defense objection to that interpretation was sustained. (Vol. 5, p. 1090:22-25; p. 1091:1-8).

The CHS explained how Defendant also sent a screenshot of a script that allowed one to download large channels. (Vol. 5, p. 1092:10-17). Defendant said others made the videos, and he just copied them. He then said that he sorted them for a specific resolution so they could be uploaded to a full .rar archive. (Vol. 5, p. 1094:13-20). After being shown the videos, the CHS offered to help Defendant, but Defendant did not take him up on that offer. (Vol. 5, p. 1095:4-10). Defendant also said that he was looking for Al Hayat and Al Furqan media channels. (Vol. 5, p. 1095:14-21).

The government played several videos over defense objection. One video depicted two suicide bombers, which the CHS also described. (Vol. 5, p. 1103:13-25, GX 513). Another video showed a young girl swearing bayat at the direction of her father. (Vol. 5, p. 1105:16-23; p. 1106:5-14; GX 512).

The CHS also described how on September 16, 2019, he asked Defendant for the python script, because Defendant had only sent a screenshot. Defendant sent him the scripts and explained how the process worked. (Vol. 5, p. 1112:25-25; p. 1113:1-17). The CHS tried to run the script, but there was an error with the Arabic term "raqm," which translates to "number." (Vol. 5, p. 1115:18-25; p. 1116:1-7). Defendant also sent and described the TelegramApp.py script, which did not use bots to copy Telegram channels. Defendant said that his "brother" made the script but he "modified it to only 10 messages per line." (Vol. 5, p. 1116:15-25; p. 1117:1-11; GX 508). Defendant would reference at other times that another "brother" made the script. (Vol. 5, p. 1121:6-11).

The government then played clips from the October 8, 2019, in-person meeting. (Vol. 5, p. 1124:17-19; p. 1125:8-12, GX 505-1). Defendant also showed the CHS how to run the script on his phone. (Vol. 5, p. 1126:6-7; GX 505-2). During this meeting, the CHS and Defendant ordered food and then returned to the CHS's hotel room where they ate together. (Vol. 5, p. 1127:11-14). During this meeting, the CHS asked Defendant to walk him through the script and then send him screenshots that the CHS, not Defendant, would translate and send to ISIS. The CHS explained that it was his idea to ask Defendant to send these screenshots. The CHS also specified that the screenshots would be for ISIS. (Vol. 5, p. 1130:3-24). Defendant never provided the screenshots to the CHS.

The CHS also raised the issue of bayat with Defendant. Defendant did not bring up the subject on his own. The CHS said that he raised it because there was a video of people from Chechnya doing the bayat in a large group. (Vol. 5, p. 1135:8-12). The CHS offered to do bayat with Defendant at "the same time," but Defendant did not agree to do so. (Vol. 5, p. 1135:21-25; p. 1136:1-4). The CHS also told Defendant that one needs "three witnesses" for the pledge to be effective, which Defendant did not know. (Vol. 5, p. 1136:7-24).

The CHS and Defendant would meet again two days later on October 10, 2019. During this meeting, the CHS said that ISIS would "be so happy" with the screenshots that he asked Defendant to provide:

> Q. Who did you mean when you said, "They will be so happy"? Who will be so happy?
> A. The ISIS members, and they don't speak English. They only speak Arabic, so they will be happy about the translation.
> Q. The translation from English to Arabic?
> A. Yes, sir.
> Q. Translation of what?
> A. Of his code, his script.
> Q. That you offered to translate?
> A. Yes, sir.

(Vol. 5, p. 1138:3-12). Again, Defendant never provided those screenshots to the CHS, which was emphasized on cross-examination. (Vol. 6, p. 1193:19-25; 1194:1-8; p. 1248:1-7).

After reviewing the audio clip of the meeting, the CHS described how Defendant showed him the python script that he sent on October 8, and explained how it worked. (Vol. 5, p. 1140:9; p. 1140:13-19; pp. 1142-43 GX 506-6; GX 50-610; Vol. 5, p. 1144:17). The CHS was asked who Defendant referred to when he said "they have something that was good," and replied that "they" meant "ISIS." (Vol. 5, p. 1145:21-23). Yet, the context of the transcript shows that "they" referred to Sarh al-Khalifa, not ISIS. Indeed, the CHS said that Defendant claimed to have obtained the

videos from Sarh al Khilafa, which the CHS said meant "ISIS," again without any evidence to support the group's connection with ISIS. (Vol. 6, pp. p. 1240:25; p. 1241:1).

As the CHS's testimony continued to the next trial day, the government read a stipulation to the jury, which stated: "in January 2019 the FBI was aware that a computer code that allowed for the copying of Telegram rooms was made available by a third party." (Vol. 6, p. 1161:5-8).

The CHS also explained that on November 1, 2019, the FBI instructed him to ask Defendant if he had done Bayat. Defendant told him that he had not yet done so because he did not know the words. (Vol. 6, p. 1162:2-16). The CHS met with Defendant for the final time on November 18, 2019. (Vol. 6, p. 1165:17-24). As with the prior meetings, the CHS bought food and brought it back to a hotel room with Defendant. This time, though, Defendant was arrested by the FBI. (Vol. 6, p. 1166:2:6). The CHS did not see Defendant being arrested but said he heard a struggle. (Vol. 6, p. 1166:7-11).

On cross examination, the CHS acknowledged that he was making over $100,000 a year in salary from the FBI. (Vol. 6, p. 1172:19-21). He did not recall getting a $10,000 bonus for his work on this case, and instead thought it was part of his regular payment. (Vol. 6, p. 1173:7-14). The CHS claimed that the relationship took a turn in August 2019 when Defendant sent him a channel with ISIS videos and said he could share it with those he trusts. (Vol. 6, p. 1196:17-19). However, he acknowledged that Defendant did not say to share the videos with ISIS. (Vol. 6, p. 1196:20-22). The CHS also agreed that the material on the channels was publicly available. (Vol. 6, p. 1197:15-20). The CHS claimed that the group Sarh al Khilafa was a foundation from ISIS (Vol. 6, p. 1203:15-16), even though it appeared nowhere on any chart offered by ISIS expert Aaron Zelin. Nevertheless, he also agreed that the videos were "out there in the free world … to download." (Vol. 6, p. 1203:22-25). When showing CHS the script, Defendant said that he was

42

going to post the videos on Reddit. (Vol. 6, p. 1208:24-25; p. 1209:1). He also said that he wanted to copy the videos from one channel to another and that he stored them locally on his computer. (Vol. 6, p. 1209:4-19). The CHS also agreed that the scripts essentially copy, paste, and organize the videos. (Vol. 6, p. 1261:16-24). The CHS also clarified that even though he asked for Defendant to send screenshots of the script that could be provided to ISIS on October 10, 2019, "nothing" happened between then and November 18, 2019, when Defendant was arrested. (Vol. 6, p. 1215:25; p. 1216:1-2).

Additionally, the CHS admitted telling Defendant that it was his right to watch jihadi videos on YouTube. (Vol. 6, pp. 1232-1233:11-24; 1235:5-22; DX 33-3). Other salient points from the cross-examination include how Defendant responded, "no, of course not," when the CHS asked him if he talked to any mujahideen. (Vol. 6, p. 1234:4-13). The CHS was asked a number of questions about how "brothers" meant "ISIS brothers" and did not need clarification, but how on October 10, 2019, it was he who clarified that the screenshots would be provided to "the brothers in Dawlah." (Vol. 6, p. 1247:19-23). The CHS also agreed that the transcript at GX 506-10 was wrong, in that it reflected that Defendant said it was "not legal" to have the ISIS videos. In reality, Defendant said it was "not illegal," the exact opposite of what the CHS represented in the transcript and on his direct examination. (Vol. 6, p. 1264:2-9, 19-21; p. 1265:13-24).

On redirect, the government played a portion of a suicide bombing video and had the CHS describe what happened in the video, over defense objection that was articulated during a sidebar conference. (Vol. 6, pp. 1282-1284).

### 10) **FBI Special Agent Jacob Schaeffer**

The government's final witness was FBI Special Agent Jacob Schaeffer, who testified about Defendant's arrest on November 18, 2019. (Vol. 6, p. 1300). SA Schaeffer was present

when Defendant was arrested in the hotel room with the CHS. (Vol. 6, p. 1301:16-25). He described the scene, and how Defendant was at first compliant and then began to "resist." (Vol. 6, p. 1302:22-35). SA Schaeffer claimed that Defendant threw an agent against a wall and raised the index finger of Tawheed. (Vol. 6, p. 1303:17-20). On cross-examination, SA Schaffer acknowledged that Defendant was not charged with battery, that he did not try to "swallow" anything or destroy his computer, and that he did not try to run away. (Vol. 6, p. 1306:6-14; p. 1307:1-5).

### 11) <u>Defense Oral Motion for Judgment of Acquittal</u>

Following SA Schaeffer's testimony, the government rested its case. (Vol. 6, p. 1314:12-13). The defense orally moved for a judgment of acquittal, focusing on Defendant's independent advocacy:

> We have the essence here of independent advocacy. We have an individual who is getting these materials from the public domain. They have -- and I know we all know the great resources that the government has and the FBI has to look at things. He is getting these materials, according to all of the evidence here, from the public domain; and he is simply copying them through the use of this computer script, whatever it is.
>
> He might – it's no different than if he took his mouse and he highlighted them, and he copied and pasted them to another file or he downloaded them like people do. Yes, he's got a method that he wrote to do it faster, more efficiently, maybe better quality. But, again, there's no evidence that anyone told him to do this. There's no evidence that he's doing it at anyone's behest. There's no evidence that he sent it to anyone else. Now, the government is going to say they charged this as an attempt, and so that's what makes it different, that he wanted to do all this. But if you -- if you think about it, then there could be no independent advocacy. It would get swallowed by the word "attempt." Because according to the government, well, any time someone is doing these things, ultimately at the end of the day down the road, they were doing it because they wanted to get in tight, and they wanted to do it at the direction or control of ISIS or they were going to give it to him. We know this; you know, we're looking in our crystal ball. But that would extinguish the whole idea of independent advocacy.

> The fact is that in this country, as we said in our opening and as their own expert confirmed, in this country people can watch these videos; they can download these videos; they can possess these videos; and they can share these videos. And they need something more. And, you know, we could all say, well, it's good that they stopped him. Maybe something else, but there's no evidence of something else going on here.

(Vol. 6, p. 1308:20-25; p. 1309:1-25; p. 1310:1-13). The Court reserved ruling. (Vol. 6, p. 1310:15).

The defense rested its case without witnesses. (Vol. 6, p. 1316:5-6)

### 12) **Jury Instructions Conference**

The Court discussed jury instructions during various breaks and intervals in the course of trial. Particularly relevant to the arguments presented herein was a discussion concerning the term "for the benefit," which occurred during a break in OCE4's testimony. (Vol. 4, pp. 919-929). The defense specified their concerns with that phrase as follows:

> So your concerns -- and thank you for picking up what our concerns were with the word "benefit" -- is that there could be some type of corollary or ancillary benefit to an organization by one's independent conduct. And that's what our concerns were that were set forth in the motion even – you know, in limine regarding Dr. Zelin's testimony, which was there could be testimony or argument that somebody some – the terrorist organization may benefit from certain activity, but that activity is done independently. And there's a danger that we're trying to avoid here, and it's stemming from this word "benefit."

(Vol. 4, p. 926:1-13). Echoing these concerns, the Court observed that "Zelin's website itself could benefit one of these organizations because it allows people with an EDU address to get into it. So I'm having trouble with the word 'benefit.'" (Vol. 4, p. 926:18-23). Ultimately, the Court did not include the phrase "for the benefit" in the relevant instruction that was given to the jury.

### 13) **Government Closing**

The government's closing argument began with Defendant's statements in the messages that he does "jihad in media" and his renewed bayat to ISIS. (Vol. 7, p. 1322:10-13). The

45

government's argument continued to focus on Defendant's support for ISIS, and it portrayed his development of the "suite of computer programs" as action based on that support.  (Vol. 6, p. 1322:14-25; 1323:1-9).   It also highlighted how Defendant taught the government operatives how to configure their computers and how to run the computer scripts, even though those operatives did not portray themselves to be ISIS members.    (Vol. 6, p. 1323:10-13; p. 1328:3-6).   The government's argument treated "support" for ISIS as if it was synonymous with "material support."  (Vol. 7, p. 1325:8-10)  ("And over the next several months, the defendant's statements to OCE 2 made clear who he supported and what he was doing in. And the answer was ISIS.") ; (Vol. 7, p. 1328:14-18) ("And immediately, immediately in his conversation with that -- with OCE 4, what did the defendant say about himself? He said, "I'm a munasir. I copy channels and share." You learned what that word means. A munasir is a supporter, again, a supporter of ISIS.").  The government also described Heralds of the Internet as a "technical manifesto" to "sort, organize, and preserve ISIS official media, media the defendant knew that ISIS was having trouble keeping online, media the defendant knew that supporters like him were having trouble accessing."  (Vol. 7, p. 1326:14-21).

With regard to the distinction of "services" provided at the direction of or in coordination with ISIS, as opposed to independent advocacy, the government argued that Defendant acted in response to "directions" from ISIS.   It stated as follows:

> And, again, I anticipate that the Judge will instruct you that "services" includes advocacy or activities, activities performed in coordination with or at the direction of ISIS.
> He will also tell you that independent advocacy or activity is not prohibited by the law.
> And the evidence in this case, ladies and gentlemen, the defendant's own actions, his own words, his own computer programs, has all shown beyond a reasonable doubt that he was working to benefit ISIS and that he was responding to specific directions and calls to action that ISIS issued to supporters like him. Engage in media jihad, support the Islamic State on

the digital front.

