UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 869 |
| | ) | |
| vs. | ) | Honorable Robert W. Gettleman |
| | ) | |
| THOMAS OSADZINSKI | ) | |

## GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' POST-TRIAL MOTIONS UNDER FEDERAL RULES OF CRIMINAL PROCEDURE 29 AND 33

The UNITED STATES OF AMERICA, by JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby submits this consolidated response to the post-trial motions filed by defendant pursuant to Federal Rules of Criminal Procedure 29 and 33 (R. 167).

## I.    Background

Between June 2018 and November 2019, the defendant attempted to provide material support and resources, specifically services, to the Islamic State of Iraq and al Sham ("ISIS"), a designated foreign terrorist organization ("FTO"). Accordingly, on December 12, 2019, the defendant was charged by indictment with violating 18 U.S.C. § 2339B(a)(1). R. 16.

Trial against the defendant began with jury selection on October 4, 2021, and ended when the jury returned a verdict of guilty on October 18, 2021. R. 153.

The defendant filed consolidated post-trial motions on January 27, 2021, seeking judgments of acquittal and a new trial. R. 167. In this consolidated response to defendant's motions, the government begins by responding to defendant's

1

arguments attacking the sufficiency of the evidence on the count of conviction and then addresses the arguments that defendant raised in his motion for a new trial. For the reasons set forth below, the defendant's motions should be denied.

## II.     Defendant's Motion for Judgment of Acquittal Lack Merit.

### A.     The Legal Standard for Judgment of Acquittal

A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a guilty verdict against a defendant. Fed. R. Crim. P. 29. A defendant faces "a nearly insurmountable hurdle" in contending that the jury had insufficient evidence to find him guilty. *United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015) (internal marks omitted). In reviewing a motion for a judgment of acquittal, this Court reviews the evidence presented to the jury in the light most favorable to the government and makes all reasonable inferences in the government's favor. *See United States v. Cejas*, 761 F.3d 717, 726 (7th Cir. 2014) (citing *United States v. Larkins*, 83 F.3d 162, 165 (7th Cir. 1996)). This Court may overturn the jury's guilty verdict "only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (internal marks omitted). It was the jury's role to weigh the evidence and assess the witnesses' credibility; courts "do not second-guess the jury's assessment of the evidence." *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008).

### B.     Sufficient Evidence Supports the Jury's Finding of Guilt

The defendant's post-trial motion for a judgment of acquittal hinges on his misconstruction of what is required for "advocacy or activity performed in coordination with, or at the direction of, a foreign terrorist organization." Jury

2

Instructions, R. 152 at 22. The defendant asks this Court to narrowly define "direction" to be limited to actual and personal one-on-one specific instructions provided by ISIS to the defendant. Such a definition is inconsistent with prevailing caselaw. As detailed herein, direction is much broader. It can be, as it was with the defendant, actions taken in conformity with instructions by ISIS to its followers to perform specific actions for the benefit of the FTO. Moreover, the defendant attempted to provide his service to unofficial ISIS media organizations, groups he understood to be closely affiliated with, and that worked for the benefit of, ISIS. The evidence, when viewed in a light most favorable to the government, established that the defendant followed ISIS's direction to support ISIS in "the media and the battlefield," (Gov. Ex. 409-7), rather than an "independent advocate."

### 1) The Defendant Acted at the Direction of ISIS[1]

The defendant is charged with attempting to provide material support to ISIS. *See* Indictment, R. 16. The record evidence establishes the defendant repeatedly expressed his desire to assist, coordinate with, and/or act at the direction of ISIS and took a series of substantial steps to provide services to ISIS. Nevertheless, the defendant argues that the government has not proven that he has performed his service at the direction of, or in coordination with, ISIS. The defendant is incorrect.

---

[1] The defendant sometimes repeats the same argument twice under different subsections. For example, in a subsection dedicated to the argument that the defendant was not directed by ISIS, the defendant argues that "'Heralds' and the nas.py scripts are fundamentally related to First Amendment expression and activity." R. 167 at 66. The defendant, further in the motion, has a subsection specifically on First Amendment activity where the same argument is repeated. *Id.* at 79. For brevity, the government will only respond once when an argument is repeated.

The Supreme Court has found that "Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 36 (2010). The defendant, however, misconstrues the scope of requisite directionality in providing services to an FTO.

The defendant argues that there was no evidence that "even remotely suggested that ISIS provided an instruction or direction to Defendant regarding the creation or dissemination of" the computer script. R. 167 at 65. He argues that "at most, [he was an] independent advocate who expressed support for the goals of ISIS." *Id*. at 57. The government does not dispute that no one from ISIS personally told the defendant to create the computer script, however, such proof is not required to sustain the conviction. By responding directly to instructions by ISIS to its supporters, the defendant was acting at the direction of ISIS.

Other courts have rejected arguments that a defendant must communicate directly with ISIS members, or have any direct link with the FTO, in order to be convicted of material support. For example, the Southern District of New York's findings in *United States v. Ullah* is instructive. 2021 WL 21902 (S.D.NY January 4, 2021). There, Akayed Ullah strapped an improvised explosive device to his chest and attempted to blow himself up in Times Square after posting on his Facebook account that he was committing the attack in the name of ISIS. He was unsuccessful in his attempt. *Id*. at \*1. Ullah argued that "because he did not engage in two-way communications with ISIS, he can only have acted entirely independently of the

4

group (rather than at its direction or control)." *Id.* at *3. The court disagreed. "The record evidence, taken in a light most favorable to the government, amply establishes that Defendant acted at ISIS's direction by heeding the call of the organization's propaganda and recruiting materials." *Id.* The *Ullah* court further held, when specifically addressing services, and defining services and concerted activity to mean an act done for the benefit or command of another, found that, like Osadzinski, Ullah "carried out the attack as directed by ISIS in its propaganda videos for the express purpose of benefiting ISIS." *Id.* at *4.

In *United States v. Wright*, 285 F. Supp. 3d 443 (D. Mass 2018), aff. in part and reversed in part (937 F.3d 8 (1st Cir. 2019)), the defendants initially planned on traveling to join ISIS in Syria. They changed course after ISIS issued a fatwa[2] against an American journalist. The defendants then conspired to behead the journalist in response to the fatwa. The defense argued that "mere awareness of the desires of the terrorist organization, delivered indirectly," is not sufficient to show coordination or direction. The trial court disagreed. "In coordination with, or at the direction of, does not require a direct link to the foreign terrorist organization." *Id.* at 457.

The defendant claims that *Wright* is "hauntingly similar to the case at bar." R. 167 at 64. His reliance is misplaced. On appeal, the First Circuit vacated the conspiracy to provide material support conviction. *United States v. Wright*, 937 F.3d 8, 29-31 (1st Cir. 2019). The appellate court found that the trial court's instruction that "coordination" can be with "the strategy, the tactics" of the FTO, instead of

---

[2] A fatwa is a ruling on a point in Islamic law given by a recognize authority.

coordination with the FTO itself, constituted legal error. *Id.* at 29. Significantly, the First Circuit rejected the defendant's sufficiency challenge with respect to his conspiracy to provide material support count. *Id.* at 27. The error identified by the appellate court was in the instructions provided relating to coordination. The defendant makes no analogous claim of error in the instant matter. Moreover, the record evidence described herein was more than sufficient for a jury to conclude the defendant acted at the direction of the FTO and attempted to coordinate with ISIS. The jury was never instructed, nor did the government argue, that the defendant must simply be aligned with ISIS's strategy and tactics.

There was abundant evidence presented at trial of the defendant's intent to follow the directions of ISIS, as set forth in its messages to supporters and his subsequent actions to provide ISIS with the services it requests. *Inside 8* was an ISIS video, published by Al-Hayat, an official ISIS medial organization, that directed "supporters of [ISIS] everywhere both in the media and the battlefield" to open three social media accounts if "they" close one, "and if they close three, open thirty." The video directs ISIS supporters to "strive patiently in the digital arena and do not allow the disbelievers to enjoy a moment of sleep or to live a pleasant life." It shows someone on a computer followed by the words "Islamic State" on the computer screen, and directs supporters to "terrorize them, fill them with fear, ignite the fires of conflict and create a climate of anxiety and distress on every one of their platforms." The video further encourages its followers to take actions for ISIS by telling them that "for with every press of a key on the keyboard you amplify the force and the reach of

the explosives [on the screen at that moment is an explosion] and with every click of a mouse and with every content you disseminate whether a thunderous nasheed depicting the [ISIS] warriors, your support enrages the disbelievers" and "all of that will be registered on your scale of righteous deeds." Gov. Ex. 409-7.[3]

The evidence demonstrates that the defendant received and acted upon ISIS's instructions. In addressing ISIS Telegram channels that were being removed by Telegram, the defendant mirrored the words of *Inside 8* when he told OCE 2 that "they delete 1, we make 2 more." Gov. Ex. 200 at 47 (OCE2-CHS); Tr. 168.[4] The defendant's use of the pronoun "we" is illustrative of his intent – that he aligned himself with ISIS and considered himself to be part of the organization. The defendant told OCE2 that he wished ISIS had their own Telegram channel and he asked OCE2 if he had seen *Inside 8*. The defendant then sent OCE2 screenshots from the ISIS video. *Id*. at 58-59 (OCE2-CHS); Tr. 172.

