**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 CR 869 |
| | ) | Judge Robert W. Gettleman |
| THOMAS OSADZINSKI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF POST-TRIAL MOTIONS**
**FOR JUDGMENT OF ACQUITTAL UNDER RULE 29**
**OR, ALTERNATIVELY, FOR A NEW TRIAL UNDER RULE 33**

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 1260
Chicago, Illinois 60604
(312) 879-9500
Steve@Greenbergcd.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 404
Chicago, IL 60614
(312) 909-0434
jherman@joshhermanlaw.com

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   THE COURT SHOULD GRANT DEFENDANT'S
      RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL. .................................. 4

      A.    The Government Misconstrues the  Element of "Direction"
            That was Required, But Not  Proven at Trial .......................................... 4

      B.    The Court Should Reject the Government's "Benefit" Theory
            That the Jury Was Never Instructed on, and Thus Could Not
            Have Used to Convict. ........................................................................... 12

      C.    *Heralds of the Internet* Was Independent Advocacy and Does Not
            Support a Conviction for Attempted Material Support ......................... 18

      D.    The Government Failed to Prove that Defendant Attempted to Provide
            Services *to* ISIS, as Opposed to a Non-FTO, and its Arguments
            to the Contrary Present Serious Constitutional Due Process Problems. .............. 25

      E.    The Government Failed to Prove that Defendant
            Attempted to Coordinate with ISIS ....................................................... 32

      F.    The Government's "Attempt" Theory Nullifies Independent Advocacy. ............ 33

      G.    The Government's Arguments Demonstrate How the Material Support
            Statute is Unconstitutionally Vague as Applied to Defendant .............................. 36

III.  ALTERNATIVELY, THE COURT SHOULD GRANT
      DEFENDANT'S RULE 33 MOTION FOR A NEW TRIAL. .............................. 42

      A.    The Government Improperly Shifted the Burden
            on the Critical Issue of Independent Advocacy. ................................... 42

      B.    The Government's Repeated References to Irrelevant and Unduly
            Prejudicial Testimony Regarding Violence Requires a New Trial ...................... 46

IV.   CONCLUSION ................................................................................................. 53

i

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ............................................................... 32

*Board of Education v. Pico*, 457 U.S. 853 (1982) .................................................... 32

*Boim v. Holy Land Foundation for Relief & Development*, 549 F.3d 685 (7th Cir. 2008) .... 16, 17

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 23 (2010) ............................... *passim*

*In re Merchants Grain by & Through Mahern*, 93 F.3d 1347 (7th Cir. 1996) ............................. 7

*United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010) ........................................ 51

*United States v. Adams,* 628 F.3d 407 (7th Cir. 2010) ............................................. 43

*United States v. Amer Sinan Alhaggagi*, 978 F.3d 693 (9th Cir. 2020) ...................... 13

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015) ...................................... 31

*United States v. Briseno,* 843 F.3d 264 (7th Cir. 2016) ............................................. 42

*United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008) ........................................... 38

*United States v. Common*, 818 F.3d 323 (7th Cir. 2016) ..................................... 43, 44

*United States v. Conley*, 942 F.2d 1125 (7th Cir. 1991) ............................................. 4

*United States v. Delay*, 440 F.2d 556 (7th Cir. 1991) ............................................... 12

*United States v. Hendricks*, 950 F.3d 348 (6th Cir. 2020) ....................................... 29

*United States v. Hernandez,* 865 F.2d 925 (7th Cir. 1989) ....................................... 45

*United States v. Kaziu*, 559 F. App'x 32, 36 (2d Cir. 2014) ..................................... 35

*United States v. Marshall,* 75 F.3d 1097 (7th Cir. 1996) ........................................ 45

*United States v. Marzook*, 383 F. Supp. 2d 1056 (N.D. Ill. 2005) ............................ 38

*United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013) ..................................... 37, 51

*United States v. Memar,* 906 F.3d 652 (7th Cir. 2018) ............................................. 43

*United States v. Muna Osman Jama*, 217 F. Supp. 3d 882 (E.D. Va. 2016) .............................. 28

*United States v. Mustafa*, 753 F. App'x 22 (2d Cir. 2018) ........................................ 51

*United States v. Rafiekian*, 991 F.3d 529 (4th Cir. 2021) ........................................... 8

*United States v. Rahim*, 860 F. App'x 47 (5th Cir. 2021) ......................................... 34

*United States v. Shareef*, No. 10 C 7860, 2011 U.S. Dist. LEXIS 118649;

    2011 WL 4888877 (N.D. Ill. Oct. 11, 2011) ................................................... 50

*United States v. Suarez*, 893 F.3d 1330 (11th Cir. 2018) .......................................... 26

*United States v. Ullah*, No. 18-cr-16 (RJS), 2020 U.S. Dist. LEXIS 245691;

    2021 WL 21902 (S.D.N.Y. Dec. 31, 2020) ....................................... 29, 30

*United States v. Vargas,* 583 F.2d 380 (7th Cir. 1978)......................................... 42, 44

*United States v. Williams*, 553 U.S. 285 (2008) ........................................ 31

*United States v. Wolfe,* 701 F.3d 1206 (7th Cir. 2012)........................................ 42

*United States v. Wright*, 937 F.3d 8 (1st Cir. 2019)........................................ 10, 37

## STATUTES

18 U.S.C. §175b(d)(2)(G)........................................................................................ 8

18 U.S.C. §2339B ................................................................................................... 1

18 U.S.C. §2339B(a)(1) ........................................................................................ 13

18 U.S.C. §2339B(h) .............................................................................................. 7

18 U.S.C. §951(d) ................................................................................................... 8

## OTHER AUTHORITIES

U.S.S.G. §3A1.4 .................................................................................................... 13

## RULES

Federal Rule of Criminal Procedure 29 ..................................................... 1, 3, 4, 12

Federal Rule of Criminal Procedure 33 ......................................................... 1, 3, 42

## OTHER SOURCES

The Law Dictionary, https://thelawdictionary.org/direction/ ...................................... 6

Fondaliza Sohphoh, *What is Video Resolution?  Difference Between 360p, 480p, 720p, 180p*

    *Videos*, Nov. 24, 2020, TechGYD.Com ................................................ 19

Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/direction ... 6

U.S. Department of State, Foreign Terrorist Organizations,

    https://www.state.gov/foreign-terrorist-organizations/............................................. 30

Wikipedia, "Dawah," https://en.wikipedia.org/wiki/Dawah ...................................... 24

iii

Defendant, **THOMAS OSADZINSKI**, by and through his attorneys, **STEVEN A. GREENBERG** and **JOSHUA G. HERMAN**, respectfully submits this Reply brief in support of his consolidated motion for an order granting a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, or in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33 (Dkt. #167, "Motion").

## I.    INTRODUCTION

As it did at trial, throughout its Response the government grossly expands the scope of the material support statute (18 U.S.C. §2339B) in order to criminalize Defendant's independent and constitutionally protected activity and expression.  (Dkt. #174, "Response").  The government still fails to appreciate how it was required to prove that Defendant had a specific intent to work under the direction of, or in coordination with ISIS, the foreign terrorist organization ("FTO").  Instead, it invents a new "directionality" standard that can be met when acts are done in "conformity with the instructions of the terrorist organization." (Dkt. #174, p. 3).  But that "directionality" standard finds no support in the law and is much broader than the plain meaning of "direction."  Most importantly, the new standard ignores how one can lawfully advocate for the goals and philosophies of an FTO.  Under the government's view, if an organization publicly asks for "support," then anyone who speaks with the slightest degree of approval is providing material support.  That theory converts any and all advocacy into material support, regardless of its independence.  In the end, the government simply and improperly treats the phrases "support" and "material support" as if they are synonyms. The government's argument is also factually problematic because the only "instruction" it points to, ISIS's generalized exhortation for others to support it on the Internet, is utterly vague and inherently encompasses protected First Amendment expression.

Relatedly, the government's "directionality" theory sweeps up otherwise independent conduct and activity provided to non-FTOs, which, if allowed to stand, results in a serious constitutional Due Process and fair notice violation. That is not to say that Defendant calls for a direct one-on-one relationship with ISIS, which is how the government mischaracterizes Defendant's argument in a classic strawman-fashion. Rather, there must still be an attempt to provide services *to* the FTO, unlike here where Defendant avoided doing just that, even when the government agents dangled opportunity after opportunity to do something directly for ISIS.

The Response's efforts to show that Defendant attempted to provide services *to* ISIS are also betrayed by self-contradicting and flat-out incorrect representations of the trial evidence. For instance and as discussed below, the government interprets Defendant's use of the word "them" to clearly mean ISIS when the government itself recognizes that the conversation with OCE2 *was about an entirely different non-FTO group*. As such, the government's Response confirms that Defendant's conviction cannot stand because it was based on indelibly flawed legal theories and misrepresentations of the evidence that cannot factually support a guilty verdict.

But even worse, throughout its Response the government argues that the conviction should be upheld because Defendant intended to "benefit" ISIS. The government makes this point the lynch-pin of its Response even though the Court correctly *refused to instruct the jury on this "benefit" theory*. The Court understood that in a case involving First Amendment activity, focusing on a "benefit" that an FTO could potentially appreciate would effectively erase the "independent advocacy" safe harbor. In short, Defendant's conviction cannot be upheld based on a legal theory that the jury never considered and, in any event, convicting one solely of an "intent to benefit" ISIS would misstate the actual elements of the offense and negate independent advocacy that the Congress and the Supreme Court have given safe harbor.

2

Cognizant of the potential for misuse of the terrorism charge, particularly in cases involving disfavored speech, Congress carefully created safeguards that protect independent advocacy and First Amendment activity—even if one expresses support for a terrorist organization. The government's Response makes clear how its legal theories nullify those safe harbors, which resulted in the conviction of an innocent young man and risks setting a very dangerous precedent for prosecuting disfavored expression and viewpoints as terrorism.

The facts adduced at trial simply cannot be compared to standard material support cases involving money or physical materials sent to FTOs; individuals traveling overseas to join FTOs; individuals committing violent attacks for FTOs; or even providing other services, such as translating specific documents for FTOs. Indeed, the FBI tried to have Defendant provide such material support by asking him to translate bomb-making instructions for ISIS or prepare translations of the nas.py script for ISIS. But Defendant refused to do so. As a result, the government modified its theory and its interpretation of the law to meet the facts of the case. That theory is inconsistent with the law and the evidence is insufficient to support a conviction based on a correct understanding of the law. By expanding the law, the government has created serious constitutional concerns that will undoubtedly impact others engaged in protected yet disfavored speech. The Court should not accept the government's invitation to stretch and contort the law to fit the facts of this unique case, and should grant Defendant's Motion for a judgment of acquittal pursuant to Rule 29.

In the alternative, the Court should grant a new trial pursuant to Federal Rule of Criminal Procedure 33. The government's Response fails to defend the burden-shifting problems created in the prosecutor's rebuttal argument. Moreover, the government offers the most tangential of explanations to try and justify the repeated introduction of testimony related to bomb-making, acts

of violence, and violent videos, which were both irrelevant to the specific, non-violent offense that was charged and were unduly prejudicial given the elements of the offense.

## II. THE COURT SHOULD GRANT DEFENDANT'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL.

The legal standards for a Rule 29 motion are set forth in Defendant's Motion. (Dkt. #167, pp. 58-60). While the standard is demanding, it is by no means impossible to meet. That is especially so in a case such as this, where the government's legal theory is manifestly wrong; it seeks to uphold the conviction on another theory that was not presented to the jury; and its factual arguments rely on inference piled upon inference. *See United States v. Conley*, 942 F.2d 1125, 1129 (7th Cir. 1991).

### A. The Government Misconstrues the Element of "Direction" That was Required, But Not Proven at Trial.

One can provide advocacy and support for a terrorist organization so long as one acts independently and not under the direction of the organization or in coordination with it. The key dispute in this case is whether Defendant was an independent advocate, or whether he attempted to work under the direction of ISIS or in coordination with it. Consistent with its evidence and argument at trial, the government's Response exposes that its theory of what amounts to "direction" is fundamentally wrong and grossly expands the scope of the material support statute. As such, the evidence was insufficient to support the conviction under a correct understanding of the "direction" element, which—based on the statutory text and the plain meaning of the term— requires one to work *under* the direction or authority of the FTO. The evidence simply did not show that Defendant had the intent to do so, and a judgment of acquittal should be ordered.

