```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3    UNITED STATES OF AMERICA,        )
                                       )
 4                   Plaintiff,        )
                                       )
 5            vs.                      ) No. 19 CR 869
                                       )
 6    THOMAS OSADZINSKI,               ) Chicago, Illinois
                                       ) August 16, 2022
 7                   Defendant.        ) 9:13 a.m.

 8                      TRANSCRIPT OF PROCEEDINGS

 9           BEFORE THE HONORABLE ROBERT W. GETTLEMAN

10    APPEARANCES:

11
      For the Plaintiff:        UNITED STATES ATTORNEY
12                              BY:  MS. MELODY WELLS
                                Assistant United States Attorney
13                              219 South Dearborn Street, Fifth Floor
                                Chicago, Illinois  60604
14                              (312) 353-5300

15
      For the Defendant:        GREENBERG TRIAL LAWYERS
16                              BY:  MR. STEVEN GREENBERG
                                53 West Jackson Boulevard, Suite 1260
17                              Chicago, Illinois  60604
                                (312) 879-9500
18

19                              LAW OFFICE OF JOSHUA G. HERMAN
                                BY:  MR. JOSHUA G. HERMAN
20                              53 West Jackson Boulevard, Suite 404
                                Chicago, Illinois  60604
21                              (312) 909-0434

22

23    Official Court Reporter:  NANCY L. BISTANY, CSR, RPR, FCRR
                                219 South Dearborn Street, Room 1706
24                              Chicago, Illinois 60604
                                (312) 435-7626
25                              nancy_bistany@ilnd.uscourts.gov
```

1       (Proceedings heard in open court:)

2               THE CLERK:   19 CR 869, USA versus Thomas Osadzinski.

3               MS. WELLS:   Good morning, Your Honor.

4               Melody Wells for the United States, and I'm joined at

5       counsel's table by Special Agent Cassandra Carnright from the

6       FBI.

7               THE COURT:   Good morning.

8               Counsel?

9               MR. HERMAN:   Good morning, Judge.

10              Josh Herman with Steve Greenberg and Mr. Osadzinski,

11      who is present as well.

12              THE DEFENDANT:   Good morning.

13              THE COURT:   Good morning, folks.

14              As I think my clerk, Claire, informed you, I have

15      thoroughly read the briefs that you filed, all -- I don't

16      know -- 200 pages worth; and I am familiar with the arguments

17      that you've raised in those briefs.

18              I wanted to give you an opportunity to expand on

19      those or to argue those any further.  And I'm not saying that

20      to discourage you from saying anything you want in addition to

21      what you've already submitted or just to emphasize what you've

22      submitted, but I have given a lot of attention to the briefs

23      that you filed, and I'm happy to hear you.

24              So I'll turn it over to the defense at this point.

25              MR. GREENBERG:   Your Honor, in Josh and I talking, we

1     thought that, perhaps, it would be best if Your Honor had any

2     questions about anything rather than us just restating and

3     reemphasizing what's in the briefs.

4            THE COURT:  Not really.  Not really.  I would prefer

5     that if you wanted to emphasize whatever you would like to, I

6     would hear you on that.  And that might provoke some questions

7     from me, obviously, or not.  So it's really up to --

8            MR. GREENBERG:  Mr. Herman --

9            THE COURT:  It's really your show, not mine.

10            MR. GREENBERG:  Mr. Herman is the emphasizer, and I'm

11     the answer bot, so I'll let him go.

12            THE COURT:  I'm not surprised to hear you say that.

13            You can approach.

14            MR. HERMAN:  Okay.  And it's okay, fully vaccinated?

15            THE COURT:  Yes, although I'm afraid that has not

16     necessarily protected everybody, including my wonderful

17     courtroom deputy, who is recovering from COVID as we speak.

18     She is on the line, though, so --

19            MR. HERMAN:  Well, I hope she's feeling better.

20            THE COURT:  It's been a struggle, but she is.  She's

21     strong.  Thank you.

22            MR. HERMAN:  Judge, cognizant of the fact that you've

23     read everything and you sat through a trial and this was a case

24     that was different from a lot of cases because there was also a

25     substantial amount of pretrial litigation, and a lot of the

1    issues that were litigated in the pretrial litigation bled into
2    the trial issues.

3         And during -- sometime during trial or a pretrial
4    hearing, we had -- we had noted why we were arguing so
5    vigorously on those particular points, because this is a unique
6    and important case that does present substantial issues of, we
7    think, importance, not only for this area of the law in
8    material support cases but also First Amendment issues more
9    generally.

10        I just want to highlight a couple of things and
11   almost work backwards.  When you're -- when I was working
12   somewhere in this building for someone else who instructed me,
13   when you have your briefs, you start with the reply and work
14   backwards from the reply and see what's really at stake.

