FIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 CR 869 |
| | ) | Judge Robert W. Gettleman |
| THOMAS OSADZINSKI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OBJECTIONS TO THE
PRESENTENCE INVESTIGATION REPORT**

Defendant, **THOMAS OSADZINSKI**, by and through his attorneys, **STEVEN A. GREENBERG** and **JOSHUA G. HERMAN,** and pursuant to Rule 32(f) of the Federal Rules of Criminal Procedure , respectfully submits his Objections to the Presentence Investigation Report ("PSR").

The PSR begins with a lengthy description of the offense conduct under subheading "government's version of the facts." (PSR, pp. 4-7, ¶¶6-16). While defense counsel disagree with the government's characterization of certain facts and the conclusions drawn therefrom, to the extent deemed necessary, those issues are better addressed in context of the "nature and circumstances" of the offense set forth in the contemporaneously filed Sentencing Memorandum. Given that the section is the government's "version," counsel understands that any objections and clarifications to that section, no matter how well founded, will not result in any material changes to the PSR.

The defense objection that must be addressed here in detail is the application of the adjustment known as the "terrorism enhancement," imposed pursuant to U.S.S.G. §3A1.4. (PSR,

1

pp. 9-10, ¶¶32-35). Probation agrees with the government and applies the enhancement, which has a dramatic impact on the already overstated guidelines.

The language of the enhancement provides as follows:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. §3A1.4. The enhancement results in a dramatic increase in the advisory guideline range by adding 12 points to the base offense level and elevating one's criminal history category to VI. As one district judge aptly described, the "draconian" enhancement takes a "wrecking ball" to the guideline range. *See United States v. Jumaev*, 2018 U.S. Dist. LEXIS 119916, *13, 2018 WL 3490886 (D. Colo., July 18, 2018).

Without the severe enhancement, the base offense level is 26 for a violation of 18 U.S.C. §2339B(a)(1), the underlying crime. *See* U.S.S.G. §2M5.3(a); PSR, p. 9, ¶30. When combined with a criminal history category I, the advisory guideline range is 63-78 months. But with the terrorism enhancement, the guideline range becomes *360 months to life*, as the base offense level is 38 and criminal history category is VI. Due to the statutory cap, the guideline range here is 240 months—which is still more than 300% of the mid-point of the otherwise applicable guideline range.[1] Thus, if the terrorism enhancement applies, then it "anchors" the guideline range north of the statutory maximum, regardless of the unique aspects of the case and even though the case does

---

[1] *See* USSG §51.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.").

2

not involve any violence.[2] Yet, the terrorism enhancement is not a foregone conclusion for every terrorism case.

The enhancement only applies when the offense involved or was intended to promote a "federal crime of terrorism." Application Note 1 to U.S.S.G. §3A1.4 specifies that the term "federal crime of terrorism" has the meaning given by 18 U.S.C. § 2332b(g)(5), which has a two-part definition. "[B]oth parts of § 2332b(g)(5) must be satisfied for the enhancement to apply." *Alhaggagi*, 978 F.3d at 699; *United States v. Parr*, 545 F.3d 491, 504 (7th Cir. 2008) ("The definition is stated in the conjunctive, so both requirements must be met.").

First, 18 U.S.C. §2332b(g)(5)(A) provides that the offense must be one that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." "Calculation" focuses on the object of the defendant's offense, and requires "asking whether it was calculated, *i.e.*, planned—for whatever reason or motive—to achieve the stated object." *United States v. Amer Sinan Alhaggagi*, 978 F.3d 693, 700 (9th Cir. 2020) (quoting *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010)). Second, the offense must be one of the many enumerated offenses in 18 U.S.C. §2332b(g)(5)(B)(i)-(iv). The offense at issue here, attempted material support under 18 U.S.C. §2339B, is listed in 18 U.S.C. §2332b(g)(5)(B)(i). Thus, the focus is on the first factor, *i.e.*, whether the offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Importantly, this factor imposes a "specific intent" mental state. *United States v. Stafford*, 782 F.3d 786, 792 (6th Cir. 2015) (quotation and citation omitted) ("Application of the enhancement requires proof of the defendant's specific intent, *i.e.*, proof that he acted with the

---

[2] Of note is that Congress has not created a class of offenses that have statutory maximums consistent with the guidelines.

