# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 CR 869 |
| | ) | Judge Robert W. Gettleman |
| THOMAS OSADZINSKI, | ) | |
| | ) | |
| Defendant. | ) | |

## **DEFENDANT'S SENTENCING MEMORANDUM**

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 315
Chicago, Illinois 60604
(312) 879-9500
steve@greenbergcd.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 404
Chicago, IL 60614
(312) 909-0434
jherman@joshhermanlaw.com

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................... 1

II.    SENTENCING MEMORANDUM .......................................................................... 3

    A.    Legal Standards ............................................................................................. 3

    B.    History and Characteristics of Defendant—§3553(a)(1) ......................................... 4

        1.    Tommy's Upbringing and Ongoing Family Support ............................................... 5

        2.    Tommy's Mental Health Issues at the Time of the Offense ................................... 9

        3.    Tommy's Youth and Immaturity at the Time of the Offense .............................. 14

        4.    Tommy's Ongoing Pursuit of Education and His Future Plans........................... 17

        5.    Tommy Has Endured Harsh Conditions of Confinement
            for Three Years During the COVID-19 Pandemic ............................................... 21

    C.    A Sentence of 60 Months Followed by Strict Conditions of Supervised
        Release Would Comply with the Factors Set Forth in §3553(a)(2).................... 23

        1.    General and Specific Deterrence ....................................................................... 24

        2.    Providing Educational or Vocational Training and Medical Care and Correctional
            Treatment in the Most Effective Manner Favors a 60-Month Sentence.............. 26

        3.    A Sentence of 60 months Would Reflect the Seriousness of the Offense, Promote
            Respect for the Law, and Provide Just Punishment.............................................. 27

    D.    Nature and Circumstances of the Offense—§3553(a)(1) .................................... 30

III.   CONCLUSION ..................................................................................................... 32

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Graham v. Florida*, 560 U.S. 48 (2010) ................................................................. 15

*Miller v. Alabama*, 567 U.S. 460 (2012) ............................................................... 15

*Pepper v. United States*, 131 S. Ct. 1229 (2011) ................................................ 3, 4

*Roper v. Simmons*, 543 U.S. 551 (2005) ............................................................... 15

*United States v. Bakeas*, 987 F. Supp. 44 (D. Mass. 1997) ................................. 23

*United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) .......................................... 30

*United States v. Booker*, 543 U.S. 220 (2005) ..................................................... 27

*United States v. Carty*, 264 F.3d 191 (2d Cir. 2001) ........................................... 23

*United States v. Courtney*, 76 F. Supp. 3d 1267 (D.N.M. 2014) ......................... 24

*United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wisc. 2006) ............................ 30

*United States v. Henshaw*, No. 16-cr-30049-SMY, 2018 U.S. Dist. LEXIS 111052,

    2018 WL 3240982 (S.D. Ill. July 3, 2018) .................................................. 24, 25

*United States v. Hill*, 645 F.3d 900 (7th Cir. 2011) ............................................... 3

*United States v. Jason Ludke*, 16-CR-17 (E.D. Wi.) ............................................. 28

*United States v. Lopez*, 634 F.3d 948 (7th Cir. 2011) ............................................ 4

*United States v. Noriega*, 40 F.Supp.2d 1378 (S.D. Fla. 1999) ........................... 23

*United States v. Pacheco-Soto*, 386 F.Supp.2d 1198 (D. N.M. 2005) ................. 23

*United States v. Pressley*, 345 F.3d 1205 (11th Cir. 2003) .................................. 23

*United States v. Qualls*, 373 F. Supp. 2d 873 (E.D. Wis. 2005) .......................... 30

*United States v. Santoya*, 493 F. Supp. 2d 1075 (E.D. Wis. 2007) ....................... 4

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) .......................................... 27

**Statutes**

18 U.S.C. §3553(a) ........................................................................................ *passim*

28 U.S.C. §994(j) .............................................................................................. 15, 30

**Other Authorities**

U.S.S.G. §3A1.4 ................................................................................................. 1, 29

U.S.S.G. §5H1.1 .................................................................................................... 16

**Rules**

Fedearl Rule of Criminal Procedure 32(c) ....................................................................... 1

**Other Sources**

Catherine Insel & Stephanie Tabashneck, *White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys, and Policy Makers*, Center for Law, Brain & Behavior, Massachusetts General Hospital (2022) ............................................................. 16, 25

Elizabeth Scott, *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 642 (2016) ....................................................... 16

National Institute of Justice, *Five Things About Deterrence* ....................................................... 24

Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520, (2017) ............................................................................ 28

Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, The Sentencing Project, Nov. 2010 ..................................................... 24

Defendant, **THOMAS OSADZINSKI**, by and through his attorneys, **STEVEN A. GREENBERG** and **JOSHUA G. HERMAN,** and pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure and 18 U.S.C. §3553(a), respectfully submits his Sentencing Memorandum.

## I.     INTRODUCTION

The significant mitigation and the unique circumstances of this case compel a sentence that is not warped by the fear-driven rhetoric of terrorism and its draconian sentencing guidelines. Those guidelines, regardless of the Court's position on the "terrorism enhancement," are not even a fair starting point, much less reflective of an appropriate sentence.[1]  This is a terrorism case in name only. As shown by the evidence at trial, Tommy Osadzinski avoided contact with the designated terrorist organization, even when the undercover government operatives offered him repeated opportunities to do so through pretense and exhortation. It is also a terrorism case where Tommy engaged in no prior violent acts, as the case agent acknowledged.  (PSR, p. 8, ¶22). Instead, Tommy made excuse after excuse to eschew the opportunities provided by the operatives to participate in preparatory violent acts, and showed no initiative to engage in actual violence on his own.

Yet, at the same time, it is a case where—notwithstanding the legal defenses and arguments raised by counsel throughout these proceedings—Tommy fully recognizes what he did was wrong and that he must be held accountable. Tommy understands that, in the real world, there is no First Amendment absolutism and that even if the videos he viewed, copied, and shared were not in themselves illegal and can still be found online, that does not mean that he was right to share and preserve them.  Tommy is deeply remorseful for his conduct, the risks that his decisions created,

---

[1]  The defense has separately objected to the terrorism enhancement (U.S.S.G. §3A1.4) in a contemporaneously filed pleading.

the suffering he has caused his family and wife, and the irreparable damage that he has done to his own life by destroying his college career and branding himself as a terrorist for the rest of his life.

Tommy has arrived at this understanding over the course of his three years of detention under the most difficult conditions of confinement during the COVID-19 pandemic at the MCC. He has exhibited tremendous growth during his period of harsh isolation. He is hopeful that the Court recognizes that it is sentencing him for the words and actions of a 19 and 20-year-old, who is now just a figment of the still-young man who stands before the Court. The Tommy of today is a completely different person than the person whose conduct was on trial. This is one of the rare cases where the offense conduct can only be understood through the lens of the defendant's evolving history and characteristics. That is why it is necessary to first discuss Tommy's history and characteristics before addressing the nature and circumstances of the case, reversing the order of 18 U.S.C. §3553(a)(1). Moreover, Tommy's history and characteristics have not been presented to the Court, but the nature and circumstances of the offense have been through the trial evidence.

