UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 869 |
| | ) | |
| vs. | ) | Honorable Robert W. Gettleman |
| | ) | |
| THOMAS OSADZINSKI | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

I.      Procedural History ................................................................. 1

II.     Factual Background ................................................................. 2

        A.      The FBI Received Tips About the Defendant's Support of
                ISIS and Met With Defendant's Family ......................................... 2

        B.      OCE 1 ................................................................................ 2

        C.      The Defendant Provided Services to ISIS ..................................... 5

        D.      OCE4 ................................................................................ 12

        E.      CHS1 ................................................................................ 14

        F.      Translation Services ............................................................ 16

        G.      The Defendant Shared Instructions for Manufacturing an
                Explosive and Threatened Violence Against Law
                Enforcement .................................................................... 19

        E.      The Defendant's Arrest and Search of His Home ......................... 24

III.    Computation of the Advisory Guidelines Range ............................... 24

        A.      Offense Level .................................................................... 25

        B.      Criminal History ................................................................ 30

        C.      Anticipated Advisory Sentencing Guidelines Range .................. 30

IV.     The 3553(a) Factors ............................................................... 30

        A.      The Need for the Sentence Imposed to Reflect the
                Seriousness of the Offense, Promote Respect for the Law,
                Provide Just Punishment, Promote Deterrence, and Protect
                the Public from Further Crimes of the Defendant ....................... 31

        B.      History and Characteristics of the Defendant ........................... 37

C.    Need to Avoid Unwarranted Sentence Disparities Among Defendants Guilty of Similar Conduct ......................................... 38

D.    The Sentence Recommended by Probation Is Not Sufficient to Meet the 3553(a) Factors and Does Not Account for the Seriousness of the Offense and Likelihood that the Defendant Will Commit Other Crimes ........................................ 40

V.    Supervised Release ........................................................ 42

A.    Mandatory Conditions .................................................... 42

B.    Discretionary Conditions to Promote Respect for the Law and Deter the Defendant From Committing Future Crimes ...... 43

C.    Discretionary Conditions to Ensure Safety to Others ................. 43

VII.    Conclusion ............................................................. 45

# TABLE OF AUTHORITIES

## Other Authorities

*United States v Rahim*, 860 Fed. Appx. 47 (5th Cir. 2021)........................................29

*United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020) ...................................29, 32

*United States v. Arcila Ramirez*, 16 F.4th 844 (11th Cir. 2021)...............................28

*United States v. Damato*, 672 F.3d 832 (10th Cir. 2012)..........................................33

*United States v. Dhirane*, 896 F.3d 295 (4th Cir. 2018)..............................................33

*United States v. Giampietro*, 2022 WL 2663156 (M.D.TN July 11, 2022)...............28

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011)........................................39

*United States v. Khan*, 938 F.3d 713 (5th Cir. 2019) ..................................................30

*United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003)...........................................31, 39

*United States v. Shuck*, 713 F.3d 563 (10th Cir. 2013) ..............................................34

*United States v. Wright*, 747 F.3d 399 (6th Cir. 2014)...............................................28

## Statutes

18 U.S.C. §3583(j) ........................................................................................................43

18 U.S.C. § 922(g) ........................................................................................................44

18 U.S.C. § 3013...........................................................................................................44

18 U.S.C. § 3553(a) ...........................................................................................31, 41, 45

18 U.S.C. § 3583(d) ................................................................................................43, 44

18 U.S.C. § 2332b(g)(5)(A) ..........................................................................................29

18 U.S.C. § 2339B .................................................................................................24, 25

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby respectfully submits the following memorandum setting forth the Government's position at sentencing. Following a jury trial, the defendant was convicted of attempting to provide material support to ISIS. The evidence showed the defendant's commitment to ISIS's cause was unwavering. He sought out opportunities to assist ISIS and discussed with witnesses a variety of ways he could do so, using his computer skills. The defendant knew ISIS needed help in the "digital realm," and he offered that help, using computer code to circumvent online restrictions on copying data and saving, cataloguing, and sharing massive amounts of ISIS official and unofficial media content. Defendant knew that ISIS's messaging included high-end video content and infographics designed to incite violence, inspire deadly attacks and recruit new ISIS supporters. He wanted to make sure this message was delivered. He worked to make it widely available. For this conduct, and for the reasons described below, a sentence of 180 months' imprisonment and a lifetime term of supervised release would be sufficient but not greater than necessary to meet the goals of 18 U.S.C. § 3553(a).

## I. Procedural History

On December 12, 2019, a grand jury returned an indictment in case number 19 CR 869 charging defendant with attempted provision of material support to ISIS, in violation of Title 18, United States Code, Section 2339B. Trial in this matter began on October 5, 2021. On October 18, 2021, the jury returned a guilty verdict.

## II.     Factual Background

### A.     The FBI Received Tips About the Defendant's Support of ISIS and Met With Defendant's Family

The defendant's fascination with ISIS and violence began long before his first interaction with law enforcement. In approximately February 2018, the FBI received a tip that the defendant was consumed by ISIS propaganda, death, and military combat. On March 1, 2018, the FBI interviewed the defendant's parents at their home. During the interview the FBI informed his parents that they were from the Counterterrorism Division of the FBI and that they were concerned with the defendant's online activities. As described below, the charged conduct in this case occurred after the FBI's meeting with defendant's parents. The agents tried to interview the defendant, but he refused to meet with them.

### B.     OCE 1

On June 6, 2018, just a few months after the FBI contacted defendant's family, the defendant was active in a pro-ISIS Telegram channel called "Weapons". More specifically, without any prompting by any government actor, defendant posted a picture of instructions for manufacturing TATP, a highly unstable explosive used by terrorist organizations to commit attacks, in a pro-ISIS Telegram channel called "Weapons." Gov. Ex. 100, Tr. 31.

The defendant asked if anyone in the chatroom had the video that went with the TATP instructions. *Id.* at 4, Tr. 34. The defendant and others in the chatroom discussed security measures to take while acquiring TATP ingredients and tips for handling explosives ingredients. Later in the conversation, the defendant described

2

a video that was officially released by ISIS with English subtitles on how to make a chemical explosive in a kitchen.

When the defendant posted to the Weapons channel, OCE1, an FBI employee, was present on the channel. At the time, OCE1 was not aware who the defendant was, and OCE1 responded to the defendant's post about TATP. After exchanging greetings, OCE1 sent the defendant a screen capture of the TATP instructions the defendant had previously posted in the chatroom. OCE1 warned the defendant to be careful with TATP, due to the instability of the ingredients.

The defendant responded and he and OCE1 began discussing the defendant's interest in explosives, defendant's plans to use the explosives and the defendant's views about the FBI and other law enforcement. The defendant said, "i will be doing studying. yes. i think it will be some time before i try anything." OCE1 asked the defendant if he was studying for school and the defendant replied "*for jihad.*" (emphasis added). *Id.* at 21, Tr. 40. The defendant stated he would commit jihad in "America… the worst one." *Id.* at 23, Tr. 43. OCE1 warned the defendant to pick his target carefully and not harm innocent Muslims. The defendant identified targets, writing that it would be "best to Target the government…citizens can be risky unless they are in blatant kufr[1] (alcohol bars, LFBT parade/club)." *Id.* Tr. 43 – 44.

In his conversations with OCE1, the defendant offered his assistance to the "brothers" in ISIS and highlighted defendant's computer expertise. The defendant

---

[1] Kufr is a reference to kuffar, or non-believers.

told OCE1 that he's in a "top school for computers" and if the "brothers need help with security tell them to come to me." *Id*. at 32, Tr. 48.

In late June 2018, the defendant forwarded OCE1, whom he believed was an ISIS supporter active in the "Weapons" chat room, the March 27, 2018, voice message the FBI left for the defendant, which included the FBI agent's name and phone number.

On June 29, 2018, the defendant informed OCE1 that he had "to stay passive for now because of mukhabarat" were watching him and that he "can't get in contact with the brothers. For now." *Id*. at 47, Tr. 54. The defendant explained that he "was told by a knowledgeable brother to wait for now because awallahi[2] the FBI is watching me." Tr. 58. The defendant also described the FBI agent whose voicemail he had forwarded to OCE as a "slanderous rafid[3] whore with American mukhabarat intelligence" and stated the FBI had "5+ agents surveilling me." *Id*. at 54, Tr. 59.

