# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 CR 869 |
| | ) | Judge Robert W. Gettleman |
| THOMAS OSADZINSKI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S LIMITED RESPONSE TO THE
GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant submits this limited Response to address the government's arguments regarding the need to avoid unwarranted disparities under §3553(a)(6).[1] In its sentencing memorandum, the government cites five cases in support of its §3553(a)(6) arguments. (Govt. Response, Dkt. #195, p. 38). The government claims that two out-of-district cases are like this case, when they are not, and it overlooks several similar cases that resulted in much lower sentences. The government also selects three within-district cases, but it notably omits other in-district cases that resulted in sentences that are much closer to the 60-month sentence requested by the defense in this case. Accordingly, this Response is submitted to ensure that the Court has an accurate view of this sentencing factor.

---

[1] In responding specifically to the government's §3553(a)(6) argument, counsel do not, of course, agree with the remainder of the government's positions and arguments, some of which not accurate, such as the incorrect assertion that Tommy "engaged with official ISIS media organizations." (Govt. Response, Dkt. #195, p. 16). But rather than start an uninvited paper battle, counsel will respond to the government's memorandum at the scheduled sentencing hearing. Even so, the record must be supplemented on the §3553(a)(6) issue prior to the hearing.

1

The government provides short summaries of two out-of-district cases it contends are like the facts of Tommy's case. Unfortunately, the summaries omit key facts that show how those cases are readily distinguishable and should be disregarded.

First, in *United States v. Matthews*, 20-cr-488 (W.D. Tex.), the criminal complaint reveals how the offense conduct was far more serious than what the government portrays.[2] For instance, the *Matthews* criminal complaint describes how defendant Matthews communicated with a government online covert employee "who he believed to be an ISIS facilitator located outside the United States, for assistance in traveling to Syria." (Case No. 20-cr-488, Dkt. #3, ¶11). The criminal complaint also describes how defendant Matthews and co-defendant Molina "discussed traveling to Syria to fight for ISIS" and that "Matthews has engaged in on-line discussions with others in the chat group about travelling to Syria." (*Id.*, ¶37). These discussions included "the cost of plane tickets, who would cover Molina's expenses, whether they would travel together, transit points through Turkey, and when they could expect to start fighting." (*Id.*, ¶40).

Also missing from the government's description of the case, is how the defendants "discussed detailed plans for executing attacks using explosives and firearms." (*Id.*, ¶48). Defendant Matthews wrote that he preferred to "hit government buildings or places of interest such as economic centers like the stock market or CIA headquarters" and other targets such as "state buildings, social security buildings, the stock market or Trump Tower in New York, the White House (shooting the White House from the outside), and Washington, DC." (*Id.*). The defendants

---

[2] The public docket of the *Matthews* case does not appear to include the sentencing memoranda or plea agreement. The government's description of the case appears to be cribbed from the DOJ press release. *See* Department of Justice, U.S. Attorney's Office, Western District of Texas, Men Sentenced to Federal Prison for Providing Material Support to Terrorists, Jul. 1, 2022 (available at: https://bit.ly/3fPJR1c) (last visited Nov. 8, 2022) ("According to court documents, since May 2019, Matthews conspired with Molina to provide services to ISIS by administering an encrypted, members-only chat group for persons who supported ISIS ideology; by collecting, generating, and disseminating pro-ISIS propaganda; and by disseminating firearms training materials and bomb-making instructions.").

2

talked about escape routes, rendezvous points, traps, detonating bombs, and orchestrating a multi-location attack that "could be Netflix worthy." (*Id*.). *See also id.* ¶54 (defendant Molina discussing plans for multi-wave attacks on civilians).

In addition to discussing acts of widespread violence, defendant Molina translated a document with bomb-making instructions for a confidential human source and provided additional bomb-making instructions to the source. (*Id.*, ¶52, "Molina sent additional bomb-making instructions that he translated from English to Arabic for CHS #1. Molina indicated that he used an application to automatically translate these documents."); *Id*. ¶55 (defendant Molina agreeing with the CHS who said he would use bomb-making manuals provided by defendant Molina to kill U.S. soldiers overseas).

