```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3      UNITED STATES OF AMERICA,        )
                                         )
 4                     Plaintiff,        )
                                         )
 5           vs.                         ) No. 19 CR 869
                                         )
 6      THOMAS OSADZINSKI,               ) Chicago, Illinois
                                         ) November 17, 2022
 7                     Defendant.        ) 9:13 a.m.

 8             TRANSCRIPT OF PROCEEDINGS - Sentencing

 9          BEFORE THE HONORABLE ROBERT W. GETTLEMAN

10      APPEARANCES:

11      For the Plaintiff:      HON. JOHN R. LAUSCH, JR.
12                              United States Attorney
                                BY:  MR. BARRY JONAS
13                                   MS. MELODY WELLS
                                Assistant United States Attorneys
14                              219 South Dearborn Street, Fifth Floor
                                Chicago, Illinois  60604
15                              (312) 353-5300

16
        For the Defendant:      GREENBERG TRIAL LAWYERS
17                              BY:  MR. STEVEN GREENBERG
                                53 West Jackson Boulevard, Suite 315
18                              Chicago, Illinois  60604
                                (312) 879-9500
19
                                LAW OFFICE OF JOSHUA G. HERMAN
20                              BY:  MR. JOSHUA G. HERMAN
                                53 West Jackson Boulevard, Suite 404
21                              Chicago, Illinois  60604
                                (312) 909-0434
22

23      Official Court Reporter:  NANCY L. BISTANY, CSR, RPR, FCRR
                                  219 South Dearborn Street, Room 1706
24                                Chicago, Illinois 60604
                                  (312) 435-7626
25                                nancy_bistany@ilnd.uscourts.gov
```

1      (Proceedings heard in open court:)

2           THE CLERK:  19 CR 869, USA versus Thomas Osadzinski.

3           MR. JONAS:  Do you want us up here?

4           Good morning, Your Honor.  Barry Jonas and Melody

5      Wells for the United States.

6           MS. WELLS:  Good morning, Your Honor.

7           THE COURT:  Good morning.

8           MR. HERMAN:  Good morning, Judge.

9           Josh Herman and Steve Greenberg on behalf of Thomas

10     Osadzinski, who is present.

11          MS. KWONG:  Good morning, Your Honor.

12          Kelly Kwong on behalf of probation.

13          THE COURT:  Good morning, everybody.

14          This is here for sentencing and disposition today.  I

15     have reviewed the Presentence Report, the memos submitted by

16     counsel, all of them, all -- I don't know -- hundred pages or

17     whatever.  I've also reviewed all the letters that the defense

18     has submitted to me for consideration, and I'm prepared to

19     proceed.

20          I think the first issue we are going to have to deal

21     with is the guideline issue.

22          MR. JONAS:  That's correct, Judge, about the

23     terrorism enhancement.

24          THE COURT:  Which one of you is going to take that?

25          MS. WELLS:  Your Honor, I'm going to talk about the

1  guidelines today --

2         THE COURT REPORTER:  Judge -- excuse me, Judge.

3      (Discussion off the record.)

4         THE COURT:  All right.  Ms. Wells.

5         MS. WELLS:  Yes, Your Honor.  I just wanted to

6  address the terrorism enhancement issue, which is the principal

7  objection to the guidelines that the defense made.

8         And the question before the Court as to this

9  enhancement is whether -- specifically whether the offense was

10  calculated to influence or affect the conduct of government by

11  intimidation, coercion, or retaliation.

12         And here the evidence at trial, both in terms of the

13  defendant's own behavior, his words, his actions, and the

14  content of the information that is at issue, show very clearly

15  that the offense was calculated to really do all three of those

16  things; to intimidate the United States and its citizens and

17  other Westerners and Western governments, to coerce them into

18  complying with ISIS's demands, and to retaliate against those

19  countries and their citizens for the conduct of the government,

20  in particular, the United States' involvement in Syria and

21  other areas of the Middle East.

22         And so I want to focus first on the materials,

23  because at the trial in this case we talked at great length

24  about the defendant's actions, about the computer code that he

25  designed and developed and distributed and taught.

1          We did not get in in any great detail to the
2    materials that were the point of all of this, meaning those
3    hundreds and thousands of ISIS videos, articles, and other
4    materials that the defendant was specifically targeting, that
5    he was working with, that he cared about, that he wanted to
6    spread, that he wanted to make known, that he wanted to
7    preserve.

8          And the information in those videos is of critical
9    importance in today's sentencing and in this discussion about
10   the guidelines.  And, in particular, those hundreds and
11   thousands of videos contain information that is explicitly
12   designed to incite violence, to recruit people to ISIS
13   either -- whether as members who travel physically to the
14   Caliphate and Syria or elsewhere, or to become home-grown
15   violent extremists who would then commit murder on behalf of
16   ISIS.

17         All of those materials are just replete with really
18   terrible violence.  And we attached to the government's
19   supplemental version of the offense a few of those videos, a
20   very small sample.  And, you know, I'm not going to play any of
21   that today.  They're horrific, frankly.  But the content of
22   that matters, because when you think about what the defendant's
23   offense was calculated to do, almost to a -- to a one, each of
24   those items is explicitly designed to do all of the things that
25   are contained in the federal crime of terrorism offense;

1    namely, that intimidation, coercion, or retaliation.

2            And there's no dispute, also, that the defendant knew

3    what these materials were.  There's a lot of evidence in the

4    trial record where he shares these materials, where he talks

5    about them, where he cites his favorite portions of them to

6    include beheadings and other, you know, murders.  Right?

7            So there's no question, I think, that he knew what

8    was in -- what was contained in the materials.  There's no

9    question that he was prioritizing those materials that were

10   created by ISIS and other ISIS-supporting organizations.

11           And there's also no question that in his own words he

12   made clear that he had a problem with the United States

13   Government, that he had a dislike for the United States

14   Government.  And, in particular, we see him discussing his plan

15   to trick the FBI into investigating what he called

16   nonbelievers, so non-ISIS supporters, into -- he wanted to

17   trick the FBI into investigating those people so -- and this is

18   a quote from the defendant -- so the people who are "planning

19   attacks have less time being spied on."

20           So he wanted to specifically distract efforts from

21   the real terrorists, the real criminals, and focus the

22   attention of law enforcement on other innocent parties.

23           We also see what his purpose was in committing this

24   offense in the article that he wrote and published in the Youth

25   of the Caliphate magazine, which is specifically about his

1    distrust and dislike and disapproval of the United States
2    military.

3           We also see him discussing with the OCEs in the case
4    that he wants to encrypt files, and he did that specifically,
5    as he said, so that the mukhabarat, the FBI, cannot read them;
6    so, again, lots of efforts to obfuscate his behavior.

7           He also made clear that his -- his purpose in
8    committing this offense was media jihad; so, again, not some
9    benign purpose, not some academic interest.

10          And I also want to point out to something that's
11   cited in the government's sentencing memorandum.  It was --
12   portions of this were an exhibit at trial, and then we attached
13   our entire video to our supplemental version of the offense,
14   which is "The Fighting Has Just Begun."  This is the video in
15   which the defendant narrated portions of the video; and that's,
16   you know, as he described it to other witnesses.  That was his
17   voice.

18          And there's simply no question what this video was
19   about.  It's meant to encourage attacks against individuals,
20   against governments.  If you look at the video beginning
21   sometime around the 2-minute mark, the defendant's voiceover
22   work begins.  He continues that voiceover work.  There's some
23   news -- video footage of news that's intercut in there.  And
24   somewhere around the 9-minute mark, his portion -- his portion
25   ends.

1    And in that sort of 7-minute segment that he's

2    involved with specifically, the point of the video is to

3    criticize the United States and to encourage retaliation

4    against the United States for its leadership, for its -- its

5    presence in Syria, for its military actions, and other things.

6    And that narration ends with a specific call by the

7    defendant that's very, I think, on point here, because he

8    writes or he says -- excuse me -- that he wants to, quote,

9    "Break the pride of the crusaders" -- that's a reference to the

10   United States -- it's "an obligation until they follow the

11   orders of the Mujahideen" and halt their aggression.

12   And he invites ISIS fighters to return the flames of

13   war to countries of the aggressors like the United States.  And

14   as he's saying those words, if you watch the video the

15   9-minute, 7-second mark, you see a slide that comes up, and

16   it's written in English:  "The Muslim in their lands will

17   retaliate with an equivalent strike."  It is that retaliation,

18   Your Honor, that is the point of this information that all of

19   the defendant's work, everything he set out to do in this case

20   is about this.  It is about the retaliation.  It is about the

21   violence.  It is about the terrorism.  That's -- that's the

22   point.

23   And so all of that is inseparable from the

24   defendant's conduct.  I think the defense would have it that if

25   you take a very, very narrow view of what he did, that writing

1    computer code is not itself terrorism, but that is to close --

2    to close one's eyes to the facts of the entire case.

3              And so for those reasons, Your Honor, the

4    government's position is that the terrorism enhancement

5    applies.

6              There's one or two other small points that I want to

7    address from defense --

8              THE COURT:  Wait one second.

9         (Discussion off the record.)

10             MS. WELLS:  Thank you, Your Honor.

11             One of the things that the defense mentioned in their

12   filings is that the defendant's actions here were private

13   Telegram channels, that this was sort of a one-to-one transfer

14   of information within private channels.