And knowing about ISIS's problem keeping its media online, the defendant took action. He created a technical program that was meant to solve that problem, and he worked, he worked to preserve that ISIS media, to save it, to sort it, to organize it, to share it with others.

And, ladies and gentlemen, the evidence has shown that the defendant, who had sworn his allegiance to ISIS, was doing all of that for a reason. He was not acting independently.

(Vol. 7, p. 1334:4-24). The government also noted that the "attempt" charge required it to prove a substantial step toward providing services to ISIS and that he did so with the intent to provide services to ISIS. (Vol. 7, p. 1335:1-6). The "substantial steps" identified the government "included writing, distributing, and using the computer process described in "Operation: Heralds of the Internet" [and] modifying those other Python computer programs that you've seen, distributing those to others, teaching those to others, and using them himself." (Vol. 7, p. 1335:7-14). The government also argued that it could show that it could meet its burden by showing "what [Defendant] intended to do was provide his services to ISIS." (Vol. 7, p. 1335:15-21). The government's argument continued to focus on Defendant's intent to help ISIS. (Vol. 7, p. 1336:1-5) ("In this case, the defendant has shown through his words and through his actions over and over again exactly what he was doing, what he cared about, and who he was trying to help. And the answer is ISIS."); (Vol. 7, p. 1336:11-16).

To prove Defendant's "intent," the government highlighted the article he wrote for the Youth of the Caliphate Magazine. (Vol. 7,p. 1337:10-25; p. 1338:1-13). The government also cited Defendant's "voiceover" on the video produced by AF Media, the unofficial medial organization. (Vol. 7, p. 1338:14-18). The government argued that Defendant was inspired by official ISIS publications. (Vol. 7, p. 1338:13 ("His inspiration were ISIS official publications.")). It also argued that Defendant's intent to provide "services" was proven by his adding subtitles to videos and translations. (Vol. 7, p. 1339:4-6). After showing the "Crusader State of Russia" video,

for which the government emphasized a screenshot that read, ""Know that we will kill you in your homes as well," the government argued, "So when you ask who was the defendant intending to help, what were his goals, what was his mind-set, these actions, ladies and gentlemen, show you." (Vol. 7, p. 1347:1-8).  Similarly, the government argued that Defendant's creation of a "Nasheed" was evidence of his intent to provide "services."  (Vol. 7, p. 1347:9-24).

The government did not argue how adding subtitles to an unofficial video or a homemade "Nasheed" evidenced direction from or coordination with ISIS.  Indeed, when the government simply repeated that the evidence showed Defendant's intent to provide "services to ISIS.  (Vol. 7, p. 1342:1-14) ("And so going back to those elements, the evidence --and we're going to continue to talk about intent -- but the evidence here overwhelming shows, shows beyond a reasonable doubt, what the defendant intended to do and that his actions were done with the intent to provide services to ISIS, that his activities were to provide services to ISIS.").

The government's argument regarding "direction and coordination" appears to be based on the "Structure of the Caliphate" and "Inside 8" videos.  For instance, the government argued that Al-Furqan "instructs" in the "Structure of the Caliphate" that ISIS has a department or a Diwan of Media." (Vol. 7, p. 1343:6-10; p. 1343:17-20).  It also noted that the "Structure of the Caliphate" video referenced "supporters."   (Vol. 7, p. 1344:5-10) ("the Media Diwan and Al-Furqan in making this video specifically included someone else in the structure of their media organization, someone else who was part of the mission; and that is, supporters, supporters like the defendant."). Based on these references, the government argued that ISIS viewed supporters to be as important as official members.  (Vol. 7, p. 1344:15-23).  It then argued that these videos provided the "direction" and "coordination" necessary to carry its burden:

> But he knew something else, and I want to refer you back to this video. It's called "Inside 8," and there are several clips from this video that are in evidence in

48

> the Exhibit 409 series. And I encourage you to go back and take a look at these, look at them closely, because this video contains specific instructions and directions to ISIS supporters consistent with its media strategy. And those instructions were very specific, and they included support your khalifah, support ISIS on the digital front. And that is a direction that the defendant followed.
> (Said video recording played in open court.)
> And he was listening. He was paying attention, because the defendant sent pictures, screenshots from Inside 8 to OCE 2. He said, "Hey, did you see Inside 8?" And he'd studied it so closely. He sent these images of people in the video, these ISIS members or supporters typing back and forth on some type of messaging platform.

(Vol. 7, p. 1345:6:22). The government argued that those "instructions" from Inside 8 told supporters to "strive patiently in the digital arena" and "Do not allow the disbelievers, the Kuffar, to enjoy a moment of sleep or live a pleasant life." (Vol. 7, p. 1346:2-12). The government specifically argued that, based on Inside 8, Defendant was "following their directions, listening to their strategy, spreading that message to OCE2 who, again, he believed to be someone who worked for an organization that spread jihadi and ISIS materials related to explosives and poisons." (Vol. 7, p. 1347:10-16).

After making these points that were primarily based on the Inside 8 video, the government argued that Defendant "came up with a set of computer programs and processes that would copy quickly, efficiently, much faster than anyone could ever do manually, preserve that information, sort it, organize it, and make it available to other people, because he knew how hard it was to find online." (Vol. 7, p. 1349:13-23). The government argued that this conduct was "completely consistent with and absolutely following the specific message coming out from ISIS and its media department." (Vol. 7, p. 1349:24-25; p. 1350:1-2). The government then specified the substantial steps that Defendant used to provide "services" to ISIS, which were as follows:

> He worked with what he had from where he was, and he used his computer skills. And in doing so, he took several substantial steps toward attempting to provide those services to ISIS. And they included these;

> misdirecting law enforcement; writing the Heralds of the Internet, the process itself, the underlying script, and the teaching manual document; distributing that teaching document; using it to actually engage in the conduct that it's designed to do; modifying other Python computer programs; distributing those programs to people he believed were trying to help ISIS; teaching those same people how to do it; and using those programs himself.

(Vol. 7, p. 1350:5-16). The government then proceeded to describe these "substantial steps." Of note, it again described "Heralds" as a "manifesto," (Vol. 7, p. 1352:17-25) in which he intended to "teach everyone the transgressions of the crusaders and how the Islamic State's response to transgressions was self-defense." (Vol. 7, p. 1353:1-6). It also argued that Defendant did not act independently when he sought to obtain access to Al Hayat Media channels. (Vol. 7, p. 1355:4-17). In arguing that teaching others about the scripts was also a substantial step, the government argued that doing so would ultimately "benefit" ISIS. (Vol. 7, p. 1362:24-25; p. 1363:1). Notably, the government highlighted that Defendant's own comment that he was "the only person in the world doing this right now." (Vol., p. 7:14-22). The government concluded its argument by reiterating its theory that Defendant did not act independently because he watched ISIS media, specifically Inside 8:

> And the defendant answered very clearly again what his goal was: Spread it everywhere.
> And go back to that Inside 8 video. If they close 3 accounts, open 30. Spread it everywhere. The defendant was doing that at scale, at an exponentially higher rate than what other people could do. And he was following through with his media jihad.
> He had heard the instructions. He had heard the directions to support the caliphate on the digital front.

(Vol. 7, p. 1365:2-10).

## 14) Defense Closing

In its closing, the defense focused on the First Amendment protections afforded to Defendant and argued that his conduct and expression amounted to independent advocacy, not

material support.  (Vol. 7, p. 1374:3-25; 1375:1-15; p. 1381:1-5).  The defense also highlighted how when Defendant was given an opportunity to provide help or services to ISIS, he did not do so.  Instead, he came up with excuses.  (Vol. 7, p. 1368:6-15).   That included OCE1 asking Defendant if he wanted to meet the "brothers in the Diwan"; OCE3 asking Defendant to translate bomb instructions; and the CHS asking Defendant to take screenshots of the nas.py script.   (Vol. 7, pp. 1394-1395;  p. 1403:10-14).

The defense also emphasized that supporting the goals of the organization is not the same as providing material support to the terrorist organization.  (Vol. 7, p. 1368:16-18)  ("And as I will talk about, just because those beliefs may be the same as that of a terrorist organization does not mean it's illegal.").  The defense highlighted how Defendant told the CHS that his conduct was not illegal, and that he did not believe it was illegal because of the First Amendment.  (Vol. 7, p. 1369:7-13; p. 1369:14-21).  Also emphasized was that "services" required "concerted activity," not just "independent activity." (Vol. 7, p. 1376:23-25; p. 1377:1; p. 1377:6-10).  Those services, the defense argued, must be in coordination with or at the direction of the terrorist organization. (Vol. 7, p. 1377:16-23).   Due to these standards, as well as the specific First Amendment safe harbor in the material support statute, merely supporting and liking ISIS is not illegal.   (Vol. 7, p. 1380:13-21).  The defense also highlighted how the government's evidence of "intent" to provide material support, such as viewing and sharing videos, the posters, the nasheed, the voiceovers, the bayat, and other similar evidence was not illegal and did not amount to "services."

Turning to the "services" charged in the case, the defense noted that the only services are the programs that copied and pasted videos.  (Vol. 7, p. 1382:11-25; p. 1383:1-4).  The government waited months to arrest him for those "services."  (Vol. 7, p. 1388:17-22).  With regard to Heralds, the defense argued that it was an expression of his personal belief like any other manifesto.  (Vol.

7, p. 1400:5-11).  The defense also argued that simply because ISIS might find it beneficial for its videos to be in the world did not mean that Defendant was providing a "service."  (Vol. 7, p. 1405:10-22).  Relatedly, the defense argued that charging the case as an "attempt" did not negate the concept of independent advocacy.  (Vol. 7, p. 1408:15-20).

### 15) Government Rebuttal

In its rebuttal argument, the government stated that Defendant was not charged for First Amendment activity, but rather for what he did, namely modifying a computer script "and with distributing it to people he believed were all pro-ISIS brothers."  (Vol. 7, p. 1414:18-23).  It argued that the First Amendment did not protect Defendant because "acts" and not "speech" were at issue, such as Defendant's "voiceover for an ISIS video that glorified violence."  (Vol. 7, p. 1416:7-10). The government also emphasized that the key to Defendant's intent was to identify who he tried to benefit.  (Vol. 7, p. 1414:24-25; p. 1415:1-2).   According to the government, the "service" was in preserving ISIS videos:

> That was not in the original script. That's not window dressing. That is doing a service to ISIS so that those videos are preserved; they're not taken down; and they're preserved in a way that other people can get.
> He organized it. He added into a script the ability to organize the videos by resolution, so the brothers in the field who don't have high definition -- or high-speed internet can access the lower-resolution videos. And this was important to the defendant, and this was important to ISIS, because as you heard from Aaron Zelin and as you saw from the material we presented to you, ISIS has a media Diwan, a department of media. You don't see that here in the United States. It's because media was so important to ISIS. It helped further their mission. It recruited people. It incentivized their members and supporters, and it terrorized the people who were enemies of ISIS.

(Vol. 7, p. 1419:7-22). In response to the defense arguments that Defendant asserted that his conduct was "not illegal," the government argued that "ignorance of the law" was not a defense and that the charge did not require a "willful" mindset. (Vol. 7, p. 1420:3-17).

Focusing on the response to the defense's argument on independent advocacy, the government rephrased the inquiry as to whether "the defendant acting independently on his own, completely isolated from ISIS; or was he acting at their direction or attempting to coordinate with them?" It then answered that question simply by saying, "What the defendant did was all about helping ISIS. That's not independent." (Vol. 7, p. 1422:4-18). The defense objection was overruled. Continuing the government defined "direction" as a "blast-out from the organization to its members and its supporters to do things." It told the jury that this was the same as the announcer at a Bulls game encouraging the crowd to clap and scream. The people who do so are "taking direction from the Bulls … and that's what we have here." (Vol. 7, p. 1423:2-11). Specifically, Inside 8 told supporters to "do the media," which according to the government was "direction." (Vol. 7, p. 1423:17-21). On this point, the government's continued as such:

> So he, in creating the script, in filling the need of ISIS when their videos are taken down in social media, comes up with this idea to preserve them, to make it better, make it better organized so that the brothers can have access to them, that's responding to the direction of ISIS. And that's a service, and that's material support, and that's not independent.
> In responding to the call, the defendant is trying to build a bridge back to ISIS. Now, the language of the statute, what the Judge is going to read to you, it's coordination or direction. So just responding to the direction without more, by doing the script and distributing it, that's enough for you to find him guilty.

(Vol. 7, p. 1424:14-25).

In addition to this "direction" argument, the government made a "coordination" argument in its rebuttal. This argument asserted that the distinction between official and non-official pro-ISIS organizations was irrelevant. Specifically, the government's coordination argument focused

on how Defendant shared the "Heralds" pdf with OCE2 and Organization 1. The government argued as follows:

> This is an organization that promotes ISIS explosive material and toxic material. Why would he be sending them the script, Heralds of the Internet, how to do what he is trying to do, unless he's trying to get it out to the ISIS community?
>
> Now, whether that organization is official ISIS or unofficial ISIS doesn't matter. As Dr. Zelin told you, unofficial takes direction from official. As the defendant said -- and you'll see this when you review the binders – I don't know what's official. I don't know what's unofficial.
>
> But he doesn't care. He still reaches out. He doesn't take steps to be -- act independently. He's all in. He wants to help the organization.