Consistent with the messaging from *Inside 8*, the defendant expressed his intent to use his computer skills to assist ISIS. He told OCE2 that he's "very good at computer security" but that he "doesn't use windows for jihad work." *Id*. at 60; TR. 177. He later told OCE2, while expressing his internal conflict over whether to

---

[3] Inside 8 is in English.

[4] The page numbers in Gov. Ex. 200 (the screenshots of the communications with OCE2) begin as "OCE2-CHS," because, initially, the person behind the screen communicating with the defendant was a Confidential Human Source (CHS). At some point, the persona was taken over by the FBI agent who testified. When that occurs, the page numbers change to "OCE2" and the numbers start over. When referencing the page number of the exhibit, the government will make clear which portion of the exhibit is being referenced, either by "OCE2-CHS" or by "OCE2."

commit an act of unprovoked violence, that he does "media in jihad but the sword is the other part." *Id*. at 79; Tr. 182.

The defendant also stated that Twitter banned him in "2 minutes" after he uploaded an Amaq, an official ISIS news organization, statement. Gov. Ex. 200 at 48 (OCE2-CHS); Tr. 169. During the same discussion, the defendant described using "PGP" (pretty good privacy) encryption methods, stating that this method is "very powerful." He added that al Qaeda used that method and that he thought he "could make one of our own." He also described using another program that was "completely impenetrable" and that law enforcement could "spend 1 billion dollars and they cannot break the code." *Id*. at 54 – 57; Tr. 170. Again, the use of the word "our" in indicative of the defendant's mindset – that he considered himself part of ISIS, not an independent advocate.

Significantly, during a later conversation, OCE2 asked the defendant how he came up with the idea of adapting a computer script. In response, the defendant said, "before I was Muslim I wanted to find dawla [ISIS] videos but never could[.] its very good for dawah[5][.] the news lies about dawla videos and will never show it full[.] amin[.] In responding to OCE 2's question regarding another ISIS media support group, the defendant stated, "I don't know them too close but I love their work[.]I try to help them[.]" Gov. Ex. 200 at 89 (OCE2); Tr. 304. In a revealing moment, in discussing the challenges of locating ISIS videos on the internet, and the defendant's

---

[5]     Dawa    is    the    act    of    inviting    people    to    embrace    Islam.
http://www.oxfordislamicstudies.com/article/opr/t125/e511

project, the defendant stated "I try to help them." In context, "them" is clearly ISIS. When the defendant explained to OCE2 how he created a mechanism to download and transfer ISIS videos in a manner to evade law enforcement, he stated "I will also encrypt the files. So mukhabarat [FBI] cannot read them…the media jihad will never end." Gov. Ex. 200 at 32 (OCE2); Tr. 273. Simply put, the defendant was offering his services to ISIS because he believed his calling was to engage in "media jihad" ("now I am making as much jihad as possible." Gov. Ex. 200 at 36 (OCE2); Tr. 278).

The defendant followed ISIS's directions published in Inside 8. He first attempted to work on a project linux project "designed for ansar [ISIS supporters]." Gov. Ex. 200 at 256 (OCE2-CHS); Tr. 220-21. When asked by OCE2 how it would help the brothers in the Islamic State, the defendant replied, "it will be very secure…It will only browse Telegram." *Id*. at 259. Tellingly, in response to the OCE's question, the defendant did not state that the project was for himself, instead he acknowledged that he was creating a program to help ISIS.

He ultimately abandoned his initial project ("it's too difficult." Gov. Ex. 200 at. at 19 (OCE2); Tr. 256) and instead modified a python computer script written by another "brother" that was designed to copy and preserve ISIS videos at a rapid rate. The script copied the contents from one Telegram channel into other Telegram channels, created by the defendant, and organized the videos by quality so that the "Ikhwaan" (brothers) can access them. The defendant also expressed his intent to spread the blueprints of his computer script to others. *Id*. at 36; Tr. 275. The defendant told OCE2 that he was "making as much jihad as possible." *Id*.; Tr. 278.

9

The document *Operations Heralds of the Internet* was part of this effort. *Operation Heralds of the Internet* is a document created and distributed by the defendant, which explained how to use the defendant's computer script to copy and preserve ISIS videos. Gov. Ex. 201.[6] In the document, he tellingly writes "By Allah's permission, the brothers who have access to the disorganized al-Furat Media and al-Hayat Media Center channels will be able to organize them or give me access to them *so that I would be able to organize them*."[7] (emphasis added) The defendant's statement offering his assistance – "give me access to them so that I would be able to organize them" – to designated, official ISIS media organizations, is an affirmative statement of his attempt and desire to coordinate with ISIS and refutes the defendant's argument that he was acting for his own personal benefit. Gov. Ex. 201.

When the defendant sent *Operation: Heralds of the Internet* to OCE2, he did not tell OCE2 that this was his own personal project. Instead, he told OCE2, "this document is very complicated. it is for organizing channels. but copying channels is easy. and i will do a document for that on android. so brothers who dont have a computer can do it. it will be much neater." Gov. Ex. 200 at 71 (OCE2); Tr. at 295. The word "brothers" in the context of the conversations is clearly a reference to ISIS

---

[6] The defendant references "no name" and states that "no name" wrote the original script. The government recognizes that the defendant stated that to the OCEs and the government stipulated that the FBI was aware of the existence of a computer code that copied Telegram channels, as early as January 2019. However, this is a red herring. Whether "no name" wrote the original computer script is irrelevant. It is undisputed that the defendant modified the script, improved it and distributed it (unsolicited).

[7] Al-Furat Media and Al-Hayat Media are official ISIS media groups and are included on the Department of States' FTO designation of ISIS https://ge.usembassy.gov/amendments-to-the-terrorist-designations-of-the-islamic-state-of-iraq-and-syria-march-21/

supporters. The defendant's plan to create a second document to assist "brothers" without a computer is further evidence of his attempt to coordinate with ISIS members by teaching them how to use his methods of preserving ISIS content.

The defendant argues that his goals were innocent, claiming "it was his personal goal to save and preserve those videos to share with others, ultimately through a torrent and with online users at Reddit." R. 167 at 65. The defendant's desire to share with online users at Reddit was not for a benign purpose but instead was to divert law enforcement's attention to investigate innocent Reddit users who watch the videos, in an effort to allow ISIS members, who could access the videos on Telegram, to continue their mission without law enforcement interference. As the defendant stated, "[n]ow the [FBI] will waste their time watching a kafir who doesn't support dawla [ISIS] so this will give ikhwan who are planning attacks less time being spied on." Gov. Ex. 201 at 35 (OCE2); Tr. 276. Further, the defendant told OCE 2 that he was posting the videos on Reddit to divert law enforcement and allow ISIS members to commit attacks. OCE 2 described it best when he called the defendant's plan to post videos on Reddit as a "red herring," meant to district law enforcement and cause them to waste their time looking at people who are not supporters of ISIS, while those who are supporters of ISIS can plan attacks without falling under scrutiny. Tr. 276-77. When laying out this plan to OCE 2, the defendant stated, "now I am making as much jihad as possible." *Id*. at 36; Tr. 278.

The defendant argues in his motion that he "took it upon himself to try and preserve the videos" and that his actions constitute independent advocacy, and a

personal project no different than the work done by the government's expert Aaron Zelin. R. 167 at 66. This argument is nonsense. Aaron Zelin, a senior fellow at the Washington Institute for Near East Policy, testified this his primary focus is researching terrorist groups, Tr. 780, and that he collected and preserved ISIS videos for academics to study. Tr. 784. The defendant preserved ISIS videos with the intent to commit "media jihad" for ISIS.