The government asserts that the defense "misconstrues the scope of requisite directionality in providing services to an FTO." (Dkt. #174, p. 4). It is unclear what exactly the government

4

means by "scope of requisite directionality."[1]  Regardless of this confusing framing, it is apparent that it is the government itself that misconstrues and grossly expands the scope of the term "direction."

But prior to doing so, the government misstates Defendant's core argument as seeking  "to narrowly define 'direction' to be limited to actual and personal one-one-one specific instructions provided by ISIS to the defendant."  (Dkt. #174, p. 3).   As far as that strawman argument goes, the government claims that Defendant has asked the Court "to narrowly define 'direction' to be limited to actual and personal one-on-one specific instructions provided by ISIS to the defendant." (Dkt. #174, p. 3).  Yet, it does not nor could it cite any section of Defendant's Motion or trial transcript where that argument was made as Defendant's principal point for acquittal.

Of course, it is undisputed that Defendant had no direct contact with any real member of ISIS, as the government concedes.  (Dkt. #174, p. 4) ("The government does not dispute that no one from ISIS personally told the defendant to create the computer script.").   That point was made in Defendant's Motion to emphasize that any argument to that Defendant actually had contact with ISIS would be insufficient to sustain the verdict because of insufficient evidence.   Defendant's actual argument was that he was engaged in independent advocacy as a "supporter" who sympathized with the goals and philosophies of ISIS, but that he never operated with the intent to work under its direction or in coordination with it.  (Dkt. #167, p. 64).  Because this case does not involve direct contact with ISIS, either attempted or actual, the government keeps trying to expand the meaning of "direction" to try and meet the facts and defend the verdict. It is, in their view, all encompassing.

---

[1] Undersigned counsel have not found a single material support decision from any federal court that has ever used the word "directionality."

In particular, the government broadly argues that "responding directly to instructions by ISIS to its supporters" is enough to prove that Defendant "was acting at the direction of ISIS." (Dkt. #174, pp. 4-5). It also states that "actions taken in conformity with instructions by ISIS to its followers to perform specific actions for the benefit of the FTO." (Dkt. #174, p. 3). The government stretches that already expansive and problematic definition even farther when it adds, "the defendant attempted to provide his services to unofficial ISIS media organizations, groups he understood to be closely affiliated with, and that worked for the benefit of, ISIS." (Dkt. #174, p. 3). These broad interpretations of "direction", which are designed to meet the facts of this case, fail on multiple levels and should be rejected. In evaluating these claims this Court should ask itself, rhetorically, what could anyone possibly do that would not fall under this broad umbrella? Is there any room for independent advocacy when anyone who supports ISIS must be acting at its direction, because they have asked people to support it? The reasoning is circular and leaves no room for any independent advocacy. The circular nature of their argument notwithstanding, the government is simply wrong.

*First*, the government misconstrues the nature of "direction" in the material support statute. "Direction" cannot be proven simply by how a defendant acts. "Direction" requires more, namely an element of control and supervision. Dictionary definitions of "direction" confirm as much. For instance, Merriam-Webster defines "direction" as "guidance or supervision of action or conduct" (*See* https://www.merriam-webster.com/dictionary/direction). *See also* The Law Dictionary, *Black's* 2nd Ed. (*See* https://thelawdictionary.org/direction/) (similarly defining "direction" as "The act of governing; management; superintendence.").

The statutory context also confirms that merely acting in apparent "conformity" with instructions does not meet the "direction" element for the material support statute. The material

support statute requires one to "work *under* the terrorist organization's direction or control." 18 U.S.C. §2339B(h) (emphasis added). *See also id*. ("Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.").

Case law also refutes the government's use of "directionality." In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("HLP"), the Supreme Court held that this particular provision also applies to the "services" provision that the government used in this case. *HLP*, 561 U.S. at 24. Further, in looking at the statutory text, the meaning of "direction" can be gleaned from its context. Congress used the word "control" along with "direction." The use of "control" helps explain what Congress intended with "direction." *See In re Merchants Grain by & Through Mahern*, 93 F.3d 1347, 1353-54 (7th Cir. 1996) ("absent statutory definitions, we accord words and phrases their ordinary and natural meaning and avoid rendering them meaningless, redundant, or superfluous; we view words not in isolation but in the context of the terms that surround them; we likewise construe statutes in the context of the entire statutory scheme and avoid rendering statutory provisions ambiguous, extraneous, or redundant; we favor the more reasonable result; and we avoid construing statutes contrary to the clear intent of the statutory scheme."). "Direction" means acting subject to the authority of the FTO or being controlled by the FTO. The government's definition of "direction"—acting in "conformity with instructions"—misses the critical component of ongoing supervision, oversight, management, and control over his action. The court should reject the government's broad interpretation.

Acts done in "conformity with instructions" or that "mirror" instructions, as the government describes, are not the equivalent of acting "under the direction" of ISIS. The government's formulation will sweep up wholly innocent conduct. Indeed, the government's

definition—as with its expansive theory—criminalizes independent activity, *i.e.*, conduct that may have an appearance of conforming with the desires of the FTO, but is nevertheless done without any supervision or control of the FTO (or any attempt to work under the supervision/control) of the FTO. In other words, one can act in "conformity" with instructions or exhortations of an FTO but still be independent.

That is the very position the government, through now Justice Elena Kagan, took before the Supreme Court when it wrote, "Congress did not prohibit individuals from joining terrorist groups, expressing solidarity with them, or even inciting others to engage in terrorist conduct." *See* Dkt. #167, p. 2 (quoting Case No. 08-1498, Govt. *HLP* Merits Brief, pp. 14-15). The government does not even try to reconcile that position with the arguments it made at trial and in its Response to Defendant's Rule 29 motion.

The government's *HLP* merits briefing provides additional grounds for rejecting the expansive view of "directionality" that it currently advances. The primary issue in *HLP* was whether the material support statute was unconstitutionally vague. In arguing against that point, the government posited that the "the relevant question is whether the concept of coordination is too indeterminate to provide the basis for criminal liability," which it then answered in the negative by pointing to two federal statutes, 18 U.S.C. §175b(d)(2)(G) and 18 U.S.C. §951(d). Each of those statutes prohibits certain conduct by individuals who operated "subject to the direction or control" of a foreign government or official. The government's more expansive definition of merely acting in "conformity" with "instructions" is far too expansive and should be rejected as it would infringe upon constitutionally protected parallel advocacy.[2]

---

[2] With respect to §951(d), the Fourth Circuit recently explained: "To fall within §951's ambit, a person must do more than act in parallel with a foreign government's interests or pursue a mutual goal. An 'agent' further 'agrees to operate . . . subject to the *direction or control*' of that government." *United States v. Rafiekian*, 991 F.3d 529, 538 (4th Cir. 2021) (emphasis in original). Operating "subject to" the direction

***Second***, even under the government's overly broad construction of "direction," the evidence was insufficient to support a conviction because the "instructions" the government tries to identify are hopelessly vague and implicate protected First Amendment conduct.  For instance, the government argues, as it did at trial, that Defendant followed the instructions of ISIS to support it on the Internet and commit "online jihad."   But "supporting" ISIS on the internet, expressing solidarity with it, and advocating on its behalf are all permissible activities.  The government's efforts to identify a more specific set of "instructions" fare no better and instead highlight the insufficiency of the evidence.

As it did at trial, the government argues that Defendant "followed ISIS's directions published in Inside 8."  (Dkt. #174, p. 10).  In particular, the government argues that based on the Inside8 video, supporters in the media were to open three social media accounts if "they" closed one and if they closed three to open thirty.  (Dkt. #174, p. 7).  The government also quotes the video as saying "strive patiently in the digital arena and do not allow the disbelievers to enjoy a moment of sleep or live a pleasant life."  (*Id*.).  In its closing argument, the government pointed to Inside8, which it portrayed as containing "specific instructions and directions to ISIS supporters consistent with its media strategy."  (Vol. 7, p. 1345:10-12).  According to the government, those "very specific" instructions that "defendant followed" included, "support ISIS on the digital front." (*Id*., p. 1345:14-15).

Treating these excessively generalized aspirational statements as "direction" and "instruction" that results in a terrorism crime creates serious constitutional problems.  For instance,

---

of a foreign government is consonant with working "under the foreign terrorist organizations direction and control" language from §2339B(h).  Importantly, the Fourth Circuit rejected many of the government's broad formulations of §951(d) liability, including that one can violate the statute "simply by acting in accordance with foreign interests."  *Rafiekian*, 991 F.3d at 541.

if, after watching Inside8, an internet user posted a pro-ISIS video in a Reddit combat-footage forum or even sent a video to a friend, under the government's theory, that person would have committed an act of terrorism.  Even worse, under the government's theory a person who would repeatedly post the pro-ISIS videos taken down on Reddit, Twitter, or other social media companies due to terms of service violations has suddenly committed acts of terrorism.  Likewise, someone who expressed pro-ISIS opinions in an online list-serve, such as by disagreeing with the foreign policy decisions of the United States or any other country that bombed territories that resulted in civilian deaths, could be said to be providing material support to ISIS.  The concerning hypotheticals and likely instances of "criminal" behavior under the government's expansive view of "direction" are limitless and completely eliminates painstakingly protected activity and conduct.

The government argues that Defendant "aligned" himself with ISIS and "received and acted upon ISIS's instructions" because he used the pronoun "we" when he wrote to OCE2, "they delete 1, we make 2 more."  (Dkt. #174, p. 8).  The government's heavy reliance on the pronoun "we" overlooks the fact that Defendant did not describe himself as an ISIS member, but rather as a mere supporter or munasir.  Further, "aligning" oneself with the goals, philosophies, strategies and tactics of an FTO is permitted under the law.  *United States v. Wright*, 937 F.3d 8, 29 (1st Cir. 2019), *cert. denied*, 140 S. Ct. 1283, 206 L. Ed. 2d 264 (2020).  The government feebly attempts to distinguish *Wright* by observing, "The error identified by the appellate court was in the instructions provided relating to coordination.  The defendant makes no analogous claim of error in the instant matter."  (Dkt. #174, pp. 6-7).

The significance of *Wright* is not the mere instructional error, but the First Circuit's emphasis that the law permits coordination with the tactics and strategy of a foreign terrorist organization along with parallel advocacy.  The government's claim that it did not argue that

10

Defendant was "aligned with ISIS's strategy and tactics" (Dkt. #174, p. 7) is belied by the trial record. Indeed, the government even used "direction" and "strategy" interchangeably: "Who is the 'we'? Who is defendant a part of when he's expressing this idea 'We make 2 more'? He is talking about ISIS. He considered himself a part of that. He was following their directions, listening to their strategy, spreading that message to OCE 2 …" (Vol. 7, p. 1347:10-14). A conviction based on "aligning" oneself with the goals and strategy of ISIS, which include increasing the visibility of pro-ISIS messaging, should not be allowed to stand because that is not acting "under the direction" of ISIS.

The government's argument also fails on a factual level. The trial evidence showed that both the nas.py scripts copied and forwarded one *private* Telegram channel to another *private* Telegram channel. These channels were not open for public consumption and subject to takedowns by Telegram and were consequently not created in reaction to Telegram closing those channels. One had to have permission to join one of these private channels as a subscriber. (Vol. 3, Tr., p. 470:20-21; p. 478:19-25, p. 479:1; p. 519:22-25; p. 520:1-3; Vol. 5, p. 943:12-22).