15        And when we were writing the reply, what I found --
16   what we found ourselves to be in a position was that we were
17   addressing almost new arguments that weren't necessarily
18   presented at trial and particularly this theory of a benefit
19   and whether or not this evidence could support a conviction on
20   a theory that the jury wasn't instructed on and, more
21   importantly, a theory that has amorphous and expanding
22   boundaries that Your Honor recognized when we think the Court
23   correctly declined to instruct the jury on the benefit theory
24   when you observed that this benefit theory also equally applies
25   to somebody like Zelin, somebody who could be advocating

1   completely independently or even in a parallel manner as we

2   think this important case, the *United States versus Wright* from

3   the First Circuit, discusses.  That activity could confer a

4   benefit or some benefit could be appreciated by an FTO.

5           The purpose of advocacy, independent, concerted,

6   whatever, is to confer a benefit.  I am advocating right now on

7   behalf of Thomas Osadzinski to confer a benefit upon him,

8   hopefully securing his release or if --

9           THE COURT:  You're also providing a service to him,

10  aren't you?

11          MR. HERMAN:  I am providing a service to him.  That

12  is why this case and -- needs boundaries -- these definitions

13  need to be cabined in.  We cannot be talking about these --

14  whether or not somebody appreciates a benefit.  And we believe

15  the evidence in this case -- and we repeated it throughout our

16  briefs and during the closing argument as well -- which is,

17  this is a case where somebody is scrupulously avoiding

18  opportunities to communicate with FTOs.

19          And I want to make this point clear.  We are not

20  arguing that there needs to be a direct one-on-one instruction

21  or link between a defendant and an FTO in order to sustain a

22  conviction.  But this is a case where the government argues

23  that the coordination element is met through communications

24  with non-FTOs.  And as -- particularly as we reply to that

25  argument, that presents serious due process issues about what

1    is prohibited and what is not prohibited.

2         You have an individual here who is given multiple

3    opportunities to do something for ISIS.  And, you know, we take

4    issue with the government's characterizations of the facts

5    about -- you know, especially with the CHS when he said, "Just

6    take the screenshots, and I will give it to ISIS."

7         These communications with the OCE 1, OCE 3, and the

8    CHS each included an element where they said, "Do a translation

9    for ISIS" or "Translate these bomb instructions for ISIS."  And

10   each time he backed away.

11        And that in and of itself is incredibly important

12   when that's a line that, you know, if he had crossed that line

13   and said, "Okay, yeah, here's the screenshot.  Give it to the

14   brothers in ISIS," now, that's problematic.

15        And you have to ask yourself why -- why is the

16   undercover asking that particular question?  That was a crucial

17   piece of evidence that I think his handlers recognized would

18   put the nail in the coffin of the case.

19        Same thing for OCE 1 and OCE 3 about, "Do you want to

20   communicate with ISIS?"  Why else would they do that?

21        THE COURT:  So the fact that he didn't cross the line

22   in that instance, does that preclude the conclusion that the

23   jury reached, that he crossed the line in another incident?

24        MR. HERMAN:  Well, this is --

25        THE COURT:  Or does it just show that there was a

1  line that he didn't want to cross that was clearer and that he
2  did so in the other --
3              MR. HERMAN:  Yeah, it --
4              THE COURT:  -- in providing the media jihad that he
5  called it in the other?
6              MR. HERMAN:  Based on the evidence that was
7  introduced at trial, we submit that the jury could not have
8  found that he had crossed the line, because communications with
9  non-FTOs is not prohibited.  The material support statute does
10 not cover that type of conduct that he was engaged in right
11 now.
12              And the government's response glosses the fact that
13 he was convicted of coordinating by communicating with
14 non-FTOs.  That's the coordination theory, is communicating
15 with non-FTOs equals coordination with the FTO.  And that --
16 that is a frightening proposition providing guidance to others,
17 especially when the Supreme Court in *Holder* very expressly
18 says, you can advocate on behalf of FTOs; you can get up in
19 front of the United Nations and speak on behalf of -- speak on
20 behalf of FTOs.
21              The two concepts of he's providing material support
22 by communicating to a non-FTO but somebody can get on the
23 United Nations floor and speak on behalf of the PKK or the
24 Tamil Tigers, those are irreconcilable.  And based on the
25 evidence that was here at trial, I don't think the question is

1    whether or not his -- his conscious or repeated efforts to

2    avoid communicating with the FTOs to provide a service to the

3    FTO as required by *Holder,* as reiterated by then just -- then

4    Solicitor General Kagan in the government's briefs, has to be

5    the FTO.  If somebody provides services or communicates -- and

6    we're not conceding that there were services here -- but

7    communicates with a non-FTO, there's serious due process notice

8    problems that somebody in his shoes or anybody else out there

9    trying to advocate on support -- excuse me -- advocate in

10   support of an FTO is not committing a crime of terrorism.