3

purpose of influencing or affecting government conduct and planned his or her actions with this objective in mind.")

Probation concurs with the government's position that the adjustment applies to the facts of this case. (PSR, pp. 9-10, ¶¶34-35). Probation's rationale appears to be based on several government assertions in its "version" of the offense. Specifically, Probation arrives at that conclusion by reasoning that Tommy created/modified the computer script "for the purpose of copying, preserving, and saving ISIS official media and other pro-ISIS information" and that he "did so in response to a report that Telegram was banning and deleting Telegram channels used by ISIS." (PSR, p. 10, ¶34). Probation states that this ISIS and pro-ISIS media content "is often used to recruit fighters, solicit donations and other financial support, call for attacks in the West and against other governments and civilian populations deemed to be ISIS's enemies, intimidate governments, private entities and civilians that do not share ISIS's violent jihadist philosophy and claim responsibility for terrorist attacks." (*Id.*).

Probation also portrays the script as having the ability "to easily and rapidly reproduce ISIS materials that a social media platform deletes, thus allowing others around the world access to view the information without interruption." (*Id.*). Probation further notes that Tommy knew "exactly how the computer script would be used" "to automatically reproduce ISIS materials and pro-ISIS information." (*Id.*). It also observes that there was no evidence that the "script was used for replication of non-criminal or non-terroristic content." (*Id.*). This reasoning, which mirrors the government's "version," is used to justify the terrorism enhancement. However, and with due respect to the experienced Probation Officer, this reasoning does not justify the terrorism enhancement, contains several inaccuracies, and overlooks important facts that preclude the enhancement's application.

4

Most significantly, Probation fails to find, much less discuss, that Tommy had the "specific intent" necessary for the enhancement. As noted above, Tommy must have possessed the specific intent that his actions were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" to justify the enhancement, as numerous courts have required. *Alhaggagi*, 978 F.3d at 701 (quoting 18 U.S.C. §2332b(g)(5)(A)). *See also id*. at 699-700 ("The parties agree, consistent with the district court's decision and those of our sister circuits that have addressed the issue, that § 2332b(g)(5)(A) imposes a specific intent requirement."); *see also United States v. Ansberry*, 976 F.3d 1108, 1128 (10th Cir. 2020); *United States v. Hassan*, 742 F.3d 104, 148 (4th Cir. 2014); *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009); *United States v. Ramirez*, 16 F.4th 844, 854 (11th Cir. 2021) ("For U.S.S.G. § 3A1.4 to apply, the government must satisfy the 'calculated' prong of § 2332b(g)(5)(A). To do that, the government must show that the defendant's offense was planned to influence, affect, or retaliate against government conduct, even if that was not the defendant's personal motive.").

Simply knowing that one is providing or attempting to provide material support to a foreign terrorist organization is insufficient to justify the enhancement. On this important point, the *Alhaggagi* case is both illustrative and analogous. In *Alhaggagi*, 978 F.3d 693, the Ninth Circuit Court of Appeals rejected the application of the terrorism enhancement in a material support case. There, the defendant was convicted of attempting to provide material support by opening social media accounts for others whom he knew sympathized with ISIS. Some of the accounts that the defendant opened "were later used to report ISIS attacks in Mosul, Iraq, destroyed tanks, planes, and Humvees, and the deaths of Peshmerga and Iraqi soldiers. The posts were attributed to Amaq, which is known to be ISIS's propaganda organization." *Id*. at 697. While such conduct was

5

sufficient to convict for the underlying attempted material support offense, it was insufficient to show the defendant's "specific intent" to justify the terrorism enhancement. In particular, the evidence failed to show that the defendant, as distinguished from ISIS, specifically intended to retaliate against a government. *Alhaggagi*, 978 F.3d at 704. ("Generally assisting a terrorist organization with social media does not necessarily demonstrate an intention that the accounts are to be used to retaliate against a government, and there is no evidence that Alhaggagi sought revenge on any particular government or for any specific government conduct.").