For example, it is not possible to measure the seriousness of Tommy's online chats without first appreciating that not only were those chats anonymous and online, where provocation is the norm and real-world accountability is the exception, but they were also the words of a teenager who was struggling with his identity. At that time Tommy was also undergoing significant mental health issues that were treated by a revolving door of medications and even an emergency hospitalization contemporaneous with the offense conduct. His mental health struggles included obsessive-compulsive behavior, anxiety, and depression that remained largely untreated during the offense conduct.

It is also not possible to sentence Tommy for his words and actions without first appreciating the significant growth that he has experienced during three years of imprisonment

2

that have been nothing short of shock-therapy. This growth has been due to his own natural maturation and the ongoing support of his family. Indeed, and fully consistent with brain science, Tommy's executive functioning and cognitive thinking skills have significantly developed as he has matured over the last three years. Since his incarceration, Tommy has read over 100 books covering a wide range of topics and different perspectives. (*See* Exhibit B). He has dedicated himself to this self-study as he continues to plan for a future that includes finishing college and reuniting with his family and wife. These loved ones have been constant pillars of support during these arduous three years and remain committed to ensuring his reentry into society. Recognizing Tommy's ongoing maturation also shows that the risk of recidivism is minimal and can be managed and monitored through the strict conditions of supervised release proposed by Probation. Together, these history and characteristics are powerful mitigating factors that put the nature and circumstances of the case into proper context.

Accordingly, for the reasons set forth below, counsel respectfully submit that a sentence of sixty (60) months, modestly below Probation's recommended sentence and just under the properly calculated guideline range without the severe "terrorism enhancement," to be followed by three years of supervised release with the strict conditions recommended by Probation, is sufficient but not greater than necessary to achieve the purposes of sentencing in this unique case.

## II.    SENTENCING MEMORANDUM

### A.    Legal Standards

The Federal Sentencing Guidelines serve as a "starting point" and "initial benchmark" for determining a just and appropriate sentence. *See Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Pepper v. United States*, 562 U.S. 476 (2011); *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall*, 552 U.S. at 49); *United States v. Hill*, 645 F.3d 900, 905 (7th Cir. 2011). Under

*Gall*, sentencing judges must "consider all of the 3553(a) factors" to arrive at a just sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

The Seventh Circuit has emphasized how "the Guidelines are, after all, guidelines [that] must be considered seriously and applied carefully…. In the end, however, the defendant's sentence is the responsibility of the district judge, after careful consideration of all the relevant factors under 18 U.S.C. § 3553(a)." *United States v. Lopez*, 634 F.3d 948, 953-954 (7th Cir. 2011) (internal citations omitted). Adequate consideration of the §3553(a) sentencing factors helps ensure that the sentencing decision is individualized, as it must be. Individualized consideration necessarily requires the Court to impose a sentence that is "sufficient but not greater than necessary"—a standard also known as the "parsimony" clause that is the "overarching provision" of § 3553(a). *Kimbrough*, 552 U.S. at 101. By its very terms, that provision instructs the Court to consider a sentence that is the least severe, *i.e.*, not greater than necessary. *See United States v. Santoya*, 493 F. Supp. 2d 1075, 1077 (E.D. Wis. 2007) ("This is the so-called 'parsimony provision,' which requires district courts to impose the minimum punishment needed to satisfy the purposes of sentencing—just punishment, deterrence, protection of the public and rehabilitation of the defendant."). The need to craft a sentence based on Tommy's individualized characteristics, not fear and rhetoric, is essential to ensure that the sentence is not greater than necessary.

### B.     History and Characteristics of Defendant—§3553(a)(1)

In determining the sentence to be imposed, the Court must consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). While the PSR provides an overview (PSR, pp. 12-19, ¶¶51-96), to ensure that the Court's sentence "fit[s] the offender and not merely the crime" (*Pepper*, 131 S.Ct. at 1240) it is necessary to expand on certain points, particularly with

the benefit of the character letters submitted in support of Tommy from those who truly know him.[2]

### 1.      Tommy's Upbringing and Ongoing Family Support

Tommy grew up in a close-knit and supportive family with his parents and older sister, a newly barred attorney. The strength of those bonds has been tested by Tommy's arrest, trial, conviction, uncertainty of sentencing, and stigma of being branded a "terrorist." Tommy's family and friends speak of the intense pain that they have experienced because of this case and his incarceration. His mother writes, "I hurt so much because of what happened to us. I live with tremendous pain and darkness. … Yes, I am alive but I feel like my life has stopped." (Ma. Osadzinski, Letters_002); (Me. Osadzinski, Lettres_009, "I will not sugarcoat our pain; it has been unbearable."). Knowing that he is the reason for such unnecessary hardship causes Tommy intense pain, remorse, and regret.

But despite these hardships and feelings of utter sadness, the family is now closer than ever. They speak as much as the conditions at jail permit. (PSR, p. 12, ¶53). To their great credit, Tommy's family has steadfastly supported him during the case.  (*Id*).  They will continue to do so for whatever remaining term of imprisonment he must serve, and they will be there for him during his post-release supervision.  His family stands by his side because they know that he not only has the capacity to change his mindset, but, as they will readily attest, he already has shown those changes and has expressed remorse for his conduct during the past three years of incarceration. They know these things to be true because they have watched Tommy grow and mature over the years into someone whom they know will make positive contributions if given the opportunity to do so.

---

[2] These letters have been filed under seal as Group Exhibit A.  Copies of the letters will be provided to the government and Probation.

Tommy is a first-generation American who was taught to value the freedoms of this country. His mother and father separately immigrated from Poland, both seeking the proverbial American Dream while escaping difficult political and financial conditions of their home country. His father immigrated with his family when he was 10 years old after his parents escaped the "communist environment" in Poland and sought political and religious freedoms in America. (R. Osadzinski, Letters_004; *see also* Ma. Osadzinski, Letters_001). His parents are both hard-working. (PSR, p. 12, ¶54). They dedicated themselves to ensure that their son and daughter could access education and opportunities that were beyond their own reach. (R. Osadzinski, Letters_004) ("We started to plan for our children's college education since they were born. It was our duty to make sure they strive to have a better life then us, and have families of their own.").

The Catholic church also played a large part in Tommy's young life. His father writes how the family went to Church every Sunday, and that Tommy was "taught to treat people with kindness and respect." (R. Osadzinski, Letters_004). Others recall how Tommy would try to live out those lessons, whether it was putting others before himself (R. Osadzinski, Letters_006); having "empathy for children with disability" (Ma. Osadzinski, Letters_001); caring for animals and others in need (Letters_016); (T. Podolski, Letters_020); (T. Lestari, Letters_012); and, at present, helping illiterate inmates in the jail. (Me. Osadzinski, Letters_009).

As discussed in more detail below, Tommy has a relentless intellectual curiosity that has led him to consume a veritable library of material while at the MCC and to learn new subjects and material. Others saw these traits in nascent form when he was a child. (M. Chwistek, Letters_021) ("I remember him being a happy, smart and creative child."). Early on he had a thirst for studying and learning new things on a wide variety of subjects. (A. Mordzinski, Letters_023, "As Tom got older and smarter he stayed passionate about studying and learning new things. He was always a

very bright kid. Back than I had several conversations with Tom and I was very impressed with his all-around knowledge."); (A. Najder, Letters_018, "He was intelligent and curious to learn new things.").