OCE1 asked if the defendant could fight them, to which the defendant replied, "if I must I will attain shahadah[4] …. inshaAllah. i know a brother in contact with IS [ISIS] media department… if i do it there will be an isdar."[5] Tr. 61. OCE1 asked the defendant if he had weapons. The defendant replied that he had a knife and that he knows "some brothers with guns but I prefer the Kalashnikov.[6] Id. at 57, Tr. 62.

[2] Awallah is a term used to mean swearing to God.
[3] Rafid is an Arabic term which translates to 'rejecter,' and is often used by Sunni extremists as a pejorative epithet for Shi'ite Muslims.
[4] Shahada is an Arabic term for the Muslim profession of faith. Based on the content and context of this conversation it appears that the defendant meant Shaheed, which is an Islamic term for martyrdom.
[5] Isdar is an Arabic term for a news announcement.
[6] A Kalashnikov is an automatic rifle, more commonly known as an AK-47.

Defendant also said, "any American employee will not be innocent. Americans who work for American law enforcement…the agents who follow me..." Id. at 60, Tr. 63.

The defendant further discussed how he would attack law enforcement, stating that he knew a person who could get him a "glock17…9mm hollow tip FMJ armor piercing rounds."[7] Id. at 65, Tr. 65-66. Later in the same conversation, the defendant told OCE1, "I am doing a lot of reading… like explosive making… once I get my gun and explosive belt, the mukhabarat will never get me." Id. at 66, Tr. 67.

## C.    The Defendant Provided Services to ISIS

Consistent with defendant's statements to OCE1 that he could not contact "the brothers. For now," id. at 47, Tr. 54, defendant waited several months until he believed he was no longer being watched by the FBI. Then, on February 7, 2019, the defendant independently contacted OCE2, who he believed was a member of a pro-ISIS media group. The defendant began an online relationship with OCE2. On March 1, 2019, OCE2 sent the defendant a media report that Telegram had been banning and deleting Telegram channels used by ISIS. In addressing ISIS Telegram channels that were being removed by Telegram, the defendant referred to the ISIS video *Inside 8*[8] when he told OCE 2 that "they delete 1, we make 2 more." Gov. Ex. 200 at 47 (OCE2-CHS); Tr. 168. The defendant's use of the pronoun "we" shows his intent: he

---

[7] FMJ, or Full Metal Jacket, is a small arms projectile round.

[8] Clips of *Inside 8* were admitted as Gov. Exs. 409-1 through 409-8. *Inside 8* instructed ISIS supporters, "if they close one account, open another three. And if they close three, open thirty". *Inside* 8 also instructed supporters to use the internet to "terrorize" enemies, "Fill them with fear," and "create a climate of anxiety and distress on every one of their platforms". Gov. Ex. 409-7. A full copy of Inside 8 is attached to the November 3, 2022 Supplement to the Government's Version of the Offense.

aligned himself with ISIS and considered himself to be part of the organization. The defendant told OCE2 that he wished ISIS had their own Telegram channel and he asked OCE2 if he had seen *Inside 8*. The defendant then sent OCE2 screenshots from the ISIS video. *Id*. at 58-59 (OCE2-CHS); Tr. 172.

Consistent with the messaging from *Inside 8*, which instructed supporters "in the media and on the battlefield" to "strive patiently in the digital arena" and "do not allow the disbelievers to enjoy a moment of sleep or to live a pleasant life," the defendant told OCE2 he wanted to use his computer skills to assist ISIS. He said he was "very good at computer security" but that he "doesn't use windows for jihad work." *Id*. at 60; TR. 177. He later told OCE2, while in the context of discussing whether to commit an attack, that he does "media in jihad but the sword is the other part." *Id*. at 79; Tr. 182.

The defendant was aware that ISIS accounts were being taken down online. He told OCE2 that Twitter banned him in "2 minutes" after he uploaded a statement from Amaq, an official ISIS news organization. Gov. Ex. 200 at 48 (OCE2-CHS); Tr. 169. During the same discussion, the defendant described using "PGP" (pretty good privacy) encryption methods, stating that this method is "very powerful." He added that al Qaeda used that method and that he thought he "could make one of our own," referring to ISIS. He also described using another program that was "completely impenetrable" and that law enforcement could "spend 1 billion dollars and they cannot break the code." *Id*. at 54 – 57; Tr. 170. Again, the use of the word "our" was indicative of the defendant's mindset: he considered himself part of ISIS.

6

Significantly, during a later conversation, OCE2 asked the defendant how he came up with the idea of adapting a computer script to aid ISIS. In response, the defendant explained the core problem faced by ISIS. He said, "before I was Muslim I wanted to find dawla [ISIS] videos but never could[.] its very good for dawah[9][.] the news lies about dawla videos and will never show it full[.] amin[.] In responding to OCE 2's question regarding another ISIS media support group, the defendant stated, "I don't know them too close but I love their work[.]I try to help them[.]" Gov. Ex. 200 at 89 (OCE2); Tr. 304.

The defendant told OCE2 he wanted to download and transfer encrypted ISIS videos to evade detection by law enforcement. He stated, "I will also encrypt the files. So mukhabarat [FBI] cannot read them…the media jihad will never end." Gov. Ex. 200 at 32 (OCE2); Tr. 273. Simply put, the defendant was offering his services to ISIS because he believed his calling was to engage in "media jihad." Gov. Ex. 200 at 36 ("now I am making as much jihad as possible."); Tr. 278.

The defendant continued to adapt his ideas to support ISIS's media mission. On March 27, 2019, the defendant explained to OCE2, "I will begin a new and very valuable project I will be developing a custom gentoo linux designed for ansar [ISIS supporters], it can run on any computer and will be very lightweight, fast, and secure." Gov. Ex. 200 at 256; Tr. 220-21. When asked by OCE2 how it would help the brothers in the Islamic State, the defendant replied, "it will be very secure…It will only browse Telegram." *Id*. at 259. "When there are less things installed the operating

---

[9] Dawa is the act of inviting people to embrace Islam.

system is harder to hack." In response to the OCE's question, the defendant was unequivocal about who this program was for, stating that he was creating a program specifically for use by ISIS's supporters [ansar].

On April 11, 2019, in a discussion with OCE3, whom the defendant was referred to by OCE 2, defendant stated, "I love learning about computers akhi [brother]. theyre very useful for jihad." Gov. Ex. 300 at 7, Tr. 469. On May 1, 2019, the defendant sent OCE3 a video of the defendant's computer screen entitled "building the first version," which, appears to depict a Linux-based Operating System under development. Gov. Ex. 300 at 41, Tr. 657. The defendant stated the operating system would be "available for the ansar [ISIS supporters] to use," and described certain technical specifications along with features which would distinguish it from other Linux-based systems and prevent exploitation by "crusader intelligence agencies." The defendant added, "It is hard work and a lot of studying but bithnillah swt [Allah willing] I can make something useful." Tr. 661. In the same exchange, the defendant further advised OCE3 that in the meantime, OCE3 should use a specific operating system known for its security features along with other anonymization and encryption measures for any activity by OCE3 on [Telegram]. The defendant further spoke about creating a guide for "trusted brothers." Tr. 694.

On August 7, 2019, on Telegram, the defendant told OCE2 "[I] did make something… I forgot to show you," and sent a screenshot depicting computer file folders labeled in Arabic with the names of various ISIS Wilayat, or provinces.[10] Tr.

---

[10] Wilayah is Arabic for province, which OCE2 understood to be a reference to provinces of ISIS. Islamic State territory was organized into Wilayat. Official ISIS media publications are

257. The defendant said these are, "all publications from all wilayah." The defendant said, "I made my own python[11] scripts to organize everything," and sent a sample of computer code stating, "i coded this… it organizes the channels." Tr. 258-59. The defendant then sent two Telegram channel invitations to OCE2. The defendant said the first channel was "original," which OCE2 understood to mean the channel had been created by someone else. The defendant characterized the second channel as [the] "channel I made with the script." OCE2 joined both channels and saw that the "original" channel ("ISIS Channel 1") contained a large volume of official ISIS media releases, including Al-Furqan[12] media content of various file sizes. Tr. 260.