In the government's second case, *United States v. Blanco*, 20-cr-20245 (S.D. Fl.), not only did the defendant create, run, and administer multiple encrypted chatrooms that allowed direct contact between ISIS supporters and potential ISIS members but, according to the criminal complaint, he coordinated directly with an individual described as "Confederate A," a "foreign-based ISIS operative," regarding acts of violence. (Case No. 20-cr-20245, Dkt. 1, ¶20). The complaint alleged that defendant Blanco actively recruited others to provide services to ISIS by identifying members of his chatrooms who spoke foreign languages and enlisting them to translate material for dissemination online. The material included bomb-making instructions that he published in his chatrooms. (*Id*., ¶30) ("GUERRA then utilized an account from SMP3 and requested that OCE 1 help translate an instructional guide on how to build a 'mail bomb.'"). The defendant also provided funds to "Confederate A," the ISIS operative, who was heading a campaign to raise money for "key ISIS personnel" overseas. (*Id*., ¶43). According to the government's sentencing pleading, when "Confederate A" was arrested in Spain, defendant Blanco

3

edited a video that directly threatened to kill the Spanish judge overseeing the case. (Case No. 20-cr-20245, Dkt. #80, p. 5).

These two government cases involve serious contemplated violence, both domestically and abroad. These are important facts that the government did not include in its brief, and preclude any suggestion that the defendants in *Matthews* and *Blanco* provided "material support to ISIS in a manner similar to the conduct at issue here." (Govt. Response, Dkt. #195, p. 38). Unlike the defendants in the government's cited cases, Tommy never translated bomb-making instructions, connected with actual ISIS operatives, planned domestic attacks, funded ISIS operatives, or engaged in other preparatory conduct for violence. The two cases are utterly dissimilar and should be disregarded in fashioning Tommy's sentence.

Much closer than the government's cases is *Alhaggagi*, which was discussed in the defense Objections to the PSR (Dkt. #190, pp. 5-6) and also cited in the government's memorandum, but not in the §3553(a)(6) section. In *Alhaggagi*, the defendant pled guilty to attempting to provide material support to ISIS by opening numerous social media accounts that were used to post ISIS material. (Case No. 17 CR 387, C. Breyer, J.). He engaged in online discussions that may have suggested the potential for violence, but he took no action to advance any violent acts. After the Ninth Circuit remanded the case for resentencing, the district court sentenced the defendant to 57 months on the material support count, to be followed by three years of supervised release.[3]

*United States v. Waheba Issa Dais* (18 CR 143, E.D. Wi.), another material support case, also shares some similarities with Tommy's case in that the offense conduct mainly occurred online and involved the creation and dissemination of pro-ISIS content. But unlike Tommy's case,

---

[3] The defendant was also convicted of aggravated identity theft, which required a consecutive term of 24 months and resulted in a total sentence imposed of 81 months. (Case No. 17 CR 387, Dkt. #166 (Amended Judgment)).

4

defendant Dais engaged in identity theft, repeatedly hacked into online social media accounts, commandeered those accounts to disseminate ISIS propaganda, and had conversations with an Algerian who was planning an attack in France. *See United States v. Dais*, 482 F. Supp. 3d 800, 803-04 (E.D. Wis. 2020). Defendant Dais also distributed bomb-making and biological weapon material across social media platforms "for use by people who want to commit violent acts in the name of ISIS." (*Id.*, at 804). Still, the district court imposed a sentence of 90 months, to be followed by three years of supervised release.

In addition to citing the two inapposite cases of *Matthews* and *Blanco* and overlooking *Alhaggagi* and *Dais*, the government cites three-within district cases in its §3553(a)(6) analysis. But those cases are facially distinguishable as each involved attempted and planned acts of violence, as highlighted in the government's own brief summaries.