15             I think that's factually just not supported by the

16   record.  As you heard at trial, Your Honor, the defendant

17   independently found, contacted several people who turned out to

18   be government actors in this case.  So OCE 2, Jack Rogers, who

19   testified at trial, the defendant found him.  Okay?  It wasn't

20   the reverse.

21             And it's important to remember that the defendant

22   believed that OCE 2 was a representative of a pro-ISIS media

23   organization that focused on toxins and explosives and

24   publishing information related to that kind of -- to that

25   substance.

1    And what he -- what the defendant did is he shared

2  his information about his computer script with OCE 2.  That's

3  not private sharing between channels controlled by the

4  defendant.  That's pushing out a powerful tool to someone he

5  believed an ally in his cause.

6    The same thing is true for OCE 4, who the defendant

7  found on his own and who the defendant believed to be working

8  on behalf of an ISIS organization that translated official ISIS

9  propaganda into English; so, again, reaching a very specific

10  audience that the defendant was concerned with.  And, again,

11  he's sharing this script.  He taught -- in great detail he

12  taught OCE 4 how to use it and how to make it work.

13    And, again, from the defendant's perspective, he is

14  giving this to someone who has a large, you know, microphone,

15  you know, to speak out on behalf of ISIS and to spread that

16  message.  Likewise, he shared it with the CHS who he believed

17  to be a like-minded individual.

18    And so the notion that he was keeping this sort of

19  private or that he had his own library of materials for his own

20  use I think is simply unsupported by the record.

21    I'll rest there, Your Honor, unless you have any

22  questions.

23    THE COURT:  Not just now.  Thank you.

24    MR. HERMAN:  Thank you, Judge.

25    There is so much we disagree with in terms of the

1    scope and application of this extreme enhancement, which to

2    telescope out would effectively multiply the otherwise

3    applicable guideline range by 300 percent.  As indicated in

4    some of the cases we cited, it is specifically reserved for

5    those that engage in violent acts to distinguish terrorists

6    from the most reprehensible that do deserve that severe and

7    high punishment.

8            To put Tommy on the same plane as an individual who

9    would attempt to bomb, you know, a bar is, quite frankly,

10   absurd.  And to go back to the limits that the government just

11   ran through on the scope of the enhancement, I would like to

12   draw the Court's attention to the main case that we cited,

13   which is the *Alhaggagi* case, A-l-h-a-g-g-a-g-i, from the Ninth

14   Circuit, 978 F.3d 693.  In there I think we can draw three

15   principles away from the case where the court rejected

16   arguments that -- the Ninth Circuit rejected arguments that the

17   government is making here.

18           First is, you cannot base this enhancement on the

19   desires and goals of the FTO or the acts of third parties.  The

20   enhancement must be based on the specific intent of the

21   defendant.

22           Second, you have to base the enhancement on the

23   offense conduct, not the relevant conduct.  And I want to draw

24   the Court's attention specifically to footnote 6 of the

25   *Alhaggagi* opinion where the Ninth Circuit specifically said

1    that -- noted how the government was trying to base the

2    enhancement on comments that the defendant made about

3    detonating bombs in the Bay Area.  And the Court said:  It must

4    analyze whether or not the defendant provided material support

5    with a specific intent of influencing or affecting government

6    conduct.  His specific intent from other unrelated offenses is

7    not sufficient to trigger the enhancement under the 3A1.4.

8            Every reference to the use of the caliphate, all of

9    these other comments, this pure and utter B.S. regarding what

10   Tommy said about Reddit -- you know, I'll get to that maybe in

11   a little more detail -- it's not the offense conduct, which is

12   why we focus so specifically -- and this is where the Court

13   needs to focus so specifically -- on what are the services?

14           Recall back to the response to our bill of

15   particulars.  The services provided here was the script, the

16   computer code.  That is what the service is that the defendant

17   provided here and what he was convicted of, what the government

18   identified throughout trial was the services.

19           And ultimately the government -- the *Haggagi* warns

20   that the government cannot conflate the material support

21   offense.  The mental states are different.  The underlying

22   offense requires a knowledge mental state.  The enhancement

23   requires specific intent.

24           What the government has done is constructing argument

25   that would apply 3A1.4 in every terrorism case.  Anybody who

1    forwarded a video -- and we're not going to defend the videos
2    for one iota.  We didn't at trial.  There's no redeemable value
3    even if -- even if the videos are not in themselves illegal,
4    and one could argue that they are protected by the First
5    Amendment.  We're not going to sit here and say that there's
6    positive value to them, and neither will Tommy.

7         But to say that -- to accept the government's
8    argument would be anybody hitting forward on a video triggers
9    the enhancement simply because the videos could be interpreted
10   by a hypothetical third party or independent actors separate
11   and apart from the person forwarding the video to do something.

12        That is far too attenuated to base such a severe
13   enhancement, an enhancement that must be based on the
14   individual's specific intent.

15        There's also a threshold issue here which we -- I
16   don't want to skip over, and I want to -- I'm going to loop
17   back to some of those points I just made -- but a threshold
18   issue here, again, Ms. Wells quoted -- quoted the definition of
19   a federal crime of terrorism.  Is it calculated to influence or
20   affect government conduct through intimidation or coercion or
21   retaliate against government conduct?

22        And going back to the justification for this
23   enhancement in the PSR -- and Ms. Kwong, you know, respect her
24   to no end and have dealt with her office and these cases
25   often -- she notes that the -- borrowing from the government's

1  version in arguments -- that the script was modified and used
2  because of what Telegram was doing.

3          If we accept that proposition that what is -- the
4  plan, the objective of the script is to circumvent the social
5  media policy for erasing these channels; and, again, when we
6  focus on what the services are, we are looking at a script that
7  moves and copies videos in mass from one channel to another.
8  That's what the services that Tommy was convicted of consist
9  of.

10         That is not retaliation against the government.  That
11  is not attempting to influence a government to make videos
12  available in private channels that people have to be invited
13  to.  That's not us saying it.  That's the government affiant in
14  the complaint that we quoted.  These are private channels that
15  the script is operating under.  Again, the enhancement must be
16  based on the offense conduct.

17         Operating in that manner is not calculated to affect
18  government conduct.  If anything, it's an end-around social
19  media takedown policies.

20         The government has to focus on the content of the
21  videos because it cannot point to Tommy's intent.  The content
22  of the videos, ISIS's purpose in those videos is not synonymous
23  with Tommy's specific intent.  If you look at "Heralds of the
24  Internet," the PDF docket, the only evidence that it was ever
25  shared was with OCE 2 in this case.  Tommy's intent is to bring

1    people -- it's to Dawlah, for proselytizing, for religion.

2    There's no mentioning of -- mention of Tommy

3    recruiting.  There's no mentioning of Tommy intending that

4    sharing the videos would result in violence, would result in

5    fund-raising.

6    There's no evidence anywhere in the record that his

7    plan and purpose for developing the script was to achieve those

8    goals.  Relying on narration from other video or an offhanded

9    comment, which is completely absurd, to think that uploading in

10   mass videos to Reddit would so distract the good people of the

11   FBI that, you know, all these ISIS members could scurry around

12   somewhere in Syria and then commit attacks is such an absurd

13   proposition, another example of Tommy's puffery online about

14   doing something, which he never did and had ample opportunities

15   to do, again, evidence that he was just BS-ing.  That's not

16   evidence of attempting to use the script, the script, to

17   influence government conduct.

18   You can't take what ISIS's proclaimed purpose of the

19   videos was as a stand-in for Tommy's specific intent.  And

20   that's why -- that's why Ms. Wells got up and said, "I want to

21   talk about the videos.  I want to talk about the content of the

22   videos."

23   If we accept this theory, anybody that shares a video

24   has committed a federal crime of terrorism, separate and apart

25   from an underlying material support offense.  And that just

1  simply can't be.

2         And the final point, just for clarification, the

3  *Dhirane* case -- it's a Fourth Circuit case that the government

4  cites in its brief -- just to be clear, that had nothing to do

5  with the terrorism enhancement.  The specific -- the

6  enhancement in that issue in that case was 2M5.3, which is --

7  adds two points for an individual that -- whose conduct is

8  reasonably foreseeable that it will lead to violence.  And the

9  individuals in that case were fund-raisers for the terrorist

10 group al-Shabaab in the Horn of Africa.

11        And it is quite telling, Your Honor, neither

12 probation nor the government in this case sought that

13 enhancement for acts that would be reasonably foreseeable to

14 lead to violence.  And that's significant for reasons that

15 equally apply for refusing to apply 3A1.4.

16        Thank you.

17        MS. WELLS:  May I respond, Your Honor?

18        THE COURT:  Sure.

19        MS. WELLS:  Starting first with the *Alhaggagi* case

20 that Mr. Herman mentioned, this case is not on point.  And very

21 specifically, the issue that was found there with the

22 application of the terrorism enhancement is that the court at

23 sentencing did not make findings about the defendant's specific

24 intent.  And, in particular, there was no finding in that case

25 that the defendant knew how certain social media accounts were

1    going to be used on behalf of ISIS, on behalf of the FTO.

2            Here the evidence that the government is offering

3    today is, in large part, related to that issue.  There is

4    plenty of evidence that this defendant knew exactly how his

5    script would be used because, one, he was using it himself;

6    two, he was teaching it to people who, like I said, were people

7    he believed to be representatives of pro-ISIS media outlets

8    online dealing in particularly violent, dangerous things like

9    the toxins and explosives.