(Vol. 7, p. 1425:6-17).

The government concluded its rebuttal by arguing what the jury would have to find in order to acquit defendant. The argument is quoted in full as follows:

> If you believe that the defendant was intending to act as an independent advocate when OCE 2 asked the defendant about why he was doing this, why he was helping with the videos, and the defendant said "For ISIS" -- and the OCE 2 said, "For ISIS or jihad," and the defendant said "For both"; if you believe he was acting as an independent advocate when he told OCE 2 that al-Qaeda has an encryption program and he can make our own, our own, meaning ISIS; if you find -- if you believe that he was acting as an independent advocate when he talked about developing a Linux system for Ansar, the brothers, and when OCE 2 asked how would this help ISIS, the defendant said, "It would be more secure"; if you believe he was acting as an independent advocate when Operation: Heralds of the Internet he said -- and I'm paraphrasing – "al-Furat and al-Hayat can use this to organize their channels or I can do it for them"; if you believe he was acting as an independent advocate when he says to OCE 2, "I'm going to create this wild goose chase for the FBI to go off and investigate the Kuffar who don't believe in Dawlah so that the equan, the brothers who were planning attacks, have less time being spied on" – that is page – that's page 35 of the 200 series binder, the second page 35 -- if you believe he was acting as an independent advocate when he said, "There's only 10 brothers in the world who do this" and in the context of creating the script for ISIS; if you believe he was acting as an independent advocate when, in discussing the challenges of locating ISIS videos, in response to OCE 2, he says, "I try to help them" -- not "I'm acting on my own" – "I try to help them"; and if you believe he's an independent advocate when he said, "I do jihad in media";

54

and if you believe that he was an independent advocate when he pledged bayat on his own -- no one made him do it; itis on his own, and he did that a second time after Baghdadi was killed, and he had to do it for the new ISIS leader -- if you believe he was an independent advocate for all of that, plus more that you'll see in these exhibits, then find him not guilty.

But there's a more logical, common-sense answer for all that conduct; and that is, he was heeding the call of ISIS. He was providing material support in the form of services at their direction. Find him guilty. Thank you.

(Vol. 7, p. 1426:14-25; p. 1427:1-24) (Vol. 7, p. 1427:1; p. 1428:1-3). The defense objected to this argument as burden shifting. (Vol. 7, p. 1428:6-9, 19:23; p. 1429). After argument held at sidebar, the Court disagreed. (Vol. 7, p. 1429:5-11).

### 16) Jury Instructions

The jury was instructed on the elements of the offense of attempted material support, in violation of 18 U.S.C. §2339B(a)(1). It was told that it was required to find these two primary propositions to be true:

> 1. The defendant knowingly attempted to provide material support or resources, namely services, to a designated Foreign Terrorist Organization, namely ISIS;
> 2. The defendant knew that ISIS was a designated Foreign Terrorist Organization, that ISIS engaged or engages in terrorist activity, or that ISIS has engaged or engages in terrorism.

(Dkt. 152, p. 19). Because the case was charged as an "attempt," it was also instructed as follows:

> A person attempts to commit the crime of providing material support to a foreign terrorist organization if he (1) knowingly takes a substantial step toward providing material support to a foreign terrorist organization, (2) with the intent to provide material support to a foreign terrorist organization. The substantial step must be an act that strongly corroborates that the defendant intended to carry out the crime of attempting to provide material support to a foreign terrorist organization.

(Dkt. 152, p. 20). The jury was also provided definitions of the key terms, "material support and resources" and "services" in the following instructions:

> The term "material support and resources" includes any services. The term "services" refers to concerted activity, not independent activity. Services provided as material support to a foreign terrorist organization includes advocacy or activity performed in coordination with, or at the direction of, a foreign terrorist organization. Independent activity or advocacy, however, is not prohibited.

(Dkt. 152, p. 20).   Also important was the First Amendment instruction that was given, which stated as follows:

> The First Amendment to the United States Constitution provides:
> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for redress of grievances.
>
> Title 18, United States Code, Section 2339(B)(i), the statute under which Defendant is charged in the indictment, provides:
>
> Nothing in this section shall be construed or applied as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States. Advocacy that is done independently of the terrorist organization and not at its direction or in coordination with it does not violate the statute. Advocacy performed in coordination with, or at the direction of, ISIS is not shielded by the First Amendment.

(Dkt. 152, p. 24).

### 17) Jury Deliberations and Verdict

The jury began its deliberations on October 15, 2021.  On October 18, 2021, it sent a note requesting definitions of "concerted" and "substantial steps."  (Vol. 8, p. 1452:5-9).   The Court defined "substantial" to mean "important or essential."   (Vol. 8, p. 1452:19-20).   It defined "concerted" as "jointly arranged, planned, or carried out or coordinated."  (Vol. 8, p. 1456:9-10).

The jury returned its verdict of guilty on Count One on October 18, 2021.  (Vol. 8, p. 1457;18-22).

### III.    ARGUMENT

Defendant was, at most, an independent advocate who expressed support for the goals of ISIS and the evidence at trial failed to prove otherwise, even when viewing that evidence in the light most favorable to the government.  In particular, the evidence did not prove that Defendant attempted to engage in concerted activity with ISIS by attempting to act under its direction or in coordination with the terrorist organization.[6]  The trial evidence and testimony are woefully lacking in those crucial elements of direction and coordination.  Despite the voluminous record, the government's evidence of "direction" boiled down to the "Structure of the Caliphate" and "Inside 8," ISIS videos that it contended provided the ways for "media jihad" that Defendant followed.  Not only is that theory exceedingly vague, but it also does not negate the independence of Defendant's advocacy, the legality of his support under *HLP*, and the numerous independent steps that he took to express that support.  Moreover, absent rank speculation, nothing showed that Defendant's modification, use, or sharing of the computer code—the actual "services" at issue— was anything but independent activity.  There was no evidence showing that ISIS directed that the computer code be developed, and that Defendant attempted to follow that direction.  The government, at bottom, argued that because ISIS asked for support, anyone who advocated for it was attempting to do so at its direction. This argument extinguishes "independent advocacy."

The government's evidence of "coordination" is equally untenable, as it appears to be based on Defendant's hope that he could someday obtain videos from Al Hayat, and also that he sent the "Heralds" file to someone he thought worked for Organization 1, and that he shared the nas.py scripts with someone he believed was associated with Organization 2.  Even if one assumes

---

[6]  As a threshold point, it is difficult understand how someone could attempt to act under the direction of or in coordination with someone else, but not actually be doing so.  After all, you are either in some manner communicating with them or not, and if you are not communicating with them then you cannot be acting under their direction or in coordination with.

that "Heralds" and the nas.py files could be seen as services (which Defendant disputes), neither of the organizations were ISIS. Again, the Government's argument extinguishes the concept of independent advocacy by presuming support for a non-FTO is automatically support for an FTO. The government's arguments expanded the scope of the material support statute in dangerous and concerning ways and far beyond the positions staked out in *HLP*, particularly because this case, unlike most material support cases, involved First Amendment activity.

Further, the government's use of the "attempt" theory effectively nullifies the vital concept of independent advocacy and also avoided proof of a "substantial step." Put simply, from the government's perspective, there is no meaningful difference between attempting to work under the direction of ISIS or in coordination with it and independently advocating for ISIS. That cannot be the case.

Second, the government's position that there is no difference between non-FTOs and FTOs was not only contradicted by the evidence but also impermissibly broadens the law, which requires the material support be provided *to* the FTO. These and other points raised below not only show that the government failed to prove Defendant guilty beyond a reasonable doubt, but they also underscore the unconstitutional vagueness of the material support statute as applied to Defendant.

## A.  **The Court Should Order a Judgment of Acquittal Under Rule 29**

### 1)  **Legal Standards for Rule 29 Motion**

Federal Rule of Criminal Procedure 29 states that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Cr. P. 29. A Rule 29 motion should be granted when "after viewing the evidence in the light most favorable to the United States, the trial court finds that no rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt."

58

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Howard*, 179 F.3d 539, 542 (7th Cir.1999) ("[A] judgment of acquittal should only be granted if the evidence, looked at in the government's favor, is so scant that the jury could only speculate as to the defendant's guilt, and a reasonably minded jury must have had a reasonable doubt as to the defendant's guilt."). A guilty verdict, however, can be sustained only if the government introduces sufficient credible and probative evidence that the defendant was guilty of each element of the offense on each of the charges. *Neder v. United States,* 527 U.S. 1, 15 (1999); *In re Winship*, 397 U.S. 358, 364 (1970). Failure to prove an essential element entitles a defendant to an acquittal. *Jones v. United States,* 526 U.S. 227 (1999).

Though a defendant moving for judgment of acquittal under Rule 29 may "bear[] a heavy burden," it "is not insurmountable." *United States v. Cassese*, 428 F.3d 92, 98 (2nd Cir. 2005) (affirming district court's judgment of acquittal after jury verdict of guilty) (citations omitted). While the evidence must be construed in the light most favorable to the government, in a case based on circumstantial evidence, the standard "is not so heavily weighted in favor of the prosecution that in ruling on a Rule 29 motion the Court must blindly and uncritically accept that every inference the prosecution argues can reasonably be drawn from the circumstantial evidence in the record." *United States v. General Elec. Co.*, 869 F. Supp. 1285, 1290 (S.D. Ohio 1994). Rather, the district court must enter judgment of acquittal "if the trier of fact is called upon to choose between reasonable probabilities of equal weight, one innocent and the other guilty." *Id*.

"A Rule 29 motion calls on the court to distinguish between reasonable inferences and speculation. Each step in the inferential chain must be supported by evidence that allows the jury to 'draw reasonable inferences from basic facts to ultimate facts.'" *United States v. Jones*, 713

F.3d 336, 340 (7th Cir. 2013) (quoting *Coleman v. Johnson*, 132 S. Ct. 2060, 2064, 182 L. Ed. 2d 978 (2012)). *See also United States v. Sanchez*, 615 F.3d 836, 845 (7th Cir. 2010) (overturning jury verdict, stating a guilty verdict cannot rest solely on the "piling of inference upon inference.") (quoting *United States v. Moore*, 115 F.3d 1348, 1364 (7th Cir. 1997)). *See also United States v. Garcia*, 919 F.3d 489, 497 (7th Cir. 2019) ("the judge is still responsible for enforcing outer limits on reasonable inferences, guided by the relevant standard of proof.").

Moreover, and as the Seventh Circuit has emphasized in this context, "We will 'not permit a verdict based solely upon the piling of inference upon inference.' … In this regard, we emphasize the indirect, inconclusive nature of the evidence in establishing [the defendant's] intent." *United States v. Conley*, 942 F.2d 1125, 1129 (7th Cir. 1991). Importantly, "'when evidence as to an element of a crime is equally consistent with a theory of innocence as a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt.'" *Id*. (quoting *United States v. Delay*, 440 F.2d 556, 568 (7th Cir. 1991)). *See also United States v. Miller*, 761 F. Supp. 1368, 1380-81 (S.D. Ind. 1991) (granting motion for acquittal where circumstantial evidence failed to establish defendant's intent; "[w]here the government's evidence is equally strong to infer innocence of the crime charged as it is to infer guilt, the verdict must be one of not guilty and the court has a duty to direct an acquittal").

### 2) The Government Failed to Prove Defendant Guilty Beyond a Reasonable Doubt of Each of the Elements Required for an Attempted Material Support Offense.

#### a) Elements of the Attempted Material Support Offense and Relevant Law

As noted above, the jury was provided specific instructions regarding the elements of the material support offense in violation of 18 U.S.C. §2339B(a)(1); the elements of "attempt;" definitions of "material support and resources" and "services;" and on the scope of the First

Amendment. Particularly relevant is the definition of "services," which referred to "concerted activity, not independent activity." Moreover, the services can include advocacy or activity only when it is performed "in coordination with, or at the direction of, a foreign terrorist organization." The jury was instructed that "independent activity or advocacy" was not prohibited. The jury was further instructed that the material support statute does not abridge "the exercise of rights guaranteed under the First Amendment to the Constitution of the United States" and that "[a]dvocacy that is done independently of the terrorist organization and not at its direction or in coordination with it does not violate the statute. Advocacy performed in coordination with, or at the direction of, ISIS is not shielded by the First Amendment." Thus, under these instructions, the jury was required to find that any advocacy or activity was done or attempted to be done at the direction of ISIS or in coordination with ISIS. Without direction or coordination, the advocacy or activity is independent and thus not illegal.[7]

Additionally, the services must be provided *to* the foreign terrorist organization. On this point, the Supreme Court was crystal clear: "The statute prohibits providing a service '*to* a foreign terrorist organization' … The use of the word "to" indicates a connection between the service and the foreign group." *HLP*, 561 U.S. at 24 (italics in original). In its briefing before the Supreme Court, the government, represented by now Justice Kagan, specified that the statute required a "direct relationship with the foreign terrorist organization." (Govt. *HLP* Brief, p. 39; *see also id*. p. 41 ("The statute's text plainly requires that a "service" be rendered "to" a foreign terrorist

---

[7] By way of analogy, in the RICO context "In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs..." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Put another way, it requires more than parallel activity.

organization (which requires a direct relationship)"). The government argued that that "direct relationship" defeated the petitioner's concern that the statute was unconstitutionally ambiguous. *Id*., p. 41. Further, mere association with a foreign terrorist organization is not prohibited. The Supreme Court recognized that §2339B "does not criminalize mere membership in a designated foreign terrorist organization." *HLP*, 561 U.S. at 18. Again, the government's position before the Supreme Court is worth emphasizing: "Congress did not prohibit individuals from joining terrorist groups, expressing solidarity with them, or even inciting others to engage in terrorist conduct." (Govt. *HLP* Merits Brief., p. 54).