Moreover, the defendant attempted to share his video with two pro-ISIS media organizations. On February 7, 2019, the defendant contacted Organization 1. *See* Tr. at 139. At trial, OCE 2 described Organization 1 as "a pro-ISIS online publishing group which specializes in providing instructional material related to IEDs and toxins primarily to would-be attackers, plotters." Tr. at 140. Government's Sensitive Ex. 1 makes clear that the defendant was aware of which organization he was communicating with when he contacted Organization 1. Later, in October 2019, the defendant reached out to Organization 2, which was a brand used by ISIS for disseminating English translations of ISIS media content. *See* Tr. at 880-81. Likewise, the defendant was clearly aware of which entity he was attempting to contact when he reached out to Organization 2. *See* Government's Sensitive Ex. 2. After proactively contacting each organization, the defendant shared his script and his plan to promulgate his script with OCE 2 and OCE 4, purported members of these groups.

In contacting two well-known pro-ISIS media organizations and sharing with members of those entities his script, the defendant clearly attempted to provide his

service for the benefit of ISIS. That he provided this service through unambiguously pro-ISIS entities but not "official" ISIS groups does not dimmish the defendant's clear intent to provide his service for the benefit of the FTO. His outreach and subsequent contact constitute a substantial step which cannot be negated by the groups' "unofficial" status.

*Pledge to ISIS*

The defendant's position that he was only providing independent advocacy is further undercut by his formal pledge of loyalty to the leader of ISIS, known as pledging "bayah." On March 31, 2019, OCE2 asked the defendant if he pledged "bayah" to ISIS. Gov. Ex. 200 at 310 (OCE2-CHS); Tr. 237. The defendant responded that he tried but that "he can't do it perfect." He then sent OCE2 a recording, which appears to be of the defendant pledging "bayah" to ISIS. The defendant asked OCE2 if he had the full text in Arabic. The defendant then sent another voice message. OCE2 responded with "may allah accept from you my brother." *Id.*

On November 2, 2019, following the death of former ISIS-leader Abu Bakr al-Baghdadi approximately one-week prior, the defendant sent, unsolicited, his pledge to the new leader of ISIS, Abu Ibrahim Al-Hashimi Al-Qurashi, to OCE4. On the same day, the defendant also sent OCE4 an image of an ISIS flag with a handwritten note that stated, "I RENEW MY PLEDGE TO ABU IBRAHIM AL-HASHIMI AL-QURASHI, IN THE LAND OF AMERICA. Gov. Ex. 401 at 361 and 368; Tr. 1009.

Additional evidence of the defendant's intent to support ISIS includes a nasheed, an Islamic religious song, that the defendant "wrote himself" and that he hoped "Dawla [ISIS] will use it." Gov. Ex. 200 at 134-35 (OCE1-CHS); Tr. 194.

The defendant was even willing to disclose security measures to ISIS in the hopes of warning them. The defendant sent a video to OCE 2 of security buttons in a bathroom in his school. He told OCE 2 that "they are scared the mujihadid will do something." He told OCE 2 that the buttons the news doesn't show it but "the buttons are everywhere...on the street, in building." Significantly, and as evidence of his intent to help ISIS, he told OCE 2, whom he believed was part of a pro-ISIS group, that if he knows of any mujahideen who are fighting and feel like they are losing. Tell them about these buttons." Gov. Ex. 200 at 85-86 (OCE2-CHS); Gov. Ex. 206; Tr. 184-85. A few moments later, he told OCE 2 that he hoped to "inspire Muslims in Sham that even in America there are brothers like him." Gov. Ex. 200 at 87; Tr. 185. OCE 2 testified that it was his understanding that Sham, in this context, meant ISIS territory.

**The Defendant Knew Providing Support to ISIS was Illegal**

The defendant asserts that he believed he was acting within the law and that what he was doing was legal. R. 167 at 66 – 67. This argument is without merit or import. His intent was to provide services to ISIS, an organization that the defendnt knew was a designated terrorist organization. Whether he believed his conduct was illegal is not an element of an offense the government must prove. *See, e.g.*, *United States v. Blagojevich*, 794 F.3d 729, 738-39 (7th Cir. 2015) (finding mistake of law is

14

not a defense where statute required a specific intent but not willfulness or "any other proxy for knowledge of the law."). Nevertheless, the defendant was fully aware the providing material support to ISIS was illegal. During an execution of a search warrant on the defendant's residence, the FBI found the criminal complaint from *United States v. Joseph Jones and Edward Schimenti*, (17 CR 236, N.D.IL), which charged Jones and Schimenti with conspiracy to provide material support to ISIS. Gov. Ex. 602; Tr. 565. Indeed he referenced the complaint to OCE 1. Tr. 64.

* * *

In sum, the defendant contends that there was no evidence that ISIS directly instructed him to create this exact computer script. This was not necessary. The government's record evidence was more than sufficient for the jury to find that the defendant acted with the intent to follow the direction of ISIS. *United States v. Hendricks*, 950 F. 3d 348, 354 (6th Cir. 2020) ("Hendricks is right that the government presented no direct evidence of any conversation or meeting with specific ISIS members where Hendricks was directed or proposed to establish an ISIS cell…And in this case, there was a mountain of circumstantial evidence from which a juror could find beyond a reasonable doubt, that Hendricks attempted and conspired to direct services or personal to the ISIS organization – not merely operate an entirely independent venture.")

**The Defendant Was Not Required to Coordinate Directly With ISIS**

The defendant attacks the government's arguments in closing regarding attempted coordination with ISIS. He states that the government's arguments were made in brief and were "abstract and insufficient." R. 167 at 71.

First, as the Court instructed the jury, to convict the defendant for attempting to provide material support there must be direction **or** coordination with the FTO.[8] Both are not required. "The 'at the direction of' and 'in coordination with' theories provide alternative, independently sufficient grounds for sustaining the conviction." *United States v. Wright*, 937 F.3d 8, 24 (1st Cir. 2019) (citations omitted). As outlined above, the evidence presented was more than sufficient for the jury to find that the defendant acted at the direction of ISIS.

Second, while both direction and coordination are not required, there is evidence that the defendant intended to coordinate with ISIS. In *Heralds of the Internet,* the defendant stated his aspirations that the "brothers" who have access to the official ISIS Telegrams channels would give him access is, in and of itself, an expression of his desire to coordinate with ISIS. Defendant's argument that he "was simply hoping that he could obtain additional videos for his own collection" is contradicted by the actual words used by the defendant – "give me access to them

---

[8] "Services provided as material support to a foreign terrorist organization includes advocacy or activity performed in coordination with, or at the direction of, a foreign terrorist organization." R. 152 at 23. Language regarding coordination or direction is repeated in the instruction regarding the First Amendment. *Id.* at 25.

so that I can organize them." Gov. Ex. 201. He did not request access to obtain more videos for his personal collection; he wrote he wanted access to organize.

It is apparent that he was referring to administrative access which would give him rights to make changes to the channel. He wrote further in the document that, "We will write a script to organize every wilayah isdar after we finish downloading them, since there are too many to keep in just one folder." Gov. Ex. 201. This statement belies the defendant's argument. The defendant had access to videos as he was already downloading them. But as he told OCE 2, he wanted to organize ISIS videos into different Telegram channels he created by resolution so that all high definition videos are in one channel and all lower grade videos are in a separate channel, and then put the videos into an offline archive so that they can be preserved and not be removed from the internet but will still be accessible by ISIS supporters. Gov. Ex. 200 at 19 – 27 (OCE2); Tr. 259 – 264. When this statement is viewed in conjunction with his desire to access official ISIS Telegram channels to organize the channels, it is clear he was attempting to coordinate with ISIS.

**The Defendant Took Substantial Steps**

The defendant argues that "by charging the case as 'attempted' material support, the government effectively nullified the concept of independent advocacy and also relieved itself of the burden to prove a substantial step." R. 167 at 74. The defendant posits that, because the Supreme Court in *Humanitarian Law Project* stated that independent advocacy is not illegal, one can assume that the Supreme

17

Court would reject any theory, such as attempt, that nullifies independent advocacy. *Id.*

The defendant goes on to argue that in other successful prosecutions involving attempt to provide material support, the defendants always attempted to, or did, contact the FTO. He analogizes the situation to the case of *United States v. Gladish*, 536 F.3d 646 (7th Cir. 2008), where the defendant was charged with attempting to coerce a minor to engage in sexual activity. In that case, the Court overturned the conviction because it found that Gladish simply proposed to have sex with a minor but did not take any substantial steps to carry out the act, such as, for example, traveling to visit the minor or even making plans to travel. *Id.* at 649.