Further, *Heralds of the Internet* organized videos by resolution type in order to create an offline archive. This conduct is disparate from what the government identifies as the "instructions" in Inside8. Indeed, rather than acting "under the direction" of those supposed "instructions" the evidence showed that Defendant's motivation for the programs that, as the government stated, "he came up with" (*see* Vol. 7, p. 1349:13-23) was entirely independent and rooted in his own inability to find ISIS videos dating back to before his conversion to Islam. Defendant specifically told OCE2 that he individually devised the idea for *Heralds of the Internet* because, "Before I was Muslim I wanted to find dawla videos but never could," and that it is "very good for dawah," or spreading the word of Islam, because "the news lies about dawla videos and will never show it

11

full." (Vol. 2, p. 304:5-9). Importantly, Defendant did not say that it was "very good" for *dawla*, Arabic for ISIS, but instead said that the project was "very good for dawah," meaning proselytizing in Arabic.[3]

In sum, the government's Response underscores how Defendant's conviction rests on a fundamentally incorrect conception of what constitutes "direction" in the material support statute or even worse, rests on the new "directionality" standard. "Direction" is not merely acting consistent with "instructions" or aligning oneself with the goals and strategies of a terrorist organization as the government argued. Moreover, the "instructions" the government points too—supporting ISIS online—are far too broad and amorphous and the evidence used to support the conviction is more than equally consistent "with a theory of innocence as a theory of guilt," which "necessarily fails to establish guilt beyond a reasonable doubt." *United States v. Conley*, 942 F.2d 1125, 1129 (7th Cir. 1991) (internal quotation omitted). Defendant's Rule 29 motion should therefore be granted based on the failure to prove that Defendant attempted to work under the direction of ISIS, and was thus not an independent advocate.

**B. The Court Should Reject the Government's "Benefit" Theory That the Jury Was Never Instructed on, and Thus Could Not Have Used to Convict.**

Perhaps out of a recognition that the evidence of "direction" is insufficient to sustain the verdict, the government also argues that Defendant's Rule 29 motion should be denied because

---

[3] The government also refers to Defendant's failed attempt to develop a Linux project for the "ansar." Tellingly, the government correctly defines "ansar" as ISIS "supporters" *not* ISIS itself or its members. (Dkt. #174, p. 10). Moreover, Defendant's talk about a Linux operating system amounted to little, as he soon wrote to OCE2, "I had to pause because it takes 5 hours and there was a mistake" (GX 200, OCE2-CHS-COM_001-000261) and, only after being asked by the OCE2 about the status of the project over four months later, wrote "it's too difficult." (GX 200, OCE2-COM_001-000019). And more importantly, this "operating system" was not the part of the "services" that Defendant was accused of providing to ISIS. The "operating system" simply could not be used as evidence of Defendant following the direction of ISIS, much less any attempt to provide services *to* ISIS.

the evidence amply showed he had an "intent to benefit" ISIS. But that argument fails to support the verdict for several important reasons and should be rejected.

*First*, the *jury was never instructed* on the "benefit" theory, and for very good reason. Throughout the trial, the defense flagged its concerns with the "benefit" theory, which could permit a jury to find one to have provided material support based on a perceived benefit to the terrorist organization even if an individual acted independently. (Vol. 4, p. 926:1-13). After all, independent advocacy is intended to confer a benefit. The Court correctly noted that Zelin's website "could benefit one of these organizations" and expressed it was "having trouble with the word 'benefit.'" (Vol. 4, p. 926:18-23). The Court did not include the term "benefit" in the final jury instructions. The jury could not have found Defendant guilty for acting with an "intent to benefit" ISIS when it was never given that instruction. As such, the Court should reject the government's arguments based on the "benefit" theory.

*Second*, even if the jury had been presented with the "benefit" theory, the government's focus on Defendant's specific intent to benefit ISIS misstates the mental state required to convict and could not be used as a basis to deny the Rule 29 motion. Material support is a general intent crime, which requires that one knowingly provide material support to an entity that one knows is a designated foreign terrorist organization. *HLP*, 561 U.S. at 16. *See also* Dkt. #152, p. 19. Charging the offense as an "attempt" adds the specific intent *mens rea*, in that the government was required to prove that the defendant took a substantial step toward providing material support "with the intent to provide material support to a foreign terrorist organization," as specified in the jury instructions. (Dkt. #152, p. 20). *See also United States v. Amer Sinan Alhaggagi*, 978 F.3d 693, 701 (9th Cir. 2020) (contrasting the "knowledge" standard for 18 U.S.C. §2339B(a)(1) and the "specific intent" standard for the "terrorism enhancement" in U.S.S.G. §3A1.4, which "requires

13

the defendant's specific intent that the offense 'influence or affect the conduct of government by intimidation or coercion.'").

But even when charged as an "attempt" there must be proof that a defendant intended to "provide material support." And to meet that burden, the government was required to prove that Defendant specifically intended to work "under the direction" of or in coordination with the FTO in order to show that the defendant was not an independent advocate. Merely showing that Defendant had an "intent to benefit" ISIS would relieve the government of proving the actual elements of the crime. It would also not foreclose one from being an independent advocate. Indeed, as the Court recognized when it refused to instruct the jury with the "benefit" theory, one can be an independent advocate and still "benefit" the FTO. The government's argument, to the contrary, rests on a false dichotomy.

This reasoning undermines the government's reliance on Defendant's "bayat," in addition to other acts that it claims show that he acted with the intent to "benefit" ISIS as opposed to an independent advocate. (Dkt. #174, p. 15). While the "bayat" most certainly did not make Defendant a member of ISIS, it is noteworthy that the Supreme Court expressly held that §2339B "does not criminalize mere membership in a designated foreign terrorist organization." *HLP*, 561 U.S. at 18. In any event, the dubious circumstances that led to Defendant's two "bayat" pledges— each time prompted by a government agent, as Defendant highlighted in his motion (Dkt. #167, pp. 19, 41)—the mere making of this pledge does not negate Defendant's independent advocacy.

In the same vein, making a "nasheed" and saying "maybe" ISIS will use it, not I "hope" ISIS will use it, as the government incorrectly writes, (*compare* GX 200, OCE2-CHS-COM_001-000135 *with* Dkt. #174, p. 15) does not negate Defendant's independent advocacy. Likewise, it is beyond a stretch to claim that sending OCE2 (a non-ISIS member) a video of "security buttons"

14

in the men's toilet stalls on the DePaul campus showed that "defendant was even willing to disclose security measures to ISIS in the hopes of warning them. The defendant sent a video to OCE2 of security buttons in a bathroom in his school." (Dkt. #174, p. 16). This evidence is simply insufficient as a matter of fact and law to show that Defendant did not act as an independent advocate, but instead tried to work under the direction of ISIS.[4]

Despite the fact that it was not presented to the jury, the government transparently relies on the "benefit" theory to compensate for the fatal shortfall in its evidence. It argues that the conviction should stand because Defendant intended to benefit ISIS by preserving pro-ISIS videos that were otherwise being removed from the Internet. (Dkt. #174, p. 24, "The services were clearly for the benefit of ISIS as ISIS videos were frequently being removed from the internet."). The government even conflates the "direction" element with the "benefit" non-element when it asserts, "Moreover, in an attempt case, there is no requirement that the script be sent to an official ISIS media organization to sustain the conviction. Therefore, by providing the service for the benefit of ISIS – to assist ISIS in preserving their videos – his conduct satisfied the statute's directionality requirement." (*Id*.). That passage encapsulates the government's confusing argument and highlights the inadequacy of the evidence. Merely intending to benefit an FTO is not the same as intending to work under its direction, and is most certainly not mutually exclusive with independent advocacy.

For instance, suppose an individual saw an ISIS video that encouraged others to "support us in the streets." Then that same individual makes a homemade ISIS flag, and stands in the federal plaza handing out flyers that include screen shots of official ISIS videos and a manifesto explaining

---

[4] There was no evidence whatsoever that Defendant tried to help ISIS conduct a full-scale assault on the DePaul campus by warning its fighters that there were security buttons in the bathrooms. Defendant's comments were beyond hyperbolic.

how ISIS acted in self-defense. Perhaps the person even shouts his praise for ISIS. Even though this conduct could be said to confer a "benefit" to ISIS in any number of ways, such as by having an ostensible supporter voicing a pro-ISIS opinion and sharing images from official ISIS videos, no crime has been committed. Treating such behavior as criminal would pose grave First Amendment concerns.

Indeed, in *Boim v. Holy Land Foundation for Relief & Development*, 549 F.3d 685, 700 (7th Cir. 2008), the Seventh Circuit recognized that individuals could freely give moral support to FTOs. That included giving a speech "in praise" of an FTO's acts of violence (there, the firing of rockets at Israel by Hamas), which was "exercising his freedom of speech, protected by the First Amendment." *Id.*

The government also argues that the conviction should stand because Defendant did not have a "benign purpose" in sharing videos. (Dkt. #174, p. 12). In many ways, this argument is a corollary of the deeply flawed "intent to benefit" theory and further illustrates the fundamental errors in the government's legal theory. One need not have a "benign" purpose to act lawfully. For instance, the plaintiffs in *HLP*, which included human rights organizations, a retired judge and other professionals, and various non-profits, each had "benign" purposes when they sought to provide legal and advocacy assistance to the PKK and LTTE organizations and engage in advocacy-related issues. Indeed, the Supreme Court noted how the plaintiffs disagreed with Congress for providing "even seemingly benign support" to FTOs. *HLP*, 561 U.S. at 36. There was no suggestion that the plaintiffs secretly plotted to help those organizations commit acts of violence. But regardless of their "benign" and even laudable goals, the plaintiffs' desired conduct ran afoul of the material support statutes precisely because they would work under the direction of in or coordination with the terrorist organizations.

16

The Seventh Circuit also rejected the government's "benign purpose" argument in *Boim*, when it observed that "[a]nyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities. … To require proof that the donor *intended* that his contribution be used for terrorism--to make a benign intent a defense--would as a practical matter eliminate donor liability except in cases in which the donor was foolish enough to admit his true intent." *Boim*, 549 F.3d at 698-99.

In light of these established principles, and as the Court implicitly recognized when it declined to include the intent to "benefit" language in the instructions, the defense's analogy to Zelin is anything but "nonsense" as the government claims it to be. (Dkt. #174, p. 13). Try as it might to distinguish Zelin's conduct in collecting and making available the largest repository of jihadi videos, the fact of the matter is that his expansive project undoubtedly benefits ISIS and many other foreign terrorist organizations by preserving their media and making it available for others to view, download, save, and then further propagate. Zelin also obtained these videos from "official" sources to create the largest repository of jihadi videos (and no doubt he did not portray himself to be a "government expert" when doing so). (Vol. 4, p. 842:16-19; 844:1-6). Up until Zelin employed a "whitelist" in April 2019 due to the pressure of the British government, anyone— including ISIS and other FTO members—could, without any restriction, download videos from his website. (Vol. 4, p. 846:24-25; 847:1-7). And even now, one just needs an ".edu" email address or other acceptable credential to download the videos ,and anyone can stream (and thus record) the videos. (*Id.*; 847:3-23).

But despite the benefit that his website gives to terrorist organizations and notwithstanding his interaction with "official" sources, he has not violated the law because he is not acting under

the direction of ISIS or coordinating with it or any of the other terrorist organizations he catalogues. Nor did he provide any services *to* a terrorist organization. Thus, it is not his "intent" or his university, think-tank, and government expert credentials that matters, but rather the lack of direction and coordination, as well as the lack of services provided *to* a foreign terrorist organization. The same can be said for Defendant. It is of the utmost irony that during his trial testimony, Zelin himself lauded the protection of the First Amendment he received as an American citizen that allowed him to keep his website and make the jihadi videos available for others. (Vol. 4, Tr. p. 861:23-25; p. 862:1-9). Those same First Amendment guarantees reach and protect Defendant's conduct and expression.

In short, the government's reliance on a perceived intent to "benefit" ISIS should be rejected. The jury was never even instructed on that theory, and it cannot be used as grounds to find there was evidence to support the conviction. Nor would that theory be proper under the circumstances of this case. Indeed, permitting one to be convicted for intending to benefit a FTO would be the death knell of independent advocacy, as the very purpose of such advocacy is to benefit another in some manner. Put another way, it is impossible to envision a form of advocacy that does not seek to confer or actually provide a benefit to another.

### C. *Heralds of the Internet* Was Independent Advocacy and Does Not Support a Conviction for Attempted Material Support.