11          So the other important point that, just to underscore

12   here, Judge, is -- is how this case was charged as an attempt

13   case.  And, again, in our reply we point out the government

14   says it's an attempt case, but then they say, well, he's

15   actually committing material support, too.

16          This -- that's been one of the confounding kind of

17   issues in this case is about whether or not he's provided an

18   attempt, whether or not it's actual material support.  And I

19   think the confusion lies in large part that the overt acts --

20   there's a conflation in independent or -- independent advocacy,

21   material support case when we're not dealing with sending over

22   bullets, cell phones, one's person.  You're talking about what

23   is, in essence, ideas in the form of these videos that were

24   sent, and these videos that he quite clearly in Herald says,

25   "What's your intent?  What's the intention?"  It's to bring

1    people to Islam, right?  That's what the stated intention is by

2    showing that the acts of ISIS are in the form of self-defense.

3          And as disagreeable as that view may be, it's still a

4    political view.  And the first view to bring people to Islam is

5    very much a personal expression.  And what is he showing?  He's

6    showing videos that he believes are the news that is not shown

7    elsewhere.  He explains to the CHS that the definition of

8    Heralds is the news.  He is trying to bring people to Islam by

9    showing what he believes to be the news.  As misguided as that

10   may be, it's a view that he is entitled to hold.

11         But what -- before I got off on that tangent, the

12   problem with the prosecution about -- and maybe this is why

13   this attempt case has suddenly become a completed case, is --

14   is that the acts of independent advocacy support, what he is

15   saying become the overt acts or the substantive steps for the

16   attempt.  His independent support becomes material support

17   simply because some other entity says, "Yeah, it would be nice

18   if people would like us."

19         And that simply can't be.  It leaves no room for what

20   people can do, which is support FTOs and to do so

21   independently.

22         I feel like if I go further, I'm going to be

23   retreading a lot of what I know you've read, but can I just

24   check with --

25              THE COURT:  The floor is yours.  Please.

1       (Counsel conferring.)

2               MR. HERMAN:  Yes, that's -- we're going to rest on

3    our pleadings, as they say.

4               THE COURT:  Okay.

5               MR. HERMAN:  I'm going to start reading from them,

6    because I don't think I could say them better than they were

7    written, so --

8               THE COURT:  They were well written and thoroughly

9    written.

10              MR. HERMAN:  That's right.

11              THE COURT:  Thank you, Mr. Herman.

12              MR. HERMAN:  Thanks.

13              THE COURT:  Ms. Wells.  Mr. Jonas is not joining us

14   today?

15              MS. WELLS:  Mr. Jonas, unfortunately, is also ill.

16              THE COURT:  I'm sorry.

17              MS. WELLS:  And I would say -- I think I can speak

18   for him -- it would take just about the equivalent of wild

19   horses to keep Mr. Jonas away from the job and from a hearing

20   like this, and so I know he regrets not being able to be here

21   today.

22              THE COURT:  I hope he's doing better.

23              MS. WELLS:  On the mend, I'm sure, but he sends his

24   regrets.

25              I do -- I share, I think, everyone's desire here not

1    to belabor points that the Court is familiar with.  I want to

2    respond to a few things Mr. Herman said.

3           You know, there's a lot of commentary in defendant's

4    reply about this theory of a benefit or whether that is

5    appropriate or not appropriate.  And I just want to go back to

6    what happened at the trial, which is that the government put on

7    evidence that the defendant attempted to provide material

8    support to ISIS.

9           We are not arguing or trying to argue nor need we

10   argue that it was a completed offense.  The charge submitted to

11   the jury was an attempt charge.  The evidence amply supports

12   that, and I won't -- I won't belabor the facts, because I know

13   the Court is familiar.

14          But in terms of the law and the instruction, you

15   know, the Court, as you well know, Your Honor, did not instruct

16   the jury on any theory of benefit.  I think to the extent that

17   that's mentioned in the brief, it's because it's a common

18   understanding of what the word "services" means.  And often in

19   situations like this, we do refer back to dictionary

20   definitions and the like.

21          But the Court would -- the jury, excuse me, was

22   instructed simply that services refers to concerted activity,

23   not independent activity.  And that is what they were

24   instructed on.  And so I think that we're a little off track

25   getting into whether this is a benefit or not a benefit.

1    I think a juror of ordinary intelligence understands

2 what the word "services" means.  I think that a dictionary

3 definition and the common understanding of that would include

4 providing a benefit, but other courts have reached that sort of

5 definition, that concept in similar but slightly differently

6 worded ways.  And so, for instance, the *Jama* case, which is a

7 Circuit Court decision, you know, described it as significant

8 activity on behalf of an FTO relative to that FTO's objectives

9 or purposes.  And I think that those kinds of formulations fit

10 the evidence that the government put forward at trial.