Similar to *Alhaggagi*, the PSR makes no finding of Tommy's specific intent to retaliate against a government. Instead, it repeats the government's position that Tommy shared the script with OCE4 and the CHS "in order to encourage other ISIS members to employ the script." (PSR, p. 6, ¶12). But in addition to not addressing Tommy's specific intent to retaliate against a government by sharing the script, Probation's factual assertion is not accurate and is undercut by the evidence.

Neither OCE4 nor CHS were ISIS members, and Tommy did not think he was communicating with ISIS members when he shared the script with them. Nor did Tommy intend that the script would be given by them to ISIS members. Contrary to the government's contention that Probation adopts, the evidence showed that Tommy avoided sharing the script with ISIS members. For example, when the CHS repeatedly encouraged Tommy to provide screenshots of the script so that the CHS could translate them for ISIS members, Tommy never followed through. The CHS admitted that even though he asked for Defendant to send screenshots of the script that could be provided to ISIS on October 10, 2019, "nothing" happened between then and November 18, 2019, when Defendant was arrested. (Vol. 5, p. 1130:3-24); (Vol. 6, p. 1215:25; p. 1216:1-2). Tommy's failure to provide the simple screenshots of the script to the CHS shows that he avoided,

rather than encouraged ISIS members to "employ the script." Thus, Probation's reasoning is based on a flawed factual premise and, moreover, does not address the critical "specific intent" issue and fails to justify the application of the terrorism enhancement.

Instead of discussing how Tommy had the "specific intent" to commit an offense "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," Probation effectively restates the "knowing" mental state that is required to commit the material support offense. By doing so, Probation conflates the mental state required to justify the enhancement with the mental statute necessary for the commission of the underlying offense. This faulty reasoning resembles the problem the Ninth Circuit identified in *Alhaggagi*—failing to distinguish between "certain dangerous terrorists more severely than persons who committed non-violent crimes" and universally applying the enhancement for every material support offense. *Alhaggagi*, 978 F.3d at 699. *See also Ramirez*, 16 F.4th at 854 ("To assume an offense listed in § 2332b(g)(5)(B) is per se a 'federal crime of terrorism' without a separate finding as to 'calculated' would render the 'calculated' requirement in § 2332b(g)(5)(A) superfluous.").

Rather than base the terrorism enhancement on a finding of Tommy's "specific intent," Probation relies on how unrelated third parties could potentially be impacted by ISIS and pro-ISIS media content, and also what ISIS itself might find advantageous. (PSR, p. 10, ¶34). But for the purposes of this enhancement, it is improper to consider how others may react to the media content as a stand-in for Tommy's mental state. This is precisely the problem flagged by the Ninth Circuit in *Alhaggagi* when it rejected the government's argument that the terrorism enhancement could be based on what ISIS hoped to achieve, and not the defendant's specific intent:

> Alhaggagi contends the district court erred in applying the terrorism enhancement because it centered its analysis on ISIS, not on Alhaggagi's conduct or mental state.

> The enhancement, Alhaggagi argues, specifically requires the district court to consider the latter, whereas the offense itself implicates the former. Alhaggagi concludes that because the district court failed to determine whether he knew how the accounts he opened were to be used, it could not find that he specifically intended that the accounts be used to coerce or intimidate a government. We agree.

*Alhaggagi*, 978 F.3d at 701. Probation simply cannot rely on how ISIS hoped the videos would be received by others to prove Tommy's specific intent. Instead, the enhancement must be based on Tommy's specific intent that the script would be used so others would commit acts of violence against a government or civilians. Probation makes no such finding, nor could it.

In addition to the overarching problem regarding the absence of any finding regarding Tommy's specific intent, Probation's reasoning suffers from additional factual flaws that further illustrate why the enhancement is improper. Those errors concern the script's purpose and functionality. At the very outset of its analysis, Probation asserts that Tommy was motivated to modify the script because of a report that Telegram banned and deleted channels used by ISIS. (PSR, p. 10, ¶34). As an initial point, this argument concedes that, if anything, Tommy was motivated to retaliate against Telegram's conduct in banning and deleting channels. Even if this were true, this resembles retaliation against a private social media company, not a government which is required to justify the enhancement.