Tommy spent hours with his father learning how to work on cars, which continued into his teenage years when he had a car of his own. (A. Mordzinski, Letters_023, "I also noticed on number of occasions that Robert and Tom were very close. I remember Robert and Tom showing us a black Ford Mustang restoration project which for me was a wonderful example of their father and son bonding time. Tom could talk for hours about various little details and how much heart and time they put into that car."); (A. Najder, Letters_018, Tommy preferred "to work with his father to update their cars or doing some woodwork"); (K. Osadzinski, Letters_015). The hours spent with his father no doubt cultivated his knack for tinkering and fixing. Indeed, his uncle recalls how he built a birdhouse with his father and continued to improve it by adding a camera connected to a thermometer to monitor the birds. (T. Podolski, Letters_020). But his intellectual curiosity also led him to challenge things. His father writes, "Tommy at earlier age was a handful, could not stand still at church, always curious and questioned everything. Had opinions about different topics." (R. Osadzinski, Letters_004).

These traits contributed to Tommy's personal decision to convert to Islam as a teenager. His father recalls that Tommy learned about Islam in one of his high school classes. (R. Osadzinski, Letters_005). Tommy would continue to explore Islam on his own and eventually decided to convert in the summer of 2018 on his own. (PSR, p. 13, ¶58). His father notes that Tommy found Islam "appealing as a source for self-improvement which helped him cope with stress and anxiety, refrain from any use of alcohol or drugs and strive to be a good person." (R. Osadzinski,

Letters_005).[3]  As discussed below, it was during this precise time-period that Tommy was also suffering serious mental health problems, including an emergency hospitalization.  He saw Islam and its strict tenets as a way to organize and structure his chaotic life.

But Tommy's exploration of Islam as a teenager was almost entirely self-directed, and notwithstanding the earnestness of his desire to learn about the religion, came at a confusing point in his life when he was struggling with his identity. His unbridled, often obsessive intellectual curiosity, combined with his contrarianism and questioning of authority (part innate, part adolescent), his mental health issues, and the lack of guardrails on the Internet, created a caustic combination that no doubt derailed and misdirected what was an honest desire to learn the truths about the religion. Now, from a perspective of greater maturity and free of the mental health problems that troubled him in the past and without unfettered access to the Internet, Tommy now sees how far off-path he veered in his attempt to understand the religion.

One positive result from Tommy's conversion to Islam was his marriage to Tuti Lestari, on June 29, 2019. (PSR, p. 13, ¶55). Tragically, they were only able to spend several weeks together before Tommy was arrested in November 2019.  His wife writes, "We only spent time together for less than a month after our wedding and we planned for second visit but he couldn't make it happen which saddened me greatly and the whole family. It supposed to be our honeymoon.") (T. Lestari, Letters_013).  Prior to his arrest, Tommy was in the process of preparing immigration paperwork for Tuti to move to Chicago.  They still plan to be together.  (T. Lestari, Letters_012) ("He also dreaming about having a big family with me, having many children

---

[3] In her letter, his mother suggests that his conversion was related to his difficulty understanding Catholicism.  (Ma. Osadzinski, Letters_002).

together and raise them in a very loving and good way and give them anything the best we never had.").

The two have maintained regular contact with each other despite the multiple barriers that stand between them, including physical distance, multiple time zones, and the restrictive conditions at the MCC that limit Tommy's ability to communicate with others. Tommy's parents have accepted Tuti as part of the family and speak regularly with her. (Ma. Osadzinski, Letters_003) ("We all love Tuti very much, she is the most wonderful young woman. I speak with her every day; we help each other carry on."); (PSR, p. 13, ¶55, "the defendant's father was supportive of the defendant's marriage to Ms. Lestari after he recalled his own marriage to the defendant's mother when they were young."). But Tommy's love for his wife is tempered with the reality of his incarceration and the uncertainty of his future. As much as he wants to remain with his wife, the term of imprisonment could ultimately determine if he will, or whether he must make the difficult decision to tell her to "live her life" without him for her sake. (PSR, p. 13, ¶55).

The entire family hopes that such an unfortunate outcome can be avoided and they remain committed to providing post-release support for Tommy. On this important point, Tommy's sister emphasizes how, despite the unbearable pain that Tommy's incarceration has caused the family, the mutual support has grown stronger and bodes well for his reintegration into society: "This level of devotion is unprecedented, and it has moved me very much. Tommy has the best possible support system waiting for him to help him re-enter society." (Me. Osadzinski, Letters_009).

## 2. Tommy's Mental Health Issues at the Time of the Offense

Tommy experienced serious mental health issues shortly before and during the offense conduct. Those mental health issues required medication, treatment, and even hospitalization on one occasion. While Tommy's mental health issues are detailed in the PSR and based on records

that have been provided to Probation (*see* PSR, pp. 14-16, ¶¶61-71), several salient points are highlighted below, as these issues require significant consideration as the Court weighs Tommy's history and characteristics, and also the nature and circumstances of the offense.

Tommy sought mental health care for anxiety in August 2017, soon after he turned 18 and just as he began his freshman year at DePaul. (PSR, p. 14, ¶61). He was prescribed Paxil, which had no effect. (*Id*.). Just two months later, on October 18, 2017, Tommy saw another mental health doctor complaining of anxiety problems. (PSR, p. 14, ¶63). Significantly, he reported that he had been experiencing depression and anxiety problems in high school but had not reported them. (*Id*.). These anxiety problems manifested in physical symptoms, such as shortness of breath and increased heart rate. He also expressed being unable to "enjoy things or get food." (*Id*.). Also notable, Tommy showed signs of obsessive-compulsive disorder. (*Id*.). Tommy was diagnosed with generalized anxiety disorder, panic disorder, generalized social phobia, and major depressive disorder in full remission. (*Id*.). He was prescribed fluoxetine (Prozac), which treats obsessive compulsive disorder, major depressive disorder, and panic disorder, and propranolol, which is a beta blocker used to treat high blood pressure and increased heart rate. (*Id*.). These mental health interventions did not help.

On March 19, 2018, Tommy sought treatment for his anxiety from another provider. (PSR, p. 14, ¶64). He was prescribed another medication, paroxetine (Paxil), an anti-depressant used to treat manic depression, obsessive compulsive disorder, panic disorder, and social anxiety disorder. (*Id*.).

One month later, on April 19, 2018, Tommy was seen by another doctor after continuing to experience mental health issues including general anxiety, compulsive behavior, avoidance of situations associated with traumatic events, and difficulty concentrating. (PSR, p. 14, ¶65).

Medical records indicate that the doctor believed that Tommy's anxiety was likely "'due to a combination of biological, psychological, and social/environmental/situational factors.'" (PSR, p. 14, ¶65). He was prescribed yet another medication, alprazolam (Xanax), used to treat anxiety and depression. (PSR, p. 15, ¶65). This doctor developed a treatment plan that involved lorazepam (Ativan), used to treat anxiety, and fluoxetine (Prozac). (*Id*.).