OCE2 also observed that the High Definition (HD) versions of the ISIS video from ISIS Channel 1 were being quickly and automatically added to the channel the defendant "made with the script" ("ISIS Channel 2"). The defendant explained that all the publications that the script were copying to ISIS Channel 2 were "HD only," adding he [the defendant] had "downloaded the entire channel [ISIS Channel 1] and organized it." Tr. 263. The defendant further explained he had made an offline archive to house media content produced by official ISIS media outlets such as Al-Furqan and itsam. The defendant said he intended to "spread it everywhere." Itsam is in reference to the ISIS-associated Al-I'tisam Media Foundation, and Furqan is in

---

often labeled according to the particular province where the footage and/or content originated.

[11] Python is a computer coding language.

[12] Al Furqan Establishment for Media Production is an official ISIS media organization and is listed as an alias of ISIS in the State Department's Foreign Terrorist Organization designation of ISIS.

reference to the Al-Furqan Media Foundation, an official ISIS media organization. Tr. 264.

On August 7, 2019, the defendant told OCE2 that he was going to spread the ISIS archive everywhere and make sure that nobody, including law enforcement, can "take it down" from the internet. During the same conversation, the defendant described the steps he would take to protect his project from law enforcement and ensure that his "media jihad" could continue. He wrote, "i will also encrypt the files[.] so mukhabarat [intelligence agencies] cannot read them[.] the media jihad will never end…now I am making as much jihad as possible." Tr. 273. During the same conversation, the defendant told OCE2 to use a computer program that was recommended by "ansar," that securely deleted computer files to prevent law enforcement from finding the files.

On August 16, 2019, the defendant told OCE2 he had finished copying materials produced by the Al Furqan Media Foundation and was creating a document that would teach others how to use the computer script he created to copy pro-ISIS material. On the same day, the defendant sent OCE2 a document titled "*Operation: Heralds of the Internet*." Gov. Ex. 201, Tr. 286. In the document, the defendant described in detail the defendant's plan to use his Python script to sort, copy, organize, and redistribute large volumes of content from ISIS official media and other pro-ISIS channels on Telegram. The defendant included screenshots of the defendant's script along with detailed explanations of how the script operated. The defendant noted steps that the defendant had already taken, information he had

already used the script to collect. And in keeping with the defendant's desire to give the script to other ISIS supporters so that they could use it to preserve ISIS recruitment material, the document further explained how the computer script could be modified by others to export information for additional ISIS channels.

On August 16, 2019, after the defendant sent *Operation: Heralds of the Internet* to OCE2, the defendant said he wanted to create another, simpler tutorial document for copying and organizing channels on Telegram for pro-ISIS supporters who used Android cellular telephones, writing "this document is very complicated. it is for organizing channels. but copying channels is easy. and i will do a document for that on android. so brothers who dont have a computer can do it. it will be much neater." Tr. 295. During the same conversation, the defendant stated,

> i am downloading the i'tisam channel and now i am almost done organizing the wilayah channel since i found a mistake i made, there was a old Furat Media channel and al-Hayat Media Center[13] channel. Almost all HD isdars. but i lost the brothers who made it."

Tr. 296. The defendant was aware that ISIS media needed to reach new recruits in English-speaking countries and he characterized the particular importance of "Furat" and "Al-Hayat" media, by stating, "they are so important akhi because they are in English so people understand." *Id*.

The defendant explained that part of his plan included distributing ISIS videos on Reddit, an online social media platform, with the expectation that this will divert

---

[13] Al-Hayat Media is an official ISIS media organization and is listed as an alias of ISIS in the State Department's Foreign Terrorist Organization designation of ISIS.

the FBI's attention away from ISIS followers and cause law enforcement to waste time and resources by investigating others. As the defendant stated, "[n]ow the [FBI] will waste their time watching a kafir who doesn't support dawla [ISIS] so this will give ikhwan who are planning attacks less time being spied on." Gov. Ex. 201 at 35, Tr. 276. Further, the defendant told OCE 2 that he was posting the videos on Reddit to divert law enforcement and allow ISIS members to commit attacks. OCE2 described the defendant's plan to post videos on Reddit as a "red herring," meant to district law enforcement and cause them to waste their time looking at people who are not supporters of ISIS, while those who are supporters of ISIS can plan attacks without falling under scrutiny. Tr. 276-77. When laying out this plan to OCE 2, the defendant stated, "now I am making as much jihad as possible." *Id*. at 36; Tr. 278.

### D.    OCE4

On October 2, 2019, the defendant, unsolicited, contacted a user account on Telegram operated by OCE4, who portrayed him/herself online as affiliated with a pro-ISIS online organization that translated official ISIS media information into English. Tr. 880. The defendant said, "ahki, do you have English translated isdarat [publications] from the wilayah? I'm a munasir [supporter] and copy channels and share." Gov. Ex. 401 at 4-5, Tr. 885-86. The defendant sent a screenshot showing a Telegram channel that appeared to have been created by the defendant, titled "Channel with every isdar ever." The channel contained 3,488 photos, 8,860 videos, 2,100 files, 3,457 audio files, and four shared links. *Id*. at 14, Tr. 892.

On October 3, 2019, OCE4 told the defendant a "brother" who knew computer code would contact the defendant on Telegram. OCE4, posing as the "brother,"

contacted the defendant from a separate user account on Telegram and inquired about the code which copied Telegram channels. The defendant instructed OCE4 to download the application Termux, what the defendant described as "a linux emulator." Tr. 903. Termux is an application that allows a user to run Linux tools on an Android device. A "linux emulator" was necessary because the defendant used a Linux operating system. *See* Tr. 431-433.

During the same conversation, the defendant taught OCE4 how to use the defendant's Python script to automatically duplicate and save ISIS information on Telegram. The defendant instructed OCE4 to use Termux to install Python and run the application. Once Python was installed, the defendant provided four Telegram bots for OCE4 to use. The defendant gave OCE4 directions on running Termux on an Android device. The defendant demonstrated how to pull the content from a channel and post all the content into a blank channel. OCE4 watched as the Python script automatically copied all the content from a channel containing 587 images, videos, text files, or audio files of Russian language ISIS materials and posting the content into a previously empty channel. According to OCE4, it took approximately four minutes to copy the content of the ISIS channel and repost it into the previously empty channel. Gov. Ex. 401 at 65 - 73, Tr. 908 – 916. According to OCE4, the same process, if done manually, would have taken "hundreds of man-hours". Tr. 974.

On October 3, 2019, in the same conversation, the defendant explained to OCE4 that the script was designed to evade Telegram's spam restrictions, which blocked mass copying of files within the application and banned users who engaged

in "spamming" of that nature. The defendant explained "if you forward too many [messages] Telegram can ban or restrict your account[.] but with this bot program, Telegram never bans." Telegram limits the number of messages a Bot may send to approximately 500 per minute. The defendant explained that because of this limitation, when the first bot reaches 500 messages, the Python script automatically rolls over to a second bot, and when the second bot reaches 500 messages, the Python script automatically rolls over to a third bot, and so forth. According to the defendant, the script rotates through a total of eight bots before starting again with bot one. With the defendant's technical solution to the spam restrictions in place, the defendant was able to copy ISIS media channels rapidly and automatically without being banned.

By October 4, 2019, with the defendant's guidance and instruction, OCE4 installed and used the script. Later in the conversation, the defendant sent OCE4 a picture of files showing ISIS material, including magazines, speeches, and videos taken from different locations online. The defendant stated the files contain over 700GB of material, and that he had "download[ed] all and organize[d]."

E.    CHS1

In the winter of 2019, CHS1 met the defendant. Over the course of their relationship, CHS1 told the defendant that CHS1 was an ISIS supporter. On August 21, 2019, during an in-person meeting, the defendant invited CHS1 to a series of six channels on Telegram, with titles like "wilayah isdar," "itisam," "al-furqan," "speeches," "magazines," and stated, "these channels are all owned by me akhi, share with anyone you trust." Tr. 1089. The defendant then sent CHS1 a screenshot of the Python script he used to archive ISIS content and said "preview of copying a big

14

channel with the script the brothers made." Tr. 1091. The Python script the defendant sent to CHS1 appeared to be the same script he sent to OCE2 and OCE4. CHS1 asked the defendant if he acquired all these videos himself, to which the defendant replied, "some brothers made them all and I just copy them. But I did modify and sort them to 360p versions only so I can upload a full .rar[14] to archive." Tr. 1094.