In *United States v. Jonas Edmonds and Hassan Edmonds*, (15 CR 149, Lee, J.), the defendants planned travel to join ISIS to commit acts of violence overseas and planned the mass murder of National Guardsman at home, which involved substantial steps such as dropping Hassan Edmonds off at the airport to join ISIS, surveillance of the Guard base, discussions with undercovers believed to be ISIS members discussing "body counts" and the purchasing of weapons. The plot was expressly designed to kill numerous troops, while Hassan Edmonds also intended to travel overseas to join ISIS and commit further acts of violence, which resulted in convictions on two separate counts of material support (conspiracy and attempt to provide material support).[4]

---

[4] In its sentencing memorandum for defendant Jonas Edmonds, the government described the offense conduct as follows:

> Defendant's yearning to support ISIL was not satiated by simply helping his cousin travel. He wanted to do more, so he upped the ante by plotting to attack Hasan's National Guard base after Hasan left for the Middle East. Defendant took steps to plan the attack by traveling to the Guard base with UC2 and Hasan in order to conduct surveillance. While

5

In *United States v. Edward Schimenti and Joseph Jones* (17 CR 236, Wood, J.), where the defendants were ultimately sentenced to less time than what the government seeks for Tommy, the defendants believed they were providing cell phones to ISIS that would be used in improvised explosive devices to kill others.[5] The defendants also drove the CHS to the airport where they believed he would travel to join ISIS.

---

> outside the base, and as part of their planning, defendant and Hasan discussed the route of the attack in the base, how to identify the officers who would be killed first, and how many Guardsmen would be killed. While there, Hasan retrieved a training schedule from inside the base to identify the optimal time to murder as many soldiers as they could. Defendant stated that they (meaning defendant and UC2) would commit the attack while wearing Hasan's Guard uniforms.

(Govt. Sent. Memo, 15 CR 149, Dkt. #64, pp. 9-10). The government's description of Hassan Edmonds' violent offense conduct is extensive and begins with the following introduction in its sentencing memorandum:

> In September 2011, defendant Hasan Edmonds joined the Illinois National Guard. Upon his enlistment, defendant solemnly swore to support and defend the Constitutions of his country and state "against all enemies" and to bear "true faith and allegiance" to both. Based on this promise, defendant was entrusted with the honor of wearing his country's uniform in the service of his fellow citizens.
>
> But instead of remaining true to that oath—the same expression of fidelity made by the nearly 7,000 servicemembers who, since September 11, 2001, have given this Nation the last full measure of devotion—defendant betrayed both his word and his country by plotting to kill his fellow soldiers on behalf of the so-called Islamic State of Iraq and the Levant. Had this scheme succeeded, we would have been left to mourn yet more victims of ideological terrorism.

(Govt. Sent. Memo, 15 CR 149, Dkt. #84, pp. 9-10).

[5] In its sentencing memorandum, the government described the defendant's knowledge that the cell phones would be used to take human lives:

> While waiting in the CHS's vehicle for UC2 to arrive at the meeting location, the CHS showed a video of a Humvee being hit by an IED. The CHS explained that ISIS fighters were attaching phones to explosives to blow up vehicles and that is what ISIS would be using the cell phones that Schimenti and Jones provided to the CHS.
>
> After the meeting with UC2, Schimenti, Jones and the CHS gathered at Jones' home. While there, Jones provided an additional cell phone to the CHS. Jones stated he hoped it would kill many "kuffar [non-believers]." Schimenti also said, "Many." The CHS said when the CHS makes it to Syria, the CHS will make a video and upload it for Jones and Schimenti to view. Schimenti stated if he sees the CHS "cutting the kuffar neck," Schimenti will be "so happy that day."

(Govt. Sent. Memo, 17 CR 236, Dkt. #268, p. 12).

In *United States v. Tounisi* (13 CR 238, Der-Yeghiayan), the defendant attempted to travel overseas to join the FTO Jabhat al-Nusrah and commit acts of violence, including a "fixation on engaging in a suicide operation." (Govt. Sent. Memo, 13 CR 238, Dkt. #84, p. 7). The defendant was arrested at the airport after communicating with a recruiter who was an undercover FBI employee after or while buying a ticket for overseas travel.[6]

Thus, each of the government's cases involved acts of violence and plans to commit violence that are entirely absent from Tommy's case. (PSR, p. 8, ¶22). Moreover, the sentences imposed in those cases are not representative of the wide range of sentences imposed in material support cases. Notably, the government omits several cases prosecuted by its office where district courts imposed sentences closer to or lower than the 60 months requested in this case.[7]

For example, in *United States v. Al Jayab* (16 CR 181; 18 CR 721, Ellis, J.), the court imposed a sentence of 60 months after the defendant was convicted of providing material support to a foreign terrorist organization. In *Al Jayab*, defendant traveled to Syria where he joined and fought with a designated terrorist organization before returning to the United States. The defendant was also convicted of making false statements to federal agents about his travel. In addition to the terrorism enhancement, the defendant received a 2-level enhancement pursuant to U.S.S.G. §2M5.3(b)(1) because the offense and relevant conduct involved the provision of material support

---

[6] The government highlighted the risk for violence in its sentencing memorandum:
> The potential to have become a tool of the organization, to have killed innocent people or even to have returned to the United States and conduct an attack at their direction, was ever present and a risk that we as United States citizens face every time a fellow citizen joins a terrorist organization.