10           So there's no lack of knowledge here.  And in

11   particular, on the question of specific intent, Mr. Herman

12   cited "Operation:  Heralds of the Internet," which, as the

13   Court well remembers, is the defendant's own document.  He

14   wrote it; he drafted it.  It's his explanation of how his

15   computer program works and how he wants it to be used.

16           And Mr. Herman read a portion of a sentence from that

17   in which he said, well, the intention of the document,

18   according to the defendant, is to bring people to Islam.  The

19   rest of that sentence, Your Honor, says:  And to teach everyone

20   the transgressions of the crusaders and how the Islamic State's

21   response to transgressions is self-defense.

22           And make no mistake, the Islamic State's response to

23   transgressions, that is terrorism; that is acts of violence.

24   Those are murders of innocent people around the world.  That is

25   what the defendant's intent was.

1       And if you look just a little further down the page,

2   this document is clearly intended to be spread more widely.

3   Just the very last sentence, the defendant is talking about

4   various ISIS media channels that he wants to -- that he wants

5   to use his script on and, particularly, Al-Furqan.  And he

6   says:  The Furqan channel is easier for beginners.

7       Implicit in that and, frankly, in the rest of this

8   document, is this notion, oh, it's easier for beginners.  So

9   when other people start to learn how to do this, as I have

10  already learned, this is a good starting point, because this

11  one is simple.  We'll get to the more complicated ones later.

12      His intent -- his specific intent was always to use

13  this script to teach others, which he did, as the trial

14  evidence showed, and to spread it around.  And when he talks

15  about the transgressions of the crusaders and Islamic State's

16  response, that is directly on point with what the terrorism

17  enhancement is meant to cover.  That is meant to tell Western

18  countries like the United States, citizens of Western countries

19  like the United States, you should be afraid of us.

20      And the defendant's own views about this were also

21  clear during the trial.  There was testimony from Jack Rogers,

22  and this is at page 234 of the trial transcript.  And OCE 2,

23  Jack Rogers, was explaining a conversation that he was having

24  with the defendant.  And the defendant responded:  "I saw

25  Baghouz," which the witness explained was the sort of last

1   stand of ISIS's physical caliphate in a location called

2   Baghouz.  The defendant says, "I saw Baghouz, and it made me

3   hate this country."

4           So that is his specific intent, Your Honor.  And all

5   of this information goes back to the exact language that's in

6   the enhancement, and that applies here.

7           THE COURT:  Do you want to get the last word?

8           MR. HERMAN:  Yeah.  It's still -- we're still missing

9   the question about how this is calculated to intimidate a

10  government.

11          If I send videos to somebody else, how they react to

12  it is not -- does not supplant specific intent.  Whatever they

13  do does not supplant the specific intent that is required.

14          This is -- you know, we have to think about proper

15  applications of this enhancement.  Traveling overseas to join a

16  group, committing acts in that way where one is the individual

17  actor that is perpetrating where their acts will reflect upon

18  their intent.  That's simply not the case here, Judge.

19          Thank you.

20          THE COURT:  Okay.  Well, it's an interesting issue.

21  And I agree that this isn't the most aggravated type of conduct

22  that might result in application of this enhancement, but I

23  don't think there's any serious question, very frankly,

24  respectfully to the defense team, who has done a terrific job

25  in this case, I just don't think there's any serious argument

1    that he didn't intend to promote terrorism in all the ways that

2    Ms. Wells just went through, including fooling the FBI so that

3    people who want to commit actual violence would be somehow

4    overlooked by the FBI when they were directed towards people

5    who were not ISIS followers.

6              We know that ISIS is a terrorist organization.  The

7    script was meant to promote that terrorism, and there was no

8    other reason for this defendant's conduct other than to promote

9    the terrorist activities of ISIS.

10             I don't think I have to go through all of the

11   examples that Ms. Wells just went through, but the retaliation

12   that he mentions, the attacks on the FBI.  And the case that

13   you cited from the Ninth Circuit, that didn't reverse the

14   decision.  It just said you have to consider -- you shouldn't

15   just consider what ISIS is doing.  You have to consider what

16   the defendant is doing.

17             And when we consider what Mr. Osadzinski did

18   throughout the period that this violation included was all

19   direct towards promoting the terrorist activities of ISIS.  So

20   I just don't even think this is a particularly close case.  I

21   know you do, but I really don't.

22             And I agree that some -- a lot of the other cases are

23   distinguished.  He didn't go overseas.  He didn't acquire

24   weapons.  He didn't engage in bomb making or that sort of

25   thing.  Those are all, I think, 3553 factors, which I'm going

1       to talk about soon, but I think that although this isn't the

2       most aggravated case that would apply this enhancement, I think

3       that it clearly applies in this case.

4               And I have taken into consideration all of your

5       arguments.  I think they're well made, but I just don't agree

6       with the defense position on this.  This is not just a private

7       thing.  He wanted these videos.  He wanted the actions that he

8       believed might be taken by ISIS to be broadcast and followed,

9       and he certainly intended to support the terrorism of this

10      terrible organization.

11              So I find that the enhancement does apply.  I think

12      it is a pretty draconian enhancement, but terrorism in our

13      world today is a pretty draconian part of our lives.  And so

14      I'm agreeing with the probation officer's report and the

15      government's position that the offense level is increased the

16      14 points to 38.

17              The criminal history goes from I -- he really doesn't

18      have a criminal history; I think that is, again, a 3553 factor

19      that we could talk about -- but it goes up to a VI.

20              So the guideline range would be basically 240 months

21      because of the statutory maximum.

22              So let's talk about the mitigating factors here and

23      the aggravating --

24              MR. HERMAN:  Judge, seeing that I'm 0 for 1, I'm

25      going to tag out.  We had a deal if I won that I could finish

1   it.

2          THE COURT:  I was hoping that -- I was hoping that

3   maybe you would take this.

4          MR. HERMAN:  No.

5          THE COURT:  I have to listen to Mr. Greenberg again.

6          MR. HERMAN:  He brings years --

7          MR. GREENBERG:  That's the only thing that the

8   reporters are going to now put in.  The Judge complained he had

9   to listen to Mr. Greenberg.

10         THE COURT:  I was only kidding.

11         MR. JONAS:  Judge, given that Ms. Wells is 1 and 0,

12  maybe I should have her make the argument for the 3553.

13         THE COURT:  This is not a ballgame.  This is a much

14  more serious matter, but I appreciate where we stand here.

15         Okay, folks.  Let's talk about this, because I think,

16  frankly, this is a very serious issue.

17         So, Mr. Greenberg, I think the ball is in your court.

18         MR. GREENBERG:  You want me to go first, Judge?

19         THE COURT:  I think when it comes to 3553 factors,

20  usually the defense should go first, unless you don't want to.

21         MR. GREENBERG:  I mean, as long as I can get a last

22  word.

23         THE COURT:  Oh, you'll get a last word.

24         MR. GREENBERG:  All right.  Judge, I have -- one of

25  the reasons I wanted to cover this area is I have known this

1   family for probably 20 years now, I think since 2001 or 2002.

2   And I've -- I've known the parents.  I knew the -- his mother's

3   brother, and that's how I knew them.

4        I didn't know Tommy.  I didn't know his sister.  But

5   when I first met him, which was essentially when the FBI came

6   knocking on his door -- not when he got arrested but maybe a

7   year or so before he got arrested and sort of said, you know,

8   this behavior is problematic -- and I talked to him, a couple

9   of things struck me.

10        One was he was a little bit different than -- than I

11  expected in the way he looked at things.  And I don't mean in

12  the way he looked at things from a political standpoint, but he

13  could have been one of my own children's friends.  He grew up

14  in Northbrook.  He went to Glenbrook North.  His family now

15  lives in Highland Park where I grew up and where I raised my

16  family.  He's a year younger than one of my children, and his

17  sister is the same age as one of my children.  And this could

18  have been someone that I knew, one of my kids' friends.

19        And he grew up in an environment that I was familiar

20  with, but it seemed like something was missing.  And as we now

21  have come to learn, at the time that was going on and these

22  activities were going on, he was lonely, and he was having

23  mental health issues, serious mental health issues, which,

24  unfortunately, in the time he's been in the MCC have only been

25  minimally addressed.  They've been addressed somewhat, but

1    because he was in there during COVID for so much of the time,

2    he wasn't able to get the counseling that he needed and maybe

3    sort of address those issues quite to the extent.  Hopefully

4    he'll be able to do that as he goes through and serves his

5    sentence and certainly on whatever period of supervised

6    release, be it three years, five years, or whatever.

7            But there were some issues, and the issues hadn't

8    really gotten recognized.  Now, why is that?  I'm not quite

9    sure, because you would think that someone would not sort of

10   slip through the system -- going to Glenbrook North wouldn't

11   slip through the system, you know, like we see so many times

12   where families don't recognize it.

13           But there were definitely some issues.  He was alone.

14   He was searching for acceptance.  He didn't really have many

15   friends at school.  We talked to some of his friends in terms

16   of the defense in seeing if they could add anything, and they

17   were like, "Well, we were friends with him; but, you know, we

18   thought he was weird.  Like, we were nice to him, but we

19   weren't hanging out with him.  We weren't inviting him to go

20   with us, to go watch the ballgame or to go have pizza and

21   beer," even though they were underage.  They were in college,

22   so they were doing that.  "We weren't bringing him along."