Both before and after *HLP*, courts recognized that advocating for the goals and philosophies of a terrorist organization does not amount to illegal material support. In *Boim*, 291 F.3d at 1026, the Seventh Circuit observed that the defendants in that case "may, with impunity, become members of Hamas, praise Hamas for its use of terrorism, and vigorously advocate the goals and philosophies of Hamas. Section 2339B prohibits only the provision of material support (as that term is defined) to a terrorist organization." *See also United States v. Lindh*, 212 F. Supp. 2d 541, 574 (E.D. Va. 2002) (emphasis in original) ("The term [personnel] is aimed at denying the provision of human resources to proscribed terrorist organizations, and not at the mere *independent* advocacy of an organization's interests or agenda.").

Particularly instructive is *United States v. Wright*, 937 F.3d 8, 28 (1st Cir. 2019), which reversed a defendant's material support conviction on a jury instruction error. There, the instruction permitted a conviction based on coordination with the strategy of a terrorist organization, rather than the terrorist organization itself. That erroneous jury instruction provided as follows:

> The support must be "material," which means it's got to make some sort of difference, not a major coup necessarily, but it's got to make some

difference to the goals, plans, strategy, tactics of this foreign terrorist organization, in this case it's ISIS. And there's got to be — what they do — and again this is all part of this terrorist connection, what they plan to do has — the specific language I want to use is that it has to be "conduct done in coordination with or at the direction of the foreign terrorist organization."

Now the coordination — and the reason that the government has to prove that is to prevent, um, the law from applying [to] some random act, just a random act of violence and then ISIS latches onto that and says, "Oh, yeah, those were our soldiers," or something like that. They have to — the conspiracy has got to be, um, cognizant of and acting in coordination — it doesn't have to be direct orders, but in coordination with the strategy, the tactics of the foreign terrorist organization, in this case ISIS. Well, that's the first question.

*Wright*, 937 F.3d at 27 (emphasis in original).

The First Circuit concluded that the underlined sentence misstated controlling law and warranted reversal. The defendant argued that the underlined portion allowed the jury to convict "merely by having coordinated with ISIS's publicly available strategy and tactics, while acting independently of the terrorist organization itself." *Wright*, 937 F.3d at 28. The government countered that when read as a whole, the instruction required the jury to find "that the 'coordination' was with ISIS itself and not merely with its publicly available strategy and tactics." *Wright*, 937 F.3d at 28. The First Circuit disagreed with the government's reading and determined that the natural reading of the instruction was that the coordination could be with the strategy and tactics of ISIS, rather than with the organization itself. *Wright*, 937 F.3d at 29. The court concluded that the erroneous instruction required reversal because it permitted the jury to deem "a defendant to have acted 'in coordination with' a terrorist organization based merely on a finding that the defendant had operated in parallel to that organization." *Wright*, 937 F.3d at 29. It also found no support in the law for such an "expansive construction of the 'material support or resources' element of the offense." *Wright*, 937 F.3d at 29.

*Wright* is hauntingly similar to the case at bar. Defendant's conviction rests on his "parallel advocacy" where he, at most, supported or sympathized with the goals, philosophies, and strategies of ISIS rather than providing (or attempting to provide) services to the organization itself. Indeed, it was nothing more than coordination "with its publicly available strategy and tactics," something the Government in Wright agreed was allowed.

**b) The Evidence Was Insufficient to Show that Defendant Acted or Attempted to Act under the Direction of or in Coordination with ISIS, Rather Than Engaging in Independent Advocacy and Activity.**

**i. Defendant's Independent Advocacy and Activity**

Defendant clearly engaged in independent advocacy and activity. Mere support for the foreign terrorist organization is not material support. One can lawfully support and advocate for a terrorist organization. *Boim*, 291 F.3d at 1026; *HLP*, 561 U.S. at 18. The government's focus throughout trial and especially during closing argument was showing that Defendant "supported" ISIS. But being a "munasir," or supporter, is not a crime. And the evidence that the government pointed to as evidence of his "support," such as writing an article in the Youth of the Caliphate magazine; printing posters; swearing Bayat; doing a voiceover for an AF Media video (Vol. 7, p. 1338:14-18); providing subtitles for videos (Vol. 7, p. 1339:4-6); and, making a homemade "nasheed" (Vol. 7, p. 1347:9-24), are all individual and independent activity that at most express support for the goals and philosophies of ISIS.[8]

It was the government's burden to show that he went beyond and engaged in "concerted" activity by attempting to work in coordination with or under the direction of ISIS. Before

---

[8] While all of these activities were independent, with specific regard to the "nasheed" that Defendant sent to OCE2, Defendant's comment that maybe ISIS would use it revealed how little he knew of ISIS. As Zelin testified, ISIS only used media produced by its official channels. ISIS was not a Reader's Digest that took fan submissions. To think that it would consider a homemade nasheed from an American teenager is utterly absurd and, in any event, does not involve the "services" that Defendant was charged with attempting to provide.

addressing the failure of the government to prove direction and coordination, it is important to understand the independent nature of the actual "services" that the government argued Defendant provided: the "Heralds of the Internet" document and the nas.py scripts.

The government's description of "Heralds" as a "manifesto" aptly encapsulates its personal and individualized nature. (Vol. 7, p. 1326:14-16; p. 1353:1-6). The document was a statement of belief that expressed Defendant's own view that ISIS acted in self-defense. Indeed, the "Intention/Niyyah" was as follows: "Bring people to Islam and teach everyone the transgression of the Crusaders and how the Islamic State's response to transgressions is self-defense." He understood that the videos and other media further conveyed and supported that belief. It was his personal goal to save and preserve those videos to share with others, ultimately through a "torrent" and with online users at Reddit. Aside from the assistance of the mysterious overseas Internet friend "no name," who was in the background of the case, there is no evidence suggesting that "Heralds" was anything but an independent project. Moreover, the "search" function that distinguished "Heralds" from the nas.py scripts, which essentially added the ability to filter videos by resolution or other search term, was appropriately described by expert Baggett as "window dressing." (Vol. 3, p. 466:6–15). There was certainly no evidence that ISIS provided any instruction or direction on how to create the "Heralds," and to specifically direct others to develop a "search" function that could organize video files by resolution.

There was no evidence that even remotely suggested that ISIS provided an instruction or direction to Defendant regarding the creation or dissemination of the nas.py script. Any finding to the contrary would be based on speculation insufficient to convict. *Jones*, 713 F.3d at 349. Again, aside the role of "no name" who apparently wrote the scripts (and there is no evidence he acted at ISIS's direction or in coordination with it), there was no evidence that ISIS had any

65

involvement—even under the government's expansive "direction" theory—regarding the development of the script. *United States v. Katz*, 582 F.3d 749, 752 (7th Cir. 2009) ("A jury cannot speculate its way out of reasonable doubt.").

Rather, even if ISIS had a problem keeping its videos online and accessible due to social media company terms of service, Defendant taking it upon himself to try and preserve the videos is, irrefutably, independent conduct. Moreover, Defendant expressed that he started this project to collect and preserve videos because he, himself, could not find the videos online. This was a personal project, not a service provided to or at the request of ISIS. (It was not unlike what Aaron Zelin did when he encountered the same problem.) The government's argument concedes as much when it repeatedly stated that "he came up" with these programs on his own. (Vol. 7, p. 1349:13-23).

It must also be emphasized that both "Heralds" and the nas.py scripts are fundamentally related to First Amendment expression and activity. There can be no argument that there is not an inherent First Amendment component to watching and sharing videos and media, no matter how abhorrent the content of the material is. "Heralds" and the nas.py scripts were merely vessels for that expression. Moreover, "Heralds" itself has intrinsic First Amendment value. If a "manifesto" does not receive First Amendment protection, then nothing should.[9]

Additionally, the fact that Defendant told the CHS on multiple occasions that it was "not illegal" was powerful evidence that he did not have the specific intent to and was not attempting

---

[9] It also cannot go without mention that, per the stipulation read in Court, the FBI was aware of a computer code that copying of Telegram channels as far back as January 2019. (Vol. 6, p. 1161:5-8). Further, the government waited multiple months to arrest Defendant after he shared the nas.py scripts with OCE4 and even more time passed after he shared "Heralds" with OCE3, suggesting that these "services" were not as serious as the government witnesses portrayed them to be—especially when considering that all it would take would be for Defendant to post the script online and then it would be widely available for use (which he did not do, of course).

to coordinate with ISIS or work under its direction, but was instead operating completely independently. During the October 10, 2019, in-person meeting, Defendant unequivocally told the CHS that it was not illegal to have the videos. The government rather conspicuously mis-transcribed this statement to have Defendant saying that it was "not legal." The government's attempt to minimize the importance of these statements was mistaken. During its rebuttal argument, the government contended that Defendant's belief that his conduct was "not illegal" was irrelevant because the offense did not require a "willfulness" mental state. However, that argument even contradicted the position it took in its closing argument, when it acknowledged that the "attempt" charge required it to prove "beyond a reasonable doubt that what he *intended* to do was provide his services to ISIS." (Vol. 7, p. 1335:15-21). Believing that one's conduct is "not illegal" is flatly inconsistent with the specific intent required to violate the law. Therefore, Defendant's mental state was indeed relevant. His statement of belief that what he was doing was "not illegal" further shows how his conduct was truly independent and not under the direction of or in coordination with ISIS.

### ii. The Government Failed to Prove That Defendant Attempted to Work Under the Direction of ISIS.

The government's primary argument at trial against Defendant's independent advocacy and activity was its effort to show that he attempted to work at the direction of ISIS. The thrust of this argument focused on what ISIS said it wanted and how it portrayed its goals. This was most apparent with Zelin, who described how ISIS viewed media operatives to be as important as those fighting on the ground. (Vol. 4, p. 819:2-13; Vol. 4, p. 833:7-22; Vol. 4, p. 834:2-10). However, whether ISIS viewed supporters as important has no bearing on whether Defendant intended to work under the direction of or in coordination with ISIS. It is Defendant's knowledge and intent that matter, not that of ISIS. In other words, ISIS could have viewed outside support as essential

to its mission in spreading media, but Defendant still could have acted independently.   But more importantly, acting "consistently with and absolutely following the specific message coming out from ISIS" (Vol. 7, p. 1349:24-25) is permitted parallel advocacy and support of the goals of ISIS, not acting at the direction of ISIS.

The government focused on two specific videos that were found on Defendant's devices, amongst the thousands of media products in the channels he created:   The Structure of the Caliphate and Inside 8.   (Vol. 7, p. 1343:17-20; p. 1344:5-10; p. 1345:6-22).   In essence, the government's theory was that Defendant's conduct was directed by the messages in those videos to perform "media jihad."   In its closing argument, the government specifically argued that Defendant was "working to benefit ISIS and that he was responding to specific directions and calls to action that ISIS issued to supporters like him to engage in media jihad, support the Islamic State on the digital front. And knowing about ISIS's problem keeping its media online, the defendant took action. He created a technical program that was meant to solve that problem, and he worked to preserve that ISIS media, to save it, to sort it, to organize it, to share it with others."  (Vol. 7, p. 1334:11-20).   The government argued that the videos provided instructions, specifically Inside8:

It's called "Inside 8," and there are several clips from this video that are in evidence in the Exhibit 409 series. And I encourage you to go back and take a look at these, look at them closely, because this video contains specific instructions and directions to ISIS supporters consistent with its media strategy. And those instructions were very specific, and they included support your khalifah, support ISIS on the digital front. And that is a direction that the defendant followed.

(Vol. 7, p. 1345:7-15).   The government continued to describe these "instructions" from Inside 8 as follows:

And Inside 8 said something else. It contained other directions and instructions to supporters. And here you can see where they specifically equated and made it clear that people who were working in media and on the battlefield were the same:  Supporters of the khalifah everywhere, both

68

> in the media as well on the battlefield. That was the audience. That's who they were talking to.
>
> And those instructions told them to strive patiently in the digital arena. And those instructions said: Do not allow the disbelievers, the Kuffar, to enjoy a moment of sleep or live a pleasant life.

(Vol. 7, p. 1346:2-12). But the videos were not instruction manuals that Defendant followed. The exhortation to "strive patiently" and not allow the disbelievers "to enjoy a moment of sleep or live a pleasant life" can hardly be described as providing specific directions necessary to satisfy the federal terrorism statute. And even if it can be said that Defendant was inspired by the message to open additional media accounts counts, his independent modification and use of the nas.py scripts and "Heralds" at most reflect his support of the objectives and goals of ISIS, and not material support provided to the terrorist organization. Indeed, the government's argument conceded that Defendant was "listening to their strategy" before he shared "Heralds" with OCE2. (Vol. 7, p. 1347:10-16). Ultimately, and contrary to the government's argument, Defendant was not charged with committing "media jihad." He was specifically charged with providing "services" in the form of "Heralds" and the nas.py scripts, not some wide-ranging and amorphous support of ISIS on the "digital front."[10]

The government's theory and the evidence to support "attempted direction" was problematic on many levels and ultimately insufficient to negate Defendant's independent advocacy and activity and thus his innocence. Of course, ISIS would desire that dozens of people go out to the federal plaza waiving ISIS flags or going online and saying how great ISIS is. But that does not mean that their conduct is any less protected and any less independent, even if ISIS said that it wanted supporters to sing its praises.