The defendant's position that he was "all talk" and did not take a substantial step towards commission of the offense ignores the evidence. By charging attempt, the government is not required to allege or establish actual coordination or direction with ISIS, as long as the government presents evidence that the defendant attempted to do so by taking a substantial step.

The defendant took multiple substantial steps towards his goal of providing support to ISIS, any one of which, when viewed in a light most favorable to the government, would support the jury's verdict. Examples of the substantial steps include: the modification of the python computer script for the purpose of preserving, and organizing ISIS videos that were being removed from the internet; the authorship of *Heralds of the Internet* for the purpose of teaching others how to implement the script so that the video preservation project could profligate (I told two

friends, who told two friends…); the distribution of *Heralds of the Internet* to OCEs whom he met in ISIS friendly Telegram rooms and whom he believed were members of pro-ISIS media organizations, for the purpose of proving his bona fides and for the purpose of promulgating the script; and teaching the CHS how to use the script for the same purposes. Any one of these steps goes beyond mere "talk" and constitutes action done in furtherance of his attempt to provide support to ISIS. *United States v. Rahim*, 860 Fed. Appx. 47, 53 (5th Cir. 2021) ("Rahim took a number of substantial steps toward providing material support to ISIS…these steps were…conduct strongly corroborative of the firmness of defendant's criminal intent.").

The defendant's argument that an "attempt" conviction without contact, or attempted contact, with the FTO would be in conflict with the Supreme Court's independent advocacy jurisprudence is without merit. The defendant cites no cases to support that position and the statute is not limiting in its definition of attempt. Indeed, "a direct link [to the FTO] is neither required by statute nor mandated by HLP [Humanitarian Law Project]." *United States v. Mehanna*, 735 F.3d 32, 50 (1st Cir. 2013).

Moreover, the defendant clearly intended to provide services to ISIS. The government's burden is to establish the defendant *attempted* to provide this service to ISIS (as well as to an extent, coordination). In other words, the defendant did not attempt to take direction from ISIS, he in fact took direction and decided, in following that direction, to provide a service through the modification of the computer script. While he later taught this script to OCE 4, who was able to employ it, completion of

19

the service is not necessary for a jury to convict. *United States v. Kaziu*, 559 Fed. Appx. 32, 37 (2nd Cir. 2014) ("it was not necessary for Kaziu to succeed in assisting al-Shabaab in its war against the Somali government for him to be convicted of attempting to do so."). As the Court instructed the jury, as long as the jury found that the defendant took a substantial step towards his goal, then he has attempted to provide material support and could be found guilty. R. 152 at 21.

**2) The Defendant's Provision of Services Was *To* ISIS**

The defendant asserts that the conviction should be overturned because the defendant only engaged with unofficial ISIS organizations and therefore did not have a direct relationship with ISIS. In other words, that the defendant did not provide a service to ISIS but instead only engaged with unofficial ISIS groups. This is a retread of the prior argument and, as stated above, there is no requirement that the government prove, for a conviction for attempting to provide material support, a direct relationship with the terrorist organization. The defendant cites no caselaw to support his position but instead points to a case where a defendant believed his provision of support would go to Al Qaeda. R. 167 at 76-77.

Without a doubt, directly providing aid to members of the FTO meets a definition of "to," but the material support statute prohibits additional conduct as well. Again, the defendant wishes the Court to view the wording of the statute in a very narrow light. The word "to" includes for the benefit of, as defined in this context in the HLP case. "Congress intended to reach all persons who act on behalf of an FTO

to further its goals and objectives in significant ways." *United States v. Jama*, 217 F. Supp. 3d 882, 892 (E.D. Va 2016).

> "[S]ervice" similarly refers to concerted activity, not independent advocacy. *See* Webster's Third New International Dictionary 2075 (1993) (defining 'service' to mean "the performance of work commanded or paid for by another: a servant's duty: attendance on a superior"; or "an act done **for the benefit** [emphasis added] or at the command of another"). Context confirms that ordinary meaning here. The statute prohibits providing a service '*to* a foreign terrorist organization.' § 2339B(a)(1) [emphasis in original]. The use of the word "to" indicates a connection between the service and the foreign group. We think a person of ordinary intelligence would understand that independently advocating for a cause is different from providing a service to a group that is advocating for that cause."

*Humanitarian Law Project*, 561 U.S. 1, 23–24.

Simply put, ISIS directed its followers to use the internet to support ISIS. The defendant heard these instructions and followed them by creating the script to preserve ISIS videos. He used the script personally and distributed the script to others who he believed to be ISIS supporters and instructed them in the use of the script. The services were clearly for the benefit of ISIS as ISIS videos were frequently being removed from the internet.

Moreover, in an attempt case, there is no requirement that the script be sent to an official ISIS media organization to sustain the conviction. Therefore, by providing the service for the benefit of ISIS – to assist ISIS in preserving their videos – his conduct satisfied the statute's directionality requirement. *See United States v. Mustafa*, 406 Fed. Appx. 526, 530 (2nd Cir. 2011) (providing jihad training and disseminating training manuals on the internet *for the benefit* of Al Qaeda, implicates the core meaning of the statute that proscribes knowingly providing material support

21

**to** a foreign terrorist organization (emphasis added)); *United States v. Suarez*, 893 F. 3d 1330, 1335 (11th Cir. 2018) (Defendant engaged with undercover agents that he believed were ISIS members. The court held that "it is irrelevant that he did not make contact with ISIS, because the law only requires that Suarez directed (or attempted to direct) his services to ISIS.").

This Court defined "service" to mean "concerted activity, not independent activity." R. 152 at 23. The Court then, in response to a jury note, further defined "concerted" to mean "jointly arranged, planned or carried out, or coordinated." The instructions are wholly consistent with the definition set forth in *Holder v. Humanitarian Law Project* as well as the plain meaning of the words found in Websters Dictionary. The jury found that the defendant's conduct met the definition of concerted; that the defendant knowingly provided services **to** ISIS, acting at its direction and not independently. The evidence, when viewed in a light most favorable to the government, supported the jury's verdict. As this Court found, in ruling on defendant's pre-trial motion to dismiss, "The scale and sophistication of this script transforms his conduct from an individual expressing an opinion, to providing a service **to** an FTO." *United States v. Osadzinski*, 2021 WL 3209671*3 (N.D.IL July 29, 2021) (emphasis added).

### 3) The Defendant's Conduct Was Not Protected First Amendment Activity

The defendant filed a pre-trial motion to dismiss the indictment in which he argued that the material support statute was vague as applied to him and that his

conduct was protected by the First Amendment. R. 65. The Court denied the motion. R. 93.

The defendant, in his post-trial motion, rehashes these same arguments. Namely, that the defendant's conduct was an expression of his opinion, that the computer code he employed had its own intrinsic First Amendment protection, and that he was exercising political speech. These arguments were rejected by the Court in its opinion and the defendant has not presented any new information that should cause this Court to change its decision.

As the Court noted in its opinion (R. 93 at 5 − 6), the Supreme Court has distinguished between independent advocacy (protected speech) and "advocacy performed in coordination with, or at the direction of, a foreign terrorist organization." (not protected speech). *See Humanitarian Law Project*, 561 U.S. at 26 (citations omitted); *Mehanna*, 735 F.3d at 49. As such, proscribed conduct/services that may be considered speech are not an exempted class of conduct under the material support statutory framework. Indeed, the Supreme Court has clarified that when material support takes the form of speech, "the statute is carefully drawn to cover only a narrow category of speech, to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Id*.

Furthermore, the evidence at trial established that the defendant was not attempting to engage in political speech was but instead attempting to provide a service to an organization that he knew was a designated Foreign Terrorist Organization. Specifically, and by way of example, the defendant cites *Operations*

*Heralds of the Internet* ("Heralds") in support of his position that he was merely advocating his opinion (Gov. Ex. 201). The defendant states that "the project was quite literally designed for Defendant to share videos in order to express an opinion." R. 167 at 80. He points to the name "Heralds," meaning "news" as evidence of his intent. The defendant, however, ignores the substance of the document. Heralds was a step-by-step instructional manual on how to quickly copy ISIS videos. The defendant created and distributed Heralds so that other ISIS members and supporters could implement the script and allow for the proliferation and preservation of ISIS videos published by, among others, official ISIS media organizations al-Furat Media and al-Hayat Media Center. The defendant, in Heralds, stated, "All praise is due to Allah for providing me the knowledge to begin copying all 360p videos in a matter of 20 minutes since sitting down and beginning this document. By Allah's permission, the brothers who have access to disorganized al-Furat Media and al-Hayat Media Center channels will be able to organize them or give me access to them so that I would be able to organize them."