The government's reliance on *Heralds of the Internet* as evidence of Defendant's attempted material support to ISIS is misplaced for a number of reasons and cannot support the conviction. As it did at trial, the government tries to portray that .pdf document as proof that Defendant worked under the direction of ISIS and to benefit ISIS. It does so by arguing that Defendant did not describe it as his "own personal project," which means it must have been for ISIS, and that he did not have "innocent" goals. (Dkt. #174, p. 12). The government grasps onto the use of the term

"brothers," which it interprets to mean both "ISIS supporters" and "ISIS members." (*Id*.). And it latches onto the reference to organizing Al Hayat Media Center videos as evidence that Defendant attempted to coordinate with ISIS. (Dkt. #174, p. 27). These arguments are based on speculation, unreasonable inferences that are contradicted by the evidence, misunderstandings of the law, and ultimately do not show that *Heralds of the Internet* was sufficient evidence to support the conviction.

It is first helpful to remind the Court what *Heralds of the Internet* actually was based on the evidence introduced at trial. *Heralds of the Internet* was a .pdf file that described a process used to download and organize video files by their resolution type. It was not some task that Defendant attempted to complete under the direction of ISIS or in coordination with it. Nor did the evidence show that Defendant attempted to provide *Heralds of the Internet to* ISIS. *Heralds of the Internet* used a version of the nas.py python script and added a feature that sorted the video files by resolution, such as 360p or 720p.[5] Defendant discussed creating an offline archive of videos organized by different resolution types and then uploading the files to archive.org. (GX 201, OCE2-COM_001-000061). These videos would be stored in different folders, as Defendant described to OCE2 on August 7, 2019, at GX200, OCE2-COM_0001-000020-21). In describing those folders, Defendant told OCE2, "I made my own python scripts to organize everything." (GX200, OCE2-COM_0001-000021). He explained how he used a script and "downloaded the entire channel and organized it" by resolution. (GX200, OCE2-COM_0001-000024).

---

[5] Resolution types are described by terms such as "360p" and "720p," which refers to the "total number of horizontal lines that video has from top to bottom and represent the corresponding Video resolutions for a particular video." *See* Fondaliza Sohphoh, *What is Video Resolution? Difference Between 360p, 480p, 720p, 180p Videos*, Nov. 24, 2020, TechGYD.Com (available at: https://bit.ly/3PsLMpw) (last visited May 16, 2022). The "p" stands for "progressive scan." The higher the number, the better the video quality.

The evidence at trial showed that Defendant sent *Heralds of the Internet* only to OCE2. (GX 201, OCE2-COM_001-000061). Thus, the government's claim that the document was "distributed by the defendant" (Dkt. #174, p. 11) is an overstatement, as the evidence showed it was only "distributed" to OCE2. And while *Heralds of the Internet* included screenshots of the nas.py script, it did not include the full script in a manner that could be readily used and Defendant never provided that script to OCE2. Defendant later explained to OCE2 that he would create an "offline archive" and then a torrent file from which he could eventually share the videos. (GX200, OCE2-COM_0001-000027). Indeed, the stated "objective" of the document was to upload the files in 360p format to archive.org. (GX 201, OCE2-COM_001-000061). But there was no evidence showing that Defendant actually uploaded any files to archive.org. And most importantly, the stated "Intention" of the document was to "Bring people to Islam and teach everyone the transgressions of the Crusaders and how the Islamic State's response to transgressions is self-defense." (GX 201, OCE2-COM_001-000061). Indeed, when OCE2 asked Defendant "how you came up with the idea" for *Heralds of the Internet*, Defendant responded, "before I was Muslim I wanted to find dawla videos but never could. its very good for dawah." (GX 200, OCE2-COM_001-000090). The fact that OCE2 asked Defendant how *he* came up with the idea emphasize the personal and independent nature of the project, as does Defendant's response as to its origins.

Contrary to this trial evidence, the government tries to spin *Heralds of the Internet* as a project that was done for ISIS. (Dkt. #174, p. 10). As discussed at length above, even if Defendant had an intent to benefit ISIS, that would not mean he was working under the direction of ISIS and would not take his conduct outside the realm of independent advocacy. But the government's own strained and self-contradicting arguments betray its overall point.

To start, the government describes *Heralds of the Internet* as "defendant's project," which admits that it was in fact his own project, not ISIS's project. (Dkt. #174, p. 10). The government emphasizes the words "brothers" and "them" to argue that Defendant intended to use *Heralds of the Internet* to help ISIS. But the government's *own brief* shows why those arguments fail. Indeed, the government portrays *Heralds of the Internet* as an attempt to coordinate with ISIS because Defendant said that he hoped it would help "Brothers," which the government says "is clearly a reference to *ISIS supporters*." (Dkt. #174, p. 12) (emphasis added). The government continues, and in the very next sentence writes, "The defendant's plan to create a second document to assist "brothers" without a computer is further evidence of his attempt to coordinate with *ISIS members* by teaching them how to use his methods of preserving ISIS content." (Dkt. #174, p. 12) (emphasis added). But ISIS "supporters" and ISIS "members" are not interchangeable, as either a matter of fact or matter of law. The law prohibits providing material support to an FTO, not "supporters" of an FTO, who may be nothing more than sympathizers, "fanboys," or curious onlookers who want to view pro-ISIS videos. It is also noteworthy how in *Heralds of the Internet* Defendant describes "no name," who developed the nas.py script to begin with, as "brother" in two separate instances. (GX 201, OCE2-COM_001-000063, 64). There was no evidence introduced at trial that "no name" was an ISIS member. In short, the evidence does not show that Defendant's use of the word "brother" is synonymous with "ISIS," and most certainly does not show that *Heralds of the Internet* was done with the specific intent to coordinate with ISIS.

In the same context, the government argues how "[i]n a revealing moment, in discussing the challenges of locating ISIS videos on the internet, and the defendant's project, the defendant stated "I try to help them." In context, 'them' is clearly ISIS." (Dkt. #174, p. 10). But it is the

government that ensnares itself in its own "gotcha" moment. One only needs to look at the preceding sentence to see how the government's conclusion flatly ignores the trial evidence.

Immediately before writing that by "them" Defendant "clearly" meant "ISIS," the government writes, "In responding to OCE2's question *regarding another ISIS media support group*…." (Dkt. #174, pp. 9-10) (emphasis added). The "them" is plainly *not* ISIS. It is a completely different media support group. In point of fact, the group was Sarh al-Khilafa, a group that Zelin did not even identify as an "unofficial" pro-ISIS group, much less an "official" group (and certainly not an FTO itself).

The government also argues that Defendant's intent to coordinate with ISIS is evidenced by the following statement, "By Allah's permission, the brothers who have access to the disorganized al-Furat and al-Hayat Media Center channels will be able to organize them or give me access to them so that I would be able to organize them." (GX 201, OCE2-COM_001-000063-64). According to the government, Defendant "stated his aspirations that the 'brothers' who have access to the official ISIS Telegram channels would give him access is, in and of itself, an expression of his desire to coordinate with ISIS." (Dkt. #174, p. 11).

First, this argument fails because it rests on the conclusion that "brothers" must mean "ISIS," even though the government interprets the word to mean "supporters" and "members." There is no evidence that Defendant told OCE2 that he prepared *Heralds of the Internet* under the direction of ISIS or in coordination with it. The lack of any reference to Inside8 or any other ISIS propaganda in *Heralds of the Internet* severely undercuts the government's speculative argument that Defendant made the document pursuant to the instructions of ISIS vis-à-vis Inside 8. Thus, in addition to being legally unsound, the government's argument is factually unsupported and insufficient to support the verdict.

Second, there was no evidence that one had to interact with ISIS "members" to access "official" content. Indeed, that was something even Zelin testified he did in order to collect videos for his large collection. And, in any event, interacting with ISIS members would not be illegal.

Third, it is pure speculation to conclude that organizing videos by resolution type was providing a service to ISIS by acting under its direction or in coordination with it, and consequently the collection of the videos was not for his personal use. There was not a shred of evidence in the voluminous record that ISIS had a problem with disorganized video channels, had a preference for resolution or file size, or anything that would otherwise support the government's legally unsound "benefit" theory. Any organization of the videos by resolution size was entirely for Defendant's personal purposes. Moreover, the record established that Defendant sought the Al-Hayat Media Center and Al-Furat videos for his own personal offline collection. Indeed, Defendant's subsequent communications with OCE4 show that he did, in fact, organize and create a folder of videos from Al Hayat Media Center.

In early October 2019, Defendant began communicating with OCE4. During those chats on Telegram, Defendant described copying channels. The discussion included reference to a programs for copying channels. OCE4 specifically referenced that "Sarh" or "Sarh al Khilafah," the very same, lower-tiered, unofficial media organization, already had a script that was used to copy channels. (GX 400, OCE4-COM_001-000088). Defendant responded and said that Sarh al Khilafah had their own app and forwarded it to OCE4. (GX 400, OCE4-COM_001-000089-90). Later, Defendant specifically referenced this other unofficial group as "sarh al Khilafah" having the script. (GX 400, OCE4-COM_001-000098). Defendant then told OCE4, "i wish I had English translated isdar/i only have some." (GX 400, OCE4-COM_001-000092). OCE4 said that "we" [Organization 2] has many but they are not in good order. (GX 400, OCE4-COM_001-000092).

Defendant then said, "that's ok akhi i sort it myself" and then he forwarded a screenshot of different folders.  (GX 400, OCE4-COM_001-000092-93).  Defendant added, "i download all and organize."  (GX 400, OCE4-COM_001-000093).  One of those folders was "Al Hayat Media Center." Another file said "jihadology crawl before censorship.txt"  Thus, the government's argument that Defendant sought administrative access to the Al-Hayat Media Center and Al-Furat files so he could organize them for ISIS is not supported by the evidence.  Rather, the trial evidence actually showed that Defendant sought the Al-Hayat Media Center and Al-Furat files for his own personal collection, which he organized in folders next to the material he saved from jihadhology.net.

Finally, if there was any doubt that Defendant wrote *Heralds of the Internet* for personal reasons, one only need to look at the stated "Intention" of the document and Defendant's answer to OCE2's question about why he "came up" with the project.  The very first words of the "Intention" are, "Bring people to Islam."  (GX 201, OCE2-COM_001-000061).  Moreover, Defendant told OCE2 that he developed the project because he could not find ISIS (or dawlah) videos before he converted to Islam.  (GX 200, OCE2-COM_001-000089).  He then added that the project was very good for "dawah," which means "spreading the word of Islam."  (*See* Vol. 1, p. 68:4-6); *see also* Wikipedia, "Dawah," defined as, "the act of inviting or calling people to embrace Islam" (https://en.wikipedia.org/wiki/Dawah) (last visited May 16, 2022).  Thus, Defendant specifically told OCE2 that sharing videos was good for proselytizing purposes, rather than for ISIS.  The government cites this passage favorably, oblivious to how it directly undermines its argument on multiple levels by showing that Defendant was not only acting independently but was motivated for religious reasons, which deserve the utmost First Amendment protection.  (Dkt. #174, pp. 9-10).

**D. The Government Failed to Prove that Defendant Attempted to Provide Services *to* ISIS, as Opposed to a Non-FTO, and its Arguments to the Contrary Present Serious Constitutional Due Process Problems.**

As noted above, the government mischaracterizes and reduces Defendant's argument as requiring a direct, two-way communication with the FTO or its members in instructing him to create the nas.py script and the organizing function. (Dkt. #174, p. 17) ("In sum, the defendant contends that there was no evidence that ISIS directly instructed him to create this exact computer script. This was not necessary."). But that is not Defendant's argument at all. Rather, Defendant's argument is that the government was required to prove that Defendant intended to work under the direction of ISIS or in coordination with it and that he knowingly attempted provided services *to* ISIS. That burden requires the government to prove more than the government's overbroad standard, which only requires proof that Defendant "acted with the intent to follow the direction of ISIS." (Dkt. #174, p. 17). The government's standard omits the element of providing services *to* ISIS.[6]

The government then offers a broad and untenable construction of the word "to" that includes any conduct that could "benefit" an FTO. (Dkt. #174, p. 23). It reasons that the "word 'to' includes for the benefit of, as defined in the HLP case." (Dkt. #174, p. 23). But, as discussed at length above, the government cannot rely on the "benefit" theory to support Defendant's conviction when the jury was never even instructed on that theory, and when it could sweep up innocent conduct.