11    And as for the evidence itself, we did identify a

12 number of different types of services.  You know, it was the

13 creation of this document, "Operation Heralds of the Internet."

14 It was the modification -- multiple modifications of the

15 computer script.  It was using the computer script himself.

16 There was evidence of the defendant's deployment of that

17 script.  It was teaching and educating others about how that

18 script worked.

19    And we put on various witnesses that described how

20 the defendant went, and sometimes in great detail, through

21 step-by-step technical processes to make sure that those people

22 could use this process that he had developed and modified and

23 refined, often on a user-specific basis.  You know, he would

24 tailor to one witness who said, "Hey, I don't speak Arabic.

25 Can you give me an English version?  Sure, here's the English

1    version."

2            And so those -- I think that those kinds of

3    activities are well within the scope of what an ordinary person

4    would understand to be a service.  And if we take a

5    hypothetical and teleported ourselves into the physical

6    caliphate in Syria, one of the videos that we saw at trial

7    talked about the ISIS bureaucracy and how they -- they really

8    were interested in taking all comers.  There was a person

9    welding for ISIS.  There was a person -- you could be an

10   accountant for ISIS.  You could be a librarian for ISIS and

11   organize their books and materials and keep things in a fashion

12   that was useful to that bureaucracy.

13           So I think the services definition for a person of

14   ordinary intelligence would encompass all of the evidence that

15   the government put forward at trial.

16           I also want to turn to a couple of discrete points

17   that Mr. Herman made.

18           One, the defense has argued that the defendant here,

19   I think scrupulously avoided, was the phrase that I recall

20   being used, actually connecting with ISIS or the real FTO, but

21   I think the evidence shows something entirely different.  I

22   think the evidence shows that the defendant was seeking out at

23   every opportunity he could find people who were involved in

24   doing the work that ISIS does and coming as close to -- as

25   close to ISIS as he could -- as he could manage.  He was

1   looking for people who were supporters, members, believers,
2   et cetera.

3           And the two media organizations that were sort of
4   represented by our witnesses at trial, OCE 2 and OCE 4, it's
5   important to recall what those media organizations did.  The
6   first of those was involved in spreading information about
7   toxins and explosives, and the second was involved in
8   translating from Arabic to English official ISIS media for
9   Al-Hayat.

10          And if we go back to the actual FTO designation in
11  the case, those media organizations are included in the
12  designation themselves.  This isn't some far-off branch or
13  irrelevant component of ISIS.  Al-Hayat and some of these other
14  media organizations are ISIS.  They are listed in the State
15  Department's designation.  It's all one and the same.

16          And so the defendant was out there finding people at
17  every opportunity who he could work with and who he could
18  connect with.  And this went far beyond what the concern in the
19  *Wright* case was, which was mentioned in argument and in the
20  reply brief, and that's the case originally out of
21  Massachusetts.

22          We do not have the issue that presented itself in
23  *Wright* where there was an instruction to the jury that it would
24  be sufficient to find coordination where a defendant acted in
25  accordance with the strategy and tactics of ISIS.  That

1    instruction would essentially describe a parallel activity.

2    That would be independent advocacy.

3              That is not the instruction that was given in this

4    case, and that's not what the evidence supports.

5              I also want to return to a point that Your Honor

6    made.  I think it's absolutely correct that if there's

7    information, as the defense suggests, "Well, the defendant did

8    not cross the line here," that, of course, does not preclude

9    him from crossing the line at other points and for the jury to

10   find that that's exactly what happened.

11             What is important is that all of the evidence of his

12   actions and his words are properly considered when the jury

13   determined his intent, and intent is a paramount issue in this

14   case.  And despite the concerns of First Amendment activity

15   that have floated around throughout this case, it's sort of

16   readily apparent and I think the courts considering material

17   support cases have made clear that there is no First Amendment

18   restriction on considering speech to determine knowledge and

19   intent with respect to prohibited conduct.

20             And so to the extent that the defendant was talking

21   to different witnesses who he believed to be like-minded

22   supporters to the -- to the extent that he was expressing his

23   views and his preferences and his support of ISIS's messages,

24   et cetera, all of that was properly before the jury to

25   determine whether or not he intended to commit the crime that

1  he was charged with committing.  And I submit that there was

2  more than enough evidence for them to find that he did.

3          And I'll end, Your Honor, with one last point.  The

4  defense has said over and over that they're not arguing that

5  you have to have a one-to-one connection between the defendant

6  and the ISIS mother ship, so to speak.  But I think that

7  effectively when you dig into the arguments, that is what

8  they're arguing, because at the same time we're saying, "Well,

9  it's insufficient that he only communicated with these non-FTO

10  people."