Moreover, Probation and the government ignore the important distinction that the script was used to copy and forward videos from one *private* channel to another *private* channel. Importantly, Telegram did not delete messages from private channels. The FBI acknowledged as much in the Criminal Complaint:

> Individuals who post pro-ISIS media content frequently have their social media accounts suspended or deleted for violating terms of service. According to public announcements made by [Telegram], as well as its terms of service, [Telegram] prohibits, *inter alia*, the use of its service to send and spam and promote violence. I understand that [Telegram] may remove publicly available content that promotes violence, *but it does not remove private content*.

8

Criminal Complaint, ¶14 (emphasis added). Private channels were not available to the public at large. Unlike a public channel, an individual could only access a private channel by receiving an invitation link. *See* Criminal Complaint, ¶13(c) ("Social Media Platform 1 [Telegram] allows collections of users to communicate with each other in chat rooms called groups. Groups may be invitation only. Groups may be public or may be invitation only."). One could not simply log onto Telegram, search for the videos that were forwarded by the script, and then download the videos or share them with others.

Thus, Probation's assertion that Tommy allowed "others around the world access to view the information without interruption" (PSR, p. 9, ¶35) vastly overstates the evidence and concerning the limits on the script's functionality and underscores why the terrorism enhancement is inapplicable. In short, creating a computer script to copy and forward videos from one private Telegram channel to another private channel can hardly be said to be aimed at "influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Ansberry*, 976 F.3d at 1112 (finding terrorism enhancement was improper and holding that "for a § 3A1.4 terrorism enhancement based on the defendant's retaliation against government conduct to apply, the conduct retaliated against must objectively be government conduct.").

Rather than being designed to retaliate against a government, the evidence at trial showed that Tommy's collection and organization of the videos was an independent project, fueled by his own obsessive-compulsive behavior and personal predilections rather than the terrorist organization's edict. There was absolutely no evidence that ISIS somehow needed to have videos organized by "provinces." Tommy did this entirely on his own. Similarly, there was no evidence

that ISIS sought to have videos organized by resolution size. Again, Tommy did entirely on his own and for his own purposes.[3]

Along these lines, Probation notes that there was no evidence that the script was used for any non-terrorist purpose. This does not prove Tommy's specific intent. Further, the evidence showed that Tommy also used the script to organize videos taken from Aaron Zelin's website. OCE4 recognized as much when he made the following comment to OCE2 in a private chat: "Not in a way that might be 'exculpatory' but his list was from scraping Zelin's site." (1A55_001-000039). OCE2 then responded, "Oh no doubt. Just saying [Tommy] was a fanboi." (*Id*.). Separate and apart from the critical "specific intent" that is lacking, these factual points further show why the terrorism enhancement should not be imposed.

## POSITION ON THE ADVISORY SENTENCING GUIDELINE RANGE

When the guidelines are calculated without the terrorism enhancement, the base offense level is 26 and the criminal history category is I. The advisory sentencing guideline range is 63-78 months. As set forth in the contemporaneously filed Sentencing Memorandum, a sentence of 60 months is submitted to be sufficient but not greater than necessary pursuant to the §3553(a) factors.

---

[3] The evidence also shows that Tommy began collecting the videos because he could not find them online—not in retaliation against any government and not even in retaliation against a private social media company. Indeed, when OCE2 asked Defendant to explain how he came up with the idea for Heralds, Defendant said, "Before I was Muslim I wanted to find dawla videos but never could," and that it is "very good for dawah," or spreading the word of Islam. (Vol. 2, p. 304:5-8).

Respectfully submitted,

/s/ Steven A. Greenberg
**STEVEN A. GREENBERG,**

/s/Joshua G. Herman
**JOSHUA G. HERMAN**
Attorneys for Defendant

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 315
Chicago, Illinois 60604
(312) 879-9500
steve@greenbergcd.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 404
Chicago, IL 60604
(312) 909-0434
jherman@joshhermanlaw.com

## <u>CERTIFICATE OF SERVICE</u>

      Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing was served on November 3, 2022, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

                /s/ Joshua G. Herman
                53 W. Jackson Blvd., Suite 404
                Chicago, IL 60614
                (312) 909-0434
                jherman@joshhermanlaw.com