To put things in context of the larger timeline of significant case events, it was in February 2018 that Tommy's ex-girlfriend made a tip to the FBI that he was obsessively collecting and watching ISIS videos. (PSR, p. 4, ¶6). That tip that kicked off the investigation into Tommy. It is clearly significant that at the same time the investigation began, Tommy was experiencing severe anxiety issues and demonstrating obsessive-compulsive behavior and simply not thinking clearly. The interventions around this time failed to help Tommy's mental health issues. Those issues were apparent to others at the time. On June 4, 2018, the FBI interviewed one of Tommy's high school friends. As reflected in the FD-302 report from that interview, this friend described Tommy as a "'computer guy' and 'crazy' due to mental illness." (FBI302_001-000019).[4]

Things became much worse on July 17, 2018, when Tommy was admitted to NorthShore University Health System on an emergency basis for what his family believed was an allergic reaction to Xanax and Prozac. (PSR, p. 15, ¶66). He reported having difficulty breathing and experiencing anxiety. (*Id*.). As noted in the PSR, hospital records reflect that Tommy was crying, agitated, not "making sense," speaking only in Polish, felt "acutely fearful," and told hospital staff that his elevated anxiety was due to legal issues, which specifically related to the FBI's attempt to interview him and his family members. (*Id*.). Hospital records curiously suggest that he overdosed

---

[4] This same friend told the FBI that Tommy was "not 'violent', he was struggling to find his place in the world" and that he was a "good person." (FBI302_001-000020).

on Xanax despite the fact that he only took one .5 mg tablet based on the number of pills he had remaining. (*Id*.). Tommy was discharged from the hospital after being diagnosed with acute anxiety and benzodiazepine intoxication, even though "a drug test returned negative results for benzodiazepines." (*Id*.). Based on the medical records, it appears that Tommy was not admitted on an inpatient basis because he did not present himself as a danger and denied hallucinations. (*Id*.). To again put things in the context of the timeline of the case, it was on June 6 and 29, 2018, that Tommy chatted with OCE1 in the Telegram "weapons" room, just weeks away from his hospitalization.

On July 19, 2018, two days after his emergency hospitalization, Tommy was seen at an outpatient mental health treatment center in Chicago for his anxiety issues and for nightly nightmares that he was experiencing. (PSR, p. 15, ¶67). He told the treatment providers that he believed he was being followed by the FBI. (*Id*.). Tommy was diagnosed with "adjustment disorder, anxiety, and cannabis use disorder, moderate, in sustained remission." (*Id*.). The facility recommended intensive outpatient treatment, medication management, and family therapy. (*Id*.). None of these follow-up interventions took place.

Tommy and his family believe that the battery of medications he was prescribed in a short period of time did not effectively treat his mental health issues. (PSR, p. 15, ¶68). If anything, the carousel of medications exacerbated matters. Tommy stopped taking medication entirely in July 2019. While his anxiety issues are still present, he reports being able to manage the anxiety by reading, studying, and keeping himself productive in jail, which "helps alleviate feelings of anxiety." (*Id*.). Importantly, Tommy also noted that his regular communications with his family stabilize him. (*Id*.). While Tommy's haphazard and potentially counter-productive mental health

treatment history left much to be desired, there is little doubt that he will benefit from treatment and therapy as part of his supervised release.

In addition to the mental health issues, Tommy's sister and a long-time family friend express concerns about a potential neuropsychological disorder that was missed. Tommy's sister told Probation that even though her brother did not show obvious signs of mental and emotional health problems, she now believes he displayed "'subtle' signs of autism when he was young." (PSR, p. 15, ¶69). Those signs included food intolerances, playing alone for extended periods of time, and being more emotionally sensitive than his peers. (*Id*.). Tommy's mother also wonders whether "she missed signs that he could have benefitted from special education services." (PSR, p. 17, ¶84).

Another long-time family friend who "evaluates pediatric neurodevelopmental disabilities" for a living has expressed the same concerns about an undiagnosed neuropsychological disorder.[5] (Letters_016). In their letter, they note how objective factors indicate a potential disorder and, at a minimum, call for an evaluation. Specifically, Tommy's "language milestones were not met on time; he did not speak until the age of 3 years (for context, typically developing children begin saying single words around 12 months, and phrase speech by 2 years)." (Letters_016). He also engaged in "sensory-seeking behaviors" like smelling his sister's hair. (Letters_016). Based on their own observations from growing up with Tommy, they also recall his "social difficulties, sensory sensitivities, repetitive speech, and restricted interests" that could be indicators of autism spectrum disorder. (Letters_017).

---

[5] This individual has expressed a desire to remain anonymous for professional reasons even though their letter is submitted under seal.

Importantly, the author notes that there is a "great stigma of psychological disorders in our Polish immigrant community" that may have led to Tommy never being evaluated for potential neurodevelopmental disabilities. (Letters_016). Such disabilities are "wrongfully attributed to 'neglectful parenting'" that discourages testing and prevents children from receiving interventions. (Letters_017). Based on their professional experience, they would have encouraged Tommy to get evaluated "at a center specializing in autism spectrum disorders" but that "[h]ighly intelligent adults on the spectrum can be difficult to diagnose without an extensive parental interview of childhood behavior and a performance-based assessment specifically evaluating autism symptoms (ADI-R and ADOS-2, respectively)." (Letters_017). Upon his release, Tommy's family intends to give him a full neuropsychological analysis and all meaningful supports that he may require.

### 3. <u>Tommy's Youth and Immaturity at the Time of the Offense</u>

Tommy was only 19 years old during much of the offense conduct and only 20 years old at the time of his arrest. He had just started his junior year at DePaul. His youth should not only be seen as a strong mitigating factor but should also be as evidence of his strong potential for rehabilitation. Tommy has already demonstrated that rehabilitation for the past three years, which has coincided with the maturation of his developing brain, specifically the frontal lobe that crucially facilitates our decision-making. Indeed, the Supreme Court, Congress, and the Sentencing Commission have identified youth as a mitigating factor that prohibits the most severe sentences and often justify a reduced sentence in other circumstances. Ongoing research and scholarship concerning brain development in young adults provides even more reasons to temper the punishment imposed on young offenders like Tommy. These issues are highly relevant for the Court's consideration, and together they provide strong support for a sentence well below the

guidelines, particularly given Tommy's lack of meaningful criminal history prior to his arrest and his demonstrated rehabilitation while in pretrial custody.

The Supreme Court has issued a string of cases relying on Eighth Amendment cruel and unusual punishment standards to prohibit the most severe punishments, namely the death penalty and life without parole, for juvenile offenders. *See Roper v. Simmons*, 543 U.S. 551 (2005); *Graham v. Florida*, 560 U.S. 48 (2010); and, *Miller v. Alabama*, 567 U.S. 460 (2012). These decisions rely on scientific studies that identify how juvenile offenders are categorically different and less deserving of the most severe punishments because they display "transient immaturity," are more susceptible to the influence, and due to their developing brains, have a greater potential for rehabilitation. For instance, in *Miller*, the Court held that mandatory life-without-parole sentences for juvenile offenders were unconstitutional because juveniles are "constitutionally different from adults for the purposes of sentencing" because "juveniles have diminished culpability and greater prospects for reform" and "are less deserving of the most severe punishments." *Miller*, 567 U.S. at 471. The Court recognized that psychological, neurological, and social science substantiate how a child's culpability is less than an adult's with regard to any offense. *Id.* at 474.