On October 8, 2019, CHS1 and the defendant met in person in Chicago, Illinois. During the meeting, CHS1 observed the Arch Linux operating system on the defendant's laptop. The defendant briefly showed CHS1 the password for the computer, which he kept on a piece of paper in his wallet. The defendant claimed he would swallow the piece of paper if caught by authorities. The defendant shared with CHS1 the Python scripts associated with *Operation: Heralds of the Internet*. Tr. 1113.

On October 10, 2019, CHS1 and the defendant met in person again. During the meeting, the defendant showed CHS1 how to download the software to use the script. The defendant also showed CHS1 how to operate the script, which CHS1 was later able to do on his own computer. The defendant showed CHS1 how he would edit the video quality of ISIS videos he disseminated using his phone. The defendant indicated that the original Python script came from another ISIS supporter and that he edited the Python script for his ISIS preservation project. The defendant told CHS1 he had been sending screenshots with instructions for using the Python script to individuals in Chechnya to use. The defendant discussed with CHS1 a new project he was working on using a Python script to copy and organize high quality ISIS videos. The

---

[14] A .rar file is a data container that stores one or more files in a compressed form.

defendant informed CHS1 that "I'm the only person in the world do[ing] this right now." Gov. Ex. 506-10.

### F. Translation Services

The defendant's support to ISIS went beyond creating and distributing the computer script discussed above. He also engaged with official ISIS media organizations to provide translation services, including a voice over on an ISIS recruitment video. On February 7, 2019, when the defendant first contacted OCE2, he told OCE 2 that he had written an article, under the pen name "Brush", called "A Message of Inspiration to the Mujahideen: Fighting the American Crusader soldiers and their puppets" for a pro-ISIS magazine called "Youth of the Caliphate." Tr. 147. A copy of that issue of Youth of the Caliphate was admitted as Government Exhibit 205. In addition to an article titled "A Message of Inspiration to the Mujahideen" by "Brush," the magazine features, inter alia, a picture of a soldier carrying an ISIS flag and an image and download link for "To The Crusader State of Russia," which (as discussed below) the defendant contributed to.

On February 10, 2019, the defendant told OCE2 in Arabic, *"I know English well. If you need help tell me…"* Tr. 153. On February 13, 2019, the defendant told OCE2 that he was working with another ISIS supporter, who had asked the defendant to translate pro-ISIS videos from Arabic to English for a pro-ISIS media group and who the defendant described as "100% not mukhabarat," meaning not law enforcement. During a later conversation, on March 18, 2019, the defendant explained how he became involved with the pro-ISIS organization the defendant stated "I met [Individual 2] and they needed one english speaking brother. after we

trusted each other then he gave me work to do and alhamdulillah I am part of it 1.5 years ago i met him." Tr. 197.

On February 13, 2019, the defendant sent OCE2 links to a YouTube video titled, "ISIS operate freely in Iraq, and Security Forces unable to follow!!" and "TO THE CRUSADER STATE OF RUSSIA." The video celebrated a deadly attack in Russia. The defendant told OCE2 that he had "presented translations to them." Gov. ex. 204, Tr. 155. Clips from To the Crusader State of Russia were admitted at trial. Gov. Exs. 204-1 and 204-2. A full copy of the video is attached the November 3, 2022 Supplement to the Government's Version of the Offense. The video includes English subtitles that state, in part, "We say to all groups of disbelief[.] Don't think that we are only fighting you within the lands of the Islamic State[.] Know that we will kill you in your homes as well."

On February 24, 2019, OCE2 asked the defendant if he still translated for the pro-ISIS media group. The defendant responded "Yes, *thanks be to God.*" The defendant then sent OCE2 files containing translations of portions of a video called "Holding firm to the Pledge 2," and stated, "I edited the translation for this one." Clips from this video were admitted at trial. Gov. Exs. 202-1 and 202-2. A full copy of the video is attached to the November 3, 2022 Supplement to the Government's Version of the Offense. The video contains footage of ISIS fighters, battle footage and includes an Arabic-language voiceover calling for ISIS fighters and supporters to stand together against the West. The video then features images of major cities with the ISIS flag flying and the English text "Soon, god willing." The video concludes with an

English language instruction to "Join the Camps of the Mujahideen in Iraq." During the same conversation, the defendant said, "if you need any help I will help too"… "sometimes I am busy with school, but jihad is always more important than relaxing and games." Tr. 164.

On March 4, 2019, the defendant forwarded OCE2 a video produced by a pro-ISIS group. He asked OCE2, just prior to sending the video, "did you know I did the voice for [the video]. Tr. 188. The defendant then followed by sending a video, titled "The Fighting Has Just Begun." Clips and still images from the video were admitted at trial. Gov. Exs. 203-1 through 203-22. A full copy of the video is attached to the November 3, 2022 Supplement to the Government's Version of the Offense.

The video urges ISIS supporters to "return the flames of war into the countries of aggressors" and includes a song urging the viewer to "go and answer the call, don't spare none, kill them all, it is now time to rise, slit their throats watch them die." Gov. Ex. 203. The video ends with images of severed heads rolling on the ground. In the video, a narrator is heard delivering commentary in English, which concludes with the following:

> …To break the pride of the crusaders is an obligation until they follow the orders of the mujahideen[15] and halt their aggression. We invite you, our muwahhid[16] brother, to return the flames of war into the countries of the aggressors. Just as the planes of the crusaders burnt the homes of Muslim residents in Iraq and Sham,[17] the Muslim in their lands will retaliate with an equivalent strike.

---

[15] Mujahideen are Jihadist fighters.
[16] A muwahhid is a person who witnesses to the oneness of God.
[17] Sham is a historical term referring to the greater Syria region.

18

Immediately after sending the video to OCE2, the defendant stated, "I did the voice," referring to the English-language narrator. In response to OCE2's question as to the purpose of his actions – were they for jihad or the Islamic State, the defendant replied "both." A few days prior, the defendant also sent OCE3 three different file versions of the same video, confirming that he had narrated the video.

## G. The Defendant Shared Instructions for Manufacturing an Explosive and Threatened Violence Against Law Enforcement

The defendant, both online and during his interactions with covert government actors, professed a willingness and desire to commit violence against law enforcement agents. For example, defendant discussed by making an explosive belt to target law enforcement, attacking law enforcement if defendant was arrested, and becoming martyr. The defendant was particularly fixated on a specific FBI agent assigned to this case.

On May 28, 2018, an agent assigned to this matter received a voicemail from an unknown caller who stated that he had found her name, number, and job title posted on the internet and thought it was "weird" and wanted to see if it was real. He also stated he thought she should know her information was posted online.

The caller, a college student, was identified and interviewed by the FBI. He stated that used Discord, a gaming chat forum, when another person who went by "Friend_of_Tawheed#6248," entered the chat and stated that he was under investigation by the FBI, that he was being followed by the FBI, and that the FBI had come to his home. The college student challenged the truthfulness of Friend of

Tawheed and, in response, Friend of Tawheed shared the case agent's phone number in the chat room.

On March 2, 2019, the defendant talked to OCE2 about military recruiters and Selective Service Registration. The defendant advised OCE2 he would never be picked up for military service[18] because he is on the "terrorist watch list" and suggested that he would commit a car bombing attack if he was drafted, writing "if they pick me… [eyeball emoji] [car emoji] [dynamite emoji]." Tr. 180.

During the same conversation, the defendant discussed Nidal Hasan[19] with OCE2. The defendant stated, "there was one Mujahid who did this… he joined the American army and killed 12 of them on their base." The defendant subsequently sent a link to a Wikipedia article on the shooting. The defendant stated, "I keep thinking about it leaving the dunya[20] is hard" and "I do jihad in media but the sword is the other part." Tr. 182.

The defendant concluded, "if they ever come to arrest me by Allah, I will make dawah[21] with the sword. I will never go to their false man made court." Tr. 187. OCE2

---

[18] The defendant's Youth of Caliphate article also discussed U.S. military recruitment and selective service registration in the context of encouraging ISIS supporters. *See* Gov. Ex. 205 ("0 mujahideen have no doubt in your mind that the crusaders minds are occupied with worldly problems as a result of their own countries' manmade laws of falsehood. Without doubt they feel resentment towards the very cause they are fighting for – risking their lives in order to uphold their evil and criminal system of disbelief so remain firm for you are fighting on the path of the lord of Muhammad … you fight for the sake of obtaining Jannah through martyrdom.")