(Govt. Sent. Memo, Case No. 13-cr-328, Dkt. #84, p. 11).

[7] Undersigned counsel Herman was an attorney of record on each of these three cases discussed below.

with the intent, knowledge, or reason to believe that the support would be used to commit a violent act. The district court sentenced the defendant to 60 months in prison.

In *United States v. Raja Khan* (10 CR 240, Zagel, J.), the defendant was sentenced to 90 months for providing material support to a terrorist organization. The case involved the defendant's provision of funds to others associated with al Qaeda when those funds were intended to support military-style attacks against the Indian government. Additionally, the defendant traveled overseas where he visited training camps and met with others whom the defendant believed were providing training to al Qaeda. The defendant's plea agreement included the additional enhancement pursuant to §2M5.3(b)(1) for violence. The defendant was sentenced to 90 months in prison under a cooperation plea agreement that was governed in part by Rule 11(c)(1)(C), which cabined the sentence between 60 and 96 months.

The government also neglects the case of *United States v. Hamzah Khan* (14 CR 564, Tharp, J.), where the defendant was convicted of attempting to provide material support after he was caught at the airport before boarding a plane intending to join ISIS after he communicated with ISIS recruiters online. The defendant acknowledged that upon arrival in Syria, he would work under the direction of ISIS in roles ranging from non-violent assistance to physical combat on the battlefield. Pursuant to a cooperation plea agreement, the government agreed to recommend a sentence of 60 months, well below the anticipated guideline range of 180 months. The court imposed a sentence of 40 months.

These and many other cases illustrate in-action the concerns raised by Judge Adelman in *Ludke* (16 CR 17, E.D. WI) highlighted in the defense Sentencing Memorandum—sentencing judges must exercise significant discretion in terrorism cases if the §3553(a) factors and parsimony clause are to have any meaning at all. (Dkt. #191, p. 28). True, some cases such as *Raja Khan* and

8

*Hamza Khan*, cited above, involved cooperation plea agreements, but they also involved violence and the imposition of the terrorism enhancement (U.S.S.G. §3A1.4) that elevated the guidelines far above the sentences that were ultimately imposed. These cases thus demonstrated how even when that enhancement is properly applied, it can be disregarded based on other §3553(a) factors.

But most important for the purposes of this Court's sentencing decision for Tommy Osadzinski, the §3553(a)(6) factor should not be further warped by a limited, cherry-picked sample of distinguishable cases that each involve violence, something that is crucially not present in this case. Put simply, any disparity between the sentence imposed in this case and that imposed in the government's cases, would be one that is warranted, which is consistent with §3553(a)(6)'s direction to avoid *unwarranted* disparities. *United States v. Warner*, 792 F.3d 847, 862 (7th Cir. 2015) ("Section 3553(a)(6) forbids not all sentencing disparities but only 'unwarranted' ones").

        Respectfully submitted,

        /s/ Steven A. Greenberg
        **STEVEN A. GREENBERG,**

        /s/Joshua G. Herman
        **JOSHUA G. HERMAN**
        Attorneys for Defendant

**GREENBERG TRIAL LAWYERS**
53 West Jackson Blvd., Suite 315
Chicago, Illinois 60604
(312) 879-9500
steve@greenbergcd.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 404
Chicago, IL 60604
(312) 909-0434
jherman@joshhermanlaw.com

## **CERTIFICATE OF SERVICE**

      Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing was served on November 10, 2022, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

      /s/ Joshua G. Herman
      53 W. Jackson Blvd., Suite 404
      Chicago, IL 60614
      (312) 909-0434
      jherman@joshhermanlaw.com