23           So -- and he was having trouble in his life, frankly,

24   dating.  He wasn't able to meet girls.  He wasn't able to

25   really get involved.  And he finally found sort of a sense of

1    being in religion, in the Islamic religion.  And he got sucked

2    in, Judge.  He was vulnerable, and he got sucked in.  And he

3    got sucked into the beliefs, and he got sucked into the world.

4    And the deeper he got into it, the more he got sucked into it.

5           And I would point out that in the facts of this case,

6    Judge, in the evidence are efforts by these OCEs and these

7    other people to suck him in deeper to get him to do things.  I

8    don't know if Your Honor recalls the bomb-making instructions

9    and some of the other things.  And he'd be, like, "Yeah, yeah,

10   sure, sure, I'll help."  But he never did.  He knew to stop.

11   He knew to stop.

12          So while you may believe that the terrorism

13   enhancement is appropriate is you've indicated that it's a

14   3553(a) factor.  He certainly knew not to do these other

15   things, but he was looking for acceptance.

16          You can't justify what he did after the jury's

17   verdict.  We can believe what we want as defense lawyers and as

18   a defense team; but, you know, we respect that verdict.

19          But what was he doing?  He was taking these videos,

20   and these videos are available.  He may have been sharing the

21   videos in a different way than Aaron Zelin shares them, but in

22   many ways, he wasn't doing anything that much different.  The

23   difference is Zelin says, "These videos I'm sharing are bad,"

24   and Tommy said, "These videos I'm sharing are good."

25          And that's really in many ways the distinction, is he

1  said they're good, and Zelin said they're bad.

2  And I know we can parse it out, and we can argue
3  about all of that.  But we have to evaluate what we're talking
4  about here through who he was at the time, and we also have
5  to -- you know, we've come to learn that young people, even
6  though they're adults and they're at college, their minds
7  aren't developed, and they think differently, and they're more
8  impulsive.  And how many times do we say that someone who is
9  young makes the wrong decision and doesn't really know because
10  of their youth?

11  I would do almost everything different at this point
12  in my life than what I did when I was in college or in law
13  school or whatever.  The first thing I'd do is I'd, of course,
14  study more so I could have gone to a better law school.  But
15  how much do we look at that?  And I think science has come
16  around to recognize.

17  So we have to look at it that now he's 23.  When he
18  was doing these things, he was, you know, 19 -- 18, 19, 20
19  maybe and how it's different.  And the things he's also done,
20  Judge, he's a very impulsive person.  I think that's -- I think
21  that's part of his mental health issues.  I don't know if
22  it's -- what is it, OC, DC, whatever it is or, you know,
23  whatever the diagnosis -- he gets focused on something, and he
24  dives into it.

25  Now, that's great for computer programming, because

1    that requires that level of concentration where you could sit
2    there for hours and hours and hours and just digitize
3    something.  But maybe it's not so good for some other things
4    like this, where he got deeper and deeper into it.  But as he
5    gets older, that also will be less likely, and he will overcome
6    that.  Because we know as people get older, they do less.
7    They -- they offend less, and they learn to make wiser
8    decisions.

9              And hopefully with the benefit of this experience, he
10   knows to take that sort of focus and put it somewhere else.
11   And I think he's done that.  We addressed it -- I'm not going
12   to belabor it, but we addressed it in our materials, all the
13   things he's done during the time he's been at MCC, which is
14   like being in solitary confinement.  It's very hard time.

15             The government has made some reference to recidivism,
16   Judge.  And there are studies out there about recidivism.  In
17   fact, there was something called the TRACER Act that they tried
18   to pass to track people, and Congress didn't end up passing it.
19   The House did, I think, and the Senate didn't.  And if I'm
20   wrong, Mr. Jonas can correct me.

21             But I think that they found that the recidivism rate
22   for cases like this of people who had been charged and released
23   is under 2 percent.  It's a very, very low recidivism rate.

24             And when we look at Tommy, you know, Tommy wants to
25   finish this, do what time you impose, and we -- you know, we've

1   asked for five years, Judge.  Probation, looking at everything,

2   has said 78 months is an appropriate sentence.  And certainly

3   Ms. Kwong knows.  She does -- as I understand it, she does all

4   of the PSRs on these cases or she's got a bit of expertise in

5   that area.

6          But, you know, when he gets out, he wants to go back

7   to college.  And forever, Judge, he's going to be tarred with

8   this.  When he goes for a job interview, imagine, they're going

9   to Google his name because any employer is going to Google you,

10  and this is going to come up.  This is going to affect the rest

11  of his life.  And he's going to probably -- I think he's going

12  to talk about that, how he has made a -- he was a college

13  student.  He should be graduating now or he should have been

14  graduating.  He should be at his first job.  And what a mess

15  he's made of his life, and what a mess he's, frankly, made of

16  his family's life where they'll always have this label on him.

17         But he has good qualities.  He's smart.  He's a good

18  person.  He didn't take those extra steps when they asked him

19  to take those extra steps.  And a sentence at the minimum or

20  where probation has come in on this I think is appropriate,

21  with a term of supervised release where he can be monitored,

22  and I'm sure that the government is going to watch him very

23  carefully.  And I don't think this is the kind of person where

24  you're going to have to worry about him ever offending or

25  coming into court again.

1          THE COURT:  Thank you.

2          Before responding, do you have anybody besides the

3    defendant who wishes to say anything to the Court?

4          MR. GREENBERG:  I don't think so, Your Honor.

5    They've all submitted letters.  As you know, his parents have

6    been here all the time for him, and they're here again today.

7          Okay?  His sister would be here, but she graduated

8    from law school; she passed the bar.  She's now at her first

9    job and didn't want to -- didn't -- couldn't take off work

10   today.

11         THE COURT:  It might have been instructive.

12         All right.  Mr. Jonas.

13         MR. JONAS:  Thank you, Judge.

14         I'm going to first adopt the arguments Ms. Wells made

15   with regard to 3A1.4.  I think they're equally applicable to

16   the 3553(a) factors, and they overlap some of my argument with

17   hers.  But to the extent that I don't, I do want to adopt hers.

18         I want to start with the seriousness of the offense.

19   And, you know, the defendant throughout the trial and

20   continuing throughout the sentencing has, in our view,

21   minimized his conduct by attempting to portray it simply as

22   sharing and preserving videos.

23         Mr. Herman talks about simply someone forwarding

24   videos; and in their sentencing memo, they refer to this as

25   well.  But it's so much more than that.  That is a myopic view

1 | of the defendant's conduct.

2 | You have to look at the bigger picture. His goal, as

3 | Your Honor recognizes, was to make media jihad by modifying the

4 | computer code, allow for the high-speed copying of these ISIS

5 | videos, and to preserve them, because they were being taken off

6 | the internet by social media companies, rightfully so and for

7 | good reason.

8 | And his goal was not to just make the code to

9 | preserve the videos. It was also to help spread the code so

10 | that -- that it would perpetuate the preservation of videos. I

11 | told two friends, who told two friends, who told two friends

12 | type of analogy. And that's why he gave it to OCE 2 and OCE 4.

13 | He also wanted to create, as your Your Honor

14 | recognized, the false flag where he would divert the FBI's

15 | attention away from the ISIS members who were committing acts

16 | of violence and have the FBI focus on more innocent parties who

17 | may have curiosity about the videos.

18 | So why do all this? Well, as we reference in our

19 | sentencing memo and as Aaron Zelin testified at trial, the

20 | media part was essential to ISIS's success. And they were a

21 | very successful terrorist organization for a very long time,

22 | taking a large swath of land between Syria and Iraq, creating a

23 | caliphate and trying to expand that both land grab and their

24 | impact across the world.

25 | And these videos were incredibly important to them

1    for that success for a number of reasons.  As Ms. Wells said,

2    they recruited new members.  They inspired, and they incited

3    current members to actions, and they terrorized their enemy.

4    These videos are horrible.  They contained messages from

5    leaders criticizing the United States and the West.  They

6    contained slick battle scenes with music, which was designed to

7    inspire.

8           They gave directions to people on who to attack and

9    how to attack it.  The video that the defendant is on talks

10   about burning down different places.  And they contained

11   graphic scenes of violence to include beheadings.

12          The defendant's conduct in helping ISIS's media war

13   may not have been violent in and of itself.  He may not have

14   committed an act of violence by itself.  What he did was he

15   helped promote and encourage violence, and he helped promote

16   the ISIS media machine, which, as I said, was essential to its

17   survival.  In fact, that media machine continues today even

18   though ISIS no longer has a territory that it once did.

19          But it's more than just a code.  And Your Honor at

20   the sentencing phase has the opportunity to look at the bigger

21   picture here.  The defendant narrowed -- sorry -- narrated a

22   video, and he gave translations for other ISIS videos.  And

23   what I find astonishing, having done a lot of these cases

24   before, is how a 19-year-old from the north suburbs of Chicago

25   can find his way onto an ISIS video made overseas by an ISIS

1    unofficial media group.  That's amazing.

2         What that tells me is not only was he in contact with

3    these people -- so it's not just the FBI he's talking to -- but

4    that he convinced them that he's not law enforcement, and he

5    convinced them to allow him to help them.  They trusted him.

6         And that shows that he wasn't simply a keyboard

7    warrior sitting behind his computer screen and acting

8    anonymously, thinking he could say things, and no one is going

9    to consider it serious or take it seriously.  That is a

10   significant aggravating factor, Judge.