---

[10] The government's argument arguably confused the jury by focusing on other technical projects, such as "Ansar OS," which Defendant told OCE2 was "too difficult" to complete. Even though "Ansar OS" was not a "service," the government still argued that Ansar OS was "supposed to help ISIS," leaving the impression that it was in fact a "service." (Vol. 7, p. 1326:2-6).

69

To convict one based on his viewing, possession, discussing, and sharing of publicly available videos and media produced by or in support of an FTO would nullify the "independent advocacy" exception of the material support statute. Given the intrinsic First Amendment qualities of viewing, discussing, and sharing videos, treating such activity and expression as "direction" would also override Congress's intent when it specifically provided a First Amendment safe harbor in 18 U.S.C. §2339B(i).

In this case, the government's theory criminalizes parallel advocacy, which it has often argued is permitted. Consistent with *HLP* and its progeny, such as *Wright* from the First Circuit, one can lawfully advocate for the goals of the FTO, in support of the FTO, and even be a member of the FTO. It is simply natural, and logical, that one can learn of those goals by reviewing material produced by the FTO. The advocacy that follows the review of such material is not somehow transformed into material support. Rather, it is an extension of what is lawful. The government's theory, that ties "direction" to the possession of the FTO's propaganda, effectively eradicates the concept of independent advocacy.

Likewise, the government's argument leads to arbitrary and nonsensical results. For instance, under the government's theory, an individual could do precisely what Defendant did and it would be perfectly legal, so long as he had not watched Inside 8. In other words, the mere fact a video was watched, lawfully, makes the ensuing conduct unlawful. There is a strict liability for anything after simply because you watched.

Even if one were to accept that the government could prove "direction" simply because one possessed or viewed a video from the FTO, that theory is factually insufficient in this case. There was insufficient evidence to establish a link between Defendant watching Inside 8 and the development of "Heralds" or any of the nas.py scripts. The government failed to show that

Defendant developed, modified, or shared "Heralds" and the nas.py scripts because of the supposed "direction" exhorted by the ISIS videos he possessed. To the contrary, Defendant told the CHS that he's "the only person in the world do this right now," (GX 506-10, p. 8), which underscores the independent nature of this project. Defendant never said that he was doing that project at the direction of ISIS. As such, the government's theory—even accepting it on its face—cannot be believed.

### iii. The Government Failed to Prove That Defendant Attempted to Coordinate With ISIS.

The government's evidence and argument regarding any attempted "coordination" with ISIS is even more abstract and insufficient. The government referenced coordination in two brief passages during the entirety of its closing arguments. First, it noted that Defendant attempted to coordinate with ISIS when he said that he wrote to OCE4 that he hoped the brothers who had access to the Al-Hayat media channels could give him access so he can download and access the videos. The government's convoluted "coordination" argument was based on that single statement:

> He wanted this process to reach ISIS. He wanted it to be used by al-Hayat. He wanted it to be used so that he could go in and help them get their house in order or he hoped maybe they'll use it themselves.
> He wanted to coordinate with al-Hayat. He wanted to coordinate with ISIS. He was responding to those directions to engage in media jihad to support ISIS on the digital front. There is nothing independent about this.

(Vol. 7, p. 1355:10-17). Defendant's hope that someone will share Al-Hayat videos with him is hardly evidence of an attempt to coordinate with ISIS. Defendant was simply hoping that he could obtain additional videos for his own collection.

The government made a different, but equally futile coordination argument in its rebuttal. That argument was based on Defendant's communications with the unofficial organizations.

Specifically, the government argued, "the defendant also tried to coordinate. Remember, he reached out to Organization 1 and after develops a script and after develops "Operations: Heralds of the Internet," and he sends it to Organization 1." (Vol. 7, p. 1425:1-4). The government then argued that Defendant sent the computer script to Organization 1 in order to "try to get it out to the ISIS community." (Vol. 7, p. 1425:8-9). It then noted that Zelin testified that "unofficial takes direction from official" (Vol. 7, p. 1425:12)—which, as noted above in the background section, is not what Zelin said at all. Communicating with an independent, unofficial pro-ISIS organization is not coordinating with ISIS as the Supreme Court required in *HLP*.[11] As a baseline, *HLP* required that services are provided "to" the FTO. That standard is not met, even under the government's strained theory that sending "Heralds" to Organization 1 was an attempt to coordinate because it reflected an intent to share the document with "the ISIS community," *i.e.*, not the FTO itself. The argument is also belied by the facts. Specifically, Defendant assiduously avoided communicating with ISIS even when given the opportunity.

Indeed, the government's position on "coordination" cannot be reconciled with the fact Defendant did not try to contact ISIS directly to provide services, but he also repeatedly avoided contacting ISIS when government operatives provided him with opportunities to do so. No doubt, those offers to provide services to ISIS were intentional and designed to develop incriminating evidence. For instance, during their June 6, 2018, chats, OCE1 expressly offered Defendant a chance to contact the brothers in the Diwan. One who wanted to coordinate with ISIS would surely have accepted that invitation. Defendant did not do so. Similarly, in April and May of 2019,

---

[11] Notably, the Supreme Court did not define "coordination" in *HLP*, which has led to ambiguity and scholarly debate as to its scope and meaning. *See* Kasey A. Feltner, *Swipe Right for ISIS: Social Media and Material Support to Foreign Terrorist Organizations*, 26 B.U. Pub. Int. L.J. 95, 110 (2017). Even with that ambiguity, *HLP* required that the services be provided to the FTO and never suggested that one can be guilty of material support by "coordinating" with a non-FTO.

OCE3, who was introduced to Defendant by OCE2 as being "independent," specifically said that the translation of the instructions for the "B-thing" was for the brothers in the Khilafah, which meant ISIS. OCE3 testified that he intentionally linked the translation project to ISIS. Rather than translate the two-page document himself, which could have easily been done with an online translation service or even a dictionary, Defendant made numerous excuses about the unavailability of other people who were offline and even disappeared. The translation was never done. Again, Defendant refused to provide a service to ISIS.

Additionally, on October 10, 2019, the CHS specifically told Defendant to make screenshots of the nas.py program so that the CHS could translate them so, according to the CHS, they could be sent to ISIS:

| | |
|---|---|
| CHS: | So, what I need you to do? |
| TO: | Um-hum |
| CHS: | Walk me through it; step by step. |
| TO: | I will. |
| CHS: | Then, get a screen shot and then I will translate it for the brother in the *State*. Now … |
| TO: | Um-hum. |
| CHS: | So, lot of brothers in the *State*, *Allah willing*, and the brothers [UI] *brother*, they don't speak English. |
| TO: | Um-hum |

(GX 506-1, p. 1). At trial, the CHS that it was his idea to tell Defendant to walk him through the script, how it worked, and then take a screenshot of it so he could "translate it for the brothers in Dawlah in ISIS." (Vol. 6, p. 1130:11-15). The CHS brought up the screenshots again at the end of the October 10, 2019, meeting:

| | |
|---|---|
| CHS: | Screenshot it, send it to me so I can make proper translation. |
| TO: | Um-hum |
| CHS: | And I will send it back to you. |
| TO: | …and you can send it to the brothers, you know people … you know, people can we get the *reward* (UI). |

| TO: | Um-hum. |
|---|---|
| CHS: | You know. |
| TO: | Um-hum |

(GX 506-10, p. 18).  Defendant never provided these screenshots to the CHS after the CHS said that he would translate them so they could be sent to ISIS.  Merely sharing the script with the CHS and showing him how it worked is not enough to show coordination with ISIS.  The CHS never said that he would then instruct ISIS members how to use the script.  Nor did Defendant ever ask him to do so.  Thus, in addition to being legally flawed, the government's two passing references to "coordination" in its closing argument are unsupported by the trial record.

### iv. The Government's "Attempted" Material Support Theory Nullifies Independent Advocacy and Abolishes the Requirement of a Substantial Step.

Independent advocacy and activity, even full-throated support of the FTO that "benefits foreign terrorist organizations," is not material support.  *HLP*, 561 U.S. at 39.  But by charging the case as "attempted" material support, the government effectively nullified the concept of independent advocacy and also relieved itself of the burden to prove a substantial step.  Put simply, the conviction cannot stand when the "substantial step" is itself independent advocacy and protected First Amendment conduct and expression.  This issue was not squarely addressed in *HLP*, which was not an "attempt" case.   In *HLP*, the plaintiffs sought to communicate directly with the FTOs and provide services and training on topics including how to use humanitarian and international law to resolve disputes; teaching how to petition the United Nations for relief; and offering legal skills to help negotiate peace agreements.  Still, the Supreme Court's unquestionable recognition that one can independently advocate for an FTO and even benefit that FTO by doing so indicates that it would reject any theory that nullifies independent advocacy when the charge is framed as an "attempt."  Moreover, in cases that have found an "attempt" to provide material

support, defendants have attempted to contact or actually contacted members of the FTOs.[12] That did not occur here.

By way of analogy, in *United States v. Gladish*, 536 F.3d 646 (7th Cir. 2008), the Seventh Circuit addressed a challenge to a conviction under 18 U.S.C. §2422(b), which charged an attempt to coerce a minor to engage in sexual activity. The government's evidence included numerous provocative and sexual electronic communications between the defendant and someone he thought was a minor. The defendant did not try to meet with the purported minor. The Seventh Circuit held that the conviction could not stand because "[t]reating speech (even obscene speech) as the 'substantial step' would abolish any requirement of a substantial step." *Gladish*, 536 F.3d at 650. Similarly, using one's protected speech and advocacy in support of the FTO as evidence that the person is attempting to act under its direction and control by sympathizing with it impermissibly abolishes the "substantial step" requirement. One can act parallel to an FTO, or consistent with its goals and philosophies as discussed in *Wright*. The case for acquittal is even stronger here than in *Gladish* because the material support statute does not extend to independent advocacy and it also expressly includes a First Amendment safe harbor.[13]

In short, simply because the FTO may have similar or overlapping goals such as, for instance, to publicize its propaganda and share its videos, the mere fact that someone independently shares the videos does not mean they are attempting to coordinate with the FTO. If

---

[12] *See* Feltner, 26 B.U. Pub. Int. J.J. at 112 (*supra* note 11) ("The federal courts' decisions following Holder all have a common factor when defendants were found guilty of attempting to provide material support in the form of a service or personnel. That common factor is that each defendant took an affirmative step in attempting, and in some cases succeeding, to contact members of the FTO in an effort to help that FTO in some way.").

[13] The fundamental problem using an "attempt" charge in material support cases, especially when the "services" involve expression and opinion, also include creating a "double inchoate" offense. *See* Norman Abrams, *A Constitutional Minimum Threshold for the Actus Reus of Crime? MPC Attempts and Material Support Offenses*, 37 Quinnipiac L. Rev. 199, 243, footnote 170, 261 (2019).

it did, then there is no such thing as independent advocacy. That may now be the government's preference, but it is not the law.

### c) The Evidence Was Insufficient to Convict Because Services Must Be Provided (or Attempted) to the FTO, not a non-FTO.

The government's evidence and arguments focused on Defendant's communications with groups and organizations that were not designated foreign terrorist organizations. In particular, the government relied heavily on Defendant's association with AF Media, including the voice-over work; his articles in "Youth of the Caliphate," and his communications with Organization 1 (through OCE2) and Organization 2 (through OCE4), especially providing "Heralds" to the former and the nas.py scripts to the latter. That evidence was insufficient to support a conviction for attempted material support and is problematic on many levels.

The government's theory grossly expands the cabined scope of the material support statute in a manner that is inconsistent with the government's positions before the Supreme Court. As noted above, the government told the Supreme Court that the §2339B was not unconstitutionally ambiguous precisely because the statute required a "direct relationship" with the foreign terrorist organization, as the text "plainly requires that a 'service' be rendered 'to' a foreign terrorist organization." (Govt. *HLP* Merits Brief, p. 41). Contrary to that position, the government obtained a conviction based on communications with non-FTOs. Importantly, the problem is not just that Defendant had no actual interactions with ISIS. Courts have affirmed convictions under §2339B(a)(1) when the defendants do not have direction communications with the FTOs. But even in those scenarios, the evidence showed that the defendants knew that the services they provided, typically money, weapons, or other tangible items, would be delivered *to* the FTO, albeit through an intermediary (often the FBI in a sting operation). *See*, *e.g.*, *United States v. Mohanad Hammadi*, 737 F.3d 1043, 1046 (6th Cir. 2013) (§2339B(a) conviction based on the defendant

providing "two rocket-propelled grenade launchers …, two machine guns, two boxes of plastic explosives, and two sniper rifles" that the FBI undercover told them "were intended for al Qaida in Iraq."). And even if the government's theory was legally sound, the evidence was insufficient to show that communication with non-FTOs provided a service "to" the FTO, ISIS.