The defendant was not, as he claims, merely looking to share videos. He was also offering official ISIS organizations the service of accessing their Telegram channels so that he could organize ISIS videos for them. He was performing, to use his words, "media jihad." The defendant also expressed his intentions to teach others how to employ the script, telling OCE 2, "Alhamdulillah I finished furqan and I am writing a document which teaches it.  I am downloading it now." Gov. Ex. 200 at 69B (OCE2); Tr. at 285 - 86.

24

The defendant also asserts that his conviction violated his First Amendment right to association. R. 167 at 81. He states that his sharing of *Heralds of the Internet* with OCE 2 and of an explosive document with OCE 1, were protected First Amendment right of association conduct. This argument has no foundation in the law or the evidence. The defendant was convicted of attempting to provide services to ISIS. His interactions with OCE 1 and OCE 2, to include sharing of documents, were part and parcel of his illegal conduct. He shared *Heralds of the Internet* with OCE 2 because a) he was attempting to build up his ISIS bona fides with OCE 2 and b) he believed OCE 2 could help spread the computer script. The defendant was not convicted based on his association with ISIS but rather because of his provision of material support. *See United States v. Marzook*, 383 F. Supp. 2d 1056, 1068 (N.D. Ill. 2005) ("Thus, in prohibiting the act of providing material support to FTOs, Section 2339B does not run afoul of the First Amendment."); *United States v. Chandia*, 514 F.3d 365, 371 (4th Cir. 2008) ("Chandia's argument that § 2339B violates the First Amendment right of association is fore-closed by *Hammoud,* which rejected a similar argument because the statute "does not prohibit mere association; it prohibits the *conduct* of providing material support to a designated FTO.").

Finally, the defendant summed up his intentions clearly when in conversation with OCE 2 regarding another ISIS supporter group, he said "I don't know them too close but I love their work. *I try to help them.*" Gov. Ex. 200 at 89 (OCE2); Tr. 304. He was not preserving videos for his own viewing pleasure or sharing videos with friends, but to assist ISIS.

His actions on behalf of ISIS fall squarely within Congress's prohibition of providing material support, which includes a "narrow category of speech made, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Humanitarian Law Project*, 561 U.S. at 25.

### 4) The Material Support Statute Is Not Vague

The defendant reasserts that the material support statute is vague as applied to him because a) he could not have known that it is illegal to communicate with unofficial ISIS organizations and b) the government did not prosecute Aaron Zelin.

The evidence showed that the defendant was attempting to provide a service to ISIS. "Service," however, as set forth in the statute, is not ambiguous and "does not require similarly untethered, subjective judgments." *Humanitarian Law Project*, 561 U.S. at 21. "[A] person of ordinary intelligence would understand the term 'service' to cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization." *Id.* at 24. In other words, to violate § 2339B by providing a "service," the government must prove that the defendant engaged in "concerted activity, not independent activity," to a foreign terrorist organization, that was done in coordination with, or at the direction of, a FTO, or at least an attempt to do so." *Id.* at 23 – 24. As set forth herein, the defendant, in attempting to provide support to ISIS, did so at the direction of ISIS, specifically the charge to commit online jihad by copying videos. There is no requirement in the statute that the defendant actually communicated with an official from ISIS or an official ISIS organization. His

engagement with groups that were unofficial ISIS organizations was sufficient to demonstrate his intent to support ISIS when he distributed the script to two OCEs.

The defendant's argument that he was intentionally avoiding communicating with ISIS when given the opportunity by OCE 1 or OCE3 is irrelevant. First, it does not matter whether he actually communicated with official ISIS to be convicted of the offense. Second, the defendant's characterization of his inaction is not born out by the evidence and is speculative. Another reading as to why the defendant did not follow up with the OCEs is that the defendant was concerned about law enforcement. He told OCE 1 that the "mukhabarat," meaning the FBI, knows who he is. He had explained that the FBI had come to visit him and that "hijrah," meaning travel to an Islamic land to fight, would be very hard. Tr. at 41.

The defendant told OCE 3, who asked the defendant to translate some material, that the "brother" who was going to help him with the translation had a "security problem" and that that brother was being followed by the "mukhabarat." Tr. at 717. In both instances, the defendant referenced concerns about the FBI, from which a reasonable jury could infer dissuaded him from further action.

Moreover, there is nothing in the record to explain why the defendant did not provide screenshots of his script to the CHS for translation. To state it was because the defendant did not want to provide a service to ISIS or that it means the statute was vague to him, flies in the face of cumulative weight of the evidence.

Finally, the defendant argues that the prosecution was arbitrary because the government has not prosecuted Aaron Zelin, the government's expert on ISIS media.

Mr. Zelin is a senior fellow and researcher at the Washington Institute for Near East Policy, a think tank located in Washington, D.C., and a research scholar at Brandeis University. Zelin's academic work focuses on ISIS and al Qaeda in Syria and Tunisia. Tr. at 779-780. As part of his work, he has created and maintained the website Jihadology.net. Mr. Zelin described Jihadology as "a primary-source archive, so it has content from the groups that I study as well as other groups because it's part of a project so that other researchers have access to this information so that they themselves can do research on it, of course. You know, journalists, people in government, diplomats, humanitarian workers, lawyers as well as others that use [sic] it useful for their professional purposes." Tr. at 784.

Mr. Zelin did not create jihadology at the direction of ISIS nor with the intent to assist ISIS. He did so for research purposes. To equate his conduct with the defendant's completely ignores all the evidence of the defendant's intent, such as his bragging that he was committing "media jihad."

As during trial, the defendant attempts to dismiss the weight of the evidence against him by arguing that simply "viewing, possessing, discussing, and sharing of publicly available videos and media" is not illegal. This argument ignores the cumulative effect of his actions and his express intent for modifying and distributing his script to pro-ISIS supporters and entities. The defendant's own words and actions clearly demonstrate his intent to provide services to ISIS.

28

### III.    Defendant's Motion for a New Trial Lack Merit.

### A.    The Legal Standard for a New Trial

A court may vacate a judgment and grant a new trial upon a defendant's motion "if the interest of justice so requires." Fed. R. Crim. P. 33; *see also United States v. Berg*, 714 F.3d 490, 500 (7th Cir. 2013); *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012). Rule 33 motions are generally disfavored and courts should grant them only in "the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (internal marks omitted); *see also United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) ("A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.") (internal marks omitted). Although the Court has broad discretion in ruling on a motion under Rule 33, the Seventh Circuit has cautioned:

> The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable. . . . The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand. . . . Motions for new trial based on weight of the evidence are not favored. Courts are to grant them sparingly and with caution, doing so only in those really exceptional cases.

*United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989) (internal marks omitted).

In addition, a new trial is in the interest of justice where "the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). "[A] defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006).

### B.     The Defendant Received a Fair Trial

The defendant argues for a new trial on two principal grounds. First, that the government shifted the burden of proof to the defense during the rebuttal argument. Second, that the testimony of OCE1 and the repeated showing of ISIS videos were prejudicial. These arguments lack merit, and the motion should be denied.

### 1)  The Government Did Not Shift the Burden of Proof

It goes without saying that the government bears the burden of proving each and every element of an offense beyond a reasonable doubt. And at no point can the burden be shifted to the defense. The government, however, did not shift the burden during its rebuttal argument.

The defendant argues that the prosecutor "told the jurors they had to believe the defense theories of points of attack, and every one of them, to acquit." R. 167 at 85. The defense argues that, as a result, the government misstated the law.

During rebuttal argument, the government ended its argument with an itemization and summarization of some of the government's evidence by prefacing with the words, "if you believe that he was acting as an independent advocate when…" and then concluded the point by stating that, if the jury believed he was acting as an independent advocate for these reasons, then "find him not guilty." For several reasons, this argument did not shift the burden of proof.

First, the jury could have acquitted the defendant on other grounds. In *United States v. Common*, 818 F.3d 323 (7th Cir. 2016), the government stated during closing argument that if the jury believed the police officers framed the defendant, and if they believed the defendant's argument overcame the government's evidence and

proved the officers are liars, then the jury should acquit. The court found that because the prosecutor's comments "did not state that the only way to find Common not guilty was to find that the officers lied. Rather, the government presented a conditional statement: *If* the jury believed the officers were lying and framed Common, then the jury should acquit. This did not preclude the jury from acquitting Common for another reason, such as the government not meeting its burden of proof." *Id.* at 332 (emphasis in original). The government, in this case, preceded every statement with "if."