As it did at trial, the government asserts that "defendant heard these instructions and followed them by creating the script to preserve ISIS videos," and thereby provided services which were "clearly for the benefit of ISIS as ISIS videos were frequently being removed from the

---

[6] For the reasons set forth above, Defendant maintains that the evidence was insufficient to prove any specific "direction" that Defendant acted with the intent to follow under the proper definition of "direction."

25

internet." (Dkt. #174, pp. 23-24). Under this broad theory, anyone who forwarded an ISIS video could be guilty of attempting to provide material support (or actually providing material support) because it would have the effect of preserving a video on the internet which would have an incremental benefit to ISIS by keeping the video available.[7]

The government's argument on this point is difficult to track because of how it misconstrues "direction" and then conflates it with its "benefit" theory. By doing so, the government negates the "direction" requirement and posits that it is enough that the FTO received some benefit. Specifically, it writes: "by providing the service for the benefit of ISIS – to assist ISIS in preserving their videos – his conduct satisfied the statute's directionality requirement." (Dkt. #174, p. 24). That proposition is fundamentally wrong as a matter of law and is insufficient to sustain a conviction. Again, the government ignores that the "direction" element requires that an individual work or attempt to work under the direction of the FTO. The government appears to believe that it can prove direction if it shows that the FTO could appreciate a benefit from something an individual did or attempted to do. That cannot be correct.

Recognizing that the evidence failed to show that Defendant attempted to provide services *to* ISIS, the government relies on his communications with Organization 1 (through OCE2) and Organization 2 (through OCE4) to argue that it was enough that Defendant "attempted to share his video [sic] with two pro-ISIS media organizations." (Dkt. #174, p. 13). Continuing, the government contends that "[i]n contacting two well-known pro-ISIS media organizations and sharing with members of those entities his script, the defendant clearly attempted to provide his

---

[7] The same cannot be said with the conduct at issue in the cases cited by the government, *United States v. Mustafa*, 406 F. App'x 526, 528 (2d Cir. 2011) and *United States v. Suarez*, 893 F.3d 1330, 1332 (11th Cir. 2018). (Dkt. #174, p. 24). There, the defendants respectively provided training for committing acts of violence, which constituted "training and expert advice or assistance to a foreign terrorist organization," and attempted to recruit others to commit terrorist acts of violence by interacting with undercover FBI agents who posed as ISIS members capable of providing explosive devices.

service for the benefit of ISIS"). (Dkt. #174, p. 14). It adds that providing a "service" to "pro-ISIS entities but not "official" ISIS groups does not dimmish [sic] the defendant's clear intent to provide his service for the benefit of the FTO. His outreach and subsequent contact constitute a substantial step which cannot be negated by the groups' "unofficial" status." (Dkt. #174, p. 14).

In addition to hinging on the unsound and misplaced "intent to benefit" theory, the government's argument rests on several legal and factual fallacies. Neither Organization 1 nor Organization 2 were "official" ISIS organizations. More importantly, neither were FTOs. Nor were these "official" ISIS outlets or "brands," as the government's own expert described one as an "unofficial outlet." (Vol. 4, pp. 816-817). There was no evidence that Defendant asked OCE4 to give the nas.py script to ISIS or that OCE4 said that he would do so. In other words, there was no evidence that Defendant knowingly providing the script to OCE4, as part of an "unofficial outlet," with the intent that it be provided *to* ISIS. The government cites no case law nor other authority that permits a terrorism conviction to stand based on communications with a non-FTO.[8] The entire debate over whether an organization is an "official" or "non-official" entity is a red-herring. The organization is either part of an FTO, or it is not. The fact that the evidence showed that Defendant *avoided* providing services *to* ISIS, such as through translations for bomb-making instructions or of the nas.py script, most certainly diminishes whether he intended to act under the direction of ISIS. The Defendant knew the line, and was careful not to cross it. The line was then skewed, moved, and redrawn, squarely around the facts of his case. It is now clear that it was never

---

[8] The government faults the defense for not citing case law to "support his position" that support to a non-FTO is not support to an FTO. (Dkt. #174, p. 22-23). Defendant need not cite case law for the basic proposition. It *is the law* that material support must be provided *to the FTO*, rather than some other entity. It is the government that should offer cases showing that support to an "unofficial" group or other non-FTO entity is material support to the FTO. The government does not and cannot cite any case for this broad proposition that would grossly expand the scope of material support law.

27

a line, rather an amoeba, made up entirely by untenable positions and circular, circumventive arguments.

Turning to the cases cited in the government's Response, *United States v. Muna Osman Jama*, 217 F. Supp. 3d 882 (E.D. Va. 2016) actually supports Defendant's position. In *Jama*, the defendants were supporters of the FTO al-Shabaab [AS] who "knew and associated with persons who were themselves part of AS." *Jama*, 217 F. Supp. 3d at 887-88. The issue was whether the defendants' delivery of funds to some of those people who were part of al-Shabaab was material support. The district court recounted how the defendants delivered funds to individuals who worked for AS and operated two safe houses in Kenya used for medical and military operations; and received money for AS in Somalia that were exclusively for AS. *Id*. at 889. The district court also noted how the defendants "had access to leaders within AS and, through those contacts, had access to non-public information pertaining to AS's financial needs as well as other activities with which it was involved, including military activities. They also coordinated to some degree their fundraising with the specific needs of AS." *Id*. at 889. This evidence was sufficient to prove that the defendants "thought and intended as part of their agreement that the funds that would be delivered to certain individuals would be funds delivered to AS or to individuals who acted as conduits for the delivery of these funds or other unlawful material support to AS," and not that they intended to provide funds only to those who support AS, as the defendants argued. *Id*. at 890.

The issue in *Jama* was whether the intermediary figures could be "deemed part of an FTO," so that the defendant's provision of support to those individuals was the same as providing support to the FTO. *Id*. at 892. The facts in *Jama* are distinguishable on virtually every level. OCE2 and OCE4 simply cannot be portrayed as mere intermediaries or conduits to ISIS, unlike the figures in *Jama* and their respective roles with AS, which included managing safe houses, directing finances,

28

and interacting with and even being part of the FTO itself. There is no evidence that OCE2 and OCE4 claim to be directed by ISIS, that they had contacts with ISIS and access to its leadership, or that they claimed to be part of ISIS.

The government also tries to analogize the trial evidence to *United States v. Hendricks*, 950 F.3d 348 (6th Cir. 2020), but that case is also easily distinguishable. In *Hendricks* the defendant was charged with conspiracy and attempting to provide material support in the form of personnel and services to ISIS. *Id*. at 350. The defendant conceded that he tried to form a terrorist cell to commit domestic attacks. *Id*. at 352. He argued that the evidence did not do so on behalf of ISIS. The Sixth Circuit disagreed, citing evidence that showed he "communicated with and took direction from ISIS members" and "viewed himself and his recruits as agents of ISIS." *Id*. at 352-53. The defendant specifically told others that he spoke with senior ISIS members who instructed him to remain in the United States rather than travel overseas. *Id*. at 353. The evidence also showed that the defendant "viewed himself and his recruits as agents of the ISIS organization." *Id*. at 353. There was simply no comparable evidence presented at Defendant's trial.

The government's citation to *United States v. Ullah*, No. 18-cr-16 (RJS), 2021 WL 21902, 2020 U.S. Dist. LEXIS 245691, at *2-4 (S.D.N.Y. Dec. 31, 2020) is also misplaced, and that case is readily distinguishable in any event. (Dkt. #174, p. 5). In *Ullah*, the Defendant was convicted of attempting to provide material support to ISIS and other offenses after he tried to detonate a suicide bomb on the New York subway. As the district court recounted in its order denying the defendant's Rule 29 motion, "[w]hile on his way to Midtown, he posted a message to his Facebook account that taunted the President of the United States for failing to keep America safe and announced that he was acting on behalf of the Islamic State of Iraq and al-Sham ('ISIS')." *Ullah*, 2020 U.S. Dist. LEXIS 245691 at *3. The defendant argued that he acted "entirely independently"

of ISIS because he "did not engage in two-way communications with ISIS." *Id.* at \*7. The district court noted that the definition of "direction" refers to "command from one person to another, not a two-party discussion of options." *Id*. at 8. It held that the defendant provided himself as personnel to ISIS after attempting to commit a terrorist attack, which ISIS specifically called for in its propaganda videos that the defendant watched. His pre-attack online post confirmed that he was acting on behalf of ISIS. These facts stand in stark contrast to the government's "services" theory and the evidence in Defendant's case. For instance, unlike the defendant in *Ullah*, Defendant never explicitly stated that he modified "no name's" computer script, or that he decided to organize videos by resolution size at the direction and on behalf of ISIS. Further, providing personnel to commit a physical act of violence is substantially different than the expression-related "services" at issue in this case.

Importantly, the government's premise that evidence of communications with a non-FTO equates to material support to an FTO present serious constitutional problems. The lists of designated terrorists and foreign terrorist organizations exist for a reason. FTOs are specifically and publicly named. *See* U.S. Department of State, Foreign Terrorist Organizations, available at: https://www.state.gov/foreign-terrorist-organizations/ (last visited May 16, 2022). The FTO list provides fair notice to the general public and names those entities that the Department of State has determined to be off-limits. The Department of Justice cannot unilaterally expand that list by adding "unofficial" or even "official" "affiliated" entities that are not on the list. A group is either a prohibited FTO or it is not.

The government's theory at trial and repeated in its Response criminalizes expression and communication that it is, at best, directed at a non-FTO. This theory presents significant Due Process and First Amendment association concerns and invite debate about how many degrees of

separation are enough to ensure that communication with a non-FTO entity is not act of terrorism. *See United States v. Williams*, 553 U.S. 285, 304 (2008) ("A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."). That is an untenable standard, as illustrated when the government's witness identified a group as an ISIS "brand" but its own expert called it an "unofficial outlet." Both descriptors are far too slippery to provide fair notice to the public about what is prohibited. That is precisely why the law requires services be provided *to* the FTO, not an affiliate or other entity that Department of Justice intelligence officers deem to be "close enough" to the FTO.

Along these lines, the government misconstrues Defendant's point about how the evidence showed that he did not believe that his conduct was not illegal. The government argues that whether Defendant "believed his conduct was illegal is not an element of an offense the government must prove." (Dkt. #174, p. 16). The government cites *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) and argues that "mistake of law" is not a defense when statute did not require willfulness. But Defendant does not and did not raise a mistake of law defense. Rather, Defendant's knowledge that he was acting independent of the FTO, and specifically not attempting to act under its direction or in coordination with it, is a statement of fact relevant to his mental state, in that he was not knowingly providing services *to* the FTO, and also not attempting to (*i.e.*, intending) to work under the FTO's direction or in coordination with it. The issue is not, as the government appears to argue, that Defendant believed it was legal to provide services to an FTO. That is not what Defendant argued or what the evidence showed he believed, for that matter.[9]

_____

[9] The government's final point in this section is equally misguided. It references the Court's pretrial ruling denying Defendant's motion to dismiss and specifically quotes the Court's view that the "scale and

### E. The Government Failed to Prove that Defendant Attempted to Coordinate with ISIS.

The government's Response focuses on the "direction" element of the material support statute. It briefly references "coordination" while arguing that Defendant was not required to coordinate "directly with ISIS" because he "intended to coordinate with ISIS." (Dkt. #174, p. 18). According to the government, that "intent to coordinate" was proven by Defendant's request in *Heralds of the Internet* to gain access to the Al-Hayat Media Center and Al-Furat media channels, which was "an expression of his desire to coordinate with ISIS." (Dkt. #174, p. 18). As discussed above, that statement is insufficient to support the material support conviction. Concluding that "brothers" unequivocally meant "ISIS" is speculative, as even the government interprets the term to include "supporters." There was no evidence that those particular channels were run by ISIS, as opposed to just containing particular ISIS or pro-ISIS videos. The preservation or compilation of these videos pertains to no inherit agenda or malice, as seen through Aaron Zelin's "Jihadology" website. There was no call by ISIS or any other entity for someone to "organize" channels by resolution type. And Defendant's ultimate purpose for organizing the videos was entirely personal, being the creation of an offline archive of folders containing videos of a specific resolution type,

---

sophistication of this script transforms his conduct from an individual expressing an opinion, to providing a service to an FTO." (Dkt. #174, p. 25). The government makes no other effort or argument to apply the Court's pre-trial opinion in opposition to Defendant's post-trial motion. It does not argue that the "scale and sophistication" of the program meets the "direction" element of the material support statute, in that somehow the "sophistication" of the script somehow proves that Defendant was attempting to work under the direction and in coordination with ISIS. Nor could it, as the issues are apples and oranges. Needless to say, Defendant respectfully disagrees with the Court's pre-trial ruling, as there is no doctrine of First Amendment law establishing that speech or expressive activity loses protection the larger its scale or sophistication. Indeed, one could argue the exact opposite is true because the larger the scale the greater the audience, which would amplify the First Amendment protections that should also be increased. *Board of Education v. Pico*, 457 U.S. 853, 866-67 (1982) ("we have held that in a variety of contexts 'the Constitution protects the right to receive information and ideas.'"); *Bartnicki v. Vopper*, 532 U.S. 514, 533-34 (2001). Under the "scale" argument, individuals like Zelin—the self-admitted purveyor of the largest repository of jihadi videos—would be entitled to the least protection.

which he showed to OCE4.[10]  For these reasons, the government's brief argument on "coordination" should be rejected, as there was insufficient evidence to support Defendant's conviction on that theory.