11          I don't think the law requires that.  In the *Ullah*

12  case out of SDNY, the judge noted there that the defense was

13  over-reading the independent advocacy of the statute.  And I

14  think that's what's happening here as well.

15          The *Ullah* case, as you may recall, Your Honor, was

16  one in which the defendant was convicted, and the evidence at

17  trial showed that he was radicalized by watching ISIS videos,

18  including one called "Flames of War II" that specifically

19  instructed supporters to commit attacks at home if they were

20  unable to go overseas and join the physical caliphate.

21          Similar evidence was offered at our trial where ISIS,

22  its official media components, said to people out in the world,

23  "If you can't come here, commit attacks at home.  If you can't

24  commit attacks at home, join the media war."

25          And that's what the defendant did.  And so I think

1    the facts are parallel; and here, just like in *Ullah*, there is

2    no need for us to show that he connected with an individual

3    person who was in the caliphate.

4        What he did take were substantial steps to make those

5    connections.  He was acting at the explicit direction of the

6    FTO, and he took -- he took significant steps, substantial

7    steps in order to connect and coordinate with ISIS to

8    participate in its mission.

9        And so, Your Honor, unless you have any further

10   questions, I will also rest on the government's papers, but I'm

11   happy to answer any questions if you have them.

12       THE COURT:  No, that's fine.

13       Mr. Herman, do you want to -- or Mr. Greenberg?

14       MR. GREENBERG:  Yes, Judge.

15       THE COURT:  I can't keep you down, can I?

16       MR. GREENBERG:  Judge, you know, I listened to what

17   the government says in this case, and I have to tell you that

18   as I listened to the case when we were trying it, I think my

19   view of the case changed a little bit.  And as I'm listening to

20   them here, I'm more and more convinced that this is so

21   dangerous, because they talk about Tommy interacting with

22   like-minded supporters.  But it's lawful to support these

23   organizations.  So if you're interacting with like-minded

24   supporters, you're interacting with people where it's lawful.

25       They say that there was -- that they weren't

1    prosecuting independent advocacy, but they charge it as an

2    attempt.  And when they charge it as an attempt, they were

3    saying, "Look, when you try to advocate on behalf of this

4    organization by doing your computer things that you did, you

5    wanted to provide services at their direction or control."

6              They talk about intent.  He has to have intent to

7    want to be doing this with ISIS, and that's what's missing.

8    And the example that kept going through my mind when we were

9    trying the case and still goes through my mind -- and Josh

10   scoffs at me every time I bring it up -- is take the Bears.

11   Terrible football organization, right?  Terribly run franchise,

12   but I support the Bears.  I wear my Walter Payton jersey to go

13   out.  It says I'm a Bears fans and all of that.  I am

14   supporting the Bears.  The Bears say, "Show your Bears pride.

15   Wear our jerseys.  Cheer, you know, for our team."  Right?

16             When I do that stuff, I'm not doing it in

17   coordination with the Bears.  I am doing it because I support

18   the franchise.  It's my team.  Okay?

19             ISIS could have been his team, but that doesn't mean

20   that he's committing a crime.  And that's really what this

21   case -- when you break it down -- we could talk about jury

22   instructions and -- you know, I'm a firm believer that jurors

23   don't understand 90 percent of the instructions we give them.

24   I don't understand 80 percent, and I went to law school, and

25   I've been trying cases for 35 years.

1          But he is free under the law, under the First

2    Amendment, under due process, under all of that, he is free to

3    support this organization and to do things.  He is free to

4    watch their videos.  He is free to share their videos.  He is

5    free to create a YouTube channel with their videos.  All of

6    that is permissible conduct under the law.

7          So they charge it as an attempt, and they say that

8    the substantial step that he took was trying to advocate.  But

9    he's independently advocating.

10         Anyone who is independently advocating is

11   essentially -- they're supporting the organization.  What is

12   the essence of advocacy?  It is to support whoever you're

13   advocating for if you do that.

14         So, again, it keeps coming to me.  And in listening

15   to all of these arguments today and again in rereading

16   everything today, they need to -- they can't just show that he

17   hung out with like-minded people, that he talked to like-minded

18   people, that he shared ideas with like-minded people.

19         They need to show that there was this connection to

20   the underlying illegal organization, because otherwise anybody

21   and everybody who performs independent advocacy is committing a

22   crime.  And that is 1000 percent what the law does not allow.

23         And if you sort of turn it the other way, Judge, and

24   you say to yourself, "What could somebody do to independently

25   advocate for ISIS that is less than what he did and not run

1     afoul of the law?"