Echoing these judicial findings, Congress has encouraged the Sentencing Commission to ensure that guidelines recommend non-prison sentences for first-time offenders who are not convicted of crimes of violence. 28 U.S.C. § 994(j). In 2010, the Sentencing Commission amended its policy statement on age to expressly state that departures may be based on age and youth. *See*

15

U.S.S.G. §5H1.1, titled "Age (Policy Statement)." The commission has updated its view of youth as being "not ordinarily relevant" to finding that it "may be relevant."[6]

Recent scientific research has continued to provide support for treating younger offenders, including late adolescents like Tommy, with greater leniency at sentencing. In a 2022 report entitled, *White Paper on the Science of Late Adolescence, A Guide for Judges, Attorneys, and Policy Makers*, researchers observed that late adolescents like Tommy between ages 18-21 act more like adolescents (ages 14-17) than young adults (ages 22-25) "due to differences in brain maturation."[7] *See also* Elizabeth Scott, *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 642 (2016) ("Over the past decade, developmental psychologists and neuroscientists have found that biological and psychological development continues into the early twenties, well beyond the age of majority. Recently, researchers have found that eighteen-to twenty-one-year-old adults are more like younger adolescents than older adults in their impulsivity under conditions of emotional arousal.").

Compared to young adults, late adolescents are more likely to "take more risks," "engage in sensation-seeking behavior," "respond to immediate outcomes and are less likely to delay gratification," "are more responsive to peer involvement," and "are also more easily swayed by adult influence and coercion." *White Paper on the Science of Late Adolescence*, p. 2. Tommy's provocative online comments and risky communications with unknown people online were all

---

[6] The Commission explained that it "adopted this departure standard after reviewing recent federal sentencing data, trial and appellate court case law, scholarly literature, public comment and testimony, and feedback in various forms from federal judges." (Appendix C—Volume III, November 1, 2010 (amendment 739), "Reason for Amendment," p. 1193 of 2016 Edition).

[7] Catherine Insel & Stephanie Tabashneck, *White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys, and Policy Makers*, Center for Law, Brain & Behavior, Massachusetts General Hospital, p. 2 (2022) (available at: https://bit.ly/3TZHU0w) (last visited, Oct. 27, 2022) ("*White Paper on the Science of Late Adolescence*").

16

features of his adolescent behavior. Additionally, his relationship with the CHS, who was older than him, treated him to dinner, taught him religion, gave him false praise, supervised him for a "ruse" job and paid him $1,000, and offered the potential for future work, bears the markings of an adolescent susceptible to adult influence. Research also indicates that most late adolescents who engage in criminal behavior "will not continue to offend and become adult repeat offenders through their twenties, thirties, and beyond." *Id.*, p. 3. Tommy has already demonstrated rehabilitation while in prison, accompanied by his maturation and understanding of his wrongdoing.

Thus, the evolving legal standards which are backed up by science, very much support how Tommy has a significant opportunity to move beyond his conviction in this case, and the poor decision-making that led to his involvement in this offense, so that he may live a productive, law-abiding life. Put simply, the Court can and should consider these points and Tommy's youth under §3553(a). *See Gall*, 552 U.S. at 58 (holding that "it was not unreasonable for the District Judge to view Gall's immaturity at the time of the offense as a mitigating factor…. Indeed, his consideration of that factor finds support in our cases.").

#### 4. Tommy's Ongoing Pursuit of Education and His Future Plans

Tommy's inability to continue and complete college is a significant consequence of his actions. As noted above, his immigrant parents worked hard to ensure that he had a chance to go to college. Through his conduct, he has failed them and he has failed himself. When he was arrested in November 2019, Tommy had just started his junior year at college at DePaul and had completed 92 credit hours. (PSR, p. 17, ¶81). And in the Spring of 2021 when he should have been graduating, he was languishing in the MCC under strict COVID-19 protocols with limited access to his family after being expelled from DePaul based on his arrest in this case. For someone with a deep love of

17

learning who was looking forward to graduating and pursuing a successful career, his inability to continue college was a devastating loss.  (Me. Osadzinski, Letters_008, "I want to highlight Tommy's passion for knowledge and education and his exceptional work ethic. He tries to shield us from how arduous and painful it is for him to be incarcerated but he often expresses deep sadness about his loss of university education and worries that no other institution will allow him to continue to study.").

At DePaul Tommy sought course material covering a wide variety of topics.  His focus was on computer studies, which started out rather rough as noted in his college transcript, including an "F" in "Python for Programmers," a "C+" in "Data Analysis" in the Spring 2017-2018 semester, and a "C+" in "Intro to Computer Science I" in the Winter 2018-2019 semester. (Exhibit C).  He also took classes in Modern Russian Authors (Nabokov & Bulgakov), Diversity & Inclusion in Cinema & TV, a Multiculturalism Seminar, and several classes connected to Islamic studies.  (*Id*.).

Tommy has not let his expulsion from DePaul and incarceration deter his quest for learning, knowledge, and self-improvement. While he completed some programs at the MCC when they recently became available after the restrictive pandemic-related conditions abated (PSR, pp. 17-18, ¶86), he has also taken the initiative to read voraciously while at the MCC, constantly seeking to satisfy his intellectual curiosity with new subjects.  He has sought a wide variety of topics and exposure to a broad spectrum of perspectives.

In their letters, his family members write about his insatiable appetite for books. (Ma. Osadzinski, Letters_002, "All this time he is keeping himself busy reading books and working on math problems and drawing. We send him books on a regular basic [sic], he has read more books that some people in a lifetime. He keeps a list of books he read [sic] which I'm sure you will see."). Indeed, as reflected in Exhibit B, since his arrest in November 2019, he has read over 100 books.

The wide range of authors subject matter is nothing short of incredible and speaks volumes as to his mindset. For instance, he has read classics (Jane Austen, William Shakespeare, Poe, Dostoevsky, Tolstoy, Twain, Thoreau); more contemporary works (Lee, Orwell, Wells, Salinger, Bradbury, Vonnegut); science fiction and horror (Herbert, King, Sagan); works on law, advocacy, and legal criticism (Alexander, Burger, Scalia); and numerous other works. He has read *The Diary of Anne Frank* and studied Russian history. He has read *The Godfather* and *The Adventures of Alice in Wonderland*. He has read Dale Carnegie and Alex Haley.[8] As of writing, Tommy has shared with undersigned counsel that he is presently reading *Les Miserables* by Victor Hugo, *Arabian Nights*, by John Arden, and *I Wouldn't Have Missed It: Selected Poems of Ogden Nash*. His family supplies these books and can attest to his appetite for a wide variety of topics. His sister notes how he is drawn to biographies of Supreme Court Justices:

> My brother has read an innumerable amount of books over the last three years, from light-hearted comic books to great works of English and Russian literature. His favorite by far are biographies and historical non-fiction, in particular biographies of Supreme Court Justices. His favorite Supreme Court Justice is Justice Felix Frankfurter, a champion of civil rights and the marginalized, but there are many close seconds, including Justice Ruth Bader Ginsburg, owing to her background as a child of Eastern European immigrants and her prolific civil rights advocacy.