[19] On November 5, 2009, Hasan shot and killed 13 people and injured more than 30 others at Fort Hood, a military post in Texas.

[20] Dunya refers to the temporal world, or life on earth, as opposed to the eternal spiritual realm.

[21] Dawah means to invite, call or summon another. The term is often used to describe when Muslims share their faith with others, and acts include charity and proselytization.

asked for clarification from the defendant, and the defendant posted emojis of a knife and two crossed swords. The defendant stated, "In sha Allah it won't happen but if Allah wills it, I will make the jihad." As described below, the defendant was arrested in a hotel room (away from his personal belongings). He fought the arresting agents, consistent with his statements to OCE2.

Between March 24 and 30, 2019, the defendant sent OCE2 pictures and videos of himself using wires and tools to solder his airsoft pistol.[22] OCE2 asked if the defendant was building a bomb. The defendant replied, "I want to learn how. I was fixing my gun." Tr. 349.

On March 31, 2019, the defendant asked OCE2, "akhi. do you think you have a guide to make a detonator?" Tr. 227. The defendant explained he wanted the guide because "I want to study it and practice making them so I know." Tr. 228. The defendant asked about certain volatile explosives, stating "the acetone and peroxide ones. they are not safe, right? they can explode from heat and they become less powerful after a long time." Tr. 228. The defendant explained his readiness to use such explosives, writing, "I am thinking about it but I don't want to do martyrdom operation and I don't want to be caught in sha Allah. I want to study and read and understand." He described Chicago as a target city, calling it a "good opportunity here because the city is big and there are many people. I saw Baghuz[23] and it made me hate this country. I can't sit in the chair while muslims are dying." Tr. 233-34.

---

[22] An airsoft gun is a realistic replica gun system that shoots plastic bullets using air power.
[23] Baghouz was an ISIS stronghold in Syria and was taken over by US, Kurdish and European Union forces in 2019.

During the same conversation, OCE2 asked the defendant if he pledged "bayah" to ISIS. Gov. Ex. 200 at 310, Tr. 237. The defendant responded that he tried but that "he can't do it perfect." He then sent OCE2 a recording of the defendant pledging "bayah" to ISIS. The defendant asked OCE2 if he had the full text in Arabic. The defendant then sent another voice message. OCE2 responded with "may allah accept from you my brother." *Id.*

This was not the only time the defendant pledged allegiance to ISIS. On November 2, 2019, following the death of ISIS-leader Abu Bakr al-Baghdadi, the defendant sent, unsolicited, his pledge to the new leader of ISIS, Abu Ibrahim Al-Hashimi Al-Qurashi, to OCE4. On the same day, the defendant also sent OCE4 an image of an ISIS flag with a handwritten note that stated, "I RENEW MY PLEDGE TO ABU IBRAHIM AL-HASHIMI AL-QURASHI, IN THE LAND OF AMERICA. Gov. Ex. 401 at 361 and 368; Tr. 1009.

The March 31, 2019 conversation with OCE2 turned back to martyrdom. The defendant stated that he didn't think he could become a martyr but that "if there were brothers and weapons here i would do it." During the same conversation, the defendant commented on the "mukhabarat" [security and intelligence services], the defendant stated, "and if I am ever caught they won't arrest me. I will be a shahid[24] before they ever capture me." Tr. 236.

The defendant sent a video to OCE 2 of security buttons in a bathroom in his school. He told OCE 2 that "they are scared the mujihadid will do something." He told

---

[24] A shahid is a martyr.

OCE 2 that the buttons the news doesn't show it but "the buttons are everywhere...on the street, in building." Significantly, and as evidence of his intent to help ISIS, he told OCE 2, whom he believed was part of a pro-ISIS group dedicated to publishing information about toxins and explosives, that if he knows of any mujahideen who are fighting and feel like they are losing. Tell them about these buttons." Gov. Ex. 200 at 85-86; Gov. Ex. 206; Tr. 184-85. A few moments later, he told OCE 2 that he hoped to "inspire Muslims in Sham that even in America there are brothers like him." Gov. Ex. 200 at 87; Tr. 185. OCE 2 testified that it was his understanding that Sham,[25] in this context, meant ISIS territory.

On May 9, 2019, the defendant discussed with CHS1 his research of the case agent who had previously attempted to interview him in March 2018. The defendant stated, "So the FBI Counterterrorism Division started harassing me and my family...they said for internet activities." The defendant told CHS1,

> It's not counterterrorism, listen these people they don't have any bond for the Islamic community. They don't have any work being a police officer. They got the job, they got the job because [the agent's] dad was a politician.[26] This Agent and then that was in 2016 right after Trump got elected, March 2016. So [the agent] doesn't even have the job for [the agent's] qualifications, just because it's a politician. They're not good at counterterrorism."

---

[25] ISIS is also commonly referred to as Daesh, which is the acronym for the Arabic name for ISIS: al-Dawlah al-Islamīyah fī l-ʿIrāq wa-sh-Shām.
[26] The case agent's father was an elected official in another state.

23

CHS1 then asked the defendant to clarify what he meant, to which the defendant stated, "[T]he agent's dad….The agent that follows me and like tries to…Yeah, FBI!"

### E.    The Defendant's Arrest and Search of His Home

On November 16, 2019, the defendant was arrested and a search warrant was executed at the defendant's apartment. The arrest took place in a hotel room during a meeting between the defendant and CHS1. The defendant, consistent with his previous statements, resisted the agents. Tr. 1302-03.

A search of the defendant's home revealed a homemade ISIS flag, stencil materials for making the flag, and several pro-ISIS posters. Agents also found evidence of the defendant's research on the case agent. Specifically, they found a copy of a criminal complaint alleging that two defendants conspired to provide material support to ISIS, in violation of 18 U.S.C. § 2339B. The case agent was the affiant of that complaint. Significantly, and underscoring the concern over the defendant's willingness to commit violence in the name of jihad, the agents found in the defendant's bedroom a crude two-panel handwritten drawing depicting an FBI agent stating, "Stop there terrorist." The "terrorist" is pointing a gun at the agent. In the second panel, the agent appears to be dead while lying in a pool of blood, while the "terrorist" is screaming "Allahu Akbar," in Arabic.

## III.   Computation of the Advisory Guidelines Range

The government concurs with Probation's guideline calculation, including the application of Guideline § 3A1.4(a). However, because the defendant objects to the

12-level increase pursuant to Guideline § 3A1.4(a), the government will address the guideline calculation in detail.

### A.  Offense Level

1.  Pursuant to Guideline § 2M5.3(a), the base offense level is 26.

2.  Pursuant to Guideline § 3A1.4(a), the offense level is increased by 12 levels, because the offense is a felony that involved, and was intended to promote, a federal crime of terrorism, as defined in Title 18, United States Code, Section 2332b(g)(5), namely, the offense: "(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) was a violation of…Title 18, United States Code, Section 2339B." *United States v. Giampietro*, 2022 WL 2663156 *3 (M.D.TN July 11, 2022). The second element – that the defendant was convicted of an offense that is enumerated as one of the many offenses listed in 2332b(g)(5)(B) – is not in dispute.

As to the first element, the defendant's motive in committing the offense is not relevant to the application of this enhancement. "Section 2332b(g)(5)(A) does not require proof of a defendant's particular motive. 'Motive' is concerned with the rationale for an actor's particular conduct. 'Calculation' is concerned with the object that the actor seeks to achieve through planning or contrivance." *United States v. Awan*, 607, F.3d 306, 317 (2nd Cir. 2010); *United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014)("[A] defendant who provided material assistance to terrorist organizations, but claimed his goal was to assist an oppressed group of Muslims, is eligible for the enhancement regardless of his purportedly benign motive."); *United States v. Arcila Ramirez*, 16 F.4th 844, 854 (11th Cir. 2021) ("[T]he government must

show that the defendant's offense was planned to influence, affect or retaliate against government conduct, even if that was not the defendant's personal motive."); *United States v Rahim*, 860 Fed. Appx. 47, 57 (5th Cir. 2021). Thus, the appropriate focus is not "on the defendant, but on his 'offense,' asking whether it was calculated, i.e., planned—for whatever reason or motive—to achieve the stated object." *United States v. Alhaggagi*, 978 F.3d 693, 700 (9th Cir. 2020).