11        So he wasn't just interacting with the FBI.  As he

12   told -- and what started this investigation off in the first

13   place, Mr. Greenberg said he was -- the defendant was lonely;

14   he had trouble meeting girls.  Not quite the case.

15        He -- the FB -- it started off when an ex-girlfriend

16   left a tip for the FBI that the defendant was watching these

17   videos and was telling her that he was talking to ISIS media

18   folks.  That's what started this investigation off.

19        The FBI then confirmed that with another

20   ex-girlfriend.  So he wasn't having trouble meeting girls.  He

21   had girlfriends who were concerned about him.

22        And so the fact that he's engaging with these people

23   overseas, like I said, shows that he is being very proactive in

24   his conduct, which is just something that we don't always see

25   in these terrorism cases, where people are actually engaging

 1    back and forth and assisting ISIS members overseas.

 2              MR. GREENBERG:  They are called exes because there's

 3    a problem.

 4              MR. JONAS:  We don't know what the problem was,

 5    though.

 6              MR. GREENBERG:  But they're called exes because

 7    there's a problem.

 8              MR. JONAS:  Well --

 9              THE COURT:  Let's have one lawyer at a time, please.

10              MR. JONAS:  So, Your Honor, I don't think you should

11    put blinders on the way the defense is asking you to and view

12    things incredibly narrowly.

13              We are asking you to look at the entire picture here

14    of the defendant's conduct and its impact, not on ISIS.  It's

15    positive impact for them, but it's negative impact on the rest

16    of the world.

17              Another factor is promoting respect for the law that

18    we laid out in our sentencing memo, all the ways that the

19    defendant disparaged law enforcement, talking about how if they

20    come after him, he's going to commit a car bomb attack or he's

21    going to engage in violent jihad by the sword, I think is the

22    term he used.

23              He said he would never be taken to a man-made court.

24    Well, here he is.  He stalked the case agent.  He forwarded her

25    voicemail that she left for him to OCE 1, not knowing that

1   OCE 1 was an FBI agent.  He provided her information on a
2   website or a social media account called Discord.  In fact, she
3   received a phone call from someone to follow up to see if it
4   was all real.  He researched her background.

5          He had a stick figure drawing, as Your Honor knows,
6   of what clearly is him attempting to kill her.  And she was
7   concerned about all this.

8          She testified in the trial of *U.S. versus Schimenti*
9   *and Jones* before Judge Wood that I prosecuted.  And when she
10  testified, we were concerned that the defendant would show up
11  because, as we know, he was aware of that case.  The complaint
12  was found in his bedroom.  We had asked Judge Wood and she
13  agreed to provide extra security.  We had metal detectors
14  outside the courtroom when that agent testified because of the
15  concern about the defendant.

16         And when he was arrested in a controlled
17  environment -- because we were concerned about the statements
18  we made if we try to arrest him at his home where he could have
19  access to weapons, we arrested him in a controlled environment
20  in a hotel room -- it took four FBI agents to take him down,
21  and he kicked one of those agents clear across the room.

22         So when he said that he would commit an attack
23  against the FBI or against law enforcement if they came for
24  him, he was true to his word.  And so one of the factors the
25  Court must consider is promoting respect for the law.

1      There's also the deterrence.  The defendant says in

2  the sentencing papers that three years in prison has deterred

3  him, but we actually -- we don't know that.  He believed and

4  was motivated by an ideology that goes beyond money or romance

5  or emotion.  It was an ideology based upon his belief in God,

6  and that ideology as -- continues and can continue outside of

7  court, if you think about -- or outside of prison.

8      If you think about it, Judge, is he said he would not

9  be -- would not appear in the false man-made court.  He doesn't

10  believe in our laws.  And so putting him into prison is not

11  going to act as deterrence or putting him into prison for a

12  five-year sentence certainly will not act as a deterrence.

13      And beyond that, as we talked about, the FBI tried to

14  interview him before he committed the crime that he was charged

15  with.  Based upon the -- a tip by the ex-girlfriend, the FBI

16  tried to interview him, and he wouldn't talk to them.  And so

17  they interviewed his parents, and that did not deter him.  In

18  fact, that encouraged him.  He went on rampages about the FBI,

19  about law enforcement.

20      And so it should have scared him straight.  He was a

21  19-year-old kid going to DePaul.  The FBI knocks on your door

22  and your parents' door.  You should back off from what you were

23  doing, and instead he went full bore.

24      The only thing -- the only impact the FBI's

25  investigation had on him was to cause him to slow down, because

1    as he told OCE 1, he was waiting for the FBI to back off and

2    stop looking at him before he would do anything.  And sure

3    enough, he went dark for a few months and then reappeared

4    several months later in communications with OCE 2.

5         MR. GREENBERG:  Judge, I just for the record want to

6    object to a reference of him not talking to the FBI as being

7    aggravating, because he has a constitutional right not to talk

8    to the FBI.  So I just want to object to that.

9         You can't hold his exercise of his constitutional

10   right as an aggravating factor.

11        MR. JONAS:  I am not saying that that's an

12   aggravating factor.  I'm saying that goes to deterrence, and it

13   shows that the FBI knocking on his door, knowing they were

14   looking at him, did not deter him from committing the crime.

15        He has the absolute right not to talk to them.  I

16   don't disagree with Mr. Greenberg.  But that should have scared

17   his straight.  And so deterrence isn't a factor Your Honor

18   should consider.

19        This could have all been avoided if he took the

20   message from the FBI and just backed down.  He could have

21   still -- you know, we fully respect his conversion to Islam.

22   He could have been a practicing Muslim.  There are millions and

23   millions of practicing Muslims in the world that do not support

24   terrorism.  And he said he decided to support a terrorist

25   group.

1    I want to pivot briefly, Judge, to some of the
2  mitigating arguments that the defense raised in their
3  sentencing memo as well as what Mr. Greenberg raised.

4    And the first one is his mental health.  They go into
5  great detail in the sentencing memo about his mental health.
6  And reading it, you know, you get the image that the defendant
7  was practically incapacitated.  They said -- they used the term
8  "He had serious mental health problems."

9    But I think that's actually overstating.  First, he
10 was a fully functioning college student.  Okay?  He was getting
11 As, Bs, some Fs, some Cs, a whole mix of grades.  But he was
12 going to college, and he was doing well, and he was taking
13 exams, and he was showing up in the class.

14    He lived with his sister in an apartment in Chicago.
15 He didn't have to -- you know, he took care of himself.  He had
16 a job in a library, which, by the way, he used to print ISIS
17 posters.  He was able to get married.  He traveled halfway
18 around the world to get married.

19    No indication that his mental health problems were so
20 serious that it caused him to be delusional.  I'm not saying
21 they're saying he was delusional, but certainly they're saying
22 the mental health problems are what caused him to support ISIS.

23    There's no indication that whatever mental health
24 issues he had, to whatever extent they were, was the causation
25 for him supporting ISIS.  According to the NIH -- if you just

1    go online and Google it -- 20 percent of the population has

2    some sort of mental health issue.  There's over 300 million

3    people in the United States.  That means there's 6 million

4    people walking around with some mental health issue ranging

5    from minor to severe.  But you don't see 6 million people

6    supporting ISIS.

7            Most of them don't commit crimes.  Most people with

8    mental health issues function, as the defendant functioned.

9    The fact that the defendant supported ISIS --

10           THE COURT:  You would mean 60 million, wouldn't you?

11           MR. JONAS:  I said 60 million?

12           THE COURT:  You said 6.

13           MR. JONAS:  Six.  My math is off.  Sorry, Judge.

14           Sixty million, it makes the point even more so.

15   We're not bringing 60 million material support cases here.

16           THE COURT:  Thank God.

17           MR. JONAS:  Thank God is right.

18           So the fact that he may have had some mental health

19   issues doesn't excuse what he did knowing -- and he knew full

20   well what he was doing.

21           Moreover, you know, the defendant in the sentencing

22   memo blames his anxiety on being investigated by the FBI.

23   Well, I come back to what I said a few moments ago.  If he

24   was -- if he was anxious or had anxiety because the FBI knocked

25   on his door and he was concerned about the FBI investigating

1    him, he should have backed off.  And instead, he went full bore

2    and committed the crime for which he's been convicted of.

3              I like the fact that Mr. Herman said "BS."  I was

4    concerned I may say the same, but the fact that he opened the

5    door to using that words, I'm calling BS on blaming the FBI for

6    his mental health problems.  And I'm calling BS that the mental

7    health problems are what caused him to provide the material

8    support to ISIS.

9              He did it because he wanted to do it because he

10   bought -- he was full on board with ISIS's ideology.

11             Mr. Greenberg and in the sentencing memos talk about

12   his age.  I get it.  When I was 19, I did things I wish I

13   didn't do, stupid things.  But I didn't promote beheadings.  I

14   didn't promote murder or violence.

15             At 19, whether you're immature or not, you know at

16   that age that murder is wrong.  And you can't say, "Oh, he's

17   19.  Oh, it just -- you know, he's just some stupid kid."

18             At 19 you know.  And so while he may have been young,

19   he wasn't so immature that he didn't know the difference

20   between right and wrong, between murder and not murder.  You

21   know, kids at that age, maybe they're driving fast; maybe

22   they're getting -- you know, drinking under age; maybe they're

23   drinking while driving, all stupid things.  But, you know, most

24   of them aren't committing murder, and those that are are being

25   prosecuted for it.  And you can't use their age as an excuse.