Indeed, in the hearing on Defendant's motion to limit Zelin's testimony, the government anticipated that Zelin would establish how the unofficial organizations took direction from ISIS itself. But that is not what Zelin testified to at all. Rather, he opined how there is a centralized "strategic directive from the top" and then "decentralization of sort of implementation of whatever that strategic directive is; so, you know, *not necessarily in the media front*, but as we were talking about before in relation to the governance and the structure of the Islamic State, the delegated committee essentially creates these strategic directives, so that's like the central top." (Vol. 4, p. 812:21-23) (emphasis added). And when asked specifically about communications from official groups to unofficial groups, Zelin explained that the official groups will *not* necessarily "call them out specifically" but instead talk "about the importance of work in media on behalf of the group even if they are not members" and that "sometimes leaders of the group will put out audio messages, and they'll praise those who work in the media field online that are supporting the group and trying to encourage them to do more because they see it as harming their enemies." (Vol. 4, p. 813:11-125; p. 814:1-5). This type of generalized encouragement to supporter media organizations is simply not the type of direct communication and control that the government promised Zelin would establish. At most, following the "strategic directives" and goals of the FTO is protected parallel advocacy, as in *Wright*.

Nor did the specific evidence regarding Defendant's communications with the unofficial groups, including those operated by the FBI, show that he even attempted to coordinate with ISIS

or work under its direction. AF Media and Youth of the Caliphate Magazine were unofficial organizations or outlets that produced the very type of "remixes" that Zelin said ISIS disfavored because they did not represent the "official" message. (Vol. 4, p. 831:23-25; p. 832:1-8) ("They're essentially trying to say that anything from outside of the Islamic State is polluted or there's a particular agenda; and therefore, you can only get the real truth from the Islamic State. Otherwise, you're being fed some kind of distortion or lie and not the ground reality.").

Organization 1 was also an "unofficial" group. OCE2 did not represent himself to be an ISIS member and Defendant never expressed an interest in communicating with ISIS through Organization 1. With respect to Organization 2, OCE4 did not hold himself out to be an ISIS member. Nor did Defendant see OCE4 and Organization 2 as a pathway to providing services to ISIS. Defendant did not, for instance, provide OCE4 with the nas.py script and request that it be shared with ISIS. Put simply, Defendant was looking for videos for his personal collection that, at some point in the future, he could share with others. As noted above, when Defendant was given the opportunity to communicate with ISIS or provide services to ISIS, he demurred. First, he ignored OCE1's offer to meet the "brothers in the diwan." Second, he manufactured a dozen delays to not translate the two-page bomb instructions for ISIS. Third, he never provided the simple screenshots to the CHS for the "brothers in the State."

In short, by obtaining a conviction based on the argument that one can provide services *to* an FTO by communicating with a non-FTOs that may very well support the message and goals of the FTO, the government has vastly expanded the material support statute in a way that neither Congress nor the Courts intended. Indeed, the position contradicts the government's own arguments before the Supreme Court, in which it repeated that the requirement of a "direct relationship" to the FTO saved the statute from unconstitutional ambiguity.

78

### d) A Judgment of Acquittal Should be Ordered Because Defendant Was Convicted for Protected First Amendment Activity.

Prior to trial, Defendant moved to dismiss the Indictment on First Amendment grounds. The concerns raised in that pre-trial pleading were reinforced at trial. Put simply, the government's evidence and arguments highlighted the unconstitutional vagueness of the statute and the conviction ultimately rested on protected First Amendment conduct. Defendant adopts the arguments set forth in the Motion to Dismiss briefing. (Dkt. 65, 90). The Court's order denying the Motion to Dismiss was flawed in several meaningful ways, and ultimately does nothing to cure the evidentiary flaws at trial.

In that pretrial order, the Court focused on the "translation services and building the computer script that prevented ISIS videos from being deleted" as not being protected political speech. (Dkt. 93, p. 6). As an initial point, it is unclear what "translation services" referred to, and, in any event, Defendant was not charged with attempting to provide "translations" as "services" to ISIS. The Court's rationale for finding the "computer script" to not be part of protected political speech was because it "benefitted the FTO by quickly and efficiently re-uploading videos, operating at a speed and scale much greater than could any one individual." (*Id.*). However, as the Court would later recognize during an in-trial instructions conference, "if you do something that benefits somebody, I could do something totally innocent, and it could benefit somebody else." (Vol. 4, p. 924:8-10; *id.* p. 926:18-20) ("Zelin's website itself could benefit one of these organizations because it allows people with an EDU address to get into it."). Ultimately, the jury was not instructed on the "benefit" theory.

In its order denying Defendant's Motion to Dismiss, the Court also reasoned that Defendant's activity was not protected political speech because "the scale and sophistication of this script transforms the conduct from an individual expressing an opinion, to providing a service

to an FTO." (Dkt. 93, p. 6). But the scope of the First Amendment's protection is not a matter of scale. A political pamphleteer sharing a protest flyer with one person in the Federal Plaza does not lose the protections of the First Amendment when he picks up a bullhorn to express grievances to a crowd of hundreds. An online petition emailed to one person does not fall outside the First Amendment because it is emailed to 1,000 followers.

Moreover, the very language of "Heralds" plainly stated that Defendant obtained, saved, and ultimately intended to share the videos in order to express an opinion. This "manifesto," as the government repeatedly portrayed it to be, included a statement of personal intent whereby Defendant believed the videos would show that ISIS was acting in self-defense. He told OCE2 that he named the project "Heralds" because he wanted to spread the "news." (Vol. 2, p. 295:7-11). The project was quite literally designed for Defendant to share videos in order to express an opinion. In addition to having their own intrinsic first amendment value as computer code (*Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001)), the nas.py scripts worked to facilitate the expression of that opinion. No matter how controversial, disfavored, and offensive that opinion was, it is still entitled to First Amendment protection. *Hill v. Colorado*, 530 U.S. 703, 787 (2000) (Kennedy, J., dissenting) ("Laws punishing speech which protests the lawfulness or morality of the government's own policy are the essence of the tyrannical power the First Amendment guards against"); *Elrod v. Burns*, 427 U.S. 347, 356 (1976) ("political belief and association constitute the core of those activities protected by the First Amendment"); *see United States v. Nagi*, 254 F. Supp. 3d 548, 557-58 (W.D.N.Y. 2017) (*quoting*, *HLP*, 561 U.S. at 32 ) ("In short, *Humanitarian Law Project* held that, while § 2339B does not proscribe pure speech—even radical speech that 'might be viewed as promoting the group's legitimacy.'"). A conviction based on the substance of that opinion is clearly content-based and cannot stand.

The conviction also violated Defendant's First Amendment right to association. "Coordination" necessarily "involves association." *HLP*, 561 U.S. at 43 (Breyer, J., dissenting). At trial, the government relied heavily on Defendant's communications with individuals in a "Weapons" chatroom. And as articulated in its rebuttal argument, the government's "coordination" theory turned on Defendant's sharing of the "Heralds" document with OCE2 and Organization 1, which was purportedly involved in providing instructional materials related to toxins and explosives. However, these communications were all protected under the First Amendment right to associate and cannot form the basis of a criminal conviction. "[T]he First Amendment protects advocacy even of *unlawful* action so long as that advocacy is not "directed to inciting or producing *imminent lawless action* and . . . *likely to incite or produce* such action." *HLP*, 561 U.S. at 43-44 (Breyer, J., dissenting) (quoting *Brandenburg* v. *Ohio*, 395 U.S. 444, 447 (1969)) (emphasis in original). The government did not argue, nor could it show, that Defendant's communications met the *Brandenburg* standard.

### e) Defendant's Conviction Violates the Due Process Clause Because the Material Statute, As Applied, Was Vague and Failed to Provide Requisite and Fair Notice.

Defendant also argued in his pretrial Motion to Dismiss that the Indictment was unconstitutionally vague and failed to provide adequate and fair notice in violation of the Fifth Amendment. (Dkt. 65, p. 18, "Accordingly, because individuals like Defendant are not on notice as to the difference between protected speech and association and unprotected speech and association, the Court should dismiss the charge under 18 U.S.C. §2339B as unconstitutionally vague."). The vagueness doctrine "rests on concerns about fair notice and arbitrary enforcement." *United States v. Jones*, 689 F.3d 696, 701 (7th Cir. 2012); *United States v. Antzoulatos*, 962 F.2d 720, 726 (7th Cir. 1992) ("The most important aspect of the doctrine is the requirement that the

legislature establish minimal guidelines to govern the discretion of law enforcement officials.")
"A conviction fails to comport with due process if the statute under which it is obtained fails to
provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that
it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553
U.S. 285, 304 (2008).  Importantly, when a statute "interferes with the right of free speech or of
association, a more stringent vagueness test should apply." *Hoffman Estates v. Flipside, Hoffman
Estates, Inc*., 455 U.S. 489, 499 (1982).  For the reasons discussed above, a reasonable person
would not know that communicating with a non-FTO could be prosecuted as attempting to
communicate with an FTO.  That is especially so when the evidence at trial showed that the non-
FTOs, particularly Organization 1 and Organization 2, advertised online and could be readily
accessed with a few clicks.   The evidence also showed that Defendant avoided communicating
with ISIS or providing services to ISIS when given the opportunities to do so by OCE1, OCE3,
and the CHS in particularly when he told Defendant to provide screenshots that could be provided
to ISIS.  The trial evidence also displayed the arbitrary nature of the prosecution.  Prosecution
expert Aaron Zelin also obtained jihadi media products from the official sources (using a fake
name and account) and then posted the material, numbering in the thousands, for public
consumption on his website.  Yet instead of prosecuting him, the government paid him $400 per
hour. Thus, the trial evidence only reinforced the vagueness problems that Defendant highlighted
in his pre-trial motion and why the material support statute, as applied, does not provide a
reasonable person with notice of what conduct is actually proscribed.   *United States v. Coscia*,
866 F.3d 782, 791 (7th Cir. 2017); *United States v. Johnson*, 875 F.3d 360, 370 (7th Cir. 2017).

### B. Alternatively, the Court Should Grant Defendant a New Trial Under Rule 33

#### 1) Legal Standards for Rule 33 Motion

A district court may grant a new trial "if the interest of justice so requires," and the Court is afforded wide discretion in that determination. Fed.R.Crim.P. 33(a). A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict. *United States v. Berry*, 92 F.3d 597, 600 (7th Cir.1996), and this Court is afforded wide discretion in that determination. *United States v. Inglese*, 282 F.3d 528, 538 (7th Cir. 2002) (district court's decision on "prejudice" is afforded "great deference"); *United States v. Gillaum*, 372 F.3d 848, 857 (7th Cir. 2004) (district court's decision to grant a new trial is reviewed for abuse of discretion).

Even in circumstances when evidence is properly admitted, "the court in reviewing a motion for a new trial must consider the weight of the evidence, and must grant a new trial if that evidence 'preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" *United States v. Washington*, 184 F.3d 653, 657-58 (7th Cir. 1999) (quoting *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989)).

#### 2) Defendant is Entitled to a New Trial Because the Government's Improper Closing Arguments Shifted the Burden of Proof.

"It is well established that a prosecutor's misstatements of law in closing argument can be grounds for reversal. … Included within this restriction are statements that in effect distort the burden of proof by suggesting incorrectly what the jury must find in order to reach a certain verdict." *United States v. Vargas*, 583 F.2d 380, 386 (7th Cir. 1978) (citation omitted); *United States v. Phillips*, 527 F.2d 1021, 1023-24 (7th Cir. 1975) (reversing conviction for prosecutor's misstatement of the law in closing argument). It is axiomatic that a "[a] prosecutor should not

misstate the law during closing argument." *United States v. Artus*, 591 F.2d 526, 528 (9th Cir. 1979) (holding that prosecutor's misstatement of law during closing argument constituted plain error requiring reversal); *United States v. Sandoval-Gonzalez*, 642 F.3d 717, 727 (9th Cir. 2011) ("[T]he court's failure to correct the prosecutor's misstatements of law were reversible error . . . ."); *United States v. Rodrigues*, 159 F.3d 439, 450 (9th Cir. 1998) (reversing where prosecutor's "account of what the government had to prove to convict under § 215 was simply wrong.").

During its closing argument—particularly its rebuttal argument, when the defense had no opportunity to respond and correct the prosecutor's erroneous and misleading argument—the government misstated the law, diminished its burden of proof, and shifted the burden to the defense. As courts have recognized, statements by a prosecutor "can have a significant impact on jury deliberations 'because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligations as a representative of a sovereignty.'" *United States v. Carter*, 236 F.3d 777, 785-86 (6th Cir. 2001) (quoting *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000)). Misstatements have an equal force.

### a) The Prosecutor's Rebuttal Argument Impermissibly Shifted the Burden of Proof to the Defense.

A prosecutor is not permitted to argue to the jury that the defendant is obligated to present evidence of his innocence. *United States v. Saint Louis*, 889 F.3d 145, 156 (4th Cir. 2018) ("It is well settled that prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence."); *United States v. Maras*, 940 F.2d 91, 98 (2nd Cir. 1990) ("Prosecutor should not argue that the defendant's failure to adequately explain the weakness in his case requires a guilty verdict as it may impermissibly shift the burden of proof to the defendant."); *United States v. Muller*, 819 Fed. Appx. 701 (11th Cir. 2020); *Rand v. United States,* 2020 WL 1126182; 2020 LEXIS 39148

(W.D.N.C., Mar. 6, 2020). Where a prosecutor's comments during closing impermissibly cross the line of argument and constitute burden-shifting, such comments violate the defendant's right to due process. *See Engle v. Isaac*, 456 U.S. 107, 151 (1982) ("That an oppressive shifting of the burden of proof to a criminal defendant violates due process is not a new doctrine within constitutional law.").