Similarly, in *United States v. Hernandez*, 865 F.2d 925 (7th Cir. 1989), the government, in responding to a defense argument about an informant not testifying, stated during rebuttal argument that the informant's testimony would have been duplicative of an agent's testimony and if the jury did not believe the agent, the jury should acquit the defendant. The Court held these comments were proper and were not a misstatement of the law. "The prosecutor did not state that in order to find [defendant] not guilty, the jurors had to necessarily disbelieve [witness]. The prosecutor correctly posited that if the jury disbelieved the government's witnesses, they should acquit the defendant. No error exists in this statement." *Id.* at 929-930.

In *United State v. Marshall*, 75 F.3d 1097 (7th Cir. 1996), in response to the defendant's argument that the agent lied during testimony, the government stated to the jury that if they believe that the agent did not testify truthfully, the jury should find the defendant not guilty. The Court found that prosecutor's comments were not

improper because "the AUSA did not state that it was the *only* way" to find the defendant not guilty (emphasis in original). *Id.* at 1108.

Contrast *United States v. Vargas*, 583 F.2d 380 (7th Cir. 1978), where the prosecutor stated that if the defense were to be believed, then five agents who testified must have lied. The prosecutor instructed the jury that if they find the defendant not guilty, the jury should write down that each agent is a liar. The other alternative, the prosecutor said, was a verdict of guilty. The Court, in reversing the verdict and remanding for a new trial, found that by arguing that the defendant could be found not guilty *only if* the agents were lying, the prosecutor's statements were improper and absolute. "To tell the jurors that they had to choose between the two sides was error." *Id.* at 387; *see also United States v. Cornett*, 232 F.3d 570, 574 (7th Cir. 2000) (In arguing that the jury would "have to find" the Court stated, "Viewed in isolation, the prosecutor's remarks misstated the burden of proof because the jury could have believed that the witnesses told the truth and yet still found that the government had failed to prove Cornett's guilt beyond a reasonable doubt.").

The statements made by the government during rebuttal were not absolute and were more akin to those examined in *Common*, *Hernandez* and *Marshall*. The government qualified each point with an *if* but never with a *must*. The government never conditioned an acquittal on the jury having to find that the jury must disbelieve the itemized evidence in totality as the only path to an acquittal. Even referencing multiple exhibits in a string left the door wide open for the jury to find other grounds

32

to acquit the defendant, not just that the government's evidence did not support the notion that he was acting as an independent advocate.

For example, the jury could have believed that the government failed to prove that the defendant was acting at the direction or control of ISIS; they could have believed that, because there was no one-on-one contact between ISIS and the defendant, that the government failed to prove that the defendant was operating under the direction of ISIS or that the defendant was attempting to coordinate with ISIS; that the government failed to prove the defendant was operating under the direction of ISIS because he rejected the FBI's invitations to contact someone in ISIS or to translate ISIS material; the jury could have discredited the government's witnesses' testimony; the jury could have found that the defendant was simply hoarding ISIS videos for his own personal collection and to share with like-minded individuals; or they could have believed that he was exercising his First Amendment rights. In short, the government never argued that the jury must disbelieve the specific, identified evidence and determine that, as a result of that disbelief, they must acquit the defendant, and that there was no other way to reach that verdict.

Second, the Court, twice, instructed the jury that independent advocacy is not a criminal violation. The Court's instruction provided, "'Material support and resources' includes any services. The term 'services' refers to concerted activity, not independent activity. Services provided as material support to a foreign terrorist organization includes advocacy or activity performed in coordination with, or at the direction of, a foreign terrorist organization. Independent activity or advocacy,

however, is not prohibited." R. 152 at 23. "Advocacy that is done independently of the terrorist organization and not at its direction or in coordination with it does not violate the statute." R. 152 at 25. The court's instructions informed the jury that they should acquit if they find that the defendant was acting as an independent advocate. The government's arguments were in direct correlation to, and were consistent with, those jury instructions.

Third, the government did not refer back to the defense when it made these statements. Although the government was responding to the defendant's closing argument writ large, the government, in itemizing some of the evidence in this manner, never directly referenced anything defense counsel stated in closing argument. In other words, the government never put before the jury the choice of accepting the defendant's argument regarding these particular exhibits or the government's argument. Instead, the government's argument focused the jury on particular exhibits in the context of the government's presentation and, consistent with the jury instructions, effectively gave the jury one path to acquittal if they did not believe certain aspects of the government's evidence. At no point during argument did the government ever allege that the defendant was required to prove that he acted as an independent advocate. "When commenting on the plausibility of a defense theory, the government's focus must be on the evidence itself and what the evidence shows or does not show, rather than on the defendant and what he or she has shown or failed to show." *United States v. Glover*, 558 F.3d 71, 78 (1st Cir. 2009).

In contrast, the cases cited by the defendant involved improper comments by prosecutors that referred to the defense. In *United States v. Wihbey*, 75 F.3d 761, 770 (7th Cir. 1996), the prosecutor stated to the jury that if the defense counsel can explain away a conversation, then the jury should acquit. The Court found this comment to be improper because it was "effectively a comment on Wihbey's failure to testify." *Id*. Here, the government made no reference to the defense counsel at all during the comments at issue, nor did the government, at any point during rebuttal argument, imply that the defendant was required, or failed, to provide any explanation for anything.

The other cases cited by the defendant are equally distinguishable for the same reasons. In *United States v. Skandier*, 728 F.2d 43, 45 (1st Cir. 1985), although affirming the verdict, the Court was critical of the government's "how-does-he [defendant] explain" argument to the jury. In *Swinford v. Warden, Dayton Correctional Institution*, 2012 WL 868979 (S.D. Ohio Mar. 13, 2012), the prosecutor commented on the defense not conducting a DNA test. In *United States v. Diaz-Diaz*, 433 F. 3d 128, 1345 (1st Cir. 2005), in response to a defense argument that the jury did not hear from the case agent, the prosecutor commented to the jury that the defendant could have called the witness. The Court found the comment improper but affirmed the conviction. In *United States v. Roberts*, 119 F.3d 1006, 1015 (1st Cir. 1997), the Court found improper the prosecutor's comments regarding the defendant's responsibilities being equal to the government's when the defendant decides to present evidence.

Again, at no point did the government in this case make any comment about the defendant presenting, or failing to present, a defense, or any reference about the defendant not testifying, or even referencing the defendant or defense when it addressed the particular evidence at issue.

### The Government Did Not Misstate the Law

The defendant further argues that the government misstated the law by conflating independent advocacy with intent when the government argued to the jury that the defendant's statements showed that he was not acting as an independent advocate. R. 167 at 86. The defendant posits that the government presented the evidence in a light that made it appear that the jury was required to find that the defendant was not acting as an independent advocate in order to convict, as opposed to the government's burden to prove that the defendant acted at the direction of ISIS. This is simply not the case.

This case turned on intent. There can be no merging of two issues (independent advocacy and intent) when both are part of the same issue. Did the defendant intend to act as an independent advocate or did he intend to follow ISIS's direction? If the government proved that the defendant was not acting independently, then by logic and reason, he was acting at the direction of ISIS.

The defendant's accusation that the government misquoted the evidence is an accusation viewed in a vacuum. R. 167 at 87-88. The defendant attempts, in his motion, to dissect each piece of evidence in isolation. The defendant argues, as he did in his closing argument, that each piece of evidence in isolation is not illegal.

36

Convictions, however, are based on the totality of the evidence to include reasonable inferences drawn from that evidence. The government's evidence, taken as a whole and which the jury had during deliberations, proved that the defendant intended to act at the direction of ISIS and was, therefore, not acting as an independent advocate. The evidence the government cited in its rebuttal argument for which the defendant criticizes –for example, when the defendant told OCE 2 that he was preserving videos for ISIS and jihad, or that he was developing a more secure operating system for ISIS – was part of that proof. The government argued, and the jury clearly acknowledged, that the evidence must be viewed as a whole. The government, furthermore, is entitled to draw inferences from the evidence in context. "The Government did nothing more than argue that the jury could make reasonable inferences based upon the evidence introduced at trial. Such argument is permissible . . ." *United States v. Jones*, 2016 WL 6822648, at *8 (N.D. Ill. Nov. 18, 2016).