### F.  The Government's "Attempt" Theory Nullifies Independent Advocacy.

Before trial, during trial, and in his post-trial motion, Defendant voiced concerns about how the government's "attempt" theory effectively nullified independent advocacy and also relieved the government's burden of proving a substantial step.  (*See* Dkt. #167, pp. 74-75).   In its Response, the government proves Defendant's point by continuing to portray Defendant's acts of independent advocacy and First Amendment expression as proof of both his "intent to benefit" ISIS and also as substantial steps toward providing "services."   The government also re-raises its strawman argument that it was not required to prove "actual coordination or direction with ISIS" but only that "defendant attempted to do so by taking a substantial step."  (Dkt. #174, p. 20).   The government's argument continues to be incomplete by omitting that any "substantial step" must involve services that are attempted to be provided *to* ISIS, not some other entity.   Indeed, the evidence is to the complete contrary, as when Defendant was explicitly given opportunities to provide services *to* ISIS through OCE3 (translations of bomb-making instructions) and the CHS (translating the script), he refused to do so.

---

[10] The government writes that defendant's statement that "We will write a script to organize every wilayah isdar after we finish downloading them, since there are too many to keep in just one folder" somehow "belies" Defendant's argument that he wanted access to the channels to organize them for his project.  (Dkt. #174, p. 19).  It is not clear how so.  Defendant did *not* have access to the videos he sought to organize and then add to his collection.  [confirm].  Even the steps described in the government's brief (Dkt. #174, p. 19) speak of independent process of downloading, organizing, preserving in an offline archive, and then later sharing with others.  The government writes that when that statement "is viewed in connection with his desire to access official ISIS Telegram channels to organize the channels, it is clear he was attempting to coordinate with ISIS."  (Dkt. #174, p. 19).

This indelible flaw in the government's argument is manifest in the evidence that it highlights as showing "substantial steps towards his goal of providing support to ISIS," including writing *Heralds of the Internet* and sending it to OCE2 and sending the nas.py script to OCE4. (Dkt. #174, pp. 20-21).[11]   But, for the reasons discussed above, communicating with these individuals and the non-FTOs is not the same as attempting to provide support *to* ISIS.

The government cites *United States v. Rahim*, 860 F. App'x 47 (5th Cir. 2021), an attempted material support case where the Defendant acted as an ISIS recruiter in an online-based application, and thereby attempted to provide personnel to ISIS.  The defendant's conduct included serving as the leader in a social media channel that had over 10,000 subscribers and in that role "recruiting fighters to travel to the Caliphate to join ISIS there, and inciting and counseling followers to commit terrorist attacks in ISIS's name in other countries."  *Rahim*, 860 F. App'x at 50-51.  He specifically took credit for a terrorist attack that occurred in Istanbul, Turkey.  *Id*. at 51. These efforts to provide "personnel" by recruiting fighters to join ISIS and commit acts of violence simply cannot be compared to the expression-based "services" that the government claims Defendant attempted to provide.

In *Kaziu*, the government cites another case that stands in stark contrast to Defendant's facts. (Dkt. #174, p. 22).  There, the defendant was convicted of conspiracy and attempt to provide material support.  The defendant's co-conspirator testified how he and the defendant plotted to travel overseas, obtain weapons, join the FTO al-Shabaab, and kill American soldiers.  They

---

[11] The government writes that Defendant's "distribution of *Heralds of the Internet* to OCEs whom he met in ISIS friendly Telegram rooms and whom he believed were members of pro-ISIS media organizations, for the purpose of proving his bona fides and for the purpose of promulgating the script" was a "substantial step" to committing the crime.  (Dkt. #174, p. 21).  First, Defendant never provided OCE2 with the nas.py script.  Second, it is entirely unclear what the government means by "proving his bona fides," how that can be distinguish in any meaningful way from First Amendment association and expression, and how that can constitute a "substantial step."

actually travelled overseas and contacted others "in an attempt to travel to Pakistan, Afghanistan, and Somalia to wage jihad." *United States v. Kaziu*, 559 F. App'x 32, 36 (2d Cir. 2014). On appeal, the Second Circuit held that it was not necessary for the defendant to actually succeed in assisting ISIS because he was charged with an attempt and in fact travelled overseas. Like *Rahim*, the facts of this "personnel" case bear no resemblance to Defendant's case. Attempting to join AS, an FTO, is in stark contrast to providing a computer script to OCE4 who posed as a member of a non-FTO.

Additionally, it must be emphasized how the government's phrasing of the purported substantial steps in furtherance of Defendant's goal of "providing support to ISIS" reveals the inadequacy of its evidence and proves the defense's point that it has conflated independent advocacy with a substantial step. One can legally provide "support" to an FTO. That support can be in the form of advocacy, sympathy, or other conduct that advances the goals and philosophies of the FTO. The law only prohibits doing so under the direction of or in coordination with the FTO. From day one, the government has expansively interpreted the law to prevent the vocalization of support of any kind, and Defendant's verdict rests on that incorrect theory.

Even more problematic and utterly confounding, the government now argues in its Response that this was not just an attempt case, but that Defendant actually provided services to ISIS, as seen in the following passage:

> Moreover, the defendant clearly intended to provide services to ISIS. The government's burden is to establish the defendant attempted to provide this service to ISIS (as well as to an extent, coordination). In other words, the defendant did not attempt to take direction from ISIS, he in fact took direction and decided, in following that direction, to provide a service through the modification of the computer script.

(Dkt. #174, p. 22). The government would later repeat that Defendant was actually convicted for his "provision of material support." (*Id.*, p. 28). The government's argument is bewildering.

35

Defendant was charged with *attempting* to provide material support, not the actual provision of material support. It is entirely improper to argue that the conviction should be upheld based on a charge that was never presented to the jury, much less returned by the grand jury or referenced in the government's response to Defendant's motion for a Bill of Particulars. Moreover, the government still does not identify the "direction" that Defendant followed other than, presumably, the vague "support us on the Internet" argument.

### G. The Government's Arguments Demonstrate How the Material Support Statute is Unconstitutionally Vague as Applied to Defendant.

The key issue for the First Amendment claim is whether the speech and expressive conduct was done at the direction of or in coordination with ISIS. As the jury was instructed, "Advocacy that is done independently of the terrorist organization and not at its direction or in coordination with it does not violate the statute. Advocacy performed in coordination with, or at the direction of, ISIS is not shielded by the First Amendment." (Dkt. #152, p. 24). The government argues that "defendant was not attempting to engage in political speech was but [sic] instead attempting to provide a service to an organization that he knew was a designated Foreign Terrorist Organization." (Dkt. #174, p. 26). The government then turns to *Heralds of the Internet*, and claims that it could not be expressive conduct because the "substance" of the document was a "step-by-step instructional manual on how to quickly copy ISIS videos." (Dkt. #174, p. 27). But it is the government that ignores and fails to address the stated purpose or "Intention" of the project, which is to "Bring people to Islam and teach everyone the transgressions of the Crusaders and how the Islamic State's response to transgressions is self-defense." (GX 201). As discussed above, the stated "Intention" of *Heralds of the Internet* was an expressly religious and political viewpoint. Moreover, the sharing of the videos was part of the overarching purpose of bringing people to Islam (*i.e.*, dawah) and expressing a political viewpoint about ISIS's conduct.

36

The government briefly cites *United States v. Mehanna*, 735 F.3d 32, 48 (1st Cir. 2013) (Dkt. #174, p. 26), where the defendant was convicted of conspiracy to provide material support and other offenses after, among other things, travelling to Yemen to attend a terrorist training camp and also publishing translations of Al-Qaeda media. The First Circuit rejected the defendant's challenges to the jury instructions given by the district court for reasons not relevant to the issues raised by Defendant. *Id*. at 48-50. The First Circuit never reached the merits of the defendant's claim that translating Al-Qaeda articles could not support the verdict because it concluded that the verdict was support by Defendant's trip to Yemen to train for battle. *Id*. 50-51. The First Circuit's more recent decision in *Wright* is far more relevant, as it emphasized how, even if Defendant's views could be seen as being consistent with the goals of ISIS, including the viewpoint that it acted in self-defense and its goal of sharing its videos, such parallel advocacy would not be illegal. *See*, *e.g.*, *Wright*, 937 F.3d at 29.

The government also claims that the conviction did not violate Defendant's right to association because he was convicted of attempting to provide services to ISIS. (Dkt. #174, pp. 27-28). It argues that his "interactions with OCE1 and OCE2, including sharing of documents, were part and parcel of his illegal conduct." (*Id*., p. 28). It contends that Defendant shared *Heralds of the Internet* with OCE 2 because "a) he was attempting to build up his ISIS bona fides with OCE2 and b) he believed OCE2 could help spread the computer script." (*Id*.).

The government's arguments are legally and factually misplaced. First, there is no prohibition on interacting with non-FTO entities and even providing services to them. Moreover, the law does not even prohibit interacting with FTOs. It only prohibits providing services to FTOs while acting under their direction or in coordination with them. Thus, merely communicating with OCE2 and even sending OCE2 a copy of *Heralds of the Internet* was not illegal and to criminalize

such interactions violates Defendant's rights to association. Second, the government again brings up Defendant's supposed attempt to "build up his ISIS bona fides" without any further explanation or the meaning of this statement or, more to the point, how it could lead to criminal liability. Third, the government's claim that Defendant believed that OCE2 could share the computer script, cannot be squared with the fact that Defendant *never even gave OCE2 the computer script*. Defendant sent OCE a .pdf that contained various screen shots of portions of the computer script but not the script itself. OCE2 also testified that he never tried to run a script. (Vol. 2, Tr. p. 369:2-3).

The government also argues that Defendant was not convicted of his association with ISIS, but rather his provision of material support. This argument, again, misses the point. The defense never claims that Defendant associated with ISIS. The problem is that he was convicted for his association with non-ISIS entities. Neither *United States v. Marzook*, 383 F. Supp. 2d 1056, 1068 (N.D. Ill. 2005) nor *United States v. Chandia*, 514 F.3d 365, 371 (4th Cir. 2008) support the government's position. To the extent they are relevant, the cases simply stand for the non-controversial proposition that providing support to FTOs does not violate the First Amendment. The point made throughout Defendant's case and these post-trial motions, which does not require further explication, is that the evidence did not show that he even attempted to provide material support *to* ISIS.

In its final unconvincing point, the government repeats the critical error in blatantly mischaracterizing Defendant's statement, "I don't know them too close but I love their work. I try to help them" (Dkt. #174, p. 28) as expressing an intent to "assist ISIS." (*Id*.). As explained above, the "them" is, without a doubt, *not* ISIS, but a non-FTO group called Sarh al-Khilafah. The government's arguments—whether disingenuous or simply careless—prove Defendant's

argument that the prosecution and conviction violates his associational rights because there is simply no prohibition on Defendant expressing a desire to help a non-FTO.