2          If you share one video, if you share -- you know,

3     Aaron Zelin, you yourself said it at trial; this is not

4     different than what Zelin was doing.  Zelin maintains a web

5     page.  There was on the -- on the news last night, there was

6     someone out -- and he did an interview; it was on ABC, the

7     Nightly News of -- he had somehow gotten into Afghanistan,

8     talking to the Taliban.  The Taliban was talking about their

9     views of things.

10          Why is that not a violation of the law?  Just because

11     he said he was a journalist?  Maybe he thought he was a

12     journalist.  And I'm pointing to Tommy, for the record.

13          So where do you draw the line?  There is nothing

14     anybody can do to independently advocate if what he did in this

15     case is illegal.

16          Anything else, Judge?

17          THE COURT:  No.

18          MR. GREENBERG:  Thank you.

19          THE COURT:  I get the point.

20          Do you want to say something?

21          MS. WELLS:  If you don't mind, Your Honor.  I'll

22     respond to the analogies just very --

23          THE COURT:  I'm going to give them the last word.

24          MS. WELLS:  No, no, I understand.

25          The Bears analogy is one that I think was touched on

1   during closing and rebuttal arguments at trial, which is the

2   government agrees if you're a Bears fan and you put a sign out

3   in your front yard that says, "I love the Bears.  Go Bears,"

4   that's fine.  You're an independent advocate.

5          If the Bears say, "Hey, we've got a game on Sunday.

6   Wear your orange Bears T-shirts today," and you show up in your

7   orange Bears T-shirt, and they go on the loud speaker, and they

8   say, "Make some noise," and you make some noise, and they lead

9   cheers, and they say, "All of the fans who love the Bears, do

10  this," and you do this, we're in a different territory in terms

11  of whether you're acting independently versus following the

12  direction of the organization.

13         Likewise, let's say you don't maybe know the head

14  coach of the Bears, not many people do.  I don't.  You don't

15  know the owners of the Bears.  Not many people know them.  I

16  don't.

17         But if you reach out to someone who you think is

18  affiliated with them and say, "Hey, I've got some really good

19  ideas that would make the team better.  I'd like to share them

20  with people, and I think that the Bears could use them, and it

21  would make their situation better.  They might not be the

22  terrible sports franchise that Mr. Greenberg has accused them

23  of being," that is different.  That is attempting to coordinate

24  with the organization.

25         And so I think when we talk about whether this is

1  independent advocacy or not, it is not the government's

2  position -- and, of course, it should not be and cannot be --

3  that there is no such thing as independent advocacy.  But the

4  facts of this case don't support that.

5        THE COURT:  Thank you.

6        Anything else, gentlemen?

7        MR. HERMAN:  No, Judge.

8        THE COURT:  Okay.  I'm prepared to rule.

9        You have basically been arguing the Rule 29 motion.

10  You also have the Rule 33 motion.  Should we -- do you want to

11  add anything about the Rule 33?  I know you briefed it to

12  death, but I'm happy to hear anything you might want to say

13  about that, or we can take them one at a time.

14        (Counsel conferring.)

15        MR. HERMAN:  Judge, we'll rely on our pleadings.

16        THE COURT:  Okay.  I'm sure Mr. Jonas is upset, but

17  he's not here to defend himself for that.

18        All right.  I think I am ready to rule.  I want to

19  try to hit all the points, not the ones that -- just the ones

20  you made today orally but the ones in the brief -- in the

21  briefs, too.  And you know the briefs are extremely extensive,

22  and I hope I hit every point.  I may miss a few, but I do want

23  to go through the conclusions that I've reached on the matters

24  that you've raised in the briefs as well as today.

25        So, first of all, the theme of the defense here is

that the defendant never intended to work with ISIS under its direction or coordination and was working independently and parallel with ISIS but never actually contacted anybody, had any contact with somebody in ISIS itself.

I understand that. I think it's an important point. I think this whole First Amendment defense is an important point for courts to consider, and I'm sure I'm not going to be the last judge to consider that point in this case.

But I think that the evidence clearly supported the jury's verdict that the defendant acted in response to ISIS's call to do media jihad. That was a very clear request from ISIS in the Inside 8 communication. And, in fact, the communications that were introduced as evidence in this case show that that's exactly what he was doing. He was answering that call. And in doing so, he was acting at ISIS's direction.

I don't want to get into the sports analogy, because I think we can -- there's a lot of wiggle room there, but in this case, there was a definite request by ISIS to commit media jihad -- and I'm using that expression because that's what was used in the case -- or at least in coordination with ISIS's call for media jihad.