(Me. Osadzinski, Letters_009). His list of books in the to-be-read queue is nearly as long as the attached list.

The quantity of what Tommy has read over the past three years is no doubt impressive and speaks to his determination and potential. Not only has Tommy read these numerous works, he has taken copious notes and copied his favorite quotes. He has provided hundreds of pages of

---

[8] The attached list does not include the numerous Manga and graphic novels that Tommy has read, as the names of which will likely have little meaning to most, despite being considered classics of their genre. His consumption of Manga is worth noting for no other reason than to highlight the letter of his wife, who notes how Tommy said he "will keep his manga comics for [their] future children which is so sweet." (T. Lestari, Letters_014).

handwritten notes to undersigned counsel. After reading (and sometimes re-reading) these books Tommy will donate them to the MCC book cart or library for others to read, and has even started a book club. (Me. Osadzinski, Letters_009, "While incarcerated at the MCC, he has tutored other people, started an informal book club where he passes around the countless books my parents send him to others with no support system, and written letters for people who are illiterate.").

But perhaps more important than the quantity is the scope and quality of the works that Tommy has personally chosen to read. He has deliberately engaged a wide variety of topics reflecting pluralistic perspectives. That diversity of viewpoints is contrary to the singular and myopic messaging that groups like ISIS mandate. Reading *1984*, *Fahrenheit 451*, and other fictional works warn of the deadly conclusions of fascistic and nihilistic societies like ISIS set out to create. Reading *The Diary of Anne Frank* and learning about Nazi Germany show what happens when that fascism becomes reality. This is simply not the reading list of an ISIS supporter.

It is also worth noting that in addition to this extensive reading, Tommy has also studied Calculus while at the MCC. (Me. Osadzinski, Letters_009, "He enjoys mathematics greatly, self-studying calculus and discrete mathematics from a series of textbooks."). As reflected in his high school transcript, Tommy did not fare so well in Precalculus, mustering only a "D" in his senior year. He managed a "B-" when he retook Precalculus as a Freshman at DePaul in 2017. More recently, he threw himself back into the subject and has provided undersigned counsel over 220 pages of legal-size handwritten calculus problems. The point here is not to show that Tommy will be a mathematician, but to illustrate his enormous self-directed energy to learn acquire information and test himself. Given proper outlets and opportunities to channel that energy, Tommy will no doubt make positive and productive contributions. A sentence that forces him to languish unnecessarily behind bars will delay and may even stunt that ambition and drive.

20

On that theme, Tommy thinks about his future daily. After completing his college education in either English literature or computer-related courses, he would like to become a professor or teach in some capacity. (PSR, p. 17, ¶82). He has discussed these plans with his family. (R. Osadzinski, Letters_006, "Tommy has a life that still needs to be lived. Tommy has plans to finish his college education."); (Me. Osadzinski, Letters_008, "Despite these obstacles, Tommy wants to go back to school and has expressed a desire to become a teacher or a college professor. I think teaching would be an ideal profession for him, as he has endless patience for others and a natural gift for explaining information.").

But he also knows that these goals might just be aspirations. Tommy understands that the stigma of his conviction may prevent him from even enrolling in college, much less becoming a teacher. He only hopes that schools will recognize his rehabilitation and see beyond the conviction, or at a minimum see value in him being able to serve as a cautionary tale that he can use to help others. Despite the inevitable challenges that he will face when trying to re-enroll in college, Tommy is determined to do so and only hopes that the sentence imposed does not unnecessarily delay the completion of his college degree.

### 5. Tommy Has Endured Harsh Conditions of Confinement for Three Years During the COVID-19 Pandemic

Tommy has spent the entirety of the global pandemic in pretrial detention over the past three years. Isolation, service interruptions, and physical restraints were and continue to be at unprecedented highs. Most programs have been unavailable until recent, and after a long period of time without any social visits, detainees are now permitted to have in-person social visits, albeit

separated by plexiglass prohibiting all physical contact.[9]  Tommy has personally endured COVID-19 infections without ameliorative care and medication.

Tommy experienced pure hell in the early stages of the pandemic when there were no available vaccines and when the prospect of an outbreak and infection in jail carried the real prospect of serious health consequences and even death.  In those early days when the virus was both a real and existential threat, Tommy and other inmates at the MCC were locked in their cells for close to 24 hours every day.  In April 2020, inmates at the MCC were granted 15 minutes per day to shower and use the phones to contact their families. These conditions lasted for about one month, when inmates were then allowed one hour out of their cells per day.  The most restrictive conditions have since been lifted but not without leaving a lasting psychological impact on inmates like Tommy.

In painful and personal terms, Tommy's mother describes the impact of her son's incarceration as follows:

> When I visit with my son, I see grown man, now 23 years old, he describes himself as feeling as age of 50. Currently we can only see him once a month for one hour, separated by a proxy glass, no hugs. He knows that this will follow him forever. His incarceration is during Covid time. He had Covid few times. Results were confirmed by two tests, he was sick four times total and not tested. Pandemic times made the whole situation even more difficult. For a year and a half, we had no visits, daily phone call is 15 minutes but in real life when many inmates are on the floor and need to make a call, he has to cut that time short. Every day, I knew that he was sitting, locked in for 24 hours in a small cell. No walks, no exercise, no social activities and sometimes no daily shower. I fear for his physical health and mental health, as well as others there.

---

[9] The PSR notes but a single disciplinary ticket from Tommy's entire three-year stay at the MCC. (PSR, p. 4, ¶4). This disciplinary report was finalized on January 15, 2020, and related to Tommy's refusal to lock down when instructed by an officer.  Tommy has explained to counsel that the incident occurred in December 2019. At the time, Tommy had been at the MCC for about a month following his arrest.  He had never been incarcerated before and was still learning the ropes and rules. Regarding the incident itself, Tommy recalled that he was in the computer room on his floor printing case law when a guard instructed him to stay in the room due to a fight that had happened elsewhere on the floor.  During lockdowns, Tommy understood that one had to remain in his cell. After he finished printing his legal work, Tommy then went back to his cell, which led to the disciplinary report.

(Ma. Osadzinski, Letters_002). His father describes the conditions that he has witnessed his son endure as "the harshest" as he can imagine and "borderline inhumane." (R. Osadzinski, Letters_006). Due to the harsh conditions, Tommy's sister shares that three years "feels like an eternity." (Me. Osadzinski, Letters_007, "While he has been detained nearly three years there, it feels like an eternity for both him and my family.").

Tommy's time in custody has indisputably been "harder time" than that served by those detained at the MCC pre-pandemic. *See*, *e.g.*, *United States v. Pressley*, 345 F.3d 1205, 1219 (11th Cir. 2003) (conditions of confinement, including 23-hour-a-day lockdowns with no outside access permitted a downward departure); *accord United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (holding that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures."); *see United States v. Bakeas*, 987 F. Supp. 44, 50 (D. Mass. 1997) ("[A] downward departure is called for when, as here, an unusual factor makes the conditions of confinement contemplated by the guidelines either impossible to impose or inappropriate."); *United States v. Pacheco-Soto*, 386 F.Supp.2d 1198 (D. N.M. 2005) (granting departure because defendant's deportable status results in conditions of confinement that are "severe and unfair"); *United States v. Noriega*, 40 F.Supp.2d 1378 (S.D. Fla. 1999) (departing downward where there "is little question that [segregated confinement] is a more difficult type of confinement than in general population. For some, the consequences of such deprivation can be serious."). The Court should consider these experiences in fashioning its sentence.