Here, the defendant's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct". The record is replete with evidence that the defendant's intent in committing the offense was to help ISIS intimidate governments through violence, incite ISIS supporters worldwide to engage in attacks on civilians, and recruit new ISIS supporters – both to join the physical caliphate and to support ISIS from their home countries.

The defendant's attempted material support was the modification, use, sharing and teaching of a computer code to preserve ISIS videos whose purpose was to recruit and motivate ISIS members and supporters. At trial, the government offered into evidence a limited number of clips of the ISIS content the defendant was preserving, protecting and sharing. As seen from the Telegram channels that the defendant shared with witnesses, he had access to thousands of ISIS videos and materials. He discussed some of those materials with the OCES. Those videos and materials are rife with grotesque and barbaric acts of violence, including IED attacks and beheadings, committed in ISIS's name and for the explicit purpose of intimidating

ISIS's enemies. By way of example, the defendant possessed two of the most notorious ISIS videos – Flames of War parts I and II. These videos are 55 and 58 minutes long and are attached to the November 3, 2022 Supplement to the Government's Version of the Offense. They depict battle scenes, executions, scenes of ISIS prisoners forced to dig their own graves, celebrations of attacks on U.S. soil for which ISIS claimed responsibility and other atrocities.

There is no question that defendant understood that ISIS, through its media operation, sought to expand its physical territory and inspire attacks against enemy nations through acts of terrorism. *See United States v. Khan*, 938 F.3d 713, 718 (5th Cir. 2019) ("ISIS is an enemy of the United States. Supporting ISIS…is some evidence that Khan's conduct was calculated to influence or affect conduct of the United States because ISIS's terrorist acts are intended to intimidate or coerce the United States.").

As further evidence of the defendant's intent to assist ISIS in influencing a government through intimidation or coercion, the defendant explained that his plan included making ISIS videos available on the social media platform Reddit to people who do not support ISIS but who are curious about their videos. The plan was to divert law enforcement's attention to investigate innocent Reddit users who watch his videos, to allow ISIS members who could access the videos on Telegram to continue their mission without law enforcement interference. As the defendant stated, "[n]ow the [FBI] will waste their time watching a kafir who doesn't support dawla [ISIS] so this will give ikhwan who are planning attacks less time being spied on." Gov. Ex. 201 at 35, Tr. 276. When laying out this plan to OCE 2, the defendant

27

stated, "now I am making as much jihad as possible." *Id*. at 36; Tr. 278. The defendant's plan is evidence of his intention to promote a federal crime of terrorism by clearing the way for ISIS followers to commit violent acts on behalf of ISIS.

The defendant also wanted to retaliate against the United States government. He was upset with the FBI for investigating him and that he wanted to target American law enforcement. He told OCE1 that he would commit jihad in America and that it would be best to target the government. He also told OCE1, when they discussed the defendant obtaining weapons, that "any American employee is not innocent. Americans who work for American law enforcement…the agents who follow me…" Tr. 63.

The terrorism enhancement reflects Congress's intent that individuals convicted of terrorism offenses, like the defendant, serve sentences that are appropriate in light of the dangerousness of their crimes and the unique risk of recidivism that they present. "Even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003). The defendant's conduct falls squarely within category of activity that Congress intended to address through the application of the terrorism enhancement, and the application of this enhancement properly accounts for the seriousness of the defendant's conduct.

Despite this evidence, the Defendant's Version of the Offense asserts that the defendant's conduct was not "calculated to influence or affect the government by

intimidation and coercion, or to retaliate against government conduct." 18 U.S.C. 2332b(g)(5)(A). In support of his position the defendant cites *United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020).

Alhaggagi is inapposite. There, the defendant opened social media accounts and email accounts for ISIS members. *Id.* at 696. The district court applied the terrorism enhancement based on this conduct. The appellate court disagreed and found that there was no evidence that Alhaggagi had the specific intent to influence or affect the conduct of a government by intimidation or coercion. Namely, the Ninth Circuit found that the district court erred because it "centered its analysis on ISIS, not on Alhaggagi's conduct or mental state." *Alhaggagi*, 978 F.3d at 701. Further, the court found that:

> the district court did not make sufficient factual findings concerning Alhaggagi's knowledge of how the accounts he opened were to be used. Although Alhaggagi participated in a chatroom replete with posts praising ISIS, denouncing the United States, and planning "to kindle strife and chaos" in the United States through Twitter, there is no evidence that Alhaggagi saw those posts, opened the accounts because of those posts, or had contact with the authors of the posts. Furthermore, Alhaggagi himself did not post to the social media accounts, he did not control how those accounts would be used, and his statements contemporaneous to the opening of the accounts demonstrate that he did not know how the accounts would be used."

*United States v. Alhaggagi*, 978 F.3d 693, 703 (9th Cir. 2020). Here, there is no such factual question. The defendant repeatedly asserted to the OCEs and CHS his desire to assist ISIS, he pledged allegiance to ISIS's leader, he brainstormed a variety of ways he could use his technical skills to assist ISIS's media mission, he contemplated committing violent attacks himself and he discussed the specific

contents of the ISIS media he was working with. The defendant also possessed, shared, and discussed with witnesses *Inside 8*, which explicitly called on ISIS supporters to protect ISIS's online footprint. All of this demonstrates that he was aware of how his efforts to provide material support would benefit ISIS and its larger mission.

In sum, the defendant intended to commit "media jihad" to help ISIS achieve its goal of eliminating governments that opposed them, including the United States, to create a worldwide caliphate. *United States v. Dhirane*, 896 F.3d 295, 305 (4th Cir. 2018) (Dhiran's fundraising directed at and designed to support al-Shabaab's military operations was sufficient to satisfy the requirements of the terrorism enhancement). The terrorism enhancement should be applied.

## B.    Criminal History

Although the defendant has no prior convictions, pursuant to Guideline § 3A1.4(a), his criminal history category is VI.

## C.    Anticipated Advisory Sentencing Guidelines Range

Pursuant to Guideline § 5G1.1(a), the Advisory Guidelines Range is capped at the statutory maximum of 240 months.

## IV.    The 3553(a) Factors

Following a calculation of the applicable Guidelines range, the Court must consider the application of the factors set forth in 18 U.S.C. § 3553(a). *See United States v. Damato*, 672 F.3d 832, 838 (10th Cir. 2012) (discussing review of sentences for "procedural reasonableness" and "substantive reasonableness"). The Court should consider each of the § 3553(a) factors, explain the chosen sentence, and explain any

deviation from the Guidelines range. *United States v. Shuck*, 713 F.3d 563, 570 (10th Cir. 2013). Those factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) the need to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

Additionally, the Court must consider the kinds of sentences available, the range set forth by the Guidelines, any pertinent policy statements by the Sentencing Commission and the need to avoid unwarranted sentencing disparities. *Id.*

### A. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Promote Deterrence, and Protect the Public from Further Crimes of the Defendant

*The Offense Was Serious*

The defendant – over the course of many months – was unrelenting in his "media jihad". As demonstrated at trial, the defendant knew, and spoke to others about, ISIS's explicit instruction that supporters should assist ISIS on the "digital front." And defendant was aware of the critical importance of media work and online activity for ISIS.

31

As seen in Gov. Ex. 603-22, "The Structure of the Khilafa," ISIS has a Central Media Office that identifies "supporters" along with other official branded publications as components of that office. *See also* Gov. Ex. 603.23T (translating the Central Media Office organization chart). Indeed, ISIS's media wing is of paramount importance to ISIS and its leadership:

> To Daesh [ISIS], the real war, which is parallel to, if not greater than military war, **is** the media war (*Media Man, You Are a Mujāhid Too* 2015a; 2015b). Since Daesh believes the war against Islam and Muslims occurs through the media, as a means to transform the identity of the *Ummah* (Muslim Community) and to distort Muslims' beliefs and values, it has invested in media activities to counteract enemy propaganda (*Media Man, You Are a Mujāhid Too* 2015a; 2015b). Therefore, in parallel with its military attacks and acts of terrorism in different countries, Daesh has placed a priority on developing a sophisticated communication strategy, and has increased its use of various media as important psychological warfare tools.