1    Again, I'm not saying he committed murder, but he promoted it.

2               So, Judge, the statute -- the sentencing guidelines

3    and the statutory maximum, as you know, are 20 years, 240

4    months.  And we're not arguing for a sentencing guideline -- a

5    guideline sentence.  We're not asking for 240 months.

6               We're asking for 15 years, a 25 percent reduction,

7    because we do recognize that there are some mitigating factors

8    here.  We cited several terrorism cases brought in this

9    district.  Not to say that those should be -- that the

10   defendant's conduct was on par with some of them but to give

11   Your Honor sort of the spectrum of sentences that have come

12   down in this courthouse.

13              And I want to address one real quick that the defense

14   raised that is not in our sentencing memo, and that's *United*

15   *States versus Al-Jayab*, a case I prosecuted, a case Mr. Herman

16   defended the defendant before Judge Ellis.  *Al-Jayab* got, I

17   believe it was, five years, 60 months.

18              Judge Ellis gave *Al-Jayab* such a low sentence because

19   she firmly believed that he was going to spend a long period of

20   time in ICE custody before he'd be deported, and that's why she

21   on the record said she was giving him only five years.  We

22   think that's an outlier.

23              We cited the sentences in the other terrorism cases

24   in the district to give Your Honor the spectrum.  And in our

25   view -- Ms. Wells' and I view of the spectrum, we think that 15

1    years fits well within the sentences given in other cases.

2          This is not the *Edmonds* case where Jonas Edmonds

3    wanted to kill 150 national guardsmen.  This is not the *Dawood*

4    case where he tried to blow up a car bomb downtown and kill the

5    FBI agent.

6          But this is also not simply a case of someone who

7    just wanted to go overseas to help and do nonviolent things on

8    behalf of ISIS, like in the *Khan* case, who pled guilty and

9    cooperated.

10         This fits in sort of somewhere in the middle, and

11   that's why we think 15 years -- with all the 3553(a) factors

12   and the circumstances of the offense, the deterrence, the

13   promotion for the law, we think 15 years is appropriate.

14         One other point, Your Honor.  We're also asking for

15   lifetime supervised release.  Defense counsel has stated in

16   their papers that the defendant has learned his lesson and that

17   the society doesn't have to worry about him committing this

18   crime again.

19         I don't know if that's true or not.  I don't.  We're

20   hearing it from defense counsel.  They make these arguments all

21   the time.  I respect the argument.  We just don't know.

22         So we believe that whatever sentence you impose on

23   the defendant, lifetime supervised release is appropriate.

24   Certainly after a certain number of years, if the defendant is

25   behaving well, he can always file a motion with the Court to

1  terminate early.  But we think at this time probation should be

2  keeping an eye on him for an indefinite period of time, so we

3  would ask for that.

4         Thank you, Judge.

5         MR. GREENBERG:  Judge, I'm not going to go into

6  everything that he just addressed.

7         I do want to touch on the FBI agent information.

8  When the message was forwarded, the identifying information was

9  deleted from the message.  The phone number --

10        (Counsel conferring.)

11        MR. GREENBERG:  -- when it was sent to the OCE, it

12  was deleted.  So there wasn't identifying.  It wasn't, like,

13  this is Jane Doe.  You know, here's her number and so on and so

14  forth.  It was just the message.

15        The FBI was following Tommy.  When we talk about his

16  mental health, they were following him around.  I believe he

17  actually ended up checking himself into a hospital because he

18  was having such anxiety over it.

19        And as I indicated when I objected, he had a right

20  not to talk to them.  That was when he had come to see me.  And

21  I think that -- I thought that was good legal advice.  I still

22  think that's good legal advice.  I hope it's not aggravating.

23  I won't tell you what else he and I talked about at that time.

24        But, you know, it's a question of really at this

25  point what do you -- what sentence is appropriate to deter him

1    from future activity and also send a message that what he did

2    was serious?  And that's really what it comes down to.

3            The deterrence, I have no doubt -- and I know I'm a

4    defense attorney -- I have no doubt that he's not going to

5    repeat this kind of conduct in this kind of case or any other

6    kind of case.  Regardless of what the videos may have shown and

7    what you think his goals were and so forth, I don't think he

8    actually wanted anyone to go out and bomb a building or kill

9    somebody or behead somebody.

10           He would make comments about stuff, but it was

11   bluster, Judge.  It wasn't -- he wasn't out there -- if he was

12   really out there wanting these things to happen, you would have

13   seen him deliver when they would encourage him to do things, go

14   get a gun, make the bomb, translate the bomb-making

15   instructions, and you would have seen him doing something like

16   that.  "Hey, I'm going to the Middle East.  I'm going to

17   fight."  You would have seen that kind of stuff.

18           So I think a lot of that was just blustering, and I

19   don't think you're going to see him back in a courtroom

20   offending again.  Obviously, a message has to be sent to others

21   that this kind of conduct is not acceptable.  But then, you

22   know, when I get cases like this, I -- and I certainly don't

23   have the breadth of experience like Mr. Jonas and Mr. Herman do

24   on them; but, you know, it's sort of like some of the state

25   court crimes -- the more serious state court crimes where

1   people get long sentences, and you wonder why is someone else
2   then committing that crime?
3          I really question, because this is an ideological
4   thing, if there's really a lot of value in a long sentence to
5   deter others, because I think that people who do these kinds of
6   things are doing them -- you know, the essence of it is, I'm
7   sacrificing my life for the cause.
8          We see -- and I hate to throw this analogy, and I see
9   where you're looking -- but we talk about suicide bombers and
10  people who do stuff like that.  They don't care about the
11  consequences.  Nothing you do to someone is going to deter
12  someone from doing that, because it's an illogical thing to do.
13  It's an illogical choice.
14         So I really don't think you have to send a long
15  sentence to deter in this case and that it really,
16  unfortunately, will send a message.  But when you look at the
17  individual you're sentencing, the one place where I sort of
18  disagree with Mr. Herman and agree with Mr. Jonas is I think
19  maybe not lifetime but a period of -- a significant period of
20  supervised release is appropriate, where people will know what
21  he's doing.  He'll have to check in.  They'll be able to
22  monitor his activities.  They'll be able to check his social
23  media and do all of those things.
24         And I think that can, you know, satisfy everyone
25  that, in fact, he is on the right path and can help him to get

1    to the right path where he can get the counseling he needs, the

2    mental health counseling, where he can get the job assistance

3    that he's clearly going to need.  And so there I sort of differ

4    from Mr. Herman, and I agree with Mr. Jonas.

5            But I think, Judge, the sentence that we've suggested

6    somewhere in there or where probation has come in is the

7    appropriate sentence in this case.

8            THE COURT:  All right.  Thank you.

9            MR. JONAS:  Thanks, Judge.

10           THE COURT:  Mr. Osadzinski, would you like to address

11   the Court?

12           THE DEFENDANT:  Yes.

13           MR. GREENBERG:  Can he come up to the podium?

14           THE COURT:  Sure.

15           THE DEFENDANT:  Well, thank you.  I had a Ted Talk

16   prepared, but I reduced it with the help of Josh, because I

17   want to say everything, and I'm going to try to not cry.

18           But I'm deeply ashamed and saddened to be standing

19   before you in this courtroom waiting to be sentenced today.

20   And at this time --

21           MR. GREENBERG:  Slow down.

22           THE DEFENDANT:  -- in my life, I should have

23   graduated from college.  I literally saw from the barred

24   windows of the MCC my graduating class on the El platform of

25   the Harold Washington Library with their blue-and-red balloons

1  while I was sitting in the jail cell during the pandemic.  And
2  I should have had my first real job, should have been with my
3  family, and should have lived in an apartment with my wife.
4  But that's a life that I've ruined with my choices and
5  decisions.

6        I have made a total and complete mess of my life, and
7  for that I want to apologize, first, to my parents, who are
8  sitting back there, and my sister, who wasn't able to make it
9  today because she's at Northwestern, and I asked her to
10 schedule it.  But they're too noisy, and she didn't want to,
11 you know, get pried into, but I'm sure she would love to be
12 here.

13       And my parents came to this country and struggled to
14 give me every single opportunity.  They raised me in a
15 beautiful home, provided me with a wonderful education that I
16 didn't perform my best at and I would love to today, only to
17 watch me self-destruct.  And I failed you, to be honest.

18       And I also want to apologize to my wife, who isn't
19 here.  And I promised her a life together and did everything I
20 could, working at UPS and at the DePaul tech support desk at
21 the Richardson Library in Lincoln Park.  But I failed her, too,
22 and I can only hope that she'll remain my wife while I serve
23 whatever sentence Your Honor imposes.

24       And I have failed everyone, and I have failed myself.
25 And I may one day be able to return to college, but it will

1    never be the same, because for the rest of my life I'm going to
2    be marked by this conviction.  Regardless of the sentence that
3    is imposed today, one day I'll be released; but everywhere I go
4    and to everyone I know, I will be labeled as a terrorist.  I
5    mean, even at the MCC people who are familiar with bad conduct,
6    you know, "What are you here for," they'll tell them, and
7    they'll be able to play cards together like anything.  But even
8    for me, you know, I -- they ask what I'm here for.  I say the
9    "T" word, and even they're concerned, and they're used to this.