Here, the prosecutor's final comments in his rebuttal argument—the last words from them before the jury deliberated—constituted burden-shifting and violated Defendant's due process rights. Specifically, the prosecutor told the jurors they had to believe the defense theories or points of attack, *and every one of them*, to acquit:

> *If you believe* that the defendant was intending to act as an independent advocate when OCE 2 asked the defendant about why he was doing this, why he was helping with the videos, and the defendant said "For ISIS" -- and the OCE 2 said, "For ISIS or jihad," and the defendant said "For both"; *if you believe* he was acting as an independent advocate when he told OCE 2 that al-Qaeda has an encryption program and he can make our own, our own, meaning ISIS; *if you find -- if you believe* that he was acting as an independent advocate when he talked about developing a Linux system for Ansar, the brothers, and when OCE 2 asked how would this help ISIS, the defendant said, "It would be more secure"; *if you believe* he was acting as an independent advocate when operation Heralds of the Internet he said -- and I'm paraphrasing – "al-Furat and al-Hayat can use this to organize their channels or I can do it for them"; *if you believe* he was acting as an independent advocate when he says to OCE 2, "I'm going to create this wild goose chase for the FBI to go off and investigate the Kuffar who don't believe in Dawlah so that the equan, the brothers who were planning attacks, have less time being spied on" -- that is page -- that's page 35 of the 200 series binder, the second page 35 -- *if you believe* he was acting as an independent advocate when he said, "There's only 10 brothers in the world who do this" and in the context of creating the script for ISIS; *if you believe* he was acting as an independent advocate when, in discussing the challenges of locating ISIS videos, in response to OCE 2, he says, "I try to help them" -- not "I'm acting on my own" – "I try to help them"; **and** *if you believe* he's an independent advocate when he said, "I do jihad in media"; **and** *if you believe* that he was an independent advocate when he pledged bayat on his own -- no one made him do it; it is on his own, and he did that a second time after Baghdadi was killed, and he had to do it for the new ISIS leader -- *if you believe* he was an independent advocate **for all of that, plus more** that you'll see in these exhibits, **then find him not guilty.**

(Vol. 7, p. 1426:14-1427:24). (emphasis added).

This argument was improper because it told the jury that they must believe the entirety of the defense case to find Defendant not guilty. During this portion of the rebuttal, which was the very end of the rebuttal, the last words of argument the jury heard, the prosecutor listed 10 different things that the jurors had to believe. Several times he connected them, using the word "and" to suggest that the jurors had to find more than one thing was true, and in the end left them thinking that they had to agree with each and every one, "for all of that, plus more," before Defendant could be found not guilty. In other words, if the jurors found any one of the 10-item laundry list had not been established by the defense they would have to find the defendant guilty. It was after reciting all 10, and saying "for all of that, plus more" before the prosecutor then told the jurors "then find him not guilty." Interestingly, the prosecutor did not recite any facts from the trial when he was concluding and urge the jurors to find the defendant guilty. Rather he only phrased it in the negative, that they could only acquit if they completely embraced the defense.

Not only did these 10 points improperly shift the burden of proof, they were each substantively incorrect. For example, the prosecutor said, "if you believe that the defendant was intending to act as an independent advocate when OCE 2 asked the defendant about why he was doing this, why he was helping with the videos, and the defendant said, 'for ISIS' – and the OCE 2 said 'for ISIS or jihad,' and the defendant said 'for both.'" This argument conflated intent with the issue of concerted activity. To prove that the defendant was not engaged in independent advocacy, the government needed to establish that he was working at "the direction of or in coordination with" ISIS. There was nothing in Defendant's statement that showed he intended to work at the direction of or in coordination with ISIS. Rather, the prosecutor placed the burden on Defendant to make the jury believe that he made this statement independently.

86

The prosecutor confused the law when he said, "if you believe he was acting as an independent advocate when he told OCE 2 that al-Qaeda has an encryption program and he can make our own, our own, meaning ISIS." The statement focused solely on what Defendant was doing, independently, and then told the jury that ISIS must have been involved, because he used the word "our," notwithstanding "our" clearly referred to Defendant and OCE 2. Further, an encryption program is speech, protected by the First Amendment. *Bernstein v. United States Dep't of State*, 922 F. Supp. 1426, 1436 (N.D. Cal. 1996) ("For the purposes of First Amendment analysis, this court finds that source code is speech."). It was improper for the prosecutor to suggest to the jury that this encryption code, if not believed to be independent advocacy, would support a finding of guilty.

The prosecutor also improperly used Defendant's independent advocacy as proof of ISIS's direction when he said, "if you believe that he was acting as an independent advocate when he talked about developing a Linux system for Ansar, the brothers, and when OCE 2 asked how would this help ISIS, the defendant said, 'It would be more secure.'" Again, the jury did not have to find that Defendant was acting independently when he talked about making a more secure system, it was the government's burden to prove that he was not. And, as before, there is no element of direction or coordination in Defendant's statement. He does not say that he was instructed to do this by someone in ISIS. In fact, he does not mention ISIS at all, the OCE brings it up.

The prosecutor's statement, "if you believe he was acting as an independent advocate when operation Heralds of the Internet he said -- and I'm paraphrasing – 'al-Furat and al-Hayat can use this to organize their channels, or I can do it for them'", paraphrased one line of a PDF document and ignored the rest. The prosecutor disregarded, and thus gave the impression to the jury that they too should disregard, the listed intention on the top of the document: "Bring People to Islam and

87

teach everyone the transgression of the Crusaders and how the Islamic State's response to transgressions is self-defense." (GX 201). This intention is the essence of political speech and independent advocacy. But in its argument, the prosecutor misquoted a single statement and told the jury they must believe it was not true to find Defendant not guilty. In rebuttal, the government paraphrased Defendant to say, "al-Furat and al-Hayat can use this to organize their channels or I can do that for them" (Vol. 7, p. 1427:2-4) when "Heralds" actually stated, "By Allah's permission, the brothers who have access to the disorganized al-Furat Media and al-Hayat Media Center channels will be able to organize them or give me access to them so that I would be able to organize them." (GX 201, pp. 63-64). The prosecutor omitted the qualification "the brothers who have access" to the channels, and made it seem as if Defendant was in direct communication with al-Furat and al-Hayat, for which there was absolutely no evidence. The prosecutor also inserted "ISIS" in places when Defendant never said so, such as "if you believe he was acting as an independent advocate when he said, 'There's only 10 brothers in the world who do this' and in the context of creating the script for ISIS…" The defense had no sur-rebuttal to tell the jury that Defendant never said, "for ISIS." The prosecutor's remaining "if you believe" points raised suffer from similar faults.

To convict, the government had to prove that Defendant attempted to act in concert with ISIS, and that he specifically intended to work at its direction or in coordination with it. But the government's rebuttal argument completely reframed the issue as to whether Defendant proved that he acted independently when it argued, "if you believe he was an independent advocate for all of that, plus more that you'll see in these exhibits, then find him not guilty." In so doing, the government flipped the burden on its head.

88

It is axiomatic that the defendant in a criminal case has no burden and need not present any evidence of his innocence to be found not guilty. *Coffin v. United States*, 156 U.S. 432, 453 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."). The jury can believe the entire prosecution case and still find that the defendant is not guilty; belief in the probability of guilt is insufficient. *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) ("It would not satisfy the Sixth Amendment to have a jury determine that the defendant is *probably* guilty, and then leave it up to the judge to determine…whether he is guilty beyond a reasonable doubt.").

By implying that the jury needed to find Defendant acted as an independent advocate to find him not guilty, the prosecutor shifted the burden to the defendant to prove his innocence by proving that he acted as an independent advocate. He snubbed the presumption of innocence, resulting in an unequivocal and unconstitutional misstatement of law. While independent advocacy is a safe harbor preventing a finding of guilty under 18 U.S.C. §2339(B)(a)(1), the jury need not find a defendant was acting as an independent advocate to find him not guilty. In fact, the jury need not find anything at all to acquit a defendant. All that is required for a finding of not guilty is that the jury believes the prosecution has failed to meet its burden of proof beyond a reasonable doubt. *In re Winship,* 397 U.S. 358 (1970). But it is not just the prosecution's overall argument that misstated the law and confused the notion of independent advocacy, each action identified by the prosecutor was protected speech behind which the Government was required to prove a criminal intent. The defendant was not required to prove an innocent intent.

#### b) **Other Courts Have Found Like Comments to Constitute Impermissible Burden-Shifting.**

The closing argument in a criminal case is "an especially delicate point in the trial process" that must be carefully scrutinized by the court. *United States v. Glover*, 558 F.3d 71, 77 (1st Cir. 2009). As a result, the examples of impermissible burden-shifting in closing arguments are numerous. The following are illustrative of comments that have been found improper:

- "Now, at this time the defense counsel will address you; . . . [then] I will have a chance to speak with you one more time and see if he can explain the story that would be any different with regard to the responsibility of the defendant in this case." *United States v. Skandier*, 758 F.2d 43 (1st Cir. 1985).

- "If they were so convinced that Bryan would be excluded on DNA, they could have had it tested as well. We know that didn't happen either, so none of those witnesses come into court…" *Swinford v. Warden, Dayton Corr. Inst.*, 2012 WL 868979, 2012 U.S. Dist. LEXIS 33550 (S.D. Oh. Mar. 13, 2012).

- "[Defense] counsel can call this witness, just like the United States." *United States v. Diaz-Diaz*, 433 F.3d 128, 135 (1st Cir. 2005).

- "When a defendant does go forward to offer evidence, the defendant has the same responsibility [as the government] and that is to present a compelling case." *United States v. Roberts*, 119 F.3d 1006, 1015 (1st Cir. 1997).

- "Of all the things that they said about Mr. Barkley, did you once hear them prove what they said in closing argument." *People v. Walker*, 2017 WL 4015721; 2017 Mich. App. LEXIS 1424 (Mich. App. Sept. 12, 2017).

A prosecutor need not be blatant in his argument for a comment to constitute burden-shifting; as the cases above establish, even the mere suggestion that the defendant must prove his case is enough.

The case of *United States v. Wihbey*, 75 F.3d 761 (1st Cir. 1996) is particularly illustrative. In that case, the prosecutor stated:

Now, if Mr. St. Clair [Wihbey's lawyer] can stand up and explain away that conversation to you, then you should let Bob Wihbey walk out of here with a verdict

of acquittal. But he can't do that, ladies and gentlemen, because that is not a conversation that an innocent man, who's been falsely accused, would have under those circumstances. There's just no other explanation except the one that's been provided from the witness stand by the eight witnesses called by the government.

*Id.* at 769. The court found that this comment impermissibly suggested that Wihbey bore the burden of proof, though it ultimately held that the defendant had forfeited the error by failing to object. *Id.* That comment is remarkably similar to the tone in the present case. In both cases, the jurors were told that *if* they believed the defense, *then* they should acquit the defendant. But this is simply not the law. In doing so, the prosecutor shifted the burden of proof because he required the jury to believe the defense rather than to believe the prosecution had proved him guilty beyond a reasonable doubt. This error crossed the line and violated Defendant's due process rights.

### c) The Prosecutor's Remarks Incurably Affected the Fairness of the Trial.

In *United States v. Wolfe*, 701 F.3d 1206 (7th Cir. 2012), the Seventh Circuit examined the factors to be considered in determining whether a prosecutor's remarks affected the fairness of the trial: "'(1) the nature and seriousness of the misconduct; (2) the extent to which the comments were invited by the defense; (3) the extent to which any prejudice was ameliorated by the court's instruction to the jury; (4) the defense's opportunity to counter any prejudice; and (5) the weight of the evidence supporting the conviction.' *United States v. Adams*, 628 F.3d 407, 418-19 (7th Cir. 2011)." Consideration of each of the above factors demonstrates that Defendant was severely prejudiced by the prosecutor's misstatement of the law, and a new trial is required. Factors (2) and (4) clearly support Defendant's argument for a new trial: the defense did not invite the government to misstate the law, and since the government persistently misstated the law during its rebuttal closing argument, the defense had no opportunity to counter or respond to the prejudice. Factors (1), (3), and (5), discussed below, also counsel strongly in favor of a finding of prejudice under

the facts of this case.

As to the first factor, undoubtedly a prosecutor's statement in closing argument that misstates the law and diminishes the burden of proof below its constitutional threshold constitutes serious misconduct. The reasonable doubt standard is the touchstone of our criminal justice system. Errors that denigrate or diminish the prosecution's burden of proof to establish guilt beyond a reasonable doubt often leads to reversals owing to the possibility of error. *In Re Winship*, 397 U.S. 358, 362 (1970). The error here is manifest and clearly affected the substantial rights of Defendant, including his fundamental constitutional right to be convicted only upon competent evidence that establishes his guilt *beyond a reasonable doubt. See In re Winship*, 397 U.S. at 364 (proof beyond a reasonable doubt is fundamental right under Fifth Amendment's Due Process Clause); *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993) (denial of right to proof beyond a reasonable doubt is structural error); *Chapman v. United States*, 500 U.S. 453, 465 (1991). Indeed, perhaps the biggest flaw with the government's posited "bright-line" is that even innocent conduct, including conduct not willfully undertaken, falls within it.