The government's comments on the evidence were not incorrect, improper, or a misstatement of the law, but were arguments based on the totality of the record and the context of the exhibits.

### The Defendant Received a Fair Trial

A review of alleged improper statements by a prosecutor involves two steps by the Court. The first is to consider whether such comments were improper. The second, is, if the comments are improper, to determine whether the remarks deprived the defendant of a fair trial, keeping mind that "improper statements during closing argument rarely constitute reversible error." *United States v. Friedman*, 971 F. 3d

700, 714 (7th Cir. 2020), *quoting United States v. Wolfe*, 701 F.3d 1206, 1211 (7th Cir. 2012). "Where the marks are found improper, the court examines them in light of the entire record to determine whether the challenged statements 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Morales*, 2021 WL 5299794, at *5 (N.D. Ill. Nov. 15, 2021) (citations omitted).

In analyzing whether the defendant was deprived of a fair trial, the Court is to look at five factors. "(1) the nature and seriousness of the misconduct; (2) the extent to which the comments were invited by the defense; (3) the extent to which any prejudice was ameliorated by the court's instruction to the jury; (4) the defense's opportunity to counter any prejudice; and (5) the weight of the evidence supporting the conviction." *Id*. As addressed above, the government's comments during the rebuttal argument were not improper. Even so, the defendant was not deprived of a fair trial.

First, the defendant contends that the government shifted the burden of proof. As stated above, the burden of proof was not shifted and there was no misconduct. As the Seventh Circuit has repeatedly held, there is no burden shifting if the government's comments were not presented in absolute terms. The comments made by the government "did not preclude the jury from acquitting [the defendant] for another reason, such as the government not meeting its burden of proof. Thus, the statements were not improper." *Common*, 818 F.3d at 332.

Second, the government's comments, while not directly referencing the defense and while consistent with the Court's instructions on independent advocacy, were

invited by the defense through the nature of their closing argument. "Tom, in this case, ladies and gentlemen, was an independent advocate. He was a freelancer." Tr. at 1381. The Court found, in denying the defense's timely objection, that the government "was basically responding to [the defendant's] your argument." Tr. at 1429.

Three, the instructions provided by the Court, both before and after the arguments, coupled with the government's embracing its burden of proof, outweighed any perceived prejudice against the defendant. "[W]e analyze several factors when assessing the prejudicial effect of a prosecutor's misstatement of the law. Of these factors we place considerable emphasis on the curative effect of jury instructions and the weight of the evidence." *Cornett*, 232 F.3d at 574.

The Court instructed the jury, before closing arguments, that the government has the burden of proof. "When the lawyers-the way this works is sort of like a debate. And if you were on a debate team, the government has the burden of proof, so they go first. Then the defense gets a chance to respond and to present argument. And then the government has a brief rebuttal afterwards to the statements, so the go last because they have the burden of proof." Tr. at 1321. The Court, again, instructed the jury after closing arguments that the government has the burden of proof. "The government has the burden of proving the defendant's guilt beyond a reasonable doubt. This burden of proof stays with the government throughout the case. The defendant is never required to prove his innocence. He is not required to produce any evidence at all." Tr. at 1433. The government also, during closing argument,

repeatedly reminded the jury that the government has the burden of proof. Tr. at 1330, 1335, 1342.

Moreover, the Court further instructed the jury that, "The lawyers' statements and arguments are not evidence. If what a lawyer said is different from the evidence as you remember it, the evidence is what counts." Tr. at 1434. "Absence evidence to the contrary, we presume that the jury understood and followed the district court's instructions." *Cornett*, 232 F.3d at 574; *United States v. Garvey*, 693 F.3d 722, 726 (7th Cir. 2012). The Court's instructions, coupled with the government's multiple references to bearing the burden of proof, were more than sufficient to overcome any perceived prejudice.

Fourth, although the defendant did not have an opportunity to respond to the government's rebuttal arguments, all other factors weigh in favor of a fair trial.

Fifth, the weight of the evidence was overwhelming. The government has summarized the evidence above.

In sum, the government's comments during rebuttal argument were not improper, the defendant was not prejudiced in any way, and the five factors of a fair trial, with the exception of factor four, all weigh heavily in favor of a fair trial for the defendant.

### 2) Display of Videos Were Not Unduly Prejudicial

The defendant moves for a new trial based on the testimony of OCE 1 and on the ISIS videos played at trial. The defendant argues that the introduction of both were unduly prejudicial, under Federal Rule of Evidence Rul2 403.

### OCE 1's Testimony Was Not Unduly Prejudicial

On June 6, 2018, the defendant, using the moniker "K-Star," sent a message to a Telegram chatroom titled "Weapons," "anyone have the video for this guide," linking to what appears to be a TATP recipe printed below an ISIS flag. Tr. 34. The defendant wrote, "And be careful getting supplies. They are watched heavily...And try to work alone unless you trust a brother very much. The spies are common. Three brothers from my city in dar al kufr were set up." Tr. 35. Later in the group conversation, another individual wrote "yes. There was a much better detailed video guide in Arabic." Tr. 35. A member of the group asked, "was it an official release from Dawlah? with English subtitles or did you mean a different one?" The defendant replied, "Yes, Dawlah. With English subtitles." Tr. 36. Dawla is a common term for ISIS.

That same day, OCE 1 direct messaged the defendant "you asked about this," referencing the TATP recipe, and advised the defendant, "be very careful[.] what you want to do with it." Tr. 39. The defendant responded that he "will be doing studying." When OCE 1 asked, "you mean studying for school?" the defendant responded, "for jihad," followed by a heart emoji and a symbol associated with ISIS. Tr. 40. In response to OCE 1's question as to where he was planning on committing jihad, the defendant stated, "Dar al kufar," a/k/a America. The defendant also informed OCE 1 that the "mukhabarat," the FBI, were watching him. Tr. 41. OCE 1 similarly advised the defendant to "pick and choose your target carefully . . . so not to harm innocent muslims . . . ." The defendant affirmed that it would be "best to Target the government

rafidah" and that "citizens can be risky unless they are in blatant kufr (alcohol bars, LGBT parade/club)." Tr. 43

In the conversation with OCE 1, the defendant noted that the Weapons chatroom they initially connected through had been deleted. The defendant advised that he still was able to "download[ ] almost everything." Tr. 47. OCE 1 asked the defendant if he "know much about computers and internet security," to which the defendant responds, "yes . . . I am in a top school for computers . . . in a few years inshaAllah I will be very skilled." Tr. 48. The defendant went on to say that with these skills, "I can help my brothers," implying ISIS. OCE 1 responded approvingly, and the defendant went on to say, "all of my computer is encrypted and i use anonymous networks for everything[.] If any of the brother need help with security tell them to come to me." *Id*. The defendant and OCE 1 then moved to a different encrypted platform where they continue communicating.

On June 29, 2018, OCE 1 messaged the defendant a greeting, and the defendant states that he had to "stay passive for now because of the mukhabarat," meaning law enforcement. Tr. 57. The defendant then noted that he would fight law enforcement if he must and would "attain Shahadah," meaning martyrdom. When OCE 1 said OCE 1 would look forward to hearing news of the defendant's attack, the defendant replied, "InshaAllah, I know a brother in contact with IS media department. If I do it there will be an isdar [media release]." Tr. 60.

The defendant once again reiterated that "any American employee will be not innocent." Tr. 63. The defendant referenced an "imprisoned brother," who was

arrested after attempting hijrah, meaning migration to ISIS-controlled territory. *Id*. The defendant then sent OCE 1 what appears to be the complaint from the material support case *United States v. Jones*, No. 17-CR-236. Tr. 64.

The defendant emphasized that he was willing to wait until the "FBI stop[ped] watching" him before acting. *Id*. OCE 1 responded approvingly. The defendant noted that he has been "doing a lot of reading of materials." When OCE 1 asked, "Quran and hadith?" the defendant responded, "like explosive making and Quran and hadith." Tr. 67. The conversation ended shortly thereafter and the defendant and OCE 1 did not communicate again.

The defendants argues, in his motion, that the evidence regarding violence and weapons was "inherently inflammatory" and "bore no casual connection to the actual charge." R. 167 at 97.

Federal Rule of Evidence 401 defines relevant evidence as evidence having "any tendency to make a fact more or less probable than it would be without the evidence" and where "the fact is of consequence in determining the action." "A party faces a significant obstacle in arguing that evidence should be barred because it is not relevant, given that the Supreme Court has stated that there is a 'low threshold' for establishing that evidence is relevant." *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012) (*citing Tennard v. Dretke*, 542 U.S. 274 (2004)). The testimony cited above easily surmounts this low bar.