Contrary to the government's arguments, the material support statute is unconstitutionally vague as applied to defendant. Indeed, the government's arguments in its Response only underscore the vagueness of the application of the material support statute in this case. Defendant will not repeat each of these points that are set forth at length above. In short, convicting Defendant for communicating only with non-FTOs, when he expressly avoided attempting to contact the FTO itself, presents serious due process and First Amendment problems. Individuals have a right to associate with non-FTOs, and even provide them with services. The law only prohibits providing services *to* FTOs, and doing so under the direction or in coordination with the FTOs. Allowing a conviction based on the government's evidence, and as further explained by the government's post-trial arguments, would create problems of a constitutional dimension. Additionally, the government's emphasis on the "benefits" that ISIS could have potentially received, which was never presented to the jury, also presents constitutional fair notice problems. For the reasons discussed above, the evidence does not show that Defendant was "attempting to provide a service to ISIS" (Dkt. #174, p. 29) because he did not provide a "service," only interacted with non-FTOs, and avoided contact with ISIS.

The issue raised in this case was not addressed in *HLP*. Put simply, the issue here is whether a person would know that the term "service" would cover advocacy performed in coordination with a non-FTO. Rather than address that point, the government instead argues that there is no statutory requirement that "defendant actually communicated with an official from ISIS or an official ISIS organization." (Dkt. #174, p. 30). At the risk of being repetitive, the government has created a strawman. Defendant never argues for a strict standard requiring direct, two-way

communication with the FTO. Instead, Defendant has argued, and the law requires, that the services be provided *to* the FTO and not to a non-FTO. That is especially so in a case such as this where Defendant avoided contact with ISIS when the government agents gave him opportunities to do so.

The government's tactic is to simply avoid responding to all the instances when Defendant refused to interact with ISIS. It argues that those instances are "irrelevant" because it does not matter whether or not he communicated with actual ISIS members. (Dkt. #174, p. 30). The government misunderstands the argument. Defendant does not insist that a conviction can only be sustained if he communicated with real ISIS members or those purporting to be. Rather, the point is and was at trial that Defendant only communicated with those who identified as non-ISIS members, he described himself as a "munasir" or supporter and not a member, and when multiple government agents told Defendant that they could connect him with ISIS members, he never accepted the offers. In light of that evidence, a conviction would render the statute vague as applied here.

The government next disputes Defendant's characterization of the evidence. It claims that Defendant did not follow up with OCE1's invitation to connect with ISIS because he was concerned about law enforcement. (Dkt. #174, p. 30). Defendant's use of the FBI watching him as an excuse was an obvious delay tactic that he used to change the subject. Obviously, Defendant was not shy talking about inflammatory things with non-FTOs and people who did not say they were ISIS members, as the chats with OCE1 plainly showed. It was only when OCE1 tried to get Defendant to actually do something, including connecting with ISIS, that Defendant suddenly became concerned with law enforcement. Likewise, Defendant's use of the FBI watching him as an excuse helped him avoid translating the bomb-making instructions to OCE3.

40

The government also notes that there is "nothing in the record to explain why the defendant did not provide screenshots of his script to the CHS for translation." (Dkt. #174, p. 31). But there is nothing in the record *because Defendant stopped talking to the CHS when the CHS brought up giving the screenshots of the script to ISIS.* There is nothing in the record because when the CHS said he would provide translations to ISIS, Defendant stopped communicating with him on that subject. The government's interpretation of why Defendant did not accept the invitations of OCE1 and OCE3 to communicate with ISIS, or the invitation of the CHS to provide a translation to him so he could provide it to ISIS, is entirely speculative. Once again, the Defendant knew the line and did not cross it. He was consequently prosecuted on entirely novel and unprecedented grounds he couldn't reasonably foresee, as they did not exist.

Finally, the government's attempts to distinguish Zelin's own conduct are unconvincing. Like Defendant, Zelin obtained pro-ISIS videos from original sources and saved them online. Unlike Defendant, Zelin also did the same for other FTOs. Also unlike Defendant, Zelin made those videos available to others without restriction and presently still makes those videos available provided that one passes a quick screening process that involves little more than an .edu email address. The government's attempt to distinguish its own expert's conduct hinges on its argument related to the "intent to assist ISIS." (Dkt. #174, p. 31). But, for the reasons discussed above, the "intent to assist" ISIS is not dispositive. It is whether one intended to work under the "direction" of ISIS or in coordination with it. Neither Zelin nor Defendant had that intent. But by the government's same logic, the conduct of Zelin and Defendant both benefitted ISIS.

III.    **ALTERNATIVELY, THE COURT SHOULD GRANT
        DEFENDANT'S RULE 33 MOTION FOR A NEW TRIAL.**

   **A. The Government Improperly Shifted the Burden
       on the Critical Issue of Independent Advocacy.**

As quoted in Defendant's Motion (Dkt. #167, pp. 54-55, p. 85), at the end of the government's closing argument, the prosecutor listed off a nine separate facts prefaced with the "if you believe" refrain that the jury needed to find in order to acquit Defendant. Defense counsel objected on burden-shifting grounds, which was overruled at sidebar. (Vol. 7, p. 1428:6-9, 19:23; p. 1429:5-11).

The government's rebuttal closing argument shifted the burden of proof by telling the jurors that they had to believe the defense theories in order to acquit. (Dkt. #167, p. 85). But contrary to the argument, the jurors could have rejected every single one of the government's "if you believe" facts and they could still have found Defendant not guilty.

Moreover, it was misleading for the government to condition an acquittal on Defendant proving that he was an independent advocate for developing a Linux operating system, creating a "wild goose chase," or pledging bayat—none of which involved the "services" that the government was required to prove. The argument was improper and denied Defendant a fair trial. *United States v. Wolfe,* 701 F.3d 1206, 1211 (7th Cir. 2012).

An argument "distort[s] the burden of proof by suggesting incorrectly what the jury must find in order to reach a certain verdict." *United States v. Vargas,* 583 F.2d 380, 386 (7th Cir. 1978). It was "bright-line" argument that told the jurors the only way to acquit was to believe the defense theory. *United States v. Briseno,* 843 F.3d 264, 271 (7th Cir. 2016) ("After posing the question 'so just to be clear, for defendant to be not guilty of this one, what would have to happen?,' the government did not present competing options and highlight the one best suited to its case.").

Telling the jury that it had to believe the defense in order to acquit denied defendant of a fair trial because: (1) the statements went to the core of the government's burden; (2) defense counsel did not invite the statements; (3) while the jury instructions spoke of the burden, they did not explain the jurors could not "believe" but still acquit; (4) the comments were made in rebuttal; and, (5) the weight of the evidence was close. *United States v. Adams,* 628 F.3d 407, 418-19 (7th Cir. 2010); *United States v. Memar,* 906 F.3d 652, 658-59 (7th Cir. 2018).

In Response, the government asserts it did not shift the burden during its rebuttal argument. (Dkt. #174, pp. 34-45). Rather, it argues that it "ended its argument with an itemization and summarization of some of the government's evidence by prefacing with the words, 'if you believe that he was acting as an independent advocate when …' and then concluded the point by stating that, if the jury believed he was acting as an independent advocate for these reasons, then 'find him not guilty." (*Id.*, p. 34). The government offers several arguments why its rebuttal argument did not shift the burden. First, the government argues that this was not burden shifting because the jury could have acquitted the defendant on other grounds. In support of this argument, the government cites *United States v. Common*, 818 F.3d 323 (7th Cir. 2016), where the government also preceded a number of statements with the qualifier, "if."

In *Common* the prosecutor's arguments did not convey that the only way to find the Defendant not guilty was to find the testifying officers lied by using a conditional "if" statement— in that "if" the jurors believed the officers were lying then they should acquit. The prosecutor in *Common* clearly argued that it was the jury who could determine who lied, and render a verdict accordingly.

Here the government did not offer the jury the option of making the determination; rather it stated that the jurors needed to believe certain things in order to acquit the defendant. The "if"

43

in this case was not similar to the one used in *Common*, in that it was not a conditional. Rather the jurors were told that they should acquit if they believe these things were true, and otherwise they should convict.

The government argues that, as in *Common*, it used a conditional "if" statement. But the case did not turn on the mere fact that the government used "if". Rather, in *Common* the prosecutor merely commented on the credibility of the officers.[12] The jury could have believed the officers and still found grounds to acquit. But as in *Vargas*, the government here presented a biconditional statement—that it had to believe the Defendant's version that he was an independent advocate in order to acquit, *even as to issues like the "bayat" that were separate from the "services" Defendant was actually charged with attempting to provide.*

In reality, the jury could have believed that the specific facts highlighted by the government showed that Defendant did *not* act independently and it *still* could have acquitted by find the government did not meet its burden of proof on other elements, such as by finding that services were not provided *to* ISIS. Thus, the prosecutor's comments asserted that that the jury had to believe the defense theory that Defendant was an independent advocate and thus distorted what the jury had to find in order to acquit. Unlike *Common*, here the message was clear, the jurors had

---

[12] In *Common*, the prosecutor made the following statements:

> If you believe that [the officers] framed an innocent man that they did not know ... vote not guilty.... [I]f [Common's argument] overcomes the government's evidence and proves that these officers who testified are liars, please acquit the defendant.... [T]o discount those officers' testimony, you must find them to be corrupt, reckless, and stupid.... How can you determine who lied? ... You can absolutely reach a verdict, and the Judge is going to instruct you on how to get there. There are two tests that you can walk through and determine ... who lied to you.

*Common*, 818 F.3d at 332 (brackets and ellipses in original).

to believe all nine facts, "plus more," to acquit, or convict if they could not believe. The Government did not leave the door open to any other possibility.

The Government's reliance on *United States v. Hernandez,* 865 F.2d 925 (7th Cir. 1989), and in *United States v. Marshall,* 75 F.3d 1097 (7th Cir. 1996) is also misplaced. As in *Common*, in *Hernandez* the prosecutor argued that if the jury disbelieved the government's witnesses, then it should acquit. *Hernandez*, 865 F.2d at 929-30. Likewise, in *Marshall*, the prosecutor merely commented that the jury should acquit if it found the agent lied during his testimony. *Marshall*, 75 F.3d at1108. As with *Common*, these two cases are readily distinguishable, as the jury could believe the witnesses and still acquit.

In each of these cases the prosecutor told the jurors that if they did not believe the government witnesses then they should acquit. Here, the prosecutor told the jurors that if they believed the defense theory they should acquit. But Defendant's theory that he was an independent advocate was an element that the government had to *disprove*. Telling them that the defendant had to prove anything is classic burden shifting. It is axiomatic that a jury does not have to "believe" anything to acquit, regardless of the source.

The government also argues that it never directly referenced anything the defense said in its closing and that it "never put before the jury the choice of accepting the defendant's argument regarding these particular exhibits or the government's argument." (Dkt. #174, p. 38). This argument is belied by the record. The government was clearly responding to the defense and listing the defense's arguments. It was obvious that the government was giving the jury the choice between accepting Defendant's version or convicting.

It further argues that it did not misstate the law by conflating independent advocacy with intent when it argued that Defendant was not acting as an independent advocate. (Dkt. #174, p.

40-41). But the government's argument only underscores its confusion of the law and how it misstated the law to the jury. The government argues that the case "turned on intent." (Dkt. #174, p. 41) and it asserts that "independent advocacy" and "intent" are "part of the same issue." It poses the issue as whether Defendant intended to act as an independent advocate or whether he intended to "follow ISIS's direction?" (Dkt. #174, p. 41). As discussed in detail above, this reasoning is misguided. The "intent" mental state is only implicated because the case is charged as an "attempt" and it relates to whether Defendant attempted to work under the direction of ISIS or in coordination with it.