The evidence I believe clearly supported the conclusion that the jury obviously reached here that there was nothing independent about that. This wasn't like going on a blog or Facebook or something like that and saying, "I love

1    ISIS" or "I love the Bears" or whatever it happens to be.  He

2    wasn't wearing an ISIS T-shirt.  That's not what he's been

3    accused of here or convicted of here.  There was just nothing

4    independent about what he was doing, in my view.

5         And certainly remember, this is a jury case.  The

6    jury had a lot of evidence to consider, a lot of excellent

7    advocacy on both sides, and they reached that conclusion that

8    it was not independent.

9         There is no requirement -- and I think everybody

10   agrees -- that he has to have actual direct contact with ISIS

11   in order to be convicted of attempting to provide a service.

12   The only evidence that was necessary is that he intended to and

13   attempted to provide the service to ISIS and to contact the

14   actual people in ISIS.

15        He believed that OC 2, for instance, was actually

16   part of ISIS and sent him Heralds in an attempt to support

17   ISIS.  That was the evidence in the case, and the jury could

18   certainly conclude that that was an attempt to provide a

19   service to ISIS.

20        I want to touch for a moment on the points that

21   you've made about Mr. Zelin.  I understand the argument quite

22   clearly.  Even if we were to conclude that Mr. Zelin was

23   supporting ISIS in some way, that doesn't mean that this

24   defendant also wasn't supporting ISIS.  But that's not what

25   happened here.

1    Mr. Zelin never attempted or intended to deal

2    directly with ISIS.  His database might, indeed, provide some

3    sort of service to ISIS, because it provides information that

4    could be accessed by anybody using the .edu URL, but so would

5    actual independent advocacy.

6    If this defendant or anybody else had strictly

7    independent advocacy on behalf of ISIS that was not criminal,

8    that was not an attempt to provide a service, just expressing a

9    point of view, that would provide a service to them.  But the

10   intent to do so by attempting to actually communicate with ISIS

11   is lacking when you compare that to Mr. Zelin.

12   I believe also the evidence supported the finding

13   that the defendant took substantial steps to provide services,

14   including the Heralds and the computer script.  Those were

15   services that he wanted to provide to ISIS and took a number of

16   steps that were introduced at trial.

17   So I just don't agree with the defense argument that

18   the evidence was insufficient to support the jury's finding on

19   those issues.

20   As far as the vagueness argument is concerned, I know

21   you didn't touch on that today, but we dealt with that

22   pretrial.  That's not the last word.  You always have to wait

23   until the trial for a final ruling on that.  But I see no

24   reason to change my view about the vagueness issue here.  I

25   think the statute clearly prescribes providing or attempting to

1    provide a service to a foreign terrorist organization, and the
2    evidence here supported that verdict.

3            For those reasons, I'm denying the Rule 29 motion for
4    acquittal.

5            With respect to the Rule 33 motion, the --
6    Mr. Jonas's closing argument, the part that the defendants are
7    claiming was improper was basically responding to the
8    defendant's closing argument.  And as the government has
9    pointed out in its briefs in this case, Mr. Jonas did not say
10   that the only way to acquit would be to accept the defendant's
11   theory here.  They -- again, he was responding to the closing
12   argument, and he said it's like -- to make an analogy, if
13   somebody had an alibi defense, among others, and, you know, "I
14   wasn't in" -- "I wasn't at the bank; I was at my mother's
15   house," and the prosecutor could say, "If you believe that, you
16   have to acquit him.  If you believe that the bank teller who
17   identified him was lying, you should acquit him."

18           That's not saying that's the only way you can acquit
19   him.  That's just responding to the defense argument.

20           And that's what Mr. Jonas did here.  I think his
21   closing argument was very carefully crafted not to step over
22   that line and somehow shift the burden of proof to the defense.
23   That's not what he said.

24           And the same thing is true about his free speech
25   argument.  Again, he was responding to the main theme of the

1   defense here, that this was a -- this was an issue of free

2   speech.  Free speech is -- the First Amendment is carved out of

3   the statute.  And so it was a major issue in this case, and it

4   was well presented by the defense, and the jury was properly

5   instructed about the First Amendment issue.  In fact, we quoted

6   the First Amendment to them.  And it was certainly argued very

7   competently by defense counsel, and Mr. Jonas in his rebuttal

8   had every reason to respond to that the way he did.

9           The jury was properly instructed.  I know maybe you

10  think that juries don't understand instructions.  I like to

11  think otherwise.  Certainly the courts and the jurisprudence of

12  our country assumes that the jury does follow the instructions.

13  And I think the instructions here were very clear.  They

14  presented both sides of this issue very clearly.  They provided

15  the elements of the offense, and they provided instructions on

16  the defense of the case, the First Amendment defense, very

17  clearly, spent a lot of time on that.

18          And given the evidence that was presented, the jury

19  had every reason or certainly the evidence was enough to

20  support the jury's finding that that defense was not

21  established.