### C. A Sentence of 60 Months Followed by Strict Conditions of Supervised Release Would Comply with the Factors Set Forth in §3553(a)(2)

In fashioning its sentence, the Court also takes into account the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for

the offense; to afford adequate deterrence (general deterrence) and protect the public from further crimes of defendant (specific deterrence); and to provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D).

### 1. General and Specific Deterrence

Starting with the issue of deterrence, general deterrence "is premised on an assumption that imposing an appropriate sentence will dissuade others from committing similar crimes," while specific deterrence focuses on "the prevention of future harm to the public by the defendant, without reference to the mechanism for achieving it." *United States v. Henshaw*, No. 16-cr-30049-SMY, 2018 U.S. Dist. LEXIS 111052, at *19-21, 2018 WL 3240982 (S.D. Ill. July 3, 2018).

Counsel recognizes the importance of general deterrence as a concept. Yet, as the Court is no doubt aware, many have observed that it is the certainty of punishment rather than the severity of punishment that has a greater deterrent impact. *See, e.g.*, Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, p. 1, The Sentencing Project, Nov. 2010; *United States v. Courtney*, 76 F. Supp. 3d 1267, 1304 n.13 (D.N.M. 2014) (citing studies). ("An avalanche of criminological studies have determined that this theoretical symmetry between severity of punishment and certainty of detection does not exist in the real world."); National Institute of Justice, *Five Things About Deterrence* ("Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment.") (available at: https://bit.ly/3Sgcstw) (last visited Oct. 18, 2022). Setting aside the debate between certainty versus severity, it is often difficult to measure how much deterrence will result from a particular sentence.

24

The value of specific deterrence is also important, but that does not mean that a prison sentence beyond the 60 months requested by the defense is necessary. Given the unique constellation of issues presented in this case—Tommy's youth at the time of the offense conduct, his mental health issues, his demonstrated rehabilitation, and his strong post-release support network—this is the type of case where additional incarceration could be detrimental. *See Henshaw*, 2018 U.S. Dist. LEXIS 111052, *21, 25, 2018 WL 3240982 (finding that in some cases, "imprisonment would actually be detrimental to the rehabilitation process … [and could] serve to derail much of the progress [a defendant] has made," and supporting a downward departure where "the general deterrent impact of a significant prison sentence is outweighed by considerations of specific deterrence, just punishment and rehabilitation").

With respect to specific deterrence, the question before the Court should be how to best protect against Tommy engaging in similar conduct. Counsel submit that those concerns are not addressed by an extended prison term, but by providing Tommy with the opportunity to complete his education, and apply his intellectual energy to productive and prosocial outlets. (Me. Osadzinski, Letters_009, "Knowing my brother to be a kind-hearted, sweet, and self-reflective person, I believe that he has the capacity to rectify his past choices and devote the rest of his life to being a better person. Indeed, he has already shown that he is not the same person he was three years ago by any means. He is also so young; he is only twenty-three years old."). Tommy has learned from the punishment that he has already experienced from three years of confinement in harsh conditions. *See also White Paper on the Science of Late Adolescence*, p. 37 ("The neuroscience and behavioral research indicate that late adolescents are particularly well suited to learning from experience given the right circumstances and contexts. Further, positive

25

reinforcement may be especially beneficial for adolescent learning, as late adolescents are more responsive to learning from reward than punishment.").

In short, specific deterrence will be best addressed by the strict conditions of supervised release that Probation recommended, including monitoring of individuals with whom Tommy interacts, so as to ensure that he maintains pro-social and positive behavior. These conditions safeguard against recidivism more than warehousing.

> **2. Providing Educational or Vocational Training and Medical Care and Correctional Treatment in the Most Effective Manner Favors a 60-Month Sentence**

A 60-month sentence will help "provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Put simply, a sentence that is anywhere close to what the government will likely seek will be counterproductive and will only succeed in warehousing Tommy.

As discussed above, what Tommy needs is a productive outlet to channel his intellectual energy. He will also benefit from mental health and neuropsychological evaluations, treatment, and a support system that will ensure that he continues to engage in pro-social behavior. He needs to return to college. His family recognizes that he will need therapy and treatment when released. (Ma. Osadzinski, Letters_003, "We can only help him and each other when he's home with us. With therapy, we can start the healing process for all of us."). Imposing an unnecessarily long sentence only delays his inevitable release and jeopardizes losing the support system that presently exists and is ready for him with open arms. Unnecessarily prolonging his incarceration will only delay that therapy, and thus not provide medical care in the most "effective" manner.

### 3. A Sentence of 60 months Would Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

Under §3553(a)(2)(A), the Court must also address whether the sentence reflects "the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." As a preliminary point, should the Court determine that the draconian, one-size-fits-all, wrecking-ball terrorism enhancement applies over the defense objection, then it should also find that the resulting guideline range vastly overstates the seriousness of the offense and exercise its broad sentencing discretion in equal measure.

The sentencing range generated by the terrorism enhancement after a trial in a material support case is invariably 360-months to life, which far exceeds the statutory maximum applicable here. This not only fails to distinguish individuals convicted of terrorism offenses from each other; it treats all defendants convicted of terrorism offenses as the worst potential offenders, deserving of punishment far exceeding the statutory maximum sentences. As such, the Court should also exercise its discretion to disregard the severe impact of the enhancement as it is inconsistent with the purposes of §3553(a) and because the guideline itself is flawed and underserving of any deference, particularly as an accurate measure of the seriousness of *this* offense and its highly individualized circumstances. *See*, *e.g.*, *United States v. Stewart*, 590 F.3d 93, 154 (2d Cir. 2009) (Calabresi, J.) (considering the terrorism enhancement and observing, "When a Guidelines recommendation has such dramatic consequences and yet covers a multitude of sins, unusually broad sentencing discretion in the district court is essential. Indeed, it must be so to comply with the Supreme Court's remedial holding in *United States v. Booker*, 543 U.S. 220, 244 (2005)."). Probation appears to concur with these sentiments with its recommended 78-month sentence, which is at the high-end of the guideline range without the terrorism enhancement.