*Daesh and the Power of Media and Message* by Jamileh Kadivar March 22, 2021.[27]

In an ISIS publication called "Media Man, You are a Mujahid," cited above, ISIS said, "[T]he media jihad against the enemy is no less important than the material fight against it. Moreover, your media efforts are considered to be among the many great forms of the rite of jihad."[28] As Dr. Zelin testified at trial, media operations were "just as important to the apparatus of the Islamic State and the future of the group as anything else." Tr. 820.

ISIS's media wing (to include unofficial groups) used Hollywood-caliber videos to recruit, to inspire its followers to commit violence, and to terrorize its enemies. Tr.

---

[27] https://www.arabmediasociety.com/daesh-and-the-power-of-media-and-message/
[28] https://academic.oup.com/book/36890/chapter/322127320

810. The defendant himself narrated a portion of an ISIS video intended to incite violence and recruit new ISIS supporters. In "The Fighting Has Just Begun", the defendant's narration instructs supporters, that to "break the pride of the Crusaders is an obligation until they follow the orders of the Mujahideen." While the defendant was speaking, an ISIS flag appeared in the corner of the video. The defendant then "invites" ISIS fighters to return the "flames of war" to the countries of the "aggressors." When he was speaking about the flames of war, a map of Western Europe appeared on the screen with flaming objects destroying the continent. Gov. Ex. 203-23. After the defendant's narration concludes, words appear on the screen that instructed ISIS supporters to commit arson, "to use easy made Molotov cocktails and throw them at the target." Gov. Ex. 203-4. The video suggests targets such as "high buildings," "forests," and "commercial sites," Gov. Ex. 203-5, and describes the benefits of arson to include "financial loss," "causing [ISIS's enemies] to intensify their guard," and to "spread panic in societies that fight Islam." Gov. Ex. 203-6. The video instructs ISIS followers to murder ISIS's enemies, stating: "kill them all," Gov. Ex. 203-11, "slit their throats" and "watch them die." Gov. Ex. 203-14.

The defendant also was aware that ISIS videos and social media accounts were being removed from the internet, impeding ISIS's media mission. The defendant watched, and distributed, the ISIS video *Inside 8* which instructed its followers to "support" ISIS "everywhere, both in the media and as well as on the battlefield." Gov. Ex. 408. The video directed its followers to open social media accounts: "if they close one account, open another three. And if they close three, open thirty."

33

The defendant followed ISIS's direction. In a discussion about ISIS channels being removed by Telegram, the defendant echoed the words of *Inside 8* when he told OCE 2 that "they delete 1, we make 2 more." Gov. Ex. 200 at 47 OCE2-CHS, Tr. 168. The defendant's use of the pronoun "we" is illustrative of his intent – that he aligned himself with ISIS and considered himself to be part of the organization. Gov. Ex. 200 at 47, Tr. 168.

The defendant used his specific skill set – his computer skills – to protect ISIS's online presence and to subvert technical limitations within the Telegram application. The defendant knew that the ISIS media machine depended on the ready availability of its materials to supporters and recruit and that the machine that would break down if its content was removed from the internet. By attempting to protect the ISIS video vault, the defendant, to use his words, was committing "media jihad."

*The Sentence Should Promote Respect for The Law*

The defendant's comments to the OCEs about committing violence against law enforcement demonstrates a lack of respect for the law. He told OCE 2 that "if they ever come to arrest me by Allah I will make dawah with the sword. I will never go to their false man made court." Gov. Ex. 200-88. Although he did not have a sword when arrested (likely because he was unaware he was about to be arrested), true to his word, he fought back when the FBI burst into the hotel room. As one arresting Special Agent testified, the defendant kicked one agent across the room and it took multiple agents to subdue the defendant. Once the defendant was handcuffed, he remained defiant: raising one finger in an ISIS salute. Tr. 1302 – 04.

34

The defendant also told the OCE 2 that if he were to be selected for the draft, he would ignite a car bomb, using emojis to represent his sentiments. Gov. Ex. 200-73.

The FBI unsuccessfully attempted to interview the defendant, prior to his appearance in the Weapons Telegram chat room, but agents were able to talk to his parents. As of a result of their brief contact with him, the defendant was aware of the identity of the case agent and distributed her phone number in a chat room on the social media application Discord. The agent received at least one phone call from another member of the room. The defendant also provided information about the agent to include who her father was.

As further evidence of the need for the sentence to promote respect for the law, as discussed above, the FBI found a drawing in the defendant's bedroom that depicts a "terrorist" shooting and killing an FBI agent.

The defendant also attempted to conceal his work from the FBI. When he explained to OCE2 how he created a mechanism to download and transfer ISIS videos in a manner to evade law enforcement, he stated "I will also encrypt the files. So mukhabarat [FBI] cannot read them…the media jihad will never end." Gov. Ex. 200 at 32, Tr. 273.

When viewed individually but certainly collectively, the defendant's statements and conduct regarding law enforcement reflect a complete lack of respect for the law.

*The Sentence Should Reflect the Need for Specific and General Deterrence*

35

As stated above, the FBI attempted to interview the defendant in the months before defendant began posting about explosives in the Weapons Telegram chat room. Despite knowing that the FBI was aware of his interest in and support for ISIS, the defendant was not dissuaded. For most people, having the FBI at their doorstep would have been a wake-up call. But not the defendant. He was motivated, patient, and deliberate. He told an OCE that he needed to wait until he was sure the FBI was no longer watching him. He then went dark for several months before he found and contacted another OCE, who he believed was working for a pro-ISIS media organization. The defendant persisted. And, a few months later, the defendant contacted another pro-ISIS media group.

Although the defendant has exercised his right to trial, and he should not be penalized for doing so, he also has not shown any remorse for his conduct or any indication that, upon release, he would not continue to engage in the same behavior that resulted in his conviction. "[T]errorists[,] [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011), citing *United States v. Meskini,* 319 F.3d 88, 92 (2d Cir.2003). The sentence imposed in this case must be sufficient to deter the defendant from providing support to ISIS, or to another terrorist organization, upon his release.

The sentence imposed in this case must also account for the need to deter others from supporting ISIS or other violent terrorist organizations. The sentences recommended by the defendant (180 months below Guidelines) and probation (162

36

months below Guidelines) would signal to others that someone can provide the types of support specifically requested by ISIS's leadership, including engaging in "media jihad," or by recruiting others to ISIS and encouraging and inciting homegrown attacks, and receive a sentence well below the advisory guidelines.

## B.    History and Characteristics of the Defendant

The government recognizes that there are significant mitigating factors that the Court should consider in fashioning a sentence that is sufficient but not greater than necessary to meet the goals of Section 3553(a). Namely, the defendant was an enrolled college student at the time of the offense, he is supported by a loving family, and he does not have any prior criminal history. The defendant also has struggled with mental health issues.

However, the defendant's criminal conduct undercuts much of this mitigation. At an age when he should have been focused on his grades, his social life and his future career, the defendant was instead unwaveringly focused on providing material support to one of the most dangerous and deadly terrorist groups in the world. His actions, his words, and his deception to others in his life, demonstrate his dedication to ISIS's cause and reveals his true character.

As demonstrated at trial, the defendant concealed his activities from his family and his school. His work for ISIS was done with care, patience, and secrecy. That a university student in Chicago was able to contact the creators of "The Fighting Has Just Begun," earn their trust, and be invited to narrate a pro-ISIS recruitment video suggests that his online efforts to support ISIS were thorough, far-reaching, and well-concealed. Remarkably, it was not the FBI that initiated online contact with this

37

defendant. Rather, the defendant's presence in pro-ISIS corners of the internet was pervasive enough that he separately found and contacted three different OCEs, all of whom he believed to be running or participating in pro-ISIS forums or publications. The defendant's unwavering commitment to ISIS, demonstrated at trial through his own words and actions, weigh in favor of a substantial sentence.

## C. Need to Avoid Unwarranted Sentence Disparities Among Defendants Guilty of Similar Conduct

The sentences recommended by the defense and probation are inconsistent with, and substantially lower than, other sentences for material support involving similar conduct and with other material support convictions in this district.

The government is aware of two recent cases in other districts where defendants have been sentenced in connection with providing material support to ISIS in a manner similar to the conduct at issue here.