10        But, Your Honor, I was in a dark place when all of
11    this happened.  And looking back, I see how alone I felt, and I
12    didn't really know who I was.  And I was struggling with mental
13    health issues.  And how I spent my life on the internet lost
14    online, I escaped my life.  And I was searching for answers and
15    thought I found them, but they were only lies.  And the videos
16    that I became so obsessed with are just poison and well
17    deserving of condemnation.

18        And if it's not clear already, I completely reject
19    ISIS.  I see the dangers of the videos and my conduct, and I
20    get it.

21        And my three years in the MCC have been hell.  And
22    I've lived the entirety of the pandemic behind bars, and I
23    lived through the COVID lock-downs and have had COVID once in
24    May 2020 and then again during the omicron wave.

25        Many times I have spent 24 hours a day in a cell, and

1    I've been separated from my family, mostly 23 -- 23-1/2 hours a

2    day where you'll be able to go out for a phone call.  And

3    sometimes I would cut it short to read opinions.  And I read

4    that Your Honor wrote in an opinion for *Elim Romanian*

5    *Pentecostal Church versus Pritzker*, that Your Honor started

6    writing "These are the times that try men's souls," quoting

7    from Thomas Paine on the crisis.

8            Sometimes I feel lucky to have survived.  The threat

9    of death loomed over me frequently; but, you know, I didn't

10   think about it at the time, just as a survival mechanism.

11           And I know that I wouldn't have been able to do any

12   of it without the support of my family.  And I have learned by

13   being in jail how to deal with all of this alone, which I wish

14   I didn't have to, but I have tried to make the best of my time

15   that I have been in custody.  I read all the time, and I try to

16   learn as much as I can around me.

17           You know, at the MCC library we have a set of

18   Encyclopedia Britannicas, but it's missing Volumes 2, 3, 4, 6,

19   12 of 20.  And, you know, I did one day read this book called

20   "The Delivery of Justice" by Chief Justice Warren Berger.  And

21   inside of it, it says "Chambers of Robert W. Gettleman."  I'm

22   not sure if Your Honor donated it to the MCC, but I did make

23   good use of it.  If it was stolen, I can make arrangements to

24   get it back to Your Honor.

25           But I do want to return to my education period, and I

1   do want to get my college degree, and I hope to learn as much

2   as possible.  I hope one day to become a teacher, but I know my

3   opportunities will be limited.  But I already that -- you know,

4   I've basically made a Ted Talk, and it could be a class

5   curriculum, teaching people from the lessons and mistakes that

6   I have made.

7            And I hope one day that I'll be able to have a family

8   of my own and have as much sense of a normal life as I can.

9   And as difficult as it will be, you know, I'm more determined

10  than ever to have that.  And I can only beg you for your

11  forgiveness, Your Honor.  And I've been in a state of regret

12  since that first -- since that first hard night in jail, and

13  that is when the person I was and pretended to be died.

14           And I've said a lot of things that I haven't meant in

15  the past, but this apology is not one of them.  I've spent

16  every day trying to become the person that I should have been.

17  And all of these nights have been extremely hard, and I have

18  tried to show my parents that I deserve their trust.  And I

19  only ask for a sentence that gives me a chance to have a life.

20           Thank you, Your Honor.

21           THE COURT:  Thank you.  You can stay up there, Mr.

22  Osadzinski, with your counsel.

23           I'll ask Ms. Kwong, is there anything you wish to

24  add?  I usually ask that --

25           MS. KWONG:  No, Your Honor.

1          THE COURT:  -- before asking the defendant to
2     allocute.

3          Well, this obviously is a very difficult decision for
4     any judge to make.  I think all sentencing decisions are
5     incredibly difficult, but this is unusually difficult.  So
6     let's start with the factors we are asked to consider.

7          And as Mr. Jonas said, they sort of overlap the issue
8     of whether the terrorism enhancement applies.  I have already
9     ruled on that, but a lot of the things that he said actually
10    support that decision.

11         The way that -- so I am talking about the seriousness
12    of the offense.  From what you have said just now, taking you
13    at your word, I think you have understood how serious this is.
14    Mr. Greenberg says a lot of it was bluster.  Maybe it was.  But
15    promoting and encouraging the violence of this hideous group
16    that you have now rejected is serious, and that is why you are
17    here today.  That's why the government takes these cases as
18    seriously as they do, because they want to put a stop to this
19    type of conduct.  They want to put a stop to the existence of
20    these kind of terrorist organizations.  And any kind of
21    support, even attempted support, of these organizations is
22    viewed very, very seriously.

23         So I don't have to add anything to what Mr. Jonas
24    said as far as the seriousness of the offense.  It's very, very
25    serious, obviously.

1        Promoting respect for the law, that's why we're here.
2   The law has brought you here today.

3        And to provide just punishment.  Punishment alone is
4   not what we're looking for.  We're looking for just judgment,
5   and that means something.  It certainly means something to me,
6   and I think it will mean something to you.

7        So just to go through those very briefly, you know,
8   the fact that you did that voiceover, as Mr. Jonas said, that
9   was unusual and remarkable.  I don't know how you were able to
10  do that, but it certainly is an aggravating factor.

11       The resisting arrest when they -- the agents came to
12  arrest you is not something you should be proud of or --

13            THE DEFENDANT:  I'm not.

14            THE COURT:  It is certainly something that we take
15  into consideration.  Okay.  I get it at this point.

16       The continued contact after the FBI came to your
17  home, in a way it cuts both ways, in my view.  One is,
18  Mr. Jonas is absolutely right.  That should have been a warning
19  sign.  If you had backed off at that point and just gone about
20  your studies and your life and your conversion and everything
21  else, we wouldn't be here today.  You wouldn't be here today.

22       Instead, as Mr. Jonas said, you went full bore after
23  that.  You went after the FBI agent.  You may not have given
24  her phone number, but you certainly went after her.  You
25  articulated your hatred for the government and the FBI, and you

1    wanted them to be deflected, as we have spoken about.

2            In a way, that is such an irrational response to the

3    FBI contact with your family that it does at least raise, in my

4    mind, the notion that you really weren't acting rationally,

5    that something was going on with you to cause you to continue

6    when you knew the FBI was looking at you.

7            And you had counsel, apparently, Mr. Greenberg has

8    told us, about this.  We are not going to get into privileged

9    communications, but I think we can guess what those

10   conversations were.  And yet, you went -- you just kept going.

11           That's not a rational response at all.  And it does

12   indicate to me that you were dealing with some mental health

13   issues, whether it was OCD or whatever.  You know, I don't want

14   to go through all of the materials that your counsel has

15   provided about that.

16           So I've gone through the aggravating factors.  I

17   don't think I have to belabor that any longer.

18           And then we get into the mitigating factors.  Since I

19   was just talking about mental health issues, the mental health

20   issues we're talking about, I agree, they're not -- they don't

21   demonstrate that you were delusional.  I think that's the word

22   that Mr. Jonas used.

23           To me they demonstrate that you were vulnerable, and

24   you were very young.  Your youth is a definite mitigating

25   factor here.  We have all done things when we were 18, 19 years

1  old that were foolish.

2  I don't know if anybody has read the book my son

3  wrote.  My son is a journalist, and he wrote a book about his

4  young life.  And in that book he confesses to some things that

5  he did that we didn't know about that he's not very proud of at

6  the moment or has not been very proud of.

7  And I think we all internalize what we did at that

8  age and some of the stupid things we did at that age.  I agree,

9  they weren't terrorism oriented.  They were just stupid things.

10  Some of them not particularly lawful.

11  But I think that whatever was going on with you at

12  that young age, at that vulnerable age, was responsible for how

13  you got sucked into this.

14  Your father wrote one of the most -- I've read all

15  the letters that you submitted.  Your father wrote a beautiful

16  letter for you, as did many other people, including your mom

17  and your sister and some friends.  But he wrote something that

18  really just jumped out at me, and I'm going to quote it.

19  He says:  "When we were growing up, we were told

20  never to talk" -- I'm going to start again.

21  "When we were growing up, we were told never to go to

22  a dark alley, never to talk to strangers, never to take candy

23  from anyone you don't know.  But we didn't realize that in this

24  era, the internet is the dark alley."

25  And I think you went down that dark alley, and you

1   took the candy from the strangers.  And the candy was the ISIS
2   ideology and the ISIS threat to the world that it still poses
3   to this day even though their so-called caliphate has been
4   destroyed.

5           So I think that those -- your age, the mental health
6   issues, the inconsistent way that you succumbed to this
7   terrible propaganda are definite mitigating factors.  They are
8   just different from everything that your family stood for, that
9   you stood for until then.

10          I think you did not join, from what I can tell -- and
11  I don't think there's any real contest about this -- you did
12  not join Islam in order to become a member of ISIS.  It sounds
13  to me like you sincerely and genuinely converted to Islam,
14  perhaps, to help you with substance issues and that sort of
15  thing.

16          Your marriage, when I first heard about that, you
17  know, it sounded kind of opportunistic.  I don't know what you
18  would call it.  It didn't sound genuine.  But from what I've
19  read from your wife and from your family, who has embraced your
20  wife, it seems to be genuine and sincere.  And hopefully in the
21  future it will be a comfort to you, and I hope she stays with
22  you during the years to come, because to me that might be the
23  most important part of your life.