As to the third factor, improper comments by a prosecutor in closing can be cured by a prompt objection and a corrective instruction from the court. *United States v. Muscarella*, 585 F.2d 242, 251 (7th Cir. 1978) ("To the extent that the prosecutor's argument can be interpreted as [burden-shifting], the government was in error. However, in the present instance the defense counsel immediately objected, and the court instructed the jury that any such suggestion by the government was incorrect… We conclude that the trial judge's contemporaneous, proper statement of the law eliminated any possible prejudice caused by the prosecutor's improper comment."). The converse is also true: "A prosecutor's misstatement of the law during closing arguments may be the basis for habeas relief, particularly when the erroneous statements are repeated and/or allowed

92

by the trial court." *United States ex rel. Jones v. Chrans*, 187 F. Supp. 2d 993, 1013 (N.D. Ill. 2002). In this case, defense counsel's objections were repeatedly overruled.

> Mr. Greenberg: Judge, I hate to keep objecting, but this is what we discussed before.
> The Court: And I'll keep overruling.
> Mr. Jonas: Thank you, Judge.

(Vol. 7, p. 1423:13–16). The overruling comment before the jury about this argument gave the jury the impression that the Court supported the prosecutor's misstatement of the burden. It reinforced, rather than mitigated, the error.

Further, it is not enough that the jury is later given proper instructions on the law: "Nor can we agree with the Government that the effect of such misinformation given under the circumstances here present was overcome by later technical instructions of the court which the Government contends correctly stated the relevant law." *United States v. Bohle*, 445 F.2d 54, 71 (7th Cir. 1971) (overruled on other grounds, *United States v. Lawson*, 653 F.2d 299 (7th Cir. 1981)).

As to the fifth factor, the weight of the evidence in this case favored the defense. There was no evidence presented by the government of Defendant having any actual or attempted contact with official ISIS Media organizations. The crux of the issue was whether Defendant acted at the direction of or in coordination with ISIS. The most the government had shown was that ISIS wanted individuals to use social media to spread its message, and Defendant may have watched that video. This conduct is especially undamaging in light of the Court's ruling in *Mehanna*, which held that "persons who act independently of a foreign terrorist organization to advance its goals or objectives are not considered to be working under the organization's direction or control. A person cannot be convicted under this statute when he's acting entirely independently of a foreign terrorist organization. That is true even if the person is advancing the organization's goals or

objectives." *United States v. Mehanna*, 735 F.3d 32, 48 (1st Cir. 2013). Thus, the weight of the evidence strongly favored acquittal. Accordingly, the factors show that not only was the argument impermissible burden-shifting, but it was so unfair to Defendant that it violated his due process rights in a way that was not, and could not, be cured.

### 3) Defendant is Entitled to a New Trial Due to the Repeated Admission and Display of Unduly Prejudicial and Irrelevant Videos and Images.

Prior to trial, Defendant moved to exclude prejudicial, irrelevant, and cumulative exhibits and other evidence, including the testimony of OCE1. (*See* Dkt. 107, 126, and 135). The defense even offered to stipulate to the videos being pro-ISIS. (Dkt. #107, p. 1). During trial, Defendant made numerous objections to the same evidence, particularly the repeated playing of inflammatory videos. To avoid repeated objections that the defense would have been forced to make, the Court recognized Defendant's standing objection. While some limitations were placed on individual pieces of the government's evidence, including self-imposed restrictions, in large part the government presented repeatedly inflammatory and prejudicial exhibits that were irrelevant to the issues. The concerns that Defendant articulated in his pretrial pleadings came to fruition, as the repeated introduction of inflammatory videos and topics deprived Defendant of a fair trial and thus warrants a new trial under Rule 33.

Federal Rule of Evidence 403 provides that even evidence that is relevant and admissible must still be barred if it is unduly prejudicial, meaning that "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Rule 403. The undue prejudice began with the government's first witness, OCE1.

Before trial, Defendant warned that "[i]nstead of offering testimony related to that computer script and about what Defendant is actually charged with, OCE1 will discuss communications about weapons, including bomb-making, which are not relevant, unduly prejudicial, confusing, and will only serve to inflame the jury." (Dkt. 126, p. 1). In denying that motion, the Court sided with the government's view that OCE1's anticipated testimony was relevant to showing the continuum of Defendant's conduct. How the "continuum" shed any light on the issues at hand remains a mystery. At its core, this was simply a rewording of the discarded concept of "inextricable intertwinement." *United States v. Gorman*, 613 F.3d 711, 719 (7th Cir. 2010) ("To ensure that there are no more doubts about the court's position on this issue—the inextricable intertwinement doctrine has outlived its usefulness. Henceforth, resort to inextricable intertwinement is unavailable when determining a theory of admissibility.").

Defendant's concerns were well-founded. Through OCE1, the government focused on bombs, TATP, explosives, weapons, guns, knives, and committing acts of violence, despite the fact that neither OCE1 (nor any other government witness for that matter) could point to any act of violence that Defendant actually planned, attempted, or committed. OCE1 testified about chats discussing the targeting of government officials and LGBT parades. (Vol. 1, pp. 43-44; p. 62:24-25; p. 63:1-2). On redirect, and over defense objection, the government highlighted the how the TATP posting referenced a terrorist attack in Paris. (Vol. 1, p. 120). It also used OCE1 to introduce Anwar Al-Awlaki, described as "an influencer and instigating acts of terrorism," again over the defense's Rule 403 objection. (Vol. 1, p. 123-124). In addition to the unduly prejudicial and irrelevant testimony, the exhibit binder with OCE1's communications included pictures of improvised and homemade explosive devices that were posted by others in the "Weapons" chatroom. Consistent with Defendant's prediction, what OCE1 did not talk about was anything

having to do with the development of computer scripts, copying and organizing videos, or any crime that Defendant was charged with committing. (Vol. 1, p. 105:18-25, p. 106:1-10); (Vol. 1, p. 128:21-25) ("Q. Are you aware that he's not charged with TATP? A. I am now. Q. Are you – he's not charged with targeting anybody for violence, right? A. Yes, I know that now."). There was zero relevance to defendant's sympathy or even support of others' violent acts, except to paint him in the worst light possible. "As then-Judge Breyer put it, "Although ... 'propensity evidence' is relevant, the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance." *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir.1982); *see also Michelson v. United States*, 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *United States v. Seals*, 419 F.3d 600, 610–11 (7th Cir.2005) (Posner, J., concurring)." *United States v. Simpson*, 479 F.3d 492, 497 (7th Cir. 2007).

It was both unnecessary and unduly prejudicial to introduce the evidence regarding discussions of violent acts through OCE1, even if it could be said that Defendant's communications with OCE1 were relevant to a chronological narrative from the government's perspective. It is the fact there were conversations that are relevant to the continuum, not the content. Where the defendant did not engage in acts of violence or even attempted to acquire weapons or explosives, OCE1's testimony on those topics was not relevant to his mental state. Instead, OCE1 only helped the government portray Defendant as a potentially dangerous and unlikable individual, who had a "very sharp knife" and could fight others if he had to, even becoming a "shahada" or martyr in the process. (Vol. 1, p. 59:23-25; p. 60:4; p. 61:7-8); (Vol. 1, p. 61; lines 12-14 ("Q. What does -- what does -- what do you interpret him to mean when he says a sharp knife can do anything b'ithnillah? A. That means he can put up a fight with a knife."). *See*

*also* Vol. 1, p. 61:24-25; p. 62:1-8; p. 66:12-14 (future dangerousness). Thus, with its very first witness the government made the jury question Defendant's potential for violence, his wanting to kill Americans, and even that he had already selected a "target." (Vol. 1, p. 44; lines 21-25). These were irrelevant topics as the jury would never be asked to consider whether Defendant committed any act of violence. Given their inherently inflammatory nature, the testimony and evidence was unduly prejudicial under Rule 403 and bore no causal connection to the actual charge.

Defendant offered to stipulate to the fact that the videos in his possession expressed pro-ISIS sentiments. The government even took the position in pretrial pleadings that the content of the videos was irrelevant. (Dkt. 83 (Response to Motion to Dismiss), p. 18, "The Content of the ISIS Videos is Irrelevant"). Yet, it still went to great lengths to play for the jury numerous videos showing graphic battlefield scenes, bombings, and terrorist attacks involving civilians being run over by trucks with audible screaming in the background, and displayed clips and freeze-frames of videos showing words like, "don't spare none," "kill them all," "slit their throats," and "watch them die," over battlefield scenes that OCE3 read into the record to underscore the shock value, all over the defense's repeated objection. (Vol. 4, pp. 709-711; GX 203-9-203-15). Also, over defense objection, the government played the video called "Crusader State of Russia" about a purported ISIS bombing of an apartment building in Russia (Vol. 1, pp. 155-157, GX 204) and "Holding Firm to the Pledge" (Vol. 1, p. 163:3-15; GX 202-1-202-2) and other videos (Vol. 1, p. 174:5-10; p. 188:23-25, p. 189). The government slowly walked through screenshots from "The Fighting Has Just Begun" video, with OCE2 reading to the jury text such as: "Methods of Burning. Set multiple small fires at nearby sites to burn forests. Use easy-made Molotov cocktails and throw them at the target. Set fire to remote location by the means available (temporary or otherwise). Pour flammable materials (gasoline-oil) to ensure the rapid spread of fire" (Vol. 1, p. 190:25;

97

191:1-5); "Potential targets. Burning high buildings and empty houses. Burning a forest near housings (especially in times of drought). Burning of commercial centers, warehouses, gas stations, and other interests of the kuffar. Destruction of the money of the kuffar, be it cars, houses, shops and others'" ( Vol. 1, p. 191:11-17); and, "A. Benefits of burnings. The financial loss of disbelievers and forcing them to intensify their guard. Setting fire does not require training or prohibited materials and spreads panic in societies that fight Islam." ( Vol. 1, p. 191:19-22). Clips of the "Fighting Has Just Begun" were replayed through OCE3, over defense objection. (Vol. 4, p. 709:11-23). Also, over objection, the government injected Omar Mateen, the notorious Pulse nightclub shooter, which again unnecessarily linked Defendant to an individual who committed actual violence. (Vol. 4, p. 702:6-24).

The introduction of irrelevant and prejudicial videos continued with the CHS. Over objection, the CHS was permitted to testify about a video depicting suicide bombers, portions of which were also played. (Vol. 5, p. 1103:13-25; GX 513). The government introduced a video of a young girl swearing bayat over defense objection. (Vol. 5, p. 1105:16-23; p. 1106:5-14; GX 512). The CHS also described other videos involving decapitations. (Vol. 5, p. 1111:1-16).

Continuing its scare tactic, the government referenced many of these videos in its closing argument. For instance, it referenced the "Fighting Has Just Begun" video and described the video to be "media jihad. That's what the video is about. Don't spare none. Kill them all." (Vol. 7, p. 1338:19-22). It reminded the jury that the video ended with people being beheaded. (Vol. 7, p. 1339:1-3). It also displayed a screenshot from the "Crusader State of Russia" video which said, "Know that we will kill you in your homes as well." (Vol. 7, p. 1340:1-8).

The repeated, unnecessary, and gratuitous introduction of these videos was unduly prejudicial, and deprived Defendant of a fair trial. Playing the videos had no probative value, as

their content had no "logical connection" between Defendant's guilt or innocence, specifically whether he was engaged in independent activity or advocacy or attempting to work at the direction of ISIS or in coordination with it. *United States v. Van Allen*, 524 F.3d 814, 825 (7th Cir. 2008) (affirming exclusion of evidence because the court failed "to see the logical connection" between the evidence and the defendant's guilt or innocence). To be sure, even if it could be argued that the videos were relevant to show that Defendant sympathized with ISIS or supported its message, that was lawful behavior, not evidence of Defendant's attempt to provide material support based on the elements that the government had to prove, meaning the government used lawful conduct to needlessly smear the defendant. Given the lack of relevancy of the content of the videos, the prejudice inherent in playing them, which should require little discussion, was clearly undue under Rule 403. A new trial should be granted, free of the prejudice caused by the introduction of the videos and testimony of OCE1.

### 4) **Defendant Preserves His Pretrial Motions Denied by the Court.**

In addition to the Motion to Dismiss and Motions filed to preclude prejudicial evidence and testimony, Defendant incorporates as if restated herein the remainder of his pretrial motions that were not resolved in his favor and stands on the arguments presented in those pleadings.

### 5) **Defendant is Entitled to a New Trial Based on Cumulative Error.**

Each of the errors discussed herein individually warrant relief. Viewed collectively, there can be no doubt that Defendant's conviction should be reversed. "Cumulative errors, while individually harmless, when taken together can prejudice a defendant as much as a single reversible error and violate a defendant's right to due process of law." *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001). These errors in cumulation, deprived Defendant of his ability to have a fair trial, one in which the jury could make a reliable judgment about his guilt or

innocence, free from the extraneous and prejudicial impact of erroneously admitted evidence, with full consideration of all properly admissible evidence, and under a proper instruction as to the requirements of the law. *United States v. Powell*, 652 F.3d 702, 706 (7th Cir. 2011).

## IV.    **CONCLUSION**

For the foregoing reasons, the Court should grant Defendant's motion for judgment of acquittal or, in the alternative, grant him a new trial.

Respectfully submitted,

/s/ Steven A. Greenberg
**STEVEN A. GREENBERG,**

/s/Joshua G. Herman
**JOSHUA G. HERMAN**
Attorneys for Defendant

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 1260
Chicago, Illinois 60604
(312) 879-9500

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 404
Chicago, IL 60604
(312) 909-0434
jherman@joshhermanlaw.com