Federal Rule of Evidence 403 "gives judges discretion to exclude relevant evidence 'if its probative value is substantially outweighed by a danger of ... unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.' Fed. R. Evid. 403." *United States v. Hamzeh*, 986 F.3d 1048, 1055 (7th Cir. 2021)

OCE 1's testimony was relevant and not unduly prejudicial for several reasons. First, the defendant's comments that he is "in a top school for computers" and that he hopes to "help my brothers" with his acquired computer skills is directly relevant to the charged conduct. Likewise, the defendant's claim that he knows someone with an "IS media" contact is similarly relevant. The defendant was charged with attempting to provide material support, namely, services, to ISIS in the form of a computer script. The defendant's comments to OCE 1 helped demonstrate that the defendant intended to support ISIS, that he had several ideas about how to support ISIS, and that those ideas included applying his computer skills in furtherance of ISIS's mission. While the script was the manifestation of this objective, the defendant's goal fundamentally was to support ISIS.

Second, the defendant's statement that he was studying for jihad and was possibly planning on committing violence in the United States on behalf "Dawla" or ISIS, directly helped establish, at the outset, his intent – that he was not acting independently in his actions but instead wanted to help ISIS. His statement that he knew a brother in ISIS media and that if he committed an attack there would be a press release, further evidenced that the defendant had, or attempted to have, a relationship with ISIS, as opposed to being an independent advocate.

44

Third, the defendant's presence in a Telegram chatroom entitled "weapons" was relevant for context, to establish that the government did not seek out the defendant but that OCE 1 passively came across the defendant in a Telegram channel where defendant was actively participating. To that end, the defendant's proactive, unsolicited comments in a chatroom titled Weapons helps dispel the argument that the government acted overzealously in its investigation of the defendant.

Fourth, his discussions regarding staying "passive for now," in regard to committing an act of violence, because the FBI was watching him, demonstrated an element of operational security. It established an awareness that his conduct was illegal and it presented an explanation as to why he sometimes failed to respond to taskings when offered. For example, when OCE 3 asked him to translate material and the defendant backed away because the person he was anticipating collaborating with was being watched by the FBI.

Fifth, the defendant's statements referencing other material support cases and his preparation for attacking law enforcement demonstrate both his knowledge that material support of a foreign designated terrorist organization, like ISIS, is illegal, and his consciousness of guilt. 18 U.S.C. § 2339B(a) prohibits knowingly providing material support or resources provided a person has "knowledge that the organization is a designated terrorist organization . . . , that the organization has engaged or engages in terrorist activity . . . . or that the organization has engaged or engages in terrorism . . . ." The above-cited communications are relevant to the government's burden of providing that the defendant acted knowingly and with the understanding

that ISIS is a designated terrorist organization or "engages in terrorist activity." 18 U.S.C. § 2339B.

Sixth, the defendant's discussion regarding violence was not the only instance when he indicated he was inclined to be prepared to commit violence. The defendant, unsolicited, asked OCE 2 "for a guide to make a detonator." Gov. Ex. 200 at 301 (OCE2-CHS); Tr. 227. He told OCE2 that he wants to "study it and practice making them so I know." *Id.* His repeated proclivity for preparing for violence in the context of ISIS, is relevant to his state of mind and his intent to support the FTO.

Finally, on cross examination, the defendant suggested OCE 1's initial contact with the defendant was innocuous. ("[Y]our first message to [the defendant] was 'how are you, akhi?' Correct? . . . And that is a common saying in . . . the Islamic tradition and in Muslim lands" (Tr. at 79); "And the word 'jihad,' jihad can mean internal struggle a well, correct . . . And you do not know what he meant when he said 'jihad,' do you?" (Tr. at 81); "He never says ISIS, right?" (Tr. at 91). As a result of this line of questioning, in which the defendant implied references to ISIS were speculative, OCE 1 testified that the initial TATP recipe shared by the defendant was an ISIS document and referenced attacks for which ISIS claimed responsibility. The government's redirect was proper and merited following the defendant's cross examination.[9]

For all these reasons, OCE 1's testimony was relevant, was not unduly prejudicial and was properly admitted.

---

[9]     In addition to an ISIS flag, above the TATP recipe was written, "An now a gift to the mujahideen who operate in the kuffar lands. We now provide to you a recipe for TATP that you might strike a blow behind the enemy lines, like we did in Paris." Tr. at 119.

### The ISIS Videos Were Not Unduly Prejudicial

The defendant further argues, as unduly prejudicial, the playing of ISIS videos and the referencing of such videos during closing argument. The defendant states that they were willing to stipulate that the videos expressed pro-ISIS sentiment and that to the extent the videos had any relevance to demonstrate the defendant's sympathy to ISIS, that was "lawful behavior." R. 167 at 99.

The videos were highly relevant and not unduly prejudicial. It should be noted at the outset that the government played only short, non-violent segments of approximately six ISIS videos or ISIS related videos. Moreover, any video that the government played was possessed by the defendant in some form, either found on one of his electronic devices or were a link to the video he sent to an OCE. With that, the videos were highly relevant and not unduly prejudicial for several reasons.

First, the video excerpts were not played to inflame the jury's passion but to establish the defendant's mindset. "Although the videos and the e-mail do not, by themselves, show that Shareef has specific plans to engage in terrorism, they nevertheless suggest that he had a preoccupation with terrorism and violence before he met the informant." *United States v. Shareef*, 2011 WL 4888877*4 (N.D. Ill Oct. 11, 2011); *Mehanna*, 735 F.3d at 60 (Al Qaida videos and pictures absorbed by the defendant "doubtless bear on his motive and intent.").

Second, the videos, specifically the ISIS video the defendant narrated, is relevant to the issue of direction or coordination versus independent advocacy. Although the video narrated by the defendant was not produced by an official ISIS

media outlet, the video was the type that ISIS used to recruit and terrorize. The defendant's willingness to be part a video demonstrated to the jury that he was not acting as an independent advocate but aligned himself with the FTO and desired to provide support, "help," to the organization, when he later modified and distributed the computer script to preserve the very same ilk of videos he not only possessed but helped create. In other words, the videos played at trial were evidence of his intent to commit "media jihad" on behalf of ISIS.

Third, the services provided by the defendant to ISIS involved a computer script to preserve ISIS videos. The jury was entitled to see evidence of such videos in order to understand their nature and why they were constantly being removed from the internet. In other words, why the defendant's computer script provided a valuable service to ISIS.

Fourth, as an element of the offense, the government was required to prove that the defendant was aware that ISIS was a designated foreign terrorist organization or aware of the underlying acts of terrorism that caused the designation. The videos were one series of exhibits that established that the defendant was aware of the violent acts of terrorism committed by the organization he chose to provide services to.

Fifth, this case is about terrorism. Presenting violent acts, in some form, to the jury, is bound within the nature of the charged conduct. "Because this was a case about supporting terrorists, it is inescapable, we believe, that there would be some evidence about violence and terrorist activity. It cannot be denied that the evidence

48

at issue was unfavorable to the defendants, but we cannot conclude that it was *unduly* prejudicial." *United States v. El-Mezain,* 664 F.3d 467, 511 (5th Cir. 2011), *as revised* (Dec. 27, 2011).

As the Court stated, in denying the defendant's pre-trial motion to suppress the videos, "These are documents and videos and other pieces of evidence in the possession of the defendant. They go to his state of mind, his intentions, which is of paramount importance in this case. So I think that they're -- even though some of them precede the actual indicted conduct here, they do put it into context, and I think the government is entitled to do that." Tr. p. 7, pre-trial conference, September 28, 2021.

### 3) Prior Motions and Cumulativeness of Errors

The defendant concludes his motion for a new trial by adopting his pre-trial motions and arguing that his motion should be granted based on a cumulativeness of alleged errors. The government adopts its responses to the defendant's pre-trial motions and requests that the court affirm its prior rulings.

The government also opposes the defendant's motion on cumulativeness because there were no errors.

## IV.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny defendant's motions for a judgment of acquittal or a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33.

Respectfully submitted,

JOHN R. LAUSCH, Jr.
United States Attorney

By:    /s/ *Barry Jonas*
BARRY JONAS
MELODY WELLS
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604

ALEXANDRA HUGHES
Trial Attorney
Department of Justice
National Security Division
950 Pennsylvania Ave.
Washington, D.C.

Dated: April 27, 2022