In sum, the government's repeated comments that it could acquit if it believed Defendant's argument that he was an independent argument—even as to issues that did not relate to the "services" he was charged with—bears absolutely no resemblance to the cases it relies upon. Defendant could not respond to those comments, which occurred at the end of the rebuttal. Thus, the last words from either party that the jury hear before deliberations was that it had to believe Defendant's argument that he was an independent advocate to acquit. Those comments were wrong, unfair, and deprived Defendant of a fair trial.

### B. The Government's Repeated References to Irrelevant and Unduly Prejudicial Testimony Regarding Violence Requires a New Trial.

The government's first witness, OCE1, testified at length about the "Weapons" Telegram chatroom and various communications with Defendant about bomb-making, explosives, and "targeting," despite the fact that those communications happened on just two occasions in June 2018, more than a year before Defendant shared *Heralds of the Internet* with OCE2 and the nas.py script with OCE4. The government also repeatedly introduced violent videos over Defendant's objection. This testimony and evidence was irrelevant and unduly prejudicial given the precise nature of the non-violent and technical charges against Defendant. This unduly prejudicial

46

testimony and evidence changed the entire narrative of the case. It forced the defense to defend against the inflammatory insinuations that Defendant was planning to commit acts of catastrophic and deadly violence and was attempting to obtain weapons, ranging from knives to bombs, none of which had nothing to do with the actual charges of saving and organizing pro-ISIS videos. Those allegations bear no comparison to charges involving actual or attempted violence, including attempts to join FTOs. It was the fact of what he did that was at issue, not the content. The law to be applied to this case would not be different if there were videos of a trophy presentation for the fighters in the field. Thus, showing these videos served no purpose other than to inflame the jury.

Still, the government argues that OCE1's testimony was relevant and not unduly prejudicial because it showed that Defendant was in a computer school and had hoped to help his "brothers" in the future, and that he said he knew someone in "contact with IS media departments" who would publicize the news of Defendant's martyrdom. (Dkt. #174, p. 49).

As to the first point, the government contends that Defendant's statement foreshadowed his intent to use "his computer skills in furtherance of ISIS's mission." (Dkt. #174, p. 49). But that conclusion is based on the speculative assumption that "brothers" means ISIS. As noted above, even the government describes "brothers" to mean "supporters," and not just ISIS "members."

And as to the second point, the government contends that the statement is relevant to show that Defendant "was not acting independently in his actions but instead wanted to help ISIS." (Dkt. #174, p. 49). But there was nothing in Defendant's statement about working under the direction of ISIS or coordinating with it. Rather, his actual words only conveyed that he supposedly knew someone who knew someone in the IS media department and if Defendant committed an act of

violence there would be an "isdar," or news release. (*See also* Vol. 1, Tr. 60-61). These exaggerated statements do not show that Defendant wanted to help ISIS, much less that he intended to act under its direction. The trial testimony did not actually show that Defendant intended to commit violence on behalf of ISIS. Rather, OCE1 asked Defendant if he could fight if he had to do so. (Vol. 1, Tr. 59:23). Defendant then responded that if he had to, he would attain "Shahadah" or martyrdom. (Vol. 1, Tr. 60:1-40). It is the government, not Defendant, who adds that this violence was to be committed on behalf of ISIS. (Dkt. #174, p. 49).

The government also argues that evidence of the Weapons chatroom "was relevant for context, to establish that the government did not seek out the defendant but that OCE1 passively came across the defendant" and to "dispel the argument that the government acted overzealously in its investigation of the defendant." (Dkt. #174, p. 50). But Defendant never made an entrapment defense or accused the government of "seeking out" Defendant. In any event, while OCE1 may have sat "passively" in the Weapons chatroom, the fact is that he did initiate contact with Defendant and, unsolicited, did so again on June 29, 2018. Moreover, rather than argue that OCE1 "overzealously" pursued Defendant, through cross-examination the defense established that, if anything, OCE1 failed to pursue Defendant notwithstanding the talk of bombs, guns, and knives, which suggested that even OCE1 and his FBI handlers did not take Defendant's boasting as serious.

Next, the government argues that Defendant's comment that he was staying "passive for now", in regard to committing an act of violence, because of the FBI was an act of operational security, and that he was thus aware that his conduct was illegal. (Dkt. #174, p. 50). The government further argues that showing Defendant's cognizance of being surveilled connected to how he "backed away" from translating bomb-making material for OCE3 because the person he

was working with was being watched by the FBI. (Dkt. #174, p. 50). This "operational security" theory of relevancy makes little sense. The argument that Defendant did not commit an act of violence because he felt he was being surveilled by the FBI has nothing to do with the charges in the case involving a computer script. The second argument about OCE3 is even more of a stretch. As with the conversation with OCE1, the discussion about bomb-making translations with OCE3 was entirely irrelevant and unduly prejudicial. The government cannot argue that one irrelevant argument becomes relevant because it links to another irrelevant point.

The government's next argument fares no better. It contends that the reference to the case of *United States v. Jones and Schimenti* and his "preparation for attacking law enforcement demonstrate both his knowledge that material support of a foreign designated terrorist organization, like ISIS, is illegal, and his consciousness of guilt." (Dkt. #174, p. 51). The government's obvious tactic with referencing the Jones and Schimenti case was to taint Defendant and to give the jury the impression that he was somehow connected to other individuals charged with material support. It had nothing to do with his "consciousness of guilt."

The government also argues that the discussions of violence with OCE1 and OCE3 were not the only references to violence, and points to one exchange with OCE2 when Defendant asked for a guide for a detonator. (Dkt. #174, p. 51). But that argument simply bootstraps irrelevant and unduly prejudicial evidence to evidence of the same ilk. And the government's further contention that the evidence "is relevant to his state of mind and his intent to support the FTO" (Dkt. #174, p. 51) fails to link the reference to the "detonator" to committing any acts to "support the FTO," much less to provide material support by acting under its direction.

The government's final relevancy argument asserts that the additional testimony about TATP and committing acts of violence were merited because of the defense cross-examination.

(Dkt. #174, p. 52). However, that cross-examination was only necessary because of the introduction of the prejudicial testimony and evidence, presented over the defense's objection. The government's redirect introduced no new evidence beyond what had already been admitted into evidence. The problem was with the introduction of the evidence in the first place.

Thus, even if one were to accept that there could be even the most attenuated relevance to Defendant's reference to studying computers at school, there was absolutely no relevance to the TATP explosive instructions, the "Weapons" chatroom, or any of the other prejudicial references to bombs, guns, and knives. Those references had no connection to any fact that was of consequences to determining the elements of the charged offense. As a result of allowing OCE1 to testify, from the very start of trial the jury was left with the impression that Defendant was a dangerous young man primed to commit violence, even though the actual charge related to a python computer script.

The government's arguments related to undue prejudice are easily addressed. It first argues that the videos were relevant to Defendant's mindset. (Dkt. #174, p. 53). But the cases it cites are distinguishable. In *United States v. Shareef*, No. 10 C 7860, 2011 U.S. Dist. LEXIS 118649, at *9, 2011 WL 4888877 (N.D. Ill. Oct. 11, 2011), the defendant claimed that his attorney was ineffective for not raising an entrapment defense. Judge Kennelly rejected the argument and noted that the violent videos on his computer including "amateur videos depicting suicide bombings and rocket attacks targeting U.S. military forces in Iraq" that the defendant had on his compute before meeting the government undercover were strong evidence of predisposition. *Id*., *14-15. Similarly, in *Mehanna,* the defendant was convicted for conspiring to provide material support by traveling to Yemen to join a terrorist training camp. The defendant argued that the trip was "to pursue Islamic studies." *Mehanna*, 735 F.3d 32 at 43. He also challenged the introduction of

50

videos and other media as irrelevant and unduly prejudicial. The First Circuit reasoned that "pictures, videos, and literature" that the defendant challenged as irrelevant spoke to the defendant's purpose in going to Yemen to join Al Qaeda. *Mehanna*, 735 F.3d 32 at 60-61.[13] In contrast to these cases, Defendant did not make an entrapment defense where the videos were relevant to show his predisposition. Nor did he take action like travel to Yemen for battlefield training and claim where he claimed that was for "purely Islamic purposes," which entitled the government to offer the videos to show his violent mental state. In contrast, here the violent content of the videos did not bear on any relevant mental state of Defendant, who did not attempt to commit any act of violence.

The government contends that the video which Defendant narrated was not unduly prejudicial because it "was the type that ISIS used to recruit and terrorize." (Dkt. #174, p. 53). In no way does point that explain why the video was still not unduly prejudicial to play, including by repeatedly using freeze-frame images with phrases like "kill them all" (GX 203-11); "slit their throats" (GX 203-14); "watch them die" (GX 203-15); and "through our blood comes success" (GX 203-20). The government argues that this and other videos were not unduly prejudicial because they "were evidence of [Defendant's] intent to commit 'media jihad' on behalf of ISIS." (Dkt. #174, p. 54). But, contrary to the government's desire, "media jihad" is not listed in the federal criminal code. The government's Response underscores how it used the graphic and prejudicial videos to portray Defendant as violent, even though the video was made from a non-

---

[13] Other cases permitting the use of violent videos in terrorism cases express similar reasoning. Indeed, in such cases involving violence, courts have permitted the use of videos extolling violence as relevant to shed light on the defendant's mental state to, for example, provide personnel to ISIS. *See, e.g.*, *United States v. Mustafa*, 753 F. App'x 22, 36 (2d Cir. 2018) ("Evidence of terrorist literature and military equipment seized from Mustafa's London residence and the Finsbury Park Mosque that he led was also probative of Mustafa's intent to support terrorism and to do so through violence."); *United States v. Abu-Jihaad*, 630 F.3d 102, 133 (2d Cir. 2010) (affirming district court determination that "the pro-jihadist contents of the videos were relevant to understanding Abu-Jihaad's motive and intent in communicating information that could have resulted in the destruction of the very ship on which he served.").

FTO entity, was not part of the "services" Defendant was charged with, and was not itself illegal, as it was not done under the direction of ISIS or in coordination with it (nor did the government argue those points).

The government also argues that the videos were not unduly prejudicial because the jury was entitled to understand why they were being removed from the Internet and why the "computer script provided a valuable service to ISIS." (Dkt. #174, p. 54). These points do not address the issue of prejudice. Instead, it highlights why the videos were irrelevant. Seeing the videos to understand why were removed from the Internet did not make a fact of consequence that the jury had to consider more or less likely. Social media platforms' terms of service were not on trial. Nor are they the law. The government continues to confuse the issues when it stresses how the script provided a "valuable service to ISIS," rather than whether Defendant attempted to work under the direction or in coordination with ISIS. This point is yet another version of the "benefit" theory that the jury never considered. Again, the whole idea of independent advocacy is to provide a benefit. So it is plainly not illegal to provide a benefit, it is only illegal to do it at the direction of or under the control of an FTO.

As a final point, the government states: "this case is about terrorism. Presenting violent acts, in some form, to the jury, is bound within the nature of the charged conduct." (Dkt. #174, p. 54). That is no doubt correct as a general matter. But it is also precisely the reason why extra caution should have been exercised and the videos should have been withheld. The mere mention of terrorism raises fears, prejudice, and hatred against the charged defendant. Moreover, while this case was charged as terrorism, the actual "services" that were charged involved no violence whatsoever. It was the government's use of the likes of OCE1, OCE3, and the repeated introduction of prejudicial and unnecessary videos that interjected the violence which deprived

Defendant of a fair trial. Thus, while the Court may have reasoned that OCE1's testimony and the videos went to Defendant's state of mind and intentions when it denied Defendant's pretrial motions, the diminished relevance and heightened prejudice of the material became apparent during trial. Given the strict proofs required by the elements and Defendant's lack of violence, Defendant is entitled to a new trial without this irrelevant, unduly prejudicial, and unfair evidence.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons as well as those set forth in Defendant's Motion, the Court should grant Defendant's motion for judgment of acquittal or, in the alternative, grant him a new trial.

Respectfully submitted,

/s/ Steven A. Greenberg
**STEVEN A. GREENBERG,**

/s/Joshua G. Herman
**JOSHUA G. HERMAN**
Attorneys for Defendant

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 1260
Chicago, Illinois 60604
(312) 879-9500

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 404
Chicago, IL 60604
(312) 909-0434
jherman@joshhermanlaw.com