22          Finally, the defendants also made a point about the

23  videos that were admitted.  I just want to say that we took

24  great care to make sure that those videos did not unnecessarily

25  include inflammatory portions of them.  They were redacted to

1    make sure that that didn't happen.  I understand that that

2    could have happened if we had allowed some of that in there.

3    We didn't.  And the fact that the videos were made were very

4    important to the prosecution of the case.

5           So just showing the portions that we did show I think

6    was a reasonable decision on the Court's part.  Certainly it's

7    a discretionary decision about the type of evidence that could

8    be allowed.  We could have allowed much more in there that

9    might have been even more damaging, but we didn't.  We redacted

10   it to exclude that portion of the videos.

11          So I think that that was properly handled at trial,

12   so I'm also denying the Rule 33 motion for those reasons.

13          So I think that it's come time to set a sentencing

14   date in this case.  It's been a long time.  I know

15   Mr. Osadzinski has been serving a lot of time in pretrial.

16   It's not a nice way to serve time, I understand, but a lot of

17   that was to allow the parties to brief the case to the extent

18   that they did, and that's just the way it is.

19          All right.  Today -- let me see.  I would like to set

20   the sentencing in this case before Thanksgiving.  We have -- I

21   have the 17th of November open or the 16th even.

22          MS. WELLS:  Either of those are fine for the

23   government, Your Honor.

24          THE COURT:  Do you want to check your calendars --

25          MR. HERMAN:  It's fine for me, but Mr. --

1          THE COURT:  Mr. Greenberg is more in demand.

2          MR. GREENBERG:  Judge, I have a matter set before

3    Judge Kness that is supposed to start November 1st and would

4    run through then.  And if it didn't go, I was hoping to,

5    perhaps, go out of town.

6          THE COURT:  Okay.  For how long?

7          MR. GREENBERG:  Well, it might -- is it possible we

8    could put it on the 17th, and I could see if that's going to go

9    or not?  We're set --

10         THE COURT:  I could make it the last week -- you

11   know, the week after Thanksgiving if that's better for

12   everybody.

13         MR. GREENBERG:  That would be -- you know what,

14   Judge, I just don't know at this point, because I don't know if

15   I'm going to be gone and when I'm going to be gone if that

16   trial doesn't go.

17         So the 17th is fine.  I just want to flag that I may

18   make a request to move it.

19         THE COURT:  Can you let us know as soon as possible?

20         MR. GREENBERG:  We're supposed to know on the 30th.

21         THE COURT:  Of this month?

22         MR. GREENBERG:  Of this month.  Yeah, he's supposed

23   to let us -- we're supposed to come in and see him on the 30th.

24   I have the whole month blocked out for it.

25         THE COURT:  Okay.  I do have the 28th and the 30th

1  open as well.  The Thanksgiving week is always a tough week to
2  do anything but --
3          MR. GREENBERG:  Yeah.  Judge, and just in -- if we go
4  away -- I don't know if my wife is going to want to go away.
5  My preference would be to go away over Thanksgiving.  My kids
6  all live on the West Coast, so I won't see them anyway, but I
7  have to just get her permission.
8          THE COURT:  I know that feeling.  Okay.
9          The 30th is open, and the 1st of December is open
10 right now.  So let us know as soon as you do, please.
11         And sentencing memos should be filed at least two
12 weeks before whatever sentencing date we ultimately set, but
13 right now I'm setting it for the 17th.
14         And we'll say -- Claire, can you hear me okay?
15         THE CLERK:  Yes.  Yes, Your Honor.
16         THE COURT:  Do we have anything else set that
17 morning?
18         THE CLERK:  We do not, Your Honor.
19         THE COURT:  Okay.  So why don't we say 10:00.
20         All right.  So you'll let us know right away,
21 Mr. Greenberg, as soon as you talk to Judge Kness about that?
22         MR. GREENBERG:  Absolutely, Judge.
23         THE COURT:  Thank you.  All right.  I think that
24 concludes everything today.
25         Thank you again.  I think excellent advocacy on both

1  sides here, and I'll see you in November.  Court will be
2  adjourned.
3          (Proceedings concluded.)
4
5
6
7
8
9
10
11
12
13                C E R T I F I C A T E
14
15
16          I, Nancy L. Bistany, certify that the foregoing is a
17  complete, true, and accurate transcript from the record of
18  proceedings on August 16, 2022, before the HON. ROBERT W.
19  GETTLEMAN in the above-entitled matter.
20
21
22  */s/ Nancy L. Bistany, CSR, RPR, FCRR*        September 22, 2022
23          Official Court Reporter              Date
            United States District Court
24          Northern District of Illinois
            Eastern Division
25