Recently, Judge Lynn Adelman disregarded the terrorism enhancement in a material support case and imposed a sentence of 84 months, despite that the guidelines were 360 months to life, reduced to 240 months due to the statutory maximum. *United States v. Jason Ludke*, 16-CR-17 (E.D. Wi.). Relevant portions of the transcript of the *Ludke* sentencing hearing are attached as Exhibit D. Judge Adelman first analogized the terrorism enhancement to the child pornography guideline, which he noted was "contrary to the purposes of sentencing in 3553(a), including the notion that sentences should be individualized and proportionate, and that we should distinguish between the worse offenders and those who are less dangerous." (Ex. D, p. 23). Citing the *Jumaev* opinion, Judge Adelman echoed that the terrorism enhancement deserved less respect because it was imposed by Congressional directive, rather than by the Sentencing Commission in its institutional role after reviewing empirical evidence. (Ex. D, p. 24).[10]

After reviewing the remaining sentencing factors, Judge Adelman rejected the government's request for a 240-month sentence and imposed a sentence of 84 months for a defendant who attempted to join ISIS while he was on supervised release for another offense; threatened to kill a federal judge; tried to have an FBI agent killed while in custody; and was Criminal History Level VI without the terrorism enhancement. Failing to vary significantly from the guidelines would treat Tommy, who sat behind a computer screen and failed to even provide the CHS with screenshots of the script for translation, with the same severity as someone who joined ISIS with the intent to kill others. Not only would the application of the enhancement erase

---

[10] For further background on how the terrorism enhancement was created through Congressional directives rather than the Commission's empirical fact-finding, *see* Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520, 1527-28 (2017). As noted in the article, the Congress created the terrorism enhancement as part of the Violent Crime Control and Law Enforcement Act of 1994, and then expanded the scope of the enhancement through the Antiterrorism and Effective Death Penalty Act of 1996 and then the USA PATRIOT Act—which speaks volumes as to the political nature of the enhancement.

the distinction between the substantive offense and the enhancement, but such an absurd outcome offends the very principal of individualized sentencing under §3553(a). As such, even if the Court finds that U.S.S.G. §3A1.4 technically applies, it should reject the guideline on policy grounds and impose a sentence as if it did not apply.

A sentence of 60 months would reflect the seriousness of the offense because Tommy will continue to live with the social stigma of being convicted of a terrorism offense. While it is his sincere desire and intent to continue is college education, the fact that he was expelled by DePaul based on the mere arrest for terrorism charges foreshadows the challenges he will face for simply enrolling in school following his release from prison as a convicted felon. His mother realizes these challenges, and reiterates Tommy's sincere desire to start over, reflecting his increased maturity and the distance he has put between the prior version of himself and who he is today:

> We can only help him and each other when he's home with us. With therapy, we can start the healing process for all of us. Most likely he will live with us forever. It's going be difficult to get in to a good school, get a prestigious job or get a bank account. He probably will never have a mortgage or life insurance, basic necessities that we all take for granted. Plus all the other restrictions that I have no idea about. I know he will have to carry this every day with him and live with it all his live but we are ready to walk with him that hard life and help him. I hope that there also will be forgiveness and a chance to prove that he can do well when given a chance. The only thing he can do to overcome this is start over. Finish his education, dedicate himself to being a good person which he is dreaming about.

(Ma. Osadzinski, Letters_003). This case will forever be Tommy's burden to bear, as the conviction is severe punishment on its own that will forever follow him and preclude him from the full liberties of citizenship.

Regarding "just punishment," even a below-guideline sentence of imprisonment would be unduly harsh on Tommy because he has no history of incarceration. The conviction for a terrorism offense will result in stricter conditions of confinement for any remaining term of imprisonment. As such, an extended prison sentence beyond 60 months would have a disproportionately severe

impact on him. *See*, *e.g.*, *United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming below-guideline sentence for first-time offender because a prison term would mean more to him "than to a defendant who previously been imprisoned"); *United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wisc. 2006) (below guideline sentence is appropriate because defendant had never been confined before and sentence was sufficient to "to impress upon him the seriousness of the offense and to deter others under similar circumstances."); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend."). *See also* 28 U.S.C. § 994(j) (Congress directs the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury."). Finally, this offense also serves as his first felony conviction, which disenfranchises Tommy from the full rights of citizenship. Given all the unique circumstances of this case, a sentence of imprisonment greater than 60 months is not necessary to achieve the purposes of sentencing.

    **D.**    <u>**Nature and Circumstances of the Offense—§3553(a)(1)**</u>

In determining the sentence to be imposed, the Court must consider the "nature and circumstances of the offense." 18 U.S.C. §3553(a)(1). As discussed above, the nature and circumstances of this offense can only be understood through the lens of Tommy's history and characteristics.

The Court no doubt recalls from the trial evidence and significant competing pre- and post-trial briefing that parties concurred with the objective facts, but differed on the significance and legal consequences of those facts. As also noted above, separate and apart from the challenges raised by the defense prior to, at, and after trial, Tommy readily acknowledges the seriousness of the offense conduct. Tommy understands the videos could be used for pernicious purposes or have a negative impact on others. He knows this all too personally because his own obsessive consumption of the videos began the process that led him to this point. Most importantly, he sees that ISIS is a vile organization and that the videos can pollute the minds of others. He deeply regrets his conduct and recognizes that there are consequences to his words and actions. He has obtained this clarity through his maturation and ongoing exposure to different viewpoints.

At the same time, counsel must again emphasize that the seriousness of this attempted material support offense is relatively less serious than the typical terrorism case by orders of magnitude. Tommy did not engage in any prior violent actions, as acknowledged by the FBI. (PSR, p. 8, ¶22). Tommy also had every opportunity to release the script on the Internet at large, to social media platforms like Reddit, or on public Telegram channels. He did not do so. There is no evidence that Tommy showed the script to anyone other than OCE4 and the CHS. There is also no evidence that he shared *Heralds* with anyone other than OCE2.[11] And most importantly, the nature and circumstances of the offense must be seen through Tommy's history and characteristics, namely his youth and the mental health issues, including anxiety and obsessive-compulsive

---

[11] The PSR notes how the FBI case agent said that the script was "on the dark web" and that "defendant imported it to Telegram and Reddit, another social media platform." (PSR, p. 5, ¶10). The FBI case agent also told Probation that "defendant intended the script to be disbursed to different areas of the internet." (PSR, p. 5, ¶10). But there was no evidence that the script was obtained on the "dark web." Rather, the parties stipulated to the fact that "in January 2019 the FBI was aware that a computer code that allowed for the copying of Telegram rooms was made available by a third party." (Vol. 6, p. 1161:5-8). The evidence indicated that Tommy obtained the script from a friend online.

disorders, that he experienced at the same time as the offense conduct.[12] As discussed above, with the continued support of his family and his ongoing maturation, those issues have much improved to such an extent that he is simply a different person than the version who was depicted by the trial evidence.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, a sentence of sixty (60) months to be followed by three years of supervised release accompanied by strict conditions is sufficient, but not greater than necessary to achieve the purposes of sentencing.

Respectfully submitted,

/s/ Steven A. Greenberg
**STEVEN A. GREENBERG,**

/s/Joshua G. Herman
**JOSHUA G. HERMAN**
Attorneys for Defendant

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 315
Chicago, Illinois 60604
(312) 879-9500
steve@greenbergcd.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 404
Chicago, IL 60604
(312) 909-0434
jherman@joshhermanlaw.com

---

[12] Commenting on Tommy's collection of videos, OCE4 sensed the obsessiveness involved in the task, as he privately wrote the following to OCE2:

> For a supporter to have done this he would have had 1. save absolutely everything (or have contact with enough people / the right people to recreate all of it); 2. Know all of the key propaganda material the State released; 3. Be obsessively focused on perfection in a way that is beyond most individuals

1A55_001-000039.

## <u>CERTIFICATE OF SERVICE</u>

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing was served on November 3, 2022, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Joshua G. Herman
53 W. Jackson Blvd., Suite 404
Chicago, IL 60614
(312) 909-0434
jherman@joshhermanlaw.com