In *United States v. Matthews, et al* (20-cr-00488, W.D. Tx.), two defendants conspired to provide services to ISIS by administering an encrypted, members-only chat group for people who supported ISIS ideology. They also collected, generated, and disseminated pro-ISIS propaganda; and disseminated firearms training materials and bomb-making to members of the chat group and others. On July 1, 2022, the defendants were sentenced to 18 years and 20 years imprisonment, respectively. R. 113 and 115.

In *United States v. Blanco* (20-cr-20245, S.D. Fl.), the defendant followed instructions from ISIS directing adherents to publish ISIS propaganda. Defendant translated ISIS materials into Spanish, produced videos that he intended to use to

recruit Spanish speakers to ISIS's cause. On February 2, 2022, the defendant was sentenced to 16 years' imprisonment. R. 89.

As an additional metric, the government summarizes cases in this district that involved convictions for the provision (or attempt or conspiracy) of material support to terrorist organizations:

- *United States v. Jonas Edmonds and Hassan Edmonds*. (15 CR 149, J. Lee). The Edmonds cousins plot involved Hassan Edmonds, a member of the Illinois National Guard, traveling to the Middle East to join ISIS while Jonas Edmonds killed National Guardsmen at Hassan's base while wearing Hassan's uniform. Both defendants pled guilty. Jonas Edmonds was sentenced to 21 years pursuant to Rule 11(c)(1)(c) plea agreement. Hassan Edmonds was convicted of two counts of providing material support to ISIS and was sentenced to the statutory maximum of 30 years.

- *United States v. Edward Schimenti and Joseph Jones*. (17 CR 236, J. Wood) Schimenti and Jones were convicted by a jury of conspiracy to provide material support to ISIS for providing cell phones to an FBI source with the belief that the cell phones would be used as parts for improvised explosive devices. Schimenti was also convicted of making a false statement to law enforcement. Jones was sentenced to 12 years and Schimenti was sentenced to 13.5 years.

- *United States v. Abdella Tounisi*. (13 CR 328, J. Der-Yeghiayan). Tounisi, who was 18 years old at the time of the criminal conduct, pled guilty to attempting to provide material support. He attempted to travel to Syria to join Jabat al Nusra, a designated foreign terrorist organization. He was sentenced to the then-statutory maximum of 15 years.

**D.** **The Sentence Recommended by Probation Is Not Sufficient to Meet the 3553(a) Factors and Does Not Account for the Seriousness of the Offense and Likelihood that the Defendant Will Commit Other Crimes**

Probation[29] has recommended a sentence that is 162 months below the applicable advisory Guidelines, citing 18 U.S.C. § 3553(a) and USSG §4A1.3(b) (permitting a downward departure "if reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes". According to probation, a 78-month sentence is warranted because the defendant did not engage in any violence. Probation asserts that defendant's lack of criminal history and limited contact with law enforcement suggest that Criminal History Category I better represents the seriousness of the offense and the likelihood that defendant will commit additional crimes than Category VI. These conclusions misunderstand the evidence in this case and do not adequately reflect the defendant's conduct.

For the reasons outlined above, the defendant's conduct is serious, and merits a sentence substantially higher than that recommended by Probation. Probation's narrow view of the specific conduct of material support that the defendant was convicted of attempting to provide to ISIS – the computer code to assist the ISIS media wing – ignores that his criminal behavior was inextricably intertwined with

---

[29] On November 3, 2022, the defendant filed a sentencing memo advocating for a 60-month sentence. For the same reasons that Probation's recommendation is insufficient to achieve the goals in 18 U.S.C. § 3553(a), the defendant's recommendation is not appropriate in this case.

violence. He was neither ignorant of, nor indifferent to, ISIS's violent mission. To the contrary, his work was centered on preserving and sharing information specifically designed to recruit ISIS supporters and convince them to commit attacks on behalf of ISIS.

Moreover, the defendant's efforts to come up with new and unique ways to provide support to ISIS undercut any argument that he was "all talk, no action". The defendant was no mere keyboard warrior. He engaged. The fact that a 19-year-old from suburban Chicago became a narrator on an ISIS video created by a known ISIS media support group based outside the United States, demonstrates his perseverance in supporting ISIS. It shows that the defendant collaborated with real ISIS supporters, not just online FBI personnel. More so, he earned a position of trust – convincing the makers of the video that he was not an undercover law enforcement but instead a true supporter willing to help. And they accepted him as one of their own.

Beyond narrating the video and providing translation on another ISIS video, the defendant also was "studying for Jihad" as he told OCE 1. The FBI found the defendant in a Telegram chat room called "Weapons," not passively reading other postings, but actively looking for an instructional video on how to make explosive weapons. Although the defendant may not have been planning to imminently commit a violent act, the defendant's "studying" coupled with his other statements regarding committing attacks against law enforcement, show that the defendant was preparing to commit violence.

For these reasons, the seriousness of the offense does not support a variance or downward departure of the type recommended by Probation. In addition, Criminal History Category I does not better account for likelihood that defendant will commit additional crimes than Category VI. Defendant's disdain for law enforcement was apparent throughout his discussions with the OCEs. He fought the arresting agents. He has expressed no remorse or accountability for his conduct. All of this suggests that he continues to be a risk for recidivism and supports a finding that Criminal History Category VI should be applied.

For all of these reasons, in consideration of the mitigating facts cited by Probation, and in light of other sentences imposed in material support cases in this district and elsewhere, the government respectfully requests that the court sentence the defendant to 180 months' imprisonment.

## V. Supervised Release

The Court may impose a term of supervised release of any term of years up to life. 18 U.S.C. §3583(j). In light of the seriousness of defendant's conduct, and for the reasons stated above, the government requests that the court impose a life term of supervised release. The government further recommends the following conditions of supervised release:

### A. Mandatory Conditions

- The defendant shall not commit another federal, state or local offense. *See* 18 U.S.C. § 3583(d); Guideline § 5D1.3(a)(1).

- The defendant shall not unlawfully possess a controlled substance. *See* 18 U.S.C. § 3583(d); Guideline § 5D1.3(a)(2).

42

- The defendant shall submit to the collection of a DNA sample from the defendant at the direction of the U.S. Probation Office if the collection of such a sample is authorized pursuant to 42 U.S.C. § 14135a(a). *See* 18 U.S.C. § 3583(d); Guideline § 5D1.3(a)(8).

- The defendant shall pay the assessment imposed in accordance with 18 U.S.C. § 3013. *See* Guideline § 5D1.3(a)(6)(B).

**B.    Discretionary Conditions to Promote Respect for the Law and Deter the Defendant From Committing Future Crimes**

- The defendant shall not leave the judicial district in which the defendant is being supervised without the permission of the court or the probation officer. *See* Guideline § 5D1.3(c)(1);

- The defendant shall report to the probation officer as directed by the probation officer. *See* Guideline § 5D1.3(c)(2);

- The defendant shall follow the instructions of the probation officer. *See* Guideline § 5D1.3(c)(3);

- The defendant shall notify the probation officer of any change in residence, employer, or workplace within 72 hours. *See* Guideline § 5D1.3(c)(6);

- The defendant shall not meet, communicate, or otherwise interact with a person whom he knows to be engaged, or planning to be engaged, in criminal activity. *See* Guideline § 5D1.3(c)(9).

-  The defendant shall permit the probation officer to visit the defendant at home or work at any reasonable time, and to confiscate any contraband in plain view of the officer. *See* Guideline § 5D1.3(c)(10).

- The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer. *See* Guideline § 5D1.3(c)(11).

**C.    Discretionary Conditions to Ensure Safety to Others**

- Defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon. *See* 18 U.S.C. § 922(g); Guideline § 5D1.3(d)(1).

- The defendant shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. The defendant shall consent to the installation of computer monitoring software on all identified computers to which defendant has access. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of monitoring software. The defendant shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

  The cost of monitoring shall be paid by the defendant at the monthly contractual rate, if the defendant is financially able, subject to satisfaction of other financial obligations imposed by this judgment.

  The defendant shall not possess or use any device with access to any online computer service at any location (including place of employment) without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system.

44

## VII.   Conclusion

The government recommends that this Court sentence the defendant 180 months' imprisonment followed by a life term of supervised release. This sentence would be sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:   */s/Barry Jonas*
BARRY JONAS
MELODY WELLS
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604


ALEXANDRA HUGHES
Trial Attorney
Department of Justice
National Security Division
950 Pennsylvania Ave.
Washington, D.C.


Dated: November 3, 2022