24          Your family and your community are extremely
25  supportive of you.  I think they are obviously disappointed and

1    saddened to have you here today.  And that to me is a very

2    important part of my decision when it comes to what kind of

3    sentence to impose here.

4            Other mitigating factors are -- and we can consider

5    these -- the type of -- the length, the three years that you've

6    been in pretrial detention at the MCC during the COVID period,

7    and that was hard time for sure.  I know that.

8            And I think your counsel is correct that when it came

9    to actually providing or being asked to provide bomb-making

10   instructions, you backed off of that.  I mean, there was a

11   line, obviously, that you knew was there; and despite all of

12   the other things that you said and did, that was not a line you

13   were going to cross.

14           I think there has been extraordinary post-conviction

15   rehabilitation here.  Just looking at your reading list, I wish

16   my reading list was that long.  I've read a lot of those books.

17   I guess from what you just said that we -- we had a book

18   collection around the court years ago where we all contributed

19   to the library at the MCC.  I didn't know that my stamp was on

20   the book that you read by Justice Berger, but I am glad you

21   read it.  There's an awful lot of wisdom in those books, and

22   there's a lot of humor in those books.

23           And I do want to give you credit for renouncing ISIS

24   at this point.  I think you realize, not just as a matter of

25   convenience, but I think that you get it.  And when we come to

1    sentencing, a lot of the decisions that we have to make or that

2    certainly I feel any judge should make is, does the defendant

3    get it?

4            The government says that you haven't shown any

5    remorse.  You have shown remorse.  Is it genuine?  I hope so.

6    I hope so.  You have certainly had enough time to think about

7    it.

8            But I think taking all of those and balancing the

9    mitigating and aggravating factors here that we've just talked

10   about, a sentence of 90 months is appropriate.  It's more than

11   you are asking for, a little more than our wonderful probation

12   officer has recommended, and it's less than the government

13   would like.  But I agree with one thing that Mr. Greenberg

14   said.  There's always a first -- there's a first time for

15   everything, you know; and that is, that I think a fairly long

16   period of supervised release is appropriate here.  Because

17   while you are on supervised release -- we're going to go

18   through the terms of supervised release -- you are going to be

19   tested to see how sincere you really are today.

20           You are not going to be able to use the internet

21   unless approved by the government, by the probation officer,

22   and perhaps by me or whatever judge might be sitting in my

23   place at the time.  I'm not sure I'll be here in 10 years

24   but -- and during that period -- during that period of time,

25   you know, your conduct could allow you a little more freedom as

1  time goes on.

2          If you want to take a college course, there may be a

3  way for you to do that without using -- without being, you

4  know, allowed to use the broad internet.  There may be a

5  closed-circuit type of course that you could take of some sort.

6  I certainly encourage you to try to do your best to finish your

7  studies and to move ahead.

8          I think that something you said just a few minutes

9  ago, that you might be able to find some future in helping

10 other people who might fall into this dark place that you fell

11 into avoid that, and if anybody can make that point, it would

12 be you.

13         So I'm going to sentence you to a period of 10 years

14 of supervised release.  I think a lifetime is kind of long.

15 Mr. Osadzinski will be in his 30s by the time he finishes his

16 sentence and starts his supervised release.

17         One of the things we do during periods of supervised

18 release is we look at -- even the Court will look at the

19 progress or lack of progress being made during that period.

20 And if there is a problem, we could deal with that problem.  I

21 hope there isn't.  If there is success and no problems,

22 sometimes we deal with it that way as well.

23         But I think that's about as long a period of

24 supervised release as is required here to do it.  There's no

25 money to pay a fine.  Just for the record, the offense level is

1    38.   The criminal history is boosted to VI from I.  I mean, you

2    really don't have a criminal history record, but because of the

3    enhancement, it goes to a VI, which is the maximum.

4         And there's no money to pay a fine here.  There's a

5    $100 special assessment payable today.  You do have a right, of

6    course, to appeal your conviction and the sentence by filing a

7    notice within 14 days.  Your counsel can certainly talk to you

8    about that.

9         So I'd like to go through the conditions of

10   supervised release.  I don't remember whether there was any

11   objection to any of those.

12        MR. HERMAN:  Judge --

13        THE COURT:  I had so many other issues to deal with

14   that I just never got to that.

15        MR. HERMAN:  We do not object.  And intentionally

16   we -- if you have gathered already, we understand the

17   importance of supervised release and the conditions.

18        Obviously, some technical issues may arise when we

19   start up, and --

20        THE COURT:  Well, let's go through --

21        MR. HERMAN:  -- we'll come back if we need to.

22        THE COURT:  Let's just go through them.  I know the

23   Court of Appeals likes me to do that so -- even though you have

24   stated what you just did.

25        First of all, it starts on page 20 of the PSR.  You

1    can't commit another crime while you are on supervised release.

2    You can't possess a controlled substance.  And cooperate in a

3    DNA sample.  Refrain of use of a controlled substance.  I don't

4    think there's really any problem with you there.

5         Seek employment, that's number 4 on page 20.  I know

6    that you want to keep doing that and getting your education.

7         Don't communicate with anybody you know to be engaged

8    in criminal activity, especially -- this is number 6 on page

9    21 -- anybody who has anything to do with a foreign terrorist

10   organization or any persons located outside the United States

11   without approval of probation, with the exceptions of members

12   of your family.  And that would, obviously, include your wife

13   and her family as well.  That's how I interpret that.

14        Refrain from excessive use of alcohol.  Your

15   religion, of course, prohibits use of alcohol.  You cannot

16   possess a firearm or a destructive device or any kind of

17   dangerous weapon.

18        Participate in a mental health treatment program,

19   which is for you benefit, obviously.  Don't leave the federal

20   jurisdiction that you're released in.  The counties of our

21   jurisdiction here in the Northern District are on the top of

22   page 22, paragraph 14.

23        Report to your probation officer as directed.  Allow

24   your probation officer to visit you at any reasonable time.  I

25   don't ever check off work, school, or community service, but at

1    your home or any other reasonable place.

2        And allow the confiscation of any contraband should

3    that be found by the probation officer.  I hope that doesn't

4    happen.

5        Notify your probation officer within 72 hours, three

6    days after any change of your employment, your residence, that

7    sort of thing, any major change in your life.

8        Notify your probation officer within 72 hours if you

9    have any type of contact with law enforcement, even a traffic

10   violation or anything like that, just to avoid any type of

11   unnecessary paperwork.

12       For special conditions on top of page 23 -- well,

13   before we get to the special conditions, submit yourself and

14   your home and residence and vehicles, computers, papers,

15   et cetera, to a search by the probation officer.  And this is

16   for the reasons we just talked about, so that they can make

17   sure you are not slipping into any other kind of problems.

18       Tell anybody who does come to your residence that you

19   are -- that the residence is subject to such search.

20       Provide -- I'm on number 6 of special conditions on

21   page 23.  Provide probation with access to your financial

22   information for the same reasons we talked about.

23       Don't enter into any agreement to be an informer or

24   law enforcement agent without Court permission.  This is number

25   11 on page 25.

1    Don't possess any external storage device without
2    approval of probation.  Again, if you are seeking -- the ones
3    we are going to talk about right now, if you are seeking to go
4    back to school, you may be able to use some sort of device,
5    computer, whatever, to study, but you are not going to be able
6    to use the internet generally, at least without Court
7    permission or approval of probation.  And that means number 14,
8    that first box there, is the complying with the computer and
9    internet monitoring program.  So they are going to be
10    monitoring your use of any type of device that you might have.
11    I'm not going to go through the entire paragraph there.  To the
12    extent you can financially pay for that, you are required to do
13    that.  Don't possess any device or access any online computer
14    service, again, without approval.

15    And submit to periodic polygraph testing at the
16    direction of probation as a means to ensure that you are
17    complying with all of these conditions.

18    Any objections to any of those?

19    MR. HERMAN:  No, Judge.

20    THE COURT:  Okay.  All right.  Again, I want to thank
21    your family, in particular.  I know your parents have been
22    behind you there throughout this.  I hope that they are a
23    source of comfort to you, and I know this has been a very
24    difficult period in your life.  You will still be a young man
25    when you get through this, and I hope we never have to meet

1    again after you have served your time.

2              And I want to thank the government for all the fine

3    work that they did in this case, too.  It's been a pleasure

4    professionally for me on both sides.

5              Court will be adjourned.

6              THE CLERK:  All right.

7              MR. HERMAN:  Judge, can we -- I'm sorry.  Can we make

8    a recommendation for a facility?

9              THE COURT:  Oh, sure.  I'm sorry.  Yes, go ahead.

10             MR. HERMAN:  A facility as close as possible to

11   Chicago to permit family visitation.

12             THE COURT:  All right.  That's the way the BOP likes

13   to put it.  I'll certainly put that in.  I have no problem with

14   that.

15             MR. HERMAN:  Thank you.

16             MR. JONAS:  Thank you, Judge.

17         (Proceedings concluded.)

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Nancy L. Bistany, certify that the foregoing is a complete, true, and accurate transcript from the record of proceedings, to the best of my ability, on November 17, 2022, before the HON. ROBERT W. GETTLEMAN in the above-entitled matter.

*/s/ Nancy L. Bistany, CSR, RPR, FCRR*        November 21, 2022

Official Court Reporter                Date
United States District Court
Northern District of Illinois
Eastern Division